UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x
                                            :

JULIE AVERBACH FOR THE ESTATE OF      :
STEVEN AVERBACH, *et al.*,              :
                        Plaintiffs,    :
                                              :
                                            :   1:19-CV-00004 (GHW) (KHP)
   - v -                                     :
                                            :

CAIRO AMMAN BANK,                 :
                        Defendant.    :
                                              :
---------------------------------------------------------------- x

## CAIRO AMMAN BANK'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO <u>FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1), 12(B)(2) AND 12(B)(6)</u>

**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, NY 10020-1104
Phone:  (212) 335-4500
Fax:  (212) 335-4501

*Counsel for Defendant Cairo Amman Bank*

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ...................................................................................................1

PARTIES ....................................................................................................................................4

     A.    Plaintiffs ....................................................................................................................4

     B.    CAB ...........................................................................................................................4

PLAINTIFFS' ALLEGATIONS .................................................................................................5

     A.    The Twelve Attacks ..................................................................................................5

     B.    CAB's Alleged Forum-Related Conduct ..................................................................6

     C.    CAB's Alleged Financial Services ............................................................................6

STANDARDS OF REVIEW .......................................................................................................8

ARGUMENT ..............................................................................................................................9

I.     PLAINTIFFS FAIL TO ALLEGE PLAUSIBLY A *PRIMA FACIE* BASIS FOR THIS COURT TO EXERCISE PERSONAL JURISDICTION OVER CAB. ...................9

     A.    This Court Lacks Jurisdiction Over CAB Because CAB Did Not "Transact Business" in New York Within the Meaning of New York's Long-Arm Statute. ....................................................................................................................9

     B.    Due Process Precludes this Court from Exercising Jurisdiction Over CAB. ........14

II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF UNDER THE ATA. .............17

     A.    The Complaint Fails to Plead Facts Sufficient to Meet the Intent Requirement for Aiding and Abetting Liability....................................................17

     B.    The Complaint Fails to Plead Facts Sufficient to Meet the Substantial Assistance Element of Aiding and Abetting Liability. ..........................................20

III.   PLAINTIFFS JULIE AVERBACH, NEVENKA GRITZ, ARIE MILLER, MATANYA NATHANSEN AND THE STEINHERZ FAMILY LACK STANDING TO BRING AN ATA CLAIM AGAINST CAB........................................22

     A.    Plaintiffs Arie Miller, Julie Averbach, Nevenka Gritz and Matanya Nathansen Are Foreign Nationals Who Lack Standing To Bring Claims For Their Own Personal Injuries Under The ATA......................................................22

     B.    Plaintiffs the Steinherz Family Have Not Alleged Plausibly That They Were Injured by Reason of an Act of International Terrorism or That Their Claims Are "Fairly Traceable" to CAB's Alleged Conduct. ..............................................24

CONCLUSION..........................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amigo Foods Corp. v. Marine Midland Bank-N.Y.*,
  39 N.Y.2d 391 (1976) ....................................................................................10, 12, 13

*Amigo Foods Corp. v. Marine Midland Bank-New York*,
  402 N.Y.S.2d 406 (1st Dep't 1978) .................................................................13, 14

*Amigo Foods Corp. v. Marine Midland Bank-New York*,
  46 N.Y.2d 885 (1979) ............................................................................................13

*Asahi Metal Indus. Co. v. Superior Court*,
  480 U.S. 102 (1987).........................................................................................16, 17

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................................8

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
  305 F.3d 120 (2d. Cir. 2002)..................................................................................15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................................8

*Best Van Lines, Inc. v. Walker*,
  490 F.3d 239 (2d Cir. 2007)................................................................................9, 14

*Brill v. Chevron Corp.*,
  No. 15-cv-04916, 2018 WL 3861659 (N.D. Cal. Aug. 14, 2018) ......................2, 20

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)................................................................................................15

*Cain v. Twitter, Inc.*,
  No. 17-cv-02506, 2018 WL 4657275 (N.D. Cal. Sept. 24, 2018)............................3

*Celton Man Trade, Inc. v. Utex, S.A.*,
  No. 84 CIV. 8179 (WCC), 1986 WL 6788 (S.D.N.Y. June 12, 1986)..............12, 15

*Chloé v. Queen Bee of Beverly Hills*, LLC
  616 F.3d 158 (2d Cir. 2010).....................................................................................9

*Crosby v. Twitter, Inc.*,
  921 F.3d 617 (6th Cir. 2019) ...................................................................................2

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*D&R Glob., Selections, S.L. v. Bodega Olegario Falcon Pineiro*,
    29 N.Y.3d 292 (2017) .................................................................................................10

*Dale v. Banque All. S.A.*,
    No. 02 CIV. 3592 RCCKNF, 2004 WL 2389894 (S.D.N.Y. Oct. 22, 2004) ...................12, 15

*Ehrenfeld v. Bin Mahfouz*,
    9 N.Y.3d 501 (2007) ..................................................................................................9

*Fields v. Twitter, Inc.*,
    881 F.3d 739 (9th Cir. 2018) ......................................................................................2

*Gonzalez v. Google, Inc.*,
    335 F. Supp. 3d 1156 (N.D. Cal. Aug. 15, 2018) .......................................................3

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) .............................................................................17, 21

*Hau Yin To v. HSBC Holdings, PLC*,
    700 F. App'x 66 (2d Cir. 2017) .........................................................................9, 10, 12

*Honickman, et al. v. Blom Bank SAL*,
    No. 19-cv-00008-KAM-SMG (E.D.N.Y. filed Jan. 1, 2019) ..................................23

*Jazini v. Nissan Motor Co., Ltd.*,
    148 F.3d 181 (2d Cir. 1998)......................................................................................8

*Jesner v. Arab Bank, PLC*,
    138 S. Ct. 1386 (2018)........................................................................................5, 23

*Keeton v. Hustler Magazine, Inc.*,
    465 U.S. 770 (1984)................................................................................................12

*Kemper v. Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) .........................................................................2, 20, 22

*Licci v. Lebanese Canadian Bank*,
    20 N.Y.3d 327 (2012) ...............................................................................................11

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013).............................................................................. *passim*

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018).........................................................................17, 18, 20, 21

**TABLE OF AUTHORITIES**
**(continued)**

*Lopez v. Shopify, Inc.*,
No. 16-cv-9761 (VEC) (AJP), 2017 WL 2229868 (S.D.N.Y. May 23, 2017) ........................14

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)..................................................................................................22

*Mastafa v. Chevron Corp.*,
770 F.3d 170 (2d Cir. 2014)........................................................................................8

*Morris v. Khadr*,
415 F. Supp. 2d 1323 (D. Utah 2006).......................................................................23

*O'Sullivan v. Deutsche Bank AG*,
No. 17-cv-8709, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019).............................2, 18, 19, 20

*Owens v. BNP Paribas, S.A.*,
897 F.3d 266 (D.C. Cir. 2018) ....................................................................................2

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
712 F.3d 705 (2d Cir. 2013).........................................................................................8

*Robinson v. Overseas Military Sales Corp.*,
21 F.3d 502 (2d Cir. 1994)...........................................................................................8

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013)...........................................................................................2

*Saperstein v. Palestinian Auth.*,
No. 04-cv-20225, 2006 WL 3804718 (S.D. Fl. Dec. 22, 2006) ...............................23

*Siegel v. HSBC Bank USA, N.A.*,
No. 17-cv-6593, 2018 WL 3611967 (S.D.N.Y. July 27, 2018)...........................2, 20

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016)...............................................................................................24

*Strauss v. Credit Lyonnais, S.A.*,
379 F. Supp. 3d 148 (E.D.N.Y. 2019) ...................................................................3, 19

*Taamneh v. Twitter, Inc.*,
343 F. Supp. 3d 904 (N.D. Cal. 2018) ...............................................................2, 21, 22

*Tamam v. Fransabank Sal*,
677 F. Supp. 2d 720 (S.D.N.Y. 2010).......................................................................11

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*In re Terrorist Attacks on Sept. 11, 2001*,
    295 F. Supp. 3d 416 (S.D.N.Y. 2018)..................................................................8

*In re Terrorist Attacks on Sept. 11, 2001* (Al Rajhi Bank),
    714 F.3d 118 (2d Cir. 2013)............................................................................2

*TF-Harbor, LLC v. City of Rockwell, Tex.*,
    18 F. Supp. 3d 810 (N.D. Tex. 2014) ............................................................24

*Vasquez v. Hong Kong & Shanghai Banking Corp. Ltd.*,
    No. 18 CIV. 1876 (PAE), 2019 WL 2327810 (S.D.N.Y. May 30, 2019) ..............13

*In re Veon Ltd. Secs. Litig.*,
    No. 15-cv-08672 (ALC), 2018 WL 4168958 ....................................................14

*Weiss v. Nat'l Westminster Bank Plc*,
    No. 05-cv-4622, 2019 WL 1441118 (E.D.N.Y. Mar. 31, 2019)....................3, 19, 20

**Statutes**

18 U.S.C. 2333(a) ....................................................................................22, 24

18 U.S.C. § 2333......................................................................................17

18 U.S.C. § 2333(d) ..................................................................................20

18 U.S.C. § 2333(d)(2) ..............................................................................17

18 U.S.C. § 2339B ....................................................................................18

**Other Authorities**

Amman Stock Exchange, *Cairo Amman Bank: Information*,
    https://bit.ly/2V1V9DH ..............................................................................4

Bank for International Settlements, Committee on Payments and Market
    Infrastructures, *Correspondent Banking*, Consultative Report No. 136 (Oct.
    2015) ........................................................................................5, 6, 10

BLACK'S LAW DICTIONARY (10th ed. 2014) ......................................................23

Cairo Amman Bank, Official Website, http://www.cab.jo..........................................4

Jesse Dukeminier & Robert Sitkoff, WILLS, TRUSTS, AND ESTATES (9th ed. 2013) ............23

**TABLE OF AUTHORITIES**
(continued)

Page(s)

The Federal Reserve, et al., *U.S. Dep't of the Treasury & Federal Banking Agencies Joint Fact Sheet on Foreign Correspondent Banking: Approach to BSA/AML and OFAC Sanctions Supervision and Enforcement* (Aug. 30, 2016), https://www.occ.treas.gov/topics/compliance-bsa/pub-foreign-correspondent-banking-fact-sheet.pdf ..................................................................5

World Economic Forum, New Markets Lab, *The Role of Law and Regulation in International Trade Finance: the Case of Correspondent Banking* (July 2017), http://www3.weforum.org/docs/WEF_White_Paper_The_Role_of_Law _and_Regulation.pdf ................................................................10

**Rules**

31 C.F.R. § 1010.610 ..................................................................5

Fed. R. Civ. P. 4(k)(1)(A) ............................................................9

Fed. R. Civ. P. 12(b)(1)...............................................................1

Fed. R. Civ. P. 12(b)(2)............................................................1, 8

Fed. R. Civ. P. 12(b)(6)............................................................1, 8

N.Y. C.P.L.R. § 302(a) ..............................................................14

N.Y. C.P.L.R. § 302(a)(1)........................................................9, 14

N.Y. C.P.L.R. § 302(a)(2)...........................................................13

Cairo Amman Bank ("CAB" or "the Bank") respectfully submits this memorandum of law in support of its motion to dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(2), for failing to allege plausibly a *prima facie* basis to exercise personal jurisdiction over CAB; Fed. R. Civ. P. 12(b)(6), for failing to allege sufficient facts to support a reasonable inference that CAB aided and abetted the terrorist attacks that injured Plaintiffs; and, with respect to Plaintiffs Julie Averbach, Nevenka Gritz, Arie Miller, Matanya Nathansen and the Steinherz Family, Fed. R. Civ. P. 12(b)(1), because these Plaintiffs lack standing to assert a claim under the ATA for their personal injuries.

## SUMMARY OF ARGUMENT

This case arises from 12 deplorable acts of violence, including suicide bombings and shootings, perpetrated in Israel between December 2001 and August 2003 during the Palestinian-Israeli conflict known as the Second Intifada. More than 15 years after the last attack, on the eve of the expiration of the extended statute of limitations for their claims, Plaintiffs filed their prolix 121-page, 815-paragraph Complaint against CAB. The vast majority of the Complaint is devoted to a description of the attacks, Plaintiffs' injuries, and a history of Hamas, including lengthy descriptions of individuals and entities not even alleged to be customers of the Bank. It is not until the last few pages of the Complaint that Plaintiffs even purport to allege facts specific to CAB, and many of those purported facts are conclusory allegations. The Complaint also fails to note that in 2005 and 2007, these same Plaintiffs, represented by the same counsel, brought similar suits against other banks, specifically National Westminster Bank, Plc and Credit Lyonnais S.A., which have since been dismissed on the merits.

CAB condemns senseless violence and does not condone terrorists' acts or terrorism in any form. However, while "[t]he desire to hold someone accountable for this grievous loss is

eminently understandable," CAB "is the wrong defendant." [1]   The fact that "[t]hose directly responsible may be beyond the reach of the court" and "[s]econdary actors, such as the organizations that fund[ed] the terrorists, are often amorphous and difficult to hale into court" does not permit imposing liability on CAB for terrorist attacks in which it took no part.[2]

CAB is a Jordanian bank that has no operations or employees in the United States.  Its only alleged forum-related conduct—the passive receipt of wire transfers initiated by other banks, which unilaterally directed those transfers through CAB's New York correspondent accounts—provides an inadequate basis to exercise personal jurisdiction over CAB.  Moreover, Plaintiffs fail to plausibly allege facts sufficient to establish aiding and abetting liability under the ATA. They do not—and cannot—allege that the 15 terrorists who committed the bombings and shootings at issue were customers of CAB or recipients of any funds from the Bank.  Nor do Plaintiffs plausibly allege sufficient facts to satisfy essential elements for imposing ATA liability.

As recent decisions from the Second Circuit, Ninth Circuit, Seventh Circuit, Sixth Circuit, D.C. Circuit, and multiple district courts make clear, ATA lawsuits like this one—which seek to hold private companies civilly liable for terrorist attacks far removed from the defendants' alleged commercial services—are legally deficient and routinely dismissed.[3]  As noted above, these very

---

[1]    *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 396 (7th Cir. 2018) (affirming dismissal of lawsuit brought against a German bank by a survivor of a U.S. soldier killed by terrorists in Iraq for failure to allege plausibly the elements of an ATA claim for secondary liability (there, conspiracy)).

[2]    *Id.* at 386.

[3]    *See e.g., Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013); *In re Terrorist Attacks on Sept. 11, 2001* (Al Rajhi Bank), 714 F.3d 118 (2d Cir. 2013); *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018); *Kemper*, 911 F.3d at 396; *Crosby v. Twitter, Inc.*, 921 F.3d 617 (6th Cir. 2019); *Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018); *O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019); *Siegel v. HSBC Bank USA, N.A.*, No. 17-cv-6593, 2018 WL 3611967 (S.D.N.Y. July 27, 2018); *Taamneh v. Twitter, Inc.*, 343 F. Supp. 3d 904 (N.D. Cal. 2018); *Brill v. Chevron Corp.*, No. 15-cv-04916, 2018 WL 3861659 (N.D. Cal. Aug. 14, 2018); *Gonzalez v. Google, Inc.*, 335 F. Supp. 3d 1156 (N.D. Cal. Aug. 15, 2018); *Cain v. Twitter, Inc.*, No. 17-cv-02506, 2018 WL 4657275 (N.D. Cal. Sept. 24, 2018).

Plaintiffs (represented by their current counsel) brought two similar lawsuits against National Westminster Bank, a British bank, and Credit Lyonnais, a French bank, seeking to hold those banks secondarily liable for providing financial services to alleged Hamas-affiliated charities—including many of the same charities at issue here. *Weiss v. Nat'l Westminster Bank Plc*, No. 05-cv-4622, 2019 WL 1441118, at *11 (E.D.N.Y. Mar. 31, 2019); *Strauss v. Credit Lyonnais, S.A.*, 379 F. Supp. 3d 148, 163 (E.D.N.Y. 2019). In dismissing those cases, the Court held that Plaintiffs failed to allege facts plausibly showing that the bank defendants were "generally aware" that in providing banking services to their customers they were "playing a role" in the terrorist activities of Hamas or providing substantial assistance to the persons who committed the attacks at issue—two essential elements that must be sufficiently pled to maintain an ATA aiding and abetting claim. *Weiss*, 2019 WL 1441118, at *11; *Strauss*, 379 F. Supp. 3d at 163. Plaintiffs' Complaint against CAB suffers from the same fatal deficiencies.

Finally, the individual claims of Plaintiffs Julie Averbach (Compl. ¶¶ 29-30), Matanya Nathansen (*id.* ¶¶ 127-131), Nevenka Gritz (*id.* ¶¶ 381-82), and Arie Miller (Compl. ¶¶ 454-55) must be dismissed for the additional reason that they are all foreign nationals who have no standing under the ATA to bring claims for their personal injuries.[4] Similarly, the claims of the Steinherz Family (*id.* ¶¶ 461-81) must be dismissed because their claims arise from Altea Steinherz's slip-and-fall—not an "act of international terrorism"—and are not "fairly traceable" to CAB's financial services.

---

[4] CAB does not contest Plaintiffs' right to bring claims on behalf of the estates of their relatives in their capacities as legal representatives of those estates and for which they have standing under the ATA.

## PARTIES

### A.    Plaintiffs

Plaintiffs are alleged victims (or relatives of victims) of 12 terrorist attacks that occurred in Israel between December 1, 2001 (Compl. ¶¶ 409-10) and August 19, 2003 (*id*. ¶¶ 68-70) during the Palestinian-Israeli conflict.  With the exception of Plaintiff Arie Miller (*id*. ¶ 454), Plaintiffs allege that they are either U.S. nationals or the heirs, survivors, or estates of such nationals.  Of these Plaintiffs, 27 assert claims relating to injuries or deaths allegedly resulting from the attacks;[5] and 87 are relatives of those so injured who assert claims for "emotional pain and suffering."[6]

### B.    CAB

CAB is a public shareholding company organized under the laws of the Kingdom of Jordan and subject to its laws and regulations.  It provides routine commercial banking services to its customers.[7]  *Id.* ¶ 500.  Since its establishment in 1960, CAB has maintained its headquarters and principal place of business in Amman, Jordan.  *Id.*  CAB employs more than 2,200 people across its operations, including 89 branches in Jordan, 21 branches in the Palestinian Territories, and one branch in Bahrain.[8]  *See id.* ¶¶ 500-02.  CAB's shares are traded on the Amman Stock Exchange under the symbol CABK.[9]  *See id.* ¶ 500.  CAB maintains no offices, branches, or employees in the United States.  As alleged in the Complaint, from 1999 to 2004 (the "relevant time period" (*id*.

---

[5]      *Id.* ¶¶ 12, 70, 98, 124, 132, 144, 150, 200, 207, 212-13, 263, 275, 297, 315-16, 336, 351, 362, 376, 388, 405, 411, 417, 440, 473, 488.

[6]      *Id*. ¶¶ 29, 34, 37, 41, 44, 47-48, 58, 62, 85-86, 90-91, 94, 114-15, 119-21, 127, 157-58, 164, 170, 174, 177, 180, 184, 187, 190, 193, 196, 238, 242, 248, 251, 257, 267-69, 271-72, 286, 289, 292, 305, 310, 312, 325, 329, 330-31, 340, 343, 344, 355, 358, 366, 367, 369, 380-81, 390-91, 397, 399, 401, 424-26, 431, 434, 436, 438, 453, 457-59, 475, 477, 479-80, 484, 495, 497-98.

[7]      Cairo Amman Bank, Official Website, http://www.cab.jo.

[8]      *Id.*; *see also* Amman Stock Exchange, *Cairo Amman Bank: Information*, https://bit.ly/2V1V9DH.

[9]      Amman Stock Exchange, *Cairo Amman Bank: Information*, https://bit.ly/2V1V9DH.

¶ 6)), CAB maintained correspondent accounts in New York at Citibank, American Express Bank Ltd., and the Bank of New York (collectively, the "Correspondent Banks").[10]  Transfers through these accounts were cleared by the Correspondent Banks, which employ compliance systems to block financial activity with indicia of terrorism financing or other crimes.[11]  Both in the United States and in Jordan, "substantial regulations govern these transactions."  *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1395 (2018).

CAB has never been accused by United States regulators or prosecutors of negligent or intentional wrongdoing, much less knowingly providing substantial assistance in support of terrorism.

## PLAINTIFFS' ALLEGATIONS

### A.     The Twelve Attacks

Plaintiffs claim that the 12 attacks that caused their injuries were committed by 15 "Hamas terrorists."  Appendix A.  The Complaint does not allege that any of these terrorists were customers of CAB or recipients of any funds transferred through the Bank.  Appendix A.

---

[10] "Correspondent banking can be defined, in general terms as an arrangement under which one bank (correspondent) holds deposits owned by other banks (respondents) and provides payment and other services to those respondent banks." Bank for International Settlements, Committee on Payments and Market Infrastructures, *Correspondent Banking*, Consultative Report No. 136, at 6 (Oct. 2015). https://www.bis.org/cpmi/publ/d136.htm (internal quotation marks omitted) (hereinafter, "BIS Correspondent Banking Report").  "At the most basic level, correspondent banking requires the opening of accounts by respondent banks in the correspondent banks' books and the exchange of messages to settle transactions by crediting and debiting those accounts."  *Id.*

[11] *See, e.g.*, 31 C.F.R. § 1010.610 ("Due diligence programs for correspondent accounts for foreign financial institutions"); The Federal Reserve, Federal Deposit Insurance Corporation, Office of the Comptroller of the Currency, and the National Credit Union Administration, *U.S. Dep't of the Treasury & Federal Banking Agencies Joint Fact Sheet on Foreign Correspondent Banking: Approach to BSA/AML and OFAC Sanctions Supervision and Enforcement* (Aug. 30, 2016), https://www.occ.treas.gov/topics/compliance-bsa/pub-foreign-correspondent-banking-fact-sheet.pdf.

### B.      CAB's Alleged Forum-Related Conduct

Plaintiffs allege that CAB "maintained correspondent banking relationships in New York with [the Correspondent Banks]" and that it "purposefully and knowingly used its correspondent bank accounts in New York . . . to facilitate a large volume of U.S. dollar-denominated funds transfers to Hamas."  Compl. ¶¶ 6-8.  The Complaint, however, provides no facts to support this conclusory allegation; nor could it. As discussed in Point I, *infra,* the only transfers identified in the Complaint in support of this allegation were *incoming* transfers. Any decision as to how to route U.S. dollar-denominated transfers to CAB's customers, or even whether to use CAB's correspondent bank account in New York to effect such transfers as opposed to other available options, would have been made by the originating bank executing the transfer on behalf of its customer, not by CAB or its customer.  *See* BIS Correspondent Banking Report, *supra* note 10, at 7.  The Complaint alleges no facts to the contrary.

### C.      CAB's Alleged Financial Services

The Complaint alleges that CAB provided banking services in Jordan and the Palestinian Territories to 17 charities and 4 individuals (the "Alleged Bank Customers") who were associated or otherwise somehow connected with Hamas.  *See* Appendices B-C.  None of the charities is alleged to have played any role in the 12 attacks at issue.  Nor does the Complaint allege that they played a role in any other act of terrorism.  In fact, the Complaint acknowledges that these charities "perform actual social work and provide charitable services," including among other projects providing clothing, food, and financial assistance for the needy; health care; summer camps; educational programs and schools; support for orphans; assistance for the disabled; and leisure

activities.  Compl. ¶ 623.[12]  Nor were any of these charities designated by the U.S. as supporters of terrorism at the time of the attacks, with the sole exception of the Holy Land Foundation whose account was immediately closed by CAB on December 5, 2001, the day after its designation by the U.S. and its appearance on the OFAC list.[13]

Similarly, none of the 4 individual Alleged Bank Customers were designated as supporters of terrorism prior to the attacks, and the Complaint is devoid of any allegations that 3 of the 4 individuals—Taha, Hamad, and Musameh—had any role whatsoever in the attacks.  *See id*. ¶¶ 767-76.  Although the Complaint alleges that one of the individuals, Abbas al-Sayed, was "one of" the planners of the Park Hotel bombing, his name did not appear on any terror list prior to that attack, and the Complaint does not allege that any funds it alleges were transferred into his account played any role in that attack. To the contrary, the last alleged transfer in the Complaint involving his account was in May 2001, a full 10 months before the Park Hotel bombing.  The Complaint does not even attempt to allege any connection between that distant transaction and the attack. *Compare id.* ¶¶ 763-66 (al-Sayed's banking activities), *with id.* ¶ 403 (Odeh's commission of the Park Hotel attack).

---

[12]     *See, e.g., id. ¶¶* 680 (Al Salah Charity "distributed 200,000 food packages"); 710 (Tulkarem Zakat Committee provided "financial aid" and "clothing and food for the needy"); 717 & 725 (Nablus Zakat Committee and Al-Tadamun Charitable Society provided "social welfare, education, religious studies and health" services); 732 (Jenin Zakat Committee "operate[d] in the areas of health and education, services for children and employment"); 738 (Ramallah al-Bireh Zakat Committee's "principal activities … are support for orphans, providing health services and running summer camps"); 760 (Al-Ihsan Charitable Society – Hebron "specialized in taking care of the disabled and … helping the poor, downtrodden and unfortunate members of Palestinian society").

[13]     The U.S. Treasury Department designated the Holy Land Foundation ("HLF") as a Specially Designated Global Terrorist ("SDGT") on December 4, 2001. The Complaint does not allege that HLF played any role in the attacks or provided any funds for the attacks through CAB.

## STANDARDS OF REVIEW

To survive a motion to dismiss for lack of personal jurisdiction under Federal Rule 12(b)(2), "the plaintiff has the burden of making a *prima facie* showing that personal jurisdiction over the defendant exists." *In re Terrorist Attacks on Sept. 11, 2001*, 295 F. Supp. 3d 416, 424 (S.D.N.Y. 2018) (citation omitted). That showing must be made with well-pleaded facts, rather than "conclusory non-fact specific jurisdictional allegations." *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185-86 (2d Cir. 1998). Courts should not "draw argumentative inferences in the plaintiff's favor" when determining whether this burden has been met. *In re Terrorist Attacks on Sept. 11, 2001*, 295 F. Supp. 3d at 424 (quoting *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994)).

To survive a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court may consider only well-pled factual allegations, *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014), and must ignore "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by merely conclusory statements." *Iqbal*, 556 U.S. at 678 (citation omitted). A pleading that offers "labels and conclusions" of the elements of a cause of action and "naked assertion[s] devoid of 'further factual enhancement'" will not do. *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678) (other citations omitted).

**ARGUMENT**

I.   **PLAINTIFFS FAIL TO ALLEGE PLAUSIBLY A *PRIMA FACIE* BASIS FOR THIS COURT TO EXERCISE PERSONAL JURISDICTION OVER CAB.**

This Court lacks personal jurisdiction over CAB.  New York's long-arm statute and principles of due process govern the outer bounds of this Court's jurisdiction.  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 244 (2d Cir. 2007); *Chloé v. Queen Bee of Beverly Hills*, LLC, 616 F.3d 158, 163-64 (2d Cir. 2010); *see* Fed. R. Civ. P. 4(k)(1)(A).  Both must be satisfied and  Plaintiffs satisfy neither.

A.   **This Court Lacks Jurisdiction Over CAB Because CAB Did Not "Transact Business" in New York Within the Meaning of New York's Long-Arm Statute.**

The only allegations in the Complaint that involve New York are that 5 CAB customers received a total of 23 incoming transfers through a CAB correspondent account in New York.  Compl. ¶¶ 579-80, 764, 769, 772, 776.  But CAB's passive maintenance of correspondent bank accounts—without plausible factual allegations that CAB repeatedly and purposefully used those accounts to direct complaint-related transactions through them—does not constitute transacting business under New York law.

To establish personal jurisdiction under N.Y. C.P.L.R. § 302(a)(1), "the defendant must have transacted business within the state and the claim asserted must arise from that business activity."  *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 67 (2d Cir. 2017).  A defendant transacts business only if it "engaged in 'some act by which [it] purposefully availed itself of the privilege of conducting activities within New York.'"  *Id.* (quoting *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501, 508 (2007)).  In the context of correspondent banking, a plaintiff must allege that its claim arose out of "the kind of intentional and repeated use of correspondent accounts that amounts to a transaction of business."  *Id.*, 700 F. App'x at 67.  A bank's mere maintenance of a correspondent account in New York and passive receipt of funds that pass through that account is

insufficient to confer jurisdiction over the bank. *Amigo Foods Corp. v. Marine Midland Bank–N.Y.*, 39 N.Y.2d 391, 394-96 (1976). A foreign bank purposefully avails itself of transacting business in New York only if it "seeks out and initiates contact with New York" through "volitional acts" involving the specific transfers alleged in the complaint. *Hau Yin To*, 700 F. App'x at 67 (quoting *D&R Glob., Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 29 N.Y.3d 292, 298 (2017)).

The Complaint in this case does not allege that CAB or its customers initiated or directed any case-related transfers through New York. To the contrary, it alleges only that CAB was the passive recipient of a small number of incoming wire transfers from third-party originating banks. Compl. ¶¶ 579-80, 764, 769, 772, 776. That is not purposeful availment. *See, e.g.*, *Amigo Foods*, 39 N.Y.2d at 394-96.

Correspondent banking transactions are merely a series of electronic communications to facilitate the interbank transfer of U.S. currency.[14] In alleging that CAB is subject to New York long-arm jurisdiction based on incoming transfers, Plaintiffs ignore the fact that when executing international wire transfers, it is the originating bank—*not the recipient bank or its customer*—who unilaterally determines what U.S.-dollar denominated correspondent account to use to facilitate transactions in U.S. dollars, and may send "U.S.-dollar-denominated wire transfers . . . through correspondent bank accounts anywhere in the world." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013) ("*Licci III*"). In this case, all of the

---

[14] *See, e.g.*, BIS Correspondent Banking Report, *supra* note 10, at 6 ("At the most basic level, correspondent banking requires the opening of accounts by respondent banks in the correspondent banks' books and the exchange of messages to settle transactions by crediting and debiting those accounts."); World Economic Forum, New Markets Lab, *The Role of Law and Regulation in International Trade Finance: the Case of Correspondent Banking* at 9 (July 2017), http://www3.weforum.org/docs/WEF_White_Paper_The_Role_of_Law_and_Regulation.pdf.

incoming interbank transfers identified in the Complaint went in one direction—from other banks to CAB.  Neither CAB nor its customers chose or dictated the route of transfer for these funds. Rather, the third-party originating banks independently decided to transfer the funds to CAB through the Citibank Correspondent Account, despite the availability of an alternative route of transfer that would not have passed through New York.  *See*, *e.g.*, *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 729 (S.D.N.Y. 2010) (noting that "[u]nderlying Plaintiffs' argument is the faulty assumption that U.S. dollars can only be obtained in the United States").  Although the independent third-party originating banks may have purposefully directed their conduct toward New York, the focus of the jurisdictional analysis is CAB's conduct, not the unilateral conduct of the originating banks.  *See, e.g., Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 340 (2012) ("*Licci II*") ("[T]he [personal jurisdiction] inquiry logically focuses on the defendant's conduct.").

The facts of this case are far different from those presented in *Licci II*, 20 N.Y.3d at 340-41, where the court found jurisdiction based on "dozens" of transfers directed by the foreign bank involving millions of dollars. As the Second Circuit held in *Licci III*, 732 F.3d at 165, 170-71:

> The jurisdictional basis for the plaintiffs' claims is LCB's execution of dozens of dollar-denominated wire transfers through its AmEx correspondent amount in New York.
>
> \* \* \*
>
> We conclude that the selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs . . . constitutes purposeful availment of the privilege of doing business in New York . . . . [Internal citation and quotation marks omitted]
>
> \* \* \*
>
> *In light of the widespread acceptance and availability of U.S. currency, LCB could have, as it acknowledges, processed  U.S. dollar-denominated wire transfers for the Shahid account through correspondent accounts anywhere in the world. . . . But LCB deliberately chose to process the many Shahid wire transfers through AmEx in New York.* [Emphasis supplied]

Here, unlike *Licci* where the Court found "purposeful availment" because LCB "deliberately chose" to process the transfer through its New York correspondent bank and was in a position to do so as the originating bank, neither CAB nor its customers had any role, in the normal course of business, of directing the originating bank's choice of route, and the Complaint does not plead facts otherwise. The originating bank's selection of CAB's Citibank Correspondent Account in New York, as opposed to some other account or route, is, from CAB's perspective, purely "fortuitous." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984).

This case fits squarely within the scope of the rule of law first announced decades ago in *Amigo Foods*: A foreign bank's mere maintenance of a correspondent account in New York and passive receipt of funds that pass through that account is insufficient to confer jurisdiction over the bank. *Amigo Foods Corp.*, 39 N.Y.2d at 396; *see, e.g.*, *Hau Yin To*, 700 F. App'x at 67-68; *Celton Man Trade, Inc. v. Utex, S.A.*, No. 84 CIV. 8179 (WCC), 1986 WL 6788, at *4 (S.D.N.Y. June 12, 1986) (citing cases); *Dale v. Banque All. S.A.*, No. 02 CIV. 3592 RCCKNF, 2004 WL 2389894, at *5 (S.D.N.Y. Oct. 22, 2004) (same). The facts of *Amigo Food* are instructive here. There, the plaintiff (Amigo Foods) contracted to purchase potatoes from a company in Maine (E.H. Parent). *Amigo Foods*, 39 N.Y.2d at 394. The contract required Amigo Food pay E.H. Parent by letter of credit through a Maine bank (Aroostook), which in turn maintained a correspondent account with a New York bank (Irving). *Id.* Amigo Foods received the letter of credit from Marine Midland Bank (Marine), which sent the letter to Irving (the correspondent bank). E.H. Parent refused to accept payment, however, leading Amigo Foods to sue E.H. Parent, Marine, and Aroostook in New York court for breach of contract. Aroostook moved to dismiss for lack of personal jurisdiction because its only connection to New York was the correspondent bank account it maintained with Irving. The Court of Appeals agreed that Aroostook's mere maintenance of a

correspondent account, without more, was insufficient to bring a foreign bank within the scope of New York's long-arm statute.  *Id*. at 396.  As a result, the Court of Appeals remanded the case for jurisdictional discovery into the nature of Aroostook's relationship with the New York correspondent bank.

The facts revealed during discovery in *Amigo Foods* demonstrate that there is no personal jurisdiction over CAB here.  On remand, "it became clear that after [E.H.] Parent had made a demand for payment, Amigo had directed Marine to wire funds to Parent for its account, but it was Marine that unilaterally chose to deposit the funds with Irving in New York, in the interests of speed."  *Vasquez v. Hong Kong & Shanghai Banking Corp. Ltd.*, No. 18 CIV. 1876 (PAE), 2019 WL 2327810, at *9 (S.D.N.Y. May 30, 2019) (citing *Amigo Foods Corp. v. Marine Midland Bank-New York*, 402 N.Y.S.2d 406, 408 (1st Dep't 1978) ("*Amigo Foods II*"), *aff'd,* 46 N.Y.2d 885 (1979) ("*Amigo Foods III*")).  The fact that the third-party originating bank in *Amigo Foods* unilaterally opted to use the defendant bank's out-of-state correspondent account in New York, without the latter bank's approval of or participation, was determinative.  *See Amigo Foods II*, 402 N.Y.S.2d at 408.  For that reason, the First Department of the Appellate Division held that Amigo Foods could not establish personal jurisdiction over Aroostook under the long-arm statute.  *Id.* (citing N.Y. C.P.L.R. § 302(a)(2)).  Aroostook had not purposely availed itself of the privilege of transacting business in New York, the court explained, because Aroostook had "passively and unilaterally" been made the recipient of funds.  *Id*.  The New York Court of Appeals affirmed on the merits, without opinion, "for reasons stated" by the Appellate Division.  *Amigo Foods III*, 46 N.Y.2d at 885.

*Amigo Foods* and its progeny mandate the dismissal of the Complaint here.  As in *Amigo Foods*, CAB's "only connection with New York was the maintenance of its correspondent

relationship and incidental checking account with [Citibank New York] and the unilateral choice

of [the originating third-party banks] to make the transfers through [that account] in New York."

*Amigo Foods II*, 402 N.Y.S.2d at 408.  That is insufficient, as the New York Court of Appeals has

repeatedly held, to exercise jurisdiction over CAB in New York under C.P.L.R. § 302(a)(1).

### B. Due Process Precludes this Court from Exercising Jurisdiction Over CAB.

The fact that CAB is not subject to jurisdiction under New York's long-arm statute should

end this Court's jurisdictional inquiry.  N.Y. C.P.L.R. § 302(a).  But even if this Court were to

conclude—which it should not—that personal jurisdiction were proper under state law, it should

still find that exercising jurisdiction over CAB under the facts presented here is inconsistent with

constitutional principles of due process and fair notice.  "The reach of New York's long-arm statute

… does not coincide with the limits of the Due Process Clause."  *Best Van Lines*, 490 F.3d at 244.

Although the two inquiries overlap, due process still may require the Court to decline to exercise

jurisdiction even where the long-arm statute has been satisfied.  *See*, *e.g.*, *Lopez v. Shopify, Inc.*,

No. 16-cv-9761 (VEC) (AJP), 2017 WL 2229868, at *8 (S.D.N.Y. May 23, 2017).

The due process analysis "typically proceeds in two steps."  *Licci III*, 732 F.3d at 170

"[D]ue process requires a plaintiff to allege (1) that a defendant has 'certain minimum contacts'"

with the relevant forum, and (2) that the exercise of jurisdiction is "reasonable" under the

circumstances.  *Id.* at 169-70.  The Plaintiffs have failed to satisfy their burden as to each

requirement.

First, CAB does not have the necessary contacts with New York because, at the time of the

transfers, CAB could not have reasonably "forsee[n] being haled into court" in New York.  *In re*

*Veon Ltd. Secs. Litig.*, No. 15-cv-08672 (ALC), 2018 WL 4168958, at *5 (quoting *Bank Brussels*

*Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d. Cir. 2002)).  Here, Plaintiffs

allege that almost 20 years ago, between 1999 and 2004, a handful of third-party originating banks

sent CAB fewer than 25 U.S. dollar-denominated wire transfers through a Correspondent Bank Account that CAB maintained in New York.  These transfers amount to less than $575,000, and required no volitional conduct from CAB.  CAB's conduct and connection with a New York Correspondent Bank is so *de minimis* and insignificant that CAB could not have possibly foreseen that it would provide grounds for a foreign court, thousands of miles away from Jordan, to exercise jurisdiction over the Bank nearly 20 years later.

The lack of foreseeability is further established by the fact that, during the relevant time period, New York courts repeatedly and consistently held that it was "well settled that the existence of a correspondent banking relationship between a foreign bank and a New York correspondent bank does not subject the foreign bank to jurisdiction here."  *Celton Man Trade*, 1986 WL 6788, at *4 (citing cases in 1986); *Dale*, 2004 WL 2389894, at *3 (citing cases for same in 2004).  Only after *Licci* broke new ground in 2012 was it imaginable that foreign banks could be haled into a New York court based solely on a few correspondent banking transactions involving customer transfers.  Using *Licci*'s pronouncement of law in 2012 to retroactively establish what was foreseeable to CAB in 1999 to 2004 would violate due process and offend traditional notions of fair play and substantial justice. And, as noted, even *Licci* does not subject a foreign bank to personal jurisdiction in New York in the absence of a volitional act by the foreign bank to direct complaint-related transfers through its New York correspondent bank.

Second, exercising jurisdiction over CAB on the circumstances present here would be constitutionally unreasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).  In assessing whether asserting personal jurisdiction would be reasonable, this Court must analyze the following factors:  (1) the burden exercising jurisdiction will have on the defendant; (2) the interests of the forum state in resolving the litigation; (3) the plaintiffs' interest in obtaining

convenient and effective relief; (4) the [international] judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.  *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113-14 (1987).

While the Court in *Licci III* weighed many of the same factors—the fact that the bank was foreign based, that the injuries for which compensation was sought occurred in Israel, that the documents and witnesses are located abroad—there is a significant difference.  In that case, the Court weighed those burdens against the United States' and New York's interest in monitoring New York's banking system at the time to "ensure that its system is not used as an instrument in support of terrorism, money laundering, or other nefarious ends."  *Licci III*, 732 F.3d at 174.

When the Court in *Licci* conducted that balancing exercise, the actions of LCB and Amex, the New York correspondent bank, were a mere two years removed from the attacks giving rise to Plaintiffs' claims, and the Court could legitimately claim that the timeliness of the monitoring function outweighed the burden on the foreign defendant.  Here, the transfers and actions of both the foreign bank and the correspondent bank occurred almost 20 years ago.  U.S. interests in monitoring the practices and procedures of banks from nearly two decades ago is clearly entitled to considerably less weight now when balanced against the significant burden on the foreign defendant and witnesses, all of them located abroad, along with the relevant documents, and where the attacks giving rise to Plaintiffs' injuries occurred abroad.  As the Supreme Court held in *Asahi*, "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders."  *Asahi Metal*, 480 U.S. at 114.

Accordingly, this Court should conclude that due process protections prevent it from exercising personal jurisdiction over CAB.

## II.       PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF UNDER THE ATA.

The Complaint asserts a single cause of action against CAB for aiding and abetting liability under the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d)(2). Compl. ¶¶ 806-15.  Prior to the enactment of JASTA, there was no secondary liability under the ATA.  In enacting JASTA, Congress created limited secondary liability under narrow circumstances where: (1) a plaintiff's injuries arose from an act of international terrorism "committed, planned, or authorized" by an officially designated foreign terrorist organization ("FTO"), and (2) the defendant "aids and abets, by knowingly providing substantial assistance [to]. . . the person who committed" the terrorist act.  *Linde v. Arab Bank, PLC*, 882 F.3d 314, 318 (2d Cir. 2018).

Congress further instructed that "the proper legal framework for how [aiding and abetting] liability should function" under the ATA is identified in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). 18 U.S.C. § 2333 Statutory Note (Findings and Purpose § 5).  It requires proof of three elements:  "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation."  705 F.2d at 477.  To avoid dismissal of the aiding and abetting claim, the Complaint must include non-conclusory allegations satisfying all of these elements.  The Complaint here fails to do so.

### A.       The Complaint Fails to Plead Facts Sufficient to Meet the Intent Requirement for Aiding and Abetting Liability.

In the ATA context, aiding and abetting liability "requires the secondary actor to be aware that, by assisting the principal, it is itself assuming a role in terrorist activities."  *Linde,* 882 F.3d

17

at 329 (internal quotation marks omitted).  As the Second Circuit explained, this intent requirement is different from the *mens rea* required to establish material support in violation of 18 U.S.C. § 2339B, which "requires only knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities." *Id.* at 329-30.  Here the Complaint fails to allege any facts from which the Court can plausibly infer that CAB was "generally aware" that it was playing a "role" in any FTO's violent or life-endangering activities when it provided arm's-length, routine commercial banking services to its customers.

There is no allegation in the Complaint—nor could there be—that any of the 15 named "person[s] who committed" the attacks at issue were CAB customers or that CAB transferred any funds to the perpetrators of the attacks or dealt directly with Hamas.  Nor does it assert that any of the Alleged Bank Customers were themselves designated as FTOs, provided funds to the perpetrators of the attacks, or played any role in planning, facilitating, orchestrating or committing the attacks, with the sole exception of one individual (Abbas al-Sayed) whose name never appeared on any designated terror list and whose last alleged CAB banking transaction occurred a full 10 months before his alleged involvement as "one of" the planners of the Park Hotel bombing. Indeed, 16 of the Alleged Bank Customers were never designated by the U.S. as specially designated global terrorists ("SGDT"), and of the 4 who were designated, 3 were only first designated as SGDTs years *after* the last attack, "further undermining any inference that [the bank] had reason to know about these entities' connections with FTOs." *O'Sullivan*, 2019 WL 1409446, at *9; Appendices B-C.  The Bank closed the account of the only one that was designated (the Holy Land Foundation) immediately upon learning of its designation.

Plaintiffs plead no facts from which the Court can infer that CAB knew that the banking services it provided its customers would play a role in the attacks.  To the contrary, Plaintiffs

recognize that the 17 charities alleged to be customers of the Bank "perform[ed] actual social work and provide[d] charitable services." Compl. ¶623; *see*, *supra*, note 10. And while Plaintiffs attempt to draw a line between the banking services CAB provided to the charities and the terror activities of Hamas, their efforts fall well short of alleging a viable secondary liability claim. Plaintiffs allege, for example, that the Al-Ihsan Charitable Society's "specialized . . . care of the disabled . . . helped Hamas develop its reputation for helping the poor, downtrodden and unfortunate members of Palestinian society" (Compl. ¶760). But that allegation, even accepted as true for purposes of this motion, would not support a reasonable inference that CAB was "generally aware" that by providing banking services to the Al-Ihsan Charitable Society, it was playing a substantial role in bringing about the attacks that injured Plaintiffs. What it plausibly supports is the reasonable inference that CAB was aware that it was providing banking services to a charity that provided humanitarian services to "poor and downtrodden members of Palestinian society." As the court held in *O'Sullivan*, entities such as Al-Ihsan and the other charities at issue clearly provided a variety of legitimate services, and do not "exist solely to further terror." Providing routine banking services to those charities "does not support a plausible inference that those services played a substantial role in bringing about the attacks that injured Plaintiffs." *O'Sullivan*, 2019 WL 1409446, at *6 & fn.11; *see also Weiss*, 2019 WL 1441118, at *5 (noting that Plaintiffs' experts "admitted that [the alleged Hamas-affiliated charities] performed charitable work"); *Strauss*, 379 F. Supp. 3d at 157 (same).

In sum, the Complaint is simply devoid of any factual allegations from which the Court can properly infer that CAB was "generally aware" that it was "assuming a 'role' in terrorist activities" generally or, more specifically, the attacks that injured Plaintiffs when it provided arm's-length financial services to the Alleged Bank Customers. *Linde*, 882 F.3d at 329; *Weiss*,

2019 WL 1441118, at \*11; *O'Sullivan*, 2019 WL 1409446, at \*10; *see also* <u>Appendices B-C</u>.  Even if the Complaint alleged plausibly that the banking services CAB performed for the Alleged Bank Customers provided material support to Hamas fronts, that would be insufficient.  As the Court held in *Siegel v. HSBC Bank USA, N.A.*, No. 17-CV-6593, 2018 WL 3611967, at \*4 (S.D.N.Y. July 27, 2018), quoting from *Linde*, "aiding and abetting an act of international terrorism requires more than the provision of material support to a designated terrorist organization," it  requires that the defendant be "generally aware" that it was "playing a role" in the attacks that injured Plaintiffs.  The Complaint makes no such plausible allegations here.  *See also Weiss*, 2019 WL 1441118, at \*11; *Kemper*, 911 F.3d at 394; *Brill*, 2018 WL 3861659, at \*3 ("At most, the amended complaint alleges that Chevron should have known that it was contributing to terrorism and chose to ignore the possible consequences. That is in effect an allegation of recklessness, but [Section 2333(d)] requires more." (internal citations omitted)).

### B.  The Complaint Fails to Plead Facts Sufficient to Meet the Substantial Assistance Element of Aiding and Abetting Liability.

The Complaint also fails to allege sufficient facts that CAB provided "substantial assistance" to the "person[s] who committed" the attacks at issue.  In determining whether assistance is "substantial enough" to support aider and abettor liability, courts consider six factors: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance."  *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 483-84).  For assistance to be considered "substantial" it must have played a "<u>major part in prompting the tort</u>" or been "<u>integral</u>" to the tort.  *Halberstam*, 705 F.2d at 483-85 (emphasis supplied); *accord Taamneh*, 343 F. Supp. 3d at 918 (finding dispositive

absence of allegations that defendants' services "played a major or integral part in ISIS's terrorist attacks").

The facts of *Halberstam* are instructive.  The defendant (Linda Hamilton) was a partner in a two-person team that engaged in a years-long joint criminal enterprise involving concealing and laundering the proceeds of armed robberies.  She was closely linked to the principal (Bernard Welch): (1) they were housemates and partners for the 5 years of their criminal enterprise; (2) substantial quantities of stolen loot and the tools used in the commission of their crimes, including a smelting furnace used to melt stolen gold and silver into bars, were kept in their shared residence; (3) they each played a separate but "indisputably important" role in ensuring the success of the overall criminal venture—Welch, the pilferer, Hamilton, the launderer; and (4) "the principal business in which Welch and Hamilton engaged while at home" was the disposal of stolen loot. *Halberstam*, 705 F.2d at 486-88.

The facts here are a far cry from those alleged in *Halberstam* giving rise to aider and abetter liability.  Plaintiffs have not alleged that CAB "encouraged" any of the 12 attacks at issue (or, for that matter, any terrorist activity to which Plaintiffs might seek to tie Hamas); that CAB provided any assistance that helped anyone (whether the 15 terrorists or Hamas) carry out the 12 attacks or that played any meaningful role in those attacks; or that CAB was present at any of the 12 attacks. There is also no "real dispute that the relationship between [CAB] and [the alleged Hamas-affiliated charities and individuals] is an arms'-length one—a market relationship at best." *Taamneh*, 343 F. Supp. 3d at 918.  Moreover, "[r]ather than providing targeted financial support," CAB is alleged to have "provided routine services generally available to members of the public." *Id.* (citation omitted).  And there are no facts that support a reasonable inference that CAB was "one in spirit" with the terrorists who committed the attacks at issue (specifically) or Hamas

21

(generally) when it provided financial services.  *Id*.  As the Seventh Circuit held in *Kemper*, 911 F.3d at 395, dismissing the ATA claims there, "[n]one of the allegations suggest[ed] that [the defendant bank] cared how its. . . customers obtained or spent the funds that it processed."

In sum, the Complaint fails to allege facts upon which the Court may plausibly infer that CAB "knowingly" provided "substantial support" to the "person[s] who committed" the acts of international terrorism at issue.

### III. PLAINTIFFS JULIE AVERBACH, NEVENKA GRITZ, ARIE MILLER, MATANYA NATHANSEN AND THE STEINHERZ FAMILY LACK STANDING TO BRING AN ATA CLAIM AGAINST CAB.

In addition to the reasons set forth above requiring dismissal of the Complaint, Plaintiffs Julie Averbach, Nevenka Gritz, Arie Miller, Matanya Nathansen and the Steinherz family lack standing to assert ATA claims for their personal injuries.  The ATA confers statutory standing only on "[a]ny national of the United States injured . . . by reason of an act of international terrorism, or his or her estate, survivors, or heirs[.]"  18 U.S.C. §§ 2333(a) (emphasis supplied); 2333(d)(2) (incorporating Section 2333(a)'s standing requirements by reference).  To satisfy constitutional standing requirements, each plaintiff must also allege plausibly "a causal connection between the injury and the conduct complained of—the injury has to be fairly . . .  trace[abled] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

#### A. Plaintiffs Arie Miller, Julie Averbach, Nevenka Gritz and Matanya Nathansen Are Foreign Nationals Who Lack Standing To Bring Claims For Their Own Personal Injuries Under The ATA.

Plaintiff Arie Miller is "a citizen and resident of the State of Israel"—not a "national of the United States"—who asserts a claim for his "great concern and anxiety" resulting from the non-fatal injuries suffered by his son, Plaintiff Netanel Miller, a U.S. national who has no "estate,

survivors, or heirs."  Compl. ¶¶ 440-52, 454.[15]  Thus, Arie Miller satisfies none of the ATA's statutory standing requirements.  *Jesner*, 138 S. Ct. at 1404 ("[T]he [ATA] provides a cause of action only to 'national[s] of the United States,' and their 'estate, survivors, or heirs.'"); *Saperstein v. Palestinian Auth.*, No. 04-cv-20225, 2006 WL 3804718, at *1 n.3 (S.D. Fl. Dec. 22, 2006) (dismissing ATA claims brought by alien relatives of a U.S. national injured (but not killed) in a terrorist attack for lack standing under the statute); *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1337 (D. Utah 2006) (same).[16]  In fact, he has conceded his lack of ATA standing and, for this reason, voluntarily dismissed his claims in a lawsuit filed contemporaneous to this one.[17]  Similarly, Plaintiffs Julie Averbach and Matanya Nathansen are also citizens and residents of the State of Israel, and Nevenka Gritz is a citizen and resident of France.  Compl. ¶¶ 29, 127, 381.  While they have standing to bring claims as legal representatives on behalf of the estates they purport to represent, they have no standing, as foreign nationals, to assert claims for their own personal injuries.

---

[15]   *See also* BLACK'S LAW DICTIONARY (10th ed. 2014) (a survivor is "[s]omeone who outlives another"); Jesse Dukeminier & Robert Sitkoff, WILLS, TRUSTS, AND ESTATES (9th ed. 2013) ("No living person has heirs.").

[16]   Concluding otherwise, and permitting aliens to assert ATA claims for their own personal injuries would improperly "bypass Congress' express limitations on liability under the statute."  *Jesner*, 138 S. Ct. at 1405.

[17]   *See* Ltr. from G. Osen, Esq., to Hon. Kiyo A. Matsumoto, *Honickman, et al. v. Blom Bank SAL*, No. 19-cv-00008-KAM-SMG (E.D.N.Y. filed Jan. 1, 2019) (acknowledging that Arie Miller does not have standing to sue under ATA precedent) (*Honickman* ECF No. 26); *see also* Notice of Voluntary Dismissal, *Honickman, et al. v. Blom Bank SAL*, No. 19-cv-00008-KAM-SMG (E.D.N.Y. filed Jan. 1, 2019) ("Plaintiff Arie Miller, by and through the undersigned counsel, hereby gives notice that he is voluntarily dismissing his claims against Defendant BLOM Bank SAL without prejudice.") (*Honickman* ECF No. 27).

**B.    Plaintiffs the Steinherz Family Have Not Alleged Plausibly That They Were Injured by Reason of an Act of International Terrorism or That Their Claims Are "Fairly Traceable" to CAB's Alleged Conduct.**

The claims of the Steinherz Family arise from Altea Steinherz injuries that were incurred when one of the 12 terrorist attacks at issue "was now over"; and was prompted—not by an act of international terrorism—but by a slip-and-fall following her decision, while walking home from a restaurant with her husband, to begin running after seeing "a crazed-looking man" also walking along the street somewhere en route.  Compl. ¶¶ 461-67.  Because Altea Steinherz's injuries were not factually and proximately caused "by reason of an act of international terrorism," 18 U.S.C. 2333(a), her claims, and the derivative claims of her relatives for emotional distress (*id.* ¶¶ 475, 477, 479-80), must be dismissed.

Additionally, the Steinherz Family lacks Article III standing because the Complaint contains no facts to support a reasonable inference that Altea Steinherz's injuries are "fairly traceable" to CAB's alleged financial services.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (holding that to have standing, a plaintiff's injuries must be fairly traceable to the challenged conduct of the defendant).  Here, Plaintiffs' injuries are not fairly traceable to CAB's banking services.  Nor are they even the result of an injury incurred while "fleeing" the scene of a bombing.  They are the result of her decision, while walking home, to run after seeing a person whose appearance scared her and her subsequent fall while running.  At a minimum, the appearance of the stranger prompting Ms. Steinherz to run is an intervening cause resulting in her injuries having nothing to do with CAB.  *See, e.g., TF-Harbor, LLC v. City of Rockwell, Tex.*, 18 F. Supp. 3d 810, 820-21 (N.D. Tex. 2014) ("In situations where there is an intervening cause of the plaintiff's injury, courts examine whether the defendant's actions had a determinative or coercive effect upon the action [of the third party]."  And "where the third party's conduct is not

sufficiently dependent on the challenged action, courts generally hold that the plaintiff has not satisfied the fairly traceable element.").

## **CONCLUSION**

For the foregoing reasons, the Complaint fails to make a *prima facie* showing of personal jurisdiction over CAB, and fails to state a claim for secondary liability under the ATA. Additionally, the claims asserted by Plaintiffs Averbach, Gritz, Miller, Nathansen and the Steinherz Family for their alleged personal injuries must be dismissed for lack of standing.

Dated:  July 16, 2019

Respectfully submitted,
DLA PIPER LLP (US)

By:  /s/*Jonathan D. Siegfried*
Jonathan D. Siegfried
jonathan.siegfried@dlapiper.com
Douglas W. Mateyaschuk II
douglas.mateyaschuk@dlapiper.com
Andrew J. Peck
andrew.peck@dlapiper.com
1251 Avenue of the Americas, 27th Floor
New York, NY 10020-1104
(212) 335-4500

Courtney G. Saleski (*pro hac vice* motion
forthcoming)
courtney.saleski@dlapiper.com
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, PA 19103
(215) 656-3300

Brett Ingerman
brett.ingerman@dlapiper.com
6225 Smith Avenue
Baltimore, Maryland 21209-3600
(410) 580-4177

*Counsel for Cairo Amman Bank*

Of Counsel:
Rana Bahri
Cary Kotcher

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x
                                                                 :
JULIE AVERBACH FOR THE ESTATE OF STEVEN    :
AVERBACH, *et al.*,                                    :
                         Plaintiffs,           :
                                                                  :
           - v -                                      :    1:19-CV-00004 (GHW) (KHP)
                                                                    :
CAIRO AMMAN BANK,                                  :
                         Defendant.          :
                                                                   :
------------------------------------------------------------------- x

**APPENDICES IN SUPPORT OF CAIRO AMMAN BANK'S
MOTION TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO
<u>FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1), 12(B)(2) AND 12(B)(6)</u>**

**DLA Piper LLP (US)**
1251 Avenue of the Americas
New York, NY 10020-1104
Phone:  (212) 335-4500
Fax:  (212) 335-4501

*Attorneys for Defendant Cairo Amman Bank*

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

**APPENDIX A:** THE TWELVE TERRORIST ATTACKS .......................................................................... 1

**APPENDIX B:** THE CHARITIES ALLEGED TO BE CAB CUSTOMERS ........................................... 2

**APPENDIX C:** THE INDIVIDUALS ALLEGED TO BE CAB CUSTOMERS ...................................... 4

**APPENDIX A:**
**THE TWELVE TERRORIST ATTACKS**

| Attack | Date | "Person Who Committed" The Attacks |
|---|---|---|
| Ben Yehuda Street Bombings | Dec. 1, 2001 | • Nabil Halabiya (Compl. ¶ 409)<br>• Osama Bahar (Compl. ¶ 409)<br>• Unknown bomber(s) (Compl. ¶ 410) |
| Park Hotel Bombing | Mar. 27, 2002 | • Abd al-Baset Odeh (Compl. ¶ 403) |
| Sheffield Club Bombing | May 7, 2002 | • Muhammad Muammar (Compl. ¶ 386) |
| Patt Junction Bus #32A Bombing | June 18, 2002 | • Muhamad al-Ghoul (Compl. ¶ 482) |
| Hebrew University Bombing | July 31, 2002 | • Mohammad Odeh (Compl. ¶ 335) |
| Ariel Bombing | Oct. 27, 2002 | • Muhammad Kazid Faysal al-Bustami (Compl. ¶ 487) |
| Shooting Attack on Route #60 | Jan. 29, 2003 | • Farah Hamad (Compl. ¶ 314)<br>• Yasser Hamad (Compl. ¶ 314) |
| Mike's Place Bombing | April 30, 2003 | • Asif Muhammad Hanif (Compl. ¶ 295) |
| Commuter Bus #6 Bombing | May 18, 2003 | • Basem Takruri (Compl. ¶ 9) |
| Jaffa Road Bus #14A Bombing | June 11, 2003 | • Abd el-Mu'ati Shabana (Compl. ¶ 262) |
| Shooting Attack on Route #60 | June 20, 2003 | • Ahmad Najjar (Compl. ¶ 199)<br>• Farah Hamad (Compl. ¶ 199) |
| Egged Bus #2 Bombing | Aug. 19, 2003 | • Ra'ed Abdul Hamid Misk (Compl. ¶ 68) |

## APPENDIX B:
## THE CHARITIES ALLEGED TO BE CAB CUSTOMERS

| Name | Alleged Role in Attack | U.S. Designation[1] |
|---|---|---|
| Al-Ansar Charitable Society | None | No |
| Holy Land Foundation | None | SDGT (Dec. 4, 2001) |
| Al-Ihsan Charitable Society | None | SDGT (May 4, 2005) (for being a charitable front for Palestinian Islamic Jihad, not Hamas) |
| Islamic Charitable Society – Hebron | None | No |
| Al Jam'iya Al-Islamiya (Islamic Society – Gaza) | None | No |
| Jenin Zakat Committee | None | No |
| Al Mujama Al Islami (The Islamic Center – Gaza) | None | No |

---

[1] The U.S. Designation refers to the following:

*Foreign Terrorist Organization ("FTO")*: an organization declared a terrorist organization by the United States Secretary of State in accordance with section 219 of the United States Immigration and Nationality Act. 8 U.S.C. §§ 1189(a)(1), (d)(4).

*Specially Designated Global Terrorist ("SDGT")*:  an individual or organization found by OFAC, pursuant to Executive Order 13224, to have committed or to pose a significant risk of committing acts of global terrorism.  *See* 31 C.F.R 515.305 *et seq.*; Exec. Order 13224, 66 Fed.Reg. 49079 (Sept. 23, 2001).

*Specially Designated Terrorist ("SDT")*: an individual or organization determined by OFAC, pursuant to Executive Order 12947, to be a threat to the Middle East peace process.  *See* 31 C.F.R. 595.311 *et seq.*; Exec. Order 12947, 60 Fed.Reg. 5097 (Jan. 23, 1995), *amended by* Exec. Order 13099, 63 Fed.Reg. 45167 (Aug. 20, 1998).

| Name | Alleged Role in Attack | U.S. Designation[1] |
|---|---|---|
| Muslim Youth Association – Hebron | None | No |
| Nablus Zakat Committee | None | No |
| Qalqilya Zakat Committee | None | No |
| Quran and Sunnah Society Qalqiya | None | No |
| Ramallah – Al Bireh Zakat Committee | None | No |
| Al Salah Islamic Society in the Gaza Strip | None | SDGT (Aug. 7, 2007) |
| Al-Tadamun Charitable Society (in Nablus) | None | No |
| Tulkarem Zakat Committee | None | No |
| Al-Wafa Charitable Society | None | No |
| Welfare Association for Palestinian and Lebanese Families (Al Waqfiya) | None | SDGT (Oct. 4, 2012) |

## APPENDIX C:
## THE INDIVIDUALS ALLEGED TO BE CAB CUSTOMERS

| Name | Alleged Role in Attack | U.S. Designation |
|---|---|---|
| Sayed Salem Abu Musameh | None | NS-PLC[2] (Sept. 16, 2016) |
| Ghazi Ahmad Hamad | None | No |
| Abbas Mohamed al-Sayed | Planner of the Park Hotel Bombing. (Compl. ¶ 765). | No |
| Mohamed Saleh Taha | None | No |

---

[2] *Non-Specially Designated National and Blocked Person elected to the Palestinian Legislative Council ("NS-PLC")*: members of the Palestinian Legislative Council ("PLC") "elected to the PLC on the party slate of Hamas," and not necessarily designated by the OFAC List. Section (b) of General License 4, issued pursuant to the Global Terrorism Sanctions Regulations (31 C.F.R. Part 594), the Terrorism Sanctions Regulations (31 C.F.R. Part 595), and the Foreign Terrorist Organizations Sanctions Regulations (31 C.F.R. Part 597), authorizes (but does not require) U.S. financial institutions to reject transactions with NS-PLCs.