UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

JULIE AVERBACH FOR THE ESTATE OF STEVEN   :
AVERBACH, *et al.*,   :
  :
         Plaintiffs,   :
  :   No. 19-cv-00004-GHW-KHP
     -against-   :
  :
CAIRO AMMAN BANK,   :
  :
        Defendant.   :

------------------------------------------------------------------------x

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
CAIRO AMMAN BANK'S MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

    A.   HAMAS Is a Prominent Terrorist Group That Committed Hundreds of Attacks During the Second Intifada, Including Those at Issue Here. ........................................ 2

    B.   HAMAS Relies on Vast Sums of U.S. Dollars to Operate Its Terror Apparatus and the Social and Political Networks That Support That Apparatus. ............................. 3

    C.   HAMAS "Charities" Are Part of HAMAS, and, as Found by the U.S. Government, They Play a Role in Its Terrorism. ................................................................................. 4

    D.   CAB Provided Banking Services for HAMAS's Fundraising Network, Disregarding Clear Indications of Terror Financing. .............................................................................. 6

    E.   CAB Also Provided Financial Services to Organizations That Openly Encouraged and Subsidized Terrorists, Particularly Suicide Bombers. ........................................ 6

    F.   CAB Knowingly Provided Banking Services to Notorious HAMAS Leaders and HAMAS Institutions. .............................................................................................................. 8

ARGUMENT ........................................................................................................................ 9

    I.   THIS COURT HAS PERSONAL JURISDICITON OVER DEFENDANT. ............. 9

    II.  PLAINTIFFS HAVE PLAUSIBLY STATED A CLAIM UNDER JASTA, § 2333(d). .......................................................................................................................... 14

        A.   *Halberstam* Provides the Proper Legal Framework for Civil Liability Under 18 U.S.C. § 2333(d)(2). ........................................................................................................ 14

        B.   Plaintiffs Have Sufficiently Alleged That CAB Was Generally Aware of Its Role in HAMAS's Overall Illegal and Tortious Activity. ............................................... 15

        C.   Plaintiffs Plausibly Allege That CAB Provided Substantial Assistance to HAMAS. ........................................................................................................................... 23

    III.  THE STEINHERZ FAMILY'S INJURIES WERE A REASONABLY FORESEEABLE CONSEQUENCE OF THEIR ATTACK. ..................................... 24

    IV.  PLAINTIFFS JULIE AVERBACH, MATANYA NATHANSEN, AND NEVENKA GRITZ HAVE STANDING TO BRING SOLATIUM CLAIMS. ............................. 25

CONCLUSION .................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Al Rushaid v. Pictet & Cie*,
    28 N.Y.3d 316 (2016) ............................................................................................... 12

*Amigo Foods Corp. v. Marine Midland Bank-New York*,
    61 A.D.2d 896 (1st Dep't, 1978) ....................................................................... 10, 11

*Boim v. Holy Land Found. for Relief & Dev.*,
    549 F.3d 685 (7th Cir. 2008) .................................................................................. 18

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 474 (E.D.N.Y. 2012) ................................................................... 22

*Goldberg v. UBS AG*,
    660 F. Supp. 2d 410 (E.D.N.Y. 2009) ................................................................... 22

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) .......................................................................... *passim*

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ................................................................................................... 22

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009) ................................................................................... 17

*In re Farm Family Casualty Ins. Co. (Trapani)*,
    301 A.D.2d 740 (3d Dep't 2003) ........................................................................... 25

*Keeton v. Hustler Magazine, Inc.*,
    465 U.S. 770 (1984) ............................................................................................... 10

*Kemper v. Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) .................................................................................. 24

*Lelchook v. Commerzbank AG*,
    No. 10-cv-5795, 2011 WL 4087448 (S.D.N.Y. Aug. 2, 2011)................................ 20

*Lelchook v. Islamic Republic of Iran*,
    No. 16-cv-07078, 2019 WL 2647998 (E.D.N.Y. June 27, 2019)............................ 16

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003)................................................................................... 23

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013)..................................................................................... 10, 12, 13

*Licci v. Lebanese Canadian Bank*,
   20 N.Y.3d 327 (2012) ............................................................................................... 10, 13

*Linde v. Arab Bank, PLC*,
   384 F. Supp. 2d 571 (E.D.N.Y. 2005) ........................................................................ 18, 25

*Linde v. Arab Bank, PLC*,
   882 F.3d 314 (2d Cir. 2018)....................................................................................... *passim*

*Linde v. Arab Bank, PLC*,
   97 F. Supp. 3d 287 (E.D.N.Y. 2015) .......................................................................... *passim*

*Miller v. Arab Bank, PLC*,
   372 F. Supp. 3d 33 (E.D.N.Y. 2019) .......................................................................... 1, 16

*O'Sullivan v. Deutsche Bank AG*,
   No. 17-cv-8709-LTS-GWG, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ........................ 20

*Official Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
   549 B.R. 56 (S.D.N.Y. 2016)...................................................................................... 12

*Owens v. BNP Paribas*,
   897 F.3d 266 (D.C. Cir. 2018) ................................................................................... 20

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013)......................................................................................... 20

*Siegel v. HSBC Bank USA, N.A.*,
   No. 17-CV-6593, 2018 WL 3611967 (S.D.N.Y. July 27, 2018) ...................................... 21

*Siegel v. HSBC Bank USA, N.A.*,
   No. 18-2540-cv, --- F. 3d ----, 2019 WL 3719976 (2d Cir. Aug. 8, 2019).......................... 21

*Strauss v. Crédit Lyonnais, S.A.*,
   925 F. Supp. 2d 414 (E.D.N.Y. 2013) ........................................................................ 18, 19, 23

*Strauss v. Crédit Lyonnais, S.A.*,
   No. 06-cv-702(DLI)(RML), 2019 WL 1492902 (E.D.N.Y. Mar. 31, 2019).......................... 21

*United States v. El-Mezain*,
   664 F.3d 467 (5th Cir. 2011) ..................................................................................... 4, 19

*United States v. Maldonado-Rivera*,
   922 F.2d 934 (2d Cir. 1990)....................................................................................... 24

*Weiss v. Nat'l Westminster Bank PLC*,
   453 F. Supp. 2d 609 (E.D.N.Y. 2006) ............................................................ 18, 25

*Weiss v. Nat'l Westminster Bank PLC*,
   768 F.3d 202 (2d Cir. 2014)........................................................................... 16, 23

*Weiss v. Nat'l Westminster Bank PLC*,
   No. 05-cv-4622(DLI)(RML), 2019 WL 1441118 (E.D.N.Y. Mar. 31, 2019)......................... 21

*Weiss v. Nat'l Westminster Bank PLC*,
   278 F. Supp. 3d 636 (E.D.N.Y. 2017) ................................................................ 22

**Statutes**

18 U.S.C. § 2333(d)(2) .................................................................................. 14, 23

Fed. R. Civ P. 4(k)(1).................................................................................... 9

Justice Against Sponsors of Terrorism Act, Pub. L. 114-222 (2016).......................... 1, 13, 14, 18

N.Y.C.P.L.R. § 302(a)(1)................................................................................ 9, 13

## INTRODUCTION

Plaintiffs are (a) United States citizens injured in terrorist attacks committed in Israel between 2000 and 2003 (the "Attacks"), and their family members, and (b) the family members and estates of U.S. citizens killed in the Attacks. The Complaint alleges the Attacks were perpetrated by the designated Foreign Terrorist Organization ("FTO") HAMAS during a period of near-daily terrorism commonly referred to as the "Second Intifada." Plaintiffs claim that defendant Cairo Amman Bank ("CAB") aided and abetted HAMAS by providing it with crucial financial services in violation of 18 U.S.C. § 2333(d), added to the Anti-Terrorism Act ("ATA") in 2016 through the Justice Against Sponsors of Terrorism Act, Pub. L. 114-222 (2016) ("JASTA").

This Action closely resembles other cases brought against CAB's sister bank, Arab Bank, PLC, under the ATA,[1] encompassing many of the same Plaintiffs, Attacks, HAMAS leaders and HAMAS-controlled institutions. Like Arab Bank, CAB is a Jordanian bank with a significant presence in the Palestinian Territories. Plaintiffs allege that CAB knowingly and substantially assisted HAMAS by providing it with an array of financial services, including maintaining accounts for well-known HAMAS leaders and institutions, processing U.S. dollar transactions for them through CAB's New York correspondent accounts, and paying families of HAMAS suicide bombers on behalf of Saddam Hussein's regime and a Hezbollah-funded organization – both seeking to incentivize terrorist attacks. Plaintiffs allege that CAB was fully aware of HAMAS's conduct, including its campaign of suicide bombings and other terrorist attacks, and understood the significance of its own role in facilitating large transfers of funds to HAMAS, including the cross-border transfer of U.S. dollars, from donors and co-conspirators around the world to the Palestinian Territories and making those funds readily available to the terrorist organization.

---

[1]     *See Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 334 (E.D.N.Y. 2015), *vacated on other grounds*, 882 F.3d 314 (2d Cir. 2018); *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 47 (E.D.N.Y. 2019).

Tellingly, CAB's brief ignores these similarities and omits any reference to the Complaint's factual allegations concerning its facilitation of payments to the families of suicide bombers and other terrorists. CAB also declines to address controlling ATA law directly. Instead, because Congress explicitly established *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) as the guide for interpreting § 2333(d), CAB distorts *Halberstam's* aiding and abetting analysis beyond recognition and largely ignores the Second Circuit's *Linde* decision which applied *Halberstam* to § 2333(d). When CAB does mention *Linde* substantively, it resorts to citing a lower court decision "quoting Linde," rather than contend with the case itself. Moreover, CAB does not even reference, let alone address, *Miller*, the case most factually analogous to this Action, which addresses similar claims squarely under § 2333(d). As explained in depth below, instead of grappling with *Halberstam* and meaningfully addressing the decisions most directly on point, CAB instead relies on a series of cases with self-evidently inapposite or divergent factual allegations to invite this Court to error.

## STATEMENT OF FACTS

### A.   HAMAS Is a Prominent Terrorist Group That Committed Hundreds of Attacks During the Second Intifada, Including Those at Issue Here.

HAMAS is a radical Islamist terrorist organization operating in the Palestinian Territories formerly led by Ahmed Yassin (or "Sheikh Yassin"). Compl. ¶¶ 504-06. HAMAS's operational terrorist wing is known as the *Izz al-Din al-Qassam* Brigades (the "*Qassam* Brigades"). *Id.* ¶ 518. The United States designated HAMAS a Specially Designated Terrorist ("SDT") on January 24, 1995, an FTO on October 8, 1997, and a Specially Designated Global Terrorist ("SDGT") on October 31, 2001. *Id.* ¶¶ 604-07. During the Second Intifada (2000-2004), HAMAS launched hundreds of terrorist attacks that killed and injured hundreds of civilians, including numerous American citizens, *id.* ¶ 616 and committed the Attacks at issue. *See infra*, at 15 n.11.

**B.      HAMAS Relies on Vast Sums of U.S. Dollars to Operate Its Terror Apparatus and the Social and Political Networks That Support That Apparatus.**

Since its inception in 1987, HAMAS has operated a network of social and political institutions sometimes referred to as the "*da'wa*," consisting of mosques, hospitals, religious schools, clinics and other institutions that form the movement's political base in the West Bank and Gaza Strip. *Id.* ¶¶ 507, 509-11, 595-601, 622. These institutions raise substantial funds for HAMAS's political and operational terrorist infrastructure and free up (fungible) money to plan and perpetrate suicide bombings and other terrorist attacks. *Id.* ¶¶ 623, 625. They also provide income streams to HAMAS operatives, assist HAMAS in recruiting new supporters, generate and disseminate HAMAS propaganda, and compete with the Palestinian Authority in delivering social services and facilitating payments (including "martyr" payments) to families of HAMAS operatives killed, injured or imprisoned as a result of their terrorist activities. *Id.* ¶ 624.

HAMAS used its *da'wa* to support its terror activities, including suicide bombings, by (i) using the *da'wa*'s educational institutions to indoctrinate youths into a "culture of martyrdom for Allah"; (ii) transferring millions of dollars to relatives of suicide terrorists and HAMAS prisoners, thus providing a safety net for potential recruits concerned that their families would be adversely affected by their deaths or imprisonment; and (iii) recruiting suicide bombers. *Id.* ¶ 617. HAMAS's *da'wa* also financed its terror campaign by accepting "large sums" collected through the "charity activities" of HAMAS's operatives abroad, as set forth in an internal HAMAS memorandum captured by the Israeli army. The memorandum noted that HAMAS will continue to "build up the activities and operations" of its charitable organizations by, among other things, "***taking advantage of the conditions and the atmosphere of death***." *Id.* ¶¶ 618-21.

HAMAS's use of its *da'wa* to fundraise became public knowledge even outside the

Palestinian Territories as early as 1994. *Id.* ¶ 595. *The New York Times* reported that year that HAMAS had collected millions of dollars a year from "associations operating largely abroad but with ties to the international Muslim Brotherhood network" as well as "from Islamic and Arab communities in the United States" and Western Europe. *Id*. In 1996, *The New York Times* reported on the HAMAS *da'wa*'s intensified fundraising. *Id*. ¶ 598.

### C.   HAMAS "Charities" Are Part of HAMAS, and, as Found by the U.S. Government, They Play a Role in Its Terrorism.

HAMAS fundraisers located abroad are key members of HAMAS's *da'wa*, closely tied to *Qassam* Brigades operatives in the Palestinian Territories, and to HAMAS political leaders in Turkey, Qatar and elsewhere in the Middle East. *Id.* ¶ 537. Several of these fundraisers have been designated SDGTs by the U.S. Government, which characterized them as "a web of charities raising funds on behalf of HAMAS and using humanitarians [sic] purposes as a cover for acts that support HAMAS. Funds are generated by, and flow through, these organizations on behalf of HAMAS," ¶¶ 543-48, 556-57, or entities otherwise identified as HAMAS fundraisers.[2]

Notably, CAB provided financial services to HAMAS by maintaining bank accounts and providing financial services for the SDGT Holy Land Foundation ("HLF"). *Id.* ¶ 777. During the relevant period, CAB maintained one or more U.S. dollar-denominated accounts for HLF; at the beginning of 2001, one account had a balance in excess of $600,000. *Id.* ¶ 575-76. Most of the funds HLF transferred from the United States to its offices in the Palestinian Territories were sent through CAB's correspondent account with Citibank in New York and were for very large

---

[2]     *See, e.g.*, *United States v. El-Mezain*, 664 F.3d 467, 485 (5th Cir. 2011) *as revised* (Dec. 27, 2011) ("HLF held itself out to be the largest Muslim charity in the United States, ostensibly with the mission of providing humanitarian assistance to needy Palestinians living in the Israeli-occupied territory of the West Bank and Gaza. The Government charged that in reality HLF's mission was to act as a fundraising arm for Hamas, also known as the Islamic Resistance Movement, and to assist Hamas's social wing in support of Hamas's goal to secure a Palestinian Islamic state in what is now Israel.").

amounts. *Id.* ¶¶ 577-80. HLF, formerly the preeminent HAMAS fundraiser in the United States, worked with European and other international fundraisers to funnel money to HAMAS institutions in the Palestinian Territories (many of them CAB customers, *see id.* ¶¶ 754, 786) and was described as a "key fundraising operation for HAMAS" by *The New York Times in 1996. Id.* ¶¶ 568, 570-72.

Israel designated HLF a HAMAS organization that "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks," in 1997. *Id.* ¶ 574. The Treasury Department designated HLF an SDGT in 2001; in 2004, HLF and several of its directors were indicted for providing material support to HAMAS (resulting in a 2008 jury conviction affirmed by the Fifth Circuit). *Id.* ¶¶ 581-82, 587-88. CAB also maintained an account for the Welfare Association for Palestinian and Lebanese Families in Lebanon, another HAMAS fundraising organization that was later designated an SDGT in 2012.[3] ¶ 777.

Examples of U.S.-designated HAMAS fundraisers that transferred funds to accounts at CAB include:

- HAMAS's primary fundraiser in France, Comité de Bienfaisance et de Secours aux Palestiniens ("CBSP"), designated a terrorist organization by Israel in 1998 and an SDGT by the U.S. in 2003 ("[CBSP is] part of a web of charities raising funds on behalf of HAMAS and using humanitarians [sic] purposes as a cover for acts that support HAMAS."). *Id.* ¶¶ 538-39, 543-45, 547.

- HAMAS's primary fundraiser in the U.K., the Palestinian Relief and Development Fund ("Interpal"), designated a terrorist organization by Israel in 1998 and an SDGT by the U.S. in 2003 ("[Interpal is a] principal charity utilized to hide the flow of money to HAMAS" through its role as "the fundraising coordinator of HAMAS."). *Id.* ¶¶ 540-46.

- HAMAS's primary fundraiser in Germany, the Al-Aqsa Foundation, declared a terrorist organization by Israel in 1998, *id.* ¶¶ 551-52, its offices shuttered by Germany in July 2002, *id.* ¶¶ 553-55, designated an SDGT by the U.S. in 2003 ("Al Aqsa is a critical part of Hamas' terrorist support infrastructure.") *Id.* ¶¶ 556-57.

---

[3]     *See* https://www.treasury.gov/press-center/press-releases/Pages/tg1725.aspx.

### D.      CAB Provided Banking Services for HAMAS's Fundraising Network, Disregarding Clear Indications of Terror Financing.

Despite the extensive media reporting and Israeli designations highlighting the direct link between HAMAS's fundraisers and its terror apparatus, CAB processed transfers and maintained accounts for HAMAS's fundraising network. For example, as noted above, CAB maintained one or more U.S. dollar-denominated accounts for HLF, *id.* ¶¶ 575-76, 777-79, that received funds HLF transferred from the United States to the Palestinian Territories via New York. *Id.* ¶¶ 577-80.

CAB also processed multiple transfers originating from Al-Aqsa Foundation branches to CAB account holders in the Palestinian Territories *after* Israel declared it a terrorist organization and the German government closed its German offices. *Id.* ¶¶ 558-59, 562. Even *after* the U.S. designated the Al-Aqsa Foundation an SDGT, CAB continued processing transfers originating from the Al-Aqsa Foundation to CAB account holders. *Id.* ¶¶ 560-62.

### E.      CAB Also Provided Financial Services to Organizations That Openly Encouraged and Subsidized Terrorists, Particularly Suicide Bombers.

CAB knowingly provided substantial assistance to, and aided and abetted, HAMAS by furnishing financial services to Iraqi and Iranian sponsored organizations that encouraged and subsidized Palestinian terrorism during the Second Intifada by transferring funds to the families of Palestinian "martyrs" and prisoners to encourage Palestinians to continue launching terrorist attacks. *Id.* ¶ 787. Seeking broad Palestinian support for Saddam Hussein, Iraq funneled millions of dollars to its Ba'athist surrogate in Ramallah called the Arab Liberation Front ("ALF"), which paid (including via CAB) families of "martyrs" affiliated with any terror organization (including HAMAS). *Id.* ¶¶ 788-89, 796. The payments started at $10,000 for a "martyr's" family, but ALF rapidly developed a system to incentivize suicide attacks over other attacks by paying families a premium upon presentation of evidence that the "martyr" intended to die during the attack. *Id.*

¶¶ 789-90. For example, in August 2001, the families of a "martyr" who died as part of a suicide attack began receiving $15,000. In March 2002, this was increased to $25,000.[4] *Id.* ¶ 791.

ALF martyr payment "ceremonies" received widespread media coverage, particularly in the local Palestinian media. *Id.* ¶¶ 793-95. Media coverage was not limited to local newspapers, however. According to an article in the *Guardian* on March 12, 2003, CAB held accounts for ALF from which "martyr" payments were made:

> With each cheque, drawn on the Cairo Amman Bank, came a large certificate decorated with the Iraqi and Palestinian flags. "A gift from President Saddam Hussein to the family of a martyr in the al-Aqsa intifada," the inscription read. "To those who irrigate the land with their blood. You deserve the honour you will receive from God and you will defeat all who bow before your will."

*Id.* ¶ 796. CAB also knowingly provided substantial assistance to, and aided and abetted, HAMAS by providing financial services to the *al-Ansar* Society. *Id.* ¶ 798, 804. The families of HAMAS "martyrs" were among the recipients of payments transferred from Hezbollah's *Shahid* Foundation (or "Martyrs Foundation") in Lebanon to the *al-Ansar* Society in the Palestinian Territories. *Id.* ¶ 798. Israel designated *al-Ansar* an "illegal association" in 2003. *Id.* ¶ 798 n.16. *Al-Ansar* advertisements in Palestinian newspapers instructed families of "martyrs" seeking payments which documentation to produce in support of their claims. *Id.* ¶ 800.

In addition to listing CAB accounts on its website, *al-Ansar* expressed its goals explicitly:

> Al-Ansar opens its doors to the families of martyrs who seek it in order to register their martyrs, who, with their noble blood, have watered the pure soil of Palestine, drawing thereby the features and portrait of the coming freedom and the coming dawn.

*Id.* ¶¶ 802, 804. The *Shahid* Foundation's website also published lists of Palestinian "martyrs" whom it financially supported and included the dates of the martyr's birth and death, as well as

---

[4]     Those who died for other reasons, such as so-called "work accidents" (premature detonation of explosives) or in firefights with Israeli forces, were paid $10,000. Compl. ¶ 791.

their organizational affiliation (i.e., HAMAS or other terrorist groups). *Id.* ¶ 803.

> **F.     CAB Knowingly Provided Banking Services to Notorious HAMAS Leaders and HAMAS Institutions.**

CAB knowingly provided financial services to notorious HAMAS leaders (*id.* ¶¶ 762-76) and institutions (*id.* ¶¶ 753-61). The leaders included Abbas al-Sayed, one of HAMAS's most senior political and military leaders in the West Bank and the mastermind of the March 27, 2002 Park Hotel bombing. *Id.* ¶¶ 763-66. It also included Mohamed Saleh Taha, one of the founders of *Al-Mujama Al-Islami* (HAMAS's founding institution) and a prominent HAMAS leader in the central Gaza Strip, *Id.* ¶¶ 647-48, 767-69, and Ghazi Ahmad Hamad, a long-time HAMAS public spokesman, senior editor of HAMAS's newspaper, and later, the deputy foreign minister in HAMAS's government in Gaza in 2012. *Id.* ¶¶ 770-72.

During the relevant period, CAB knowingly maintained accounts for and provided financial services to HAMAS's operational headquarters in Gaza, *Al-Mujama Al-Islami*, which formed the backbone for HAMAS's *Qassam* Brigades, and HAMAS's *Al-Jam'iya Al-Islamiya*. Both institutions were founded by Sheikh Yassin himself and led by prominent HAMAS activists (*e.g.*, Ismail Haniya, then Yassin's chief of staff and now HAMAS's overall leader, worked for the latter). *Id.* ¶¶ 518, 647-48, 661-63, 676, 754. The Palestinian Authority closed both organizations temporarily in September 1997, identifying them as HAMAS institutions. *Id.* ¶ 602. Israel declared both institutions unlawful organizations belonging to HAMAS in 2002. *Id.* ¶¶ 659, 667. In August 2003, the Palestinian Minister of Security identified both institutions as part of HAMAS, which led the Palestinian Monetary Authority to place a temporary freeze on their bank accounts the next day. *Id.* ¶¶ 658, 780.  Since the mid-1990s, Western media outlets repeatedly reported on *Al-Jam'iya Al-Islamiya*'s affiliation with HAMAS. *Id.* ¶¶ 669-75.

CAB knowingly maintained accounts for, and provided financial services to, numerous

other HAMAS-controlled *da'wa* organizations in Gaza and the West Bank. *Id.* ¶¶ 754, 786. Israel declared many of them unlawful organizations in 2002 because they belonged to HAMAS; each received funding from HAMAS's fundraising networks. These organizations included *Al-Salah* Islamic Society-Gaza;[5] Al Wafa Charitable Society; Islamic Charitable Society-Hebron;[6] Tulkarem Zakat Committee; *Al-Tadamun* Charitable Society-Nablus; Jenin Zakat Committee; Ramallah-Al-Bireh Zakat Committee; and Muslim Youth Association-Hebron.[7] *Id.* ¶¶ 682-751.

With the exception of *Al-Salah* Islamic Society-Gaza, the funds in the accounts of these HAMAS institutions were seized by the Israel Defense Forces during its February 2004 raids of the Ramallah branches of Arab Bank and CAB. *Id.* ¶¶ 698, 785-86. In 2007, the U.S. Justice Department identified many of these same entities as "organization[s] that operate[] on behalf of, or under the control of, Hamas" in the list of unindicted co-conspirators in the criminal case of *United States v. Holy Land Foundation*. *Id.* ¶¶ 660, 709, 713, 722, 737, 744, 751.

## ARGUMENT

## I.  THIS COURT HAS PERSONAL JURISDICITON OVER DEFENDANT.

CAB devotes most of its brief to contesting this Court's personal jurisdiction over it. Nevertheless, Plaintiffs have alleged facts that constitute a prima facie showing that personal jurisdiction exists under N.Y.C.P.L.R. § 302(a)(1). *See* Fed. R. Civ P. 4(k)(1). Specifically, Plaintiffs have alleged facts that are materially the same to those the Second Circuit and New York Court of Appeals found sufficient in the *Licci* family of cases, namely the "repeated use of a

---

[5]    *Al-Salah* Islamic Society-Gaza was later designated an SDGT by the U.S. Treasury Department on August 7, 2007. *Id.* ¶ 683. Its bank accounts were temporarily frozen by the Palestinian Monetary Authority in December 2001. *Id.* ¶ 681. Moreover, some of its offices had been temporarily closed by the PA in 1997. *Id.* ¶ 679.

[6]    The Islamic Charitable Society-Hebron's offices were temporarily closed by Israel in 1996. *Id.* ¶ 703

[7]    The Muslim Youth Association-Hebron's offices were temporarily closed by the Israeli army in March 1996 and by the PA in December 2001. *Id.* ¶ 747.

correspondent account in New York on behalf of a client—in effect, a 'course of dealing'—[which] show[s] purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339 (2012)).

As in *Licci*, CAB "deliberately chose to process the many" wire transfers alleged in the Complaint through banks in New York. *Id.* at 171. Also, as in *Licci*, CAB's "use of a correspondent account in New York to accomplish its dollar-denominated wire transfers was recurring," and Plaintiffs alleged "dozens" of transactions, such that CAB's New York contacts were not "random, isolated, or fortuitous." *Id.* (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). Further, Plaintiffs alleged that CAB maintained dollar-denominated accounts for various HAMAS leaders and institutions, and that transfers on behalf of those accounts were settled and cleared through correspondent accounts, which CAB chose to maintain in New York. Compl. ¶¶ 5-8, 577-80, 764, 769, 772, 776, 779.

CAB argues that it did not purposefully avail itself of New York because Plaintiffs only alleged that it "passive[ly]" *received* transfers from other entities, and it was *those* entities' choice to send dollars to CAB through CAB's New York correspondent account (as opposed to through some other, unnamed route). CAB Brief ("Br.") at 9-11. CAB relies on the New York Court of Appeals decision in *Amigo Foods*, but mischaracterizes it, omits controlling New York case law, and misstates the way U.S. dollar-denominated correspondent banking works. *Id.* at 12-14. *See Amigo Foods Corp. v. Marine Midland Bank-New York*, 61 A.D.2d 896, 896 (1st Dep't, 1978), *aff'd*, 46 N.Y.2d 855 (1979).

*First*, CAB misconstrues *Amigo Foods*, in which the New York Court of Appeals found

no personal jurisdiction over defendant Maine Bank after a New York plaintiff attempted to wire a single payment to it through its "incidental checking account" at another New York bank. 61 A.D.2d at 896. CAB omits two material facts from *Amigo Foods*: (1) the Maine bank instructed its New York correspondent bank to *reject* the payment, meaning the Maine bank did not pass the transaction on from its New York account to its client in Maine and (2) the plaintiff *could have*, but did not, send the payment "directly" to the Maine bank in Maine. *Id.* As the court pointed out, it was plaintiff's bank's "unilateral choice" to make the deposit through defendant's correspondent account in New York "rather than directly . . . in Maine." *Id.* Here, however, CAB *accepted* payments in its New York correspondent accounts and passed them on to its customers, HAMAS leaders and HAMAS-controlled institutions, by crediting their accounts in the Palestinian Territories. CAB misleadingly argues that counterparties chose to send U.S. dollar-denominated transfers to these CAB clients through CAB's New York correspondent accounts "despite the availability of an alternative route of transfer that would not have passed through New York." Br. at 11. But no other "routes" appear to have existed—based on publicly available information, CAB likely held no dollar-correspondent accounts outside of New York at that time,[8] and CAB only lists New York accounts in its brief. *See* Br. 4-5.

*Second*, the New York Court of Appeals has expressly rejected the argument that *receiving* transfers is insufficient for personal jurisdiction. In *Al Rushaid*, defendant Swiss bank "Pictet" argued that the court had no personal jurisdiction over it because it only passively received funds from certain vendors through its correspondent account at Citibank in New York, which Pictet's client "TSJ" allegedly used in a money laundering scheme. The Court of Appeals disagreed:

> After the vendors sent the money to Citibank, Pictet did not ignore or reject the

---

[8]     According to CAB's listings in the Bankers' Almanac (a primary resource for marketing correspondent accounts, *see* https://accuity.com/bankers-almanac-for-payments/), within the range of relevant years, CAB's U.S. dollar-clearing correspondent accounts were *all* in New York. *See* Exhibit 1 to the Declaration of Michael J. Radine.

funds, as the defendant did in *Amigo Foods* . . . . Rather, Pictet credited the funds in that correspondent bank account to TSJ, an essential step in the money-laundering scheme. Citibank and the other banks held funds for Pictet, then Pictet credited them to the TSJ account, and next distributed the funds to the employee accounts. It is of no moment that [other defendants] "directed the vendors" to deposit the money in the New York accounts because what matters is defendants' banking activity with the correspondent accounts, here, that the money deposited in New York was credited to the Pictet accounts in accordance with Pictet's money-laundering. As described in the complaint, the employees accessed the funds in those accounts after Pictet credited the transfer from its New York correspondent account.

*Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 327-28 (2016). *See also Official Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 65 (S.D.N.Y. 2016) ("Significantly, *Amigo Foods* did not hold that jurisdiction . . . did not lie because the defendant had received, rather than transferred, the funds at issue."). CAB likewise repeatedly accepted transfers into its New York accounts and passed them on to its HAMAS customers, from which payments Plaintiffs' claims arise.

CAB argues that the *Licci* cases themselves distinguish sending and receiving funds through correspondent accounts, but that argument mischaracterizes the holding of the cases. The *Licci* decisions generally discuss LCB's "processing" of transactions through New York, *see Licci*, 732 F.3d at 171, not sending them. Sending and receiving transactions both require effectively identical "processing"—i.e., debiting the sending account and crediting the receiving account at each stage in the transaction. Indeed, the Second Circuit explained that, as "the [New York] Court [of Appeals] pointed out, the [*Licci*] plaintiffs' claims are also grounded in the allegation that LCB violated various statutory duties by using its correspondent account to funnel money *to* Shahid and Hizballah." *Licci*, 732 F.3d at 169 (emphasis added). This is unsurprising—both *Licci* and this case involve terrorist groups soliciting donations from overseas that flow into the Middle East;

neither case focuses on terrorist groups transferring money *from* their accounts in the Middle East.[9]

*Third*, CAB affirmatively chose to offer its customers (including notorious HAMAS leaders and institutions) the option of maintaining U.S. dollar-denominated accounts and chose to maintain correspondent bank accounts in New York to facilitate the settling and clearing of its dollar-denominated transactions. As in *Licci*, for CAB, "[p]resumably, using the [New York] account was cheaper and easier . . . than other options, and whatever financial and other benefits [CAB] enjoyed as a result allowed the bank to retain [HAMAS leaders and institutions] as [] customer[s] and to support [their] allegedly terrorist activities and programs." 20 N.Y.3d at 340.

*Finally*, CAB argues that even if the Court finds its conduct satisfies § 302, it does not satisfy constitutional requirements. *Licci*, of course, addressed the constitutional prong of personal jurisdiction: "LCB's repeated use of the correspondent account—and hence New York's banking system—as an instrument to achieve the wrong complained of in this suit *satisfies the minimum contacts component of the due process inquiry*." *Licci*, 732 F.3d at 173 (emphasis added).[10] The court also found that modern communication and transportation make suit in New York "reasonable," and that New York and the U.S. have an interest in preventing terror financing. *Id.* at 173-74. Finally, as the court observed, it would be "rare" and "unusual" for a court to determine that the exercise of personal jurisdiction over a defendant was permitted by § 302(a)(1) but prohibited under due process principles. In fact, the court noted that it was aware of "no such decisions in this Circuit." *Id.* at 170. This case should not be the first.

---

[9]     Of course, discovery will presumably reveal that relevant funds were both sent *and* received through CAB—indeed, it defies credulity that CAB drew some sort of principled line at *sending* money on behalf of its HAMAS-linked account holders.

[10]     *See also* JASTA § 2(a)(6) ("entities … that knowingly or recklessly contribute material support … directly or indirectly" to terrorist groups that threaten U.S. nationals "should reasonably anticipate being brought to court in the United States to answer for such activities.").

## II.     PLAINTIFFS HAVE PLAUSIBLY STATED A CLAIM UNDER JASTA, § 2333(d).

### A.     *Halberstam* Provides the Proper Legal Framework for Civil Liability Under 18 U.S.C. § 2333(d)(2).

JASTA established that plaintiffs may assert statutory secondary liability for acts of international terrorism committed, planned, or authorized by an FTO against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). JASTA was explicitly added to *expand* the relief already available to civil litigants under 18 U.S.C. § 2333(a):

> The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA, § 2(b). *Accord Linde*, 882 F.3d at 328 (describing JASTA as an "expansion" of the ATA).

JASTA directs courts to interpret aiding and abetting liability pursuant to *Halberstam* (an appellate case reviewing a full trial record, not a motion to dismiss). *See also Linde*, 882 F.3d at 329 (same). In *Halberstam*, the defendant, Linda Hamilton, was found civilly liable for aiding and abetting the murder of Michael Halberstam by her boyfriend, Bernard Welch, during a botched burglary. *See id.* at 474 ("[Ms. Hamilton is] civilly liable, as a joint venturer ... for the killing of Michael Halberstam"). However, Hamilton, who assisted what she claimed was her boyfriend's antiques business, did not know about the murder—or even the burglary:

> It was not necessary that Hamilton knew specifically that Welch was committing burglaries. Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night—whether as a fence, burglar, or armed robber made no difference—because violence and killing is a foreseeable risk in any of these enterprises.

*Id.* at 488.

The *Halberstam* court set forth "the elements of traditional tort theory that permit holding a nonparticipant in a burglary that led to murder civilly responsible for the economic consequences of so terrible an injury." 705 F.2d at 489. They are:

(1) the party the defendant aids must perform a wrongful act that causes an injury;

(2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance; and

(3) the defendant must knowingly and substantially assist the principal violation.

705 F.2d at 477. Plaintiffs have plausibly alleged each of these elements. Because the first is not contested by CAB,[11] Plaintiffs discuss the second and third below.

## B. Plaintiffs Have Sufficiently Alleged That CAB Was Generally Aware of Its Role in HAMAS's Overall Illegal and Tortious Activity.

### 1. The Scienter Required for Civil Liability Under 18 U.S.C. § 2333(d)(2).

Hamilton acted as her boyfriend's "banker, bookkeeper, recordkeeper, and secretary," and denied knowing of the criminal nature of his "evening forays." *Id.* at 486, 488. Notwithstanding that her actions were "neutral standing alone," the court found that "it defies credulity that Hamilton did not know that something illegal was afoot." *Id.* at 486. Thus, the court concluded that because she "knew about and acted to support Welch's illicit enterprise," she "had a general awareness of her role in a continuing criminal enterprise." *Id.* at 488. Because the killing was "a natural and foreseeable consequence of the activity Hamilton helped Welch to undertake," and because her services substantially assisted the burglary resulting in murder, she was liable as an aider and abettor of the murder. *Id.*

---

[11]   Plaintiffs have plausibly alleged, and CAB has not disputed for purposes of this motion, that HAMAS is an FTO and committed the Attacks. *See* Compl. ¶ 607 (designation of HAMAS during relevant period), ¶¶ 9-10, 68-69, 199, 262, 295, 314, 333-35, 386-87, 403, 409-10, 482, 487 (alleging that HAMAS committed the Attacks).

*Linde*, following *Halberstam*, held that in the terrorism context, a bank can be found liable for aiding and abetting a terrorist organization if it was generally aware of "a 'role' in terrorist activities" performed by that organization. 882 F.3d at 329. Plaintiffs need *not* show "specific intent," "intent to participate in a criminal scheme as 'something that he wishes to bring about and seek by his action to make it succeed,'" or that the bank "knew of the specific attacks at issue when it provided financial services for Hamas." *Id.* Two recent JASTA decisions relating to terror financing apply *Linde*'s holdings. *See Lelchook v. Islamic Republic of Iran,* No. 16-cv-07078, 2019 WL 2647998, *4 (E.D.N.Y. June 27, 2019) (finding Iranian Bank Saderat liable for aiding and abetting Iranian terror attacks); *Miller*, 372 F. Supp. 3d at 33 (denying motion to dismiss claims that Arab Bank aided and abetted HAMAS terror attacks). As discussed further below, neither court required a showing (or pleading), as urged by CAB here, that the specific funds defendant provided be earmarked for terrorist attacks or directly traceable to such attacks.

"Terrorist activities" in *Linde* does not refer to terrorist *attacks*, just as the "overall illegal or tortious activity" in *Halberstam* was "personal property crimes at night," *not* murder. *See, e.g.*, *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 208-09 (2d Cir. 2014) (holding that, under § 2339B of the ATA, "engaging in terrorist activities" includes "solicit[ing] funds for Hamas"). Thus, as in *Halberstam* and *Linde*, Plaintiffs must plausibly allege that CAB was "generally aware of [its] role" in "terrorist activities," from which terrorist *attacks* were a natural and foreseeable consequence. An equivalent formulation of the general awareness requirement articulated in *Halberstam* in this case would be:

| Defendant (Secondary Tortfeasor) | Form of Substantial Assistance | Principal Tortfeasor | Illicit Scheme of Which Defendant Must Be Generally Aware | Foreseeable Resulting Tort |
|---|---|---|---|---|
| Ms. Hamilton | Banking, Bookkeeping | Welch | Property crimes at night | Murder |
| CAB | Banking, financial services | HAMAS | Terrorist activities (including soliciting, collecting and transferring funds on behalf of an FTO) | Terrorist attacks |

### 2. The Complaint Plausibly Alleges That CAB Was Generally Aware of Its Role in HAMAS's Terrorist Activities.

Although courts are expected to be "lenient in allowing scienter issues …. [t]o survive motions to dismiss," *In re DDAVP Direct Purchaser Antitrust Litig.,* 585 F.3d 677, 693 (2d Cir. 2009) (internal quotation marks and citation omitted), the Complaint sets forth many specific allegations providing a strong inference of CAB's awareness of its role in HAMAS's fundraising activities, including the central fact that it held accounts for numerous well-known HAMAS leaders and HAMAS-controlled institutions, ¶¶ 575-80, 753-76, 762-79, 786, and that it processed transfers from other HAMAS institutions, ¶¶ 558-62.

CAB contends that it only provided "arm's-length, routine commercial banking services to its customers," Br. at 18, which were not *themselves* designated FTOs and were not among the "15 named" individuals who carried out the attacks at issue or even provided them support directly. CAB also argues that its customers—except Abbas al-Sayed— did not plan or commit the Attacks at issue. *Id.* CAB also asserts that it did not "deal[] directly with Hamas." *Id.* Each assertion is either untrue or irrelevant to pleading CAB's scienter at this stage.

*First*, CAB declines to address the Complaint's allegations that it knowingly processed Saddam Hussein's highly publicized reward payments to the families of suicide terrorists and Hezbollah's long-running payment program to Palestinian "martyrs." Checks drawn on CAB

accounts accompanied by certificates saluting terrorists "who irrigate the land with their blood" are *not* routine. Compl. ¶ 796. Likewise, facilitating payments on behalf of a "charity" customer openly dedicated to funding families of martyrs who, "with their noble blood, have watered the pure soil of Palestine," *id.* ¶¶ 801, 804, indicates, in *Halberstam*'s phrase—"that something illegal was afoot." 705 F.2d at 486.

*Second*, knowingly providing material support to notorious HAMAS leaders and *da'wa* institutions is not routine. The fact that these transactions may have been *executed* in a routine manner—"neutral standing alone" in *Halberstam*'s phrasing—is not dispositive of whether a defendant was generally aware of its role in an illicit scheme. *See Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 625 (E.D.N.Y. 2006) ("[G]iven plaintiff's allegations regarding the knowing and intentional nature of the Bank's activities there is nothing 'routine' about the services the Bank is alleged to provide.") (quoting *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 587-88 (E.D.N.Y. 2005)). In any event, whether "financial services to HAMAS should . . . be viewed as routine . . . . raises questions of fact for a jury to decide." *Linde*, 882 F.3d at 327.

*Third*, contrary to CAB's assertion, Plaintiffs *do* claim it "dealt directly with HAMAS"— for instance, Plaintiffs alleged that CAB provided financial services and maintained accounts for "well-known HAMAS leaders." *See* Compl. ¶¶ 762-76.[12] Further, that HAMAS-controlled institutions were not *themselves* designated FTOs is irrelevant. Courts have already rejected as "silly" and "implausible" the suggestion that HAMAS's FTO status does not extend to institutions under its control. *Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 435 (E.D.N.Y. 2013)

---

[12]     CAB's invention of an extreme "direct[ness]" requirement into the JASTA standard itself conflicts with the express statutory purpose, which is to provide victims of terrorism a remedy against those who "have knowingly or recklessly provided material support or resources, directly or *indirectly*, to the persons or organizations responsible for their injuries." JASTA § 7 (emphasis added). *See also Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 701-02 (7th Cir. 2008) (*en banc*) (providers of material support cannot "escape liability because terrorists and their supporters launder donations through a chain of intermediate organizations").

(citation omitted). *See also id.* ("a reasonable jury could find that the 13 Charities are operating as Hamas front groups."); *Linde*, 97 F. Supp. 3d at 334 (crediting the "substantial record on which the jury could reasonably conclude that these charities were controlled by Hamas"). Moreover, those decisions related to many of the *same* institutions implicated here. In fact, as the *Linde* court pointed out, "the defendants in the Holy Land Foundation trial were convicted for providing material support to Hamas in violation of 18 U.S.C. § 2339B for providing funds to many of the very same charities at issue in this case." *Id.* (citing *El—Mezain,* 664 F.3d 467).

CAB also argues that it could not have known that its customers were HAMAS-controlled institutions or were fundraising for HAMAS because they "perform[ed] actual social work and provide[d] charitable services," or because some were designated only after the relevant period. But some of their customers' counterparties *were* already designated. *See, e.g.*, Compl. ¶¶ 560-62 (CAB processed multiple transfers originating from Al Aqsa Foundation branches to CAB account holders after it was designated an SDGT). The U.S. also designated Sheikh Yassin, founder of HAMAS-controlled *Al-Mujama Al-Islami* and *Al-Jam'iya Al-Islamiya*, *before* the relevant period. *See id.* ¶¶ 657, 720. CAB also fails to mention the Israeli designations that apply to CAB's branches in the Palestinian Territories. *See, e.g.*, *id.* ¶ 574 (Israel designated HLF—a CAB customer from 1998-2003—in 1997 for "transferring monies to families of HAMAS activists, who carried out deadly attacks").

Further, U.S. (and Israeli) designations are far from the sole basis for a bank's alleged knowledge. As noted above, several of CAB's customers were flagship HAMAS institutions and publicly identified as such even in Western media reports going back to the 1990s. They were also controlled by senior HAMAS leaders who were widely known within the Palestinian Territories. *See* Compl. ¶¶ 762-76 (prominent CAB customers), 657 (prominent leaders and founders of CAB

customers). Following the *Linde* trial, the district court found "a *cornucopia* of circumstantial evidence to support a jury finding that defendant knew or was willfully blind to the charities' Hamas affiliations," including "numerous well-known Hamas leaders who occupied leadership roles in the charities." *Linde*, 97 F. Supp. 3d at 334–35 (also citing examples). Such evidence would apply with equal force here.

Unable to find legal support for its reading of JASTA, CAB relies on *O'Sullivan*, informing this Court that the decision relates to providing material support to charities:

> As the court held in *O'Sullivan*, entities such as Al-Ihsan and the other charities at issue clearly provided a variety of legitimate services, and do not "exist solely to further terror." Providing routine banking services to those charities "does not support a plausible inference that those services played a substantial role in bringing about the attacks that injured Plaintiffs."

Br. at 19. (quoting *O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709-LTS-GWG, 2019 WL 1409446, at *6 & n.11 (S.D.N.Y. Mar. 28, 2019)). Contrary to CAB's assertion, *O'Sullivan **does not relate to charities at all***—it relies on this Circuit's holding that providing financial services for a *nation state*, along with some of its largest state-run corporations, which have other "legitimate agencies, operations and programs to fund," is *not* akin to providing material support to an FTO. *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013).

In fact, CAB omits language from the very same paragraph it cites:

> As the *Owens* court recognized, Congress found, in enacting other provisions of the ATA, that a total prohibition on financial support to terrorist organizations was justified because "money earmarked for peaceful activities donated directly to a terrorist organization nevertheless furthers the organization's violent ends." Congress, however, made no similar findings with respect to state sponsors of terrorism, even permitting certain financial transactions with the appropriate licenses.

*O'Sullivan*, 2019 WL 1409446, at *6 (quoting *Owens v. BNP Paribas*, 897 F.3d 266, 276 (D.C. Cir. 2018)). *See also Lelchook v. Commerzbank AG*, No. 10-cv-5795, 2011 WL 4087448, at *1 (S.D.N.Y. Aug. 2, 2011) (the FTO "distinction takes the case outside the rule of *Rothstein*, for *a*

*terrorist front organization has no legitimate function that the United States recognizes*")
(emphasis added).

Likewise, in order to avoid *Linde*'s *controlling* holding that a defendant need not know
about the specific alleged attacks, CAB relies on a lower court case as "quoting from *Linde*" and
"requir[ing] the defendant be 'generally aware' that it was 'playing a role' *in the attacks that
injured Plaintiffs*." Br. at 20 (quoting *Siegel v. HSBC Bank USA, N.A.*, No. 17-CV-6593, 2018 WL
3611967, at *4 (S.D.N.Y. July 27, 2018)) (emphasis added). As shown above, however, this
"interpretation" of *Linde* is incorrect, and CAB's attempt to use it to avoid *Linde* itself is telling.[13]

Finally, CAB cites a pair of related decisions dismissing claims that two European banks
provided material support to HAMAS-controlled institutions: *Strauss v. Crédit Lyonnais, S.A.*, No.
06-cv-702(DLI)(RML), 2019 WL 1492902, *6-7 (E.D.N.Y. Mar. 31, 2019) and *Weiss v. Nat'l
Westminster Bank PLC*, No. 05-cv-4622(DLI)(RML), 2019 WL 1441118, at *6 (E.D.N.Y. Mar.
31, 2019). However, these cases (both of which are under appeal) reviewed a trial-ready record—
the claims survived multiple rounds of motions to dismiss and motions for summary judgment.
The two decisions also erroneously held that plaintiffs must show that the funds defendants
transferred "were used to perpetrate the 15 attacks" at issue, or that the charities "participated in,
planned, trained the perpetrators of, requested that someone carry out, or were the cause of the
attacks giving rise to Plaintiffs' claims." *Id.*

As the Supreme Court explained, Congress and the Executive Branch rejected the
distinction between an FTO's violent, political and social welfare or religious activities, because

---

[13]     On August 8, 2019, the Second Circuit affirmed *Siegel*, once again noting that "although '[s]uch awareness
does not require proof of ... specific intent' or knowledge 'of the specific attacks at issue,' it does require that "the
bank was generally aware that[, by providing financial services to a client,] it was thereby playing a 'role' in [the]
violent or life-endangering activities." *Siegel v. HSBC Bank USA, N.A.*, No. 18-2540-cv, --- F. 3d ----, 2019 WL
3719976, at *5 (2d Cir. Aug. 8, 2019) (quoting *Linde*, 882 F.3d at 329).

"money is fungible" and FTOs "do not maintain legitimate financial firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations. Thus, funds raised ostensibly for charitable purposes have in the past been redirected by some terrorist groups to fund the purchase of arms and explosives." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010) (internal quotation marks omitted).

Lower courts have also repeatedly rejected a requirement that plaintiffs trace transactions to specific attacks. For instance:

> Common sense requires a conclusion that Congress did not intend to limit recovery to those plaintiffs who could show that the *very dollars* sent to a terrorist organization were used to purchase the implements of violence that caused harm to the plaintiff. Such a burden would render the statute powerless to stop the flow of money to international terrorists, and would be incompatible with the legislative history of the ATA.

*Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 429 (E.D.N.Y. 2009). *See also Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 507 (E.D.N.Y. 2012) ("A contribution, if not used directly, arguably would be used indirectly by substituting it for money in Hamas' treasury; money transferred by Hamas' political wing in place of the donation could be used to buy bullets."); *Linde*, 97 F. Supp. 3d at 323 (adopting Judge Gershon's prior ruling that "rejected defendant's argument that plaintiffs were required to trace specific dollars to specific terrorist attacks"). Again, JASTA's stated purpose was to *expand* ATA liability further beyond the bounds set forth in cases like *Goldberg, Gill and Linde*.

Finally, Plaintiffs have pleaded that the terrorist attacks were a "natural and foreseeable consequence" of transferring funds for FTOs and paying families of suicide bombers. *Halberstam*, 705 F.2d at 488. In fact, many of the Plaintiffs here are also plaintiffs in *Weiss* in which the district court held that they had raised as a triable issue that their injuries were "reasonably *foreseeable* ... as a *natural consequence*" of U.K. bank National Westminster Plc's role in transferring Interpal's funds to HAMAS-controlled "charities." 278 F. Supp. 3d 636, 640 (E.D.N.Y. 2017)

(quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)) (emphasis added). *See also*

*Strauss*, 925 F. Supp. 2d at 432 (finding the same for French bank Crédit Lyonnais's support for

CBSP).

### C. Plaintiffs Plausibly Allege That CAB Provided Substantial Assistance to HAMAS.

Plaintiffs have plausibly alleged that CAB "knowingly provid[ed] substantial assistance"

to HAMAS during the relevant period. § 2333(d)(2).[14] *Halberstam* identified six factors to assess

substantial assistance: (1) the nature of the act encouraged, (2) the amount of assistance given by

defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to

the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance.

*Halberstam*, 705 F.2d at 483-84. The Second Circuit explained that "[d]isputed facts pertinent to

these factors and the weight to assign such factors" are factual issues for the trier of fact and not

matters that can be determined as a matter of law. *Linde*, 882 F.3d at 330.

CAB only commits one paragraph of its brief to the substantial assistance factors, arguing

that (with the exception of Abbas al-Sayed) Plaintiffs did not allege that CAB "encouraged" or

"provided any assistance" to anyone who committed, played a role in, or was present for, the

Attacks.[15] Br. at 21. It repeats that it engaged in only "arm's-length transactions," and maintains

that it was not "'one in spirit' with the terrorists" or did not "care" how its HAMAS customers

used its services. *Id.* at 21-22.

---

[14]    Although the "substantiality inquiry for causation is not identical to the substantiality inquiry for aiding and abetting," *Linde*, 882 F.3d at 330, that provision of financial services to HAMAS-controlled institutions proximately caused many of the Attacks already withstood summary judgment in *Weiss*, 768 F.3d at 212, and *Strauss*, 925 F. Supp. 2d at 434, and a challenge to the jury verdict in *Linde*, 97 F. Supp. 3d at 334.

[15]    CAB spends another paragraph portraying the criminal relationship between Linda Hamilton and Bernard Welch as much more "closely linked" than its relationship with its HAMAS customers. Br. at 21. CAB mischaracterizes the case—as explained above, the *Halberstam* court could only determine that Ms. Hamilton knew "that something illegal was afoot," namely, "some type of personal property crime at night." *See supra* at 14. CAB knew that the FTO HAMAS committed terrorist attacks.

As set forth above, CAB provided HAMAS with critical access to the U.S. financial system that allowed it to raise funds globally and easily channel them into the Palestinian Territories, and CAB processed reward payments to the families of suicide bombers and other terrorists. That CAB was not present at the scene of the attacks is immaterial, given the importance of its support to HAMAS. *See Halberstam*, 705 F.3d at 488 (noting defendant was not present for murder but illicit enterprise depended on her assistance). CAB does not challenge the offensiveness of the acts encouraged and the foreseeable consequences—terror financing and terrorist attacks on civilians. That CAB did not "care" if HAMAS used its services to brutally murder civilians is likewise irrelevant[16]—*Halberstam* distinguished "a deliberate long-term intention to participate in an ongoing illicit enterprise" (here, financing HAMAS) from a "passing fancy or impetuous act." *Id.* at 488. CAB's years of providing critical financial services to HAMAS was not a "passing fancy."

## III.   THE STEINHERZ FAMILY'S INJURIES WERE A REASONABLY FORESEEABLE CONSEQUENCE OF THEIR ATTACK.

CAB contends that the claims of Plaintiffs Altea and Jonathan Steinherz and their family members should be dismissed, characterizing the circumstances of their physical and emotional injuries as a "slip-and-fall." On the contrary, these injuries, suffered when Ms. Steinherz was nine months pregnant and attempting to flee with her husband from the site of the December 1, 2001 Ben Yehuda Street bombings (a coordinated double-suicide bombing and car bombing at a pedestrian mall targeting first responders), Compl. ¶¶ 409-10, 461-81, were "reasonably foreseeable consequence[s]" of the attack. *Halberstam*, 705 F.2d at 487. They and every other

---

[16]      CAB takes the "caring" principle from a Seventh Circuit decision that was assessing the *mens rea* necessary for *conspiracy*, *Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018), not aiding and abetting, as alleged here. Further, in the Second Circuit, a conspirator need only *know* the objective of the conspiracy and agree to further it, not "care" about it as a personal motivation. *See United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990) ("The goals of all the participants need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes.").

person in the vicinity were within the zone of intended and foreseeable harm. *See, e.g., In re Farm Family Casualty Ins. Co. (Trapani)*, 301 A.D.2d 740, 740-42 (3d Dep't 2003) (upholding claim premised on injury incurred while plaintiff ran from sparks raining down on her from a powerline that was struck by driver's vehicle). Thus, the Steinherz family's claims should not be dismissed.

## IV.   PLAINTIFFS JULIE AVERBACH, MATANYA NATHANSEN, AND NEVENKA GRITZ HAVE STANDING TO BRING SOLATIUM CLAIMS.

CAB challenges the standing of Plaintiffs Arie Miller (voluntarily dismissed on August 7, 2019), Julie Averbach, Matanya Nathansen and Nevenka Gritz to bring solatium claims for their personal injuries because "they have no standing, as foreign nationals, to assert claims for their own personal injuries," Br. at 23, but CAB cites no case law in support of that proposition. Mr. Nathansen and Ms. Gritz are foreign nationals who lost children who were U.S. nationals and Ms. Averbach is an Israeli national who lost a husband who was a U.S. national. Compl. ¶¶ 11, 29, 124, 127, 376, 381. The ATA's "congressional purpose was to grant a remedy to U.S. nationals *and their families* who suffered from *injury to an individual or property* as a result of international terrorism." *Linde*, 384 F. Supp. 2d at 589 (emphasis added). Ms. Averbach, Mr. Nathansen and Ms. Gritz qualify as "survivors or heirs" of a U.S. national killed by reason of an act of international terrorism. As the late Judge Sifton noted, "it is sufficient for plaintiffs to allege a familial relationship, such as that of child, parent, spouse, or sibling of a U.S. national," *Weiss*, 453 F. Supp. 2d at 620 (citation omitted), as Plaintiffs did here.

## CONCLUSION

For the reasons set forth herein, CAB's motion to dismiss should be denied in its entirety.

Dated: August 9, 2019
      Hackensack, NJ

By:     /s/ Gary M. Osen
        **OSEN LLC**
        Gary M. Osen, Esq.
        Ari Ungar, Esq.
        Michael J. Radine, Esq.
        Dina Gielchinsky, Esq.
        Aaron Schlanger, Esq.
        2 University Plaza, Suite 402
        Hackensack, NJ 07601
        Telephone (201) 265-6400

        **ZUCKERMAN SPAEDER LLP**
        Shawn P. Naunton, Esq.
        485 Madison Avenue, 10th Floor
        New York, NY 10022
        Telephone (646) 746-8655

        **TURNER & ASSOCIATES, P.A.**
        C. Tab Turner, Esq.
        4705 Somers Avenue, Suite 100
        North Little Rock, AR 72116
        Telephone (501) 791-2277

        **KOHN, SWIFT & GRAF, P.C.**
        Steven M. Steingard, Esq.
        Stephen H. Schwartz, Esq.
        Neil L. Glazer, Esq.
        1600 Market Street, Suite 2500
        Philadelphia, PA 19103
        Telephone (215) 238-1700

        Attorneys for Plaintiffs