USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 01/21/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AVERBACH et al.,

                                    Plaintiffs,

                 -against-

CAIRO AMMAN BANK,

                                    Defendant.

**REPORT AND
RECOMMENDATION ON
MOTION TO DISMISS**

**19-cv-0004-GHW-KHP**

**TO:    HONORABLE GREGORY H. WOODS, UNITED STATES DISTRICT JUDGE**
**FROM: KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

This case arises out of a series of terrorist attacks in Israel perpetrated by *Harakat al-Muqawama al-Islamiya* ("Hamas"), a Palestinian terrorist organization, during the Second Intifada—a period of intense Israeli-Palestinian violence between 2000 and 2004 that included attacks on Israeli civilian centers, military installations, and buses.  Plaintiffs include United States nationals injured in the attacks, as well as the estates, heirs, and families of U.S. nationals killed or injured in the attacks.  They bring suit against Defendant Cairo Amman Bank ("CAB") pursuant Anti-Terrorism Act ("ATA") as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), alleging that CAB aided and abetted these attacks by providing financial services to Hamas through affiliated charities and prominent members of Hamas.  18 U.S.C. § 2333, as amended by JASTA, Pub. L. No. 114-222, 130 Stat. 852 (Sept. 28, 2016).

CAB moves to dismiss Plaintiff's claims.  Doc. Nos. 46-47, 52.  CAB asserts that the Court does not have personal jurisdiction over them pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(2), challenges the standing of certain individual Plaintiffs, and argues that Plaintiffs have failed to state a claim under Rule 12(b)(6).

Though Plaintiffs have sufficiently pleaded a basis for personal jurisdiction, Plaintiffs have failed to plead facts sufficient to state a claim for aiding and abetting terrorism under 18 U.S.C. § 2333(d)(2).  Accordingly, I respectfully recommend that CAB's motion to dismiss pursuant to Rule 12(b)(6) be granted.

## FACTUAL BACKGROUND

The Court draws the below recitation of relevant facts from the Complaint.  For the purposes of the instant motion, the Court treats the well-pleaded factual content in the Complaint as true.

Plaintiffs or their family members were killed or injured in one of twelve terrorist attacks that occurred in Israel between December 1, 2001 through August 19, 2003 during the Second Intifada (collectively, the "Attacks").  *See* Appendix A; Compl. ¶ 611, 752 n.14.  Plaintiffs allege that these attacks were committed by terrorists affiliated with Hamas.  *See* Compl. ¶¶ 9, 68, 199, 262, 295, 314, 333-34, 386, 403, 409, 482, 487, 504.  CAB is a financial institution incorporated and headquartered in Amman, Jordan.  *Id*. ¶ 500.  CAB operates branches in Jordan and in the Palestinian territories.  *Id.* ¶¶ 501-02.  Plaintiffs allege that, during the relevant period (1999-2004), CAB knew that Hamas committed terrorist acts, including the Attacks at issue, and knowingly provided Hamas assistance by "transferring significant sums of money to Hamas and its operatives and maintaining bank accounts for its senior operatives and key institutions."  *Id*. ¶ 808.

The following information is provided for context.  Hamas was established in the Gaza Strip in 1987.  *Id.* ¶¶ 515, 518.  It consists of both a civilian infrastructure known as the *da'wa*, that provides for religious and social work, and an operational militant arm, the *Izz al-Din al-*

2

*Qassam* Brigades, which engages in terrorist activities. *Id.* ¶¶ 507-09, 515-18.[1]  Hamas's civilian

infrastructure is made up of charities and other organizations including mosques, hospitals,

religious schools, clinics, and other institutions that provide social services. *See id*. ¶¶ 507, 509-

11, 595-601, 617 n.11, 622-25; *see, e.g., id.* ¶¶ 692, 717.  Plaintiffs allege that Hamas's civil

infrastructure plays a central role in funding Hamas's terrorist activities by acting as sources of

fungible funds that are then allocated from Hamas's civilian infrastructure to Hamas's militant

arm. *Id.* at ¶¶ 617-21, 623-25.  Plaintiffs also allege that Hamas's civil infrastructure further

supports the militant arm by providing payments to operatives (including "martyr payments"),[2]

recruitment support, and propaganda support.  *Id.*

The U.S. government designated Hamas as a Specially Designated Terrorist ("SDT") in

1995. *Id.* ¶ 604.  In 1997, Hamas was designated as a Foreign Terrorist Organization ("FTO")

and continues to carry the FTO designation to this day.[3]  *Id.* ¶ 607.  In 2001, Hamas also was

designated as a Specially Designated Global Terrorist ("SDGT"), making it illegal for any person

within the United States or subject to its jurisdiction to provide material support to Hamas.  *Id.*

¶¶ 607-08; *see* 18 U.S.C. § 2339B (prohibiting the knowing provision of "material support or

resources to a foreign terrorist organization, or attempts or conspir[acy] to do so").

Plaintiffs allege that, in contravention of United States law, CAB aided and abetted

Hamas's terrorism by providing financial services to seventeen charities alleged to be members

of Hamas's civilian infrastructure and to four prominent members of Hamas (collectively, the

---

[1] The Court refers to the two branches, respectively, as the civilian infrastructure and the militant arm.

[2] "Martyr payments" are payments made to the families of terrorist operatives who have been killed, injured, or imprisoned as a result of their terrorist activities. Compl. ¶ 624.

[3] *See* 8 U.S.C. § 1189 (a) (authorizing the Secretary of State to designate foreign organizations that engages in terrorist activity that threatens the security of U.S. nationals or the national security of the United States as foreign terrorist organizations).

"Account Holders"). *See* Appendices B, C, D.  These services included maintaining accounts and processing wire transfers for the Account Holders.  *Id.*  ¶ 752.

The charity Account Holders are not alleged to have directly participated in any of the Attacks.  Instead, Plaintiffs claim that the charity Account Holders' charitable/social activities provide support and funds to Hamas's militant arm.  *Id.* ¶¶ 623-25.  One of the charity Account Holders, the *al-Ansar* Charitable Society, made "martyr payments" to the families of terrorist operatives who were killed, injured, or imprisoned as a result of their terrorist activities.  *Id.* ¶¶ 624-25, 798-804.  Two of the charities were alleged to have been designated by the U.S. government as some form of terrorist organization after the Attacks, one, the Holy Land Foundation ("HLF"), was designated a terrorist organization by the U.S. government in December 2001, and the rest have not been designated by the U.S.  *See, e.g.*, *id.* ¶¶ 575-81, 683, 777; *see* Appendix B.  However, as early as 1997 and 1998, the Israeli government designated some of the charities as affiliated with Hamas or as unlawful.  *See, e.g.*, *id.* ¶¶ 659 (*Al-Mujama Al-Islami*), 697 (*Al-Wafa* Charitable Society), 740 (*Ramallah—Al-Bireh Zakat* Committee).  For example, in 1997, it designated HLF to be a Hamas organization that made martyr payments.  *Id.* ¶ 574.  Additionally, in 1997, the Palestinian Authority temporarily closed some of the charity Account Holders, including HLF, *Al-Mujama Al-Islami and Al-Jam'iya Al-Islamiya,* and identified them as "HAMAS institutions and associations."  *Id.* at ¶ 602

The individual Account Holders are alleged to be spokespeople and leaders in Hamas.  *See id.* ¶ 763 (Abbas al-Sayed), ¶ 767 (Mohamed Saleh Taha), ¶ 770 (Ghazi Hamad); ¶ 774 (Sayed Salem Abu Musameh).  al-Sayed was a planner of the March 27, 2002 Park Hotel

Bombing, one of the Attacks at issue.  *Id.* ¶ 765.  Another individual, Taha, was a founder of *Al-Mujama Al-Islami*, alleged to be a pre-cursor to Hamas.  *Id.* ¶ 647-48, 767-69.

Plaintiffs contend that CAB knew or should have known that the charity Account Holders were affiliated with Hamas based on Western media reports, terrorism designations from the Israeli government, and in some cases, the identity of charity's leadership, who were alleged to be prominent members of Hamas.  *See, e.g.*, *id.* ¶¶ 595-601, 631-34, 659, 667-675, 682, 763, 767, 770, 775.  Plaintiffs similarly claim that CAB knew or should have known that the individual Account Holders were "well-known Hamas leaders," based on Western media reports, Israel's designations, and their public facing roles on behalf of Hamas.  *Id.* ¶¶ 762-76.  Accordingly, they allege that CAB knowingly provided financial services to Hamas organizations and individuals. *Id.* ¶¶ 753-76.

The services that CAB provided to the Account Holders included the transfer of funds internationally.  To facilitate that service, CAB maintained correspondent banking relationships with banks in New York, including Citibank, N.A., Bank of New York, and American Bank Ltd (the "Correspondent Banks").  *Id.* ¶¶ 6-8.  CAB used the Correspondent Banks' infrastructure to effect fund transfers in U.S dollar-denominated funds to its Palestinian customers.  *Id*.  Plaintiffs do not allege that CAB has any branches or employees in New York or any business relationships in New York other than with the Correspondent Banks.  The Complaint identifies a total of twenty-three fund transfers made from December 1999 through September 2001 through CAB's New York-based Correspondent Banks for the benefit of five Account Holders identified in the Complaint.  Plaintiffs contend these transfers are a basis for this Court's

assertion of personal jurisdiction.  *See* Appendix D.  It is not clear from the Complaint whether

and when CAB terminated its banking relationship with each of the Account Holders.[4]

## PROCEDURAL HISTORY

Plaintiffs filed this action on January 1, 2019.  The case was assigned to the Honorable

Gregory H. Woods, who referred the case to the undersigned on May 13, 2019 for general

pretrial management and dispositive motions.  After a hearing on May 23, 2019, the Court

stayed discovery pending the resolution of Defendant's anticipated motion to dismiss.  Doc. No.

34.  The Court found that the burden and costs of discovery as compared to the minimal

prejudice against the Plaintiffs weighed in favor of a stay.  Doc. No. 38, Tr. of Oral Arg., May 23,

2019; *see O'Sullivan v. Deutsche Bank AG*, No. 17CIV8709LTSGWG, 2018 WL 1989585 (S.D.N.Y.

Apr. 26, 2018).  The instant motion to dismiss followed.

## LEGAL STANDARDS

CAB moves to dismiss the complaint on several grounds.  First, it argues that this Court

lacks personal jurisdiction over it.  To survive a motion to dismiss for lack of personal

jurisdiction, plaintiffs must make a prima facie showing that jurisdiction exists.  *Best Van Lines,*

*Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007).  When analyzing whether plaintiffs have met

their burden, courts construe the pleadings and any supporting materials in the light most

favorable to the plaintiffs.  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* ("*Licci IV*"), 732 F.3d

161, 167 (2d Cir. 2013).  In a federal-question case such as this one, a court employs a two-step

inquiry in deciding whether it may assert personal jurisdiction.  *Id.* at 168.  First, the court

determines if personal jurisdiction is permissible under the law of the forum state.  *Id.* (citing

---

[4] CAB states that it closed the account for HLF on December 5, 2001, the day after it was designated as a terrorist
organization by the U.S. government.

*Best Van Lines*, 490 F.3d at 242).  If jurisdiction is permissible under state law, the court then determines if the exercise of personal jurisdiction "is consistent with the due process protections provided by the United States Constitution."  *Id.* at 169 (citing *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d Cir.2007)).

CAB also argues that certain individual Plaintiffs lack standing to sue under JASTA or the U.S. Constitution.  To demonstrate standing, a plaintiff must show that he or she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016).  The most important of the three elements is injury in fact, which requires that the plaintiff show "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical."  *Id.* at 1548 (internal quotation marks omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  The injury requirement is a "low threshold" that can be satisfied by emotional harm.  *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 41 (E.D.N.Y. 2019) (citations omitted).  Pleading traceability merely requires that a plaintiff "demonstrate a causal nexus between the defendant's conduct and injury."  *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (citation omitted).  The traceability requirement presents a relatively low bar for a plaintiff to meet.  *Id.* at 91-92.

Lastly, CAB moves to dismiss for failure to state a claim.  When considering a motion to dismiss under Rule 12(b)(6), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 222 (2d Cir. 2019).  The court, however, does not credit "conclusory allegations or legal conclusions

masquerading as factual conclusions. *Siegel*, 933 F.3d at 222 (quoting *In re Facebook, Inc.,*
*Initial Public Offering Derivative Litig.*, 797 F.3d 148, 159 (2d Cir. 2015)). To survive the motion,
the complaint must contain "sufficient factual matter . . . to 'state a claim to relief that is
plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v.*
*Twombly*, 550 U.S. 544, 570 (2007)). While detailed factual allegations are not required, the
complaint must contain more than mere "labels and conclusions or a formulaic recitation of the
elements of a cause of action." *Id.* (internal quotation marks and citation omitted). "[N]aked
assertions devoid of further factual enhancement" are insufficient to survive a motion to
dismiss. *Id.* (internal quotation marks, alteration, and citation omitted). As the United States
Supreme Court explained in *Ashcroft v. Iqbal*, the "plausibility standard" asks for "more than a
sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks and
citation omitted).

JASTA, the law under which Plaintiffs bring this suit, renders liable "any person who aids
and abets, by knowingly providing substantial assistance [to], or who conspires with the person
who committed[,] such an act of international terrorism." *Siegel*, 933 F.3d at 222-23
(alterations in original) (quoting 18 U.S.C. § 2333(d)(2)); *see generally* JASTA, Pub. L. No. 114-
222 at Statutory Note. Congress enacted JASTA "'to provide civil litigants with the broadest
possible basis, consistent with the Constitution of the United States, to seek relief against
persons, entities, and foreign countries' that 'have provided material support, directly or
indirectly,'" to organizations or persons that engage in terrorist activities against the U.S.
*Siegel*, 933 F.3d at 222 (quoting JASTA, Pub. L. No. 114-222 at Statutory Note § 2(b) (Purpose).

Aiding and abetting claims under JASTA are evaluated pursuant to a two-pronged analysis set forth in *Halberstam v. Welch,* 705 F.2d 472 (D.C. Cir. 1983).  JASTA, Pub. L. No. 114-222 at Statutory Note § 2(a)(5) (Findings).  This includes assessing whether the defendant was generally aware of its role as part of an illegal or tortious activity when it provided assistance to the person or entity that committed the wrongful act that caused injury to the plaintiff and whether the defendant knowingly provided substantial assistance for that act.  *Id*. at 477.

### DISCUSSION

The Court first addresses whether it may exert personal jurisdiction over CAB.  The Court then proceeds to assessing whether certain individual Plaintiffs have standing to bring claims against CAB.  The Court then addresses whether Plaintiffs have adequately pleaded the elements of JASTA aiding and abetting.

### A.  Personal Jurisdiction

Under Rule 4(k)(1)(A), a federal court may exercise personal jurisdiction to the extent allowed by law of the state where it sits.  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* ("*Licci II*"), 673 F.3d 50, 61 (2d Cir. 2012).  The applicable New York long-arm statute provides, in relevant part, that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state" when the plaintiff's claim arises from the business that the non-domiciliary transacted in New York.  N.Y.C.P.L.R. 302(a)(1); *Licci IV*, 732 F.3d at 168.  As a threshold issue, a plaintiff must plead that the defendant "purposefully avail[ed] itself of the privilege of conducting activities in New York thereby invoking the benefits and protections of its law."  *Amigo Foods Corp. v. Marine Midland Bank-New York* ("*Amigo Foods I*"), 348 N.E.2d 581, 584 (1976); *accord Licci II*, 673 F.3d 50, 61.

9

In a similar case, *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* (referred to herein as *Licci II*),[5] the United States Court of Appeals for the Second Circuit asked the New York State Court of Appeals to determine whether the New York long-arm statute could reach Lebanese Canadian Bank ("LCB"), a foreign bank accused of assisting terrorists.  673 F.3d at 50, 66–75. Similar to CAB, LCB was accused of using correspondent banking accounts in New York to "conduct[] dozens of international wire transfers on behalf of" an organization alleged to be part of Hezbollah's[6] financial arm.  *Id.* at 55.  The plaintiffs asserted theories of primary liability under the ATA, aiding and abetting liability under the ATA (pre-JASTA) and international law, and violation of Israeli laws.  *Licci IV*, 732 F.3d at 166.  The New York Court of Appeals found that the requirements of the two-prong test for establishing personal jurisdiction over LCB under New York's long-arm statute were met.  *Id.* at 168–69; *see Licci v. Lebanese Canadian Bank* ("*Licci III*"), 984 N.E.2d 893 (2012).   Under the test, the plaintiff must plead facts showing that (1) the foreign bank's maintenance and use of the correspondent account was purposeful; and (2) a nexus or substantial relationship between the claim and use of the correspondent account.  *Licci IV*, 732 F.3d at 168-69 (applying test).

With regard to the first factor, purposeful use of a correspondent account may be considered the "transaction of business" for purposes of New York's long-arm statute.  *Licci IV*, 732 F.3d at 168.  Purposeful use can be demonstrated by showing repeated use of a

---

[5] There are a number of opinions arising from the *Licci* case.  *See Licci v. American Express Bank Ltd.*, 08-cv-07253-GBD.  Some bear the *Licci* caption and some do not.  In this decision, the Court cites only to the four *Licci*-captioned cases that discuss personal jurisdiction under New York law.

[6] The transliterations "Hizbollah" and "Hezbollah" refer to the same organization.  *Compare Licci II*, 673 F.3d at 54 *with Licci by Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201, 205 (2d Cir. 2016) (discussing same facts and organization but with different transliterations).  The Court preferences the use of "Hezbollah" because the Complaint uses that spelling but notes that other courts in this Circuit have also used "Hizbollah."

correspondent account, which evinces the foreign bank's taking advantage of "New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci III,* 984 N.E.2d at 900 (citing *Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 774 N.E.2d 696, 701 (2002)); *Licci II*, 673 F.3d at 66; *see Al Rushaid, et al. v. Pictet & Cie, et al.*, 68 N.E.3d 1 (2016). Thus, the "frequency and deliberate nature of [the foreign bank's] use of its correspondent account" is critical to the assessment of whether the foreign bank purposely availed itself of the advantages of conducting business in New York. *Licci IV*, 732 F.3d at 168 (internal quotation marks omitted) (citing *Licci III*, N.E.2d at 901); *see also Amigo Foods Corp. v. Marine Midland Bank-New York* ("*Amigo Foods II*") 402 N.Y.S.2d 406 (App. Div. 1978) (finding no personal jurisdiction where there was only a single fund transfer through correspondent account that the defendant bank rejected at target account holder's direction), *aff'd*, 387 N.E.2d 226 (1979).

With regard to the second factor, whether there is a nexus between the plaintiff's claim and the defendant's use of the correspondent account, at least one of the elements of the pleaded cause of action must arise from the use of the correspondent account. *See Licci IV*, 732 F.3d at 169 (citing *Licci III*, 984 N.E.2d at 901).

### 1. Purposeful Availment

Plaintiffs have alleged that there were twenty-three fund transfers through the Correspondent Banks in the two years immediately prior to the first of the Attacks. Appendix D; Compl. ¶¶ 579, 580, 764, 769, 772, 776. The Second Circuit noted that the use of a correspondent account, standing alone, can be grounds to find personal jurisdiction so long as the use is purposeful. *See Licci IV*, 732 F.3d at 168. In *Licci,* the LCB used its correspondent

accounts for dozens of transfers for the *Shahid* Foundation, allegedly a part of the financial arm of Hizballah. *Licci III*, 984 N.E.2d at 894. These dozens of transfers constituted repeated, and thus purposeful, use of the New York-based accounts and a "course of dealing" sufficient to satisfy the transaction of business requirement of New York's long-arm statute. *Licci III*, 984 N.E.2d at 900 (internal citation omitted).

Here, Plaintiffs identify fewer transfers through the Correspondent Banks than identified by the plaintiffs in *Licci*. *See* Appendix D. The most transfers received by any one of the Account Holders was seven. Also, the time period during which the transfers took place is more concentrated in this case than in *Licci*. The fund transfers in *Licci* took place from 2004 until July 2006, a period of more than two years. *Licci v. Am. Exp. Bank Ltd.*, 704 F. Supp. 2d 403, 405 (S.D.N.Y. 2010) ("*Licci I*"), *aff'd in part, Licci II, vacated in part, Licci IV*. The transfers here involving any single Account Holder took place over less time and altogether over a period of less than two years (that is, between December 1999 and September 2001). *See* Appendix D; Compl. ¶¶ 579-580 (two transfers to HLF in December 1999 and January 2001), 764 (seven transfers to al-Sayed from February 2001 to May 2001), 769 (five transfers to Taha from December 2000 to September 2001), 772 (six transfers to Hamad from October 2000 to April 2001), 776 (three transfers to Musameh from February 2001 to September 2001). Nevertheless, this Court finds that Plaintiffs have pleaded sufficient use of the correspondent accounts in New York to demonstrate purposeful availment.

When holding that the defendant in *Licci* had established a course of dealing and thereby purposefully availed itself of transacting business in New York for purposes of New York's long-arm statute, the New York Court of Appeals cited *Indosuez International Finance*

*B.V. v. National Reserve Bank*, 774 N.E.2d 696, 701 (2002) with approval. *Licci III*, 84 N.E.2d at 897, 900. *Indosuez's* course of dealing involved only six New York-based banking transactions in a period of less than two years. *Indosuez*, 774 N.E.2d at 701. This was sufficient to constitute a course of dealing in New York and a basis for the exercise of personal jurisdiction over the foreign bank defendant. *Id*.; *see Licci III*, 84 N.E.2d at 897 (citing *Indosuez* in describing a course of dealing)**.** Thus, dozens of transfers over an extended period are not necessary to establish a course of dealing and purposeful use of the New York correspondent accounts. Because Plaintiffs plead more overall transactions than in *Indosuez* over a similar time frame, Plaintiffs have sufficiently pleaded a course of dealing by CAB with the Correspondent Banks to demonstrate purposeful use of them. *Licci III*, 84 N.E.2d at 900.

To the extent CAB argues that it was merely the passive recipient of fund transfers and did not purposefully avail itself of the correspondent accounts, its arguments are unpersuasive. In *Amigo Foods Corp. v. Marine Midland Bank-New York*, the court found that the use of a New York correspondent account was insufficient to establish personal jurisdiction because the foreign bank was a passive recipient of funds. 402 N.Y.S.2d at 408. However, in that case, the foreign bank rejected the one and only fund transfer that tied it to New York. *Id.* at 407. In the recent *Al Rushaid v. Pictet & Cie* case, the New York Court of Appeals explained that *Amigo Foods* provided an example of a situation where the use of the correspondent account was *not* purposeful but also that a plaintiff need only show that the contacts and use of the correspondent account was more than just "happenstance."[7] 28 N.Y.3d 316, 327 (2016). *Al*

---

[7] The other cases that Plaintiffs cite to for the proposition that "passive receipt of funds that pass through [an] account is insufficient to confer jurisdiction over a bank," are inapposite. *See* Def.'s Opp'n at 9. Those cases either

*Rushaid* expressly rejected the argument CAB advances by holding that a finding of purposeful availment of a correspondent account "[does] not require that the foreign bank itself direct the deposits, only that the bank affirmatively act on them."  68 N.E.3d at 9.

When a foreign bank repeatedly approves deposits and the movement of funds through a correspondent account, it is transacting business; that the foreign bank did not initiate the transaction does not change the analysis.[8]  *Id.* at 10; *see also Licci IV*, 732 F.3d at 168 ("[*Amigo Foods I*] stands for the proposition that the *use* of a New York correspondent account, standing alone, may be considered a 'transaction of business' . . . if the defendant's use of the correspondent account was purposeful." (emphasis added)); *Official Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 65 (S.D.N.Y. 2016) ("Significantly, *Amigo Foods* did not hold that jurisdiction did not lie simply because the defendant's use of the correspondent account was limited to a single instance; nor did it hold that jurisdiction did not lie because the defendant had received, rather than transferred, the funds at issue.").  Thus, crediting funds in a correspondent account is volitional use of the account, and repeated crediting of funds is a course of conduct sufficient to demonstrate purposeful use.

Here, unlike in *Amigo Foods*, there was no refusal to act on the fund transfers through the correspondent accounts.  Making reasonable inferences in Plaintiffs' favor, CAB used the

---

did not involve a correspondent bank, *Hau Yin To v. HSBC Holdings PLC,* No. 15CV3590-LTS-SN, 2017 WL 816136, at *7 (S.D.N.Y. Mar. 1, 2017), *aff'd*, 700 F. App'x 66 (2d Cir. 2017) or were decided before the *Licci* line of cases and their progeny, *Dale v. Banque All. S.A.*, No. 02 CIV. 3592 RCCKNF, 2004 WL 2389894, at *5 (S.D.N.Y. Oct. 22, 2004). *See Vasquez v. Hong Kong & Shanghai Banking Corp. Ltd.,* No. 18 CIV. 1876 (PAE), 2019 WL 2327810, at *12 (S.D.N.Y. May 30, 2019), at *12 n.4 (distinguishing *Hau Yin To* as not involving the maintenance and usage of correspondent banks).

[8] Though not controlling, Judge Garcia's concurrence in *Al Rushaid* is informative.  In *Al Rushaid*, as here, "there can be no dispute that once the money was in the correspondent account—a time when only the [foreign bank] held title to the funds—the bank affirmatively and deliberately transferred the money" elsewhere.  68 N.E.3d at 15 (Garcia, J. concurring).

money transferred into the correspondent accounts to then credit money to the Account Holders at least twenty-three times, indicating volitional activity that constitutes purposeful use of the accounts.[9]  *See Licci II*, 20 N.Y.3d at 340 (speculating that while "LCB could have routed the dollar transactions on behalf of Shahid elsewhere," based on the facts pleaded, it was reasonable to infer that using a New York correspondent account "was cheaper and easier for LCB than other options, and whatever financial and other benefits LCB enjoyed as a result allowed the bank to retain" its customers).

There were seven transfers to al-Sayed, five transfers to Taha, and six transfers to Hamad, even without considering all the transfers as a whole.  Compl. ¶¶ 764, 769, 772.  Under *Licci* and *Al Rushaid*, this is enough to establish a course of dealing and therefore the purposeful availment prong of New York's long-arm inquiry.

### 2.  Articulable Nexus

In addition to purposeful availment the court also must be satisfied that there is "an articulable nexus, or substantial relationship, between the claim asserted and the [defendant's] acts that occurred in New York" to find personal jurisdiction.  *See, e.g.*, *Licci II*, 673 F.3d at 66. Establishing a nexus or substantial relationship is not heavy burden; a plaintiff need only plead facts showing that the foreign bank's use of its correspondent accounts "is not completely unmoored from the [legal claim], regardless of the ultimate merits of the claim."  *Licci III*, 984 N.E.2d at 900 ("[T]he [nexus] inquiry under [New York's long-arm statute] is relatively

---

[9] The parties disagree about whether CAB could have processed their fund transfers elsewhere in the briefing.  *See* Pls.' Opp'n at 11; Defs.' Reply at 2 n.3.  This dispute merely underscores the central importance of the New York banking system and CAB's need to offer services through New York.  Either as the only option or amongst a number, CAB still had to offer New York as an option.

permissive.").  So long as Plaintiffs have adequately pleaded that at least one of the elements of their claims arose from CAB's use of the New York correspondent accounts, Plaintiffs will have met their burden.  *See Licci IV,* 732 F.3d at 169-70 (citing *Licci III*, 84 N.E.2d at 900-02).

CAB has not contested the nexus requirement, but the Court addresses it nonetheless because the Court has an independent duty to determine whether personal jurisdiction exists. To establish their JASTA aiding and abetting claim, Plaintiffs must plead that (1) the party whom CAB aided performed a wrongful act that caused an injury, (2) CAB was generally aware of his role as part of an overall illegal or tortious activity at the time that he provided the assistance, and (3) CAB knowingly and substantially assisted the principal violation.  *See Halberstam*, 705 F.2d at 477; JASTA, Pub. L. No. 114-222 at Statutory Note § 2(a)(5) (Findings).  Here, Plaintiffs have properly pleaded (and CAB has not contested) that the party CAB allegedly aided, Hamas, committed terrorist acts that caused Plaintiffs' injuries.  Plaintiffs also have properly alleged that the aid provided to Hamas came about, in part, via money transfers through CAB's New York correspondent accounts.  These allegations are sufficient to establish the second prong of New York's long-arm inquiry. *Licci III*, 984 N.E.2d at 901.  Thus, the Court may exercise jurisdiction over CAB pursuant to Rule 4(k)(1)(A) and New York's long-arm statute.

### 3.  Due Process

Finding that New York's long-arm statute reaches CAB does not end the analysis. The exercise of personal jurisdiction also must be consistent with the Constitution's due process protections.  *Licci IV*, 732 F.3d at 169 (citing *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d Cir. 2007)).  CAB argues that, even if the Court were to find that the requirements of New York's

long-arm statute are met, the Court should refuse to exercise of personal jurisdiction for due process reasons.  CAB offers no on-point case authority supporting this argument.

The due process inquiry focuses on whether the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).  Here, the Court asserts specific jurisdiction and so must analyze the relationship between the forum and the claims.  *Licci IV*, 732 F.3d at 169–70.  To do this, a court first looks at whether "the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being hailed into court there."  *Id.* at 170 (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir.2002)).  Then the court "determine[s] whether the assertion of personal jurisdiction would comport with fair play and substantial justice."  *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).  As to the latter determination, courts consider factors including "the burden on the defendant, the interests of the forum State, [] the plaintiff's interest in obtaining relief," the "judicial system's interest in obtaining the most efficient resolution of controversies," and the states' interest in "furthering fundamental substantive social policies."  *Asahi Metal Indus. Co. v. Superior Court of California, Solano Cty.*, 480 U.S. 102, 113 (1987).  It is the rare case when constitutional due process principles prohibit the exercise of personal jurisdiction that is otherwise permissible under New York's long-arm statute.  *Licci IV*, 732 F.3d at 170.

In *Licci,* the Second Circuit "conclude[d] that the selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs for which the

plaintiffs seek redress, constitutes 'purposeful [] avail[ment] . . . of the privilege of doing business in New York.'"  *See Licci IV*, 732 F.3d at 171 (alterations in original) (citation omitted). Likewise, CAB's "selection and repeated use of New York's banking system" to allegedly assist Hamas constitutes purposeful availment sufficient to permit the assertion of specific jurisdiction in keeping with the Constitution's due process protections.  *See Licci IV*, 732 F.3d at 171 (citation omitted).

The Second Circuit in *Licci* also found that the exercise of jurisdiction over the foreign bank did not offend traditional notions of fair play and substantial justice, because "'modern communication and transportation ease' any burden the defense of this case in New York might impose." *Licci IV,* 732 F.3d at 173–74 (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 574 (2d Cir. 1996)).  The court further found that the federal and state governments had an "interest in monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism."  *Id.*  For the same reasons articulated in *Licci*, the exercise of personal jurisdiction over CAB in this case does not offend fair play and substantial justice and is thus consistent with constitutional due process guarantees.

For all the above reasons, I recommend finding that the Court may exercise personal jurisdiction over CAB and rejecting CAB's motion on this point.

**B.  Standing**

**1.  Plaintiffs Julie Averbach, Matanya Nathansen, and Nevenka Gritz**

CAB argues that Plaintiffs Julie Averbach, Matanya Nathansen, and Nevenka Gritz may not bring claims on their own behalf under JASTA.[10]  Averbach, Nathansen, and Gritz are all foreign nationals who are bringing claims for personal injuries including, *inter alia*, physical injury, pain and suffering, loss of companionship, and emotional distress.  *See* Compl. ¶¶ 29, 33, 127, 131, 381, 385.  The relevant statute, 18 U.S.C. § 2333(a), states:  "Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."

Plaintiffs argue that Averbach, Nathansen, and Gritz are survivors and heirs of U.S. nationals killed in the Attacks and should be able to bring claims on their own behalf, not just on behalf of their deceased relatives.  They read Section 2333(a) broadly to encompass such claims and rely on two pre-JASTA opinions in support of their argument.  The first opinion, *Linde v. Arab Bank, PLC* ("*Linde I*"), allowed U.S. citizens to sue for non-physical injuries, stating that "[t]he claims of the *U.S. nationals* suing based on their nonphysical injuries resulting from acts of international terrorism will not be dismissed."  384 F. Supp. 2d 571, 589 (E.D.N.Y. 2005) (emphasis added).  The second opinion, *Weiss v. National Westminster Bank PLC* ("*Weiss I*"), dealt with a procedural issue and held that it was unnecessary for plaintiffs to "specifically use the terms 'heirs' or 'survivors' in alleging their relationship to U.S. nationals.  Rather, it is sufficient for plaintiffs to allege a familial relationship."  453 F. Supp. 2d 609, 620 (E.D.N.Y.

---

[10] CAB also challenged the individual claims of Mr. Arie Miller.  Mr. Miller has voluntarily dismissed his claim.  *See* Pls.' Opp'n at 25.

2006).  Neither case substantively addressed whether foreign nationals could sue for their personal injuries.  CAB cites to Justice Sotomayor's dissent in *Jesner v. Arab Bank*, *PLC*, for the proposition that "the ATA 'created a civil cause of action for *U.S. nationals* injured abroad by an act of international terrorism.'"  Def.'s Reply at 10 (emphasis in original) (quoting 138 S. Ct. 1386, 1433 (2018) (Sotomayor, J. dissenting)).  However, the *Jesner* case involved the Alien Tort Statute ("ATS") and held that the ATS did not apply to suits against foreign corporations. *Jesner*, 138 S. Ct. at 1390.  Justice Sotomayor's dissent addressed the ATA only insofar as the ATA expressly provided for corporate liability in suits brought by U.S. nationals.  *Id.* at 1433-34 In sum, none of the cases cited by the parties are on point.

While not a model of grammatical clarity, this Court reads the text of the statute to bar personal injury claims by foreign nationals insofar as it specifies that the injury must be to a "national of the United States" and that suit may be brought by the injured national "or his or her estate, survivors, or heirs" for injuries to the national.  18 U.S.C. § 2333(a).  Said another way, the first phrase of the statute defines the injury that forms the basis for the cause of action, and the word "therefor" appears to refer back to that defined injury, confining the ambit of liability to injuries to U.S. nationals.  The first phrase also identifies the injured U.S. national as a person with standing to sue.  The phrase "or his or her estate, survivors, or heirs" appears to extend the right to sue to the injured national's estate, survivors and heirs insofar as they are suing on behalf of the U.S. national that was injured by the act of terrorism.  To read the text in the manner suggested by Plaintiffs would mean that Congress was concerned with protecting non-U.S. nationals for injuries that they personally suffered outside of the United States.  Absent textual support otherwise, this clearly cannot be the correct reading.  Moreover,

the ATA's legislative history, cited by CAB, supports this Court's interpretation of the injuries that may be the basis for a JASTA claim. *See* Antiterrorism Act of 1990: Hearing on S. 2465 Before the Subcomm. on Courts & Admin. Practice of the S. Comm. on the Judiciary, at 46, 101st Cong. 84 (1990) (statement of Sen. Strom Thurmond) (stating that the ATA would allow family members to file a lawsuit *on behalf of* a slain or injured relative).

Thus, this Court respectfully recommends that CAB's motion to dismiss the personal claims of Averbach, Nathansen, and Gritz for lack of JASTA statutory standing be granted.

### 2. Steinherz Family[11]

CAB challenges the Article III standing of the Steinherz Family. Article III of the U.S. Constitution limits the jurisdiction of federal courts to decide cases and controversies brought by plaintiffs with a sufficient interest in the dispute. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-61 (1992). To have standing, the plaintiff's injury must, among other things, be fairly traceable to the actions of the defendant. *Id.*

Each member of the Steinherz Family brings suit under JASTA based on injuries suffered by Altea Steinherz, a U.S. national, on December 1, 2001, on the day of the Ben Yehuda Street Bombings. *See* Compl. ¶¶ 461-81. Altea and her husband were at a restaurant when two bombs exploded nearby. *Id.* ¶¶ 461-64. Believing the bombing had ended, they began to walk home. *Id.* ¶ 465. While walking home, they "saw a crazed-looking man run past them." *Id.* ¶ 466. Fearing that the man might be a bomber, Altea, who was nine-months pregnant with the couple's second child, "insisted that the couple turn around" and run away. She then fell while

---

[11] The Steinherz Family includes Plaintiffs Altea, Jonathan, Temima, Peter, and Laurel Steinherz, as well as Joseph Ginzberg. All are U.S. nationals.

running away and broke her arm. *Id.* ¶¶ 466-67. Altea feared for the condition of her unborn

child until he was born eleven days later, fortunately unharmed. *Id.* ¶¶ 469-74.

CAB argues that the Steinherz Family does not have standing because Altea's injuries are

not fairly traceable to CAB's financial services. *See Spokeo*, 136 S. Ct. at 1547 ("A plaintiff

invoking federal jurisdiction bears the burden of establishing . . . an injury in fact [] fairly

traceable to the challenged conduct of the defendant. . . ."). In the alternative, CAB argues that

the appearance of the "crazed-looking man," and Altea's subsequent decision to run, was an

intervening cause. Plaintiffs counter that Altea was in the zone of harm, and therefore, injuries

arising from fleeing the bombing were foreseeable.

A plaintiff "must demonstrate a causal nexus between the defendant's conduct and the

injury" to meet the "traceability requirement for Article III standing." *Rothstein*, 708 F.3d at 91

(citation omitted). The more indirect an injury, the more difficult it is to meet that burden. *Id.*

(citing *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 37, 96 S.Ct. 1917, 48

L.Ed.2d 450 (1976)). However, the burden is modest and lower than that required to

demonstrate proximate causation; where an intervening cause may foreclose a finding of

proximate cause for tort liability purposes, it does not necessarily foreclose a finding that the

injury is fairly traceable to the defendant's conduct for Article III standing purposes. *Id.* at 92.

Here, it is uncontested that plaintiffs injured by international terrorism, generally, can trace

their injuries sustained in the terror attacks to the financial services provided by defendants like

CAB. *See generally id.* Altea was hurt in the wake of a Hamas terrorist attack that occurred

nearby. There were multiple explosions. It was neither unreasonable nor unforeseeable that

the bombings would cause general fear and specific fear that another bomb may be set off later

as part of the same attack.  The very nature of terrorism is the use of violence or the threat of violence to create a climate of fear in a population, impacting the psyches of all those around the event not just the immediate victims.  Plaintiffs allege that CAB aided and abetted Hamas to carry out the Attack by providing financial services.  In light of the low burden of establishing the "fairly traceable" element of Article III standing, and given the circumstances under which Altea was injured and the goal of the bombings, Alteea's injury is fairly traceable to the bombings.  Thus, I respectfully recommend rejecting CAB's argument that the Steinherz Family lacks Article III standing.

### C.  Aiding and Abetting Liability Under JASTA

Having addressed the threshold jurisdictional issues raised by CAB, I next address CAB's argument that Plaintiffs fail to state a claim for aiding and abetting terrorism under JASTA.  As noted above, there are three elements to a JASTA claim: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam*, 705 F.2d at 477; *see* JASTA, Pub. L. No. 114-222 at Statutory Note § 2(a)(5).  These elements were first set forth in *Halberstam*, a non-JASTA case, and then adopted for JASTA, which similarly provides a cause of action for aiding and abetting.

The plaintiff in *Halberstam* was the spouse of a man killed by Welch, a burglar.  The defendant in *Halberstam* was Hamilton, Welch's long-time live-in companion, accountant, and secretary.  Halberstam alleged that Hamilton engaged in a joint criminal venture and conspiracy with Welch and sued Hamilton for civil conspiracy and aiding and abetting Welch's crimes.  705

F.2d at 474-76.  In her defense, Hamilton claimed that she did not know that the Welch was a burglar.  *Id.*  However, she ultimately was found liable for aiding and abetting Welch's crimes because she was deemed to have knowingly substantially assisted Welch by providing services in aid of his crimes.  *Id.* at 488-89.  The specific services she provided to aid in the crimes included typing transmittal letters for sale of the stolen goods, maintaining accounts for Welch, and handling the financial transactions that disposed of the ill-gotten gains.  *Id.* at 486.

The first element of the aiding and abetting claim was not at issue because there was no question that Welch committed a wrongful act that caused injury to the plaintiff.  *Id.* at 488.  As for the second element, the court concluded that Hamilton was generally aware that she was assisting Welch in the commission of crimes.  Specifically the court stated that "it defies credulity that Hamilton did not know something illegal was afoot," where there were many clues.  *Id.* at 486.  Even if Hamilton did not know that Welch was a burglar, given the types of services provided and the time period over which they were provided together with an unusual influx of wealth, the court found Hamilton had the mens rea required for general awareness of burglary and the potential for a murder to occur therefore.  *Id.* at 488.  The court stated, "it was enough that she knew [that Welch] was involved in some type of personal property crime at night . . . because violence and killing is a foreseeable risk in [Welch's burglary]."  *Id*.  As to the third element, the court found that Hamilton provided substantial assistance to Welch, pointing to the considerable amount of administrative and financial work done over a five-year period, which indicated her intent to help Welch succeed in his criminal enterprise.  *Id.*

In the context of a JASTA claim, the *Halberstam* elements can be stated as follows:  (1) the party whom the defendant aided must have committed an act of international terrorism

that injured the plaintiff; (2) the defendant must have been generally aware it was assuming a role in the party's terrorist activities at the time it provided the assistance; and (3) the defendant must knowingly and substantially have assisted the act of terrorism that injured the plaintiff. *See, e.g., Siegel,* 933 F.3d at 223–24; *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 529 (S.D.N.Y. 2019).  Here, there is no dispute that Plaintiffs have satisfied their pleading burden as to the first element of a JASTA claim; that is, they have pleaded that Hamas, an SDGT, committed various international terrorist attacks that caused injuries to Plaintiffs or their relatives.[12]  Accordingly, the Court's discussion focuses on whether Plaintiffs have met their pleading burden as to the second and third elements of their JASTA claim.

A recent, nearly identical case, *Kaplan v. Lebanese Canadian Bank*, decided by the Honorable George B. Daniels, is instructive to this Court's analysis.[13]  405 F. Supp. 3d 525.  In *Kaplan*, the plaintiffs were American citizens injured in rocket attacks by Hezbollah in Israel. 405 F. Supp. 3d at 528.  The plaintiffs alleged that LCB, the defendant bank, maintained bank accounts for two Hezbollah leaders and three Hezbollah-controlled entities (as described in *Kaplan*, collectively the "Five Customers").  *Id.*  The entities included the Shahid Foundation ("Shahid"), which provided "martyr payments" to Hezbollah terrorists and their families, as well as two other organizations which were alleged to serve as Hezbollah's "unofficial treasury" (collectively, the "Organization Customers").  *Id.* at 528-29; *see Licci v. American Express Bank*,

---

[12] "International terrorism" is defined as activities that (1) "involve violent acts or acts dangerous to human life"; (2) qualify as "a violation of the criminal laws of the United States or of any State" if committed within the United States; (3) "appear to be intended" to "intimidate or coerce a civilian population," to "influence the policy of a government by intimidation or coercion," or to "affect the conduct of a government by mass destruction, assassination or kidnapping"; and (4) "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries." 18 U.S.C. § 2331(1).

[13] The *Kaplan* decision is part of the same case as the *Licci* opinions and involves the same core parties and facts. 405 F. Supp. 3d at 537.

1:08-cv-07253-GBD, Doc. No. 99, Second Amended Compl. ("SAC") ¶¶ 38, 81.  As in this case, the plaintiffs asserted that LCB aided and abetted Hezbollah in carrying out the rocket attacks that injured the plaintiffs by processing certain money transfers through New York-based correspondent bank accounts.  *Kaplan*, 405 F. Supp. 3d at 528-29. As in this case, the defendant bank was alleged to hold accounts in the name of terrorist-affiliated organizations that were part of a terrorist organization's civilian infrastructure, as well as in the name of individuals alleged to be prominent leaders of the terrorist organizations at issue.  *Id.*  As in this case, the plaintiffs cited to various media sources and reports to show that the Accounts were affiliated with Hezbollah and demonstrate the likelihood of the bank's general awareness that it was assisting Hezbollah.  *Id.*  As in this case, one of the organizations was alleged to have made "martyr payments" to the families of individuals terrorists killed while committing terrorist acts.  As in this case, the plaintiffs alleged that, by providing financial services such as fund transfers through correspondent bank accounts, the bank played a substantial role in the attacks, because the attacks could not have been carried out without financial support.  As in this case, the plaintiffs relied on the fungibility of money to draw the connection between ostensibly neutral banking services and the terror attacks at issue.   Judge Daniels dismissed the claims, finding that plaintiffs failed to adequately plead the general awareness and assistance elements of JASTA aiding and abetting.  *Id.* at *5.

The *Kaplan* decision is in keeping with the trend in JASTA case law toward disallowing claims against defendants who did not deal directly with a terrorist organization or its proxy. *Freeman v. HSBC Holdings PLC*, No. 14CV6601PKCCLP, 2019 WL 4452364, at *1 n.2 (E.D.N.Y.

Sept. 16, 2019).  As in *Kaplan*, and as further discussed below, Plaintiffs have not met their pleading burden as to the second and third elements of their JASTA claim.

    **1.  General Awareness**

To meet the general-awareness element of their claim, Plaintiffs "must plausibly allege that defendant was 'aware that, by assisting the principal, it is itself assuming a role in terrorist activities.'"  *Siegel,* 933 F.3d, 224 (quoting *Linde v. Arab Bank* ("*Linde II*"), *PLC*, 882 F.3d 314, 329 (2d Cir. 2018)).  General awareness is not specific knowledge of or intent to commit the specific attacks that injured the Plaintiffs, but awareness that "by providing financial services to a client," it was assuming a role in terrorist activities.  *Id.*; *accord Weiss v. National Westminster Bank PLC*, 381 F. Supp. 3d 223, 239 (E.D.N.Y. 2019) ("*Weiss II*"[14]); *Linde II*, 882 F.3d at 329 ("[A]iding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization;"* it requires the defendant's awareness that "it is assuming a [role] in terrorist activities.") (emphasis in original).

Allegations that a defendant bank was generally aware it was playing a role is terrorist activities by virtue of media and non-U.S. governmental designations that its account holders supported or were terrorist organizations are insufficient absent allegations that the defendant actually read or was aware of the designations and media reports.  *Kaplan*, 2019 WL 4869617, *6-7.  As in *Kaplan*, Plaintiffs failed to allege that CAB was aware of or read any of sources tying its clients to Hamas.  *See* 405 F. Supp. 3d at 535.  Moreover, a defendant financial institution's "failure to perform due diligence on clients or [even failure] to adhere to sanctions and

---

[14] The *Weiss* litigation involves many opinions.  Because this Report and Recommendation only references *Weiss v. National Westminster Bank PLC*, 453 F. Supp. 2d 609 (E.D.N.Y. 2006) and *Weiss v. National Westminster Bank PLC*, 381 F. Supp. 3d 223 (E.D.N.Y. 2019), it references them as *Weiss I* and *Weiss II* respectively.

counter-terrorism laws" have been found insufficient to establish the general awareness

inference necessary to sustain a JASTA aiding and abetting claim. *Id.* (citations omitted).

In this case, none of the Account Holders were designated by the United States

government to be terrorists or terrorist organizations at the time of the fund transfers

identified in the Complaint, and there is nothing in the Complaint supporting an inference that

CAB read or knew of any other designations. The closest that Plaintiffs come to pleading facts

supporting an inference that CAB had knowledge that any of the Account Holders were tied to

Hamas are their allegations of a freeze by the Palestinian Monetary Authority ("PMA") on

August 24, 2003. Compl. ¶¶ 780-82. The PMA froze the assets of one of the Account Holders,

describing the freeze as "stopping support for 'Hamas Institutions.'" *Id*. The freeze was lifted

two months after it was instituted. Compl. ¶ 783. But, notably, the PMA's action took place

well after any of the fund transfers through the correspondent accounts identified in the

Complaint and after most of the Attacks. In sum, none of the allegations are sufficient to

render it plausible that CAB was generally aware that by providing financial services to the

Account Holders, it was assuming a role in Hamas's terrorist activities.

Merely provided banking services to a Hamas-affiliated charity, does not satisfy JASTA's

mens rea requirement. *Weiss II*, 381 F. Supp. 3d at 235-36, 238-39. In *Siegel v. HSBC North*

*America Holdings, Inc.*, the Second Circuit found that the plaintiffs had not adequately pleaded

facts supporting an inference that the defendant bank, HSBC, was generally aware it was

supporting terrorist activities. 33 F.3d 217, 224 (2d Cir. 2019). There, HSBC's officers even

raised concerns that the bank was providing services to Al Rajhi Bank ("ARB"), which was

believed to provide support to terrorist organizations such as al-Qaeda. The plaintiffs also

alleged that HSBC participated in a scheme to evade U.S. bank regulators in contravention of sanctions imposed on ARB.  *Id*. at 220-21.[15]

The Second Circuit held that "[a]t most, the allegations, even when viewed in the light most favorable to the plaintiffs, assert that HSBC was aware that ARB was believed by some to have links to [al-Qaeda] and other terrorist organizations."  *Id*. at 224.  The court explained that to satisfy their burden, plaintiffs would have to plead facts supporting "a conclusion that HSBC knowingly played a role in the terrorist activities."  *Id*.  Allegations supporting a conclusion that HSBC provided services for transactions linked to the terrorist attacks that injured the plaintiffs would have been sufficient.  *See id*. (explaining that plaintiffs failed to "offer any non-conclusory allegations HSBC provided banking services for any transactions relating to" attacks at issue).  But, absent "any plausible, factual, non-conclusory allegations that HSBC knew or intended that those funds would be sent to [al-Qaeda] or to any other terrorist organization," their insufficient allegations foreclosed their JASTA claim.  *Id*. at 224-25; *see also Linde*, 882 F.3d at 329 ("JASTA requires Plaintiffs to show that, 'in providing [financial] services, [Defendant] was "generally aware" that it was thereby playing a "role" in [the terrorist organization's] violent or life-endangering activities,' which 'requires more than the provision of material support to a designated terrorist organization.'" (quoting *Halberstam*, 705 F.2d at 477)).

Like in *Siegel*, none of the allegations in this case support a conclusion that CAB knew the funds transferred to the Account Holders would be used for terrorist activities, let alone the Attacks that injured Plaintiffs or their relatives.  The first of the Attacks occurred about three

---

[15] The defendant bank ultimately entered into a deferred prosecution agreement with the U.S. Department of Justice in which it admitted to violating U.S. anti-money-laundering laws.  Id. at 221.

months after any of the fund transfers identified by Plaintiffs.  *See Siegel*, 933 F.3d at 224

(noting that HSBC ceased doing business with ARB ten months before the attacks at issue,

"mak[ing] it implausible under the circumstances that HSBC had knowingly assumed a role in

the attacks"); Appendices A & D.  Additionally**,** Plaintiffs have not alleged that any of the charity

Account Holders actually took part in the Attacks.  None of the charity Account Holders were

designated by the U.S. government as terrorists or terrorist organizations when the identified

fund transfers took place.  Only one, HLF, was alleged to have been designated by the U.S.

government as a terrorist organization during the period of the Attacks.  Compl. ¶¶ 575-81.

HLF was designated as an SDGT on December 4, 2001, three days after the Ben Yehuda Street

Bombings, the first of the Attacks, and more than three months prior to the second of the

Attacks.  *See* ¶ 581; Appendices A & D.  However, Plaintiffs do not plead that any of the services

that CAB provided to HLF through the correspondent bank accounts occurred after that

designation and the U.S. government's order freezing HLF's assets.  *See* ¶¶ 576 (describing an

account in HLF's name with a balance in excess of $600,000 "at the beginning of 2001"), 579-80

(describing transfers that took place in December 1999 and January 2001). [16]

---

[16] The Court acknowledges that Plaintiffs have pleaded that other governments, such as the Israeli government, designated some of the Account Holders as terrorist-affiliated, and/or taken other legal action against some of the Account Holders because of concerns about their activities.  But, Plaintiffs have not alleged that CAB was aware of or received reports about other governments' designations at the time it provided services to the Account Holders. Nor have they provided any case law suggesting that the Court should take designations by other countries' governments to be meaningful to the issue of CAB's general awareness that it was supporting terrorist activities for purposes of JASTA liability.  The Court's own research has only found cases discussing the relevance of foreign governments' designations in determining liability for providing material support to terrorist organizations under the ATA.  *See Hussein v. Dahabshiil Transfer Servs. Ltd.*, 230 F. Supp. 3d 167, 176 (S.D.N.Y.), *aff'd sub nom. Hussein v. Dahabshiil Transfer Servs. Ltd*, 705 F. App'x 40 (2d Cir. 2017) (collecting cases involving material support to organizations after Israel had designated them to be terrorist organizations).  However, as noted above, the threshold for demonstrating general knowledge under a JASTA aiding and abetting claim is higher than the one for demonstrating knowledge of providing material support to a terrorist organization under the ATA.  *Compare Strauss v. Credit Lyonnais, S.A.*, No. CV-06-0702 (CPS), 2006 WL 2862704, at *15 (E.D.N.Y. Oct. 5, 2006) (drawing

Further, Plaintiffs' concessions that the charity Account Holders take part in actual charitable activities and provide actual social services undermine any inference that CAB had general knowledge that by providing financial services to the Account Holders it was assuming a role in Hamas's terrorist activities.  *See O'Sullivan*, 2019 WL 1409446, at *8 (holding that providing financial services to Iranian companies with connections to terrorist organizations was insufficient to show knowledge that the services were "destined to aid the [terrorist organizations] responsible for the attacks that injured Plaintiffs"); *Weiss II*, 381 F. Supp. 3d at 239 ("[M]erely provid[ing] services to [a terrorist-affiliated charity] for ostensibly charitable purposes [] does not satisfy the intent required by [the ATA for a terrorist act]. . . .").

With respect to the individual Account Holders, an allegation that the individual is a leader of Hamas is likewise insufficient under JASTA to demonstrate that CAB had general awareness that it was playing a role in terrorist activities.  In *Kaplan*, some of accounts were in the names of alleged Hezbollah leaders.  *Kaplan*, 405 F. Supp. 3d at 529, 535.  But, this was still insufficient for JASTA purposes to infer that the bank was generally aware it was providing aid to terrorist activities. *Id.* at 535.  None of the individual Account Holders in this case, other than al-Sayed, was alleged to have participated in any of the Attacks.  *See* Compl. ¶¶ 762-76.  With respect to al-Sayed, the money transfers to him were made between February 2001 and May 2001, well before the March 27, 2002 Park Hotel Bombing in which he was involved and before any other of the Attacks.  Compl. ¶ 763-65; Appendices A & D.  Plaintiffs do not allege that CAB

---

the inference in material support case that defendant bank should have known about Israeli designations because it should have done due diligence and investigated organizations that were designated by the Israeli government) *with Kaplan*, 405 F. Supp. 3d at 535 (noting that "failure to perform due diligence on clients or to adhere to sanctions and counter-terrorism laws do not, on their own, equate to knowingly playing a role in terrorist activities").

provided any services to al-Sayed in the ten months preceding the Park Hotel Bombing.  The long period of time that passed after CAB provided the services until the Park Hotel Bombing precludes an inference that CAB was generally aware that it was playing a role in that attack. *See Siegel*, 933 F.3d at 224.  Additionally, even if CAB had knowledge of the Account Holders' ties to Hamas, Plaintiffs have failed to sufficiently allege that CAB knew or intended their services would be used by Hamas or for terrorist activities.  *See id.* at 225.

This case can be distinguished from *Miller v. Arab Bank, PLC,* relied on by Plaintiffs, in which general awareness under JASTA was adequately pleaded.  372 F. Supp. at 45, 47-48. There, the defendant bank actively administered a "martyr payment" scheme that paid family members of people who died or were injured committing terrorist acts.  *Id.* at 45.  There were several "red flags" that should have tipped off the bank that it was assisting terrorist activities including:  that the bank received lists identifying violent causes of death as part of its administration of the "martyr payment" scheme, that there were advertisements describing the bank as the administrator of "martyr payments," and that a bank employee affirmatively contacted a terrorist to inform him of his eligibility for payment.  *Id.*, 372 F. Supp. 3d at 45, 47-48.  The bank also received information "indicating that it cleared fund transfers for entities that the United States government later designated as terrorist organizations."  *Id.* at 47–48.

Unlike in *Miller*, there are no facts showing that CAB was administering a "martyr payment" scheme.  While Plaintiffs allege that one of the charity Account Holders, *al-Ansar*, listed on its website two accounts at CAB, the Complaint does not allege that these accounts were used for "martyr payments" or that *al-Ansar* provided information to CAB linking its financial services to "martyr payments."  Thus, this case can be distinguished from *Miller*.

*Compare* Compl. ¶¶ 800-804 *with Miller*, 372 F. Supp. at 45, 47-48; *see also Linde II*, 882 F.3d at

321 (finding that defendant bank "process[ing] bank transfers that were explicitly identified as

payments for suicide bombings" indicated knowledge of role in terrorist activities).

      Plaintiff's reliance on *Weiss I*, for the proposition that neutral transactions in and of

themselves do not preclude an inference of general awareness, is inapposite.  Pls.' Opp'n at 18

(citing *Weiss I,* 453 F. Supp. 2d at 625).  *Weiss I* did not involve a JASTA aiding and abetting

claim, but rather a claim of providing material support to a terrorist organization.  As noted

above, the threshold for demonstrating the mens rea for JASTA liability is higher than that

needed for an ATA claim of providing material support to a terrorist organization. *See Weiss II*,

381 F. Supp. 3d at 239 (finding that knowledge under JASTA "is different from the mens rea

required to establish material support in violation of 18 U.S.C. § 2339B, which requires only

knowledge of the organization's connection to terrorism, not intent to further its terrorist

activities or awareness that one is playing a role in those activities.").  In *Weiss II*, the court

specifically stated that even "[e]vidence that Defendant knowingly provided banking services to

a terrorist organization, without more, is insufficient to satisfy JASTA's scienter requirement."

*Id*.  Here, Plaintiffs have failed to allege anything but neutral transactions.  This is insufficient to

state a claim under JASTA.

      Plaintiffs' comparison of this case to *Halberstam*, in which the defendant was found to

have aided and abetted the burglary scheme and murder, is also unavailing.  In *Halberstam*, it

was not just the mere provision of bookkeeping services from which Hamilton's general

awareness was drawn.  Rather, it was the *context* in which those services were provided that

established the requisite state of mind. *Halberstam*, 705 F.2d at 487.  In *Halberstam*, there

were a deluge of red flags indicating that "something illegal was afoot," including:  "Welch's

pattern of unaccompanied evening jaunts over five years, his boxes of booty, the smelting of

gold and silver, the sudden influx of great wealth, the filtering of all transactions through

Hamilton except payouts for goods, [and] Hamilton's collusive and unsubstantiated treatment

of income and deductions on her tax forms."  *Halberstam*, 705 F.2d at 486.  Here, all the

transfers alleged in the Complaint were small and occurred before any of the Attacks.  *See*

Appendix D.  None of the services provided were pleaded to have indicators that anything

unusual was going on.  The allegations concerning martyr payments are too attenuated to give

rise to an inference of general awareness under JASTA. [17]  *See, e.g.*, Compl. ¶¶ 796 (noting that

checks for "martyr payments" were drawn from CAB); 800-04 (involving *al-Ansar* openly making

"martyr payments" and which listed accounts at CAB on their website).  For example, there was

no indication that CAB knew that its services were being used for martyr payments.  This is in

sharp contrast to the case that Plaintiffs contend is most analogous, *Miller v. Arab Bank*.  *See*

Pls.' Opp'n at 2; *Miller*, 372 F. Supp. at 39-40, 45, 47-48 (listing information that defendant bank

had indicating terrorist activity, including information about deaths and injuries as part of

administration of "martyr payment" scheme).

---

[17]  Plaintiffs assert that "martyr payment" checks were drawn from CAB.  But, while Plaintiffs allege that the Arab Liberation Front ("ALF") provided "awards" to those who participate in terrorist attacks during the Second Intifada generally, *see* Compl. ¶¶ 787-97, there is no allegation that ties ALF's activities to the Attacks and to Hamas. Similarly, the Complaint mentions Hezbollah in connection with *Shahid* and *al-Ansar*, however the only allegation that ties Hamas to CAB is the conclusory claim that *Shahid* "sent funds to the Palestinian Territories in cooperation with the Gaza-based *al-Ansar* society," which Plaintiffs have alleged is Hamas-affiliated organization.  *See* Compl. ¶ 798; *see also Siegel*, 933 F.3d at 222 (noting that courts need not accept conclusory allegations).  There is no allegation that ties *Shahid* to CAB or the Attacks.

For the reasons discussed above, therefore, I respectfully recommend finding that Plaintiffs have failed to meet their pleading burden with respect to the general awareness element of a JASTA aiding and abetting claim.

### 2.   Substantial Assistance

With respect to the third element of a JASTA claim, the substantial assistance element, the Court looks to six factors:  (1) the nature of the act encouraged, (2) the amount of assistance given by the defendant, (3) the defendant's presence or absence at the time of the tort, (4) the defendant's relation to the principal, (5) the defendant's state of mind, and (6) the period of the defendant's assistance.  *Siegel*, 933 F.3d at 225 (citing *Linde*, 882 F.3d at 329).  The inquiry "focuses on the relationship between the act of international terrorism and the secondary actor's alleged supportive conduct."  *Kaplan*, 405 F. Supp. 3d at 536 (quoting *Linde II*, 882 F.3d at 331).

In view of these factors and the facts pleaded, it is clear that Plaintiffs have failed to meet their pleading burden with respect to this element.  There is no allegation that CAB encouraged the Attacks or any of Hamas's terrorist activities.  The closest that Plaintiffs come to demonstrating encouragement is their allegation that CAB accounts were used by the Arab Liberation Front and *al-Ansar* to make "martyr payments." Compl. ¶¶ 788-97.  The ALF is not one of the charity Account Holders in this case, however, and Plaintiffs have not pleaded that CAB was aware of that any Account Holder was involved in making "martyr payments."  Also, there are no facts in the Complaint to suggest that CAB took on any active role in encouraging or administering "martyr payments."  *Cf. Miller*, 372 F. Supp. 3d at 47.  The amount of assistance provided, making twenty-three account transfers well before any of the Attacks

occurred and holding accounts, does not give rise to a plausible inference that CAB provided "substantial" assistance to Hamas in carrying out the Attacks that injured Plaintiffs or their relatives. CAB, as a financial institution, was not and could not be physically "present" at the time of the Attacks. *See Siegel*, 933 F.3d at 225. And, while Plaintiffs pleaded that CAB continued to provide services to the Account Holders through the relevant period, they have not pleaded any facts to indicate that CAB's services contributed to the Attacks. *See Halberstam*, 705 F.2d at 488. Plaintiffs have not pleaded that CAB had any type of relationship other than an arms-length business relationship with the Account Holders and have pleaded no relationship at all to Hamas except through the Account Holders. *See Siegel*, 933 F.3d at 225. Thus, Plaintiffs have failed to plead facts indicating a close relationship of the kind in *Halberstam*, where the defendant lived with Welch and actively assisted in laundering the proceeds from the burglaries over a long period of time. *See* 705 F.2d at 488.

Similarly, there are no facts indicating a relationship analogous to the one in *Miller*, where the bank actually notified terrorists and their families of their eligibility for "martyr payments." 372 F. Supp. at 39-40; *see also Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 264 (E.D.N.Y. 2019) (finding that defendant bank had provided knowing, substantial assistance where it funneled money from Iran to Hezbollah through a complicated series of financial transfers). As noted above, Plaintiffs have failed to plead sufficient facts to establish a plausible inference that CAB knew that the services it was providing to the Account Holders would assist Hamas's terrorist activities or the Attacks that injured Plaintiffs or their relatives. Nor are there any allegations in the Complaint supporting an inference that CAB intended to assist Hamas in the Attacks. Likewise, there are no non-conclusory allegations from which the

Court can infer that Hamas actually received the funds transferred through the correspondent accounts.  Such deficiencies have led other courts in similar cases to find that the substantial assistance element of a JASTA aiding and abetting claim was not met.  *See Siegel*, 933 F.3d at 225; *see also Kaplan*, 405 F. Supp. 3d at 536 (finding that plaintiffs failed to "plausibly allege that Hizbollah received any of [the funds transferred through the Five Customers' accounts] or that [LCB] knew or intended that Hizbollah would receive the funds" even where two of LCB's Organizational Customers were alleged to be Hizbollah's "unofficial treasury").

Consideration of the last factor, duration, does not alter the Court's conclusion. Plaintiffs allege that "CAB provided millions of dollars" to Hamas by maintaining accounts for Hamas-affiliated organizations from 1999-2004.  Compl. ¶752.  However, the fund transfers through the correspondent bank accounts took place over a much shorter period of time and well before any of the Attacks that injured the Plaintiffs or their family members and before any of the Account Holders were designated by the U.S. government to be terrorist entities or terrorists.  The longest duration of assistance for any one of the Account Holders was a year. This is a much shorter time period than the four-year period that the defendant bank provided "martyr payment" services.  *See Miller* 372 F. Supp. 3d at 40-41, 47 (noting that defendant administered a "martyr payment" scheme over a four-year period in addition to maintaining accounts for alleged terrorists).

In sum, Plaintiffs' well-pleaded factual allegations, taken as true and viewed in the light most favorable to the Plaintiffs, do not contain sufficient factual matter to state a claim for relief under JASTA that is plausible on its face.  Accordingly, I respectfully recommend that CAB's motion to dismiss for failure to state a claim under Rule 12(b)(6) be granted.

## CONCLUSION

For the reasons set forth above, the undersigned respectfully recommends that CAB's motion to dismiss be granted.

Dated: January 21, 2020
New York, New York

Respectfully submitted,

KATHARINE H. PARKER
United States Magistrate Judge

## NOTICE

Plaintiffs shall have fourteen days from the service of this Report and Recommendation to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)). Defendants shall have fourteen days to file written objections.

If Defendants file written objections to this Report and Recommendation, Plaintiff may respond to the objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). If Plaintiff files written objections, defendant may respond to the objections within fourteen days. Objections and responses to objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Gregory H. Woods at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140 (1985).

**APPENDIX A**

**THE TERRORIST ATTACKS AT ISSUE**

| Attack | Date |
| --- | --- |
| Ben Yehuda Street Bombings | Dec. 1, 2001 |
| Park Hotel Bombing | Mar. 27, 2002 |
| Sheffield Club Bombing | May 7, 2002 |
| Patt Junction Bus #32A Bombing | June 18, 2002 |
| Hebrew University Bombing | July 31, 2002 |
| Ariel Bombing | Oct. 27, 2002 |
| Shooting Attack on Route #60 | Jan. 29, 2003 |
| Mike's Place Bombing | April 30, 2003 |
| Commuter Bus #6 Bombing | May 18, 2003 |
| Jaffa Road Bus #14A Bombing | June 11, 2003 |
| Shooting Attack on Route #60 | June 20, 2003 |
| Egged Bus #2 Bombing | Aug. 19, 2003 |

**APPENDIX B**

**ALLEGED CHARITY CAB ACCOUNT HOLDERS**

| Name | Alleged U.S. Designation |
|---|---|
| Al-Ansar Charitable Society | None |
| Holy Land Foundation | Specially Designated Global Terrorist (December 4, 2001) |
| Al-Ihsan Charitable Society | None |
| Islamic Charitable Society – Hebron | None |
| Al Jam'iya Al-Islamiya | None |
| Jenin Zakat Committee | None |
| Al Mujama Al Islami | None |
| Muslim Youth Association – Hebron | None |
| Nablus Zakat Committee | None |
| Qalqilya Zakat Committee | None |
| Quran and Sunnah Society Qalqiya | None |
| Ramallah – Al Bireh Zakat Committee | None |
| Al Salah Islamic Society in the Gaza Strip | None |
| Al-Tadamun Charitable Society | None |
| Tulkarem Zakat | None |

| Committee | |
|---|---|
| Al-Wafa Charitable Society | None |
| Welfare Association for Palestinian and Lebanese Families (Al Waqfiya) | Specially Designated Global Terrorist (Date Not Alleged) |

**APPENDIX C**

**ALLEGED INDIVIDUAL CAB ACCOUNT HOLDERS**

| Name | Alleged Role in Attack | Location in Compl. |
|------|------------------------|--------------------|
| Abbas Mohamed al-Sayed | Planning of Park Hotel Bombing | ¶¶ 715, 763-66 |
| Ghazi Ahmad Hamad | None | ¶¶ 770-72 |
| Sayed Salem Abu Musameh | None | ¶ 773-76 |
| Mohamed Saleh Taha | None | ¶¶ 645, 657, 767-769 |

**APPENDIX D**

**ALLEGED TRANSFERS TO CAB CUSTOMERS**

**THROUGH NEW YORK CORRESPONDENT BANKS**

| Account Holder Recipient | Number of Transfers | Period of Transfers | Amount | Location in Complaint |
|---|---|---|---|---|
| Holy Land Foundation | 2 | Dec. 1999 – Jan. 2001 | $420,026 | ¶¶ 579-580 |
| Al-Sayed | 7 | Feb. 2001 – May 2001 | $69,000 | ¶ 764 |
| Hamad | 6 | Oct. 2000 – April 2001 | $50,985 | ¶ 772 |
| Musameh | 3 | Feb. 2001 – Sept. 2001 | $6,000 | ¶ 776 |
| Taha | 5 | Dec. 2000 – Sept. 2001 | $9,870 | ¶ 769 |