UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

JULIE AVERBACH FOR THE ESTATE OF STEVEN   :
AVERBACH, *et al.*,   :
  :
        Plaintiffs,   :
  :    No. 19-cv-00004-GHW-KHP
    -against-   :
  :
CAIRO AMMAN BANK,   :
  :
        Defendant.   :

------------------------------------------------------------------------x

### PLAINTIFFS' OBJECTIONS TO THE MAGISTRATE JUDGE'S
### <u>REPORT & RECOMMENDATION</u>

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................. 2

LEGAL STANDARD ........................................................................................... 5

OBJECTIONS........................................................................................................ 5

A.    STANDARD OF REVIEW AND PLAINTIFFS' STANDING ................................. 5

Objection 1: The R&R erroneously drew inferences against Plaintiffs on a motion to dismiss. ................................................................................................................. 5

Objection 2: The R&R erred in finding that survivors and heirs of U.S. nationals killed in the attacks have no standing under the ATA. ....................................................... 8

B.    GENERAL AWARENESS OF A ROLE IN THE CRIMINAL ENTERPRISE ... 11

Objection 3: The R&R erred in finding that Plaintiffs failed to allege that CAB knew it was assisting HAMAS. .................................................................................................. 13

Objection 4: The R&R erred in requiring Plaintiffs to allege that CAB knew the funds it transferred for the HAMAS Institutions would be used for the attacks. .............................. 16

Objection 5: The R&R erroneously found the "martyr payments" described in *Miller* as the minimum showing required to establish general awareness. ................................................ 20

Objection 6: The R&R improperly imported the erroneous specific intent standard from *Kaplan*. ................................................................................................................. 20

Objection 7: The R&R erred in finding that the HAMAS Institutions CAB assisted had to themselves have participated directly in the attacks and that their engagement in charitable activities precludes liability. ............................................................................... 21

Objection 8: The R&R improperly rejected CAB's support for HAMAS alter egos as insufficiently "direct" for JASTA purposes. ........................................................................ 23

C.    SUBSTANTIAL ASSISTANCE ................................................................................. 23

Objection 9: The R&R misapplied Halberstam's six factors for finding substantial assistance. .............................................................................................................. 23

CONCLUSION .................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*Averbach v. Cairo Amman Bank*,
   19-cv-0004-GHW-KHP, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020)............................ *passim*

*Boim v. Holy Land Found.*,
   549 F.3d 686 (7th Cir. 2008) ................................................................... 18, 21, 25

*Boim v. Quranic Literacy Inst.*,
   No. 00-cv-2905-AK, 2012 WL 13171764 (N.D. Ill. Aug. 31, 2012) ................................. 7, 21

*Duncan v. Walker*,
   533 U.S. 167 (2001)............................................................................... 10

*Estates of Ungar ex rel. Strachman v. Palestinian Auth.*,
   304 F. Supp. 2d 232 (D.R.I. 2004)............................................................ 9, 10, 11

*Freeman v. HSBC Holdings PLC*,
   No. 14-CV-6601 (PKC) (CLP), 2019 WL 4452364 (E.D.N.Y. Sept. 16, 2019).................... 23

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ............................................................... *passim*

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010)................................................................................ 4, 22

*Honickman for Estate of Goldstein v. BLOM Bank SAL*,
   No. 19-cv-8-KAM-SMG, 2020 WL 224552 (E.D.N.Y. Jan. 14, 2020) ................................ 3, 4

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009)..................................................................... 12

*In re Terrorist Attacks on September 11, 2001*,
   714 F.3d 118 (2d Cir. 2013)..................................................................... 17

*Jimenez v. KLB Foods, Inc.*,
   No. 12-cv-6796 JPO, 2014 WL 2738533 (S.D.N.Y. June 17, 2014) ........................... 5

*Kaplan v. Lebanese Canadian Bank, SAL*,
   405 F. Supp. 3d 525 (S.D.N.Y. 2019)............................................................ 3, 20

*Keel v. Hainline*,
   331 P.2d 397 (Okl. 1958)....................................................................... 24

*Knox v. Palestine Lib. Org.*,
    306 F. Supp. 2d 424 (S.D.N.Y. 2004)...................................................................... 15

*Knox v. Palestine Lib. Org.*,
    248 F.R.D. 420 (S.D.N.Y. 2008) .............................................................................. 11

*Knox v. Palestine Lib. Org.*,
    442 F. Supp. 2d 62 (S.D.N.Y. 2006)........................................................................... 9

*Lelchook v. Commerzbank AG*,
    No. 10-cv-5795, 2011 WL 4087448 (S.D.N.Y. Aug. 2, 2011)................................... 10, 11, 22

*Lelchook v. Islamic Republic of Iran*,
    393 F. Supp. 3d 261 (E.D.N.Y. 2019) ......................................................................... 2

*Linde v. Arab Bank, PLC*,
    384 F. Supp. 2d 571 (E.D.N.Y. 2005) ....................................................................... 10

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018)............................................................................... *passim*

*Linde v. Arab Bank, PLC*,
    97 F. Supp. 3d 287 (E.D.N.Y. 2015) .................................................................... 13, 16

*Miller v. Arab Bank, PLC*,
    372 F. Supp. 3d 33 (E.D.N.Y. 2019) ....................................................................... 2, 9

*O'Sullivan v. Deutsche Bank AG*,
    No. 17-cv-8709-LTS-GWG, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ..................... 22

*Owens v. BNP Paribas*,
    897 F.3d 266 (D.C. Cir. 2018).................................................................................. 22

*Rosemond v. United States*,
    572 U.S. 65 (2014)................................................................................................... 4

*Siegel v. HSBC Bank USA, N.A.*,
    No. 17-cv-6593 (DLC), 2018 WL 3611967 (S.D.N.Y. July 27, 2018) ......................... 17

*Siegel v. HSBC N. Am. Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019)............................................................................. 16, 17, 23

*Strauss v. Crédit Lyonnais, S.A.*,
    379 F. Supp. 3d 148 (E.D.N.Y. 2019) ......................................................................... 3

*Strauss v. Credit Lyonnais, S.A.*,
    No. 06-cv-0702 (CPS), 2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006)...................................... 15

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001).................................................................................................................. 10

*Weinstock v. Abu Marzook*,
    No. 17-cv-23202, 2019 WL 1470245 (S.D. Fla. Apr. 3, 2019)................................................ 9

*Weiss v. Nat'l Westminster Bank PLC*,
    453 F. Supp. 2d 609 (E.D.N.Y. 2006) ................................................................................... 9

*Weiss v. Nat'l Westminster Bank Plc*,
    381 F. Supp. 3d 223 (E.D.N.Y. 2019) ................................................................................... 3

*Ziemoore v. Commissioner of Social Security*,
    No. 17-cv-4621-GHW-AP, 2017 WL 6000608 (S.D.N.Y. Dec. 1, 2017).................................. 5

**Statutes**

18 U.S.C. § 2333(a) ........................................................................................................................ 8

18 U.S.C. § 2333(d) ...................................................................................................................... 1, 2

Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, 130 Stat. 852 (2016)............. 1, 3, 4

**Rules**

Fed. R. Civ. P. 72(b)(2)................................................................................................................... 5

Fed. R. Civ. P. 72(b)(3)................................................................................................................... 5

Fed. R. Civ. P. 8(a)(2)..................................................................................................................... 5

Plaintiffs respectfully object, pursuant to Fed. R. Civ. P. 72(b), to the January 21, 2020 Report and Recommendation (the "R&R") of Magistrate Judge Katharine H. Parker. 2020 WL 486860. Plaintiffs request that the Court reject the R&R[1] and its recommended disposition and deny, in its entirety, Defendant Cairo Amman Bank's ("CAB") motion to dismiss the Complaint. As demonstrated below, the R&R is predicated on clear legal errors and erroneous analysis in its application of the Anti-Terrorism Act ("ATA"), 18 U.S.C. §§ 2331 *et. seq.*, as amended by the Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, 130 Stat. 852 (2016) ("JASTA") (added to the ATA in 18 U.S.C. § 2333(d) and § 2333 note).

The R&R contravenes *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018), the controlling standard in this Circuit on JASTA; contradicts JASTA's plain meaning; deviates from the aiding and abetting framework in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) that Congress expressly established to govern JASTA; and turns Congress' stated aim in enacting JASTA on its head: "The purpose of this Act is to provide civil litigants with the *broadest possible basis*, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b) (emphasis added.)

The R&R instead improperly *narrows*, and indeed precludes, Plaintiffs' ability to seek such relief – a particularly erroneous application at the pleading stage where Plaintiffs' burden is merely to plausibly allege Defendant's liability. Plaintiffs also object to the R&R's dismissal of the claims of three individual Plaintiffs on standing grounds; as established below, the ATA's plain meaning and Circuit precedent compel the opposite result.

---

[1]    Plaintiffs do not object to the R&R's determination that they sufficiently established a basis for personal jurisdiction over Defendant or that the Steinherz family members have standing to pursue their claims.

## INTRODUCTION

The Complaint alleges that CAB aided and abetted the Foreign Terrorist Organization ("FTO") Islamic Resistance Movement ("HAMAS")[2] by knowingly providing it with substantial assistance, including by maintaining accounts for, and/or facilitating substantial payments on behalf of, many of HAMAS's most prominent *da'wa* (social welfare network) institutions in Gaza and the West Bank, senior HAMAS leaders and HAMAS's primary fundraiser in the United States (collectively, the "HAMAS Institutions"), and two key organizations that raised and distributed funds to the families of suicide bombers and other terrorists, including HAMAS operatives . With CAB's vital assistance, Plaintiffs were seriously injured and their family members were killed in terrorist attacks HAMAS committed between 2001 and 2003. CAB thereby violated the ATA as amended by JASTA.

Since JASTA's enactment in 2016 and the Second Circuit's first application of the statute in *Linde*, district courts in this Circuit have split on what level of knowledge and what types of conduct satisfy JASTA's elements for pleading purposes. At least three courts have determined that although § 2333(d)(2) requires that a defendant know that it is assisting a criminal enterprise from which violence was a foreseeable consequence, it does *not* require that a defendant (1) have the specific intent to support terrorism or (2) know its support is specifically assisting violent acts or the specific terrorist attacks at issue. *See Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 47 (E.D.N.Y. 2019) (denying motion to dismiss claims that Arab Bank aided and abetted HAMAS terror attacks); *Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 267-68 (E.D.N.Y. 2019) (finding Iranian Bank Saderat liable for aiding and abetting Iranian terror attacks); Order, *Estate of Hirshfeld v. Bank of China, Ltd.*, No. 18-cv-1982 (KPF) (S.D.N.Y. Aug. 9, 2019), ECF No. 61

---

[2]     In addition to HAMAS's designation as an FTO in 1997, it was also designated a Specially Designated Terrorist in January 1995 and a Specially Designated Global Terrorist in October 2001. Compl. ¶¶ 604-08.

(denying motion to dismiss claims that Bank of China aided and abetted HAMAS terror attack), annexed hereto as Exhibit A.

On the other hand, two cases in this Circuit have required that a defendant either know its support is specifically assisting violent acts or the specific terrorist attacks at issue. *See Strauss v. Crédit Lyonnais, S.A.*, 379 F. Supp. 3d 148, 157-58, 164 (E.D.N.Y. 2019); *Weiss v. Nat'l Westminster Bank Plc*, 381 F. Supp. 3d 223, 232-33, 238-39 (E.D.N.Y. 2019) (both on appeal). And another decision in this Circuit, *Honickman for Estate of Goldstein v. BLOM Bank SAL*, No. 19-cv-8-KAM-SMG, 2020 WL 224552, at *9 (E.D.N.Y. Jan. 14, 2020), has, like the R&R, required that a defendant "intended to further Hamas' *violent or life-endangering activities*" or knew that the FTO-controlled organization it was assisting was itself involved in the FTO's violent activities. *Honickman* and the R&R closely follow Judge Daniels's decision in *Kaplan v. Lebanese Canadian Bank, SAL*, which held that Plaintiffs failed to plead factual, non-conclusory allegations that "Defendant knowingly and intentionally supported Hizbollah *in perpetrating the rocket attacks*." 405 F. Supp. 3d 525, 536 (S.D.N.Y. 2019) (emphasis added) (on appeal).

Plaintiffs respectfully submit that *Miller*, *Lelchook* and *Hirshfeld* correctly articulate the legal standard set forth in the Congressionally-mandated framework for JASTA set forth in *Halberstam*, *see* JASTA § 2(a)(5). And Plaintiffs maintain that their well-pleaded allegations that CAB (1) held multiple accounts for entities and individuals that it knew belonged to HAMAS; (2) provided financial services for two key organizations that raised and distributed funds to the families of suicide bombers and other terrorists; and (3) knew its own conduct benefited, and played a role in financing HAMAS satisfies the general awareness standard the statute requires – that CAB "be 'aware,' that by assisting the principal [here, HAMAS] it [wa]s itself assuming a 'role' in terrorist activities." *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 477).

The R&R and the above-mentioned district court cases that impose "a higher *mens rea* than that sufficient to establish material support in violation of the ATA," *Honickman*, 2020 WL 224552 at \*7, misread *Halberstam* and *Linde* – which held that "[s]uch awareness may not require proof of the specific intent demanded for criminal aiding and abetting culpability, *i.e.*, defendant's intent to participate in a criminal scheme as 'something that he wishes to bring about and seek by his action to make it succeed[]' [or] proof that [defendant] knew of the specific attacks at issue when it provided financial services to Hamas," *Linde*, 882 F.3d at 329 (quoting *Rosemond v. United States*, 572 U.S. 65, 76 (2014)) – and ignore the statute's expressly-stated purpose to *expand* civil liability under the ATA, *id.* at 320. *See also* JASTA § 2(b), cited *supra* at 1.

*Miller*, *Lelchook* and *Hirshfeld* not only track *Halberstam* and *Linde*, but they are also consistent with the Supreme Court's holding in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). There, the Court observed:

> In analyzing whether it is possible in practice to distinguish material support for a foreign terrorist group's violent activities and its nonviolent activities, we do not rely exclusively on our own inferences drawn from the record evidence. We have before us an affidavit stating the Executive Branch's conclusion on that question…. In the Executive's view: "Given the purposes, organizational structure, and clandestine nature of foreign terrorist organizations, it is highly likely that any material support to these organizations will ultimately inure to the benefit of their criminal, terrorist functions—regardless of whether such support was ostensibly intended to support non-violent, non-terrorist activities."

*Id.* at 33 (record citation omitted).

Plaintiffs also satisfy JASTA's substantial assistance prong under *Halberstam* because the type and amount of support CAB knowingly provided to HAMAS was substantial. *See* 705 F.2d at 488. Holding accounts for the core HAMAS entities in the Palestinian Territories and United States and senior HAMAS leaders, and providing financial services for two key organizations that raised and distributed funds to the families of suicide bombers and other terrorists, including

4

HAMAS operatives, provided HAMAS with steady, much-needed access to U.S. dollars, enabling it to underwrite its terror campaign and perpetrate near-daily, heinous terrorist attacks during the Second Intifada (2000-2004), including the ones that injured Plaintiffs.

## LEGAL STANDARD

Following a magistrate judge's submission of a report and recommendation with respect to a dispositive motion, "a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." *Id.* 72(b)(3). *See also Ziemoore v. Commissioner of Social Security*, No. 17-cv-4621-GHW-AP, 2017 WL 6000608, at *1 (S.D.N.Y. Dec. 1, 2017) (Woods, J.). Rule 72(b)(3) further provides that the "district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."

## OBJECTIONS

Plaintiffs respectfully object to Sections B(1) and C of the R&R's Discussion, as well as its Conclusion, for the reasons stated below.

## A.   STANDARD OF REVIEW AND PLAINTIFFS' STANDING

**Objection 1: The R&R erroneously drew inferences against Plaintiffs on a motion to dismiss.**

The R&R did not apply the correct standard of review under Fed. R. Civ. P. 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," and that the court "accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor." *Jimenez v. KLB Foods, Inc.*, No. 12-cv-6796 JPO, 2014 WL 2738533, at *1 (S.D.N.Y. June 17, 2014). The R&R did not do so.

For instance, the R&R's conclusion that "Plaintiffs failed to allege that CAB was aware of or read any of [sic] sources tying its clients to Hamas," R&R at *12, does not draw the plausible

inference at the pleadings stage, based on the numerous sources Plaintiffs cited in the Complaint and detailed *infra* at 13-16, that CAB was aware of the ample sources connecting the HAMAS Institutions to HAMAS, particularly as a Jordanian bank with multiple branches in the Palestinian Territories (which, as explained below, was subject to Israeli jurisdiction). The R&R's conclusion that the fact that none of the HAMAS Institutions were designated by the United States at the time of the funds transfers undercuts CAB's general awareness, R&R at *12, overstates the need for designations for knowledge purposes, *see infra* at 15-16.

In addition, the Holy Land Foundation ("HLF") *was* designated a Specially Designated Global Terrorist ("SDGT") by the United States in December 2001, during the period of the attacks implicated in this case. Compl. ¶¶ 581-82; R&R at *2, 13. The Treasury Department Press Release announcing the designation stated, *inter alia*, that HLF raised "millions of dollars annually that is used by HAMAS. Last year, Holy Land raised over $13 million[]"; and "Holy Land supports HAMAS activities through direct funds transfers to its offices in the West Bank and Gaza that are affiliated with HAMAS and transfers of funds to Islamic charity committees ('zakat committees') and other charitable organizations that are part of HAMAS or controlled by HAMAS members."

And the R&R's conclusion that there are no plausible allegations that CAB was aware of any other designations – such as the fact that Israel had designated HLF in 1997, R&R at *2, Compl. ¶ 574 (noting that Israel designated HLF a HAMAS organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks") , ignores the fact that a financial institution with multiple branches in the Palestinian Territories, which are subject to Israeli designations and oversight, would plausibly know of HLF's relationship with HAMAS. It also ignores the FBI's conclusion that "the civilian population is aware that the services being provided by the zakat committees, whether it's the

distribution of food, medical services or other social services, are being provided by HAMAS." *Id.* ¶¶ 583-84. *See also Boim v. Quranic Literacy Inst.*, No. 00-cv-2905-AK, 2012 WL 13171764, at *6 (N.D. Ill. Aug. 31, 2012) (summarizing evidence that HLF "provided significant funding" to organizations that were "either known fronts for Hamas, known supporters of Hamas, or entities whose funding is known to benefit the Hamas agenda").[3]

Similarly, the R&R's determination that an allegation that a given account holder at CAB "is a leader of Hamas is likewise insufficient under JASTA to demonstrate that CAB had general awareness that it was playing a role in terrorist activities," R&R at *14, requires more from Plaintiffs than they are obligated to plausibly allege at this stage. Plaintiffs' allegations that CAB provided financial services to an individual HAMAS leader in isolation *might* in certain circumstances be insufficient to constitute plausible allegations that CAB had the requisite general awareness that it was playing a role in HAMAS's terrorist activities. But as detailed at great length in the Complaint, and described herein, Plaintiffs plausibly alleged that CAB knowingly held accounts for *four* senior HAMAS leaders, as well as the core HAMAS entities in the Gaza Strip and West Bank, and the primary HAMAS fundraiser in the United States, HLF, and it processed funds that facilitated reward payments for the families of suicide bombers and other terrorists, including HAMAS operatives. And Plaintiffs plausibly alleged the connection between these entities and HAMAS's terrorist activities and CAB's knowledge of same. At the pleadings stage, viewed in the light most favorable to Plaintiffs, they have more than plausibly alleged CAB's general awareness of its role in HAMAS's terrorist activities.

---

[3]     Of the 12 organizations listed in *Boim*, half of the "known fronts for Hamas" were CAB customers: Islamic Charitable Society – Hebron, Ramallah Zakat Committee, Jenin Zakat Committee, Nablus Zakat Committee, Tulkarem Zakat Committee and Qalqiliya Zakat Committee. Compl. ¶ 754.

In the same vein, the R&R's conclusion that "there are no facts showing that CAB was administering a 'martyr payment' scheme," R&R at *14, does not view the allegations, discussed in detail *infra* at 19-20, in the light most favorable to Plaintiffs. On the contrary, Plaintiffs' allegations set forth CAB's facilitation of the reward payments to the families of suicide bombers and other terrorists using its accounts for *two* separate martyr payment schemes – Saddam Hussein's widely-publicized rewards program and Hezbollah's program operated though the *al-Ansar* society. *See* Compl. ¶¶ 787-804. While Saddam Hussein's incentive program rewarded "those who irrigate the land with their blood," *id.* ¶ 796, and Hezbollah's program rewarded those who "with their noble blood, have watered the pure soil of Palestine," *id.* ¶ 802, CAB's willingness to process payments for these "blood donors" provided a plausible inference that the bank knew it was playing a role in supporting Palestinian terrorism.

**Objection 2: The R&R erred in finding that survivors and heirs of U.S. nationals killed in the attacks have no standing under the ATA.**

The R&R concluded that Plaintiffs Matanya Nathansen and Nevenka Gritz, foreign nationals who lost children who were U.S. nationals, and Plaintiff Julie Averbach, an Israeli national who lost a husband who was a U.S. national, Compl. ¶¶ 11, 29, 124, 127, 376, 381, did not have standing to bring solatium claims for their personal injuries. The R&R reasoned that the ATA "confin[es] the ambit of liability to injuries to U.S. nationals," and "estates, survivors, or heirs" can only "su[e] on *behalf* of the U.S. national." R&R at *9 (emphasis added).

The ATA's civil remedy applies, however, to "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, ***or*** his or her estate, survivors, or heirs." 18 U.S.C. § 2333(a) (emphasis added). The statute requires an injury to a U.S. national, but it does not limit recovery to that injured party or, if he or she died, his or her estate – it includes claims for survivors or heirs, irrespective of citizenship: "18 U.S.C.

§ 2333(a) contains no requirement that the survivors or heirs of a United States national killed by an act of international terrorism must themselves be citizens of the United States, and this court will not read such a requirement into the statute." *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 271 (D.R.I. 2004). *See also Weinstock v. Abu Marzook*, No. 17-cv-23202-RS, 2019 WL 1470245, at *4 (S.D. Fla. Apr. 3, 2019) ("Even Dov Weinstock, who was not a United States citizen, is included among those permitted to bring claims under Section 2333. As Yitzchak's father, Dov, was a 'survivor' of a United States national who was murdered in the terrorist attack."). In fact, in permitting *these very Plaintiffs*' claims to proceed, the *Weiss* court held that "it is sufficient for plaintiffs to allege a familial relationship, such as that of child, parent, spouse, or sibling of a U.S. national." *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 620 (E.D.N.Y. 2006) (citing *Ungar*, 304 F. Supp. 2d at 264).

Thus, the statute permits different types of claims when a U.S. national dies as a result of a terrorist attack: claims of the estate, which includes the decedent's pain and suffering before death and his or her economic losses, *Knox v. Palestine Lib. Org.*, 442 F. Supp. 2d 62, 78-79 (S.D.N.Y. 2006), and claims of survivors and heirs, which together cover a decedent's family members under various definitions, *Ungar*, 304 F. Supp. 2d at 263-64 ("By including the term 'survivors' in the class of persons eligible to bring an action, Congress evidenced an intention that family members who are not legal heirs (such as the parents and siblings of a decedent who leaves children) may bring an action pursuant to the statute."), for their own injuries. *See Miller*, 372 F. Supp. at 41 ("Spouses and relative[s] in direct lineal relationships are presumed to suffer damages for mental anguish.") (quoting *Knox*, 442 F. Supp. 2d at 78); *Ungar*, 304 F. Supp. 2d at 263 ("[t]he parents or siblings of a U.S. national killed by terrorists are undeniably 'victims of international terrorism' in the sense that they suffer the loss of a close family member."). As shown in the

9

Complaint, Mr. Nathansen, Ms. Gritz and Ms. Averbach qualify as "survivors or heirs" of a U.S. national killed by reason of an act of international terrorism, and have their own claims.

The R&R's reading renders "survivors and heirs" superfluous, violating the "'cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). The ATA's "congressional purpose was to grant a remedy to U.S. nationals *and their families* who suffered from *injury to an individual or property* as a result of international terrorism." *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 589 (E.D.N.Y. 2005) (emphasis added). *See also Ungar*, 304 F. Supp. 2d at 263 (noting that the ATA's legislative history "suggests that Congress did not intend that the class of persons able to bring actions pursuant to § 2333(a) should be interpreted narrowly").

Courts have rejected the argument that the phrase "estate, survivor, or heir" in the ATA refers to the "capacity of a representative" to sue for a decedent's claim rather than to bring a separate claim:

> Commerzbank offers an alternative argument, that the use of the disjunctive **article "or" in** the text means that only the injured United States national or—if he is deceased—his estate, or his heirs, or his survivors may sue; but not more than one of these. The argument is based on a strained interpretation. The fair meaning is that any national, or that national's estate, heirs or survivors may sue. This fair interpretation implements the congressional intent to interpret the statute broadly.

*Lelchook v. Commerzbank AG*, No. 10-cv-5795-AKH, 2011 WL 4087448, at *3 (S.D.N.Y. Aug. 2, 2011) (bold original, italics and underline added). Thus, the court concluded:

> Under these principles, I hold, consistent with other courts to have addressed the issue, that *each individual Plaintiff in this case may bring claims*. First, with regard to David Lelchook's daughters, Michal and Yael, courts have suggested that "it is virtually inconceivable" that direct children of the decedent may not bring claims as heirs or survivors.

10

*Id.* at \*2 (emphasis added). *See also Ungar*, 304 F. Supp. 2d at 263 ("As originally drafted, § 2333 allowed compensation only for 'any national of the United States....' The Justice Department suggested that Congress modify the text of the bill to explicitly allow suits by the family members (as 'survivors' and 'heirs' of the victim).") (citation omitted).

A decedent's claims belong to the estate (which may be represented by any number of persons depending on state law) and those claims cannot be *separately* represented by his or her "survivor or heir." *See Knox v. Palestine Lib. Org.*, 248 F.R.D. 420, 423 (S.D.N.Y. 2008) (granting *separate* relief for "Plaintiffs [who are] the representative *and* heirs *and* survivors of the Estate of Aharon Ellis") (emphasis added). If this phrase were meant to specifically define who may represent injured parties under the ATA, it would leave children and incapacitated adults, who must be represented by guardians, completely unaccounted for under the ATA, an unsupportable position.

## B.   GENERAL AWARENESS OF A ROLE IN THE CRIMINAL ENTERPRISE

As set forth in Objections 3-8 below, the R&R misapplied  the aiding and abetting *mens rea* standard in *Halberstam* by requiring allegations that CAB knew that its assistance to HAMAS would fund terrorist activities or "the Attacks that injured Plaintiffs or their relatives." R&R at \*13. But *Halberstam* did not require the accessorial defendant know about (let alone intend) the principal tortfeasor's act of violence at all. The defendant, Linda Hamilton, was found civilly liable for aiding and abetting the murder of Michael Halberstam by her boyfriend, Bernard Welch, during a botched burglary. *See* 705 F.2d at 474 ("[Ms. Hamilton is] civilly liable, as a joint venturer ... for the killing of Michael Halberstam"). However, Hamilton, who assisted what she claimed was her boyfriend's antiques business, did not know about the murder—or even the burglary:

> It was not necessary that Hamilton knew specifically that Welch was committing burglaries. Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night—whether as a fence,

> burglar, or armed robber made no difference—because violence and killing is a foreseeable risk in any of these enterprises.

*Id.* at 488. Indeed, even her boyfriend had not planned to murder anyone—he shot Halberstam while trying to escape the scene of the burglary. *Id.* at 487.

Hamilton acted as her boyfriend's "banker, bookkeeper, recordkeeper, and secretary," and denied knowing of the criminal nature of his "evening forays." *Id.* at 486-87. Notwithstanding that her actions were "neutral standing alone," the court found that "it defies credulity that Hamilton did not know that something illegal was afoot." *Id.* at 486, 488. Thus, the court concluded that because she "knew about and acted to support Welch's illicit enterprise," she "had a general awareness of her role in a continuing criminal enterprise." *Id.* at 488. Because the killing was "a natural and foreseeable consequence of the activity Hamilton helped Welch to undertake," and because her services substantially assisted the burglary resulting in murder, she was liable as an aider and abettor of the murder. *Id.*

Thus, *Halberstam* held that a defendant could be liable for violent crimes that were the reasonably foreseeable result of a criminal enterprise, provided that the defendant was generally aware of its role in that criminal enterprise. *Linde*, following *Halberstam*, confirmed that Plaintiffs need *not* show "specific intent," "intent to participate in a criminal scheme as 'something that he wishes to bring about and seek by his action to make it succeed,'" or that the bank "knew of the specific attacks at issue when it provided financial services for Hamas." 882 F.3d at 329. As noted above, *Lelchook*, *Miller*, and *Hirshfeld* follow *Linde*'s framework and are instructive here.

Although courts are expected to be "lenient in allowing scienter issues …. [t]o survive motions to dismiss," *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009) (internal quotation marks and citation omitted), the Complaint sets forth many specific allegations providing a strong inference of CAB's awareness of its vital role in HAMAS's overall

illegal and tortious activity, including the central fact that it knowingly held multiple accounts for the HAMAS Institutions. As set forth in more detail below, *infra* at 13-16 (discussing Objection 3) the Complaint also provided detailed, non-conclusory allegations that these institutions were in fact HAMAS-controlled, that they actively facilitated HAMAS's terrorist activities, and that CAB was aware of those facts. Finally, the terrorist attacks HAMAS committed were not unforeseeable— in fact, they were not even unplanned, as in *Halberstam*; they were the logical, if not inevitable, purpose of HAMAS's fundraising and other illicit financial activities.

**Objection 3: The R&R erred in finding that Plaintiffs failed to allege that CAB knew it was assisting HAMAS.**

The R&R's conclusion is premised on the erroneous finding that Plaintiffs did not allege that CAB knew it was assisting HAMAS. In reality, after voluminously detailing that the HAMAS Institutions that CAB knowingly held accounts for, and provided financial services to,[4] were HAMAS-controlled, the Complaint plausibly alleged that CAB knew they (1) were HAMAS-controlled, and (2) actively furthered HAMAS's terrorist activities.

Defendant's sources of knowledge that the HAMAS Institutions were HAMAS-controlled, included, but were not limited to, public pronouncements made by HAMAS, Compl. ¶ 517; overwhelming overlap between the senior leadership of the HAMAS Institutions and HAMAS's public leadership (including Sheikh Yassin,[5] the iconic founder of HAMAS), *id.* ¶¶ 640, 644, 657, 676, 685-86, 690, 699, 707, 715, 720, 728, 735, 741, 749; multiple Israeli and U.S. designations (discussed *infra* at 15-16); and actions the Palestinian Authority and Israel took against these

---

[4]     Compl. ¶ 575 (HLF), ¶ 754 (listing 11 HAMAS entities); ¶¶ 763-773 (four senior HAMAS leaders); and ¶ 804 (*al-Ansar*). These were all controlled by HAMAS. *See* Compl. ¶¶ 563-88 (HLF); ¶¶ 647-744, 804 (the same 11 entities); ¶¶ 763, 767, 770, 773 (four senior HAMAS leaders).

[5]     In *Linde v. Arab Bank, PLC*, Arab Bank's chief compliance officer in the Palestinian Territories testified that Yassin "is known throughout the world" as "the head of the Hamas organization in the Palestinian Territories, and this is no secret." 97 F. Supp. 3d at 305.

entities because they were HAMAS-controlled. As a major financial institution headquartered in Jordan with multiple branches in the Palestinian Territories, CAB cannot tenably contend that it was unaware of these myriad examples tying the HAMAS Institutions to HAMAS, and the Palestinian, Israeli, and global publications reporting that fact.

Similarly, the connections between HAMAS's *da'wa* and its terrorist activities were highly (and internationally) publicized – by HAMAS and others. Therefore, CAB cannot credibly deny (much less in a motion to dismiss) that it knew the multifaceted ways that HAMAS's *da'wa* furthered its terrorist activities. As detailed in the Complaint, this close nexus between HAMAS's *da'wa* and its terrorist activities was apparent in, for instance, (1) the *Izz al-Din al-Qassam* Brigades' ("Qassam Brigades") use of HAMAS's flagship educational institution, the Islamic University of Gaza, for military purposes, including manufacturing, developing and storing weapons, Compl. ¶ 641; (2) the fact that all of HAMAS's founders served in its *da'wa*, *id.* ¶ 515; and (3) the wide overlap among HAMAS's *da'wa* and its terrorist operatives.[6]

A HAMAS founder's public statement in 1998 that "[e]veryone knows that the Islamic Resistance Movement, HAMAS, is a Palestinian Jihad movement that strives for the liberation of all Palestine from the (Mediterranean) sea to the river (Jordan), from the north to the south, from the tyrannical Israeli occupation, and this is the main part of its concern. Social work is carried out in support of this aim, and it is considered part of the HAMAS movement's strategy," *id.* ¶ 517, showed that HAMAS did not attempt to hide its use of its *da'wa* to further its terrorist activities. An August 2001 *Washington Post* article also publicly underscored the link between HAMAS's *da'wa* and its terrorist activities: "On the streets of Gaza…Hamas's status has been underpinned by a network of medical clinics, schools and welfare institutions that distribute free and subsidized

---

[6]     *See Linde*, 97 F. Supp. 3d at 334-35 (noting presence of HAMAS leaders' presence on various so-called charities supported jury finding that defendant was aware of, or at least willfully blind to, their HAMAS connections).

food to the needy. According to [HAMAS founder Sheikh] Yassin, the group distributes $2 million to $3 million in monthly handouts to the relatives of Palestinian suicide bombers; 'martyrs' who have been killed by Israelis; and prisoners in Israeli jails." *Id.* ¶¶ 601, 617.

As stated above, the R&R also erroneously concluded that the Complaint's allegations of CAB's knowledge were implausible because the HAMAS Institutions it assisted were not then designated by the United States, R&R at *12. The R&R dismisses the Israeli designations as "non-U.S. governmental designations" that CAB may not have "read or kn[own of]," R&R at *12, *13 n.16 ("other governments, such as the Israeli government"), evidently overlooking the fact that Israel has jurisdiction over the Palestinian Territories, where CAB operates and held the relevant accounts. *See, e.g.*, *Knox v. Palestine Lib. Org.*, 306 F. Supp. 2d 424, 437 (S.D.N.Y. 2004) ("the P[alestinian] A[uthority]'s authority is subordinate to Israel's sovereign control, in many fundamental ways").[7]

The R&R cites cases crediting allegations about Israeli designations, but dismisses them as a matter of law under the theory that JASTA requires "higher" knowledge not just of one's role, but even of the identity of an FTO's agent, R&R at *13 n.16—although not evidently when it comes to *U.S.* designations. *Compare id. and* *12 (dismissing U.S. designations as post-dating some of CAB's alleged conduct). The R&R also cites *Strauss v. Credit Lyonnais, S.A.*, No. 06-cv-0702 (CPS), 2006 WL 2862704, at *15 (E.D.N.Y. Oct. 5, 2006), to diminish the effect of Israeli designations, but *Credit Lyonnais did not operate in Israel or the Palestinian Territories.* Finally,

---

[7]    According to the sworn declaration of the Chief Israel Defense Forces Legal Advisor for the West Bank during the relevant period, an Israeli order that "outlawed various institutions operating in the Palestinian Territories, deemed to be part of Hamas" applied in those Territories and were contemporaneously published in Hebrew and Arabic in official sources in the Territories. Decl. of Shlomo Politis, *Linde v. Arab Bank PLC*, No. 04-cv-2799 (BMC) (VVP), ¶ 31 (E.D.N.Y. signed Oct. 24, 2014), ECF No. 1193-12.

the R&R cites *Kaplan* for the (erroneous) proposition that a bank's knowledge of designations cannot on its own equate to knowingly playing a role in terrorist activities. R&R at *13 n.16.

In any event, designations are only one means of putting a defendant on notice that it is working with a terrorist entity; they are not required to establish liability. As Judge Cogan found in *Linde*, a defendant could have actual knowledge of a terrorist entity's identity and illicit activity even if it were not designated:

> [D]efendant's decision to argue that its obligations began and ended by screening transactions against the OFAC list was completely undermined by the testimony of its own former employee....Defendant argued, for example, that "[t]here is no international banking standard that requires banks to do more than clear the transactions through the OFAC list in the United States of America." This theory...was myopic. It allowed the possibility that a well-known Hamas figure could enter the Bank, be recognized as such by every employee there, and yet, if his name did not yet show up on an OFAC list, the Bank not only could, but would be required to treat him like any other non-terrorist customer. This theory not only tolerated willful blindness—it mandated it.

*Linde*, 97 F. Supp. 3d at 314. The R&R also confuses the significance of CAB's facilitation of "martyr payments" to the families of Palestinian terrorists, R&R *15 n.17. The Complaint's detailed description of the "martyr payments" and CAB's active role in facilitating them, Compl. ¶¶ 787-804, also more than plausibly alleges that CAB not only maintained accounts and facilitated funds transfers for the benefit of HAMAS but was also a willing participant in the repugnant process of rewarding the families of suicide bombers and other terrorists during the relevant period.

**Objection 4: The R&R erred in requiring Plaintiffs to allege that CAB knew the funds it transferred for the HAMAS Institutions would be used for the attacks.**

The R&R misconstrued *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019) in recommending dismissal because Plaintiffs lacked allegations showing "that CAB knew the funds transferred to the Account Holders would be used for terrorist activities, let alone the Attacks that injured Plaintiffs or their relatives." R&R at *13. *Siegel* required no such thing—that case

involved negligence claims unsupportable under the ATA and JASTA, which require knowledge/general awareness. *Siegel v. HSBC Bank USA, N.A.*, No. 17-cv-6593 (DLC), 2018 WL 3611967, *1 (S.D.N.Y. July 27, 2018) (noting allegations that defendants "failed to take reasonable steps to ensure" they were not dealing with banks linked to terrorist financing). Further, the Second Circuit in *Siegel* adopted its holding in *Linde* that general awareness "'does not require proof of … specific intent' or knowledge 'of the specific attacks at issue.'" 933 F.3d at 224.

In any event, the allegations in *Siegel* were fundamentally weaker than, and inapposite to, the ones in this case. In *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118, 124-25 (2d Cir. 2013), the Second Circuit affirmed dismissal of ATA claims against the Saudi Al Rajhi Bank ("ARB"), among others, for allegedly providing material support to al Qaeda because the plaintiffs had failed to adequately plead that ARB's accounts or donations were used to provide funds to al Qaeda and thereby proximately cause the September 11, 2001 attacks. Nonetheless, the *Siegel* plaintiffs not only sued ARB for the same alleged conduct (albeit for a different al Qaeda attack), but also added seven HSBC defendants whom they alleged provided support *to ARB*. After the court dismissed ARB and five of the seven HSBC defendants on personal jurisdiction grounds, the plaintiffs filed a third amended complaint ("TAC") against the remaining HSBC defendants – that were even further removed from ARB's alleged conduct already found insufficient in *In re Terrorist Attacks* – which was also dismissed. The Second Circuit affirmed that dismissal.

Unlike the claims here, the TAC's claim was effectively premised on negligence, which is insufficient under the ATA. Moreover, unlike the instant case, the *Siegel* plaintiffs did not connect the HSBC defendants to ARB's alleged illicit conduct, let alone HSBC to al Qaeda in Iraq ("AQI"). 933 F.3d at 224-26. Therefore, the Court of Appeals correctly held that the *Siegel* TAC did not sufficiently plead defendants' general awareness of their role in AQI's terrorist activities. *Id.* at

224-25. Here, however, Plaintiffs have plausibly alleged that CAB knowingly facilitated, and was generally aware of its role in, HAMAS's terrorist activities.

The R&R also mistakenly concluded that Plaintiffs had not sufficiently alleged Defendant's general awareness because the first attack occurred approximately three months after any of the funds transfers Plaintiffs specifically identified, and in *Siegel* defendant HSBC stopped doing business altogether with its customer bank (ARB) 10 months before the attacks at issue there, and that gap was deemed too long. R&R at *13. Whereas HSBC "ceased doing business" with ARB, CAB *continued* holding accounts for and providing financial services to HAMAS's core institutions and leaders in Gaza and the West Bank throughout the time of the attacks. *See, e.g.*, Compl. ¶ 561 (transfers through 2004); ¶¶ 785-86 (Israeli authorities raided CAB branch and "confiscat[ed] terror funds" deposited there). Indeed, the *Siegel* complaint contained no allegations of any transfers by HSBC to an FTO let alone specific transactions for specific amounts or to specific accounts. In any event, *Siegel* never held that the 10-month period was singularly dispositive of HSBC's mental state—it was simply insufficient to overcome those plaintiffs' claims that HSBC was merely ***negligent*** in not acting on suspicions that ARB could have had connections to terrorism. *See Boim v. Holy Land Found.*, 549 F.3d 686, 700 (7th Cir. 2008) (*en banc*) ("*Boim III*") (holding that knowing contributions to an FTO two years before the date of an attack gives rise to liability).

The R&R repeats the error in finding the year-long period between CAB's alleged transactions for senior HAMAS political and military leader Abbas al-Sayed and the March 27, 2002 Park Hotel bombing he planned, in which more than two dozen people were killed, including Hannah Rogen, whose estate is a Plaintiff in this action, overly long for *mens rea* purposes. *Id.* ¶¶ 763, 765. Moreover, there is no basis to infer that CAB closed al-Sayed's account after the last

transfer that Plaintiffs specifically pleaded (before any discovery). In any event, the seven transfers for $69,000 Plaintiffs are able to allege now would be sufficient on the basis of al-Sayed's senior role in HAMAS itself, even without his role in the Park Hotel attack. For instance, the last transfer was only a few months before the December 1, 2001 Ben Yehuda Street Bombings, *id.* ¶¶ 409-10.

Finally, the R&R repeated the error again in premising its *mens rea* conclusion on its view that all of the alleged transfers were small and occurred *before* any of the attacks and that because CAB is not alleged to have "actively administered" the "martyr payments schemes," it did not plausibly know it was facilitating them. R&R at *14. The support Defendant provided was not "small," the fact that it occurred before the attacks *supports* Plaintiffs' argument and the facilitation of martyr payments provides a strong inference of CAB's knowing participation in rewarding and supporting terrorism. Again, CAB's $69,000 in transfers to al-Sayed alone could have paid for scores of terrorist attacks. And while that knowing support to al-Sayed alone provides the plausible inference of CAB's general awareness, CAB's support of HAMAS was exponentially larger: during the relevant period CAB held accounts for, and processed funds transfers on behalf of, three other senior HAMAS leaders as well as the core HAMAS entities in Gaza and the West Bank, as well as the primary HAMAS fundraiser in the United States, and facilitated the martyr payment scheme that directly incentivized suicide bombings and other terrorist attacks.

With respect to the martyr payments, the Complaint sets forth in well-pleaded, non-conclusory language that CAB knowingly participated in two elaborate schemes that facilitated the transmission of reward payments to the families of suicide bombers and other terrorists. Compl. ¶¶ 787-804. Saddam Hussein's program even paid a premium for successful suicide attacks, *id.* ¶¶ 790-01, received widespread media coverage, particularly in the Palestinian media, *id.* ¶¶ 792-95, but also internationally, *id.* ¶ 796. Likewise, *al-Ansar* publicly encouraged family members of

suicide bombers and other terrorists, including HAMAS operatives, to receive payments. *Id.* ¶¶ 803-03. The Complaint notes that *al-Ansar*'s website listed two accounts it held at CAB. *Id.* ¶ 804. These allegations more than plausibly allege at the pleading stage that CAB was generally aware that by holding accounts for entities publicly encouraging family members of suicide bombers and other terrorists to claim rewards for terrorist attacks it was playing a role in facilitating terrorism.

**Objection 5: The R&R erroneously found the "martyr payments" described in *Miller* as the minimum showing required to establish general awareness.**

In addition to overlooking Plaintiffs' allegations as to the martyrs' payments, the R&R improperly set such allegations as set forth in *Miller* as a prerequisite for a bank's general awareness. The *Miller* plaintiffs relied on evidence obtained during a decade-long discovery process in *Linde* to allege that Arab Bank knowingly administered a "martyr payment" scheme. R&R at *14. However, the Second Circuit in *Linde* did not hold that the martyr lists were necessary pre-conditions for finding general awareness; it merely noted they are one way that a defendant may be shown to be generally aware of its role in terrorist activities. 882 F.3d at 330. Nothing in *Linde*'s reasoning suggests that evidence was necessary at *trial*, much less at the pleading stage.

**Objection 6: The R&R improperly imported the erroneous specific intent standard from *Kaplan*.**

The R&R erroneously predicated its analysis on *Kaplan*, R&R *12, which required allegations that the defendant "knowingly and intentionally supported Hizbollah in perpetrating the rocket attacks." *Kaplan*, 405 F. Supp. 3d at 536. *Kaplan* misstated the proper legal standard under *Linde*, which does not require allegations of defendant's "specific intent," "intent to participate in a criminal scheme as 'something that he wishes to bring about and seek by his action to make it succeed,'" or that it "knew of the specific attacks at issue when it provided financial services for Hamas." *Linde*, 882 F.3d at 329. Moreover, JASTA, as confirmed in *Halberstam* and *Linde*, does not require that Plaintiffs intend to bring about a certain result; in *Halberstam*, the

defendant did not intend, or even know about, the implicated murder—or even the burglaries. As detailed above, with respect to general awareness, Plaintiffs must plausibly allege that CAB was generally aware of its role in HAMAS's terrorist activities, *i.e.*, its criminal enterprise. As detailed in the Complaint, and described above, Plaintiffs have done so.

**Objection 7: The R&R erred in finding that the HAMAS Institutions CAB assisted had to themselves have participated directly in the attacks and that their engagement in charitable activities precludes liability.**

The R&R erred in finding that because the HAMAS Institutions engaged in some charitable activities and did not *directly* assist HAMAS in the attacks, CAB is shielded from liability. *See* R&R at *13-14, 16. As explained above, CAB was well aware that, notwithstanding any charitable activities the HAMAS Institutions provided, HAMAS's *da'wa* (an Arabic term used to describe HAMAS's social welfare network) was intimately linked to and enabled its perpetration of terrorist activities. *Boim*, 2012 WL 13171764 at *6 (summarizing evidence that HLF "provided significant funding" to organizations that were "either known fronts for Hamas, known supporters of Hamas, or entities whose funding is known to benefit the Hamas agenda"). As the Complaint notes, the HAMAS Institutions facilitated the transfer of money to relatives of HAMAS terrorists and prisoners, providing a safety net for potential recruits concerned that their deaths or imprisonment could adversely affect their families. Compl. ¶ 617. The HAMAS Institutions also provided a reservoir of new recruits for suicide attacks, *id.*, and they played a central role in financing its terror campaign by providing the means to maintain the institutions that served as recruiting grounds for HAMAS. *Id.* ¶ 618. *See Boim III*, 549 F.3d at 698 ("Hamas's social welfare activities reinforce its terrorist activities both directly by providing economic assistance to the families of killed, wounded, and captured Hamas fighters and making it more costly for them to defect (they would lose the material benefits that Hamas provides them), and indirectly by enhancing Hamas's popularity among the Palestinian population and providing funds for indoctrinating

schoolchildren. Anyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities.") (citations omitted).

As the Supreme Court noted in *Holder*, "[m]uddying the waters between its political activism, good works, and terrorist attacks, Hamas is able to use its overt political and charitable organizations as a financial and logistical support network for its terrorist operations." 561 U.S. at 31 (quoting Dr. Matthew Levitt, *Hamas: Politics, Charity, and Terrorism in the Service of Jihad*, at 2 (2006)). Indeed, as cited *supra* at 4, the Supreme Court concluded that FTOs like HAMAS are so tainted that any contribution to them furthers their terrorist goals. *Id.* Nearly every FTO engages in some humanitarian work, in large measure to further its terrorist activities. If such work barred general awareness, JASTA would be a dead letter.

The R&R's error is compounded by its reliance on *O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709-LTS-GWG, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019), as "holding that providing financial services to Iranian companies with connections to terrorist organizations was insufficient to show knowledge that the services were 'destined to aid the [terrorist organizations] responsible for the attacks that injured Plaintiffs.'" R&R at *14 (quoting *O'Sullivan*, 2019 WL 1409446 at *8). The R&R overlooks the fact that *O'Sullivan supports* Plaintiffs' position, contrasting support to state sponsors of terrorism from support to FTOs:

> As the *Owens* court recognized, Congress found, in enacting other provisions of the ATA, that a total prohibition on financial support to terrorist organizations was justified because "money earmarked for peaceful activities donated directly to a terrorist organization nevertheless furthers the organization's violent ends." Congress, however, made no similar findings with respect to state sponsors of terrorism, even permitting certain financial transactions with the appropriate licenses.

*O'Sullivan*, 2019 WL 1409446, at *6 (quoting *Owens v. BNP Paribas*, 897 F.3d 266, 276 (D.C. Cir. 2018)). *See also Lelchook*, 2011 WL 4087448, at *1 (holding that the FTO "distinction takes

the case outside the rule of *Rothstein* [*v. UBS AG*, 708 F.3d 82 (2d Cir. 2013)], for *a terrorist front organization has no legitimate function that the United States recognizes*") (emphasis added).

**Objection 8: The R&R improperly rejected CAB's support for HAMAS alter egos as insufficiently "direct" for JASTA purposes.**

The R&R misapplies the observation of a trend "toward disallowing claims against defendants who did not deal directly with a terrorist organization or its proxy" from *Freeman v. HSBC Holdings PLC*, No. 14-CV-6601 (PKC) (CLP), 2019 WL 4452364, at *1 n.2 (E.D.N.Y. Sept. 16, 2019)). R&R at *12. *Freeman* analyzed conspiracy liability under § 2333(d)(2)—which, whatever its impact on directness, does not apply to aiding and abetting. Indeed, as *Freeman* noted, "[t]he Second Circuit has also acknowledged this congressional intent and has suggested that the provision of indirect assistance may suffice to give rise to aiding-and-abetting liability under § 2333(d)." *Freeman*, 2019 WL 4452364 at *21 n.41 (citing *Siegel*, 933 F.3d at 223 n.5).

Finally, the *Freeman* court itself distinguished the allegations there – a complicated conspiracy involving several European banks and commercial agents of Iran's terrorist apparatus – with cases in which defendants "deal directly with a terrorist organization *or its proxy*." *Id.* at *1 n.2 (emphasis added). Judge Chen stated in the sentence after the one the R&R cited, "[e]ven post-JASTA, courts have continued to distinguish between ATA claims based on a defendant's provision of support or services to a state sponsor of terrorism, such as Iran, and those alleging the direct provision of support and services to *a terrorist organization or its fundraising affiliate*." *Id.* (emphasis added). Here, CAB assisted HAMAS through its proxies and fundraising affiliates.

**C.    SUBSTANTIAL ASSISTANCE**

**Objection 9: The R&R misapplied Halberstam's six factors for finding substantial assistance.**

**Nature of the Act Assisted.** The R&R erroneously found that "[t]here is no allegation that CAB encouraged the Attacks or any of Hamas's terrorist activities." R&R at *16. Under

23

*Halberstam*, the nature of the act "dictates what aid might matter, *i.e.*, be substantial." 705 F.2d at 484. As explained above and in Plaintiffs' briefs at length, financial services to HAMAS "mattered" to its financing of terrorism and the *da'wa* system that supports its terror infrastructure. *Halberstam* also noted that "the blameworthiness of the tortious act or the seriousness of the foreseeable consequences" could be considered in the "nature of the act" and "state of mind" factors. *Id.* at 484 n.13. There, "eraser throwing" was deemed "something more pernicious than 'horse play.'" *Id.* (citing *Keel v. Hainline*, 331 P.2d 397 (Okl. 1958)). Here, CAB assisted HAMAS, an FTO that seeks to kill and maim civilians.

**Amount of Assistance.** The R&R misapplied *Halberstam*'s amount of assistance factor in deeming 23 account transfers "well before" any of the implicated attacks insubstantial assistance. R&R at *16. As explained *supra* at 18-19, the account transfers were not made "well before" the attacks. In addition, as also noted above, CAB's maintenance of accounts for many of HAMAS's core entities in the Palestinian Territories, four of its senior leaders, and its primary fundraiser in the United States, itself constituted substantial assistance. Plaintiffs also plausibly alleged CAB's role in *two* highly-publicized martyrs payment programs. CAB provided HAMAS with critical access to the U.S. financial system that allowed it to raise funds globally and easily channel them into the Palestinian Territories.

**Presence at the Time of the Tort.** Although CAB was not present at the scene of the attack, R&R at *16, neither was the defendant in *Halberstam* at Halberstam's murder. However, a financial institution like CAB cannot ever be "present" at an attack, and yet *Halberstam* does not immunize banks. *See Halberstam*, 705 F.3d at 488.

**Relation to the Tortious Actor.** The R&R misconstrued *Halberstam*'s "relationship" factor (which it "accord[ed] a low priority") concluding that Plaintiffs did not plead that CAB had

24

the "close" relationship with HAMAS that Hamilton had with Welch in *Halberstam*, only an arms-length business relationship. R&R at *16. In *Halberstam*, this factor asks whether the relationship "lent greater force" to the assistance, 705 F.2d at 484—obviously, CAB's years-long role as HAMAS's willing banker lends the greatest force to the financial services it performed for HAMAS. The factor is not about closeness—no bank is in a personal relationship with a terrorist group—as is clear from the example in *Halberstam* of a security guard and a motorist. *Id.*

**State of Mind.** As stated above, the R&R erroneously concluded that CAB did not know its services assisted HAMAS's terrorist activities or the Attacks that injured Plaintiffs. R&R at *16. CAB's state of mind is addressed above, but it is clear that its long-term, knowing assistance "was no passing fancy or impetuous act." *Halberstam*, 705 F.2d at 488.

**Duration of Assistance.** The R&R misapplied *Halberstam*'s sixth substantial assistance factor, concluding that the funds transfers took place "well before" the attacks and that the longest duration of the funds transfers for any one of the implicated entities was one year, much shorter than the four-year period in *Miller*. R&R at *17. *Miller* does not set the floor for the time period that must be established to satisfy this *Halberstam* factor. As explained above, in the context of general awareness, the funds transfers did not occur "well before" the attacks. *See Boim III*, 549 F.3d at 700 (finding a two-year period sufficient). CAB provided substantial assistance to the HAMAS Institutions for years during the entire relevant period. *See supra* at 18-19. The R&R nonetheless incorrectly focuses on the specific funds transfers identified in the Complaint and *penalizes* Plaintiffs for their level of specificity by ignoring the plethora of accounts that CAB held for HAMAS and drawing the unsupported negative inference that CAB provided no assistance through those accounts other than the transactions specified.

## CONCLUSION

For the reasons stated above, this Court should reject the R&R as to CAB's liability and

deny CAB's motion to dismiss in its entirety.


Dated: February 11, 2020
      Hackensack, NJ

                          Respectfully submitted,

                          By:    /s/ Gary M. Osen
                                    **OSEN LLC**
                                    Gary M. Osen, Esq.
                                    Ari Ungar, Esq.
                                    Michael J. Radine, Esq.
                                    Dina Gielchinsky, Esq.
                                      Aaron Schlanger, Esq.
                                      2 University Plaza, Suite 402
                                    Hackensack, NJ 07601
                                    Telephone (201) 265-6400

                                    **ZUCKERMAN SPAEDER LLP**
                                    Shawn P. Naunton, Esq.
                                    485 Madison Avenue, 10th Floor
                                    New York, NY 10022
                                    Telephone (646) 746-8655

                                    **TURNER & ASSOCIATES, P.A.**
                                    C. Tab Turner, Esq.
                                    4705 Somers Avenue, Suite 100
                                    North Little Rock, AR 72116
                                    Telephone (501) 791-2277

                                    **KOHN, SWIFT & GRAF, P.C.**
                                    Steven M. Steingard, Esq.
                                    Stephen H. Schwartz, Esq.
                                    Neil L. Glazer, Esq.
                                    1600 Market Street, Suite 2500
                                    Philadelphia, PA 19103
                                    Telephone (215) 238-1700

                                    Attorneys for Plaintiffs