# Exhibit A

J897HIRC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  ESTATE OF YONADAV HIRSHFELD,
   et al.,
4
                    Plaintiffs,
5
           v.                          18 Civ. 1982 (KPF)
6
   THE BANK OF CHINA LIMITED,
7
                    Defendant.
8
   ------------------------------x
9                                      New York, N.Y.
                                       August 9, 2019
10                                     12:00 p.m.

11 Before:

12               HON. KATHERINE POLK FAILLA

13                                     District Judge

14               APPEARANCES (via telephone)

15 LAW OFFICES OF PAUL G. GASTON
        Attorneys for Plaintiffs
16 BY:  PAUL G. GASTON

17 SCHER & SCHER P.C.
        Attorneys for Plaintiffs
18 BY:  DANIEL J. SCHER

19 DORSEY & WHITNEY LLP
        Attorneys for Defendant
20 BY:  LANIER SAPERSTEIN
        JOSHUA KORNFIELD
21      MARK SULLIVAN
        SHAN JIANG
22

23

24

25

1          (In open court)

2          THE COURT:  Counsel, good afternoon.  This is Judge

3   Failla.  I thank you very much for participating in this call

4   by phone.  Please state your appearances.

5          MR. GASTON:  Good afternoon, your Honor.  This is Paul

6   Gaston on behalf of plaintiffs.  And Mr. Perlin regrets he

7   cannot join us today because it's already Friday night in

8   Israel, and he did not want to ask for another continuance, so

9   I will be handling the conference with Mr. Scher.

10          MR. SCHER:  Mr. Scher is on the line also for the

11   plaintiff.  Dan Scher.

12          THE COURT:  Yes.  And welcome to you both.  I

13   certainly understand did Mr. Perlin, and we understand and

14   that's fine.  My expectation, gentlemen, is I will be

15   presenting my opinion, but I don't know that I would have much

16   in the way of colloquy with the parties.

17          Representing Bank of China, may I have appearances,

18   please.

19          MR. SAPERSTEIN:  This is Lanier Saperstein on behalf

20   of Bank of China from Dorsey & Whitney.  I have three of my

21   colleagues with me:  Mr. Mark Sullivan, Josh Kornfield and Shan

22   Jiang.

23          THE COURT:  OK.  Welcome to all of you, and thank you

24   very much.

25          All right.  Let me then please begin.  And let me

J897HIRC

1    begin by not apologizing but recognizing that there are more

2    exciting things to do than listen to a judge read into the

3    record a decision, but I want to give you a decision at the

4    earliest opportunity I had, and I didn't want to trouble you

5    all to come in here just to hear me read it, so I appreciate

6    your accommodations in that regard.

7            And I also wanted you to know -- and I am sure you all

8    know -- that the Second Circuit issued a decision yesterday --

9    I don't have a number for the case other than the name is

10   Siegel v. HSBC Bank -- upholding a decision of Judge Cote's.  I

11   believe that there are some similarities and some differences,

12   but to the extent you wanted to make me aware of a very

13   recently issued decision in this area, I wanted you to know

14   that I am aware of a recently issued decision in this area.

15   So, I'll just put that to the side for a moment.

16           Our conference this afternoon is for me to render an

17   oral decision on defendant's motion for judgment on the

18   pleadings, and I will just cut to the chase and explain, for

19   the reasons I'm about to address, I am denying the motion.

20           I do want to make clear that I found both side's

21   materials, but particularly the defense's materials and oral

22   presentation, to be excellent, and so I imagine that's cold

23   comfort to you given the result I'm about to give, but really

24   it was very good and made me think a lot.

25           The issue, the way I see it -- and I think this will

1    be reflected at various points in my decision -- is that both

2    sides are very well versed in this area of the law, and I think

3    as a result the defense is able to call to my attention so many

4    cases that touch on these areas of the law.  And the

5    plaintiffs, through their very experienced counsel, are able to

6    submit pleadings that address -- within the bounds of Rule 11

7    of course -- each of the issues that have been raised in these

8    cases.

9         So, I find ultimately that the plaintiffs have, if you

10   will, threaded the needle necessary to have this case survive a

11   motion for judgment on the pleadings.

12        You are all familiar with the allegations of the

13   amended complaint, so to keep you from remaining on this call

14   forever, I'm not giving a full recitation of the facts.  I will

15   be addressing the procedural history only as necessary.

16        Although this decision touches on all of the issues

17   raised by the parties, I'm discussing some in greater depth

18   than others.  I will briefly resolve the issues regarding the

19   political question and Totten doctrines, and devote more of my

20   time to the personal jurisdiction arguments and as well the

21   arguments for primary and secondary liability under the ATA and

22   JASTA.  If there is a point on any of these issues that hasn't

23   been addressed fully, I promise you that it has been

24   considered, and I am not going to get to that level of

25   granularity in resolving this motion at this stage.

1          I will speak very briefly, because again you all are

2     very well aware of the law in this area, but a motion for a

3     judgment on the pleadings is subject to the same standards as a

4     motion to dismiss under Federal Rule of Civil Procedure

5     12(b)(6).  There are so many cases for that proposition; I will

6     give you one*:  Bank of New York v. First Millennium, Inc*., 607

7     F.3d 905 (2d Cir. 2010).  And in this setting I am to "draw all

8     reasonable inferences in the non-moving party's favor, assume

9     all well-pleaded factual allegations to be true, and determine

10    whether they plausibly give rise to an entitlement to relief."

11    I am quoting there from *Faber v. Metropolitan Life Insurance*

12    *Company*, 648 F.3d 98, 104 (2d Cir. 2011).  "To survive a motion

13    to dismiss, a pleading must contain sufficient factual matter,

14    accepted as true, to 'state a claim to relief that is plausible

15    on its face.'"  I will just say *Ashcroft v. Iqbal* and *Bell*

16    *Atlantic Corporation v. Twombly*, I'm confident everyone on this

17    call is aware of those cases.  "While *Twombly* does not require

18    heightened fact pleading of specifics, it does require enough

19    facts to 'nudge a non-moving party's claims across the line

20    from conceivable to plausible.'"  "Where a pleading alleges

21    facts that are merely consistent with liability, it stops short

22    of the line between possibility and plausibility of entitlement

23    to relief."  That said, I am not to accept legal conclusions or

24    threadbare recitals or conclusory statements.  Those do not

25    suffice.

1          Let me turn, please, to the political question

2     doctrine.  "Prominent on the surface of any case held to

3     involve a political question is found, one, a textually

4     demonstrable constitutional commitment of the issue to a

5     coordinate political department; or, two, a lack of judicially

6     discoverable and manageable standards for resolving it; or,

7     three, the impossibility of deciding without an initial policy

8     determination of a kind clearly for nonjudicial discretion; or,

9     four, the impossibility of a court's undertaking independent

10    resolution without expressing lack of the respect due

11    coordinate branches of the government; or, five, an unusual

12    need for unquestioning adherence to a political decision

13    already made; or, six, the potentiality of embarrassment from

14    multifarious pronouncements by various departments on one

15    question."  And that is a long quote from *Baker v. Carr*, 369

16    U.S. 186, a Supreme Court decision from 1962.

17          Defendant here argues that this case should be

18    dismissed primarily under the second, but also under the first,

19    fourth and sixth *Baker* factors, and principally defendant

20    argues that the instant action is nonjusticiable because

21    plaintiffs do not have the power or ability to compel the

22    production of evidence -- namely from Israel or the People's

23    Republic of China -- that would be necessary to support the

24    core claims in this case.

25          I want to be clear -- and that's why I'm reading this

1  statement -- to be sure, in the related lawsuits, as the

2  parties have defined them, plaintiffs were unable to obtain the

3  necessary evidentiary cooperation from Israel and the PRC, but

4  I cannot automatically discredit plaintiffs' arguments that the

5  passage of time may have altered the landscape or that similar

6  evidence might be available from third parties.  At the very

7  least, I cannot definitively decide this issue until I am

8  presented with a discovery dispute or told myself about

9  Israel's or the PRC's unwillingness to cooperate, and,

10  accordingly, the motion to dismiss under the political question

11  doctrine is denied.

12          Turning to the Totten doctrine, which was set forth

13  initially in *Totten v. United States*, 92 U.S. 105, from 1875,

14  and expanded upon by *Tenet v. Doe*, 544 U.S. 1, in 2005, I have

15  been asked by the defense to apply the Totten rule to bar

16  plaintiffs' claims, all of which defendant claims are

17  impossible to litigate without improperly disclosing classified

18  information.

19          At the moment, I find the instant case to be too

20  tenuous a connection to the ideas and the policy goals of

21  *Totten* or *Tenant*.  While *Totten* concerned a contract dispute

22  between a U.S. spy and the federal government, the instant

23  matter involves Bank of China's support of Hamas.  Here, the

24  very subject matter of the action is not a state secret.  Even

25  if it were, the Court is not convinced that it is required to

1  expand *Totten* to cases involving state secrets of foreign

2  states.  And for this reason the motion to dismiss under the

3  Totten doctrine is denied.

4         I'm going to spend a little bit more time on this

5  issue of personal jurisdiction.  The parties do not dispute

6  that Bank of China is not subject to general jurisdiction, and

7  so we're really focusing on specific jurisdiction in this case.

8  And in the framework of specific jurisdiction, I may exercise

9  personal jurisdiction over a defendant if it has been properly

10  served, if I have a statutory basis for exercising personal

11  jurisdiction, and if the exercise of personal jurisdiction

12  comports with constitutional due process.  I am citing here to

13  *Licci v. Lebanese Canadian Bank*, 673 F.3d 50 (2d Cir).  And the

14  parties are disputing whether under Federal Rule of Civil

15  Procedure 4(k)(1)(A), personal jurisdiction lies under New York

16  CPLR 302(a)(1), which is the New York long arm statute relating

17  to non-domiciliaries that transact business in New York.  To

18  establish personal jurisdiction under this provision, the

19  defendant must have transacted business within the state and

20  the claim asserted must have arisen from that business

21  activity.

22         The crux of the issue in this regard is the role

23  played by a correspondent bank, more precisely whether Bank of

24  China's use of a correspondent account in New York to send

25  money from Iran to a Bank of China account in China meets the

1   requirements of New York's long arm statute.

2          In the complaint plaintiffs allege that "Bank of China

3   repeatedly used its New York branch office to transfer or aid

4   in the transfer of substantial sums of money to, from, and on

5   behalf of Hamas, Iran, and others to enable Hamas to carry out

6   its terrorist activities, including the terrorist shooting."

7   Conversely, defendant argues that Bank of China merely

8   maintained a correspondent account in New York, which is

9   insufficient in and of itself to confer jurisdiction under CPLR

10  302(a)(1).  And for the reasons that follow, I find that

11  plaintiffs have sufficiently pleaded the requirements of New

12  York's long arm statute.

13         Now, as a threshold matter, I agree with the defendant

14  that the use of a correspondent bank account isn't *per se*

15  jurisdictional -- I am citing here to *Amigo Foods Corporation*

16  *v. Marine Midland Bank of New York*, 39 N.Y.2d 391, a Court of

17  Appeals New York decision from 1976 -- and, rather, the key

18  jurisdictional inquiry relates to the frequency and the

19  deliberate nature of the defendant's role in these

20  transactions.  And that is another *Licci* decision, this one

21  from New York State Court, 20 N.Y.3d 327 (2012).  The most

22  recent cases on this issue in New York courts would be this

23  third *Licci* decision and *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d

24  316 (2016), which focus my attention on several factors

25  including the number of transfers, by whom the transfers were

1  initiated, through what banks, and the degree to which the

2  correspondent bank was aware of and permitted rather than

3  rejected the transfers.

4          Now, considering Bank of China's activities in light

5  of these factors, I find that defendant's correspondent banking

6  activity, as pleaded, is sufficient to establish a purposeful

7  course of dealing constituting the transaction of business in

8  New York under CPLR Section 302(a)(1).  As alleged in the

9  operative complaint, Bank of China conducted dozens of wire

10  transfers for Hamas, totaling millions of dollars and,

11  according to plaintiffs, these dollar transfers were initiated

12  by Hamas and Iranian officials in Iran, Syria and other Middle

13  Eastern countries, and they were executed by and through Bank

14  of China's branches in the United States.  The operative

15  complaint further asserts that Bank of China had a policy of

16  turning a blind eye to its customers' involvement in terrorism,

17  going so far as to advise its customers as to how it might

18  conceal the nature and identity of their U.S. banking

19  transactions.  I am accepting -- as I must at this stage -- the

20  well-pleaded but nonconclusory allegations in the operative

21  complaint as true, and I find that those allegations suffice to

22  give the Court personal jurisdiction over Bank of China.

23          Defendants argue that Bank of China did not have an

24  active role in the correspondent banking process because the

25  transfers were initiated by customers at Middle Eastern banks,

1   and I find that ultimately to be unavailing, because I believe

2   this argument ignores the fact that while Bank of China

3   allegedly provided banking services to Hamas, it was Hamas

4   itself who was sending the money and therefore initiating the

5   transfers, not Bank of China.  Quoting from *Al Rushaid*, "A

6   foreign bank with a correspondent account that repeatedly

7   approves deposits and the movement of funds through that

8   account for the benefit of its customer is no less 'transacting

9   business in New York' because the customer, or a third party at

10  the customer's direction, actually deposits or transfers the

11  funds to New York."  That quote is from 28 N.Y.3d at 328.

12  Here, as in *Licci* and *Al Rushaid*, the quantity and quality of

13  the alleged contacts, as pleaded in the complaint, establish a

14  course of dealing with New York, and the transaction and claim

15  are not merely coincidental.

16          Plaintiffs have made a *prima facie* showing of personal

17  jurisdiction pursuant to New York's long arm statute, and

18  precisely for this reason I am not addressing plaintiffs'

19  proffered alternative bases for personal jurisdiction,

20  including New York corporations law, the New York banking law

21  and Federal Rules of Civil Procedure 4(k)(1)(C) and 4(k)(2),

22  and I am denying the motion to dismiss for lack of personal

23  jurisdiction.

24          I am now addressing the issues of primary and

25  secondary liability under the ATA and JASTA, and I am denying

1    defendant's motion on these bases as well.  But I will note, as

2    I suggested at the beginning of this decision, I'm at the

3    motion for the judgment on the pleadings stage, and I am

4    obligated, based on the cases that I have read to you earlier,

5    to accept the well-pleaded allegations of the operative

6    complaint.

7         Letting this case go forward, I am saying nothing

8    about my view of the strength of the allegations or the likely

9    disposition in a summary judgment motion.  And for this reason,

10   and given how I am bound to accept the well-pleaded

11   allegations, I am addressing these arguments somewhat briefly.

12        The ATA defines the term "international terrorism" as

13   activities that:  A, involve violent acts or acts dangerous to

14   human life that are a violation of the criminal laws of the

15   United States or of any state, or that would be a criminal

16   violation if committed within the jurisdiction of the United

17   States or of any State; B, appear to be intended (i) to

18   intimidate or coerce a civilian population; (ii) to influence

19   the policy of a government by intimidation or coercion; or

20   (iii) to affect the conduct of a government by mass

21   destruction, assassination or kidnapping; and, C, occur

22   primarily outside the territorial jurisdiction of the United

23   States.

24        And with regards to primary liability, defendant's

25   first argument is that plaintiffs do not allege an act of

1  international terrorism because Bank of China's routine banking

2  services were neither violent nor life endangering.  Now,

3  although the provision of material support is not a *per se*

4  violation of the ATA, it can satisfy the violent acts or

5  dangerous to human life prongs of the ATA.  And that is *Lind v.*

6  *Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018).  And here I find

7  the plaintiffs sufficiently -- I would say barely is perhaps a

8  strong term -- but they do make it, they sufficiently allege

9  that Bank of China's banking services were used for violent or

10  life-endangering purposes.  As alleged in the complaint, Bank

11  of China executed transfers for known Hamas operatives.  They

12  were aware of the Hamas affiliations, and the transfers were

13  necessary for the attack at issue here.

14      Secondly, defendant argues that plaintiffs have not

15  met the general *mens rea* requirement of the ATA or the more

16  demanding scienter requirements of the underlying criminal

17  statutes.  Here the Court disagrees.  Plaintiffs allege that in

18  April of 2005, Israeli government officials told officials at

19  the PRC that the transfers were being used by Hamas to enhance

20  its ability to plan and carry out terrorist attacks.  And I

21  find that that allegation suffices to plead Bank of China's

22  actual knowledge.

23      Finally, with regard to primary liability, the

24  defendant asserts that plaintiffs have not sufficiently alleged

25  that Bank of China's banking services were the proximate cause

1   of plaintiffs' injuries.  And looking now at the ATA's "by

2   reason of" requirement, as set forth in 18 U.S.C. Section

3   2333(a), a plaintiff must show that a defendant's alleged

4   conduct was the proximate cause of the plaintiff's injury.

5   Quoting here from *Rothstein v. UBS AG*, 708 F.3d 82, 89 (2d Cir.

6   2013).  And to put that a little bit differently, the alleged

7   violation must have led directly to the plaintiff's injuries;

8   the defendant's acts must be a substantial factor in the

9   sequence of responsible causation; and the plaintiff's injury

10  must be reasonably foreseeable or anticipated as a natural

11  consequence.

12          Here I find that the plaintiffs have sufficiently

13  alleged proximate causation.  The amended complaint alleges the

14  following:  Number one, beginning in 2003 Bank of China

15  conducted dozens of wire transfers for Hamas, totaling several

16  million dollars; number two, many of these transfers were made

17  to the accounts of Said al-Shurafa, a senior officer and agent

18  of both Hamas and the PIJ; and, three, al-Shurafa then effected

19  these transfers to Hamas leadership for the purpose of

20  planning, preparing for, and executing terrorist attacks;

21  number four, Bank of China's provision of these wire transfers

22  allowed Hamas to carry out the Mercaz Harav attack.

23  Defendant's argument that plaintiffs have not sufficiently tied

24  al-Shurafa to Hamas is unavailing at this stage of the

25  litigation.  Again, at this stage plaintiffs have made a

1    sufficient showing.

2            I turn briefly to secondary liability under JASTA,

3    otherwise known as the Justice Against Terrorism Act, an act in

4    2016, that specifically was engaged or implemented in order to

5    amend the ATA to permit claims for secondary liability for

6    aiding and abetting in a conspiracy.  JASTA includes two

7    statutory requirements:  Number one, that an act of

8    "international terrorism" be "committed, planned or authorized"

9    by an FTO, and two, that a defendant conspire with the person

10   who committed the act of "international terrorism" or knowingly

11   and substantially aid and abet the act of "international

12   terrorism."  And Congress has instructed courts to apply the

13   legal framework set forth in *Halberstam v. Welch*, the D.C.

14   Circuit decision from 1983, to consider aiding and abetting and

15   conspiracy liability.  In this regard as well, defendant makes

16   two arguments:  First, defendant argues that plaintiffs do not

17   sufficiently allege the *Halberstam* elements of conspiracy --

18   specifically that there was an agreement between Bank of China

19   and Hamas to participate in a terrorist attack and, second,

20   defendant asserts that plaintiffs have failed to allege two

21   elements of aiding and abetting liability:  Number one, the

22   awareness and knowledge requirement; and, number two,

23   substantial assistance.  But here again plaintiffs' allegation

24   that the Israeli government sent a delegation to China to spell

25   out to China and by extension the Bank of China the

J897HIRC

1    significance of its assistance to Hamas suffices to meet all of

2    these elements at the pleading stage.

3        Therefore, and for all of these reasons, I am

4    dismissing the motion for judgment on the pleadings in its

5    entirety.

6        Now, of course, I want counsel to think about my

7    decision, but it would seem to me that the next step would be

8    the discussion or meeting between the parties to propose a

9    discovery schedule to me.

10       There is a case management plan that I have on my web

11   page that would give suggested dates.  I do not know if this is

12   a case in which the parties would prefer a more tailored or

13   more bespoke case management plan that addresses the issues in

14   this case.

15       So, turning to Mr. Gaston, sir, you might need some

16   time to do this.  How much time would you like to confer with

17   your adversaries and propose something to me?

18       MR. GASTON:  Well, I think we could confer and propose

19   something pretty quickly, but I would also like to mention that

20   we already have discovery requests outstanding, and they have

21   been served on defendant since about six or seven months ago.

22   But as to scheduling and deadlines and so on, I think we do

23   have to discuss that.

24       THE COURT:  Well, all right.  Then perhaps I should

25   ask the question of your adversary.

J897HIRC

1          Mr. Saperstein, I want you to have the time that you

2     need to speak with your adversaries but, as well, to consider

3     these pending discovery requests that did not need to be

4     answered while this motion was pending.  So, how much time

5     would you like to have that opportunity to review those

6     requests, think about the time that is necessary and speak with

7     your adversaries before proposing something to me?

8          MR. SAPERSTEIN:  I think in order to respond to their

9     requests, I believe I would have 30 days, and that's what I

10    would request to respond to them.

11         But if I might suggest -- and this is what I will

12    suggest to plaintiffs' counsel -- is that perhaps we do

13    discovery by a staggered process.  So, for example, it's clear

14    from your decision that the April 2006 meeting is critical and

15    central to the plaintiffs' allegations, so I would propose that

16    perhaps we focus on whether Israel will agree to make a witness

17    available.  Because once we have that answer, we can move into

18    the political question doctrine, to see if it's ripe then, as

19    well as addressing the core allegations of plaintiffs' claim.

20         THE COURT:  Let me please do this, because I know

21    already that the parties will not reach agreement on this

22    issue, so I'm going to do something a little bit different.

23         Mr. Gaston, would you be able to provide for me a

24    letter in two week's time, on or before the 23rd of August,

25    outlining how plaintiffs believe discovery should be

1    structured.

2              MR. GASTON:  Yes, certainly.

3              THE COURT:  Thank you very much.

4              Mr. Saperstein, would you be able to provide for me a

5    letter on or before August 23, so two weeks from today,

6    regarding how the defense believes discovery should be

7    structured?

8              MR. SAPERSTEIN:  Your Honor, if I may ask for an extra

9    week, and it's for a purely selfish reason.  I'm slated to be

10   on vacation between the 17th and I believe the 22nd.

11   Obviously, I can work while I'm on vacation, but I would rather

12   not.

13             THE COURT:  Yes.  Sir, I don't want you to think that

14   I am so cruel that I will make you work on your vacation.

15   You'll come to realize later on how cruel or not I am.  So, I

16   will give both of you until the 30th.  Certainly, if you turn

17   it in earlier, that's great, but I won't look at it until I

18   have both of them.

19             I'm just going to say this -- and you will do with

20   this whatever you think is appropriate -- you're not going to

21   agree; I can tell that already.  But, rather, perhaps --

22   perhaps in your letters to me you might want to present certain

23   fall-back positions.  It's fine if you want to -- if you will

24   excuse the baseball metaphor -- you can hit for singles or you

25   can hit for home runs, but if you try to hit for the home run

J897HIRC

1    and strike out, then you may be in a worse position.  So,

2    perhaps you want to give me your dream proposal, how discovery

3    would be if you were ruling this courtroom, and then perhaps

4    give me a fallback position so I can see if there is any

5    commonality between the parties.  But I do understand both of

6    your positions about discovery, and I'm not surprised by either

7    of them.

8            So, I will hear from you on or before the 30th of

9    August.  In the interim, I wish you all a happy rest of your

10   summer, a happy Friday today.

11           I am confident that one or both of you will get the

12   transcript in this case, and when you order it, I will receive

13   it automatically.  And I will talk to you in the future.

14           So, Mr. Gaston, is there anything else you want to

15   bring to my attention today?

16           MR. GASTON:  No, your Honor.

17           THE COURT:  All right.  Thank you.

18           And thank you as well to Mr. Scher for sitting in on

19   the call.

20           MR. SCHER:  Thank you.

21           THE COURT:  Mr. Saperstein, anything else you want to

22   bring to my attention today?

23           MR. SAPERSTEIN:  May I just confer with my colleagues

24   just for one second?

25           THE COURT:  Of course.

1        MR. SAPERSTEIN:  No, your Honor.  Thank you.

2        THE COURT:  Mr. Saperstein, to the extent the folks in

3    the room with you assisted you with your written and oral

4    submissions, please thank them on my behalf as well.

5        MR. SAPERSTEIN:  Thank you.  I will.

6        THE COURT:  All right.  Thank you.  We are adjourned.

7            – – –

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25