UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

JULIE AVERBACH FOR THE ESTATE OF STEVEN   :
AVERBACH, JULIE AVERBACH, TAMIR   :
AVERBACH, DEVIR AVERBACH, SEAN   :
AVERBACH, ADAM AVERBACH, MAIDA   :
AVERBACH FOR THE ESTATE OF DAVID   :
AVERBACH, MAIDA AVERBACH, MICHAEL   :
AVERBACH, EILEEN SAPADIN, MOSES STRAUSS,  :
PHILIP STRAUSS, BLUMA STRAUSS, AHRON   :
STRAUSS, ROISIE ENGELMAN, JOSEPH STRAUSS,  :
TZVI WEISS, LEIB WEISS, LEIB WEISS FOR THE  :
ESTATE OF MALKA WEISS, YITZCHAK WEISS,  :
YERUCHAIM WEISS, ESTHER DEUTSCH,   :
MATANYA NATHANSEN, CHANA NATHANSEN,  :
MATANYA NATHANSEN AND CHANA   :
NATHANSEN FOR THE ESTATE OF TEHILLA   :
NATHANSEN, YEHUDIT NATHANSEN, S.N., A   :
MINOR, HEZEKIEL TOPOROWITCH, PEARL B.   :
TOPOROWITCH, YEHUDA TOPOROWITCH,   :
DAVID TOPOROWITCH, SHAINA CHAVA NADEL,  :
BLUMY ROM, RIVKA POLLACK, RACHEL   :
POTOLSKI, OVADIA TOPOROWITCH, TEHILLA   :
GREINIMAN, YISRAEL TOPOROWITCH,   :
YITZCHAK TOPOROWITCH, MICHAL   :
HONICKMAN FOR THE ESTATE OF HOWARD   :
GOLDSTEIN, MICHAL HONICKMAN, EUGENE   :
GOLDSTEIN, LORRAINE GOLDSTEIN, RICHARD  :
GOLDSTEIN, BARBARA GOLDSTEIN INGARDIA,  :
MICHAEL GOLDSTEIN, CHANA FREEDMAN,   :
DAVID GOLDSTEIN, HARRY LEONARD BEER,  :
HARRY LEONARD BEER AS EXECUTOR OF THE  :
ESTATE OF ALAN BEER, HARRY LEONARD BEER  :
AS EXECUTOR OF THE ESTATE OF ANNA BEER,  :
PHYLLIS MAISEL, ESTELLE CAROLL, SARRI   :
ANNE SINGER, JUDITH SINGER, ERIC M. SINGER,  :
ROBERT SINGER, DANIEL ROZENSTEIN, JULIA  :
ROZENSTEIN SCHON, ALEXANDER ROZENSTEIN,  :
ESTHER ROZENSTEIN, JACOB STEINMETZ,   :
DEBORAH STEINMETZ, JACOB STEINMETZ AND  :
DEBORAH STEINMETZ FOR THE ESTATE OF   :
AMICHAI STEINMETZ, NAVA STEINMETZ, ORIT  :
MAYERSON, NETANEL STEINMETZ, ANN   :
COULTER FOR THE ESTATE OF ROBERT L.   :
COULTER, SR., DIANNE COULTER MILLER,   :

**AMENDED COMPLAINT**
**JURY TRIAL DEMANDED**


19-cv-00004-GHW-KHP

ROBERT L. COULTER, JR., DIANNE COULTER          :
MILLER AND ROBERT L. COULTER, JR. FOR THE       :
ESTATE OF JANIS RUTH COULTER, LARRY             :
CARTER AS THE ADMINISTRATOR OF THE              :
ESTATE OF DIANE LESLIE CARTER, LARRY            :
CARTER, SHAUN CHOFFEL, RICHARD                  :
BLUTSTEIN AND KATHERINE BAKER FOR THE           :
ESTATE OF BENJAMIN BLUTSTEIN, RICHARD           :
BLUTSTEIN, KATHERINE BAKER, REBEKAH             :
BLUTSTEIN, NEVENKA GRITZ FOR THE ESTATE         :
OF DAVID GRITZ, NEVENKA GRITZ, NEVENKA          :
GRITZ FOR THE ESTATE OF NORMAN GRITZ,           :
JACQUELINE CHAMBERS AND LEVANA COHEN            :
AS THE ADMINISTRATORS OF THE ESTATE OF          :
ESTHER BABLAR, JACQUELINE CHAMBERS,             :
LEVANA COHEN, ELI COHEN, SARAH ELYAKIM,         :
JOSEPH COHEN, GRETA GELLER, ILANA               :
DORFMAN, REPHAEL KITSIS AND TOVA                :
GUTTMAN AS THE ADMINISTRATORS OF THE            :
ESTATE OF HANNAH ROGEN, TEMIMA SPETNER,         :
JASON KIRSCHENBAUM, ISABELLE                    :
KIRSCHENBAUM, ISABELLE KIRSCHENBAUM             :
FOR THE ESTATE OF MARTIN KIRSCHENBAUM,          :
JOSHUA KIRSCHENBAUM, SHOSHANA BURGETT,          :
DAVID KIRSCHENBAUM, DANIELLE                    :
TEITELBAUM, NETANEL MILLER, CHAYA               :
MILLER, ARIE MILLER, AHARON MILLER, SHANI       :
MILLER, ADIYA MILLER, ALTEA STEINHERZ,          :
JONATHAN STEINHERZ, TEMIMA STEINHERZ,           :
JOSEPH GINZBERG, PETER STEINHERZ, LAUREL        :
STEINHERZ, GILA ALUF, YITZHAK ZAHAVY,           :
JULIE ZAHAVY, TZVEE ZAHAVY and BERNICE          :
ZAHAVY,                                         :
                                                :
                    Plaintiffs,                 :
                                                :
        -against-                               :
                                                :
                                                :
CAIRO AMMAN BANK,                               :
                                                :
                    Defendant.                  :
                                                :
----------------------------------------------------------------------x

Plaintiffs Julie Averbach for the Estate of Steven Averbach, Julie Averbach, Tamir Averbach, Devir Averbach, Sean Averbach, Adam Averbach, Maida Averbach for the Estate of David Averbach, Maida Averbach, Michael Averbach, Eileen Sapadin, Moses Strauss, Philip Strauss, Bluma Strauss, Ahron Strauss, Roisie Engelman, Joseph Strauss, Tzvi Weiss, Leib Weiss, Leib Weiss for the Estate of Malka Weiss, Yitzchak Weiss, Yeruchaim Weiss, Esther Deutsch, Matanya Nathansen, Chana Nathansen, Matanya Nathansen and Chana Nathansen for the Estate of Tehilla Nathansen, Yehudit Nathansen, S.N., a minor, Hezekiel Toporowitch, Pearl B. Toporowitch, Yehuda Toporowitch, David Toporowitch, Shaina Chava Nadel, Blumy Rom, Rivka Pollack, Rachel Potolski, Ovadia Toporowitch, Tehilla Greiniman, Yisrael Toporowitch, Yitzchak Toporowitch, Michal Honickman for the Estate of Howard Goldstein, Michal Honickman, Eugene Goldstein, Lorraine Goldstein, Richard Goldstein, Barbara Goldstein Ingardia, Michael Goldstein, Chana Freedman, David Goldstein, Harry Leonard Beer, Harry Leonard Beer as Executor of the Estate of Alan Beer, Harry Leonard Beer as Executor of the Estate of Anna Beer, Phyllis Maisel, Estelle Caroll, Sarri Anne Singer, Judith Singer, Eric M. Singer, Robert Singer, Daniel Rozenstein, Julia Rozenstein Schon, Alexander Rozenstein, Esther Rozenstein, Jacob Steinmetz, Deborah Steinmetz, Jacob Steinmetz and Deborah Steinmetz for the Estate of Amichai Steinmetz, Nava Steinmetz, Orit Mayerson, Netanel Steinmetz, Ann Coulter for the Estate of Robert L. Coulter, Sr., Dianne Coulter Miller, Robert L. Coulter, Jr., Dianne Coulter Miller and Robert L. Coulter, Jr. for the Estate of Janis Ruth Coulter, Larry Carter as the Administrator of the Estate of Diane Leslie Carter, Larry Carter, Shaun Choffel, Richard Blutstein and Katherine Baker for the Estate of Benjamin Blutstein, Richard Blutstein, Katherine Baker, Rebekah Blutstein, Nevenka Gritz for the Estate of David Gritz, Nevenka Gritz, Nevenka Gritz for the Estate of Norman Gritz, Jacqueline Chambers and Levana Cohen as the Administrators of the Estate of Esther Bablar, Jacqueline Chambers, Levana Cohen, Eli Cohen, Sarah Elyakim, Joseph Cohen, Greta Geller, Ilana Dorfman, Rephael Kitsis and Tova Guttman as the Administrators of the Estate of Hannah Rogen, Temima Spetner, Jason Kirschenbaum, Isabelle Kirschenbaum, Isabelle Kirschenbaum for the Estate of Martin Kirschenbaum, Joshua Kirschenbaum, Shoshana Burgett, David Kirschenbaum, Danielle Teitelbaum, Netanel Miller, Chaya Miller, Arie Miller, Aharon Miller, Shani Miller, Adiya Miller, Altea Steinherz, Jonathan Steinherz, Temima Steinherz, Joseph Ginzberg, Peter Steinherz, Laurel Steinherz, Gila Aluf, Yitzhak Zahavy, Julie Zahavy, Tzvee Zahavy and Bernice Zahavy, by their attorneys, allege the following:

## **NATURE OF THE ACTION**

1.     This is a complaint for damages arising out of the unlawful conduct of Cairo Amman Bank ("CAB") – a Jordanian bank headquartered in Amman, Jordan. CAB aided and abetted the Islamic Resistance Movement ("HAMAS"), a Foreign Terrorist Organization ("FTO") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")) by knowingly providing substantial assistance to HAMAS, and is civilly liable under 18 U.S.C. § 2333(d) of the Anti-Terrorism Act ("ATA") to those American citizens

(and their estates, survivors and heirs) who have been killed or injured in their person by reason of such acts of international terrorism perpetrated by HAMAS.

2.      CAB knowingly – and with awareness of its important role – provided financial services to HAMAS in several related ways set forth below, by maintaining accounts for, and facilitating substantial payments on behalf of, several of HAMAS's leaders and most prominent institutions.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333, 2338, as a civil action brought by citizens of the United States who have been killed or injured by reason of acts of international terrorism, and their estates, survivors, and heirs.

4.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (d) and 18 U.S.C. § 2334(a).

5.      CAB is subject to personal jurisdiction in the State of New York pursuant to 18 U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2) because it has transacted business and committed tortious acts within the United States by transferring funds through the United States for the benefit of the FTO HAMAS and has purposefully availed itself of United States jurisdiction in the course of committing the wrongful acts alleged herein.

6.      Specifically, CAB transfers most of its U.S. dollar wire transfers through three correspondent banks located in New York: Bank of New York Mellon Corporation, JP Morgan Chase and Standard Chartered Bank. During the relevant period (1999-2004), CAB maintained correspondent banking relationships in New York with Citibank, N.A., American Express Bank Ltd. and Bank of New York.

7. During the relevant period, CAB purposefully and knowingly used its correspondent bank accounts in New York, particularly its account with Citibank, N.A. (Account No. 3612-1701), to facilitate a large volume of U.S. dollar-denominated funds transfers to HAMAS.

8. During the relevant period, CAB also purposefully and knowingly used its correspondent bank accounts in New York with Bank of New York, N.A. (Account No. 8900291605) and American Express Bank Ltd. (now Standard Chartered Bank) (Account No. 300732396).

## THE PARTIES

### A.   The Plaintiffs

### THE COMMUTER BUS #6 BOMBING – MAY 18, 2003

9. On May 18, 2003, Basem Takruri, a HAMAS suicide bomber, boarded Bus #6, a commuter bus heading for Jerusalem, and detonated his explosives.

10. Seven people ranging in age from 35 to 68, were killed by the explosion, and 20 others were injured.

### The Averbach Family

11. Steven Averbach was a citizen of the United States and a resident of the State of Israel when he died.

12. Steven died in 2010 as a result of injuries sustained during the suicide bombing that occurred on May 18, 2003. He was 44 years old.

13. At the time of the attack Steven resided near Tel Aviv, Israel. He was a married father of four sons ranging in age from 2 to 13 at the time. Steven and his wife, Julie, were married in 1994 and have two sons together, Sean Averbach and Adam Averbach.

14.     Steven's older sons, Tamir and Devir are from a prior marriage.

15.     On May 18, 2003, Steven boarded the commuter bus heading for Jerusalem and took a seat facing the back.

16.     As the bus pulled away from the stop, it suddenly stopped, and the bus driver allowed another passenger to get on.

17.     Steven caught a glimpse of him and saw that he was wearing a heavy coat in warm weather that covered bulges underneath it. He also saw what looked like a trigger mechanism in his right hand.

18.     Having worked in the anti-terrorist division in the Israeli Army and the Israeli Police, knowing that Israeli buses do not usually pick up passengers after they have begun to leave the station, seeing the tension on the faces of the people on the bus, and taking into account Takruri's aforementioned suspicious characteristics, Steven immediately recognized that a terrorist attack was imminent.

19.     Steven grabbed the gun he carried and turned toward Takruri, who detonated the explosives.

20.     Steven absorbed a substantial amount of the impact of the explosion and multiple pieces of shrapnel.

21.     Steven sustained a critical wound when a ball bearing originally packed together with the bomber's explosives penetrated through the skin and muscles of his neck and lodged between his C3 and C4 vertebrae. The ball bearing lodged in his spinal canal causing severe compression damage to his spinal cord. The object was eventually removed during surgery, but not before it had caused severe damage to his spinal cord that rendered him a quadriplegic.

22.     Following surgery, Steve was moved to intensive care where he stayed for five

weeks. He almost died there several times because of an extremely high fever and from the blast injury to his lungs. He subsequently underwent numerous operations to his back, groin and gastric intestines. He also had a tracheotomy and had a gastric feeding tube inserted as a result of the damage caused by the tracheotomy.

23.     Steven was forced to return to the Intensive Care Unit at least twice with complications.

24.     Steven was paralyzed from his neck down.

25.     On more than one occasion, Steven pleaded with his doctors and family members to take him off of life support.

26.     He was completely dependent on the 24-hour care provided to him and had no foreseeable hope of recovery.

27.     Steven lived in constant pain. He battled depression and took antidepressants.

28.     As a result of the attack, Steven Averbach sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress from May 18, 2003 until his death.

29.     Plaintiff Julie Averbach is a citizen and resident of the State of Israel. She is the widow of Steven Averbach, and the mother of Sean Averbach and Adam Averbach.

30.     Plaintiff Julie Averbach brings this action both individually and as the legal representative of the Estate of Steven Averbach.

31.     As a result of the injuries Steven sustained, Julie had to relocate her family to be closer to the rehabilitation center where Steven resided for nearly a year. Steven moved home from the rehabilitation center in July 2004 but required continuous 24-hour care. Following the attack, Julie was, in most respects, a single parent and could not enjoy the normal companionship, day-

5

to-day assistance and mutual support that she had previously received from her husband.

32.     Julie underwent psychological counseling after the attack.

33.     As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Julie Averbach has experienced emotional pain and suffering, loss of her husband's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

34.     Plaintiff Tamir Averbach is a citizen of the United States and a resident of the State of New Jersey. He is a son of Steven Averbach and Steven's first wife.

35.     After the attack, Tamir underwent psychological counseling for approximately one year.

36.     As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Tamir Averbach has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

37.     Plaintiff Devir Averbach is a citizen of the United States and a resident of the State of New Jersey. He is a son of Steven Averbach and Steven's first wife.

38.     After the attack, Devir experienced difficulty making friends, his grades declined, he cried, and he felt angry. He also underwent psychological counseling.

39.     Tamir and Devir witnessed their father's relentless and painful suffering and repeated surgeries and brushes with death. They remember what it was like before the attack, when he was an able-bodied man.

40.     As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Devir Averbach has

experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

41.     Plaintiff Sean Averbach is a citizen of the United States and a resident of the State of Israel. He is a son of Steven Averbach and Julie Averbach.

42.     As a result of the brutal attack on his father, he has been emotionally traumatized and has lost the sense of protection and safety he once enjoyed from his father. Due to the severity of his father's injuries, ordinary companionship and simple pleasures of traveling with or playing sports with his father were denied to him.

43.     As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Sean Averbach has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

44.     Plaintiff Adam Averbach is a citizen of the United States and a resident of the State of Israel. He is a son of Steven Averbach and Julie Averbach.

45.     As a result of the brutal attack on his father he has been emotionally traumatized and does not remember a time when his father was capable of using his arms and legs. Due to the severity of his father's injuries, ordinary companionship and simple pleasures of walking together, playing sports together, or driving in a car with his father were denied to him.

46.     As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Adam Averbach has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

47.     David Averbach was a United States citizen and resident of the State of New Jersey

when he died in 2013. He was the father of Steven Averbach.

48.     Plaintiff Maida Averbach is a citizen of the United States and a resident of the State of New Jersey. She is the mother of Steven Averbach.

49.     Plaintiff Maida Averbach brings this action both individually and as the legal representative of the Estate of David Averbach.

50.     Maida Averbach and David Averbach had returned home late on May 17, 2003, from a dinner honoring David. Soon thereafter, Maida switched on Fox News and learned that a bus had been bombed in Jerusalem on Sunday morning in Israel. Maida recognized her son's body leaning out of a stretcher on the news footage but decided not to inform her husband until the next morning.

51.     After a sleepless night, Maida received a telephone call on Sunday morning at 5:50 a.m. from her daughter-in-law and a social worker from Hadassah Hospital. They explained that Steven had been grievously wounded by the explosion and a ball bearing had lodged between his C3 and C4 vertebrae.

52.     As a respected surgeon with many years of experience, David immediately understood the severity of his son's injuries.

53.     At the time of the attack, David Averbach and Maida Averbach had partially retired from their jobs so that they could spend more time with Steven and his children.

54.     Following the attack, Steven's constant inability to use his hands and legs, his inevitable battle with depression and the emotional effect it has had on Steven's four children were a constant source of anguish to both of his parents.

55.     As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, (before he died) David Averbach

experienced emotional pain and suffering, loss of his son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

56.    Plaintiff Maida Averbach experienced severe mental anguish and extreme emotional distress as a result of the terrorist attack from the moment she saw her son's body on television in the early morning hours of May 18, 2003.

57.    As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Maida Averbach has experienced emotional pain and suffering, loss of her son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

58.    Plaintiff Michael Averbach is a citizen of the United States and a resident of the State of New Jersey. He is the brother of Steven Averbach.

59.    Michael Averbach has always looked up to his brother and admired him. The injuries that his brother sustained, as well as his subsequent death, have been a severe emotional blow to Michael.

60.    Since the date of the attack, Michael flew to Israel repeatedly, often at his brother's request, simply to sit by Steven's bedside and talk.

61.    As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Michael Averbach has experienced emotional pain and suffering, loss of his brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

62.    Plaintiff Eileen Sapadin is a citizen of the United States and a resident of the State of New Jersey. She is the sister of Steven Averbach.

63.     Eileen was staying at her parents' home with her husband and three of her four children on the morning her mother received notification of the attack.

64.     Eileen has experienced tremendous emotional pain and sadness as a result of the severity of the injuries that Steve sustained as a result of the attack, as well as his subsequent death.

65.     After the attack, she suffered from anxiety and depression, had trouble sleeping, and cried every day.

66.     Since the attack, she lost more than thirty pounds and has suffered physical exacerbations of a colitis condition that was in remission prior to the attack that severely injured her brother, and subsequently resulted in his death.

67.     As a result of the suffering that Steven experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Eileen Sapadin has experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

### THE JERUSALEM EGGED BUS #2 BOMBING – AUGUST 19, 2003

68.     On August 19, 2003, Ra'ed Abdul Hamid Misk, a HAMAS suicide bomber, detonated explosives on Egged Bus #2.

69.     Twenty-three people were killed and over 130 others were injured in the attack.

### The Strauss Family

70.     Plaintiff Moses Strauss is a citizen of the United States and a resident of the State of New Jersey.

71.     Moses was studying in Israel in 2003 and was planning to return to the United States in April 2004.

72.     At around 9:00 pm on August 19, 2003, he boarded Egged Bus #2 in Jerusalem

after praying at the Kotel (also known as the "Western Wall" or "Wailing Wall").

73.     Approximately 15 minutes into the bus ride, Moses heard a deafening boom when Misk detonated the explosives on the bus.

74.     Moses fell forward as a result of the explosion. His eyeglasses, jacket, hat and cell phone flew off his body.

75.     As Moses regained his bearings and realized what had occurred, he witnessed people screaming and crying, and he saw blood and body parts all around him.

76.     His clothes were covered with blood, and his hearing was severely impaired.

77.     To exit the bus, Moses stepped over bodies, and in a state of shock made his way toward his apartment. As he reached the corner near his apartment, he saw a friend, and they went into his friend's apartment and telephoned Moses's father, plaintiff Philip Strauss, to tell him Moses had been in an attack, but was alive. After making the telephone call, the friend drove Moses to Hadassah Hospital.

78.     As a result of the explosion, Moses's body ached, especially his right ear and hand. After arriving at the hospital, he underwent numerous tests, and doctors removed the shrapnel from his ear and hand.

79.     Days after the attack, Moses still experienced agonizing pain in his ear, and his hearing loss did not improve.

80.     After the attack, Moses returned to the United States without completing his studies in Israel.

81.     Moses was examined by medical specialists in both Israel and the United States. Both physicians confirmed that he would require surgery on his ear.

82.     In the winter of 2004, Moses underwent ear surgery in the United States. His ear is

still not completely healed, and he has been told that his condition will never improve. An ear specialist continues to monitor his condition.

83.     Moses continues to relive the attack, the images of the attack replaying in his mind daily.

84.     As a result of the attack, plaintiff Moses Strauss has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

85.     Plaintiff Philip Strauss is a citizen of the United States and a resident of the State of New York. He is the father of plaintiff Moses Strauss.

86.     Plaintiff Bluma Strauss is a citizen of the United States and a resident of the State of New York. She is the mother of plaintiff Moses Strauss.

87.     After hearing of the attack, Bluma attempted unsuccessfully to reach Moses on his cell phone. When she tried to reach him at his apartment, someone else answered the telephone and said that her son was not there. Bluma grew increasingly concerned.

88.     Upon learning that her son was injured in the bombing, Bluma's distress grew.

89.     As a result of the attack, plaintiffs Philip Strauss and Bluma Strauss have experienced severe mental anguish and extreme emotional distress.

90.     Plaintiff Ahron Strauss is a citizen of the United States and a resident of the State of New Jersey. He is a brother of plaintiff Moses Strauss.

91.     Plaintiff Roisie Engelman is a citizen of the United States and a resident of the State of New Jersey. She is the sister of plaintiff Moses Strauss.

92.     Roisie Engelman was on vacation when she received a telephone call advising her that there had been a bombing in Israel. Roisie attempted to contact Moses on his cellular telephone but was unable to reach him. She also telephoned her other brother, Ahron, attempting to locate

Moses or her parents.

93.   When Roisie finally received the news that Moses had been injured in the bus bombing, she was very concerned and extremely anxious.

94.   Plaintiff Joseph Strauss is a citizen of the United States and a resident of the State of New Jersey. He is a brother of plaintiff Moses Strauss.

95.   Joseph learned of the attack while watching the news on an airplane. He was aware that the bombing had occurred near the neighborhood where Moses lived. Upon arriving in California, Joseph spoke to his parents and learned of Moses's condition. During the plane flight, Joseph experienced great anxiety because he was uncertain if his brother had been present at the bombing.

96.   Ahron Strauss, Roisie Engelman and Joseph Strauss experienced great anxiety after learning of the attack that caused the injuries that Moses sustained.

97.   As a result of the attack, plaintiffs Ahron Strauss, Roisie Engelman and Joseph Strauss have experienced severe mental anguish and extreme emotional distress.

**The Weiss Family**

98.   Plaintiff Tzvi Weiss is a citizen of the United States and a resident of the State of New Jersey.

99.   Tzvi was in Israel studying at a rabbinical college in 2003 and was planning to return to the United States on August 21, 2003.

100.   On the evening of August 19, 2003, Tzvi boarded Egged Bus #2 in Jerusalem after visiting the Kotel, Judaism's holiest site, to pray. He was on his way to a friend's wedding.

101.   As the bus arrived at Shmuel Hanavi Street, he heard a terrible explosion. Everything went black, and he could not hear anything but a deafening ringing in his ears.

102.    In the panicked aftermath of the explosion, Tzvi jumped out of a window of the bus and began to run, stumbling over dead bodies and body parts as he fled the scene.

103.    Tzvi was covered with blood, and his hand had been cut. His body was shaking from the shock of the experience, and he had a constant terrible ringing in his ears.

104.    Once he got his bearings, Tzvi telephoned one of his brothers, plaintiff Yitzchak Weiss, and waited for him to arrive to accompany him to the hospital.

105.    An ambulance transported Tzvi to Bikur Cholim Hospital where he underwent medical tests.

106.    Both of his eardrums had been completely torn, and his hearing in his left ear was severely impaired. He continued to experience severe pain in his hand and was unable to bend his fingers.

107.    Tzvi decided to return home to the United States to be near his family while he began recovering from the injuries and the effects of having been a victim of a terrorist attack. He returned to the United States the following day and visited an ear specialist within hours of his arrival. He underwent tests and was advised to have surgery on his left ear to attempt to regain some of his hearing loss in that ear. Tzvi obtained a second opinion from another doctor who agreed with the diagnosis.

108.    After a number of examinations by the initial physician, and after treatment with antibiotics, Tzvi underwent surgery on his left ear. After the surgery, the incessant ringing in his ears became louder and worse than before.

109.    Tzvi also visited another physician for treatment of the severe pain in his hand. He was told the injuries might require surgery.

110.    Tzvi continued to visit doctors on numerous occasions to assess his ears, and

underwent many tests, but the agonizing ringing continued. Eventually, it was determined that the surgery on Tzvi's left ear had not been successful. Tzvi suffered numerous panic attacks because of his injuries and the symptoms that continued to affect him.

111.    As a result of the injuries that he sustained in the attack, combined with the memories of the attack itself, Tzvi's mental health deteriorated. The suffering that Tzvi has endured as a result of the injuries he sustained in the attack is ongoing and relentless. It has negatively impacted every aspect of his life.

112.    Tzvi enrolled in rabbinical college upon his return to the United States, but the injuries and their symptoms prevented him from concentrating on his schoolwork, and he could no longer realize the academic success that he had achieved prior to the attack.

113.    As a result of the attack, plaintiff Tzvi Weiss has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

114.    Plaintiff Leib Weiss is a citizen of the United States and a resident of the State of New York. He is the father of plaintiff Tzvi Weiss.

115.    Malka Weiss was a citizen of the United States and a resident of the State of New York when she died in 2018. She was the mother of plaintiff Tzvi Weiss.

116.    Plaintiff Leib Weiss brings this action both individually and as the legal representative of the Estate of Malka Weiss.

117.    Leib Weiss and Malka Weiss experienced great anxiety after learning of the attack that injured Tzvi and observing the suffering that he has endured as a result of his injuries.

118.    As a result of the attack, plaintiffs Leib Weiss and Malka Weiss (before her death) have experienced severe mental anguish and extreme emotional distress.

119.    Plaintiff Yitzchak Weiss is a citizen of the United States and a resident of the State

of Israel. He is a brother of plaintiff Tzvi Weiss.

120.   Plaintiff Yeruchaim Weiss is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Tzvi Weiss.

121.   Plaintiff Esther Deutsch is a citizen of the United States and a resident of the State of New York. She is the sister of plaintiff Tzvi Weiss.

122.   Yitzchak Weiss, Yeruchaim Weiss and Esther Deutsch experienced great anxiety after learning of the attack that injured Tzvi and observing the suffering that he has endured as a result of his injuries.

123.   As a result of the attack, plaintiffs Yitzchak Weiss, Yeruchaim Weiss and Esther Deutsch have experienced severe mental anguish and extreme emotional distress.

**The Nathansen/Toporowitch Family**

124.   Tehilla Nathansen was a citizen of the United States and a resident of the State of Israel when she died.

125.   Tehilla was three (3) years old and sitting on her mother's lap when she was murdered in the suicide bomb attack on August 19, 2003.

126.   The Nathansen family had boarded the bus at the Kotel in Jerusalem, where they had just completed their prayers.

127.   Plaintiff Matanya Nathansen is a citizen and resident of the State of Israel. He is the father of Tehilla Nathansen.

128.   Plaintiff Chana Nathansen is a citizen of the United States and a resident of the State of Israel. She is the mother of Tehilla Nathansen.

129.   Plaintiffs Matanya Nathansen and Chana Nathansen bring this action individually, on behalf of the Estate of Tehilla Nathansen, and on behalf of their minor daughter, S.N.

16

130.   As a result of the explosion, Matanya suffered fractures in both feet and in his collar bone, and sustained injuries to his lungs, eye and finger. He is now hearing impaired and can no longer walk properly.

131.   As a result of the attack, plaintiff Matanya Nathansen has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress from the injuries he sustained, from witnessing and experiencing first-hand the death of his 3-year-old daughter, Tehilla, as well as the severe injuries sustained by his wife and young daughters (all of whom are U.S. citizens).

132.   Chana was severely injured in the explosion that killed Tehilla, was taken to Hadassah Hospital, and remained there for 12 days.

133.    Although Chana repeatedly asked about Tehilla's whereabouts, she did not learn until the next day that she had been killed. That uncertainty was torture for Chana.

134.   Chana's spleen was torn, and her ribs were broken.

135.   She had seven ball bearings that caused holes in her chest, leg and arm that had to be removed from her body.

136.   She has undergone numerous surgeries.

137.   Shrapnel lodged throughout her body, including her eye.

138.   Chana's hip was crushed, necessitating a hip replacement. She still experiences pain in that area.

139.   Her hearing is impaired, and she suffers from tinnitus.

140.   Chana cannot walk long distances, and she has a limited range of movement.

141.   She feels indescribable pain at losing Tehilla and seeing her daughter Yehudit injured and her daughter S.N. severely injured.

142.     Chana has undergone psychological counseling.

143.     As a result of the attack, plaintiff Chana Nathansen has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress from the injuries she sustained, from witnessing and experiencing first-hand the death of her 3-year-old daughter, Tehilla, and witnessing the severe injuries sustained by her daughters, plaintiff S.N., a minor, and plaintiff Yehudit Nathansen.

144.     Plaintiff Yehudit Nathansen is a citizen of the United States and a resident of the State of Israel. She is a daughter of plaintiffs Chana Nathansen and Matanya Nathansen, and the sister of Tehilla Nathansen and plaintiff S.N.

145.     At the time of the explosion, Yehudit was sitting with her aunt, a few seats away from her parents.

146.     Yehudit incurred cuts on her neck and waist from the explosion and was treated at Bikur Cholim Hospital in Jerusalem.

147.     She hears constant noise in her ears, which makes her tense.

148.     Yehudit suffered nightmares, sadness and guilt and underwent psychological counseling.

149.     As a result of the attack, plaintiff Yehudit Nathansen has sustained physical injuries and experienced severe mental anguish and extreme emotional distress due to her own injuries and from witnessing and experiencing first-hand the death of her 3-year-old sister, Tehilla, as well as the severe injuries sustained by her mother, father, and baby sister.

150.     Plaintiff S.N., a minor, is a citizen of the United States and a resident of the State of Israel. She is a daughter of plaintiffs Chana Nathansen and Matanya Nathansen, and the sister of Tehilla Nathansen and plaintiff Yehudit Nathansen.

151.    S.N. was sitting on Chana's lap at the time of the explosion. She was 5 months old at the time. As a result of the explosion, S.N. sustained burns all over her face, and her eardrums were ruptured.

152.    She suffered bilateral lung contusions and a fracture of her left femur and right leg and hip, deep lacerations in her arm that have left permanent scars, and scars on her face and legs.

153.    S.N. also had multiple shrapnel and metal pellets lodged in her body, including in her eyes, and a laceration of the bone of her left forearm and in her left wrist. She has pain in her upper left arm.

154.    She is hearing impaired and suffers from tinnitus.

155.    She underwent psychological counseling.

156.    As a result of the attack, plaintiff S.N. has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

157.    Plaintiff Hezekial Toporowitch is a citizen of the United States and a resident of the State of Israel. He is the father of plaintiff Chana Nathansen and the grandfather of the three Nathansen girls.

158.    Plaintiff Pearl B. Toporowitch is a citizen of the United States and a resident of the State of Israel. She is the mother of plaintiff Chana Nathansen and the grandmother of the three Nathansen girls.

159.    In the middle of the night, Hezekial and Pearl were notified by telephone of the bombing that had killed their granddaughter, Tehilla, and crippled their daughter, Chana. That night they traveled to Jerusalem. Pearl attempted to obtain further details about the condition of her son-in-law and her granddaughters.

160.    In the aftermath of the bombing, Chana, Matanya, and their children were

transferred to different hospitals thereby complicating the family's efforts to locate them.

161.    Hezekial was supposed to travel to the central morgue in Holon to attempt to identify his granddaughter's body but was in too much shock to do so. He was initially told to identify the bodies of <u>two</u> granddaughters since S.N. had not yet been identified at the hospital and was thought to be deceased.

162.    As a result of the attack, plaintiff Hezekial Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of his 3-year-old granddaughter, Tehilla, as well as the severe injuries sustained by his daughter, and injuries sustained by his granddaughters and son-in-law.

163.    As a result of the attack, plaintiff Pearl B. Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old granddaughter, Tehilla, as well as the severe injuries sustained by her daughter, and injuries sustained by her granddaughters and son-in-law.

164.    Plaintiff Yehuda Toporowitch is a citizen of the United States and a resident of the State of New Jersey. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

165.    In the middle of the night Yehuda was notified by telephone of the bombing that had killed his niece and crippled his sister.

166.    He had been working at a resort when he received the telephone call, and quickly rushed to a nearby television where graphic images of the bombsite were being broadcast by Israeli television.

167.    Yehuda rushed home, traveled with his parents to the Tel Aviv area, and stopped at the home of one of his sisters. He took a taxicab to the central morgue and attempted to identify

Tehilla's remains but could not positively identify them because of the nature and extent of Tehilla's injuries.

168.    Yehuda then made arrangements for necessary DNA testing, which ultimately confirmed his niece's identity.

169.    As a result of the attack, plaintiff Yehuda Toporowitch has experienced severe mental anguish and extreme emotional distress from the death of his 3-year-old niece, Tehilla, and the attempt to identify her remains. He has also experienced severe mental anguish and extreme emotional distress as a result of the severe injuries sustained by his sister and other niece and injuries to his brother-in-law.

170.    Plaintiff David Toporowitch is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

171.    David was not present when his parents were notified by telephone of the bombing that killed his niece and crippled his sister. Instead, he had to piece together the events by himself after his family had already left for Jerusalem.

172.    Like the rest of his immediate family, David visited his sister and niece in the hospital and experienced the shock and severe mental anguish and extreme emotional distress resulting from the emotional trauma of burying his young niece and dealing with the pain and loss experienced by his sister.

173.    As a result of the attack, plaintiff David Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of his 3-year-old niece, Tehilla, as well as the severe injuries sustained by his sister and other niece.

174.    Plaintiff Shaina Chava Nadel is a citizen of the United States and a resident of the

State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

175.   Like the rest of her immediate family, Shaina visited her sister and niece in the hospital and experienced the shock and mental anguish resulting from the emotional trauma of burying her young niece and dealing with the pain and loss experienced by her sister.

176.   As a result of the attack, plaintiff Shaina Chava Nadel has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries sustained by her sister and other niece and injuries to her brother-in-law.

177.   Plaintiff Blumy Rom is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

178.   Like the rest of her immediate family, Blumy visited her sister and niece in the hospital and experienced the shock and mental distress resulting from the emotional trauma of burying her young niece, Tehilla, and dealing with the pain and loss experienced by her younger sister.

179.   As a result of the attack, plaintiff Blumy Rom has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries sustained by her sister and other niece and injuries to her brother-in-law.

180.   Plaintiff Rivka Pollack is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

181.   Like the rest of her immediate family, Rivka visited her sister and niece in the hospital and experienced severe mental anguish and extreme emotional distress from burying her young niece and dealing with the pain and loss experienced by her older sister and injuries to her

brother-in-law.

182.   She stayed with her baby niece S.N., caring for her during the two weeks that she was hospitalized and for two months after her discharge from the hospital. Having to change the dressings on her niece's wounds, care for her various injuries, and take her to doctors, has deeply affected her.

183.   As a result of the attack, plaintiff Rivka Pollack has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries incurred by her sister, other niece and brother-in-law.

184.   Plaintiff Rachel Potolski is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

185.   Like the rest of her immediate family, Rachel experienced the shock and mental distress resulting from the emotional trauma of burying her young niece, Tehilla, and dealing with the pain and loss experienced by her younger sister.

186.   As a result of the attack, plaintiff Rachel Potolski has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries incurred by her sister, other niece and brother-in-law.

187.   Plaintiff Ovadia Toporowitch is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

188.   Like the rest of his immediate family, Ovadia experienced the shock and mental distress resulting from the emotional trauma of burying his young niece, Tehilla, and dealing with the pain and loss experienced by his younger sister.

189.   As a result of the attack, plaintiff Ovadia Toporowitch has experienced severe

mental anguish and extreme emotional distress from experiencing the death of his 3-year-old niece, Tehilla, as well as the severe injuries incurred by his sister, other niece and brother-in-law.

190.    Plaintiff Tehilla Greniman is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

191.    Like the rest of her immediate family, Tehilla experienced the shock and mental distress resulting from the emotional trauma of burying her young niece, Tehilla, and dealing with the pain and loss experienced by her younger sister.

192.    As a result of the attack, plaintiff Tehilla Greniman has experienced severe mental anguish and extreme emotional distress from experiencing the death of her 3-year-old niece, Tehilla, as well as the severe injuries incurred by her sister, other niece and brother-in-law.

193.    Plaintiff Yisrael Toporowitch is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

194.    Like the rest of his immediate family, Yisrael experienced the shock and mental distress resulting from the emotional trauma of burying his young niece, Tehilla, and dealing with the pain and loss experienced by his younger sister.

195.    As a result of the attack, plaintiff Yisrael Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of his 3-year-old niece, Tehilla, as well as the severe injuries incurred by his sister, other niece and brother-in-law.

196.    Plaintiff Yitzchak Toporowitch is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

197.    Like the rest of his immediate family, Yitzchak experienced the shock and mental

distress resulting from the emotional trauma of burying his young niece, Tehilla, and dealing with the pain and loss experienced by his younger sister.

198.    As a result of the attack, plaintiff Yitzchak Toporowitch has experienced severe mental anguish and extreme emotional distress from experiencing the death of his 3-year-old niece, Tehilla, as well as the severe injuries incurred by his sister, other niece and brother-in-law.

<u>**THE SHOOTING ATTACK ON ROUTE #60 – JUNE 20, 2003**</u>

199.    On June 20, 2003, Ahmad Najjar and Farah Hamad, two HAMAS terrorists, perpetrated a shooting attack on Route #60 near the Yabroud underpass, killing one person and seriously injuring three others.

**The Goldstein Family**

200.    Howard Goldstein was a citizen of the United States and a resident of the State of Israel when he died.

201.    He was murdered on June 20, 2003, while driving his car with his parents on Route #60 in Israel.

202.    Howard was driving his parents and his wife from Eli to Jerusalem where they had stayed the previous night following the wedding of Howard's son, plaintiff David Goldstein. Howard and his wife and parents were traveling for a weekend in Jerusalem to further celebrate David's wedding (which had taken place the previous night).

203.    While Howard was driving, Howard's father, plaintiff Eugene Goldstein, was seated in the front passenger seat and Howard's mother, plaintiff Lorraine Goldstein, was seated behind her husband. Howard's wife, plaintiff Michal Goldstein (now Michal Honickman), was seated in the rear seat of the car, on the driver's side, behind Howard.

25

204.    At some point, as Howard was driving, Eugene noticed two individuals on the side of the road near the Yabroud underpass. As the Goldsteins' car approached, the men turned and began rapidly firing their guns at the Goldsteins' vehicle.

205.    Howard was struck by at least one bullet and ultimately succumbed to his injuries while driving and slumped over the steering wheel.

206.    At some point in time, while Howard was slumped over the steering wheel, Eugene grabbed the steering wheel and maintained control of the car until it crashed and rolled over, approximately eight miles south of where the HAMAS gunmen had opened fire.

207.    Plaintiff Michal Honickman, formerly known as Mindy Goldstein, is a citizen of the United States and a resident of the State of Nevada. She is the widow of Howard Goldstein.

208.    Plaintiff Michal Honickman brings this action both individually and as the legal representative of the Estate of Howard Goldstein.

209.    As a result of the attack, Michal was injured when glass fragments from the vehicle's windows struck her body, including her left eye. She also sustained hairline fractures of her ribs, bruising, and physical trauma when the vehicle eventually crashed and rolled over.

210.    Michal has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress having been present during the attack, and witnessed the death of her husband, whom she had to bury and mourn with her children, while her in-laws were hospitalized, all in the context of what had been, prior to that point, a joyous family occasion celebrating her son David's wedding.

211.    As a result of Howard's death, plaintiff Michal Honickman experienced emotional pain and suffering, loss of her husband's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

212.    Plaintiff Eugene Goldstein is a citizen of the United States and a resident of the State of Florida. He is the father of Howard Goldstein.

213.    Plaintiff Lorraine Goldstein is a citizen of the United States and a resident of the State of Florida. She is the mother of Howard Goldstein.

214.    Eugene suffered multiple gunshot wounds in the attack.

215.    His shoulder blade was fractured, and his lungs were punctured. Shrapnel was lodged in his lung, liver and kidneys. A bullet remains stuck between his heart and his lungs.

216.    These injuries, which caused Eugene immense pain, were life threatening. Indeed, it was highly improbable that Eugene would survive them.

217.    Eugene's injuries necessitated insertion of a trocar, a metal cylinder used to drain blood from his chest and facilitate insertion of a chest tube to maintain suction and permit healing of the lung. Insertions of a trocar and chest tube are extremely painful.

218.    Eugene was unable to see Lorraine for approximately five days after the attack and did not have specific information about her condition. His uncertainty about Lorraine's condition caused him immense anxiety.

219.    As a result of the attack, Eugene still has several bullet fragments lodged in his chest. He must undergo an x-ray every three months to monitor their condition.

220.    As a result of the attack, Eugene has difficulty falling and remaining asleep. He constantly replays the image of the attack in his mind.

221.    He blames himself for taking his wife to attend his grandson's wedding.

222.    Lorraine was shot multiple times and severely injured in the attack.

223.    She suffered a bullet fragment injury from a bullet that clipped the tip of her nose and her left upper lip and lodged in her mouth. The fragment necessitated intubation and

emergency surgery, during which the fragment was removed from an area less than an inch from the carotid sheath, which contains the carotid artery and the internal jugular vein. Disruption of either of them would have resulted in her death.

224.    At one point during her hospital stay, Lorraine was placed on life support.

225.    Lorraine's chewing muscles were severely and permanently damaged, and she could not eat solid food for approximately one year.

226.    She required physiotherapy that encompassed use of a ratchet-like device designed to force her jaws open. It was very painful.

227.    Lorraine still requires physical therapy because the scar tissue in her jaw prevents her from fully opening it. She still suffers from pain and headaches.

228.    She requires bridges (partials) because she lost her teeth as a result of the attack, and extensive periodontal and dental work.

229.    She was also struck by bullets that entered her body through her left shoulder and right lower neck. The resulting wounds caused her excruciating pain at the time.

230.    She must also deal with the harmful effects of shrapnel that lodged throughout her body, especially in her back. She also suffered a shattered nose and septum as well as various lacerations.

231.    Lorraine had difficulty sleeping because she thought about Howard's death.

232.    Eugene and Lorraine remained in Jerusalem at Hadassah Hospital for approximately 10 days and were unable to return home when they were discharged from the hospital because the airline did not give Eugene permission to fly due to the poor condition of his lungs.

233.    As a result of the attack, plaintiffs Eugene Goldstein and Lorraine Goldstein have

sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

234.    As a result of Howard's death, plaintiffs Eugene Goldstein and Lorraine Goldstein have experienced emotional pain and suffering, loss of their son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

235.    The Goldstein family in New York received notice of the attack from two cousins, one of whom saw images of the attack on the internet and sent an instant message to the immediate family.

236.    The Goldstein family sat in horror as they watched images of the attack on the Cable News Network (CNN) shortly after the attack occurred. The video broadcast showed Howard, Eugene and Lorraine being pulled from the wreckage of the car Howard had been driving.

237.    Lorraine's face and hair were covered with blood.

238.    Plaintiff Richard Goldstein is a citizen of the United States and a resident of the State of New York. He is a son of plaintiffs Eugene Goldstein and Lorraine Goldstein and a brother of Howard Goldstein.

239.    After learning of the attack, plaintiff Richard Goldstein telephoned his sister, plaintiff Barbara Goldstein Ingardia, at work and asked her to return home immediately. When she arrived, her extended family was present. They shared the tragic news that their parents and brother had been attacked. Barbara then made plans to fly to Israel to care for her parents.

240.    As a result of the attack, plaintiff Richard Goldstein has experienced severe mental anguish and extreme emotional distress caused by the life-threatening injuries to both of his parents.

241.    As a result of Howard's death, Richard Goldstein has experienced emotional pain

and suffering, loss of his brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

242.    Plaintiff Barbara Goldstein Ingardia is a citizen of the United States and a resident of the State of New York. She is the daughter of plaintiffs Eugene Goldstein and Lorraine Goldstein and the sister of Howard Goldstein.

243.    Barbara left her job and her immediate family behind and traveled to Israel to care for her parents in Israel during their recovery and to mourn the loss of her brother.

244.    In addition to grappling with the devastating emotional consequences of her brother's death, she was forced to deal with the uncertainty of her mother's recovery due to her severe injuries and age.

245.    Barbara blames herself for encouraging her parents to attend the wedding.

246.    As a result of the attack, plaintiff Barbara Goldstein Ingardia has experienced severe mental anguish and extreme emotional distress caused by the life-threatening injuries to both of her parents.

247.    As a result of Howard's death, Barbara Goldstein Ingardia has experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

248.    Plaintiff Michael Goldstein is a citizen of the United States and a resident of the State of Florida. He is a son of plaintiffs Eugene Goldstein and Lorraine Goldstein and a brother of Howard Goldstein.

249.    As a result of the attack, plaintiff Michael Goldstein has experienced severe mental anguish and extreme emotional distress caused by the life-threatening injuries to both of his parents.

250.     As a result of Howard's death, Michael Goldstein has experienced emotional pain and suffering, loss of his brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

251.     Plaintiff Chana Freedman is a citizen of the United States and a resident of the State of New York. She is the daughter of Howard Goldstein and plaintiff Michal Goldstein.

252.     Chana and her husband were eating lunch at a mall in Jerusalem when they learned that her father and grandparents had been involved in what they believed to be an automobile accident.

253.     Chana's husband received a telephone call from his father informing the couple to go directly to Hadassah Hospital.

254.     When Chana and her husband arrived at Hadassah Hospital, a social worker informed them that Chana's father had died in the terrorist attack.

255.     Chana informed her brother, David and his wife, who had just been married, of the attack when they arrived at the hospital.

256.     As a result of Howard's death, plaintiff Chana Freedman has experienced emotional pain and suffering, loss of her father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

257.     Plaintiff David Goldstein is a citizen of the United States and a resident of the State of Israel. He is the son of Howard Goldstein and plaintiff Michal Goldstein.

258.     At the time of the attack, David was at a Jerusalem hotel awaiting his family's arrival for weekend wedding celebrations when he was notified that something had happened to his parents and his grandparents, and that they had been taken to Hadassah Hospital.

259.     Upon his arrival at the hospital, David learned that his father had been killed in the

31

attack, and that his mother and grandparents had been injured.

260.     Prior to the attack, David frequently spoke to his father, including on the morning of his father's death.

261.     As a result of Howard's death, plaintiff David Goldstein has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

## THE JAFFA ROAD BUS #14A BOMBING – JUNE 11, 2003

262.     At approximately 5:30 p.m. on June 11, 2003, Abd el-Mu'ati Shabana, a HAMAS suicide bomber dressed as an ultra-Orthodox Jew, boarded Egged Bus #14A at the Mahane Yehuda market. A short while later, as the bus drove down Jaffa Road near the Davidka Square, Shabana detonated his bomb, destroying the bus and killing 17 people and injuring over 100 more, including dozens of bystanders.

### The Beer Family

263.     Alan Beer was a citizen of the United States when he died.

264.     Alan was on the bus returning from a condolence call to his friend's family when Shabana detonated his explosives and killed him.

265.     Alan's friend, to whom he had paid the condolence call, learned of the bus bombing and telephoned plaintiff Harry Leonard Beer, Alan's brother, in Cleveland, Ohio. Harry quickly telephoned his sister, plaintiff Phyllis Maisel, whose son happened to have been in the area of the bombing earlier. Harry then telephoned his other sister, plaintiff Estelle Caroll, and informed her of the terrorist attack.

266.     After speaking with her brother, Phyllis asked her son to return to the crime scene and identify Alan's body. Thereafter, Alan's mother, Anna Beer, Harry Leonard Beer and Estelle

Caroll flew to Israel to attend Alan's funeral.

267.    Plaintiff Harry Leonard Beer is a citizen of the United States and a resident of the State of Ohio. He is the brother of Alan Beer.

268.    Anna Beer was a citizen of the United States and a resident of the State of Ohio when she died in 2016. She was the mother of Alan Beer.

269.    Plaintiff Harry Leonard Beer brings this action in his individual capacity, as the executor of the Estate of Alan Beer, and as the executor of the Estate of Anna Beer.

270.    As a result of Alan's death, plaintiff Harry Leonard Beer has experienced emotional pain and suffering, loss of his brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

271.    Plaintiff Estelle Caroll is a citizen of the United States and a resident of the State of Virginia. She is a sister of Alan Beer.

272.    Plaintiff Phyllis Maisel is a citizen of the United States and a resident of the State of Israel. She is a sister of Alan Beer.

273.    As a result of Alan's death, plaintiffs Estelle Caroll and Phyllis Maisel have experienced emotional pain and suffering, loss of their brother's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

274.    As a result of Alan's death, (before her death) Anna Beer experienced emotional pain and suffering, loss of her youngest child's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

**The Singer Family**

275.    Plaintiff Sarri Anne Singer is a citizen of the United States and a resident of the State of New Jersey.

276.     On June 11, 2003, Sarri boarded Bus #14A in Jerusalem to meet a friend for dinner. The bus was filled with rush hour commuters. Eventually she was able to take a seat near the window.

277.     Shortly thereafter, Shabana detonated his bomb only two to three seats away from where Sarri was seated, killing everyone sitting and standing near her and causing the roof of the bus to fall in.

278.     When the explosives were detonated, Sarri felt a shockwave across her face.

279.     Sarri was struck with shrapnel from the explosion that entered her shoulder and broke her clavicle.

280.     After the blast, she was unable to open her left eye, and her right eye was extremely restricted.

281.     Sarri was unable to hear because of a loud ringing in her ears, and her eardrums ruptured.

282.     Barely walking, Sarri was taken to an ambulance.

283.     She incurred wounds to her face and legs resulting in scarring. She underwent physical therapy and additional surgery.

284.     Shrapnel lodged in Sarri's gums, moving her teeth and necessitating dental work.

285.     As a result of the attack, plaintiff Sarri Anne Singer has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

286.     Plaintiff Judith Singer is a citizen of the United States and a resident of the State of New Jersey. She is the mother of plaintiff Sarri Anne Singer.

287.     Judith learned of the attack when her son telephoned her at work.

288.     As a result of the attack, plaintiff Judith Singer has experienced severe mental

anguish and extreme emotional distress.

289.    Plaintiff Eric M. Singer is a citizen of the United States and a resident of the State of New Jersey. He is the brother of plaintiff Sarri Anne Singer.

290.    Eric first learned of the attack when he received an emergency phone call from his father while Eric was having lunch in a restaurant. After speaking with his mother and notifying his office, Eric and his father flew that night to Israel to be with Sarri.

291.    As a result of the attack, plaintiff Eric M. Singer has experienced severe mental anguish and extreme emotional distress.

292.    Plaintiff Robert Singer is a citizen of the United States and a resident of the State of New Jersey. He is the father of plaintiff Sarri Anne Singer.

293.    After learning of the attack, Robert traveled to Israel to be with his daughter.

294.    As a result of the attack, plaintiff Robert Singer has experienced severe mental anguish and extreme emotional distress.

## THE MIKE'S PLACE BOMBING IN TEL AVIV - APRIL 30, 2003

295.    On April 30, 2003, Asif Muhammad Hanif, a HAMAS suicide bomber, entered Mike's Place, a popular bar situated on the seashore a few hundred meters from the American Embassy in Tel Aviv, and detonated his explosives,[1] killing three people and injuring more than 50 others.

296.    Hanif, 22, was a British citizen who entered Israel through Jordan.

## The Rozenstein Family

297.    Plaintiff Daniel Rozenstein is a citizen of the United States and a resident of the State of Florida.

---

[1]      There were actually two bombers, both British nationals sent by HAMAS, but the explosive belt on one of the terrorists failed to detonate.

298.    Daniel was seated inside the bar and decided to step outside when he crossed paths with Hanif in the entryway just as he detonated his explosives.

299.    As a result of the attack, Daniel suffered second degree burns over his entire body.

300.    After three days in the hospital, Daniel slipped into a coma that lasted eight days. He was placed on a respirator and other life supports for two weeks. He remained in the hospital for one and a half months, followed by eight months of treatment as an outpatient.

301.    As a result of the bombing, he sustained severe hearing loss. He has also suffered a permanent loss of balance, is often dizzy, and frequently experiences black outs.

302.    Daniel's right hand no longer functions properly as it is covered in scar tissue. Much of the rest of his body is also covered by scar tissue, including his back.

303.    He also suffers from memory loss, nightmares and post-traumatic stress disorder ("PTSD"). He has also sustained a traumatic brain injury ("TBI") and undergone psychological counseling.

304.    As a result of the attack, plaintiff Daniel Rozenstein has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

305.    Plaintiff Julia Rozenstein Schon is a citizen of the United States and a resident of the State of Florida. She is the sister of plaintiff Daniel Rozenstein.

306.    On the night of the bombing, Julia received a telephone call from the father of Daniel's girlfriend. She was told there had been an attack and that no one was certain of Daniel's condition.

307.    When Julia first saw Daniel, she did not recognize him because his body was horribly burned, and his face and ears were swollen beyond recognition. She spent many days in the hospital and was there when her brother slipped into a coma.

308.    Julia still suffers nightmares and is traumatized by the attack. Even now, she calls her brother compulsively to be certain that he is not in danger.

309.    As a result of the attack, plaintiff Julia Rozenstein Schon has experienced severe mental anguish and extreme emotional distress.

310.    Plaintiff Alexander Rozenstein is a citizen of the United States and a resident of the State of Israel. He is the father of plaintiff Daniel Rozenstein.

311.    As a result of the attack, plaintiff Alexander Rozenstein has experienced severe mental anguish and extreme emotional distress.

312.    Plaintiff Esther Rozenstein is a citizen of the United States and a resident of the State of Florida. She is the mother of plaintiff Daniel Rozenstein.

313.    As a result of the attack, plaintiff Esther Rozenstein has experienced severe mental anguish and extreme emotional distress.

## THE SHOOTING ATTACK ON ROUTE #60 - JANUARY 29, 2003

314.    On January 29, 2003, Farah Hamad and Yasser Hamad, two HAMAS terrorists, perpetrated a shooting attack on Route #60, seriously injuring one person.

### The Steinmetz Family

315.    Plaintiff Jacob Steinmetz is a citizen of the United States and a resident of the State of Israel.

316.    Plaintiff Deborah Steinmetz is a citizen of the United States and a resident of the State of Israel. She is the wife of Jacob Steinmetz.

317.    On January 29, 2003, Jacob was driving their car on Route #60. Deborah sat in the front passenger seat of the car. As their car made a turn, two masked men began shooting at the car. The entire driver's side of the car was riddled with bullets.

318.    Two bullets hit Jacob. One shot passed through the car seat and lodged in his leg. The other shot entered his arm and passed through his elbow.

319.    After arriving at the hospital and over the next few days, Jacob underwent a number of operations.

320.    Four metal spikes were surgically inserted into his bone in order to restrain his arm. The spikes remained there for three months and severely restricted his arm's mobility. Additional plastic surgeries were performed. Jacob received a skin graft from his leg to cover the opening in his elbow.

321.    In 2003, Jacob underwent a complete elbow replacement that included the placement of a large metal hinge.

322.    Presently, the use of Jacob's arm is greatly limited.

323.    As a result of the attack, plaintiff Jacob Steinmetz has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

324.    As a result of being in the car that terrorists targeted, plaintiff Deborah Steinmetz has experienced great anxiety and severe mental anguish and extreme emotional distress.

325.    Amichai Steinmetz was a citizen of the United States when he died. He is the son of plaintiffs Jacob Steinmetz and Deborah Steinmetz.

326.    In 2009, Amichai Steinmetz went missing while on a trip to India. In December 2015, an Israeli court declared Amichai Steinmetz dead.

327.    Following the attack and prior to his declaration of death in 2015, Amichai Steinmetz experienced severe mental anguish and extreme emotional distress as a result of the attack.

328.    Plaintiffs Jacob Steinmetz and Deborah Steinmetz bring this action both

individually and on behalf of the Estate of Amichai Steinmetz.

329.    Plaintiff Nava Steinmetz is a citizen of the United States and a resident of the State of Israel. She is a daughter of plaintiffs Jacob Steinmetz and Deborah Steinmetz.

330.    Plaintiff Orit Mayerson is a citizen of the United States and a resident of the State of Israel. She is a daughter of plaintiffs Jacob Steinmetz and Deborah Steinmetz.

331.    Plaintiff Netanel Steinmetz is a citizen of the United States and a resident of the State of Israel. He is the son of plaintiffs Jacob Steinmetz and Deborah Steinmetz.

332.    As a result of the attack, plaintiffs Nava Steinmetz, Orit Mayerson and Netanel Steinmetz have experienced severe mental anguish and extreme emotional distress.

### THE HEBREW UNIVERSITY CAFETERIA BOMBING - JULY 31, 2002

333.    On the afternoon of July 31, 2002, approximately 100 people were eating lunch in the Frank Sinatra cafeteria on the Hebrew University Mount Scopus campus in Jerusalem. A bomb planted inside the cafeteria exploded, killing nine people, five of them Americans, and injuring as many as 70 others.

334.    HAMAS planned and perpetrated the attack.

335.    Mohammad Odeh, a HAMAS operative, who worked at Hebrew University as a painter for an Israeli contractor, set off the bomb.

**The Coulter Family**

336.    Janis Ruth Coulter was a citizen of the United States when she died.

337.    Janis was in the cafeteria when the bomb exploded, killing her and injuring her friend who was eating lunch with her.

338.    Janis was the assistant director of the Hebrew University's Rothenberg International School's Office of Academic Affairs in New York.

339.    She had arrived in Israel just one day before the bombing to accompany a group of 19 American students who were scheduled to attend classes at the university.

340.    Robert L. Coulter, Sr. was a citizen of the United States and a resident of the State of Massachusetts when he died in 2018. He was the father of Janis Ruth Coulter.

341.    Robert L. Coulter, Sr.'s widow, Ann Coulter, brings this action on behalf of the Estate of Robert L. Coulter, Sr.

342.    Robert L. Coulter, Sr. was watching television news that morning in the United States when he saw a "news flash" about a bombing at Hebrew University. Thinking he saw Janis's head lying in an unsealed body bag, he called his other daughter, plaintiff Dianne Coulter Miller. Dianne called Janis's boss in New York and both Robert L. Coulter, Sr. and his daughter desperately tried to reach Janis on her cell phone without success.

343.    Plaintiff Dianne Coulter Miller is a citizen of the United States and a resident of the State of Massachusetts. She is the sister of Janis Ruth Coulter.

344.    Plaintiff Robert L. Coulter, Jr. is a citizen of the United States and a resident of the State of Massachusetts. He is the brother of Janis Ruth Coulter.

345.    Plaintiffs Dianne Coulter Miller and Robert L. Coulter, Jr. bring actions individually and as the legal representatives of the Estate of Janis Ruth Coulter.

346.    Robert L. Coulter, Jr. had heard about the bombing on the radio on the way to work but did not make the connection with Janis's visit to Israel. His father called him at work about the possibility that Janis was at the cafeteria, whereupon he drove immediately to his father's house.

347.    Initially, Janis was identified only through the numbers on her medical alert bracelet. Eventually, the family retrieved Janis's dental records and faxed them to Israel where, later that evening, her death was confirmed.

348.    As a result of Janis's death, (before his own death in 2018) plaintiff Robert L. Coulter, Sr. experienced emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

349.    As a result of Janis's death, plaintiff Dianne Coulter Miller has experienced emotional pain and suffering, loss of her sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

350.    As a result of Janis's death, plaintiff Robert L. Coulter, Jr. has experienced emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

**The Carter Family**

351.    Diane Leslie Carter was a citizen of the United States when she died.

352.    She was eating lunch in the cafeteria when the bomb exploded.

353.    Diane was killed by the bomb blast.

354.    In 1990, Diane had moved to Israel, where she worked as a librarian and archivist in the National Library on the Givat Ram campus of Hebrew University in Jerusalem.

355.    Plaintiff Larry Carter is a citizen of the United States and a resident of the State of North Carolina. He is the father of Diane Leslie Carter.

356.    Plaintiff Larry Carter brings this action both individually and as the Administrator of the Estate of Diane Leslie Carter.

357.    Larry learned of his daughter's death from a journalist who called his home. After conferring with his ex-wife, Diane's mother, Larry was able to confirm that his daughter was, in fact, killed in the bombing.

358.    Plaintiff Shaun Choffel is a citizen of the United States and a resident of the State of Virginia. She is the sister of Diane Leslie Carter.

359.    Both Larry and Shaun learned that Diane had been buried in Israel only moments before the funeral was scheduled to begin. Neither of them had the opportunity to say goodbye to Diane.

360.    As a result of Diane's death, plaintiff Larry Carter has experienced emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

361.    As a result of Diane's death, plaintiff Shaun Choffel has experienced emotional pain and suffering, loss of her sister's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

**The Blutstein Family**

362.    Benjamin Blutstein was a citizen of the United States when he died.

363.    He was killed by the bomb blast.

364.    Benjamin had come to Israel for a two-year study program at the Pardes Institute in Jerusalem to become a teacher.

365.    Benjamin was scheduled to fly home to visit his family in Pennsylvania the day after he was murdered by HAMAS terrorists. Instead, two days after the attack, Benjamin's body was flown home and buried in his parents' hometown of Harrisburg, Pennsylvania.

366.    Plaintiff Richard Blutstein is a citizen of the United States and a resident of the State of Pennsylvania. He is the father of Benjamin Blutstein.

367.    Plaintiff Katherine Baker is a citizen of the United States and a resident of the State of Pennsylvania. She is the mother of Benjamin Blutstein.

368.     Plaintiffs Richard Blutstein and Katherine Baker bring this action both individually and on behalf of the Estate of Benjamin Blutstein.

369.     Plaintiff Rebekah Blutstein is a citizen of the United States and a resident of the State of Pennsylvania. She is the sister of Benjamin Blutstein.

370.     Richard first heard about the attack while watching Fox News early in the morning. He then called Benjamin's cell phone and heard a recording. Shortly thereafter he contacted friends in Israel to ascertain if Benjamin had been injured in the attack. After a friend made a positive identification, Richard received a call confirming Benjamin's death.

371.     Katherine learned that her son had been killed in the attack when she received a call from a representative of the American Embassy. She was too overwhelmed with emotion to call her husband. Richard received the call from a neighbor, who was with Katherine. Katherine then composed herself enough to inform her daughter, Rebekah.

372.     As a result of Benjamin's death, plaintiff Richard Blutstein has experienced emotional pain and suffering, loss of his son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

373.     As a result of Benjamin's death, plaintiff Katherine Baker has experienced emotional pain and suffering, loss of her son's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

374.     Although Rebekah's father had informed her about the attack, Rebekah learned that her brother had died when her mother telephoned her.

375.     As a result of Benjamin's death, plaintiff Rebekah Blutstein has experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, protection, advice and counsel, and severe mental anguish and extreme emotional distress.

**The Gritz Family**

376.    David Gritz was a citizen of the United States when he died.

377.    He was killed by the bomb blast.

378.    He had come to Israel for the first time with the help of a scholarship from the Hartman Institute to study philosophy and write his doctorate.

379.    He died after being in Israel for only two weeks.

380.    Norman Gritz was a citizen of the United States and a resident of France when he died in 2005. He was the father of David Gritz.

381.    Plaintiff Nevenka Gritz is a citizen and resident of France. She is the mother of David Gritz, who was an only child.

382.    Plaintiff Nevenka Gritz brings this action individually and on behalf of the Estate of David Gritz and the Estate of Norman Gritz.

383.    Nevenka and Norman were in New York on the day their son was murdered. Friends informed them that television reports had indicated that a bombing had taken place at Hebrew University. Nevenka and her husband attempted to reach their son by phone, and then called the Israeli consulate in the hopes of getting more information. Eventually, confirmation came from the Israeli consulate that David's body had been identified.

384.    As a result of David's death, (prior to his death) Norman Gritz experienced emotional pain and suffering, loss of his only child's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

385.    As a result of David's death, plaintiff Nevenka Gritz has experienced emotional pain and suffering, loss of her only child's society, companionship, comfort, advice and counsel, and severe mental anguish and extreme emotional distress.

## THE SHEFFIELD CLUB BOMBING - MAY 7, 2002

386.   On the night of May 7, 2002, Muhammad Muammar, a HAMAS suicide bomber, entered the third floor of a building in Rishon Letzion's new industrial area that housed the Sheffield Club (social club) and detonated a bomb.

387.   Fifteen people were killed in the attack, and more than 50 others were injured.

**The Bablar Family**

388.   Esther Bablar was a citizen of the United States when she died.

389.   Although Esther initially survived the attack, she died of her injuries the following morning.

390.   Plaintiff Jacqueline Chambers is a citizen of the United States and a resident of the State of Florida. She is a daughter of Esther Bablar.

391.   Plaintiff Levana Cohen is a citizen of the United States and a resident of the State of Florida. She is a daughter of Esther Bablar.

392.   Plaintiffs Jacqueline Chambers and Levana Cohen bring actions both individually and on behalf of the Estate of Esther Bablar.

393.   Esther had spent the month before the bombing in Florida with her youngest daughter, Levana, who had just given birth to Esther's grandchild. The day before the attack she had been in New York visiting her other daughter, Jacqueline.

394.   On the day of the attack, a member of the Bablar family in Israel contacted Esther's sister, Sarah Elyakim, in New York and told her the tragic news. Eventually Esther's daughters were notified, and they quickly made arrangements to fly to Israel with their aunt and uncle.

395.   As a result of Esther's death, plaintiff Jacqueline Chambers has experienced emotional pain and suffering, and the loss of her mother's society, companionship, comfort,

protection, attention, advice and counsel, and severe mental anguish and extreme emotional distress.

396.    As a result of Esther's death, plaintiff Levana Cohen has experienced emotional pain and suffering, and the loss of her mother's society, companionship, comfort, protection, attention, advice and counsel, and severe mental anguish and extreme emotional distress.

397.    Plaintiff Eli Cohen is a citizen of the United States and a resident of the State of New York. He is the son of Esther Bablar. He is being represented by his legal guardian, plaintiff Jacqueline Chambers.

398.    As a result of Esther's death, plaintiff Eli Cohen has experienced emotional pain and suffering, and the loss of his mother's society, companionship, comfort, protection, attention, advice and counsel, and severe mental anguish and extreme emotional distress.

399.    Plaintiff Sarah Elyakim is a citizen of the United States and a resident of the State of New York. She is the sister of Esther Bablar.

400.    As a result of Esther's death, plaintiff Sarah Elyakim has experienced emotional pain and suffering and the loss of her sister's companionship, advice and counsel, and severe mental anguish and extreme emotional distress.

401.    Plaintiff Joseph Cohen is a citizen of the United States and a resident of the State of New York. He is the brother of Esther Bablar.

402.    As a result of Esther's death, plaintiff Joseph Cohen has experienced emotional pain and suffering and the loss of his sister's companionship, advice and counsel, and severe mental anguish and extreme emotional distress.

## THE PASSOVER MASSACRE AT THE PARK HOTEL IN NETENAYA - MARCH 27, 2002

403.    On March 27, 2002, Abd al-Baset Odeh, a HAMAS suicide bomber, blew himself

up near the dining area within the Park Hotel in Netanya. It was the night of the Jewish holiday of Passover, and the hotel dining room was filled with hundreds of people celebrating the Passover Seder with their families and friends.

404.    Thirty people were killed, and 140 others were injured.

**The Rogen Family**

405.    Hannah Rogen was a citizen of the United States when she died.

406.    Hannah was severely wounded in the attack and died of her wounds six days later, on April 2, 2002.

407.    Hannah was a Holocaust survivor who immigrated to the United States after World War II. She was attending the Passover Seder at the invitation of a childhood friend, Yulia Talmi, who was also killed in the attack.

408.    Greta Geller is the great niece of Hannah Rogen. She, along with Ilana Dorfman, Rephael Kitsis, and Tova Guttman, bring this action as the court-appointed administrators of the Estate of Hannah Rogen.

## THE BEN YEHUDA STREET BOMBINGS - DECEMBER 1, 2001

409.    In the late evening of December 1, 2001, Nabil Halabiya and Osama Bahar, two HAMAS suicide bombers, blew themselves up in a pedestrian mall in Jerusalem as part of a coordinated double suicide bombing. A large quantity of nails was packed with each of the bombs. Eleven people were killed, and 188 others were injured.

410.    After the two suicide bombings, HAMAS terrorists detonated a car bomb near the site of the first two attacks.

**The Spetner Family**

411.    Plaintiff Temima Spetner is a citizen of the United States and a resident of the State

of Missouri.

412.    On December 1, 2001, Temima was walking down the pedestrian mall in Jerusalem when one of the suicide bombers detonated his explosives approximately 10 yards from where she was standing. Temima was hit by shrapnel on her arms and fingers. While bleeding heavily, and with clothing soaked in blood, Temima began running up the walkway and fell. Someone came to her aid and attempted to stop the bleeding until ambulances arrived at the scene.

413.    As a result of the attack, the femoral artery of Temima's right leg was severed. She was transported to the hospital where doctors operated on her to stop the bleeding. The following day it was determined that Temima's intestines had been punctured by shrapnel, and she underwent another operation to repair her intestines and remove most of the shrapnel. Temima remained in the hospital for ten days.

414.    There is significant scarring on Temima's thigh and the lower part of her abdomen. She continues to experience numbness in her right leg and is highly sensitive to pain in that leg.

415.    Temima has also experienced psychological trauma as a result of the attack.

416.    As a result of the attack, plaintiff Temima Spetner has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

**The Kirschenbaum Family**

417.    Plaintiff Jason Kirschenbaum is a citizen of the United States and a resident of the State of New York.

418.    Jason Kirschenbaum was on Ben Yehuda Street in Jerusalem on December 1, 2001 when the double suicide bombing took place.

419.    As a result of the first explosion, Jason was thrown to the ground. As he stood up, the second suicide bomber detonated his explosives and Jason was thrown in another direction.

420.    When he got up the second time, he felt numb. Jason saw his left arm dangling back and forth and held it because he thought it might fall off. When he began running up the street for help, he felt a sharp pain in his leg and back.

421.    Jason was taken to Shaare Zedek Hospital in Jerusalem where he underwent two operations. Surgeons removed 8 metal bolts from his arm, leg and back.

422.    Jason had to undergo several months of physical therapy for the injuries to his arm, leg and back. He still has scarring where he was branded by the bolts that penetrated his skin.

423.    As a result of the attack, plaintiff Jason Kirschenbaum has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

424.    Plaintiff Isabelle Kirschenbaum is a citizen of the United States and a resident of the State of New York. She is the mother of plaintiff Jason Kirschenbaum.

425.    Martin Kirschenbaum was a citizen of the United States and a resident of the State of New York when he died in 2008. He was the father of plaintiff Jason Kirschenbaum.

426.    Plaintiff Isabelle Kirschenbaum brings this action both individually and as the representative of the Estate of Martin Kirschenbaum.

427.    Isabelle first learned of the double suicide bombing while watching CNN. After numerous telephone conversations, she ultimately received a telephone call confirming that Jason had been injured in the attack.

428.    As a result of the attack, plaintiff Isabelle Kirschenbaum has experienced severe mental anguish and extreme emotional distress.

429.    Martin Kirschenbaum learned of the attack when he and Isabelle Kirschenbaum received the telephone call confirming that Jason had been injured in the attack.

430.    As a result of the attack, (before his death) Martin Kirschenbaum experienced

severe mental anguish and extreme emotional distress.

431.    Plaintiff Joshua Kirschenbaum is a citizen of the United States and a resident of the State of New York. He is a brother of plaintiff Jason Kirschenbaum.

432.    Joshua Kirschenbaum was in Tel Aviv at the time of the attack. Martin and Isabelle telephoned Joshua to advise him that his brother Jason had been injured in the attack in Jerusalem. Hours later, he finally located his brother in the emergency room at Shaare Zedek Hospital in Jerusalem.

433.    As a result of the attack, plaintiff Joshua Kirschenbaum has experienced severe mental anguish and extreme emotional distress.

434.    Plaintiff Shoshana Burgett is a citizen of the United States and a resident of the State of New York. She is a sister of plaintiff Jason Kirschenbaum.

435.    As a result of the attack, plaintiff Shoshana Burgett has experienced severe mental anguish and extreme emotional distress.

436.    Plaintiff David Kirschenbaum is a citizen of the United States and a resident of the State of New York. He is a brother of plaintiff Jason Kirschenbaum.

437.    As a result of the attack, plaintiff David Kirschenbaum has experienced severe mental anguish and extreme emotional distress.

438.    Plaintiff Danielle Teitelbaum is a citizen of the United States and a resident of the State of New Jersey. She is a sister of plaintiff Jason Kirschenbaum.

439.    As a result of the attack, plaintiff Danielle Teitelbaum has experienced severe mental anguish and extreme emotional distress.

**The Miller Family**

440.    Plaintiff Netanel Miller is a citizen of the United States and a resident of the State of Israel.

441.    On the evening of December 1, 2001, Netanel was with friends enjoying ice cream at the pedestrian mall in Jerusalem when one of the HAMAS suicide bombers detonated his explosives a few feet away from him. Netanel had his back to the bomber, and he was thrown to the ground as a result of the explosion.

442.    A nut from the bomb lodged in the upper part of Netanel's leg. Other nuts hit him in the back, resulting in burns. His hand and knee were also injured.

443.    Netanel, in shock and unaware of the severity of his injuries, attempted to walk home, limping on his injured leg. After walking approximately 30 feet, Netanel collapsed on the sidewalk. Only then did Netanel become aware of how much he was bleeding from the wounds he had sustained in his leg. His attempts to use pressure to stop the bleeding were unsuccessful.

444.    Some people stopped to help him, and Netanel handed them his cellular phone, asking them to call his parents, Arie and Chaya Miller. Netanel spoke to his father, who had been an Army medic. Arie asked Netanel specific questions about his condition and insisted Netanel seek medical help.

445.    Ultimately, Netanel was taken to Shaare Zedek Hospital by ambulance. Since Netanel had lost a great deal of blood, he was given a blood transfusion.

446.    Arie came to the hospital. Chaya arrived an hour or so later after she found someone to stay with her other children at her home.

447.    Netanel was admitted to the hospital and remained there for two days.

448.    Netanel endured the pain in his leg for nearly two years.

449.    The pain in Netanel's leg became so severe that he had to undergo surgery, and the nut that was still lodged in his leg was finally removed.

450.    It is still painful for Netanel to hike, an activity that he has always enjoyed.

451.    Netanel had flashbacks as a result of the attack and underwent psychological counseling.

452.    As a result of the attack, plaintiff Netanel Miller has sustained severe physical injuries and experienced severe mental anguish and extreme emotional distress.

453.    Plaintiff Chaya Miller is a citizen of the United States and a resident of the State of Israel. She is the mother of plaintiff Netanel Miller.

454.    Plaintiff Arie Miller is a citizen and resident of the State of Israel. He is the father of plaintiff Netanel Miller.

455.    Upon learning that their son Netanel had been injured in the bombing and knowing he has suffered greatly as a result of those injuries, plaintiffs Chaya Miller and Arie Miller experienced great concern and anxiety.

456.    As a result of the attack, plaintiffs Chaya Miller and Arie Miller have experienced severe mental anguish and extreme emotional distress.

457.    Plaintiff Aharon Miller is a citizen of the United States and a resident of the State of Israel. He is the brother of plaintiff Netanel Miller.

458.    Plaintiff Shani Miller is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Netanel Miller.

459.    Plaintiff Adiya Miller is a citizen of the United States and a resident of the State of Israel. She is a sister of plaintiff Netanel Miller.

460.    As a result of the attack, plaintiffs Aharon Miller, Shani Miller, and Adiya Miller have experienced severe mental anguish and extreme emotional distress.

**The Steinherz Family**

461.    Plaintiff Altea Steinherz is a citizen of the United States and a resident of the State of Israel.

462.    Plaintiff Jonathan Steinherz is a citizen of the United States and a resident of the State of Israel. He was the husband of plaintiff Altea Steinherz at the time of the attack.

463.    On December 1, 2001, Altea Steinherz was nine months pregnant. Altea and Jonathan were at a restaurant in Jerusalem when they heard a bomb explode nearby.

464.    Altea wanted to get home to her daughter who was with a babysitter at the time, but she knew that bombings in Israel were frequently followed by a second bomb intended to kill or injure people fleeing from the first bomb.

465.    A short time later Altea and Jonathan heard another bomb explode. Believing the bombing was now over, they began to walk home.

466.    While walking in the street, they saw a crazed-looking man run past them. Altea thought that he might have been the bomber and insisted that the couple turn around, away from the direction from which the man had come.

467.    As they began to run, Altea fell twice, and she broke her left arm as a result of one of the falls.

468.    She experienced severe pain in her arm after the attack and continued to experience pain for many years afterward.

469.    Altea was afraid that, as a result of her falls, her pregnancy might have terminated.

470.    Until her son, Yitzhak, was born 11 days later, Altea and Jonathan feared for the

condition of their unborn child.

471.    Altea became less self-confident and more fearful generally. She had sleeping difficulties and underwent psychological counseling.

472.    Jonathan felt tremendous anxiety and stress, had significant difficulty sleeping, and underwent psychological counseling.

473.    As a result of the attack, plaintiff Altea Steinherz sustained physical injuries and experienced severe mental anguish and extreme emotional distress.

474.    As a result of the attack, plaintiff Jonathan Steinherz experienced severe mental anguish and extreme emotional distress.

475.    Plaintiff Temima Steinherz is a citizen of the United States and a resident of the State of Israel. She is the daughter of plaintiffs Altea Steinherz and Jonathan Steinherz.

476.    As a result of the attack, plaintiff Temima Steinherz has experienced severe mental anguish and extreme emotional distress.

477.    Plaintiff Joseph Ginzberg is a citizen of the United States and a resident of the State of New York. He is the father of plaintiff Altea Steinherz.

478.    As a result of the attack, plaintiff Joseph Ginzberg has experienced severe mental anguish and extreme emotional distress.

479.    Plaintiff Peter Steinherz is a citizen of the United States and a resident of the State of New York. He is the father of plaintiff Jonathan Steinherz.

480.    Plaintiff Laurel Steinherz is a citizen of the United States and a resident of the State of New York. She is the mother of plaintiff Jonathan Steinherz.

481.    As a result of the attack, plaintiffs Peter Steinherz and Laurel Steinherz have experienced severe mental anguish and extreme emotional distress.

**PATT JUNCTION BUS # 32A BOMBING - JUNE 18, 2002**

482.    At approximately 7:50 a.m. on June 18, 2002, Muhamad al-Ghoul, a HAMAS terrorist, boarded Bus #32A in the Gilo neighborhood of Jerusalem. Almost immediately, he detonated the large bomb which he carried in a bag stuffed with ball bearings. The blast destroyed the front half of the bus, packed with people on their way to work and a group of schoolchildren. Nineteen people were killed, and 74 others were injured.

**The Aluf Family**

483.    Boaz Aluf was a citizen of the State of Israel when he died.

484.    Plaintiff Gila Aluf is a citizen of the United States and a resident of the State of Israel. She is the widow of Boaz Aluf.

485.    On the morning of June 18, 2002, Boaz was going to work in the computer department of Jerusalem's Bank Tefahot and was on Bus #32A when al-Ghoul detonated the bomb.

486.    As a result of Boaz's death, plaintiff Gila Aluf has experienced emotional pain and suffering, and the loss of her husband's society, companionship, comfort, protection, attention, advice and counsel, and severe mental anguish and extreme emotional distress.

**THE ARIEL BOMBING – OCTOBER 27, 2002**

487.    On October 27, 2002, Muhammad Kazid Faysal al-Bustami, a HAMAS suicide bomber, detonated his explosives at a gas station outside of the West Bank town of Ariel, killing three Israeli soldiers and injuring 15 other people.

**The Zahavy Family**

488.    Plaintiff Yitzhak Zahavy is a citizen of the United States and a resident of the State of Israel.

55

489.    On October 27, 2002, Yitzhak was waiting with his platoon for a transport pickup at a gas station at the entrance to the town of Ariel.

490.    Al-Bustami emerged and stood approximately 50 meters from Yitzhak.

491.    Three of Yitzhak's fellow soldiers were killed as they (and Yitzhak) unsuccessfully attempted to stop al-Bustami before he detonated his explosives.

492.    Yitzhak suffered shrapnel injuries to his leg and was taken to Meir Hospital.

493.    The emotional effects of the attack continue to affect Yitzhak to the present day.

494.    As a result of the attack, plaintiff Yitzhak Zahavy has sustained physical injuries and experienced severe mental anguish and extreme emotional distress.

495.    Plaintiff Julie Zahavy is a citizen of the United States and a resident of the State of Israel. She is the wife of plaintiff Yitzhak Zahavy.

496.    As a result of the attack, plaintiff Julie Zahavy has experienced severe mental anguish and extreme emotional distress.

497.    Plaintiff Tzvee Zahavy is a citizen of the United States and a resident of the State of New Jersey. He is the father of plaintiff Yitzhak Zahavy.

498.    Plaintiff Bernice Zahavy is a citizen of the United States and a resident of the State of New Jersey. She is the mother of plaintiff Yitzhak Zahavy.

499.    As a result of the attack, plaintiffs Tzvee Zahavy and Bernice Zahavy have experienced severe mental anguish and extreme emotional distress.

**B.**    **The Defendant**

500.    Cairo Amman Bank was founded in 1960 under the regulations of the Central Bank of Jordan and commenced its banking services on July 1, 1960. It operates 89 branches in Jordan,

and its headquarters is located on Arar Street in Wadi Sarqra, PO Box 950661, Amman, Jordan, 11195. CAB is a publicly traded company, listed on the Amman Stock Exchange.

501.    CAB first opened a branch in the Palestinian Territories in 1961. It returned to the Palestinian Territories in 1986 and has since expanded to 21 branches there. CAB's head office in the Palestinian Territories is located on National College Street in Ramallah.

502.    CAB is one of the largest banks both in Jordan and in the Palestinian Territories. As of June 30, 2018, it has over 2.8 billion Jordanian Dinars (approximately $4 billion USD) in total assets, and over 1,000 employees.

503.    At all times relevant to this Amended Complaint, CAB's Chairman of the Board of Directors was Khaled Sabih al-Masri. He served as Chairman from July 1999 to October 2012. Although he is still a board member, Al-Masri was replaced as Chairman by Yazid Adnan Mustafa al-Mufti in 2012. Al-Mufti previously served as CAB's General Manager from 1989 until October 2004.

## FACTUAL ALLEGATIONS

## I.    THE ISLAMIC RESISTANCE MOVEMENT (HAMAS)

### A.    HAMAS's Founding

504.    Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably the Islamic Resistance Movement ("HAMAS"), a radical Islamist terrorist organization committed to the globalization of Islam through violent "jihad" (holy war).

505.    HAMAS[2] was established in the Gaza Strip on December 10, 1987, shortly following the outbreak of the First Intifada.[3] HAMAS announced its founding in an "official"

---

[2]    Hamas is an acronym of the Arabic "*Harakat al-Muqawama al-Islamiya*" – Islamic Resistance Movement – but its name also means, in Arabic, enthusiasm, courage, zeal for battle.

[3]    The term "First Intifada," as used herein, relates to the violent conflict that broke out in December 1987

communique on December 14, 1987.

506.    It represented the culmination of approximately 15 years of preparation and organization building, led by Ahmed Yassin (also known as "Sheikh Yassin"), the unrivaled leader of what had been the Muslim Brotherhood Movement in the Gaza Strip.[4]

507.    Although Yassin had been confined to a wheelchair throughout his adult life, he worked unceasingly for the establishment of HAMAS in the Gaza Strip. When HAMAS was established in Yassin's home in 1987, the Islamic Resistance Movement already had a defined ideology and a group of pre-existing institutions in Gaza, such as *Al-Mujama Al-Islami* (the Islamic Center), *Al-Jam'iya Al-Islamiya* (the Islamic Society) and the Islamic University of Gaza that were the flagship institutions of the Brotherhood's civilian social framework – the *da'wa*.[5]

508.    The U.S. Government has described the purpose of HAMAS's *da'wa* as follows:

> Through this grass-roots approach, (known as *dawa* - "preaching" or "calling"), Hamas achieves a number of goals. Among other perceived benefits, it (1) assures popular support for the movement, and through its popular support improves its ability to compete with opposing political factions; (2) provides a base from which to indoctrinate and recruit future activists, including military recruits, to carry out suicide bombings and other terrorist acts; (3) provides a benign cover through which millions of dollars can be transferred from overseas into Hamas operated or controlled institutions; and (4) since money is fungible, the overseas support for the *dawa* frees resources that can then be devoted to terrorist activity.[6]

---

between the Palestinians and Israel.

[4]     The Muslim Brotherhood Movement was established in Egypt in 1928 by Hassan al-Banna, and was dedicated to the goal of fighting Western influences on Muslim society; ensuring the adherence of Muslims to Islamic law (Shari'a); and following the rectification of Muslim society, to eventually establish an Islamic state that would expand its rule over the world by means of jihad and a call to join Islam.

[5]     The word "*da'wa*," whose basic meaning in Arabic is "the call to the believers to shelter beneath the faith – return to the faith," is used herein to refer to "the civilian infrastructure of HAMAS."

[6]     *See* Second Supp. Trial Brief of the United States, *United States v. Holy Land Foundation*, 3:04-cr-00240-P, ECF No. 1171, at 5-6 (N.D. Tex. Sept. 12, 2008). A copy of the Trial Brief is attached as **Exhibit A** to the Amended Complaint.

509.     On December 10, 1987, after violence broke out in the Jabalia Refugee Camp, Sheikh Yassin invited six of the leaders of the Muslim Brotherhood in Gaza to his home.

510.     There the group decided to establish HAMAS, an organization that would combine terror against Israel with its *da'wa* (civilian infrastructure) through organizations such as *Al-Mujama Al-Islami* and *Al-Jam'iya Al-Islamiya*.

511.     In 1973, Yassin established *Al-Mujama Al-Islami*, and in 1976 he set up *Al-Jam'iya Al-Islamiya*. The two organizations, which were based in Gaza, quickly expanded and established branches throughout the Gaza Strip, but neither of them was, at the time of its establishment, *openly* militant.

512.     Initially the two organizations placed their emphasis primarily on mosques. The mosques were not meant solely for prayer. They also served as centers for religious, social, educational, cultural and political activity, while enjoying a measure of ex-territorial immunity that derived from their religious nature.[7]

513.     The seven participants in the December 1987 meeting are considered by HAMAS to be its founding fathers. All of them were members of the Muslim Brotherhood, and six of them were members of *Al-Mujama Al-Islami*: Sheikh Yassin, Salah Shehada, Abd al-Aziz al-Rantisi, Muhammad Sham'a, Ibrahim al-Yazuri, Isa al-Nashar, and Abd al-Fatah Dukhan.

514.     At the meeting, Sheikh Yassin was recognized as the supreme leader of HAMAS.

515.     His six associates in founding the movement became HAMAS's leadership council, and each of them was appointed to head a particular region: Salah Shehada was responsible for the

---

[7]     Yassin and the Muslim Brotherhood did not accept the secular Palestine Liberation Organization (PLO) as the sole official representative of the Palestinian people, and subsequently began challenging representatives of PLO organizations in the trade unions, charitable societies, and universities in Gaza and the West Bank. In Gaza, where Yassin's leadership was more aggressive, the Muslim Brotherhood gradually seized control of the Islamic University of Gaza (founded in 1978) by removing the university's PLO-affiliated administration and replacing them with members of *Al-Mujama Al-Islami*.

northern Gaza Strip; Muhammad Sham'a was put in charge of Shati Refugee Camp; Ibrahim al-

Yazuri was put in charge of Gaza City; Abd al-Fatah Dukhan was put in charge of the central

camps (four refugee camps); Isa al-Nashar was put in charge of the Rafah area; and Abd al-Aziz

al-Rantisi was responsible for the Khan Yunis area.

516.    All seven of HAMAS's founders were members of the *da'wa* apparatus (the

civilian infrastructure of the Muslim Brotherhood and later of HAMAS).

517.    In a February 1, 1988 article titled "Islam's Voice in Gaza," *Time Magazine* wrote

about Sheikh Yassin and his obvious connection to the Islamic Center in Gaza:

> Sheik Yasin, 51, is a spiritual leader of the Islamic fundamentalist
> movement in Gaza and thus a prime force behind the religious gale that has
> recently fanned the flames of unrest in the occupied territories. Born in the
> Arab village of Al-Joura, Sheik Yasin has been paralyzed below the neck
> since age 15 as the result of an athletic accident. He resides with his wife
> and eleven children in a one-story house in Gaza City. Family members
> assist him in dressing and eating. Despite his handicap, he runs al-Mujama
> al-Islami, a community organization that builds mosques and sponsors
> cultural activities.

518.    In a January 1998 interview with a HAMAS publication, Dr. Ibrahim al-Yazuri,

one of the aforementioned founders of HAMAS, offered a telling description of HAMAS's

philosophy regarding charitable giving:

> Everyone knows that the Islamic Resistance Movement, HAMAS, is a
> Palestinian Jihad movement that strives for the liberation of all Palestine,
> from the (Mediterranean) sea to the river (Jordan), from the north to the
> south, from the tyrannical Israeli occupation, and this is the main part of its
> concern. Social work is carried out in support of this aim, and it is
> considered to be part of the HAMAS movement's strategy . . . The HAMAS
> movement is concerned about its individuals and its elements, especially
> those who engage in the blessed jihad against the hateful Israeli occupation,
> since they are subjected to detention or martyrdom. The movement takes
> care of their families and their children and provides them with as much
> material and moral support as it can. This is one of the fundamental truths
> of Islamic work and thus represents the duties of the Islamic state . . . The
> movement provides this aid through the support and assistance it gives to

the zakat (Islamic alms-giving) committees and the Islamic associations and institutions in the Gaza Strip.

519.    Years before the establishment of HAMAS, Sheikh Yassin and the Muslim Brotherhood in the Gaza Strip had developed the civilian infrastructure (such as *Al-Mujama Al-Islami*, *Al-Jam'iya Al-Islamiya* and other organizations) which would soon form the backbone and recruiting grounds for HAMAS's operational terrorist wing, later named the *Izz al-Din al-Qassam* Brigades (herein, the "Qassam Brigades").[8]

520.    In January 1988, HAMAS also established a branch in the West Bank, through three of the leaders of the Muslim Brotherhood there: Jamil Hamami, Hamed Bitawi and Sa'id Bilal. As in the past, HAMAS relied on the infrastructure of the Muslim Brotherhood in the West Bank to build the backbone of command of HAMAS and its resources, while absorbing key zakat committees[9] and charitable societies in the West Bank, and where necessary, also setting up new institutions.

**B.    HAMAS in the 1990s**

521.    In December 1992, as a result of increased terrorist activity perpetrated by HAMAS, the government of Israel decided to deport over 350 HAMAS operatives to Lebanon.

522.    This step later became known as the *Marj al-Zuhur* Deportation because the deported Islamists were delivered to a check point by that name in southern Lebanon during their brief exile.

---

[8]    In 1984, the Israel Defense Forces ("IDF") uncovered a weapons cache in Yassin's house. He was later arrested and convicted of "establishing a radical Islamic religious organization whose aim was to destroy the State of Israel and replace it with a religious Islamic state." He was sentenced to 13 years in prison but released a year later as part of the "Jibril Prisoners' Exchange" on May 21, 1985.

[9]    The term "Zakat" means tithing in Arabic. This is one of the five Pillars of Islam (Arkan al-Islam). It is loosely used herein to refer to a form of semi-compulsory charitable giving.

523.   The *Marj al-Zuhur* Deportation was a formative moment in the history of HAMAS and its mythology. It established its status as a leading Palestinian political organization and brought it to prominence in the Arab and international arenas.

524.   HAMAS members who were deported to *Marj al-Zuhur* have a special place in HAMAS's history, quickly became the most iconic members of HAMAS, and later emerged as key leaders of the HAMAS *da'wa.*

525.   The international community condemned the deportations and at the end of 1993 the Israeli Supreme Court ultimately determined that the Government of Israel was compelled to return the *Marj al-Zuhur* deportees.

526.   The saga transformed the *Marj al-Zuhur* deportees into celebrities within the Palestinian arena. The HAMAS deportees later became the backbone of HAMAS leadership.

527.   On September 13, 1993, President Clinton hosted the signing ceremony in Washington, D.C. for the so-called "Oslo Accords" presented by Yasser Arafat, Chairman of the Palestine Liberation Organization ("PLO") and Israel's Prime Minister Yitzhak Rabin and his foreign minister, Shimon Peres.

528.   The agreement had several significant aspects, including the withdrawal of Israeli forces from parts of the West Bank and Gaza, and the creation of the Palestinian National Authority ("PA"), headed by PLO Chairman Yasser Arafat.

529.   Under the agreement, the newly formed PA would perform the services previously provided by Israel, including education, health, social welfare, taxation and tourism.

530.   The agreement also included Letters of Mutual Recognition, whereby the Israeli government recognized the PLO as the legitimate representative of the Palestinian people, while the PLO recognized the right of Israel to exist and purportedly renounced terrorism, violence and

the desire for the destruction of Israel.

531.     The Oslo Accords were not, however, universally accepted by the Palestinian factions.

532.     HAMAS rejected the agreement for its recognition of Israel's right to exist.

533.     For HAMAS, the Oslo Accords contradicted its most valued tenet – the destruction of the State of Israel and the creation of an Islamic state in all of what is today Israel, the West Bank, and the Gaza Strip.

534.     Accordingly, HAMAS pursued a three-pronged strategy in the early 1990s.

535.     First, it upgraded its terror apparatus, improving the capabilities of its Qassam Brigades and beginning to perfect its bomb-making skills.

536.     Second, it intensified its efforts to subvert existing social welfare institutions – particularly in the West Bank – in order to systematically gain control of pre-existing zakat committees and other religious and social institutions that would ultimately compete with the PA for the "hearts and minds" of the Palestinian public in Gaza, the West Bank and even the Palestinian refugee camps in Jordan and Lebanon.

537.     Third, it accelerated the development of its world-wide fundraising network. While HAMAS enjoyed support from wealthy patrons in the Persian Gulf even in its prior incarnation as Sheikh Yassin's Muslim Brotherhood "branch" in Gaza, the Oslo Accords galvanized the Brotherhood's supporters in Europe, Africa and even the United States.

538.     HAMAS fundraisers and other operatives located abroad are key members of the HAMAS *da'wa*, closely tied to *da'wa* and Qassam Brigades operatives on the ground in the West Bank and the Gaza Strip, as well as to HAMAS political leaders in Turkey, Qatar and elsewhere in the Middle East.

### C.     HAMAS's European Fundraising Network

539.     Comité de Bienfaisance et de Secours aux Palestiniens ("CBSP"), HAMAS's primary fundraiser in France, was founded in 1990 and registered there as a non-profit organization.

540.     The Israeli government declared CBSP an illegal organization on May 6, 1997 because of its affiliation with HAMAS and the support it gave to HAMAS-affiliated institutions, and subsequently designated it a terrorist organization on January 17, 1998.

541.     Interpal, HAMAS's most important fundraising organization in the United Kingdom, was formally registered as a charity with the U.K. Charity Commission on August 11, 1994 and named at the time as the "Palestinian Relief and Development Fund."

542.     As early as 1995, published reports in Israel linked Interpal to HAMAS.

543.     The Israeli government declared Interpal an illegal organization on May 6, 1997 because of its affiliation with HAMAS and the support it gave to HAMAS-affiliated institutions, and subsequently designated it a terrorist organization on January 17, 1998.

544.     On August 22, 2003, following the aforementioned deadly suicide bombing aboard Bus #2 in Jerusalem on August 19, 2003 in which Tehilla Nathansen was killed and multiple members of her family severely injured, the U.S. Treasury Department designated five HAMAS-related charities and six senior HAMAS leaders as Specially Designated Global Terrorists ("SDGTs").[10]

545.     The five HAMAS-related institutions that were designated as SDGTs were:

1. CBSP, of France.

2. Association de Secours Palestinien ("ASP"), of Switzerland (an organization affiliated with CBSP).

---

[10]     A copy of the U.S. Treasury Press Release is attached as **Exhibit B** to the Amended Complaint.

3. Palestinian Relief and Development Fund, or Interpal, headquartered in the United Kingdom.

4. Palestinian Association in Austria ("PVOE").

5. Sanabil Association for Relief and Development based in Lebanon.

546.    The U.S. Treasury Press Release announcing the designations of these five entities

stated:

> The United States government has credible evidence that the following five organizations are part of a web of charities raising funds on behalf of HAMAS and using humanitarians [sic] purposes as a cover for acts that support HAMAS. Funds are generated by, and flow through, these organizations on behalf of HAMAS.

547.    According to the U.S. Treasury Department, "Interpal, headquartered in the UK,

has been a principal charity utilized to hide the flow of money to HAMAS. Reporting indicates it

is the conduit through which money flows to HAMAS from other charities, e.g., the Al Aqsa

Foundation (designated under Executive Order 13224 on May 29th) and oversees the activities of

other charities. … Reporting indicates that Interpal is the fundraising coordinator of HAMAS. This

role is of the type that includes supervising activities of charities, developing new charities in

targeted areas, instructing how funds should be transferred from one charity to another, and even

determining public relations policy."

548.    According to the U.S. Treasury Department, "CBSP and ASP are primary

fundraisers for HAMAS in France and Switzerland, respectively. Founded in France in 1990,

CBSP acts in collaboration with more than a dozen humanitarian organizations based in different

towns in the West Bank and Gaza and in Palestinian refugee camps in Jordan and Lebanon. ASP,

a subsidiary of CBSP, was founded in Switzerland in 1994. The group has collected large amounts

of money from mosques and Islamic centers, which it then transfers to sub-organizations of

HAMAS. Khalid Al-Shuli is the president of CBSP and ASP."

549.     According to the U.S. Treasury Department, "PVOE is controlled by the leader of HAMAS in Austria. The money is targeted to support members of HAMAS and is funneled through other charities in Lebanon, the West Bank and Gaza or other areas of the Middle East in order to ensure the transfer of funds is undetected and reaches its intended recipients. PVOE is part of the HAMAS network of charitable organizations that includes the Al Aqsa Foundation."

550.     The six senior HAMAS leaders who were designated SDGTs were:

1.  Sheikh Yassin, the founder and spiritual leader of HAMAS.

2.  Imad Khalil Al-Alami, a member of HAMAS's Political Bureau in Damascus, Syria.

3.  Osama Hamdan, a senior HAMAS leader in Lebanon.

4.  Khalid Mishal, (then) head of HAMAS's Political Bureau and Executive Committee in Damascus, Syria.

5.  Moussa Abu Marzouk, (then) Deputy Chief of HAMAS's Political Bureau in Syria.

6.  Abd al-Aziz al-Rantisi, (then) HAMAS leader in Gaza reporting to Sheikh Yassin.

551.     In September 2003, the Central Bank of Jordan asked local Jordanian banks, including CAB, to freeze the accounts of the individuals and entities designated by the U.S. government on August 22, 2003. The freezing order was subsequently rescinded because of the political uproar and public opposition in Jordan to the freezing of HAMAS accounts.

552.     The Al-Aqsa Foundation, a major fundraiser for HAMAS, had branch offices in Holland, Belgium, Denmark, Sweden, Yemen, South Africa, and Pakistan. It was founded in July 1991 in Germany (Al-Aqsa e.V.), where it was headquartered, and which served as its main branch until at least 2002.

553.     On May 6, 1997, Israel outlawed the Al-Aqsa Foundation (including its German headquarters). On January 17, 1998, Israel declared it a terrorist organization.

554.     An August 6, 1997 article in the *Deutsche Presse—Agentur* reported:

> The Israeli government announced plans Wednesday to pressure the United States, Britain, Germany and France to stem the flow of funds from purportedly charitable organizations in those countries to the radical Hamas group.

> In a news conference for journalists from those countries, a high-ranking Israeli army representative said crushing the Hamas infrastructure invariably involved stopping the flow of funds from groups abroad masquerading under the guise of charities.

> He said Hamas--linked organizations in Europe included the Interpal Palestinian charitable organization in London and the Al Aksa Fund in Aachen, Germany. He claimed both organizations are firmly in the hand of Hamas.

> In America, the Holy Land Fund in suburban Dallas funneled 3 to 4 million dollars annually to Hamas, the official said. Similar amounts are raised by the groups in London and Aachen, he said. In France he cited the CBSP organization as a front for Hamas fundraising efforts.

> Israel has long asked governments of those countries to take steps to curtail Hamas activities on their soil, he said, but to no avail.

555.     The following day, the Associated Press reported that an "Israeli official, requesting anonymity, said that Hamas had set up offices in London, Paris and Aachen, which collected donations of more than $10 million a year. In addition to Al-Aqsa in Germany, the others were identified as the Palestinian Relief and Welfare Fund in London, and the Companie Benificent De Solidarite Avec Palestine (CBSP) in France."

556.     In July 2002, the German government closed the offices of the Al Aqsa Foundation located in Germany.

557.     According to the closure order, "AL-AQSA e.V. advocates, supports and calls for violence as means to achieve political, religious or other goals by awakening or at least strengthening the willingness of third parties to use violence as a political, religious or other means."

558.     With respect to Al Aqsa's connection to HAMAS, the order stated: "AL-AQSA e.V. already financially supported the predecessor organization of HAMAS, the 'Al-Mujama Al-Islamiya' and to this day forwards at least some of the incoming donations to HAMAS. The funds resulting from collections of donations are flowing either directly to HAMAS or via seemingly unsuspected aid organizations."

559.     On May 29, 2003, the U.S. Treasury Department designated all branches of the Al Aqsa Foundation as an SDGT pursuant to Executive Order 13224.[11]

560.     The U.S. Treasury Press Release announcing Al Aqsa's designation stated:

> Al Aqsa is a critical part of Hamas' terrorist support infrastructure. Through its headquarters in Germany and branch offices in the Netherlands, Denmark, Belgium, Sweden, Pakistan, South Africa, Yemen and elsewhere, Al Aqsa funnels money collected for charitable purposes to Hamas terrorists.
>
> Other nations, including the Netherlands, Germany, Denmark, Britain, Luxembourg and Switzerland, have also taken action against the Al-Aqsa Foundation.

561.     CAB processed multiple transfers originating from Al Aqsa Foundation branches to CAB account holders before the Al Aqsa Foundation was designated an SDGT.

562.     These included transfers from Al Aqsa Foundation in Germany to the Jenin Zakat Committee in February 2000 and February 2001 and from the Al Aqsa Foundation in Sweden in February and April 2003 (in USD).

563.     CAB also processed multiple transfers originating from Al Aqsa Foundation branches to CAB account holders *after* the Al Aqsa Foundation was designated an SDGT.

564.     These included transfers from the Al Aqsa Foundation in Sweden to the Jenin Zakat Committee in July 2003 and May 2004.

---

[11]     A copy of the U.S. Treasury Press Release is attached as **Exhibit C** to the Amended Complaint.

565.    CAB also processed multiple transfers from the Al Aqsa Foundation in Sweden to the World Assembly of Muslim Youth's ("WAMY") Gaza Office both before and after the Al Aqsa Foundation was designated an SDGT.

566.    CAB Maintained account no. 6266/1 for the Gaza Office of WAMY both during and after the relevant period.

### D.    HAMAS in the United States – the Holy Land Foundation

567.    In October 1993, less than one month after the public signing of the Oslo Accords, approximately 20 members of the so-called "Palestine Committee" in the United States gathered together in Philadelphia, Pennsylvania to discuss how to help HAMAS oppose the Oslo Accords and to continue and improve their fundraising and political activities in the United States.

568.    The Federal Bureau of Investigation (FBI) learned of the Philadelphia meeting and obtained a warrant from the Foreign Intelligence Surveillance Court to monitor the meeting, which lasted approximately three days.

569.    During the meeting, the participants discussed the problems that the Oslo Accords presented for those opposed to co-existence with Israel, and attendees were admonished not to mention "HAMAS," but rather to refer to it as "Samah," which is HAMAS spelled backwards.

570.    Attendees agreed that they must operate under an ostensible banner of apolitical humanitarian exercise in order to continue supporting HAMAS's vital social recruitment effort by financially supporting institutions, organizations and programs in the West Bank and Gaza aligned with HAMAS.

571.    The attendees noted that the United States provided them with a secure base from which to operate and their belief that continuation of jihad was inevitable.

572.    It was decided that most of the funds raised in the future should be directed toward HAMAS and to providing support to the injured, the prisoners and their families, and the martyrs and their families.

573.    Attendees identified several charitable societies and zakat committees as "ours," identifying these outwardly charitable entities as belonging to HAMAS.

574.    The Holy Land Foundation ("HLF"), which was established in 1989, emerged from the Philadelphia meeting as the preeminent HAMAS fundraising organization in the United States.

575.    However, neither the HLF nor the U.S.-based Palestinian Committee worked in isolation on behalf of HAMAS.

576.    While HLF was a vital member of HAMAS's international network of organizations dedicated to financing HAMAS's agenda, it also worked in conjunction with organizations in Europe and throughout the world to funnel money to the same closed network of HAMAS-controlled charitable societies and zakat committees in the West Bank and Gaza.

577.    These other organizations – including The Palestinian Relief and Development Fund (Interpal) in Great Britain, the Al-Aqsa Foundation in Germany, Belgium and Holland, the CBSP in France, the ASP in Switzerland, the Palestinian Association in Austria (PVOE), and the Palestinian Branch of WAMY – all operated in similar ways, sharing fundraising techniques, projects, and connections to HAMAS leaders.

578.    In May 1995, Israeli authorities raided HLF's branch office in Beit Hanina, a village near Jerusalem. Their review of the HLF branch's records led them to conclude that it was distributing funds raised by the Texas-headquartered group and funneling them to HAMAS-controlled entities.

579.    The raid yielded records listing dozens of HAMAS recipients of HLF money including the children of Yahya Ayyash, the notorious "Engineer" – HAMAS's first master bomb-maker, who was assassinated by Israel in 1996.

580.    Another recipient was the mother of Ahmed Hussein Mahmoud Shukri, a HAMAS activist sentenced to life in prison in Israel for murdering a Jewish person in Tel Aviv in 1989.

581.    Other recipients of HLF funds included the father of a HAMAS operative killed in a 1994 clash with the Israeli army, the mother of a man serving a life sentence for killing three Israeli civilians in 1992, and the family of a convicted bomber who murdered a Canadian tourist in 1990.

582.    On March 15, 1996, a feature article in *The New York Times* detailed the financing of HAMAS by so-called charitable organizations. The article specifically discussed Israeli government claims that Richardson, Texas-based HLF was a "key fundraising operation" for HAMAS and discussed HAMAS's social infrastructure.

583.    On May 20, 1996, The *Jerusalem Post* reported on proceedings in the High Court of Justice resulting in a decree by the Israeli government shutting down the HLF's Jerusalem office and authorizing confiscation of all of its property.

584.    On May 6, 1997, the government of Israel designated HLF a HAMAS organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks, or who were jailed in the wake of these attacks …."

585.    Israeli designations of HAMAS organizations were published and publicized in the Palestinian Territories (as were all relevant Israeli laws as of June 8, 1967).[12]

---

[12]    During the period from 1994 to 2004, the Government of Israel (and, to a certain extent, the Palestinian Authority) exercised jurisdiction over the Palestinian Territories. *See* Declaration of Shlomo Politis, *Linde v. Arab Bank, PLC*, No. 04-cv-2799-BMC-VVP (E.D.N.Y. Nov. 25, 2014), ECF No. 1193-13, attached as **Exhibit D** to the Amended Complaint, ¶¶ 15-17, 24-31. The Commanders of IDF forces in the Palestinian Territories therefore

586.    Following several HAMAS terror attacks, on September 25, 1997 the Palestinian Authority closed what it identified as 16 HAMAS institutions, including HLF's Gaza offices.

587.    Nevertheless, even after the Palestinian Authority's identification of HLF as a HAMAS institution in 1997, CAB continued to maintain one or more U.S. dollar-denominated accounts for HLF, including Account No. 4883 (001 000 4883 03 2111 813) in Hebron, located in the Palestinian Territories.

588.    At the beginning of 2001, the aforementioned account had a balance in U.S. dollars in excess of $600,000.

589.    Most of the funds HLF transferred from the United States to its offices in the Palestinian Territories were transferred through CAB's correspondent account with Citibank in New York.

590.    These transfers were often in very large amounts.

591.    For example, a transfer from HLF in Richardson, Texas to HLF in the Palestinian Territories dated December 28, 1999 for $190,743 was sent via "CITIBANK NY FFC CAIRO AMMAN BANK AMMAN JORDAN BR WADI SAKRAH FCC CAIRO AMMAN BANK ISLAMIC TRANSACTION HEBRON ISRAEL."

592.    For example, a transfer from HLF in Richardson, Texas to HLF in the Palestinian Territories dated January 16, 2001 for $229,283 was sent via "CITIBANK NY FFC CAIRO AMMAN BANK AMMAN JORDAN BR WADI SAKRAH FCC CAIRO AMMAN BANK ISLAMIC TRANSACTION HEBRON ISRAEL." A copy is attached as **<u>Exhibit E</u>** to the

---

exercised governmental and administrative authority, including promulgation of laws and regulations. After September 1995, all notifications concerning new laws and regulations (including Israeli designations of groups as affiliated with terrorist groups like HAMAS) were promulgated through District Civil Liaison Offices ("DLCs") which printed them, translated them into Arabic and made them available to Palestinian Authority DLCs as well. All persons and entities in the Palestinian Territories, including banks, were legally presumed to have access and notice as to such laws and regulations, including those proscribing illegal organizations.

Amended Complaint.

      **E.**    **The United States Designates the Holy Land Foundation an SDGT in 2001**

     593.    On December 4, 2001, HLF, a U.S.-based organization which provided millions of

dollars to HAMAS, was designated an SDGT pursuant to Executive Order 13224 and a Specially

Designated Terrorist ("SDT") under Executive Order 12947. HLF's designation was accompanied

by an order blocking all its assets.

     594.    The U.S. Treasury Press Release announcing HLF's designation stated, *inter alia*:

- The Holy Land Foundation for Relief and Development, headquartered in Richardson, Texas, raises millions of dollars annually that is used by HAMAS. Last year, Holy Land raised over $13 million.

- Holy Land supports HAMAS activities through direct fund transfers to its offices in the West Bank and Gaza that are affiliated with HAMAS and transfers of funds to Islamic charity committees ("zakat committees") and other charitable organizations that are part of HAMAS or controlled by HAMAS members.

- Mousa Mohamed Abu Marzook, a political leader of HAMAS, provided substantial funds to the Holy Land Foundation in the early 1990s. In 1994, Marzook (who was named a Specially Designated Terrorist by the Treasury Department in 1995) designated the Holy Land Foundation as the primary fund-raising entity for HAMAS in the United States.[13]

     595.    These findings were in part the product of an extensive FBI investigation that

culminated in what has come to be referred to as the "Watson Memorandum" – named after former

FBI Assistant Director Counterterrorism Division Dale Watson. A copy is attached as **Exhibit G**

to the Amended Complaint.

     596.    The Watson Memorandum observed:

It is the FBI's analysis that the zakat committees receiving HLFRD [Holy Land Foundation] financial support are controlled by HAMAS. GOI [Government of Israel] analysis has also determined that HAMAS activists have been elected or appointed to senior leadership positions on these zakat

---

[13]    A copy of the August 29, 1995 update to the Federal Register noting Marzook's designation is attached as **Exhibit F** to the Amended Complaint.

committees. GOI analysis, as well as open source reporting, has identified that the civilian population is aware that the services being provided by the zakat committees, whether it's the distribution of food, medical services or other social services, are being provided by HAMAS.

597.   On December 6, 2001, the *Los Angeles Times* reported on the Watson Memorandum noting that the "FBI memo provides a glimpse of how the federal government has gone about amassing evidence against groups it believes are aiding terrorists…. The money flowed from Texas to charity committees controlled by Hamas in the Palestinian territories, to Holy Land offices in the West Bank or to other groups that support Hamas, the FBI concluded."

598.   On December 4, 2001, President Bush announced that "[t]he terrorists benefit from the Holy Land Foundation, and we're not going to allow it. Money raised by the Holy Land Foundation is used by Hamas to support schools and indoctrinate children to grow up into suicide bombers [and] to recruit suicide bombers and support their families."

599.   These large deposits were then often translated into checks written by HLF in the Palestinian Territories to HAMAS *da'wa* institutions in smaller increments.

600.   For example, HLF drafted separate checks on September 30, 2000 to three branches of *Al-Jam'iya Al-Islamiya* (the Islamic Society) for $2,906, $6,615 and $2,687.

601.   The Watson Memorandum concluded that "FBI investigations of HAMAS activities in the United States have revealed that [HLF] is the primary fund-raising entity for HAMAS and that a significant portion of the funds raised by the [HLF] are clearly being used by the HAMAS organization…[and] that the [HLF] is acting for or on behalf of HAMAS. Further, senior members of the [HLF] support HAMAS ideology and activities. These HAMAS activities interfere with the Middle East peace process and pose a threat to the national security, foreign policy, or economy of the United States."

602.   In designating HLF as an SDGT, The Treasury Department found that:

HAMAS raises tens of millions of dollars per year throughout the world using charitable fundraising as cover. While HAMAS may provide money for legitimate charitable work, this work is a primary recruiting tool for the organization's militant causes. HAMAS relies on donations from Palestinian expatriates around the world and private benefactors located in moderate Arab states, Western Europe and North America. HAMAS uses a web of charities to facilitate funding and to funnel money. Charitable donations to non-governmental organizations are commingled, moved between charities in ways that hide the money trail, and are then often diverted or siphoned to support terrorism.

The political leadership of HAMAS directs its terrorist networks just as they oversee their other activities. HAMAS leader Yassin confirms this relationship, stating to al-Sharq al-Awsat on August 12, 2002: "When we make decisions on the political level and convey them to the military wing, it abides by it normally." The intensity of this relationship is reflected in Yassin's words quoted by Reuters on May 12, 1998:

"We can not separate the wing from the body. If we do so, the body will not be able to fly. HAMAS is one body."

603.    As a result of HLF's lawsuit challenging its designation as an SDGT, the federal district court for the District of Columbia commenced a detailed review of the administrative record and reiterated the evidence on which the Treasury Department relied in making its determination to designate HLF as an SDGT. It found that the record contained "ample evidence that (1) HLF has had financial connections to Hamas since its creation in 1989; (2) HLF leaders have been actively involved in various meetings with Hamas leaders; (3) HLF funds Hamas-controlled charitable organizations; (4) HLF provides financial support to the orphans and families of Hamas martyrs and prisoners; (5) HLF's Jerusalem office acted on behalf of Hamas; and (6) FBI informants reliably reported that HLF funds Hamas."[14]

604.    In 2004, HLF and several of its directors were indicted on criminal charges that it was illegally providing material support to HAMAS.

---

[14]    *Holy Land Found. for Relief and Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 69 (D.D.C. 2002), *affd*, 333 F.3d 156 (D.C. Cir. 2003).

605.     The U.S. government argued that HLF sent the money to "zakat" committees in the West Bank and Gaza (including CAB customers like the Jenin, Tulkarem and Nablus Zakat Committees) that are part of the "social wing" of HAMAS and that the social wing of HAMAS is "crucial to Hamas's success" because, among other things, it "helps win the 'hearts and minds' of Palestinians while promoting its anti-Israel agenda and indoctrinating the populace in [HAMAS's] ideology"; "supports the families of Hamas prisoners and suicide bombers, thereby providing incentives for bombing"; and "launders money for all of Hamas's activities."

606.     For these reasons, the U.S. government argued that "aid to Hamas's social wing critically assists Hamas's goals while also freeing resources for Hamas to devote to its military and political activities."

607.     In 2008, after a jury trial, HLF and five of its former directors were found guilty of illegally transferring more than $12 million to HAMAS.[15]

### F.     HAMAS Da'wa Organizations in Jordan and Lebanon

608.     The UAE-based Human Appeal International (HAI) was established in 1984 under the name Human Appeal Committee; its name was changed to Human Appeal International in 1998.

609.     HAI claims to operate in more than 10 countries and is a charter member of the original Union of Good's 101 Days Campaign.[16]

610.     A 1996 CIA report identifies HAI as having acted as a fundraiser for HAMAS.

---

[15]     Ghassan Elashi and Shukri Abu Baker, leading members of HLF, were convicted, *inter alia*, on one count of conspiring to provide material support to a designated FTO, in violation of 18 U.S.C. §2339B(a)(1); nine counts of providing material support to an FTO, in violation of 18 U.S.C. §2339B(a)(1); and one count of conspiring to provide funds, goods, and services to a specially designated terrorist group, in violation of 50 U.S.C. §§ 1701-1706.

[16]     The Union of Good evolved into HAMAS's premier fundraising umbrella organization chaired by Sheikh Yusuf al-Qaradawi. At its inception, it began as a short-term fundraising campaign called the "101 Days" campaign.

611. HAI transferred funds to various HAMAS-controlled organizations in the Palestinian Territories, but also distributed substantial sums on behalf of HAMAS to select Palestinians living in Jordan.

612. HAMAS also established a network of organizations in Lebanon, first among them Sanabil Association for Relief and Development which received millions of dollars in support from Interpal, the HLF and other parts of HAMAS's fundraising network and then channeled those funds to the Palestinian refugee camps in Lebanon to build HAMAS's support within that community.

613. According to the Watson Memorandum, "FBI analysis has linked Sanabil, Interpal and the HLF."

### G. Early Media Coverage of the HAMAS *Da'wa*

614. As early as 1994, HAMAS fundraising activities were discussed in the media. For example, an article in *The New York Times* reported:

> HAMAS funding of all its activities is estimated by the Israelis at about $30 million a year. It comes from money collected by associations operating largely abroad but with ties to the international Muslim Brotherhood network. Money is also collected from Islamic and Arab communities in the United States and in Britain, the Netherlands and other Western European locations.

615. Also, on April 14, 1994, *The Globe and Mail* (Canada) published an article titled, "Hamas evolves from political to military group" by Patrick Martin.

616. The article explained HAMAS's *da'wa* in straightforward terms and identified its best-known institution:

> The group calling itself Hamas first made its appearance in 1987, at the start of the Palestinian uprising known as the intifada. Concentrated in Gaza, where Islamic tendencies have always been strong, it stemmed from a decade-old Islamic movement known as the Mujamma …. Sheik Yassin, who had been an activist in the older Muslim Brotherhood, had been

imprisoned by the Egyptians during the regime of Gamal Nasser. When the Mujamma turned into the political movement Hamas, Sheik Yassin was again arrested, this time by the Israelis.

617.     In 1996, *The New York Times* reported on HAMAS's intensified fundraising for its

network of institutions:

> Israeli, Palestinian and Western intelligence officials say Jordan is a major conduit for much of the Hamas budget, estimated at $70 million a year, nearly all of it for the social service network of mosques, hospitals, schools and other institutions that form the movement's political base in the West Bank and Gaza Strip.

> …Jordan, intelligence officials say, is a major path through which money reaches the Hamas network of mosques and charities. Jordanian intelligence reports indicate that much of the money is coming from the Persian Gulf emirates and Saudi Arabia.

618.     On September 17, 1997, the British-based *Mideast Mirror* published an article

titled "How to break the deadlock: Armed resistance, plus Arab pressure on U.S."

619.     The article quotes the Arabic press regarding Gulf State sources of funding for

HAMAS:

> According to al-Hayat's sources, only some $ 10 million dollars is raised annually by Palestinian Islamist charities in the Gulf, most of which is paid directly to visiting fund-raising delegations or the charities' bank accounts in Jordan, or via Palestinian support groups based in the U.S. or Britain.

> Gulf-based charities also say they make a point of ensuring that recipients are recognized by the Jordanian religious affairs ministry or the PA's Jerusalem-based religious affairs department. They include the Zakat (alms) Committees in Hebron, Jerusalem, Tulkarem, Kalkilya and Gaza, which fund schools, Koran teaching classes and orphanages, provide cash or food aid to the families of martyrs, and run self-help schemes for needy families. Gulf funding also sustains the Islamic Charitable Society in Hebron, Jerusalem's Makassed Hospital, and the Wafa Society in Gaza which looks after the elderly.

> Gulf donors also insist that they have always dealt openly with such organizations, which Israel accuses of constituting the "infrastructure" of Hamas. "We used to work with these organizations in broad daylight in the days of direct Israeli occupation, and continued dealing with them under the

PA, though regrettably the pressures increased with the advent of the PA," *al-Hayat* quotes one aid worker as saying.

As for higher educational institutions, the main recipient of Gulf aid is Gaza Islamic University, which has long been described as a "Hamas stronghold."

620.    Similarly, an August 11, 2001 article in the *Washington Post* subsequently reported:

On the streets of Gaza, and to a somewhat lesser extent in the West Bank, Hamas's status has been underpinned by a network of medical clinics, schools and welfare institutions that distribute free and subsidized food to the needy.

According to Yassin, the group distributes $2 million to $3 million in monthly handouts to the relatives of Palestinian suicide bombers; "martyrs" who have been killed by Israelis; and prisoners in Israeli jails. When pressed, he was vague about the provenance of the money, which, according to the State Department, comes mainly from Palestinians overseas, Iran and private benefactors in Saudi Arabia and other moderate Arab states.

Under pressure from Israel and the West, Arafat cracked down on Hamas and Islamic Jihad following the suicide bombings in 1996. Scores of Hamas activists were jailed, and the terror attacks on Israel faded.

621.    On September 25, 1997, the Palestinian Authority temporarily closed what it identified as 16 HAMAS institutions and associations, including HLF's Gaza office, *Al-Mujama Al-Islami* (Islamic Center – Gaza) and *Al-Jam'iya Al-Islamiya* (Islamic Society – Gaza).

622.    *Agence France-Presse* reported on the closures, describing them as the Palestinian Authority's "most devastating blow on the infrastructure of the Islamic Resistance Movement (Hamas) in the Gaza Strip."

623.    The article further noted that the institutions were closed in front of "representatives of the international media, who were invited to accompany the operation" and that the Islamic Society in Gaza, "headed by Ahmad Bahr, one of Hamas['s] leaders" was also "used to host periodical meetings for the movement's leaders."

624.    The article was reprinted in the September 26, 1997 edition of the Palestinian daily newspaper, *al-Quds*.

625.    The closures, including identification of HLF as a targeted HAMAS entity, were detailed in a *Jerusalem Post* (an Israeli newspaper) news account on September 28, 1997.

626.    As the U.S. Government would later note, "[o]ver the years, the PA would, from time to time, attempt to take measures against the zakat committees and other organizations run by Hamas. Closures, however, were always short lived, a product of the political reality in which the PA needed Hamas to provide services that it was unable to effectively provide itself."[17]

627.    An unclassified October 19, 2001 "Expert Opinion" issued by the Israeli Military's Intelligence Directorate noted that the Palestinian Authority:

> generally avoids damaging the HAMAS charitable associations and social institutions. A prominent (and practically unique) exception was the "Authority's" action resulting from the February-March '96 suicide attacks. At that time, the "Palestinian Authority" took vigorous steps against HAMAS's civilian infrastructure [by] closing several major charitable associations; confiscating funds, documents, and office equipment; and arresting heads of associations and other people involved in HAMAS-related finance. In our opinion, these moves disrupted the coordination of the associations' activities. Israel acted simultaneously against the Islamic movement's institutions in Nazareth and Um-al-Fahem (primary channels for transfer of funds to HAMAS in the territories) and against "The Holy Land Foundation's" representation in Beit Hanina.

> However, a renewal of charitable association activity, even without formal authorization by the Authority (which was usually given retroactively), followed the mid-'96 decline in "Authority" activities against HAMAS's civilian and financial infrastructure.

## H.    Initial U.S. Designations of HAMAS

628.    On January 24, 1995, pursuant to Executive Order 12947, the President designated HAMAS as a Specially Designated Terrorist organization.

---

[17]    **Exhibit A** at 15.

629.    This designation made it illegal for any United States person or entity to engage in any unlicensed transactions or dealings involving the property or interests of HAMAS.

630.    HAMAS's designation as an SDT has remained in place since January 24, 1995. On October 31, 2001, Hamas was added to the entities designated as Specially Designated Global Terrorists, pursuant to Executive Order 13224 issued by President George W. Bush. HAMAS's designation as an SDGT has remained in place since October 31, 2001.

631.    On October 8, 1997, the Secretary of State designated HAMAS as a "Foreign Terrorist Organization" under section 219 of the Immigration and Nationality Act. That designation has remained in place since October 8, 1997, including throughout the relevant period of this Action.

632.    As a result of HAMAS's designation as an FTO, it became illegal for any person within the United States or subject to its jurisdiction to provide material support or resources to HAMAS.

633.    In 1996, under heavy pressure from Israel, the Palestinian Authority (under the leadership of Yasir Arafat and the PLO), which had just been established, very publicly took steps against HAMAS as a result of a wave of HAMAS terrorist attacks that took the lives of 56 Israelis.

634.    Over the years, the PA would, from time to time, attempt to take measures against the charitable societies, zakat committees and other organizations run by HAMAS. Closures and arrests were, however, always temporary.

I.    **The Second Intifada**

635.    The Second Intifada ("al-Quds" or "al-Aqsa Intifada"),[18] which broke out in

---

[18]    The term "Second Intifada" refers herein to the violent conflict launched by Palestinian factions at the end of September 2000. While the violence had no "official" ending date, it is generally considered to have subsided at the end of 2004.

September 2000, was a key turning point in HAMAS's history.

636.    In the initial weeks of the Second Intifada, large demonstrations were organized in several Palestinian cities. During this period, a Palestinian mob in Ramallah attacked two off-duty Israeli reservists, lynched them, and celebrated their deaths – with much of the scene captured on camera.

637.    Soon thereafter, HAMAS, Palestinian Islamic Jihad and the Palestinian Authority's ruling faction, Fatah, all launched attacks on Israeli civilian centers, military installations, vehicles, and civilians through suicide bombings, drive-by shootings, and rocket launchings, which killed over 1,000 Israelis, and left thousands severely wounded.

638.    From September 2000 forward, support by the Palestinian public for HAMAS grew steadily.

639.    It won elections at Palestinian universities, trade unions, and later in municipal elections in May 2005.

640.    For approximately the next four years after the outbreak of the conflict, HAMAS launched hundreds of terrorist attacks targeting civilians that have resulted in the deaths and injury of hundreds of civilians, including numerous American citizens.

641.    HAMAS's improved political standing among the Palestinians was partially a result of the work of its *da'wa* institutions which served as a supportive framework for HAMAS's terror activities, including the use of suicide terrorists, in three main areas:

- HAMAS's *da'wa*'s educational institutions[19] contributed to the indoctrination of young Palestinians into what became a "culture of

---

[19]    The *da'wa* institutions include kindergartens, schools, clubs, mosques, Quran recitation classes and student councils, most of which were controlled by HAMAS in the course of the Second Intifada. The *da'wa* also funds student associations such as *al-Kutla al-Islamiya*, which is a key source for recruiting operatives into the Qassam Brigades. For example, during the first year of the Second Intifada, at least five students from *al-Najah* University carried out suicide terrorist attacks. Other suicide terrorists were students at Hebron Polytechnic University and at al-Quds Open University. The HAMAS charitable societies and zakat committees also ran summer camps, in which

martyrdom for Allah," praising the religious virtues of those who sacrificed themselves in the framework of jihad against Israel. Suicide terrorists earned a place of honor when they received special praise as martyrs (*shuhada*).

- HAMAS's *da'wa* institutions served as a mechanism by which to transfer money to orphans, widows and other relatives of suicide terrorists and movement prisoners, and thus provided a unique safety net for potential recruits concerned that their families would be adversely affected by their deaths or imprisonment. HAMAS committees collected the names of their activists and others who were killed by Israel and would then solicit aid from its network of charitable societies abroad. In 2001, Sheikh Yassin, in an interview cited in the *Washington Post*, publicly disclosed that the *da'wa* infrastructure distributed $2-3 million dollars to the families of suicide bombers and prisoners.

- HAMAS's *da'wa* infrastructure provided a reservoir of new recruits for suicide attacks and for HAMAS's terror and murder apparatus.

642.    At the end of 2001, the Palestinian Authority (briefly) closed the offices of several Islamic associations identified with HAMAS, and the Palestinian Monetary Authority instructed bank managers in the Palestinian Territories to report all bank transfers of sums greater than $5,000, and attached a special page of instructions detailing the names of those institutions whose accounts must be reported.

643.    These included HAMAS institutions with accounts at CAB.

644.    In February 2002, Israel blacklisted 20 institutions belonging to HAMAS, including many of CAB's customers.[20]

645.    As a 2009 Report by the Israel Security Agency ("ISA")[21] found:

Since 1989, a gradual process began whereby Hamas took over charitable associations, which were not affiliated with the Muslim Brotherhood's

---

systematic indoctrination for hatred against Israel took place.

[20]    As noted above, by law, all individuals and entities in the Palestinian Territories, including CAB, were presumptively on notice of Israeli designations.

[21]    Attached to the Amended Complaint as **Exhibit H**, with translation.

current. These associations became completely identified with Hamas, and so, in effect, Hamas today controls a tangled web of charitable associations spread across "the Territories" and uses their funds to carry out its "Da'wa" activity….

Hamas is actually funding institutions, which are not strictly used for charitable activities, and in effect they **encourage terrorism**. This is done by supporting religious, welfare, and educational institutions which are controlled by the movement. **These institutions preach for "Jihad" and strongly incite against Israel. They encourage the perpetration of terrorist attacks against Israel, and support the terrorists (deceased, prisoners and wounded) and their families, who are receiving benefits that include grants and monthly allowances.** (Emphasis in original.)

**J.    Cultivation of the Culture of Death**

646.    HAMAS's *da'wa* institutions played (and play) a central role in financing the terror campaign by providing the means of raising funds to maintain the institutions that serve as recruiting grounds for HAMAS.

647.    The terrorist attacks described herein cost between $500 and $5,000 to carry out, depending on the weapons used, whether a vehicle was purchased, or a safe house was rented.

648.    The most significant operational costs incurred by HAMAS were reflected in its investment in its cradle-to-grave terrorism infrastructure.

649.    From the 1990s through the end of the Second Intifada, HAMAS devoted most of its resources to its *da'wa* institutions and activities. This infrastructure provided, among other things, (1) employment to HAMAS leaders and operatives, (2) physical structures from which to operate, hold meeting and store weapons, (3) a means by which HAMAS could infiltrate mosques and civil society institutions and use them to enhance the organization's public image, (4) a means to recruit young operatives (through camps and student organizations), (5) a means to indoctrinate young children into HAMAS's culture of "jihad" and "martyrdom," and (6) a vehicle to subsidize and reward its operatives and their families when they are killed, imprisoned or wounded.

650.    The organization's strategy was set forth in an internal HAMAS memorandum

captured by the Israeli army during a raid of the offices of the Islamic Charitable Society – Hebron. It confirmed that HAMAS arranged for the "transfer [of] large sums" to the charitable committees and other HAMAS *da'wa*'s institutions through the "charity activities" of their operatives abroad.

651.    The memorandum emphasizes that HAMAS "require[s] new bank account numbers for money transfers" and promises that HAMAS will:

> invest efforts to transfer money for the martyrs (the *shuhada*) and prisoners, via the transfer [to] charitable institutions. This is a primary goal in the framework of the effort to transfer aid money to these institutions, so that these budgets are released in the best manner and in order to bring about an improvement in the level of the movement's performance.

652.    The memorandum concludes with the promise that HAMAS will continue to "build up the activities and operations" of its charitable organizations by, among other things, "***taking advantage of the conditions and the atmosphere of death***."

653.    Through its network of charitable organizations, since the early 1990s HAMAS has intensified its efforts to consolidate its position within Palestinian society via its social and welfare projects.

654.    Although these organizations perform actual social work and provide charitable services, they also raise substantial funds for HAMAS's political and operational terrorist infrastructure and free up money to be redirected to those latter ends.

655.    These charitable organizations provide streams of income to HAMAS operatives, assist HAMAS in recruiting new supporters, generate and disseminate HAMAS propaganda and compete with the Palestinian Authority in delivering social services and facilitating payments of honorariums (including "martyr" payments) to families of HAMAS operatives killed, injured or imprisoned as a result of their terrorist activities.

656.    Funds raised by HAMAS's charitable and social organizations are fungible and are allocated in part to terrorist activities (including recruitment, training, and propagandizing) or used

to free up other funds that are then allocated for terrorist activities, including planning and carrying out suicide bombings and other violent attacks.

657.    The unclassified October 19, 2001 "Expert Opinion" issued by the Israeli Military's Intelligence Directorate noted that "HAMAS has acted to develop and expand [its religious-civilian infrastructure] in the 'territories' based on earlier activities of the 'Muslim Brothers' in the same fields" and that this activity:

> is usually carried out under the heading of "charity" ("zakah" one of the five basic principles of Islam). The movement's ideology attributes great importance to [charity] as central to expanding its circle of supporters in the general population….
>
> In the short term, this is designed to maintain HAMAS's influence with the public, to improve its ability to compete with the "Authority" [PA] regime, and to recruit terror activists - including suicide attackers. In the longer term, the movement hopes that this infrastructure will help it broaden its power base and even create an alternate civilian structure to the "Authority" [PA] as part of its struggle against the "Authority" [PA] and the peace process. HAMAS's overt civilian infrastructure acts alongside its clandestine and terrorist activities and is usually referred to as "Da'wa" (literally: preaching). **This infrastructure serves the movement and it has implications for many aspects of the movement's terrorist activities. Money smuggled into the area and passed to institutions (generally under the heading "charity") reaches HAMAS activists, their families, and the HAMAS apparatus [itself] - including the operational apparatus. Other uses for HAMAS's overt infrastructure include disguising [other] activities and locating recruits to be suicide attackers.** (Emphasis added.)

658.    The Palestinian Authority's own intelligence assessment was similar, noting that "It is not a coincidence that Hamas officials tend to search for suicide operatives. among their schools' students or their sport groups and teams. Hamas pays monthly stipends to families of martyrs and the wounded."

659.    For example, Ayman Asad Shaaban al-Shawa was a Qassam Brigades operative arrested in 1993 for attempting a suicide attack. He received five life sentences and was released

as part of a prisoner exchange in 2011. During the 18 years he spent in prison, his wife received prisoner rewards payments from a variety of sources to her account no. 75797700 at CAB.

660.    Similarly, Ayd Abdalla Abd al-Hadi Musleh was a Qassam Brigades operative from the Gaza Strip who was arrested in 1992 for participating in attacks in which Israeli soldiers were killed. He received a life sentence and was released as part of a prisoner exchange in 2011. During the 19 years he spent in prison, his wife received prisoner rewards payments from a variety of sources to her account no. 764687 at CAB.

661.    The same was true for Shadi Zakariya Rida al-Tubasi, the HAMAS suicide bomber who blew himself up on March 31, 2002 in a restaurant in Haifa, killing 16 people. Tubasi's father received multiple reward payments to his account no. 243491 at CAB's Jenin branch.

662.    A June 30, 2002 research paper issued by the Israeli Coordinator of Government Activities in the Territories ("COGAT"), Department for Advisement on Palestinian Affairs found that:

> The Da'wa's informal education system, kindergartens, summer day camps and private schools –the younger generation, from pre-school children to teenagers, are educated in all these (and later also in the university institutions such as the Islamic University in Gaza) to support Jihad and martyrdom operations – the holy war and "death in the name of Allah." There is open and outright indoctrination in these institutions. Children from kindergarten age are educated to revere the suicide attackers and they receive a message according to which, when they grow up, they can fulfill themselves best by carrying out a suicide attack against Israelis. These institutions: kindergartens, charitable societies and schools that operate under the open eye of the PA (apart from closing them for limited periods and mainly for the sake of appearances) have no real limitations on their activity. From the publications of the societies themselves (on the Internet) and from confiscated documents it emerges that they enjoy financial support from various bodies, including Islamic charitable societies throughout the Arab and Western worlds, including international organizations for support and aid throughout the world.

663.    An October 2002 Human Rights Watch report (citing the Watson Memorandum) noted that: "Examples of Hamas-controlled societies that allegedly received funds from the Holy Land Foundation were the Islamic Charitable Society of Hebron, the Jenin Zakat Committee, and the Ramallah Zakat Committee, each of which had among its officials persons who had allegedly admitted to armed activities with Hamas, including attacks against civilians."

664.    A report issued in December 2004 by the Israeli Civil Administration in the Palestinian Territories ("Government of Israel 2004 Report") also found that:

> The financial support for the families of suicide bombers also promotes the phenomenon of suicide bombings, and increases the willingness to perform them, because the terrorist who decides to do so need not worry about his family, whose economic and social situation will improve following his deed. This support, both economic and moral, takes the sting out of the punishment, which in Israel's eyes aims to deter others from joining the ranks of terror. Hamas prisoners enjoy the benefits of special treatment by the associations.

665.    To cite one example, the brother of Hamed Faleh Mustafa Abu Hijla, a HAMAS suicide bomber who blew himself up on Herzl Street in Netanya on January 1, 2001, received multiple payments rewarding the Hijla family for Hamed Hijla's death, including payments from the *Shahid* Foundation in Lebanon (discussed below) and from the Al-Islah Charitable Society in Ramallah (paid to Fathi Faleh Mustafa Abu Hijla's account at CAB).

666.    The family of another HAMAS "martyr" named Iyad Taqi, who was killed in clashes with Israeli soldiers on November 6, 2001, received $5,100 from the Arab Liberation Front ("ALF") to account 393501 at CAB.

667.    As a 2009 Report by the Israel Security Agency also found that:

> **Interrogations of Hamas activists and terrorists revealed that the support to the family sometimes contributed significantly to the mere decision to execute attacks, including suicide attacks....**

**In addition, Hamas's "Da'wa" system serves as a central tool for nurturing the "future generation" of Hamas supports and new recruits, including those assigned to commit terrorist attacks.** In effect, all the "Da'wa" frameworks constitute a recruitment pool for the movement. The financial aid, which is guaranteed in various fields (including reduced tuitions and university scholarships), is luring people into joining the movement, and even into taking part in its military activity and into executing terrorist attacks.

In this context it should be mentioned that a terrorist knows he will be rewarded even if he will only be injured. He also knows that in case he is killed during a terrorist attack, Hamas will continue to financially support his relatives, and so his death will not be in vain, as the livelihood of his family is assured. (Emphasis in original.)

K.     **Union of Good**

668.     As noted above, the Union of Good (also known as the Charity Coalition or *I'tilaf Al-Khayr* in Arabic) was established in October 2000, at the beginning of the Second Intifada, as the umbrella organization for HAMAS's global fundraising activity.

669.     Comprising more than 50 separate organizations – several of which have been designated SDGTs by the U.S. Treasury Department, including Interpal and CBSP (two major HAMAS fundraising organizations in Europe) – the Union of Good originally began as a limited 101-day fundraising drive for emergency aid at the outset of what was later called the Second Intifada, chaired by Sheikh Yusuf al-Qaradawi, the Muslim Brotherhood's spiritual leader. According to Al-Qaradawi, "[t]he martyr operations [sic] is the greatest of all sorts of Jihad in the Cause of Allah."

670.     The Government of Israel 2004 Report also found that:

The "Union of Good" divided the Palestinian territories into four districts. In each district it was associated with institutions and societies that carried out projects on its behalf:

- Southern District - the city of Hebron, the surrounding villages and refugee camps and the city of Bethlehem, including the surrounding

villages and refugee camps. The "Union" operates in this area in conjunction with the "Islamic Society", which is based in Hebron.

- Central District - Jerusalem, Ramallah, Al-Bireh and Jericho. In this area, the "Union" operates in conjunction with the "Al-Islah" Charitable Society which is based in Ramallah.

- Northern District - Nablus, Tulkarem, Jenin and Qalqilya. Here, the Nablus-based "Al-Tadamun" Society serves as the link.

- Gaza Strip District - Gaza, Khan Yunis, Rafah and the surrounding villages and refugee camps.

671.    Sheikh al-Qaradawi issued a Muslim religious edict (fatwa) that gave HAMAS and other terrorist groups religious approval authorizing suicide bombing attacks (including by women) against Israel.

672.    In a July 7, 2004 interview for BBC's "Newsnight," al-Qaradawi, referring to the suicide attacks, said: "I consider this type of martyrdom operation as an evidence of God's justice."

673.    As the 2009 ISA Report found: "Al-Qaradawi is considered by Hamas, among others, a religious and spiritual authority. His numerous public statements reveal his belief that 'Jihad' must be waged against Israel and the Jews."

674.    The 101-day fundraising drive was so successful that the Union of Good was converted into a permanent institution. It quickly became the preeminent Muslim Brotherhood fundraising mechanism in the world, raising tens of millions of dollars for HAMAS.

675.    On February 25, 2002, the Union of Good was designated by Israel in an order of the Minister of Defense of the State of Israel, based on its being "part of the Hamas organization or supporting it and strengthening its infrastructure."

676.    The Union of Good was designated by the U.S. Treasury Department as an SDGT on November 12, 2008. According to the Treasury Department:[22]

---

[22]    A copy of the U.S. Treasury Press Release is attached as **Exhibit I** to the Amended Complaint.

Union of Good acts as a broker for HAMAS by facilitating financial transfers between a web of charitable organizations—including several organizations previously designated under E.O. 13224 for providing support to HAMAS—and HAMAS-controlled organizations in the West Bank and Gaza. The primary purpose of this activity is to strengthen HAMAS' political and military position in the West Bank and Gaza, including by: (i) diverting charitable donations to support HAMAS members and the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of HAMAS.

Funds raised by the Union of Good affiliates have been transferred to HAMAS-managed organizations in the West Bank and Gaza. In addition to providing cover for HAMAS financial transfers, some of the funds transferred by the Union of Good have compensated HAMAS terrorists by providing payments to the families of suicide bombers. One of them, the Al-Salah Society, previously identified as a key support node for HAMAS, was designated in August 2007 under E.O. 13224. The Society employed a number of members of the HAMAS military wing and supported HAMAS-affiliated combatants during the first Intifada.

677.    Significantly, Al-Qaradawi was neither an obscure nor shadowy figure. On the contrary, he had his own weekly long-running television program on *Al-Jazeera* and has very publicly issued an Islamic religious edict (*fatwa*) authorizing suicide bombing attacks against Israel.

678.    In fact, on April 14, 2002, al-Qaradawi appeared on Al-Jazeera extolling "jihad and martyrdom" against Israelis and denouncing the U.S. designation of HAMAS and other terrorist organizations.

679.    HAMAS often relies on Al-Qaradawi's legal rulings in matters of current import and often turns to him to obtain legal rulings, which are published from time to time in HAMAS's official newspapers (such as *Filastin al-Muslima*).

680.    HAMAS leaders have also served openly in the Union of Good's executive leadership. For example, the Secretary General of the Union of Good, Essam Salih Mustafa Yussuf, also acted as the Vice-Chairman of Interpal while serving on the HAMAS executive committee under then-HAMAS leader Khalid Mishal.

681.    As noted above, WAMY operated an office in the Gaza Strip during the relevant period and CAB maintained an account for WAMY in Gaza.

682.    WAMY is reportedly the world's largest Muslim youth organization. It was founded in Jeddah, Saudi Arabia, in 1972 and became a Union of Good member organization in 2001.

683.    Senior WAMY officials, Dr. Saleh Bin Sulaiman al-Wahibi (who served as the organization's general-secretary) and Dr. Abd Al-Wahhab Nurwali, al-Wahibi's aide in the region of Mecca, both sat on the Union of Good's board of trustees during the relevant period.

684.    In 1996, the Central Intelligence Agency determined that the International Islamic Relief Organization (IIRO) and WAMY, both Saudi charities associated with al-Qaeda, were funding HAMAS through Interpal.

685.    WAMY was declared an unlawful association by Israel on February 25, 2002, in large part for its role in funding HAMAS institutions discussed below.

686.    In October 2002, an official HAMAS delegation, headed by Khalid Mashaal, then head of Hamas's Political Bureau, participated in WAMY's ninth convention in Riyadh, Saudi Arabia.

687.    In October 2003, CAB processed a transfer from the Al Aqsa Foundation (designated an SDGT in May 2003) to WAMY's CAB account no. 6255/1 at its Gaza branch.

688.    Even in 2004, CAB processed multiple funds transfers from the Al Aqsa Foundation to WAMY's CAB account no. 6255/1 at its Gaza branch.

689.    On at least one occasion, a January 2004 wire transfer for $68,989.31 from the Al Aqsa Foundation to WAMY's CAB account was blocked in New York.

## II.      CORE INSTITUTIONS OF HAMAS'S SOCIAL WELFARE NETWORK

### A.      Key HAMAS Institutions in Gaza

690.      At the Philadelphia Conference in 1993, the FBI's wiretaps caught the words of Dr. Mu'in Shabib, a HAMAS operative, describing the close connection between HAMAS and several of its core institutions in Gaza:

> The principal organization known to be affiliated with us is the **Islamic University of the Gaza** region, and we will speak later regarding solutions. We mention it because it is a real wound in our heart. **Number two, the Islamic Complex, which was founded in 1973 and received a license in 1976. The activities of the Complex were then more comprehensive. The Islamic Society**, which was founded in 1976. **The al-Salah Society** in the region (Gaza), which supervises the sacrifices and other matters. The Young Women's Muslim Association and **the al-Wafa Society for the Care of the Elderly**, the orphanage, a number of charity committees, a number of social service institutions which received new licenses, such as the Institution for Law and Justice, which cares for the prisoners. (Emphasis added.)

### 1.      Islamic University of Gaza

691.      The Islamic University of Gaza was established in 1978 after the Egyptian government retaliated against the PLO for its criticism of Egypt's peace treaty with Israel and blocked Gazan students from studying in Egypt.

692.      Sheikh Yassin used the controversy to orchestrate the violent removal of the university's PLO-affiliated administration and replacement with *Al-Mujama Al-Islami* members. It took five years, but Yassin ultimately gained control and the university was split into two entities: Al-Azhar University, which the PLO continued to control; and the Islamic University of Gaza, which came under the control of *Al-Mujama Al-Islami* and Yassin.

693.      Since the 1990s, the Islamic University of Gaza has been identified exclusively with HAMAS and has served as its principal source for recruitment of people into the organization's ranks in Gaza, including into the ranks of the Qassam Brigades. Many students of

the Islamic University of Gaza were recruited by the Qassam Brigades, and committed suicide attacks during the Second Intifada, among them Nafedh Ayesh Mustafa al-Nadher, who blew himself up near a bus heading to Kfar Darom on July 9, 2001, thus "killing many of the sons of monkeys and pigs, the cowardly Zionist infidels," according to the Qassam Brigades website.

694.    The Qassam Brigades also used the Islamic University's facilities for its military purposes, such as storing weapons in it; exploiting the University's laboratories for developing and manufacturing weapons; and holding secret meetings of the Brigades' commanders and members in it.

695.    HAMAS's founders Salah Shehada (who later founded HAMAS's Qassam Brigades), Ibrahim Fares al-Yazuri and Abd al-Aziz al-Rantisi were among several prominent HAMAS leaders who were publicly affiliated with the University. In fact, more than ten percent (47) of the *Marj al-Zuhur* deportees were employees, administrators or students at the Islamic University of Gaza.

696.    Khalil Isma'il Ibrahim al-Haya, who also served as Deputy Chairman of *Al-Mujama Al-Islami* in the Gaza Strip between 2002 and 2005, lectured in Islamic Law at the Islamic University of Gaza. Haya is now the deputy of Hamas's senior leader in Gaza, Yahya Sinwar.

697.    Current supreme HAMAS leader Ismail Haniya (an SDGT) served as the dean of the University of Gaza.

698.    Muhammad Saleh Taha, a co-founder of *Al-Mujama Al-Islami*, also lectured at the Islamic University of Gaza as did other HAMAS luminaries, including Ahmed Bahar and Mahmud al-Zahar.

699.    The unclassified October 19, 2001 "Expert Opinion" issued by the Israeli Military's Intelligence Directorate noted that "'The Islamic University' in Gaza is a HAMAS stronghold and

is in fact run by the movement."

700.     The June 30, 2002 research paper issued by COGAT found that a "considerable number of suicide attackers studied at the Islamic University in Gaza and participated in Islamic student activity there."

701.     From the early 1990s through 2004, the Islamic University of Gaza enjoyed financial support from CBSP, Interpal, the Al-Aqsa Foundation – Germany and many other HAMAS fundraising organizations.

## 2.     The Islamic Center (or Complex) – Gaza (*Al-Mujama Al-Islami*)

702.     As noted above, the Islamic Center (*Al-Mujama Al-Islami*) was established in 1973 by Ahmed Yassin, the founder of HAMAS and the organization's spiritual leader.

703.     The foundations, infrastructure, and key operatives of *Al-Mujama Al-Islami* laid the basis for the establishment of HAMAS, the future growth and expansion of HAMAS in the Gaza Strip, and later throughout the Palestinian arena.

704.     Both *Al-Mujama Al-Islami* and *Al-Jam'iya Al-Islamiya* (the Islamic Society), which was founded three years later, in 1976, opened branches throughout the Gaza Strip.

705.     In 1978, a branch of *Al-Mujama Al-Islami* was established in Khan Yunis.

706.     In that same year, several kindergartens which belonged to the organization in Gaza, were established.

707.     In 1985, *Al-Mujama Al-Islami*'s al-Aqsa School was built in Khan Yunis. Shortly after the organization's establishment, an additional seven branches were set up throughout the Gaza Strip.

708.     These branches were run by people who later would become the founders of HAMAS, including al-Rantisi (the branch in Khan Yunis Refugee Camp) and Abd al-Fatah

95

Dukhan (Nusairat branch).

709.    From the early 1990s through 2004, *Al-Mujama Al-Islami* enjoyed financial support from HAMAS fundraising organizations that included HLF in the United States (before HLF was declared a terrorist organization by the United States administration and its assets frozen in 2001) as well as CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) and Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) and many other HAMAS fundraising organizations.

710.    A 2000 fundraising brochure explicitly linked *Al-Mujama* to Al-Aqsa Foundation – Germany. The brochure referred to the "fragrance of the blood of the martyrs and wounded which watered the pure soil" and confirmed that Al-Aqsa Foundation donors "are committing Jihad with your monies in the land of [the people of] steadfastness, whose blood is violated and whose sanctuaries are desecrated everyday..."

711.    A subsequent brochure touting *Al-Mujama*'s social welfare activities featured photographs of HAMAS's iconic founder and spiritual leader, Sheikh Yassin, directly above one of the organization's bank account numbers at CAB. *See* **Exhibit J** attached to the Amended Complaint.

712.    An article in the December 19, 1992, issue of *The Economist* stated: "Ahmed Yassin, the wheelchair-bound founder of the fundamentalist Palestinian Islamic movement Hamas, is in prison for kidnapping and murder. Yassin, a former member of the Muslim Brotherhood, founded the Islamic Center in 1973 and Hamas in 1987."

713.    According to an April 2003 report by the International Crisis Group, the affiliation of the extensive network of institutions that comprise *Al-Mujama* with HAMAS is "readily apparent" and "all but official."

714.    In an article on the popular Islamist website Islamonline.net, Ismail Haniya, HAMAS's current supreme leader, stated that *Al-Mujama Al-Islami*, *Al-Jam'iya Al-Islamiya* and Al-Salah Charitable Society provide financial support to the martyrs' families, the injured, the prisoners and the detainees of the Intifada.

715.    Following are details of the most important key figures in *Al-Mujama Al-Islami*:

- **Ahmed Yassin**: Sheikh Yassin, one of the founders of HAMAS and the founder of *Al-Mujama Al-Islami*. Yassin was arrested in 1984 after founding *al-Mujahidun al-Filastiniyun*[23] and was sentenced to 13 years' imprisonment. He was released in 1985 as part of the "Jibril Prisoners' Exchange." He was arrested a second time in 1989, tried and sentenced to life imprisonment for his role in planning the murder of two Israeli soldiers before being released from prison once more, as a result of a botched Israeli assassination attempt in Jordan in 1997. On January 25, 1995, the U.S. Department of Treasury designated Yassin a Specially Designated Terrorist. Upon his return to Gaza, Yassin rebuilt his standing within the HAMAS leadership. On August 22, 2003, the United States declared him a Specially Designated Global Terrorist for his involvement in HAMAS. On March 22, 2004, Yassin was killed by Israel's security forces. To this day, Yassin has remained an object of veneration for HAMAS supporters, who see him as a source of authority and inspiration for the continuation of their jihad against Israel.

- **Abd al-Aziz al-Rantisi**: Al-Rantisi was one of the seven founders of HAMAS, and one of the organization's key leaders in the Gaza Strip. With the founding of HAMAS in 1987, Rantisi was appointed to head the military wing (Qassam Brigades) in the southern districts of the Gaza Strip. Rantisi served as a member of *Al-Mujama Al-Islami*'s administrative board and founded the organization's Khan Yunis branch. In 1992 he was temporarily deported, along with other senior members of HAMAS, to *Marj al-Zuhur*, where he served as HAMAS's chief spokesman to the Western media. In March 1998, Rantisi was arrested by the Palestinian Authority and held for a period of 15 months for his continued activities related to HAMAS. He was considered the most radical voice within HAMAS political leadership in the Palestinian

---

[23]    The organization was the Muslim Brotherhood's precursor to HAMAS's Qassam Brigades.

Territories. He publicly and explicitly encouraged HAMAS operatives to carry out *suicide actions* against Israel; he praised those who responded to the call for "self-sacrifice" and preached ceaseless war that would end with the destruction of Israel. On August 22, 2003, the United States designated Rantisi an SDGT. After Sheikh Yassin was killed by Israeli forces on March 22, 2004, Rantisi was declared his successor and appointed as leader of HAMAS in the Palestinian Territories. On April 17, 2004, Rantisi was killed by Israel's security forces.

- **Ibrahim Fares al-Yazuri**: Al-Yazuri was one of the "founding fathers" of HAMAS and a close friend of Ahmed Yassin. He was also one of the founders of *Al-Mujama Al-Islami* in the seventies and a member of the organization's administrative board from its inception. Al-Yazuri served as Chairman of *Al-Mujama Al-Islami* following Yassin's arrest and imprisonment in 1984. In 2000, he was listed as the Secretary General of *Al-Mujama Al-Islami.* He also taught at the Islamic University of Gaza. Al-Yazuri was later sentenced to 26 months imprisonment in Israel because of his HAMAS-related activities and subsequently arrested several times by the Palestinian Authority (following terrorist attacks carried out by HAMAS against Israel). In October 1998, the PA arrested Yazuri because he was a HAMAS leader.

- **Muhammad Hasan Sham'a**: Sham'a was involved in the establishment of *Al-Mujama Al-Islami* and oversaw the organization's public relations. Sham'a was also listed as Deputy Secretary General of *Al-Mujama Al-Islami*. Subsequently he was one of the seven founders of HAMAS and one of its political leaders. He was among the deportees to *Marj al-Zuhur* and was later arrested by the Palestinian Authority in 1995 and 1998.

- **Issa Khalil al-Nashar**: Al-Nashar was one of the seven founders of HAMAS and was responsible for its activity in Rafah. He served on the board of *Al-Mujama Al-Islami.* Al-Nashar was briefly arrested by Israel in 1988 for his membership in HAMAS and later deported to *Marj al-Zuhur*. In November 1995, he participated in the creation of HAMAS's National Islamic Salvation Party and served as head of its political bureau. In 1995, Al-Nashar was detained for four months by the PA Security Forces.

- **Khalil Isma'il Ibrahim al-Haya**: Haya served as Deputy Chairman of *Al-Mujama Al-Islami* in the Gaza Strip between 2002 and 2005. In 1981, during his studies at the Islamic University of Gaza, he became a member of the Islamic Students Association (*al-Kutla al-Islamiya*) and tried, on several occasions, to take control of the University's campus together with other members of *Al-Mujama Al-Islami*. He served as Chairman of the HAMAS faction in the Palestinian Legislative Council

in the years 2006-2007 and was one of the best-known HAMAS leaders in the Gaza Strip. He was imprisoned by Israel in 1991 for activities connected with HAMAS.

- **Abd al-Fatah Dukhan**: Dukhan was one of the seven founders of HAMAS. He served as head of the *Al-Mujama Al-Islami* branch in Nusairat Refugee Camp and was one of the *Marj al-Zuhur* deportees. He has served as a member of the Palestinian Legislative Council as part of HAMAS's Change & Reform Party.

- **Khalil Ibrahim al-Quqa**: Al-Quqa was one of the founders of *Al-Jam'iya Al-Islamiya* and headed the *Al-Mujama Al-Islami* branch in Shati. He was also one of the first to join HAMAS. Two weeks after HAMAS's establishment, Al-Quqa was arrested by Israeli security forces for incitement against Israel. Al-Quqa was deported by Israel to Lebanon in 1988, and from there he moved to Tunis and later Egypt. Two years later he was expelled from Egypt (1991) to the United Arab Emirates, where he died of natural causes in 2005.

- **Muhammad Saleh Taha**: Taha took part together with Ahmed Yassin in the founding of *Al-Mujama Al-Islami* and served as a member of the organization's Administrative Council. He was arrested on several occasions, both by Israel and by the Palestinian Authority, for his HAMAS-related activities and was deported to *Marj al-Zuhur* in 1992 along with al-Rantisi and Sham'a. He has served as a lecturer at the Islamic University of Gaza. Taha was arrested numerous times by both Israel and the PA.

- **Osama al-Mazini**: Al-Mazini was one of the heads of HAMAS's political leadership and one of the movement's prominent spokesmen. Al-Mazini served as a member of the Administrative Council of *Al-Mujama Al-Islami*. He also served as a lecturer in the Department of Psychology at the Islamic University of Gaza. He is married to Ahmed Yassin's daughter. Al-Mazini was arrested many times by Israel and by the Palestinian Authority, following terrorist attacks committed by HAMAS.

- **Nizar Muhammad Awd-Allah**: As one of Ahmed Yassin's close associates, Awd-Allah was involved in the kidnapping and murder of Israeli soldiers Sasportas and Saadon in 1989, for which Yassin was sentenced to 13 years in prison. Awd-Allah was a senior operative in both HAMAS and *Al-Mujama Al-Islami*. Awd-Allah was also appointed as the commander of the Qassam Brigades in Gaza following the arrest of Salah Shehada in 1988.

- **Maryam Muhammad Yusuf Farhat:** In 1981, Farhat supervised the

women's activities at *Al-Mujama Al-Islami.* Her eldest son, Nidal Farhat, joined the Qassam Brigades in 2000 where he oversaw the planning and carrying out of numerous terror attacks and became a HAMAS bombmaker. Farhat encouraged another son, Muhammad, to carry out a suicide attack, and was photographed with him before he departed for the attack. Farhat was elected in 2006 to the Palestinian Legislative Council as part of HAMAS's Change and Reform Party. She died in 2013.

716.    Because it was HAMAS's operational headquarters in Gaza, *Al-Mujama Al-Islami* was temporally closed by the PA on September 25, 1997.

717.    On August 24, 2003, the Palestinian Monitory Authority issued an order to freeze *Al-Mujama Al-Islami* bank accounts in all banks in the Palestinian Territories in order to stop funding HAMAS institutions.

718.    Due to its central role as a supporter of HAMAS's jihad activity, *Al-Mujama Al-Islami* was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, and by the commander of the IDF's Central Command on June 30, 2002.

719.    Throughout the relevant period (including 2002-2003 after Israel separately outlawed *Al-Mujama Al-Islami*), CAB maintained accounts for *Al-Mujama Al-Islami.*

720.    On May 29, 2007, the United States Department of Justice identified *Al-Mujama Al-Islami* as an "organization that operates on behalf of, or under the control of, Hamas" in the list of unindicted co-conspirators in the criminal case of *United States v. Holy Land Foundation*.

### 3.    The Islamic Society – Gaza (*Al-Jam'iya Al-Islamiya*)

721.    The Islamic Society (*Al-Jam'iya Al-Islamiya*) was founded in the Gaza Strip in 1976 by Ahmed Yassin and other senior member of the Muslim Brotherhood.

722.    Like *Al-Mujama Al-Islami* (the Islamic Center), it served as a base for disseminating ideology and the political platform of the Muslim Brotherhood in Gaza in the seventies.

723.    From the time of HAMAS's establishment, *Al-Jam'iya Al-Islamiya* was a significant HAMAS stronghold, operated and controlled by individuals who were identified initially with the Muslim Brotherhood and ultimately with HAMAS.

724.    On June 30, 1995, following a Palestinian Authority raid of *Al-Jam'iya Al-Islamiya*'s offices, *Agence France Presse* described it as a charity linked to the Islamic Resistance Movement [HAMAS] and identified Ahmed Bahar as a senior figure in HAMAS.

725.    In September 1997, the Palestinian Authority closed *Al-Jam'iya Al-Islamiya*, along with 16 other societies identified with HAMAS.

726.    Following a HAMAS terrorist attack in Israel in October 1998, the Palestinian Authority began a wave of arrests against HAMAS operatives in Gaza. Among those arrested were the Chairman of *Al-Jam'iya Al-Islamiya*, Sheikh Ahmed Bahar, and other senior personnel in the society.

727.    In December 2001, the Palestinian Authority closed a number of societies run by Islamic organizations (HAMAS and Palestinian Islamic Jihad), among them *Al-Jam'iya Al-Islamiya*. And on January 6, 2002, the Palestinian Monetary Authority directed the Palestinian banks to report on the sums of money held in the accounts of *Al-Jam'iya Al-Islamiya* and required them to consult with it prior to withdrawing funds from those accounts.

728.    *Al-Jam'iya Al-Islamiya* was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, and by the IDF's Central Command on June 30, 2002.

729.    *Al-Jam'iya Al-Islamiya*'s official web site has, for many years, featured an image of Ahmed Yassin, the founder of HAMAS and *Al-Jam'iya Al-Islamiya*.

730.    Similarly, senior HAMAS figures regularly participate in *Al-Jam'iya Al-Islamiya* events. Since the mid-1990s, the society has not hidden its affiliation with HAMAS from Western

journalists, and this fact was published by the leading Western media outlets.

731.     For example, both *The New York Times* ("In Gaza, Peace Meets Pathology," November 27, 1994) and the *Financial Times* ("Fundamentalists Split Palestinian Unity," September 9, 1988) identified the Islamic Society of Gaza as part of HAMAS.

732.     As early as 1993, an article in the *Independent* by Sarah Helm described a Gaza kindergarten "run by the Islamic Society, which is controlled by Hamas, the militant Islamic movement."

733.     A July 23, 1999 article published by Knight Ridder titled "Hamas wedding a political event" noted: "Thursday night's event was organized by the Islamic Society, the social arm of Hamas, the militant Islamic organization better known for the deadly suicide bombings that stalled the Israeli-Palestinian peace process in 1996."

734.     The article described how the Islamic Society organized a mass wedding in Gaza. HAMAS distributed $100 in cash and $100 in gifts to each bridegroom. The Qassam Brigades distributed fliers that called for a renewal of the Jihad against Israel and the United States. When Ahmed Yassin arrived at the celebration, the crowd cried out, "We have spilled our blood for you, Sheikh Yassin. Your way is the Jihad. We hope to die in the way that God has chosen." HAMAS leader (and the current head of HAMAS), Isma'il Haniya, declared: "No leader may hand over even a meter of the territory of Palestine. This is Islamic land, belonging to the nation."

735.     A particularly disturbing example of indoctrination activity at the Islamic Society in Gaza is reflected in a video[24] of a graduation ceremony held for 1,650 children from its 41 kindergartens. According to a widely distributed video and photographs of the event, the children were dressed in uniforms and given toy rifles or "toy" suicide belts.

---

[24]     Images from the video are attached as to the Amended Complaint as **Exhibit K**. The video can be viewed at https://www.osenlaw.com/sites/default/files/uploaded/Counter-Terrorism/Arab_Bank/hamas_org/PX1132.mp4.

736.    A pair of children were dressed as HAMAS's Sheikh Yassin and Hezbollah's supreme leader Sheikh Hassan Nasrallah while other children wore the costume of suicide bombers. Children read excerpts of Nasrallah's (then) recent speeches as other kindergarteners waved Hezbollah flags.

737.    On January 1, 2002, the BBC Monitoring Service published an article translating a HAMAS report (put out by the HAMAS political bureau's official website) claiming "a large-scale campaign" by Palestinian police forces "closing a number of Hamas Islamic Resistance Movement and Islamic Jihad-backed institutions and societies."

738.    The report identified the Islamic Society of Gaza (*Al-Jam'iya Al-Islamiya*) as one of "[t]he Hamas-backed societies."

739.    The *Mail on Sunday* (London) published an article in 2002 about a controversial donation made by the British Consulate in Jerusalem to the Islamic Society of Gaza.

> But our inquiries have revealed the leadership of **the Islamic Society**, known in Arabic as Al Jamayia Al Islamiya is closely associated with Hamas and the group has been shut down several times on Yasser Arafat's orders.
>
> Its secretary general, Sheikh Ahmed Bahar, was arrested by the Palestinian Authority's security forces alongside several Hamas leaders in October 1998 during a clampdown on terrorism. He was then described by the Palestinians as leader of the Hamas splinter group the Islamic National Salvation Party.
>
> Indeed, **the Islamic Society** makes no secret of its support for the terrorists. (Emphasis added.)

740.    Following are details of some of the important leaders in *Al-Jam'iya Al-Islamiya*:

- **Ahmed Yassin**: He was also one of the founders of *Al-Jam'iya Al-Islamiya*.

- **Ahmed Bahar**: Bahar was Chairman of *Al-Jam'iya Al-Islamiya* between the years 1985 and 2004. Bahar was arrested by the Israeli security forces and was imprisoned several times in Israeli jails, as a

result of his membership in HAMAS. One of the *Marj al-Zuhur* deportees in 1992, he was arrested several times by the Palestinian Authority following terrorist attacks carried out by HAMAS. In June 1995 he was arrested by the PA's Preventive Security, and his beard was shaved off as an act of humiliation by his captors. Ahmed Bahar worked at the Islamic University of Gaza between 2002-2003, as a lecturer in the department of Arabic language and as deputy dean of the Faculty of Arts. Bahar also served as first deputy speaker of the Palestinian Legislative Council on HAMAS's "Change and Reform Bloc" political party.

- **Muhammad Faraj Mahmud Husain al-Ghul**: Al-Ghul is one of the founders of *Al-Jam'iya Al-Islamiya*, a member of its administrative board and served as its Secretary General. Al-Ghul also worked at the Islamic University of Gaza as a lecturer. Before the outbreak of the Second Intifada, he also served as attorney for senior HAMAS figures imprisoned in Israel, among them Sheikh Ahmed Yassin. Al-Ghul was jailed by Israel between the years 1981 and 1992 for terrorist activities and was one of the *Marj al-Zuhur* deportees; in 1998 he was arrested by the PA Preventive Security Services.

- **Isma'il Hassan Muhammad Abu Shanab**: Abu Shanab was one of the founders of *Al-Jam'iya Al-Islamiya*. He also worked at Islamic University of Gaza as a lecturer at the faculty of engineering and as president of the Faculty of Applied Science. Abu Shanab was also Sheikh Yassin's deputy. He was arrested by Israel in 1989 and imprisoned for 8 years. After his release from Israeli prison, Abu Shanab became a political leader of HAMAS until he was killed in 2003.

- **Isma'il Abd al-Salam Ahmed Haniya**: Haniya served as a member of the administrative board of *Al-Jam'iya Al-Islamiya*'s senior administrative body and headed its club in Gaza for approximately ten years. Haniya led the Islamic Students Association (*al-Kutla al-Islamiya*) in the Islamic University of Gaza in the early 1980s and was the head of the Islamic University Student Union in 1985-86. Haniya held several positions at the Islamic University of Gaza, among them Secretary of the Board of Trustees and the University's Director of Academic Affairs. Haniya was arrested by Israel several times and was also one of the *Marj al-Zuhur* deportees. He served as Sheikh Yassin's chief of staff following Yassin's release from prison in 1997. In 2006, he became "Prime Minister" in the HAMAS government in Gaza and in 2017 was appointed as the overall leader of HAMAS.

741. In a letter dated November 28, 2002, the German Intelligence Service (BND) informed the German Ministry of the Interior in Berlin that it believed the Islamic Society of Gaza

was part of HAMAS.

742.    According to the BND:

> The association Al-Jam'iya Al-Islamiyaya should be considered closely associated with HAMAS. Al-Jam'iya Al-Islamiyaya has [at] least ten branches in the Gaza Strip. The president of the entire association is Dr. Ahmad Bahr, a member of the HAMAS leadership. In the winter of 2001/2002 Al-Jam'iya Al-Islamiyaya was banned by the Palestine Authority because of allegations of its affiliation with HAMAS. In 2001, the association ran 41 of its own kindergartens for 1650 children of preschool age. During a schoolyear-end party of these kindergartens in the summer of 2001 in the center owned by the association in the refugee camp al-Shati (Gaza Strip) several kindergarten classes presented paramilitary performances and parades which clearly called for the glorification of violence and support for HAMAS suicide attacks. Thus, boys about 5 years old in uniform and equipped with toy automatic weapons presented paramilitary exercises. They wore the headbands of HAMAS suicide bombers with which assassins record a video message to their families before attacks. During the same party's show scenes appeared a child disguised as HAMAS-leader Sheikh YASSIN, surrounded by more children with "bomb belts" and thus recognizable as suicide bombers. In another scene a girl before a model of the Jerusalem Dome of the Rock dipped her hands in "blood" (red paint) and with "bloody" hands held high symbolically called for the continuation of the Intifada. In closing the festive event, the president of the association Dr. Ahmad BAHR held a speech in which he praised, among other things, the "martyrs" fallen against Israel, more particularly he named the "martyr Mahmud MARMASH as a shining example for the children. On 5/18/2001, Mahmud MARMASH carried out a suicide attack in Netanya, during which 5 Israelis were killed and 74 injured.

743.    Payments to Marmash's family as a result of his "martyrdom" were deposited into CAB Account No. 1518 26968400.

744.    From the early 1990s through 2004, *Al-Jam'iya Al-Islamiya* enjoyed financial support from HAMAS fundraising organizations that included the HLF in the United States (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and as an SDGT by the U.S. in 2001) as well as CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), Interpal (designated an

unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) and many other HAMAS fundraising organizations..

### 4.     *Al-Salah* Islamic Society – Gaza (*Jam'iyat al-Salah al-Islamiya*)

745.    *Al-Salah* Islamic Society – Gaza ("*al-Salah*") was founded in the town of Dir al-Balah in the Gaza Strip in 1978 and was a key part of HAMAS's *da'wa* in Gaza after 1987.

746.    The *al-Salah* Society was closed in September 1997 by the Palestinian Authority (along with *Al-Mujama Al-Islami* and *Al-Jam'iya Al-Islamiya* in Gaza) as a result of Israeli and American pressure on the Palestinian Authority.

747.    An *Associated Press* article on March 2, 2001 described HAMAS's successful fundraising efforts particularly in the Persian Gulf and Saudi Arabia, adding: "With the money from Saudi Arabia alone, Islamic activists have distributed 200,000 food packages, and more are on the way, said Ahmed al-Kourd [sic], head of the Al Salah Charity Committee in Gaza City.

748.    Later, as a result of heavy pressure from Israel and the United States on the Palestinian Authority following several terrorist attacks, Palestinian security forces from time to time arrested the leaders of *al-Salah* while the Palestinian Monetary Authority temporarily froze the bank accounts of *al-Salah*, in December 2001.

749.    *al-Salah* was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, and by the IDF's Central Command on June 30, 2002.

750.    In a letter dated November 28, 2002, the BND informed the German Ministry of the Interior in Berlin that it believed the *al-Salah* was part of HAMAS.

751.     According to the BND:

> The association Jam'iyat al-Salah / Al-Salah Islamic Association in the center of the Gaza Strip is an Islamic social club to be directly linked to the HAMAS environment. The association's president, Ahmad AL-KURD, is a leading member of HAMAS.

752.     On August 7, 2007, the United States Treasury Department declared *al-Salah* a Specially Designated Global Terrorist. In a press release announcing the declaration, the Treasury stated that:

> Hamas has used the al-Salah Society, as it has many other charitable fronts, to finance its terrorist agenda. ... The al-Salah Society supported Hamas-affiliated combatants during the first Intifada and recruited and indoctrinated youth to support Hamas's activities. It also financed commercial stores, kindergartens, and the purchase of land for Hamas. One of the most senior Gaza-based Hamas leaders and founders, Ismail Abu Shanab, openly identified the al-Salah Society as "one of the three Islamic charities that form Hamas's welfare arm." The al-Salah Society has received substantial funding from Persian Gulf countries, including at least hundreds of thousands of dollars from Kuwaiti donors.[25]

753.     *Al-Salah* also received funding from several notable radical Islamic charitable organizations, which were members of the *Itilaf al-Khair* ("Union of Good"): Interpal (SDGT), CBSP (SDGT), Al-Aqsa Foundation (SDGT) and HLF (SDGT). An article published in the December 2005 Issue of *Filastin al-Muslima* ("Muslim Palestine," the official HAMAS newspaper), reported that from the outbreak of the Second Intifada in September 2000 to December 2005, *al-Salah*'s annual average budget was ten million dollars.

754.     Ahmad Harb Ahmad al-Kurd served as the chairman of *al-Salah* and the dominant senior figure in the Society during the relevant time period, as well as being a member of the *Itilaf al-Khair* Association in Gaza ("Union of Good").

755.     Al Kurd was a senior HAMAS member in Gaza and is considered one of HAMAS's

---

[25]     A copy of the U.S. Treasury Press Release is attached as **Exhibit L** to the Amended Complaint.

senior *da'wa* operatives.

756.   An *Agence France Presse* report of arrests of HAMAS militants in Deir el-Balah in August 1994 referred to the fact that a senior HAMAS figure named Ahmad al-Kurd was detained for questioning by the Palestinian security forces.

757.   Isma'il Abu Shanab, one of the senior leaders of HAMAS, gave an interview in January 2001 to the Jordanian newspaper *al-Watan*, in which he referred to *al-Salah* as an integral part of HAMAS's social infrastructure.

758.   On August 7, 2007, the United States declared Ahmad al-Kurd, former Chairman and then board member of *al-Salah*, as a Specially Designated Global Terrorist, and declared (in the same press release[26] announcing the declaration regarding *al-Salah* itself):

> The al-Salah Society is directed by Ahmad al-Kurd, a recognized high-ranking Hamas leader in Gaza. Al-Kurd's affiliation with Hamas goes back over a decade. During the first Intifada, al-Kurd served as a Hamas Shura Council member in Gaza. As of late 2003, al-Kurd was allegedly the top Hamas leader in Dir al-Balah, Gaza. Since mid-2005, he has served as the mayor of Dir Al-Balah, elected as a Hamas candidate.

759.   Several former members on the administrative board of *al-Salah*, in its various branches, were also known as prominent operatives in HAMAS's *da'wa*, among them:

- **Osama al-Mazini**: al-Mazini was a senior HAMAS operative and political leader in the Gaza Strip. Al-Mazini was a member of the Board of *al-Salah*, (as well as *Al-Mujama Al-Islami*, as mentioned above). He was imprisoned by Israel between 1988-1994. Al-Mazini was arrested by the PA as well, following terrorist attacks committed by HAMAS.

- **Salem Salama**: Salama was a senior HAMAS member, a member of the administrative board of *al-Salah* and one of the *Marj al-Zuhur* deportees. Salam was arrested several times by Israel during the First Intifada.

- **Mansur Abu Hamid**: Hamid was a senior member of HAMAS and Chairman of the Rafah branch of the *al-Salah* Society.

---

[26]   http://www.ustreas.gov/press/releases/hp531.htm.

760.    From the early 1990s through 2004, *al-Salah* enjoyed financial support from HAMAS fundraising organizations that included the HLF in the United States (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and as an SDGT by the U.S. in 2001) as well as CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) and many other HAMAS fundraising organizations.

**5.    Al-Wafa Charitable Society – Gaza (*Jam'iyat Al-Wafa' Liri'ayat Al-Musinnin*)**

761.    The Al-Wafa Charitable Society was founded in 1980 in the Gaza Strip by the Muslim Brotherhood, and after 1987 it became a key component of HAMAS' *da'wa* network in the Gaza Strip, providing medical care to Gazan residents. Al-Wafa's administration, its center for the elderly and the al-Wafa Hospital are located in the al-Saja'iya neighborhood of Gaza City. Al-Wafa established a medical center in Khan Yunis, whose establishment was funded by Interpal and the al-Aqsa Society in Yemen.

762.    Al-Wafa opened a branch in Rafah in 2003.

763.    An FBI recording made at the Philadelphia Conference in 1993 referred to the al-Wafa Society for the Care of the Elderly as one of "*the principal organization known to be affiliated with us…*"

764.    The Al-Wafa Charitable Society's annual budget during the relevant period was approximately $10 million dollars.

765.    Its principal sources of funding were, *inter alia*, Islamic foundations in Arab states (Saudi Arabia, Yemen, the Persian Gulf States, and Jordan); and organizations around the world that were part of HAMAS's fundraising network, including:

- CBSP – France (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003)

- Interpal – Britain (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003)

- Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003)

- IRFAN Fund – Canada (designated a terrorist organization in 2014 by Canada)

- The Union of Good (*Itilaf al-Khair*) – Lebanon/Saudi Arabia/UK (designated an unlawful association by Israel in 2002 and as an SDGT by the U.S. in 2008)

- Palestinian Association in Austria ("PVOE") – Austria designated an SDGT by the U.S. in 2003)

- Islamic Development Bank

- Al-Aqsa Islamic Charitable Society – Yemen (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003)

- WAMY – Saudi Arabia (designated an unlawful association by Israel in 2002).

766.    The Al-Wafa Charitable Society was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002 and by the IDF's Central Command on June 30, 2002.

767.    The Society's bank account was confiscated by Israel in February 2004, during IDF operations to confiscate the funds of HAMAS associations in Ramallah.

768.    Many of Al-Wafa Charitable Society's key operatives are publicly known to be members of HAMAS. Its principal leaders included:

- **Muhammad Rafiq al-Khudari**: Al-Khudari was Chairman of Al-Wafa Charitable Society's Board of Directors during the relevant period. He was known as a senior civilian official in HAMAS and was in regular contact with the HAMAS leadership.

- **Basem Naim Muhammad Naim**: Naim served as a member of Al-Wafa Charitable Society's Board of Directors and was a prominent HAMAS operative in the Gaza Strip. He later served as "Health Minister" in the HAMAS government in Gaza.

- **Dr. Muhammad Abd al-Hadi Abd al-Rahman Muhammad Shihab**: Shihab served as General Secretary for Al-Wafa Charitable Society Hospital's pharmacies and medical supplies department and was a prominent HAMAS leader and was later elected as a member of the Palestinian Legislative Council for HAMAS's Change & Reform Party.

- **Taysir Nasr al-Baltaji**: Al-Baltaji is the Director General of Al-Wafa Charitable Society and Al-Wafa Hospital. He was one of the HAMAS leaders at the Islamic University of Gaza in 1985 and was known as a senior civilian official in HAMAS.

- **Salah al-Rantisi**: Rantisi was a board member of Al-Wafa Charitable Society and also the Director of Social Health Department in the *de facto* HAMAS Health Ministry in Gaza. Rantisi is the younger brother of deceased HAMAS leader Abd al-Aziz al-Rantisi.

- **Muhi al-Din Saleh al-Hilu:** Al-Hilu was a member of the board of the Al-Wafa Charitable Society. Al-Hilu is also the headmaster of Dar al-Arqam school, which belongs to HAMAS.

- **Hazem al-Nakhala:** Al-Nakhala is a member of the board of the Al-Wafa Charitable Society. He is also the head of the Institutions Committee in HAMAS's Public Relations Department.

- **Jamal al-Zabda:** Zabda was the chairman of the Al-Wafa Charitable Society. He was also a professor at the Islamic University of Gaza, Dean of Community Service and Continuing Education, and a member of the University's board. In 2003, Zabda was elected on the HAMAS list to the Palestinian Engineers Association in Gaza.

## B.    Key HAMAS Institutions in the West Bank

### 1.    Islamic Charitable Society – Hebron (*al-Jam'iya al-Khiriya al-Islamiya Al-Khalil*)

769.    The Islamic Charitable Society – Hebron ("ICSH") was an important component in the *da'wa* infrastructure of HAMAS in the Hebron area, where it was considered the central civilian institution of HAMAS and was publicly identified with HAMAS (including by the

*Associated Press*). The Society was also known as the central civilian institution of HAMAS in the entire West Bank, and HAMAS transfers money through it to other institutions identified with it.

770.   The ICSH was founded in 1962 and unlike other *da'wa* institutions of HAMAS, such as *Al-Mujama Al-Islami, Al-Jam'iya Al-Islamiya* and *al-Salah* in the Gaza Strip, it was not under the complete control of HAMAS when HAMAS was officially founded in 1987.

771.   ICSH had branches in the Hebron-area villages of Shuyukh, Beit Ula, Yata, Dura, Bani Na'im, Beit Omar, Halhul, Tafuh, Dahariya and Samu'a.

772.   On March 5, 1996, Israel closed the offices of the ICSH, due to suspicions regarding the Society's relationship with HAMAS. The Society's offices remained closed for a brief period but were then reopened by the Palestinian Authority.

773.   A March 2, 2001, *Associated Press* article described a warehouse run by the ICSH and stated that across the Palestinian areas Islamic charities were filling a growing need created by skyrocketing unemployment and poverty and identified ICSH with HAMAS.

774.   Due to its activity and organizational identification with HAMAS, the ICSH was declared to be an illegal organization by the Israeli Minister of Defense on February 25, 2002, and by the head of the IDF Central Command's Order on June 30, 2002.

775.   In a letter dated November 28, 2002, the BND informed the German Ministry of the Interior in Berlin that it believed the Islamic Charitable Society (Hebron) was part of HAMAS. According to the BND:

> Islamic Charitable Society (Hebron) is an Islamic social club directly linked to HAMAS. This club is the most important HAMAS association on the West Bank. In April of 2002 a document of the HAMAS Leadership Abroad (Damascus) of October 2000 was found on the premises of the club, which contained a direct call to violent Intifada against Israel.

776.    The Government of Israel 2004 Report described a document sent from overseas in January 2001 that was found in 2002 in the Islamic Charitable Society in Hebron that listed the so-called *da'wa* activities of the Society, including:

- Immediate and rapid response to the needs of the resistance, in parades and confrontations.

- Mapping and identifying the main places of friction, and the weak points of the settlements and of the enemy's outposts, for the purpose of attacking them.

- Developing plans to mobilize the public, in a planned and organized manner, to confront the enemy, in a way that will minimize losses.

- Mapping the enemy's methods of operation in countering the popular resistance and identifying ways of protecting against them.

777.    The January 2001 document states that the organizational structure of the "popular resistance apparatus for the management and leadership of the Intifada" includes the establishment of an "organizational network which will cover all the areas of the required activities at times of need, such as trade areas, schools, mosques, neighborhoods, societies and universities."

778.    According to that same Government of Israel 2004 Report, the Society rented houses for the families of suicide terrorists whose houses were demolished by the IDF. It also hosted "Mourning Houses" in honor of those killed in terrorist operations on the premises of the Society.

779.    During searches carried out at the offices of the Society, the IDF unearthed:

- Copies of an Islamic magazine containing the "Last Will and Testament" of a suicide terrorist who blew himself up in a bus in 1996.

- Copies of HAMAS publications dealing with the position of the movement with respect to the pressures applied by the West for "Causing the Failure of the Intifada."

- A book by Abdullah Azzam (Osama bin Laden's spiritual guide), dealing with protecting Muslim soil, its front cover displaying fighters bearing weapons on their shoulders.

- Numerous posters of "martyred" Qassam Brigades operatives.

780.    Throughout the relevant period, most members of the ICSH administrative board were publicly identified with HAMAS. Five of the board members of the ICSH, during that period, were senior operatives in the *da'wa* infrastructure of HAMAS. Several board members were even Qassam Brigades commanders.

781.    The following is a partial list of the prominent HAMAS leaders who served as ICSH officials:

- **Abd al-Khaleq Hasan Shadli al-Natshe**: Al-Natshe was the Administrative Manager of the ICSH until August 28, 2002, when he was arrested by Israel and sentenced to 10 years' imprisonment. Until his arrest in 2002, he was considered as the head of HAMAS in Hebron and was among the *Marj al-Zuhur* deportees.[27] Al-Natshe was arrested several times by Israel in the 1980s and 1990s for membership in HAMAS and his role in facilitating terrorism. In July 1997, he was convicted for his membership in HAMAS, for transferring funds to HAMAS operatives and for his links with HAMAS leadership abroad and for receiving directions from it. According to the Government of Israel 2004 Report, "**Al-Natshe is known as the most senior Hamas activist in Hebron and is considered by the public as the head of the movement and its representative in the district**…. Prior to his arrest, he frequently appeared on and was interviewed by the media as a Hamas representative and disseminated the movement's ideology. Al-Natshe moved through the city accompanied by bodyguards." (Emphasis added). In fact, an article in the Palestinian daily newspaper *al-Hayat al-Jadida* from November 13, 2001, publicly identified al-Natshe as a member of the Hamas Political Bureau. In 2003, Khalid Mashaal, then the external leader of HAMAS, publicly identified him as one of the founders of HAMAS in Hebron.[28]

---

[27]    As part of his job, al-Natshe led HAMAS demonstrations in which he spoke about HAMAS's activities and ideology. He distributed propaganda material, served as the local spokesman describing HAMAS attacks and eulogizing "martyred" members, and distributed funds to families of HAMAS prisoners.

[28]    According to al-Natshe's police statement on October 30, 2002, he also held a personal account at CAB.

- **Adel Nu'man Salim al-Junaydi**: Al-Junaydi was the Chairman of the ICSH from the year 2000. In June 2002, he was arrested and convicted for his activity in HAMAS and was sentenced to eight months in prison; in December 2004, he was once more arrested by Israel. Al-Junaydi is a senior operative in HAMAS and was among the *Marj al-Zuhur* deportees.

- **Azam Nu'man abd al-Rahman Salhab al-Tamimi**: Salhab was a member of the ICSH administrative Board and served as Deputy Chairman under al-Junaydi. Al-Tamimi is a senior operative in HAMAS and was among the *Marj al-Zuhur* deportees. In 2003, Khalid Mishal, then the leader of HAMAS's Political Bureau, publicly identified him as one of the founders of HAMAS in Hebron.

- **Mustafa Kamil Khalil Shawar**: Shawar was a member of the ICSH administrative board and was among the *Marj al-Zuhur* deportees. In 2003, Khalid Mishal identified him as one of the founders of HAMAS in Hebron.

- **Nabil Naim Ishaq al-Natshe**: Al-Natshe was a member of the ICSH administrative board and was among the *Marj al-Zuhur* deportees. He was also arrested several times by Israel, *inter alia*, based on information that he was involved in terror activities of the Qassam Brigades which included recruiting operatives and equipping them with weapons. In 2002, he was arrested and convicted for his HAMAS activities.

- **Fathi Abd al-Aziz Amru**: Amru was a long-time leader of the Muslim Brotherhood in Hebron and after 1987 became one of HAMAS's leaders in the Hebron area. He was arrested several times by Israel and was among the *Marj al-Zuhur* deportees. Amru served as a manager at ICSH and on the board of directors of ICSH's Dura branch.

- **Naef Mahmud Muhammad Al-Rajub.** Rajub is one of HAMAS's most prominent leaders and officials in Hebron. He was arrested by Israel in 1989 and was among the *Marj al-Zuhur* deportees in 1992 and was arrested in 1994 and 1996 by Israel and briefly by the Palestinian Authority in 1996. Rajub served on the board of directors of ICSH's Dura branch.

782. From the early 1990s through 2004, ICSH received financial support from HAMAS fundraising organizations that included HLF in the United States (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and as an SDGT by the U.S. in

2001) as well as CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) and many other HAMAS fundraising organizations.

783.    The link between HAMAS's *da'wa* network and its Qassam Brigades is exemplified by ICSH's Dura branch.

784.    Both Fathi Abd al-Aziz Amru, the prominent HAMAS leader and his brother, Muhammad Abd al-Aziz Abd Muhammad Amru, a professor of Islamic law, helped run and oversee the finances of the ICSH's Dura branch.

785.    In 2000, after graduating from university, Majdi Muhammad Amru went to work for the ICSH's Dura branch. In university, he was a member of *al-Kutla al-Islamiya*, HAMAS's student organization.

786.    In February 2001, while working at the ICSH's Dura branch, Amru was recruited into HAMAS's Qassam Brigades.

787.    In July 2001 he participated in the murder of an Israeli citizen.

788.    In March 2003, he participated in the planning and execution of a suicide bus bombing in Haifa that claimed 15 lives.

789.    On May 29, 2007, the United States Department of Justice identified the ICSH as "an organization which operates in the name, or under the control, of Hamas" in its list of parties involved in the conspiracy, against which no indictment was filed in the criminal trial of *United States v. Holy Land Foundation*.

## 2.   Tulkarem Zakat Committee (*Lajnat al-Zakaa Tulkarem*)

790.     The Tulkarem Zakat Committee is a part of HAMAS's civilian infrastructure, and as such is involved in a wide range of activities, including: financial aid; provision of clothing and food for the needy; support for prisoners and the families of those killed, with emphasis on transferring funds to the families of terror operatives.

791.     The Tulkarem Zakat Committee was founded in 1981 but has, for many years, been identified as part of HAMAS's *da'wa* apparatus.

792.     When Israeli forces raided the Tulkarem Zakat Committee's offices in April 2002, they found posters, handbills, and other material praising suicide bombers and encouraging other Palestinian youths to follow in their footsteps. One handbill included a statement from the mother of Muhammad Farhat, a nineteen year old HAMAS terrorist who killed five people and wounded 24 in a March 2002 rifle and grenade attack, calling on her fellow Palestinian mothers not to stand in the way of their sons' "martyrdom." A poster featuring Abdullah Azzam, Osama Bin Laden's mentor, includes a typical passage from Azzam: "Love of Jihad has taken over my life, my soul, my sensations, my heart and my emotions. If preparing [for jihad] is terrorism, then we are terrorists. If defending our honor is extremism, then we are extremists. If jihad against our enemies is fundamentalism, then we are fundamentalists."

793.     The Tulkarem Zakat Committee was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, and by the head of the IDF's Central Command's Order on June 30, 2002.

794.     In a letter dated November 28, 2002, the BND informed the German Ministry of the Interior in Berlin that it believed the Tulkarem Zakat Committee was part of HAMAS. According to the BND:

> The Zakat-Committee of Tulkarm is clearly under the control of HAMAS. The HAMAS member Husni Hasan HAWAJA is president of the Zakat Committee. The Zakat Committee runs a chain of kindergartens under the direction of the two HAMAS members....

795.    On May 29, 2007, the United States Department of Justice identified the Tulkarem Zakat Committee as an "organization which operates on behalf of, or under the control of, Hamas." This determination appeared in the list of unindicted co-conspirators in the criminal case of *United States v. Holy Land Foundation*.

796.    Through late 2007, when the Palestinian Authority finally took action against the HAMAS civilian infrastructure in the West Bank and replaced a significant portion of the Tulkarem Zakat Committee's board, the key members of the Committee's board were known HAMAS operatives. Many of the leaders of the Tulkarem Zakat Committee, in the relevant period, did not attempt to hide their radical positions, and sometimes even gave lectures in mosques whose clear purpose was to incite hatred of Jews and Israelis.

797.    The following is a partial list of the prominent HAMAS leaders who served as Tulkarem Zakat Committee officials:

- **Husni Hasan Hussein al-Khawaja**: Al-Khawaja was Chairman of the Tulkarem Zakat Committee from 1993 until his resignation from the position in June 2008 and was Chairman of the Board of Directors of the hospital associated with the Committee. He is a publicly known HAMAS operative.

- **Sheikh Bilal Khamis Yusuf abu Safira (a.k.a. Belal Khamis)**: Khamis was among the founders of the Zakat Committee and served in a variety of senior positions until its reorganization in 2007. Among the positions in which he served are Deputy Chairman, Treasurer, and Acting Director of the Tulkarem Zakat Committee's hospital. He was publicly known as a professed HAMAS operative who had influence in the various organizations connected with HAMAS in the town of Tulkarem.

- **Sheikh Amar Tawfiq Ahmad Badawi**: Badawi was among the founders of the Tulkarem Zakat Committee and was a member of its board. He is one of the leaders of HAMAS in the region.

- **Dr. Bashar Adnan Ibrahim al-Karmi**: Al-Karmi was a member of the Tulkarem Zakat Committee's administrative board and served as Director of the Committee's hospital. Al-Karmi was publicly known to be a HAMAS operative and was among the *Marj al-Zuhur* deportees.

- **Ikhlas Abd al-Karim al-Sawis**: Al-Sawis is the wife of **Abbas al-Sayed**, who was a senior officer in the Qassam Brigades convicted by an Israeli court of planning the suicide bombing during Passover 2002 at the Park Hotel in Netanya. Al-Sawis worked as Director of the Tulkarem Zakat Committee's kindergartens.

798. From the early 1990s through 2004, the Tulkarem Zakat Committee enjoyed financial support from HAMAS fundraising organizations that included the HLF in the United States (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and as an SDGT by the U.S. in 2001) as well as CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) and many other HAMAS fundraising organizations..

799. The Government of Israel 2004 Report noted that "all the members of the [Tulkarem Zakat Committee] Board are recognized by the public as Hamas activists."

800. That same report indicates that Tulkarem Zakat Committee maintained at least four accounts at CAB as of December 2004.

### 3. Nablus Zakat Committee (*Lajnat al-Zakaa Nablus*)

801. The operations of the Nablus Zakat Committee ("NZC") in the fields of social welfare, education, religious studies and health have contributed to the prestige of HAMAS in the

area and have reinforced its image as a movement with "clean hands," which looks after the public in general, in contrast to the operations of the Palestinian Authority in the Nablus District, which were perceived as inefficient and corrupt for a protracted period of time.

802.    The NZC was founded in 1977. It was part of the *da'wa* infrastructure in the West Bank during the period under review. Additional *Zakat* Committees operate in the villages of the Nablus district; they are subordinate to the *Zakat* Committee in the city of Nablus and receive funds that are transferred through it.

803.    In 2002, the offices of the NZC's Quranic Studies Center were raided by the IDF. Among other incitement materials, the Center displayed a placard in memory of the deceased HAMAS leader Salah Al-din Daruzah.

804.    At the NZC's Quran center the Israeli army recovered a video of a children's graduation ceremony at which its deputy chairman Hamed al-Beitawi (a member of the Palestinian Legislative Council on behalf of HAMAS) spoke and lashed out at "the Jews, the Crusaders" and the "heretics," a video of the Qassam Brigades, postcards of HAMAS suicide bombers, and teaching aides showing pictures of bombings and wounded Israelis. The Committee also was in possession of a videotape depicting an armed individual reciting a speech about a planned kidnapping of someone in an Israeli Security Agency.

805.    According to the Government of Israel 2004 Report "[a]ll the members of the Zakat Committee Board of Directors are known as Hamas activists."

806.    The NZC was declared an unlawful association by the Israeli Minister of Defense on June 9, 2006 and by the head of the IDF Central Command's Order on September 3, 2006. That was because of its activities and organizational relevancy to HAMAS.

807.   The following is a partial list of the prominent HAMAS leaders who served as NZC

officials:

- **Dr. Abd al-Rahim Muhammad Radi al-Hanbali**: Hanbali's father Muhammad established the NZC in 1977 and served as its Chairman before Abd al-Rahim inherited the post in 1993. Hanbali also served as a member of *al-Tadamun*'s administration and on the executive management of the Beit El-Mal Holdings, which was declared an unlawful association by Israel and designated an SDGT on the same day as the HLF in December 2001. The Government of Israel 2004 Report described Hanbali as "a senior political Hamas activist."

- **Sheikh Hamed Suleima Jaber Khader al-Bitawi**: Bitawi was considered one of the senior religious and HAMAS leadership figures in the West Bank and served as a member of *al-Tadamun*'s administrative board since 1991. Bitawi served as chairman of *al-Tadamun* (in addition to his role as Deputy Chairman of the NZC) until the end of 2008. Bitawi was a senior member of the Muslim Brotherhood in the Nablus region (he joined in 1962) and is considered (and considered himself) a HAMAS religious authority. He served as Chairman of the Palestinian Religious Scholars Association since its establishment in 1992: this Association has approved suicide terrorist attacks against Israelis. Bitawi was also the Northern representative of the West Bank on the board of "The Union of Good." Bitawi was arrested several times by both Israel and the PA. Bitawi was one of the *Marj al-Zuhur* deportees. He was known for his poisonous sermons against the Palestinian Authority and against Israel and Jews, which included calls for the murder of Jews and for jihad.[29] For example: on August 1, 2001, Bitawi gave a speech in Nablus before an audience of 150,000 people at an event commemorating two senior HAMAS operatives recently killed by Israel, Jamal Mansur and Jamal Salim, and additional HAMAS operatives. During the speech he brandished an assault rifle and led the crowd in reciting an oath "to avenge the souls of the martyrs."[30] The Government of Israel 2004 Report described Bitawi as someone "considered to be Hamas spiritual leader in Judea and Samaria."

- **Adli Rif'at Salah Ya'ish**: Ya'ish served as Treasurer of the Committee. He is presently Mayor of Nablus on behalf of HAMAS (he was elected

---

[29]   Following a suicide bombing at a Tel Aviv café in March 1997, Bitawi told a crowd of 10,000 HAMAS supporters, "I have good news. There is a suicide bombing in Tel Aviv." He continued, "This is the only language the occupiers understand, the language of martyrdom."

[30]   Images from the video are attached as **Exhibit M** to the Amended Complaint. The video of the Nablus event is available at https://www.youtube.com/watch?v=KKma5eW7_sw (12:12-14:18).

in the local elections of December 2005). Ya'ish is publicly known in Nablus and the West Bank in general as a HAMAS member; he has fulfilled many functions in the *da'wa* of HAMAS, including membership in the executive management of the *Beit al-Mal* Company, and has served as Chairman of the *al-Tadamun* Charitable Society. Ya'ish was also among the *Marj al-Zuhur* deportees.

808.   From the early 1990s through 2004, the NZC enjoyed financial support from HAMAS fundraising organizations that included the HLF in the United States (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and as an SDGT by the U.S. in 2001) as well as CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) and many other HAMAS fundraising organizations. .

809.   On May 29, 2007, the United States Department of Justice identified the NZC as "an organization which operates in the name of, or under the control of, Hamas" in the list of unindicted co-conspirators in the criminal trial of *United States v. Holy Land Foundation*.

**4.     *Al-Tadamun* Charitable Society – Nablus**
**(*Jam'iyat al-Tadamun al-Khiriyah Al-Islamiya*)**

810.   *Al-Tadamun* Charitable Society – Nablus ("*al-Tadamun*") was founded in Nablus in 1956 and is one of the oldest charitable societies in the West Bank. Like other charitable societies or *zakat* committees, *al-Tadamun* is involved in a wide range of social activities. Unlike other institutions in HAMAS's *da'wa* infrastructure, such as *Al-Mujama Al-Islami* (The Islamic Center) or *Al-Jam'iya Al-Islamiya* (the Islamic Society), *al-Tadamun* was not a society out of which HAMAS grew. Rather, over time, HAMAS took control of *al-Tadamun*, such that by the

end of the 1990s, the *al-Tadamun* management committee was composed primarily of HAMAS leaders, and its primary goal was to promote HAMAS's goals. Hamed Bitawi, one of the Society's prominent leaders, was one of the Palestine representatives in the Union of Good's leadership.

811.   *Al-Tadamun*, is publicly identified as connected to HAMAS; in fact, it is largely considered the "flagship" of HAMAS's *da'wa* apparatus in the northern West Bank. The *al-Tadamun* Society works in close cooperation with the NZC (most of the management committee members serve in both associations at the same time), which also has a close connection with HAMAS.

812.   *Al-Tadamun*'s *da'wa* activities focused on the areas of social welfare, education and leisure, health, and other special activities, all carried out with the aim of strengthening HAMAS's power base, deepening its influence among the public and emphasizing its image as a public national movement, providing social services to the whole population. The Society's success in promoting HAMAS's standing in the eyes of the public is attested to by the fact that many HAMAS representatives elected to the municipal council and Palestinian Legislative Council came from the Society's ranks.

813.   *Al-Tadamun*'s principal involvement in the support of HAMAS terror is reflected in the transfer of funds from *al-Tadamun* to other *zakat* committees and charitable societies that are part of HAMAS's *da'wa* infrastructure, including the Jenin *Zakat* Committee and the Tulkarem *Zakat* Committee. *Al-Tadamun* also transfers funds to the families of HAMAS terrorists, including suicide bombers associated with HAMAS, and to terrorists associated with other terrorist organizations, such as Palestinian Islamic Jihad and Fatah's Al Aqsa Martyrs Brigades.

814.    Due to pressure from the United States and other countries following the September 11, 2001, terrorist attacks, the Palestinian Authority temporarily closed the main offices of *Al-Tadamun* in December 2001.

815.    *Al-Tadamun* was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, and by the head of the IDF's Central Command on June 30, 2002.

816.    In a letter dated November 28, 2002, BND informed the German Ministry of the Interior in Berlin that it believed the Al-Tadamun Charitable Society was part of HAMAS.

817.    According to the BND:

> The association Jam'iyat al-Tadamun / Al-Tadamun Charitable Society is directly linked to the HAMAS sphere of influence. In the winter of 2001/2002, the association was banned by the Palestinian Authority based on charges of affiliation with HAMAS. The association's leadership includes several persons who were deported as HAMAS activists to South Lebanon (Marj al-Zuhur) and who were among the leading HAMAS members, for example Munir AQD, Nabil BISHAWI, Kamal Abu AISHA, Abd Nassir QADAH, Adli YA'ISH, Salah al-Din MUSLAH and Hamza JABIR.

818.    The following is a partial list of the prominent HAMAS leaders who served as *al-Tadamun* officials:

- **Sheikh Hamed Suleiman Jaber Khader al-Bitawi**: (See above.)

- **Dr. Abd al-Rahim Muhammad Radi al-Hanbali**: A member of the Society's administrative board. Hanbali also served as Chairman of the NZC from 1990 (when he inherited his father's place on the Committee) until the beginning of 2008. He is a senior political operative in HAMAS.

- **Adli Rif'at Saleh Ya'ish**: Ya'ish served in several senior positions in *al-Tadamun*, including Treasurer and Chairman of the management committee, during the 90s until his election as Mayor of Nablus in 2005, on behalf of the HAMAS list. Similarly, he served as Treasurer of the NZC since 1990. He was one of the *Marj al-Zuhur* deportees.

- **Jamal Salim Ibrahim Damuni**: Salim was a member of *al-Tadamun*'s administrative board until he and Jamal Mansur, another HAMAS

leader, were killed in an IDF operation in July 2001. He was considered one of the most senior HAMAS figures in the northern West Bank, and often represented HAMAS in delegations in various negotiations with Fatah. Salim was a disciple of Abdallah Azzam, a radical Islamic religious figure who was Osama bin Laden's spiritual teacher. Salim served several terms of imprisonment in Israel between 1985 and 1991 and was also among the *Marj al-Zuhur* deportees.

- **Abdallah Abd al-Rahman Abd al-Fatah Hijawi**: Hijawi was secretary of *al-Tadamun*. He also served as one of the directors of the Quran Memorization Society, operated by the NZC. From the early 90s he was a member of the NZC. He took part in HAMAS public activities (for example, The Martyrs' Day in Nablus that was initiated by HAMAS and which was also attended by relatives of senior HAMAS members).

- **Nasuh Abas Muhamad Barham "al-Ramini"**: Barham was a member of *al-Tadamun*'s board of directors and a HAMAS candidate for the Palestinian Legislative Council, standing for HAMAS's Change & Reform Party. He was arrested by the IDF on numerous occasions from 1975 to 1996 and was under house arrest between 1981 and 1982. He was also among the *Marj al-Zuhur* deportees.

- **Hamza Muhammad Hussein Jaber**: Jaber was also active in the *al-Tadamun* Charitable Society and the Islamic Sports Club of the *al-Tadamun* Society. He is known as a veteran political HAMAS operative in Nablus, who formerly worked, *inter alia*, in the HAMAS media office in Nablus. Jaber was among the *Marj al-Zuhur* deportees.

819. The Government of Israel 2004 Report states that:

The Society is run by Sheikh Hamed Bitawi, and its executive body is the same eleven activists running the Nablus Zakat Committee, all identified as members of Hamas …. In the past, Jamal Salim, one of the senior Hamas movement members in Judea and Samaria, and who was killed during a targeted prevention operation carried out by IDF forces, was also a member of the executive body. In addition, Hamas activists who were some of the "Marj Al-Zuhur" deportees were also members of the executive body ….

820. From the early 1990s through 2004, the *al-Tadamun* enjoyed financial support from HAMAS fundraising organizations that included the HLF in the United States (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and as an SDGT by the U.S. in 2001) as well as CBSP (designated an unlawful association by Israel in 1997 and terror

organization in 1998 and as an SDGT by the U.S. in 2003), Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Union of Good (designated an unlawful association by Israel in 2002 and as an SDGT by the U.S. in 2008) and many other HAMAS fundraising organizations. .

821.    For example, the Union of Good transferred more than $50,000 to *al-Tadamun* at CAB's Account No. 321494 in 2002 and it used *al-Tadamun* as its coordinator for sending funds to the northern part of the West Bank.

822.    *Al-Tadamun*'s *da'wa* activities included collecting information on HAMAS "martyrs" to help facilitate payments to their family members.

823.    For example, the "Martyr File" for HAMAS operative Amjad Abd al-Rahim Abd al-Razaq Tubasi (killed in a clash with the IDF on December 4, 2001) includes his father's bank card from CAB identifying the account to which reward payment for Tubasi's death should be paid.

824.    *Al-Tadamun* provided the Society's buildings for mourning tents for HAMAS suicide terrorists and senior operatives "martyred" by Israel. For example, it set up a mourning tent for Hani Mustafa Rawajba, a Qassam Brigades operative who was killed while perpetrating a suicide attack. Similarly, it set up mourning tents for senior Hamas terrorists Salah al-Din Darwazah and Yahya Ayyash. HAMAS and the Darwazah family announced on July 26, 2001, that the traditional reception for mourners would be held for three days at *al-Tadamun*'s hall, and that on the last day a memorial service would be held there. A similar service took place at *al-Tadamun* after Israel killed Yahya Ayyash, HAMAS's first master bomb-maker.

825.    During the relevant period, *Al-Tadamun* received funding from HLF in the United States (after it was designated an unlawful association by Israel in 1997 and terror organization in 1998) as well as CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) and Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) and many other HAMAS fundraising organizations. In some cases, it received funding from SDGTs even after those entities were designated by the United States.

### 5.    Jenin Zakat Committee (*Lajnat al-Zakaa Jenin*)

826.    The Jenin Zakat Committee ("JZC") was founded in 1985 but has been controlled by prominent HAMAS operatives as early as the first years of the 1990s.

827.    The JZC's operations in the areas of health and education, services for children and employment have increased HAMAS's prestige.

828.    In 1996, the Palestinian Authority temporarily closed down JZC's offices.

829.    The JZC was declared to be an unlawful organization by the Israeli Minister of Defense on February 25, 2002, and by the head of the IDF Central Command's Order on June 30, 2002.

830.    In April 2003, CAB processed funds transfers from the Al Aqsa Foundation (designated an SDGT in May 2003) to the CAB account for the JZC.

831.    In July 2003, CAB processed funds transfers from the Al Aqsa Foundation to the CAB account for the JZC.

832.    On October 6, 2003, the IDF raided the JZC's offices.

833.    Until the replacement of the executive management of the committees by the Palestinian Authority in late 2007, most of the members of the JZC executive management were

openly related to HAMAS and were considered HAMAS operatives. Furthermore, the Chairman

and the Administrative Manager of the JZC, who jointly made all the important decisions regarding

the JZC throughout the relevant period and served as the *de facto* managers of the JZC, were also

HAMAS members.

834.    The following is a partial list of the prominent HAMAS leaders who served as JZC

officials:

- **Sheikh Zayd Mahmud Abd al-Rahim Zakarneh**: Zakarneh, who is known as a prominent HAMAS operative in the Jenin area, was among the founding members of the JZC and chaired the Committee from the early 1990s until 2008. In September 2005, Zakarneh was arrested and later convicted of membership in HAMAS.

- **Ahmad Salim Ahmad Salatneh**: Salatneh was the Administrative Manager of the JZC from 2002 to 2005 and de facto second-in-command to the Chairman of the Committee. Salatneh was involved in transferring bomb-making components in 1992 and was implicated in a car bomb attack in 1993. He was arrested by the Palestinian Authority and has also been arrested several times by Israel and was convicted twice for terrorist activities by Israel.

- **Jamal Abd al-Salam Asad Abu al-Hija**: Al-Hija was an employee of the JZC. He was arrested by the Palestinian security forces several times, starting in 1996. On April 12, 1999, Al-Hija was sentenced by an Israeli military court to 13 months' imprisonment, after having been convicted of membership in HAMAS. In April 2002, during an IDF campaign in Jenin, he served as commander of HAMAS in the Jenin area. Al-Hija also participated in the planning of several suicide bombings and recruited suicide bombers. He was involved in the planning of a suicide bombing in the Sbarro Restaurant in Jerusalem in August 2001, a suicide bombing of a bus on Mt. Meron in August 2002, and a suicide bombing in the Matza Restaurant in Haifa in March 2002. Al-Hija has been serving nine consecutive life sentences in an Israeli prison since August 2002.

- **Naser Khaled Ibrahim Jarar:** Jarar was one of the commanders of HAMAS's terror apparatus in Jenin. According to Israeli intelligence, he was "active in recruiting terrorist-operatives and in locating and dispatching suicide bombers and planned a series of deadly attacks against Israeli targets." He was also a founding member of JZC. Jarar was arrested several times by Israel between 1989-1998.

- **Ibrahim Hasan Ali Jaber**: Jaber became a member of the ZCin 1988 and worked in its various institutions. He was also a senior HAMAS operative who was responsible for several lethal attacks against Israeli targets. During questioning, he admitted to planning the attacks, transporting explosive devices, providing military training and possessing weapons.

835.  The Government of Israel 2004 Report noted that:

Documents were found in the offices of the Zakat Committee, which unequivocally prove the support received by the families of Palestinian terrorists from the Committee. One of the documents contains a request for aid for 12 activists, who were dominant figures amongst the terrorists in the Jenin region. This proves and exposes the connection between the Zakat Committee and terrorists and their families. In other documents, members of the Zakat Committee point to those killed ("shahids"), amongst them military Hamas operatives, as being the only ones whose families qualify for aid from the "Friends of the Arab Emirates Society."

836.  In February 2004 the IDF confiscated the Committee's funds from its bank accounts in Ramallah, as part of a comprehensive operation against terror financing.

837.  The same 2004 Civil Administration report noted that even after the Israeli Army's February 2004 seizure of terrorist funds from CAB and Arab Bank, the JZC still used a Jordanian dinar account at CAB to fund its operations.

838.  From the early 1990s through 2004, the JZC enjoyed financial support from HAMAS fundraising organizations that included HLF in the United States (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and as an SDGT by the U.S. in 2001) as well as CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and

terror organization in 1998 and as an SDGT by the U.S. in 2003), and many other HAMAS fundraising organizations..

839.    On May 29, 2007, the United States Department of Justice identified the Jenin Zakat Committee as "an organization which operates in the name of, or under the control of, Hamas" in its list of parties involved in the conspiracy, against which no indictment was filed in the criminal trial of *United States v. Holy Land Foundation*.

### 6.    Ramallah – Al-Bireh Zakat Committee
### *(Lajnat al-Zakaa Ramallah Wal-Bireh)*

840.    The *Ramallah al-Bireh Zakat* Committee ("RBZC") was founded in 1977 but has for many years been identified as part of the HAMAS *da'wa* system in the West Bank.

841.    The principal *da'wa* activities of the RBZC are support for orphans, providing health services and running summer camps.

842.    On March 17, 1996, Palestinian security forces raided several institutions, including the RBZC and confiscated many documents.

843.    The Palestinian Authority's General Intelligence Service noted in a report that the charity "supports the families of imprisoned and deported individuals" and that the "higher echelons of this society and others like it belong to Hamas, and some of them are movement [HAMAS] activists."

844.    The RBZC was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, and by the head of the IDF's Central Command's Order on June 30, 2002.

845.    In a letter dated November 28, 2002, the BND informed the German Ministry of the Interior in Berlin that it believed the RBZC was part of HAMAS.

846.    The BND concluded that the "Zakat Committee of Ramallah is closely connected with HAMAS and therefore, as part of the social network, it is to be linked to the immediate sphere of influence of HAMAS."

847.    The following is a partial list of the prominent HAMAS leaders who served as RBZC officials:

- **Dr. Husni Muhammad Abd al-Qader Abu Awad**: During the relevant period, Awad served as Chairman of the Committee, and according to a Palestinian Authority intelligence report, was identified with HAMAS.

- **Hasan Yusuf Daud al-Khalil**: Khalil was one of the founders of the RBZC and a member of its Board. In 2004 he served as the official spokesman for HAMAS in the West Bank. Khalil was among the *Marj al-Zuhur* deportees, and even served as Secretary of the deportees' camp. He was later arrested by the Palestinian Authority in 1996 and again by Israel on several other occasions.

- **Ibrahim Sa'id Hasan Abu Salem**: Abu Salem was one of the founders of the RBZC and served as the Committee's Director. In 1989 he was arrested by Israel and imprisoned for five months due to his ties with HAMAS. He was among the *Marj al-Zuhur* deportees and was arrested by the Israeli security forces in 1994 and 1999.

- **Fadel Muhammad Saleh Hamdan**: Fadel Hamdan was one of the founders of the RBZC and one of the most prominent HAMAS operatives in the Ramallah region. The FBI's Watson Memorandum noted that **Hamdan was "directly connected with the planning of suicide attacks and the psychological preparation of those who were about to carry out suicide attacks, including the Mahane Yehuda attack in July 1997**." Fadel Hamdan was among the *Marj al-Zuhur* deportees and was imprisoned in 1996 by the Palestinian Authority.

- **Mahmud Ibrahim Mahmoud Muslih**: He was director of the RBZC and is considered one of the senior HAMAS operatives in the Ramallah region. During the First Intifada, Muslih was one of HAMAS's senior leaders in charge of public relations. In 1995 and 1996 he served as HAMAS's official spokesman. He was arrested and imprisoned by Israel in 1997-1998 and again in 2003-2005 on charges of membership and activity in HAMAS. Muslih was identified in 2003 by Khalid Mishal as one of the founders of HAMAS in Ramallah.

- **Omar Hamdan**: Omar Hamdan, was a member of the RBZC. He is a prominent senior HAMAS operative in Ramallah. He also served as director and chairman of the *al-Islah* Charitable Society in Ramallah, which was also a central HAMAS-controlled institution in Ramallah. Hamdan served long periods of imprisonment in Israeli jails for his HAMAS-related activities.

848.    A Palestinian Authority intelligence document dated May 22, 2000, notes: "The monitoring of the Committee [RBZC] that we carried out made it clear that the Committee [RBZC] transfers funds from abroad to Hamas."

849.    The RBZC's accountant during this period, Raeq Sakeb Ibrahim Omar, previously worked at CAB's branch in Ramallah.

850.    Omar and was himself a HAMAS operative and was among the *Marj al-Zuhur* deportees in 1992. Upon his repatriation from Lebanon, he joined CAB and eventually became a deputy branch manager.

851.    From the early 1990s through 2004, the Ramallah al-Bireh Zakat Committee received funding from HAMAS fundraising organizations such as HLF in the United States (after it was designated an unlawful association by Israel in 1997 and terror organization in 1998) as well as CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), WAMY (designated an unlawful association by Israel in 2002), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Union of Good (designated an unlawful association by Israel in 2002 and as an SDGT by the U.S. in 2008) and many other HAMAS fundraising organizations.

852.    On May 29, 2007, the United States Department of Justice named the Ramallah al-Bireh Zakat Committee as an "organization that operates on behalf of, or under the control of,

HAMAS" in the list of unindicted co-conspirators in the criminal case of *United States v. Holy Land Foundation*.

### 7.   Muslim Youth Association – Hebron

853.   The Muslim Youth Association – Hebron ("MYAH") was established in Hebron in 1985. For many years, it has been identified as part of the HAMAS *da'wa* system in the West Bank.

854.   The principal *da'wa* activities of the MYAH are support for the education (particularly Islamic education) of poor students through financial support to kindergartens, schools and libraries.

855.   In March 1996, the Israeli army ordered the temporary closure of MYAH. In December 2001, the Palestinian Authority also temporarily closed MYAH.

856.   The MYAH was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, and by the head of the IDF's Central Command's Order on June 30, 2002.

857.   In March 2003, the executive offices of MYAH were shut down and sealed off (under an order from the Head of the IDF's Central Command.

858.   The following is a partial list of the prominent HAMAS leaders who served as MYAH officials:

- **Mustafa Kamil Khalil Shawar**: During the relevant period, he served as a member of the MYAH board as well as the board of ICSH. Shawar was among the *Marj al-Zuhur* deportees. In 2003, Khalid Mishal, then the leader of HAMAS's political bureau, identified him as one of the founders of HAMAS in Hebron. He was arrested by the ISA in August 2002 and released in March 2003.

- **Azam Nu'man abd al-Rahman Salhab al-Tamimi**: Salhab was a member of the MYAH board as well as the ICSH administrative Board. Al-Tamimi is a senior operative in HAMAS and was among the *Marj al-Zuhur* deportees. In 2003, Khalid Mishal identified him as one of the founders of HAMAS in Hebron.

- **Hatem Rashid Qafisha**: Qafisha served as the Vice President of MYAH. He was arrested on multiple occasions by Israel and the PA and was among the *Marj al-Zuhur* deportees. The Government of Israel 2004 Report refers to him as someone who is "known as a Hamas activist."

- **Malek abd al-Salam Misbah Nasser al-Din**: Nasser al-Din was an administrator at MYAH and played for its soccer team. He was also was among the *Marj al-Zuhur* deportees and a commander of the Qassam Brigades.

859.    The Government of Israel 2004 Report notes that during searches carried out at the offices of the Muslim Youth Association, "incitement [video] tapes were unearthed that document the closing ceremonies of educational institutions and scout camps during which the children glorify Hamas suicide terrorists, with the 'Engineer,' Yihya Ayash, at the top of the list, and also calling out cries in favor of the 'Izz Al-Din Al-Qassam' Brigades, promising the coming of thousands [of holy warriors] in the wake of those killed, carrying toy R.P.G. [rocket propelled grenade) launchers on their shoulders, staging the murder of an ISA operative, operating weapons and calling out taunts against the Zionists and for the return of Jerusalem, Beit She'an, Acre, Jaffa and Haifa to the Palestinians."

860.    From the early 1990s through 2004, MYAH enjoyed financial support from HAMAS fundraising organizations that included HLF in the United States (designated an unlawful association by Israel in 1997 and a terror organization in 1998 and as an SDGT by the U.S. in 2001) as well as Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al-Aqsa Foundation – Germany (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) and many other HAMAS fundraising organizations.

861.    On May 29, 2007, the United States Department of Justice named the MYAH as an

"organization that operates on behalf of, or under the control of, HAMAS" in the list of unindicted co-conspirators in the criminal case of *United States v. Holy Land Foundation*.

### 8.    Beit Fajar Zakat Committee

862.    The Beit Fajar Zakat Committee ("BFZC") was founded in 1990 and was managed during the relevant period by Dr. Issa Thawabteh, a HAMAS operative.

863.    Beit Fajar is a small town south of Bethlehem.

864.    For many years, it has been identified as part of the HAMAS *da'wa* system in the West Bank.

865.    The principal *da'wa* activities of the zakat committee have been to support orphans and the needy in the Bethlehem region and to operate kindergartens on HAMAS's behalf.[31]

866.    According to Palestinian security officials, the BFZC opened an office in Bethlehem "as a result of intense pressure exerted by Dr. Issa Thawabteh and because Dr. Issa Thawabteh plays a central role in bringing [in] support funds to Hamas institutions in Bethlehem."

867.    During the relevant period, BFZC received funding from the Al Aqsa Foundation in Germany, Interpal, WAMY and a variety of other Union of Good institutions.

868.    The BFZC received and distributed funds via at least two accounts at CAB throughout the relevant period.

869.    In a June 20, 2001 letter, the Palestinian Authority's Preventive Security Service identified the BFZC as a prominent HAMAS institution, whose members were also associated with the Qassam Brigades.[32]

---

[31]    The Palestinian Preventive Security Forces identified the kindergarten as being connected with HAMAS activity, and is under control of HAMAS activist Issa Thawabteh.

[32]    This was later confirmed by HAMAS, which published an article in its daily newspaper in 2007 complaining about the Palestinian Authority's measures against zakat committees controlled by HAMAS.

870.     On January 6, 2002, the Palestinian Monetary Authority instructed the Palestinian banks to report on the sums of money held in the BFZC's accounts and demanded that they consult with it before any withdrawal of money from those accounts.

871.     In a letter dated November 28, 2002, the BND informed the German Ministry of the Interior in Berlin that it believed the BFZC was part of HAMAS.

872.     According to the BND:

> The Zakat Committee of Beit Fajar is under the control of HAMAS and therefore, being part of the social network, is directly associated with HAMAS. The members of the Zakat committee's leadership: Is Muhammad Khalil THAWABTA, Kamal Said Rashid DIRIYA, Muhammad Jum's Aqil THAWABTA and Husain Musa Jum'a DIRIYA are members of HAMAS.

873.     The Israeli Army carried out searches of the offices of the BFZC on April 25, 2002 and November 18, 2004.

874.     The committee was declared an unlawful association in the State of Israel by the Israeli Minister of Defense on February 28, 2005 and was outlawed by the head of the IDF's Central Command on the same date.

875.     The following is a partial list of the prominent HAMAS leaders who served on the board of or the management of the zakat committee:

- **Dr. Issa Muhammad Khalil Thawabteh**: Thawabteh was Chairman of the Beit Fajar Zakat Committee.

- **Jaber Ibrahim Jaber Diriyeh**: Diriyeh is a publicly known HAMAS operative who served as a member of the board of BFZC until he was forced out in 2007 as part of the Palestinian Authority's 2007 purge of HAMAS-controlled committees.

- **Muhammad Juma Aqel Thawabteh**

- **Hussein Musa Juma'a Diriya**

- **Sheikh Kamel Saad Rashid Diriyeh**

- **Amin al-Fatah Ali Shamarkhah.**

876.     According to Israeli government assessment all six men are "HAMAS activists."

877.     During the relevant period, the BFZC received funding from CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003) Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Union of Good (designated an unlawful association by Israel in 2002 and as an SDGT by the U.S. in 2008) and many other HAMAS fundraising organizations.

### 9.     *Al-Islah* **Charitable Society in Ramallah & Al-Bireh**

878.     The *Al-Islah* Charitable Society in Ramallah & Al-Bireh ("*Al-Islah*") was one of most important components in the *da'wa* infrastructure of HAMAS in the West Bank, where it was considered the pivotal civilian institution of HAMAS.

879.     It was created to transfer HAMAS's funds to HAMAS prisoners, provide scholarships to students and subsidize and operate summer camps that encourage young people to take part in jihad. *Al-Islah* was also responsible for transferring funds to support the families of terrorists whose homes were destroyed and recommending grants to prisoners, the injured and for families of "martyrs."

880.     An analysis of Israeli intelligence figures reflects that during the three days of the Muslim holiday Eid al-Fitr in 2001, 46% (approximately $42,295) of the *Al-Islah*'s disbursements were directed to supporting terrorists and their families, compared to 43% ($39,537) for social welfare institutions.

881.     HAMAS's senior *da'wa* leadership in the Ramallah region was prominently

137

represented on *Al-Islah*'s administrative board and they were frequently replaced because several of them were arrested and convicted by Israel for their HAMAS activities.

882.    Among the members of *Al-Islah*'s administrative board were three *Marj al-Zuhur* deportees.

883.    The following is a partial list of the prominent HAMAS leaders who served on *Al-Islah*'s administrative board or as senior employees:

- **Jamal Muhammad Farah al-Tawil**: Al-Tawil is one of the *Marj al-Zuhur* deportees and a member of the Palestine Religious Scholars Association ("PRSA"), a body comprising those senior Islamic legal scholars in the Palestinian Territories who are identified with HAMAS and the Muslim Brotherhood; the PRSA provides HAMAS with religious legitimacy for its activities. He founded *Al-Islah*'s Ramallah branch at the outbreak of the Second Intifada. At the beginning of 2002, al-Tawil was arrested by IDF forces and was sentenced to three years in prison for transferring funds (through *Al-Islah*) to terrorists, the families of "martyrs," HAMAS prisoners, and members of the Qassam Brigades. Al-Tawil was identified in 2003 by the then HAMAS leader, Khalid Mashaal, as one of the founders of HAMAS in Ramallah. He served approximately six years in Israeli prisons, including from 2002 to February 2005. Tawil was involved in planning several suicide attacks, including the car bomb attack in Jerusalem's Ben Yehuda pedestrian mall in December 2001. He also served as head of a HAMAS prisoners committee. In 2005, al-Tawil was the successful HAMAS candidate for Mayor of the town of al-Bireh.

- **Omar Muhammad Ahmad Hamdan**: Hamdan served as Chairman of *Al-Islah* from al-Tawil's arrest in 2002 until May 2005, when the Society's name was changed. Hamdan also served in senior positions in the RBZC. Hamdan was imprisoned and served two years in an Israeli jail for his involvement in HAMAS terror activities.

- **Muhammad Subhi Yasin Samaha**: Samaha served as Chairman of *Al-Islah* from May 2005, when the Society changed its name from *Al-Islah* to *al-Farah* and was a member of the Society's Ramallah branch from its inception in the year 2000. Samaha is a known senior HAMAS operative in the Ramallah region. Since 2005 he has served as Secretary of the RBZC, which is also controlled by HAMAS.

- **Majed Ismail Mahmud Abu Khadija**: Abu Khadija was a member of *Al-Islah*, but upon the Society's reorganization and change of name in

138

May 2005, he stopped serving on its administrative board. Abu Khadija was one of the *Marj al-Zuhur* deportees.

- **Bajes Khalil Mustafa Nakhla**: Nakhla was a member of the administrative board of *Al-Islah* until the Society's reorganization and change of name in May 2005. Nakhla was among the *Marj al-Zuhur* deportees and is considered one of the senior HAMAS figures in Ramallah. He was arrested several times by the IDF.

- **Fadel Muhammad Saleh Hamdan**: Fadel Hamdan was among the *Marj al-Zuhur* deportees and was imprisoned in 1996 by the Palestinian Authority. He was also one of the founders of the RBZC and one of the most prominent HAMAS operatives in the Ramallah region. He served as a member of *al-Islah*'s administrative board. The FBI has cited documents seized in the offices of the Islamic Relief Agency which noted that Hamdan was "directly connected with the planning of suicide attacks and the psychological preparation of those who were about to carry out suicide attacks, including the Mahane Yehuda attack in July 1997.

- **Falah Taher Abdallah Nada**: Falah Nada was a senior employee of *Al-Islah* (from June 2001 and until his arrest by Israel on January 21, 2003) where he was responsible for the transfer of funds to families of HAMAS prisoners jailed in Israel and to HAMAS operatives who had been injured. Falah Nada was convicted for his membership in HAMAS and for recruiting a senior member of the Qassam Brigades, Muhamad Arman, who guided the so called "Silwan Cell" which was responsible for a series of terrorist acts and murders in which dozens of Israeli civilians died and hundreds of others were injured. (Arman was later arrested, convicted and sentenced to 36 life sentences.) Nada instructed three female couriers to transfer, on his behalf, letters and secret notes, money and documents to a number of people which included Jamal Al-Tawil, head and founder of the *al-Islah* society and Omar Hamdan, also a senior HAMAS member in Ramallah who served as chairman of *Al-Islah* since the arrest of Al-Tawil in 2002. Within the scope of his employment at *al-Islah*, Nada was involved in recruitment of suicide bombers and hiding wanted men. Based on these activities, Nada received an 81-month prison term.

884.   *Al-Islah*'s offices were (temporarily) closed by the Palestinian Authority on December 15, 2001 during one of its periodic crackdowns on HAMAS.

885.   On December 16, 2001 Ibrahim Al-Masri, director of the Palestinian Authority's General Intelligence Service in the Ramallah - Al-Bireh District, sent a letter to the director of the

Palestinian Authority's General Intelligence Service's Northern Districts confirming *Al-Islah*'s closure due to its identification as a "Hamas-affiliated" institution.

886.    *Al-Islah* was declared an unlawful association by the Israeli Minister of Defense on February 25, 2002, and by the head of the IDF's Central Command on June 30, 2002.

887.    In a letter dated November 28, 2002, the BND informed the German Ministry of the Interior in Berlin that it believed the *Al-Islah* was part of HAMAS. According to the BND:

> Al-Islah Charitable Society is directly associated with HAMAS. President of the association, until he was arrested by Israel, was Jamal ALTAWIL, known as a leading HAMAS member. In the winter of 2001/2002, the association was banned by the Palestinian Authority upon accusations of HAMAS membership. On the premises of the "Welfare Committee" of the association's branch in Ramallah was found a list of HAMAS activists some of whom died as "martyrs" and for whose families requests were made for financial support from donations received by the association.

888.    During the relevant period, *Al-Islah* received funding from CBSP (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al Aqsa Foundation (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), WAMY (designated an unlawful association by Israel in 2002) and many other HAMAS fundraising organizations. In some cases, it received funding from SDGTs even after those entities were designated by the United States.

889.    *Al-Islah* continued to receive funding from Interpal even after the latter was designated in August 2003.

### 10.    Qalqilya Zakat Committee

890.    Qalqilya Zakat Committee ("QZC") was established in 1968 and is considered the strongest and most dominant *Da'wa* institution in the Qalqilya region.

891.    According to the FBI's Watson Memorandum, reporting by the Israeli government "indicates that this zakat committee exists to support HAMAS activity. All four identified members of this committee have been identified by the GOT as HAMAS members."

892.    Ibrahim Dawud (a/k/a Bilal Hanoun) served as chairman of the QZC during the relevant period. The FBI described him as "Imam of the local Mosque, as well as a HAMAS activist."

893.    Sheikh Riyad Rashid Walwil was a founder, member and vice chairman of the QZC. The FBI noted that Walil "was detained by [Israel] in August 1995 for interview and admitted membership in the HAMAS. He was held under administrative arrest until July 1996, due to his HAMAS activities." The Qassam Brigades later acknowledged him as one of HAMAS's prominent leaders.

894.    The Government of Israel 2004 Report noted that "Members of the Committee's Board of Directors – [are] all publicly identified as Hamas members."

895.    The QZC assisted the families of those killed in the Intifada and families of suicide [terrorist] and families of prisoners.

896.    On May 29, 2007, the United States Department of Justice named the Qalqilya Zakat Committee as an "organization that operates on behalf of, or under the control of, HAMAS" in the list of unindicted co-conspirators in the criminal case of *United States v. Holy Land Foundation*.

897.    During the relevant period, the Qalqilya Zakat Committee received funding from HLF (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2001), the Union of Good (designated an unlawful association by Israel in 2002 and as an SDGT by the U.S. in 2008), and many other HAMAS fundraising organizations.

### 11.     Quran and Sunnah Society – Qalqilya

898.     The Quran and Sunnah Society – Qalqilya ("QSS") was founded in 1996 by a prominent local HAMAS leader, Ibrahim Dawud (a/k/a Bilal Hanoun).

899.     During the relevant period, both its treasurer (and later chairman), Khalil Khader Mustafa Abu Khader, and its vice-chairman, Kheir al-Din Awda Farah Dik, were HAMAS activists.

900.     The QSS operated two schools and a kindergarten during the relevant period, all called "The Martyrs of al-Aqsa." The Society provided scholarships and subsidies to poorer students.

901.     It also provided financial support to Palestinian terrorists in Israeli prisons.

902.     During the relevant period, the QSS received funding from the Al Aqsa Foundation (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), Interpal (same), WAMY (designated an unlawful association by Israel in 2002), and many other HAMAS fundraising organizations.

### 12.     *Al-Ihsan* Charitable Society – Hebron

903.     Al-Ihsan Charitable Society - Hebron ("*Al-Ihsan*") was established in 1983. It specialized in taking care of the disabled and helped HAMAS develop its reputation for helping the poor, downtrodden and unfortunate members of Palestinian society.

904.     *Al-Ihsan* is closely related to HAMAS's preeminent institution in Hebron, the ICSH, and many of Al-Ihsan's and ICSH's board members and employees overlap.

905.     For example, Muhammad Eid Misk, one of HAMAS's founders in Hebron, sat on the boards of both institutions as did Azam Nu'man Abd al-Rahman Salhab al-Tamimi (discussed above).

906.    The following is a partial list of the prominent HAMAS leaders who served on the board of *Al-Ihsan:*

- **Nizar Ramadan**: Ramadan served as a board member and treasurer of the *Al-Ihsan* (Hebron) for 15 years. From 1984-1986, he was the Chairman of *Al-Kutla Al-Islamiya* at Hebron University and was one of the *Marj al-Zuhur* deportees. He was arrested again in 2002 and was later elected to the Palestinian Legislative Council as part of HAMAS's Change and Reform Party.

- **Muhammad Eid Misk**: Misk is one of HAMAS's founders in Hebron and served as is a member of the board of directors of *Al-Ihsan* (Hebron)in Hebron. He was also an employee of the HLF and arrested by Israel and detained twice for several months. In 2003, Khalid Mashaal, then head of HAMAS, publicly identified him as one of the founders of HAMAS in Hebron.

- **Azam Nu'man abd al-Rahman Salhab al-Tamimi**: Salhab served as a board member of *Al-Ihsan* in addition to serving as a member of the ICSH administrative Board and Deputy Chairman and as a member of the Palestine Religious Scholars Association. Al-Tamimi is a senior operative in HAMAS and was among the *Marj al-Zuhur* deportees. He was again arrested by the IDF in 2002. In 2003, Khalid Mishal, then the leader of HAMAS's Political Bureau, publicly identified him as one of the founders of HAMAS in Hebron.

907.    During the relevant period, *Al-Ihsan* received funding from HLF (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2001), Interpal (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), the Al Aqsa Foundation (designated an unlawful association by Israel in 1997 and terror organization in 1998 and as an SDGT by the U.S. in 2003), and many other HAMAS fundraising organizations.

## III.    CAB KNOWINGLY AIDED AND ABETTED HAMAS

908.    CAB has had a long history of facilitating the flow of money used to finance terrorism in the Palestinian Territories.

909.    As far back as the First Intifada, the violent uprising by the Palestinians against

Israeli rule on the West Bank and Gaza Strip that took place between 1987 and 1993, Israeli officials warned CAB that it was being used as a conduit to finance the uprising and that it might face closures by the Israeli government.

910. Specifically, Medhat Kanaan, at the time Director of CAB's operations in the West Bank and CAB's then-Chairman Jawdat Sha'sh'a met with senior Israeli officials on August 8, 1988 who warned them that CAB "was a conduit for funds financing the Intifada."

911. This pattern continued during the Second Intifada (2000-2004) when CAB, once again, served as a major conduit for the financing of HAMAS.

912. CAB provided millions of dollars to HAMAS during the relevant period[33] in a variety of ways, including knowingly:

- Maintaining accounts and/or facilitating payments for prominent HAMAS leaders, including the commanders of HAMAS's *Qassam* Brigades;

- Maintaining accounts for HAMAS organizations in the West Bank and Gaza Strip; and

- Maintaining accounts and/or providing financial services for Specially Designated Global Terrorists affiliated with HAMAS.

## IV.   CAB PROVIDED BANKING SERVICES TO NOTORIOUS HAMAS INSTITUTIONS

913. As alleged above, HAMAS operates a social service network through local "zakat" committees and "charitable" societies. CAB has knowingly provided financial services to these organizations and affirmatively assisted them in collecting, receiving, transmitting and distributing funds to support HAMAS's terror campaign.

---

[33] In the context of this Complaint, the relevant period is co-extensive with the Second Intifada time period (1999 through 2004).

914.    Throughout the relevant period, CAB knowingly provided financial services and thereby aided and abetted HAMAS by receiving, holding and transferring funds for the following HAMAS institutions:[34]

- *AL MUJAMA AL ISLAMI* (ISLAMIC CENTER – GAZA)
  Account No. 1-974-3-2111-814
  Account No. 981

- *AL JAM'IYA AL ISLAMIYA* (ISLAMIC SOCIETY – GAZA)
  Account No. 6118643
  Account No. 5006

  Rafah Branch
  Account No. 749367

  Beit Hanoun Branch
  Account No. 4315

- AL SALAH ISLAMIC SOCIETY
  Account No. 388

- AL WAFA CHARITABLE SOCIETY
  Account No. 1411-1

- ISLAMIC CHARITABLE SOCIETY – HEBRON
  Account No. 11 00513-0
  Account No. 951
  Account No. 2295

  Yatta Branch
  Account No. 0012111009243
  Account No. 001211102329

  Dura Branch
  Account No. 2111-0742

  Bani Naim Branch
  Account No. 2068

  Beit Awla Branch
  Account No. 3041

---

[34]    The cash balances in many of these accounts were seized by the Israeli Army in February 2004.

Muslim Youth Association – Hebron
Account No. 4316
Account No. 1100771/0 (Wadi Al-Tufah Branch)

- JENIN ZAKAT COMMITTEE

  Account No. 476806-7 (Amman, Jordan Branch)
  Account No. 0150023640000

  Al Razi Hospital
  Account No. 1505239277
  Account No. 02505239277
- TULKAREM ZAKAT COMMITTEE
  Account No. 110740-0
  Account No. 6100439
  Account No. 130044
  Account No. 1109213/3
  Account No. 11092171/3
  Account No. 0150027124100
  Account No. 1250027123700
  Account No. 3350027123700

- RAMALLAH AL-BIREH ZAKAT COMMITTEE
  Account No. 111767

- NABLUS ZAKAT COMMITTEE
  Account No. 0000211101051
  Account No. 0010000105032111
  Account No. 1102247 (Islamic banking)
  Account No. 902/400336/50
  Account No. 02 500 341100 (USD)
  Account No. 01 500 341100 (JOD)

- AL-TADAMUN CHARITABLE SOCIETY – NABLUS
  Account No. 321494

- BEIT FAJAR ZAKAT COMMITTEE
  Account No. 15516700

- AL-ISLAH CHARITABLE SOCIETY IN RAMALLAH & AL-BIREH
  Account No. 0984

- QALQILYA ZAKAT COMMITTEE
  Account No. 11022-1
  Account No. 01500361866/00
  Account No. 01500361811
  Account No. 33/500/37533

- QURAN AND SUNNAH SOCIETY – QALQILYA
  Account No. 02/500/366181/00

- AL-IHSAN CHARITABLE SOCIETY – HEBRON
  Account No. 001000049032111813
  Account No. 0010000449032111
  Account No. 0010000449022111

915.    HAMAS's social welfare activities reinforce its terrorist activities both directly by providing economic assistance to the families of killed, wounded, and captured HAMAS fighters and making it more costly for them to defect (they would lose the material benefits that HAMAS provides them), and indirectly by enhancing HAMAS's popularity among the Palestinian population and providing funds for indoctrinating schoolchildren.

## V.    CAB AIDED AND ABETTED HAMAS BY DIRECTLY MAINTAINING ACCOUNTS FOR PROMINENT HAMAS LEADERS

916.    CAB knowingly maintained accounts for well-known HAMAS leaders including Abbas al-Sayed, Mohamad Saleh Taha, Ghazi Hamad and Sayed Salem Abu Musameh.

917.    These four HAMAS leaders were among more than 40 beneficiaries of funds transfers from Lebanon, primarily from an individual known as Yusuf al-Hayek.

918.    Yusuf al-Hayek made transfers totaling at least $4 million between July 2000 and October 2001 from Arab Bank in Lebanon to beneficiaries in the Palestinian Territories.

919.    More than 30 of the beneficiaries were senior HAMAS operatives and leaders of the organization, or their relatives, including HAMAS founders Sheikh Ahmed Yassin,

Muhammad Hasan Sham'a and Salah Shehada (who later founded HAMAS's Qassam Brigades), current HAMAS leader, Isma'il Abd al-Salam Ahmed Haniya and many others.

920.    A person with a name identical to "Yusuf al-Hayek" is connected to the Welfare Association for Palestinian and Lebanese Families ("Al-Waqfiya") (discussed below).

921.    The Hayek funds transfers were made on behalf of HAMAS to senior HAMAS operatives in the Palestinian Territories, including CAB account holders such as Abbas al-Sayed, Mohamad Saleh Taha, Ghazi Hamad and Sayed Salem Abu Musameh.

**A.    Abbas al-Sayed**

922.    Throughout the relevant time period (at least until his arrest in July 2002), CAB knowingly maintained account number 150027961600 for Abbas al-Sayed, one of HAMAS's most senior political and military leaders in the West Bank.

923.    Al-Sayed received at least seven transfers from a representative of HAMAS in Lebanon through CAB's correspondent account at Citibank in New York between February 2001 and May 2001 totaling $69,000.

924.    According to Al-Sayed's statement to Israeli police, he first met Jamal Mansur (a senior HAMAS leader) in prison and was offered employment in HAMAS's political media department.

925.    After leaving prison, Mansur introduced Al-Sayed to several of HAMAS's most senior leaders and was "appointed as the representative of HAMAS in Tulkarem" where, according to Al-Sayed, he was "participating in activities related to the Intifada, such as demonstrations on various occasions, delivering speeches at festivals, participating in seminars, lecturing, conducting phone interviews with various satellite channels, and representing Hamas Movement in front of popular and official parties."

926.    According to Al-Sayed, in August 2001, his "name was published as a person wanted by Israel" and he then decided to limit his movements to a minimum.

927.    Al-Sayed was one of the planners of the March 27, 2002 Park Hotel Bombing in Netanya, Israel. More than two dozen people were killed in the attack, including Hannah Rogen, whose estate is a plaintiff in this action.

928.    Al-Sayed was ultimately convicted for his central role in this attack as well as other attacks HAMAS carried out and sentenced to 35 life sentences.

929.    One of Al-Sayed's accomplices was Fawaz Bashir Badran, a senior Qassam Brigades commander in Tulkarem.

930.    Badran recruited Ahmad Alyan to carry out the March 4, 2001 suicide bombing near a bus in Netanya.

931.    Following the "success" of the bombing, Al-Sayed connected Badran to the Qassam Brigades infrastructure in Nablus.

932.    Badran also recruited Mahmud Marmash, who carried out a suicide bombing in the Sharon Mall in Netanya on May 18, 2001, killing 5 people.

933.    As noted above, payments to his family as a result of his "martyrdom" were deposited into CAB Account No. 1518 26968400.

934.    Badran also recruited Ahmad Jayusi (convicted co-conspirator in the Passover massacre of March 27, 2002) and taught him how to make explosives, but he was killed by Israeli forces in July 2001 before he could commit further acts of terrorism.

935.    Payments to his family as a result of his "martyrdom" were deposited into CAB Account No. 297445.

### B.    Mohamad Saleh Taha

936.    Throughout the relevant time period, CAB knowingly maintained account number 3723-1 for Mohamed Saleh Taha, one of the founders of *Al-Mujama Al-Islami* (The Islamic Center – Gaza) and a prominent HAMAS leader in the central Gaza Strip.

937.    Taha was arrested many times, both by Israel and the Palestinian Authority, for his HAMAS-related activities and was one of more than 350 Palestinian terrorists deported to *Marj al-Zuhur* in 1992. He also has served as a lecturer at the Islamic University of Gaza, a core HAMAS institution.

938.    Taha received at least five transfers through CAB's correspondent account from a representative of HAMAS in Lebanon at Citibank in New York between December 2000 and September 2001 totaling $9,870.

### C.    Ghazi Hamad

939.    Throughout the relevant time period, CAB also knowingly maintained account number 706785 for Ghazi Ahmad Hamad, the long-time HAMAS public spokesman, and "Deputy Foreign Minister" in HAMAS's government in Gaza in 2012.

940.    Hamad was a senior editor of HAMAS's newspaper, *Al-Risala*, and was arrested twice by the PA in the 1990s.

941.    Since the mid-1990s, Hamad was widely identified as a spokesman for HAMAS. For example, an article dated May 31, 1994 in *The New York Times* titled "Gaza's Militants Must Decide What to Do Now" described him as follows:

> Ghazi Hamad, a Hamas leader in Rafah, suggested that the group's armed wing, the Qassam Brigades, might shift its attacks to Israel and to West Bank areas outside Jericho. "We will not use violence against the Palestinian police under any circumstances, and we are ready to cooperate with them," said Mr. Hamad, who recently completed a five-year jail term. "If an attack on Israeli settlers or soldiers will lead to a conflict with the

> Palestinian police, then we will take another decision. It will have to stop.
> We don't want to be a burden."

942.   Hamad received at least six transfers from a representative of HAMAS in Lebanon through CAB's correspondent account at Citibank in New York between October 2000 and April 2001 totaling $50,985.

### D.   Sayed Salem Abu Musameh

943.   Throughout the relevant time period, CAB also knowingly maintained account number 6105176 for Sayed Salem Abu Musameh.

944.   Musameh is a senior, veteran HAMAS member, and later, a member of the Palestinian Legislative Council on its behalf.

945.   In a March 4, 1996 article in the *Independent,* Musameh was identified as "a prominent Hamas leader."

946.   Musameh received three transfers from a representative of HAMAS in Lebanon through CAB's correspondent account at Citibank in New York between February 2001 and September 2001 totaling $6,000.

## VI.   CAB AIDED AND ABETTED HAMAS BY KNOWINGLY MAINTAINING ACCOUNTS AND PROVIDED FINANCIAL SERVICES FOR HAMAS ORGANIZATIONS THAT WERE LATER DESIGNATED AS SPECIALLY DESIGNATED GLOBAL TERRORISTS

947.   CAB knowingly provided financial services to HAMAS by maintaining bank accounts and/or providing financial services for Specially Designated Global Terrorists affiliated with HAMAS, including but not limited to:

- HLF
  Account No. 2111-4883
  Account No. 6/375
  Account No. 2.5957
  Account No. 0250514976000

Account No. 3611853
Account No. 0255149760, and

- Al-Waqfiya
Account No. 002-500-100068-00.

948.  With respect to HLF, the FBI concluded that:

evidence strongly suggests that the [HLF] has provided crucial financial
support for the families of HAMAS suicide bombers, as well as the
Palestinians who adhere to the HAMAS movement. It is believed that by
providing these annuities to families of HAMAS members, the [HLF]
assists HAMAS by providing a constant flow of suicide volunteers and
buttresses a terrorist infrastructure heavily reliant on moral support of the
Palestinian populace. According to HLFRD-4, an FBI asset who has
provided reliable information in the past, in the words of Shukri Abu Baker,
[HLF]'s mission is to support the families of the martyrs.

949.  According to the Government of Israel 2004 Report, as of December 2004, HLF

maintained account no. 4883 at CAB's Islamic Bank branch in Hebron with "[t]ransactions

amounting to hundreds of thousands of dollars … found in the Foundation's current account."

950.  Al-Waqfiya was designated by the U.S. Department of the Treasury in 2012.

951.  The Treasury Department found that Al-Waqfiya:

[E]xist[s] to support the families of Hamas fighters and prisoners and to
raise money for programs and projects in the Palestinian territories intended
to spread Hamas's influence and control.

Al-Waqfiya, a central component of the Union of Good, which was
designated pursuant to E.O. 13224 in November 2008 for supporting
Hamas, was established by Hamas in 2000 to financially support the
families of Hamas terrorists. The organization has been run by senior
Hamas leadership for years, and several senior Hamas leaders play a
dominant role within the organization.

952.  The services CAB provided to the SDGTs listed above were conducted through

CAB branches located in the West Bank, Gaza Strip and Lebanon.

953.  CAB also knowingly transferred funds for SDGTs affiliated with HAMAS through

its correspondent accounts located in New York.

A.      **The Palestinian Authority Conducted Episodic Crackdowns on HAMAS**

954.    In the five years preceding the Second Intifada, the Palestinian Authority periodically instituted a series of arrests and periodic crackdowns against HAMAS operatives and institutions.

955.    For example, in June 1995, the Palestinian Authority raided the office of the Islamic Society (*Al-Jam'iya Al-Islamiya*).

956.    After a period of arrests of HAMAS operatives, in October 1996, the Palestinian Authority instituted a wholesale release of prisoners wanted by Israel. The most senior among them were often recruited into the Palestinian Police and General Security Service ("GSS").

957.    One of the prisoners released was Kamel Khalifa, a member of the Qassam Brigades who murdered two Israeli civilians in 1993 and killed two Israeli soldiers in a subsequent attack that same year.

958.    Khalifa was recruited to join the GSS.

959.    Likewise, Imad al-Din Aql, who served as an assistant to Yahya Ayyash, HAMAS's pre-eminent bomb-makers (the so-called "Engineer"), was also recruited into the GSS after his arrest.

960.    After a series of HAMAS suicide bombings, in September 1997, the Palestinian Authority temporarily closed *Al-Jam'iya Al-Islamiya*, along with 16 other societies identified with HAMAS.

961.    On October 4, 1997, in an interview with *Al-Hayat al-Jadida*, Dr. Abd al-Aziz al-Rantisi, one of HAMAS's founders, called for the Palestinian Authority to reopen all institutions it previously closed.

962.    The institutions were soon reopened, but the Palestinian Authority continued to periodically arrest (and release) senior HAMAS leaders, like Ibrahim al-Yazuri (briefly arrested

in 1998),[35] Qassam Brigades commander, Ibrahim Hamed (briefly arrested in 1999 after he planned two murders), Ahmad Baher, chairman of *Al-Jam'iya Al-Islamiya* (briefly arrested in October 1998), Ahmad al-Kurd, chairman of *al-Salah* (briefly arrested in October 1998 during the same sweep), Sheikh Hamed al-Bitawi, chairman of Al-Tadamun (arrested for a few hours on October 25, 1998) .

963.    In May 2000, the Palestinian Monetary Authority issued a general circular to Palestinian banks requesting them to report substantial incoming funds transfers from abroad.

964.    In December 2001, the Palestinian Authority closed a number of societies run by HAMAS and Palestinian Islamic Jihad, among them the Islamic Society of Gaza (*al-Jam'iya al-Islamiya*) which was identified with HAMAS.

965.    On December 23, 2001, the Palestinian Monetary Authority instructed Palestinian banks not to allow funds to be drawn on accounts controlled by the Union of Good and certain other charities, including *Al-Salah*, the Islamic Center and the Islamic Society in Gaza, without its prior approval.

966.    On January 6, 2002, the Palestinian Monetary Authority directed the Palestinian banks to report on the sums of money held in the accounts of *al-Jam'iya al-Islamiya* and required them to consult with it prior to withdrawing funds from those accounts.

### B.    The Palestinian Authority Took Temporary Measures Against HAMAS in 2003

967.    On August 23, 2003, immediately following the HAMAS suicide bombing of

---

[35]    In January 1998, al-Yazuri gave an interview to the HAMAS publication *Filastin al-Muslima* in which he was openly identified as "one of the founders of the Islamic Resistance Movement." In the interview he was asked how Palestinian society has been affected by the Palestinian Authority's actions against HAMAS's social welfare organizations. Yazuri responded that "[t]he blows dealt to the infrastructure institutions of the Palestinian society, at the hands of the Palestinian Authority are hurtful, insulting and destructive not only for Hamas, but also the Palestinian masses who have enjoyed the assistance of these institutions."

Egged Bus #2 in Jerusalem (one of the attacks in this Amended Complaint), the Palestinian Minister of Security took official steps against HAMAS when he identified *Al-Jam'iya Al-Islamiya* and at least ten other organizations as part of HAMAS. The next day, the Palestinian Monetary Authority placed a temporary freeze on the bank accounts of *Al-Jam'iya Al-Islamiya* and other HAMAS organizations.

968.    In the Order forwarded to the Palestinian Prosecutor General on August 24, 2003, then-Prime Minister and Minister of the Interior Mahmoud Abbas justified the freeze on the accounts by saying that it was a matter of "security issues" and "requirements for the public interest."

969.    In a letter written to then-Minister of the Economy Salam Fayyad, then-Palestinian Minister of Internal Security Mohamed Dahlan openly declared that the steps that had been taken were directed against "Hamas organizations." The letter described the demand to freeze the accounts as stopping support for "Hamas Institutions."

970.    Nevertheless, public outcry in the Palestinian Territories led the new Palestinian Cabinet to officially cancel the freeze order on November 17, 2003.

971.    These actions not only provided CAB with (further) actual notice that specific account holders were part of HAMAS, but also that its own government and nominal regulator was aware of that fact.

**C.    The IDF Raid in February 2004**

972.    On February 25, 2004, the Israeli Defense Forces and Israeli police forces, guided by Israel Security Agency ("ISA") officers, carried out an operation for what the Government of Israel described as "the confiscation of terror funds" which were deposited in a CAB branch in Ramallah (West Bank). According to the Israeli government, "[i]nformation regarding these bank

accounts was presented to the legal elements of the ISA, IDF and the Attorney General's Office -
all of whom authorized the operation."

973.    The seizure targeted numerous HAMAS organizations with accounts at CAB and
Arab Bank plc, including:

- *Al-Jam'iya Al-Islamiya* (Islamic Society – Gaza)

- Islamic Charitable Society – Hebron

- Islamic University Gaza

- Tulkarem Zakat Committee

- *Al-Ansar* Charitable Society

- Jenin Zakat Committee

- Nablus Zakat Committee

- *Al-Tadamun* Charitable Society (Nablus)

- Ramallah - Al-Bireh Zakat Committee

- Muslim Youth Association Hebron.

- Beit Fajar Zakat Committee

- *Al-Islah* Charitable Society in Ramallah & Al-Bireh

## VII.    CAB KNOWINGLY MAINTAINED ACCOUNTS FOR ORGANIZATIONS THAT FACILITATED PAYMENTS TO THE FAMILIES OF PALESTINIAN TERRORISTS

974.    In the competition for notoriety in supporting Palestinian terrorists, Iraq and Iran
both established organizations that, at various times, transferred money in direct support of the
families of "martyrs" and prisoners, aiming at strengthening and encouraging the Palestinians to
continue the violence.

## A.      Payments Made by Saddam Hussein's Regime

975.     Iraq established a Ba'athist surrogate in Ramallah called Arab Liberation Front ("ALF") in 1969. Itself responsible for a handful of terrorist attacks, during the Second Intifada it turned to paying families of "martyrs."

976.     Because Iraq was a designated State Sponsor of Terrorism during the relevant period and was subject to strict economic sanctions, Saddam's regime could not easily transfer large sums of money denominated in U.S. dollars since that would require U.S. dollar-clearing and settlement activity in the United States.

977.     U.S. law prohibits most dollar clearing and settlement services performed on behalf of State Sponsors of Terrorism. In some cases, involving the evasion of U.S. economic sanctions managed by the Office of Foreign Assets Control ("OFAC"), State Sponsors of Terrorism have relied on foreign banks willing to deceive U.S. regulators, such as by removing all information identifying Iraq as the source of a U.S. dollar-denominated electronic funds transfer through New York.

978.     According to U.S. Congressional investigators, Saddam Hussein illegally diverted money from the U.N. oil-for-food program, meant to serve Iraq's humanitarian needs, to make these payments.

979.     Funds collected from Iraqi oil sales authorized by the U.N.'s oil-for-food program were processed exclusively from a U.N. account held at BNP Paribas's branch in New York.

980.     As U.N. investigators would later learn, significant Iraqi oil sales revenues deposited in BNP's oil-for-food program account in New York were subsequently diverted through elaborate kickback schemes and secreted into accounts controlled by the Hussein regime.

981.     These kickbacks allowed Saddam Hussein to maintain his grip on power and to

transact regime business clandestinely despite severe restrictions imposed on Iraq's economy by U.N. and U.S. sanctions.

982.    Because of Iraq's difficulty in transferring U.S. dollars through the global financial system, most of the money earmarked for Saddam's terror incentive program was siphoned from the oil-for-food program and covertly transferred from the head office of Iraq's state-owned Al-Rafidain Bank in Baghdad to its branch in Amman, Jordan.

983.    From there, portions of the illicit U.S. dollar denominated funds were moved to Western Union accounts at CAB and ultimately deposited into one or more accounts at CAB controlled by the ALF in the Palestinian Territories. Seeking broad Palestinian support for Saddam Hussein, ALF made payments to families of martyrs affiliated with any terror organization and paid higher amounts than most martyr funding groups. The payments started at $10,000 for a martyr's family, but, as shown below, soon increased significantly.

984.    Also, unlike other groups, ALF developed a system to incentivize suicide attacks over other types of attacks (that may be less spectacular or easier to foil), paying a premium upon evidence that the martyr intended to die during the attack, such as by committing a suicide bombing or by shooting into a crowded area until gunned down by law enforcement.

985.    In August 2001, the families of a "martyr" who died as part of a suicide attack began receiving $15,000—in March 2002, this was increased to $25,000. Those who died for other reasons, such as so-called "work accidents" (premature detonation of explosives) or in firefights with Israeli forces, were paid $10,000.[36]

986.    These reward payments constituted a vast sum of money in the Palestinian Territories. For instance, according to the World Bank, in 1999, prior to the outbreak of the Second

---

[36]    Those only injured were paid $1,000.

Intifada, the Gross National Income ("GNI") per capita in the Palestinian Authority was $1,730 U.S. dollars. By the end of 2003, the GNI per capita in the PA had fallen to $1,070 U.S. dollars.[37]

987.   Although the Ba'athists did not gain significant traction politically in the Palestinian Territories, the ALF was among the "loudest" groups advertising its payments to the families of Palestinian terrorists, particularly to the families of successful suicide bombers.

988.   ALF Martyr payment "ceremonies" received widespread media coverage, particularly in the local Palestinian media.

989.   For example, one of the leading Palestinian daily newspapers, *Al Hayat al-Jadida*, reported on August 15, 2001 on the benefit increase to the families of suicide terrorists from $10,000 to $15,000.

990.   Another leading Palestinian daily newspaper, *Al Quds*, reported on August 19, 2001:

> The Gaza representative of the Arab Socialist Ba'ath party, which rules Iraq, announced yesterday that president Saddam Hussein decided to allocate the sum of $15,000 for each Palestinian martyr's family….
>
> Al-Za'anin [the Gaza representative] clarified that the last decision by the Iraqi president to increase the grant given to Palestinians who carried out martyrdom attacks ("Amaliyat Istishadiya") to $15,000 comes to emphasize the continuation of the national struggle to restore the Palestinian rights.

991.   Media coverage was not limited to local newspapers, however.

992.   On January 31, 2002, the *Los Angeles Times* reported that Saddam Hussein had ordered a memorial erected in one of Baghdad's main squares in honor of the first Palestinian female suicide bomber.

---

[37]   The economic situation in the neighboring Arab countries, in terms of GNI, was even worse. Syria's GNI, for example, was $890 U.S. dollars; Egypt's GNI was $1,290 U.S. dollars; and Jordan's GNI was $1,650 U.S. dollars.

993.    In March 2002, Saddam announced another increase in payments – families of suicide terrorists would receive $25,000 U.S. dollars, while the grants to the families of "ordinary" terrorists would remain at $10,000 U.S. dollars.

994.    On March 26, 2002, an article in the *Sydney Morning Herald* described a meeting of some 200 members of forty-seven families who gathered in the Tulkarem chamber of commerce in March 2002 to collect checks.

995.    The ALF's secretary-general Rakad Salem told reporter Paul McGeough that as of late March 2002 more than 800 families of Palestinians killed in the unrest had received $10,000 "martyr" payments, and that the funds had been "transferred by the banks-from the Iraqi banks to the banks in Palestine."

996.    In April 2002, the White House issued a statement concerning Saddam Hussein's support for international terrorism,[38] noting:

> In April 2002, Saddam Hussein increased from $10,000 to $25,000 the money offered to families of Palestinian suicide/homicide bombers. The rules for rewarding suicide/homicide bombers are strict and insist that only someone who blows himself up with a belt of explosives gets the full payment. Payments are made on a strict scale, with different amounts for wounds, disablement, death as a "martyr" and $25,000 for a suicide bomber. Mahmoud Besharat, a representative on the West Bank who is handing out to families the money from Saddam, said, "You would have to ask President Saddam why he is being so generous. But he is a revolutionary and he wants this distinguished struggle, the intifada, to continue."

997.    A June 2, 2002 article in *Reuters* titled "Iraqi, Saudi aid money wins Palestinian hearts" reported that according to the ALF, Iraq provided $20 million since September 2000 and quoted one Gaza-based ALF official, Ibrahim al-Za'anin, stating that "President Saddam made clear that [suicide] attacks must be considered the utmost act of martyrdom."

---

[38]    Available at https://georgewbush-whitehouse.archives.gov/infocus/iraq/decade/sect5.html.

998.    On July 10, 2002, *The New York Times* reported that Iraq sent large cash payments, using U.S. dollar-denominated banknotes, to the families of Palestinian suicide bombers, further cementing Saddam's popularity among the Palestinians.

999.    During a public ceremony held on September 10, 2002 in the Palestinian Territories, the participants praised the Second Intifada and thanked Saddam Hussein for the generous financial aid he bestowed upon the Palestinians. During the ceremony, certificates and grants were distributed to the families of the deceased, each receiving approximately $10,000.

1000.   On September 12, 2002, the White House issued a Background Paper on Iraq again noting Saddam Hussein's increased payments to families of Palestinian suicide/homicide bombers from $10,000 to $25,000.

1001.   According to an article in the *Guardian* on March 12, 2003, CAB held accounts for ALF from which "martyr" payments were made:

> With each cheque, drawn on the Cairo Amman Bank, came a large certificate decorated with the Iraqi and Palestinian flags. "A gift from President Saddam Hussein to the family of a martyr in the al-Aqsa intifada," the inscription read. "To those who irrigate the land with their blood. You deserve the honour you will receive from God and you will defeat all who bow before your will."[39]

1002.   On March 13, 2003, *BBC News* reported: "One by one, at least 21 families came up to receive their cheques from the Palestinian Arab Liberation Front (PALF), a local pro-Iraq group. A Hamas suicide bomber's family got $25,000 while the others - relatives of militants killed in fighting or civilians killed during Israeli military operations - all received $10,000 each."

---

[39]    The Israeli government identified a bank account of Rakad Salem and two ALF persons who were authorized signatories in CAB, noting that CAB is Western Union's agent in Jordan and the PA and inferring from seized documents that the Iraqi regime used Western Union as one method of evading U.S. sanctions and transferring U.S. dollars to CAB in the Palestinian Territories.

1003.   The payments were well enough known that, according to an April 4, 2002 CBS article, ALF officer Mahmoud Safi said: "Some people stop me on the street, saying if you increase the payment to $50,000, I'll do it immediately." While he said the comments were made "mostly ... in jest," he "acknowledged that the support payments for relatives make it easier for some potential bombers to make up their minds."

1004.   By transferring U.S. dollar-denominated funds whose source was explicitly (and very publicly) identified as Saddam Hussein's regime, CAB knowingly assisted a State Sponsor of Terrorism to evade U.S. sanctions and by knowingly facilitating reward payments to the families of suicide bombers and other terrorists, CAB knowingly aided and abetted the attacks that injured the Plaintiffs.

### B.      Payment Made by Hezbollah's *Shahid* Foundation

1005.   Saddam Hussein's regime was not alone in sponsoring and encouraging Palestinian terrorists to perpetrate further attacks. Iran made payments to "martyrs" through Hezbollah' Lebanon-based *Shahid* Foundation (or "Martyrs Foundation"), which sent funds to the Palestinian Territories in cooperation with the Gaza-based *al-Ansar* society.

1006.   The *Shahid* Foundation in Lebanon was designated an SDGT by the U.S. Government on July 24, 2007.

1007.   The U.S. Treasury Department noted at that time that the *Shahid* Foundation provided funding to, among others, Palestinian suicide bombers:

> The Martyrs Foundation is an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant, including Hizballah, Hamas, and the Palestinian Islamic Jihad (PIJ). To this end, the Martyrs Foundation established branches in Lebanon staffed by leaders and members of these same terrorist groups. Martyrs Foundation branches in Lebanon has also provided financial support to the families of killed or imprisoned Hizballah and PIJ members, including suicide bombers in the Palestinian territories.

1008.   Announcements in Palestinian papers called on the "honorable families of the martyrs of the Al-Aqsa Intifada" seeking payments from the *al-Ansar* society to produce documentation proving their claims. For instance, the documents the martyrs' families from the West Bank had to provide included the martyr's identification card and his picture (if they had it), the beneficiary's identification card, a copy of the death certificate, and a copy of the birth certificate of the martyr's sons if they had them.

1009.   The *Shahid* Foundation's website openly identified prominent HAMAS operatives as martyrs whose families received payments via accounts controlled by *al-Ansar*.

1010.   These HAMAS "martyrs" included senior HAMAS terrorists like Ibrahim Abd al-Karim Bani Awda and Basel al-Qawasmeh (commander of the HAMAS cell responsible for the Jerusalem Egged Bus #2 bombing and the Jaffa Road Bus #14A bombing). He appears as Martyr #193 on the *Al-Ansar*'s list of martyrs.

1011.   The list also included the family of Basem Takruri, the suicide bomber responsible for the Commuter Bus #6 bombing on May 18, 2003.

1012.   In yet another example, the family of Iyad Awda Mahmud Taqi, a Qassam Brigades activist killed on November 6, 2001 during an attack on Israeli soldiers, received a "martyr" payment from the *Shahid* Foundation. His father also received a reward payment from the ALF to his CAB Account No. 393501.

1013.   On May 15-16, 2001, *Al-Ansar* published paid ads in *Al-Hayat Al-Jadida* newspaper, calling the families of martyrs in Gaza to come to the Society's headquarters to receive their allocations.

1014.   According to *Al-Hayat Al-Jadida,* on August 22, 2001, *Al-Ansar* held a public celebration in honor of the martyrs' families

1015.   On its website, *al-Ansar* expressed its goals explicitly:

> Al-Ansar opens its doors to the families of martyrs who seek it in order to register their martyrs, who, with their noble blood, have watered the pure soil of Palestine, drawing thereby the features and portrait of the coming freedom and the coming dawn. Al-Ansar follows their path and shares with their families and their parents the grief, the burden and the hope.

1016.   On its website, the *Shahid* Foundation was even more direct by publishing lists of Palestinian "martyrs" who received support from the foundation and included the dates of the martyr's birth and death, as well as his organizational affiliation (Fatah, HAMAS, PIJ, and the PFLP).

1017.   On its website, *al-Ansar* listed two accounts at CAB:

- Cairo– Amman Bank, Islamic Transactions Department, 6912/3 – Gaza; and

- Cairo– Amman Bank, Islamic Business Department, 6157/1 – Nablus.

1018.   *Al-Ansar* was declared an unlawful association by Israel on October 25, 2003.

1019.   The June 30, 2002 research paper issued by COGAT found that:

> The testimonies of suicide terrorists and their families paint a picture according to which there is a strong relationship between the suicide attacker and his family members. The suicide attacker usually makes the effort to take leave of members of his family, sometimes farewell letters have been found asking for forgiveness from family members and /or explanations as to the motives for suicide and asking the relatives not to mourn him.

> It therefore seems that the family and relatives are important to the suicide attacker and concerns for his family have a considerable place in his thoughts about the consequences of the suicide.

> The suicide terrorist can put rest to his worries about the family's financial future, as the large sums of money that the suicide attacker's family receive ensure them a good standard of living and even make them rich. Today a terrorist's family receives twenty-five thousand dollars from Iraq and five thousand dollars from Saudi Arabia (written proof of this has been found in the Bi'ur Hametz operations in Tulkarem and Jenin), and ongoing support

from Islamic charitable societies, the Da'wa (for orphans, widows, and the suicide attacker's family members). We do not have complete information relating to the "package" that the suicide attacker's family receives from all sources, but we know definitely that the various Da'wa institutions serve as a pipeline for transferring money to these families and that these are large sums totaling tens of thousands of dollars for each family.

1020.   CAB was deeply involved in both providing financial services to HAMAS (and in particular, providing HAMAS with international funds transfer services primarily through dollar-clearing) as well as retail customer level services to terrorists and their families – all in the service of the Second Intifada and HAMAS's campaign of terror and murder.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## AIDING AND ABETTING HAMAS, A FOREIGN TERRORIST ORGANIZATION, IN VIOLATION OF 18 U.S.C. § 2333(d)

1021.   Plaintiffs repeat and re-allege the allegations of the foregoing paragraphs as if fully set forth herein.

1022.   Plaintiffs were all injured by acts of international terrorism as defined by 18 U.S.C. § 2331 that were committed, planned and authorized by HAMAS, a designated FTO at the time each act of terrorism described occurred.

1023.   CAB provided substantial assistance to HAMAS by transferring significant sums of money to HAMAS and its operatives and maintaining bank accounts for its senior operatives and key institutions.

1024.   CAB was fully aware of HAMAS's conduct, including its campaign of suicide bombings and other terrorist acts.

1025.   CAB even employed a HAMAS operative and *Marj al-Zuhur* deportee at its Ramallah branch after his return from Lebanon.

165

1026.   CAB's own actions were a substantial factor in causing plaintiffs' injuries, and plaintiffs' injuries were a foreseeable result of the significant sums of money CAB provided and made available to HAMAS, its leaders and operatives.

1027.   CAB understood the value and importance to HAMAS of the its own role in facilitating large transfers of funds, including the cross-border transfer of U.S. dollars, from donors and co-conspirators around the world to the Palestinian Territories and making those funds easily available to HAMAS.

1028.   The nature of the acts encouraged, which were acts of international terrorism, benefited from illegal access to millions of U.S. dollars provided by Defendant.

1029.   CAB provided this substantial assistance to HAMAS for years.

1030.   Plaintiffs' injuries were proximately caused by HAMAS's conduct, which Defendant substantially assisted.

1031.   Plaintiffs allege that CAB knowingly aided and abetted HAMAS within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." *See* Justice Against Sponsors of Terrorism Act ("JASTA"), §2b.

**SECOND CLAIM FOR RELIEF**

**COMMITTING ACTS OF INTERNATIONAL TERRORISM
IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)**

1032.   Plaintiffs repeat and re-allege every allegation of the foregoing paragraphs as if fully set forth herein.

1033.   Plaintiffs were injured in terrorist attacks (which were acts of international terrorism as defined by 18 U.S.C. § 2331) committed by HAMAS, an FTO so designated at the time each act of terrorism at issue occurred.

1034.   By knowingly providing financial services to HAMAS, CAB has provided material support to an FTO designated under the Antiterrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. § 2339B(a)(1).

1035.   CAB was fully aware of HAMAS's terroristic nature, including its campaign of suicide bombings and other acts of terrorism.

1036.   CAB knew that HAMAS had been designated an FTO by the Government of the United States.

1037.   CAB's own actions on behalf of HAMAS – which included knowingly providing extensive financial services and maintaining accounts for more than a dozen of HAMAS's most prominent institutions, several HAMAS leaders, the families of HAMAS prisoners and martyrs – constituted violations of 18 U.S.C. § 2339B(a)(1) that satisfy the definition of "acts of international terrorism" under 18 U.S.C. § 2331(1).

1038.   CAB provided financial services and facilitated massive funds transfers to individuals and entities it knew belonged to HAMAS over an extended period. That conduct was a substantial factor in the sequence of responsible causation of the attacks described herein and Plaintiffs' injuries were a reasonably foreseeable consequence of that conduct.

1039.   Hence, CAB's conduct was dangerous to human life and its acts constituted violations of the criminal laws of the United States.

1040.   Because CAB continued to provide vital services to a designated FTO during a mass terror campaign and knowingly helped facilitate reward payments to the families of suicide bombers, its conduct objectively appeared to be intended to intimidate or coerce the civilian population of Israel, intimidate its government and affect its conduct.

1041.   CAB's conduct transcended national boundaries in terms of the means by which it was accomplished.

1042.   By knowingly providing material support to a designated Foreign Terrorist Organization, CAB is civilly liable for damages to the Plaintiffs for their injuries pursuant to 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)     Accept jurisdiction over this action;

(b)     Enter judgment against CAB and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial;

(c)     Enter judgment against CAB and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333(a);

(d)     Enter judgment against CAB and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a); and

(e)     Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

April 7, 2020

By:   /s/ Ari Ungar
         **OSEN LLC**
         Ari Ungar, Esq.
         Michael Radine, Esq.
         Gary M. Osen, Esq.
         2 University Plaza, Suite 402
         Hackensack, NJ 07601
         Telephone (201) 265-6400

         1441 Broadway, Suite 6022
         New York, NY 10018
         Telephone (212) 354-0111

         **TURNER & ASSOCIATES, P.A.**
         C. Tab Turner, Esq.
         4705 Somers Avenue, Suite 100
         North Little Rock, AR 72116
         Telephone (501) 791-2277

         **KOHN, SWIFT & GRAF, P.C.**
         Steven M. Steingard, Esq.
         Stephen H. Schwartz, Esq.
         Neil L. Glazer, Esq.
         1600 Market Street, Suite 2500
         Philadelphia, PA 19103
         Telephone (215) 238-1700

         Attorneys for Plaintiffs