UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

JULIE AVERBACH FOR THE ESTATE OF STEVEN     :
AVERBACH, *et al.*,     :
    :
    Plaintiffs,     :
    :    No. 19-cv-00004-GHW-KHP
    -against-     :
    :
CAIRO AMMAN BANK,     :
    :
    Defendant.     :

---------------------------------------------------------------------x

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
CAIRO AMMAN BANK'S MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................................................ 1

**I.  THE AC PLAUSIBLY ALLEGES ALL ELEMENTS REQUIRED TO PLEAD CIVIL AIDING AND ABETTING LIABILITY UNDER 18 U.S.C. §2333(D)(2).** .................... 2

   **A.  The AC Alleges That CAB Maintained Accounts for the Holy Land Foundation After It Was Designated by the United States.** ................................................. 3

   **B.  The Hamas-Controlled "Charities" CAB Aided and Abetted Did Not Directly Take Part in the Attacks, but They and Their Leaders and Senior Employees Were Deeply Involved in Terrorism.** ............................................................................ 3

   **C.  The Fact That Hamas-Controlled "Charities" Engage in Charitable Activities and Provide Social Services Does Not Negate Their Central Role in Hamas's Terrorist Activities.** ........................................................................................................... 4

   **D.  The AC Plausibly Alleges That CAB Was Aware It Was Providing Material Support to Hamas.** ............................................................................................... 7

      **1.  Both the Government of Israel and the Palestinian Authority Repeatedly Took Actions Against CAB Customers and Publicly Identified Them as Belonging to Hamas.** ................................................................................................. 7

      **2.  The AC Provides Concrete Examples of the Public Identification of CAB Customers with Hamas and Its Terrorist Activities.** ................................. 9

   **E.  CAB Processed Payments for Designated Entities.** ..................................... 11

   **F.  CAB's Funds Transfers for Hamas Leaders Indicated Highly Unusual Activity and Were Far From Routine.** ............................................................................. 12

   **G.  CAB Aided and Abetted Multiple "Martyr Payment Programs" That Benefited Hamas Operatives and Encouraged Hamas Terrorist Attacks.** ................................. 13

**II.  THE COURT'S RELIANCE ON *KAPLAN* IS MISPLACED BECAUSE IT WAS WRONGLY DECIDED AND IS CURRENTLY ON APPEAL.** ................................... 14

**III.  PLAINTIFFS HAVE PLAUSIBLY ALLEGED PRIMARY LIABILITY FOR VIOLATIONS OF 18 U.S.C. §2339B.** ................................................................... 17

   **A.  Defendant Tacitly Concedes That Plaintiffs Have Plausibly Alleged That CAB Knowingly Provided Material Support to Hamas.** ..................................... 18

**B.** **Whether Defendant's Knowing Violations of 18 U.S.C. §2339B Satisfy the Definitional Requirements of 18 U.S.C. §2331 is Ultimately a Fact Question for the Jury.**................................................................................................................................ 19

**C.** **Plaintiffs Have Plausibly Alleged That Defendant's Conduct Was a Proximate Cause of Their Injuries.**................................................................................................. 22

**IV. PLAINTIFFS JULIE AVERBACH, MATANYA NATHANSEN, AND NEVENKA GRITZ HAVE STANDING TO SUE.** ............................................................................. 24

**CONCLUSION** ............................................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Averbach for Estate of Averbach v. Cairo Amman Bank*,
  No. 19-cv-00004 (GHW) (KHP), 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020) ..................... 25

*Averbach v. Cairo Amman Bank*,
  No. 19-cv-0004 (GHW) (KHP), 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020) ................. *passim*

*Boim v. Holy Land Found. for Relief & Dev.*,
  549 F.3d 685 (7th Cir. 2008) ............................................................... 12, 17, 20, 21

*Desert Palace, Inc. v. Costa*,
  539 U.S. 90 (2003) ............................................................................................. 9

*Doe v. Exxon Mobil Corp.*,
  654 F.3d 11 (D.C. Cir. 2011) ......................................................................... 16

*Doe v. Exxon Mobil Corp.*,
  527 F. App'x 7 (D.C. Cir. 2013) ..................................................................... 16

*Estates of Ungar ex rel. Strachman v. Palestinian Auth.*,
  304 F. Supp. 2d 232 (D.R.I. 2004) ................................................................. 25

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
  873 F.3d 85 (2d Cir. 2017) ............................................................................... 9

*Freeman v. HSBC Holdings PLC*,
  413 F. Supp. 3d 67 (E.D.N.Y. 2019) ............................................................... 21

*Gill v. Arab Bank*,
  893 F. Supp. 2d 474 (E.D.N.Y. 2012) ...................................................... 20, 24

*Gill v. Arab Bank, PLC*,
  891 F. Supp. 2d 335 (E.D.N.Y. 2012) ............................................................ 23

*Goldberg v. UBS AG*,
  660 F. Supp. 2d 410 (E.D.N.Y. 2009) ............................................................ 16

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ......................................................................... 2

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ............................................................................................. 5

*In re Terrorist Attacks on Sept. 11, 2001 (Al Rajhi)*,
   714 F.3d 118 (2d Cir. 2013)...........................................................22, 23

*Kaplan v. Lebanese Canadian Bank, SAL*,
   405 F. Supp. 3d 525 (S.D.N.Y. 2019)....................................... 1, 14, 15, 19

*Kemper v. Deutsche Bank AG*,
   911 F.3d 383 (7th Cir. 2018) ...........................................................21

*Lelchook v. Commerzbank AG*,
   No. 10-cv-5795 (AKH), 2011 WL 4087448 (S.D.N.Y. Aug. 2, 2011) ....................21

*Lelchook v. Islamic Republic of Iran*,
   393 F. Supp. 3d 261 (E.D.N.Y. 2019) ...................................................16

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   673 F.3d 50 (2d Cir. 2012)...............................................................17

*Licci v. Lebanese Canadian Bank, SAL*,
   834 F.3d 201 (2d Cir. 2016)........................................................*passim*

*Licci v. Lebanese Canadian Bank, SAL*,
   No. 08-cv-7253 (GBD), 2015 WL 13649462 (S.D.N.Y. Apr. 14, 2015) .................15

*Linde v. Arab Bank, PLC*,
   384 F. Supp. 2d 571 (E.D.N.Y. 2005) ...................................................16

*Linde v. Arab Bank, PLC*,
   882 F.3d 314 (2d Cir. 2018)........................................................*passim*

*Linde v. Arab Bank, PLC*,
   97 F. Supp. 3d 287 (E.D.N.Y. 2015) .............................................12, 20, 24

*Miller v. Arab Bank, PLC*,
   372 F. Supp. 3d 33 (E.D.N.Y. 2019) ........................................16, 20, 21, 24

*O'Sullivan v. Deutsche Bank AG*,
   No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019)..........21, 23

*Owens v. BNP Paribas*,
   897 F.3d 266 (D.C. Cir. 2018) ...........................................................21

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013)...............................................................22

*Siegel v. HSBC N. Am. Holdings*,
   933 F.3d 217 (2d Cir. 2019)..............................................................23

*Strauss v. Crédit Lyonnais, S.A.*,
    No. 06-cv-0702 (CPS), 2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006)......................................... 16

*Stutts v. De Dietrich Grp.*,
    No. 03-cv-4058 (ILG), 2006 WL 1867060 (E.D.N.Y. June 30, 2006).................................... 23

*United States v. El-Mezain*,
    664 F.3d 467 (5th Cir. 2011) ................................................................................................. 12

*Weinstock v. Abu Marzook*,
    No. 17-cv-23202 (RNS), 2019 WL 1470245 (S.D. Fla. Apr. 3, 2019) ................................... 25

*Weiss v. Nat'l Westminster Bank PLC*,
    453 F. Supp. 2d 609 (E.D.N.Y. 2006) .................................................................... 16, 24, 25

*Weiss v. Nat'l Westminster Bank PLC*,
    768 F.3d 202 (2d Cir. 2014)................................................................................................... 17

*Zapata v. HSBC Holdings PLC*,
    414 F. Supp. 3d 342 (E.D.N.Y. 2019) .................................................................................. 23

**Statutes**

18 U.S.C. §2331(1) ................................................................................................................ 17, 24

18 U.S.C. §2333(a) ........................................................................................................ 1, 2, 17, 22

18 U.S.C. §2333(d)(2) ............................................................................................................ 1, 2, 16

18 U.S.C. §2339A ........................................................................................................................... 5

18 U.S.C. §2339B .................................................................................................................. *passim*

28 U.S.C. §1350............................................................................................................................ 15

**Treatises**

Wright & Miller, 10B Fed. Prac. & Proc. Civ. § 2730 (4th ed.).................................................... 7

## PRELIMINARY STATEMENT

Plaintiffs respectfully submit this Memorandum of Law in opposition to Defendant's Motion to Dismiss Plaintiffs' Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) ("Def. Mem."). Because Defendant's motion follows both an extensive prior Report & Recommendation, *Averbach v. Cairo Amman Bank*, No. 19-cv-0004 (GHW) (KHP), 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020) ("R&R"), and decision of the District Court adopting the R&R in its entirety, Plaintiffs assume the Court's familiarity with the legal issues concerning Plaintiffs' 18 U.S.C. §2333(d)(2) claims and Defendant's challenge to the standing of Plaintiffs Julie Averbach, Matanya Nathansen, and Nevenka Gritz to bring claims under §2333(a). As set forth fully in Plaintiffs' prior opposition, ECF No. 50, and Plaintiffs' Objections to the R&R, ECF Nos. 58 and 60, Plaintiffs maintain that the Court's dismissals predicated on Fed. R. Civ. P. 12(b)(1) and 12(b)(6) are erroneous and expressly incorporate their prior arguments herein. In the interest of conserving judicial resources, this Memorandum focuses only on four central points.

First, Plaintiffs have provided a redline copy of their Amended Complaint ("AC") as Exhibit 1 hereto to assist the Court in identifying all new allegations first raised therein and devote a portion of their brief to identifying particular allegations that address elements of the Court's prior rulings concerning Plaintiffs' §2333(d)(2) claims.

Second, because the R&R and Defendant's memorandum heavily rely upon the holding of *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525 (S.D.N.Y. 2019), Plaintiffs address that case again, particularly in light of the Second Circuit's holding in the related case of *Licci by Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201 (2d Cir. 2016) ("*Licci VI*").

Third, Plaintiffs address Defendant's arguments concerning their §2333(a) primary liability claims predicated on Defendant's alleged violations of 18 U.S.C. §2339B.

<u>Fourth</u>, Plaintiffs briefly address the standing of Plaintiffs Julie Averbach, Matanya Nathansen, and Nevenka Gritz to bring claims on their own behalves under 18 U.S.C. §2333(a).

## I.    THE AC PLAUSIBLY ALLEGES ALL ELEMENTS REQUIRED TO PLEAD CIVIL AIDING AND ABETTING LIABILITY UNDER 18 U.S.C. §2333(D)(2).

As stated above, Plaintiffs maintain that the Court's prior rulings concerning the application of 18 U.S.C. §2333(d)(2) to the allegations in the original Complaint are erroneous for the reasons previously set forth. Plaintiffs maintain that *Halberstam v. Welch*'s holding that violence need only be a foreseeable result of knowing, substantial assistance applies to JASTA, as Congress dictated. In *Halberstam*, a civil aider and abettor was found liable for "a natural and foreseeable consequence of the activity" she helped the principal tortfeasor undertake, even though she had no knowledge of those consequences. 705 F.2d 472, 488 (D.C. Cir. 1983). Violence is a far more foreseeable consequence of knowingly providing financial services to a designated Foreign Terrorist Organization ("FTO") than an unplanned murder is the foreseeable consequence of providing banking, bookkeeping, recordkeeping and secretarial services to "a criminal enterprise involving stolen goods." *Id.* at 486-87.[1]

Rather than restate arguments or point to factual allegations that have previously been presented and rejected either by the R&R or the District Court's decision adopting the R&R, Plaintiffs instead draw the Court's attention to specific allegations (most of them newly set forth in the AC) that address certain specific findings made in the R&R.

---

[1]    For a more fulsome disquisition on Congress's intended application of aiding and abetting law in JASTA, *see* Amicus Brief of Eight United States Senators in *Freeman v. HSBC Holdings PLC*, 19-3970, ECF No. 87, attached hereto as <u>Exhibit 2</u>.

A.     **The AC Alleges That CAB Maintained Accounts for the Holy Land Foundation After It Was Designated by the United States.**

The R&R previously found that although the Holy Land Foundation ("HLF") was designated on December 4, 2001, Plaintiffs "do not plead that any of the services that CAB provided to HLF through the correspondent bank accounts occurred after that designation." R&R at *13. Although this is technically correct because HLF could not transfer funds from the United States "*through the correspondent bank accounts*" after December 2001 once its accounts were frozen, the AC alleges that CAB continued to provide financial services to HLF until 2004 outside the United States—spanning the entire time period when all of the Plaintiffs were injured (except for those in the Ben Yehuda Bombing, which occurred before HLF was designated by the United States). AC, ¶ 949 ("According to the Government of Israel 2004 Report, as of December 2004, HLF maintained account no. 4883 at CAB's Islamic Bank branch in Hebron with '[t]ransactions amounting to hundreds of thousands of dollars … found in the Foundation's current account.'").

B.     **The Hamas-Controlled "Charities" CAB Aided and Abetted Did Not Directly Take Part in the Attacks, but They and Their Leaders and Senior Employees Were Deeply Involved in Terrorism.**

The R&R previously found that "Plaintiffs have not alleged that any of the charity Account Holders actually took part in the Attacks." R&R at *13. Although that is not a required showing, that conclusion is correct to the narrow extent that no Hamas-controlled charitable committee or association participated in killing or injuring any of the Plaintiffs in its institutional capacity. However, the following allegations demonstrate the key roles specific leaders of these committees played in terrorist attacks, including attacks that injured Plaintiffs:

- AC, ¶¶ 692-94 (describing how the Islamic Center of Gaza (a/k/a "Al-Mujama Al-Islami") controlled the University of Gaza, which was used by Hamas's Qassam Brigades to store weapons, develop and manufacture weapons in its laboratories, and hold secret meetings);

- *Id.* ¶ 715 (describing the role of the Islamic Center of Gaza's senior operative Mizar Muhammad Awd-Allah in the kidnapping and murder of Israeli soldiers in 1989);

- *Id.* ¶ 776 (noting how the Islamic Charitable Society of Hebron ("ICSH") mapped "weak points of the settlements and of the enemy's outposts, for the purposes of attacking them");

- *Id.* ¶¶ 785-88 (noting the role the ICSH's Majdi Muhammad Amru played in the planning and execution of a suicide bus bombing in Haifa that claimed 15 lives);

- *Id.* ¶ 883 (noting the role that the head and founder of the Al-Islah Charitable Society in Ramallah & Al-Bireh ("Al-Islah"), Jamal al-Tawil, played in planning several suicide attacks, including the coordinated double-suicide bombing attack in Jerusalem's Ben Yehuda pedestrian mall in December 2001);

- *Id.* (noting the role Al-Islah's and the Ramallah – Al-Bireh Zakat Committee's ("RBZC") Fadel Muhammad Saleh Hamdan played in "the planning of suicide attacks and the psychological preparation of those who were about to carry out suicide attacks");

- *Id.* (noting how, "[w]ithin the scope of his employment at *al-Islah*," Falah Taher Abdallah Nada "was involved in the recruitment of suicide bombers and hiding wanted men," including recruiting Muhamad Arman, "who guided the so-called 'Silwan Cell' which was responsible for a series of terrorist acts and murders in which dozens of Israeli civilians died and hundreds of others were injured"); and

- *Id.* ¶ 834 (describing the role Jenin Zakat Committee's ("JZC") Jamal Abu al-Hija played "in the planning of several suicide bombings and recruit[ing] suicide bombers"; and Naser Jarar's similar role).

**C.    The Fact That Hamas-Controlled "Charities" Engage in Charitable Activities and Provide Social Services Does Not Negate Their Central Role in Hamas's Terrorist Activities.**

The R&R found "Plaintiffs' concessions that the charity Account Holders take part in actual charitable activities and provide actual social services undermine any inference that CAB had general knowledge that by providing financial services to the Account Holders it was assuming a role in Hamas's terrorist activities." R&R at *14. However, as the Supreme Court explained, Congress and the Executive Branch rejected the distinction between an FTO's violent, political and social welfare or religious activities, because "money is fungible" and FTOs "do not maintain legitimate *financial* firewalls between those funds raised for civil, nonviolent activities, and those

4

ultimately used to support violent, terrorist operations. Thus, funds raised ostensibly for charitable purposes have in the past been redirected by some terrorist groups to fund the purchase of arms and explosives." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010) (internal quotation marks omitted).[2]

This reality was broadly known not just to the U.S. Government, but to the general public in the Palestinian Territories where these groups operated openly. In fact, these governmental findings that were issued during the relevant period or describe information broadly known at the time are fully supported by the specific allegations in the AC. These include:

AC, ¶ 508 - The U.S. Government's description of Hamas's *da'wa*:

> Through this grass-roots approach, (known as dawa - "preaching" or "calling"), Hamas achieves a number of goals. Among other perceived benefits, it (1) assures popular support for the movement, and through its popular support improves its ability to compete with opposing political factions; (2) provides a base from which to indoctrinate and recruit future activists, including military recruits, to carry out suicide bombings and other terrorist acts; (3) provides a benign cover through which millions of dollars can be transferred from overseas into Hamas operated or controlled institutions; and (4) since money is fungible, the overseas support for the dawa frees resources that can then be devoted to terrorist activity.

¶ 602 - The U.S. Government's designation of the Holy Land Foundation:

> HAMAS raises tens of millions of dollars per year throughout the world using charitable fundraising as cover. While HAMAS may provide money for legitimate charitable work, this work is a primary recruiting tool for the organization's militant causes. HAMAS relies on donations from Palestinian expatriates around the world and private benefactors located in moderate Arab states, Western Europe and North America. HAMAS uses a web of charities to facilitate funding and to funnel money. Charitable donations to non-governmental organizations are commingled, moved between charities in ways that hide the money trail, and are then often diverted or siphoned to support terrorism.

---

[2]    As the Supreme Court held in enacting §2339B, Congress simultaneously repealed the "humanitarian assistance" exemption from §2339A: "Congress considered and rejected the view that *ostensibly* peaceful aid would have no harmful effects." *Holder*, 561 U.S. at 29 (emphasis added).

¶ 605 - The U.S. Government's indictment of the Holy Land Foundation, noting that:

> HLF sent the money to "zakat" committees in the West Bank and Gaza (including CAB customers like the Jenin, Tulkarem and Nablus Zakat Committees) that are part of the "social wing" of HAMAS and that the social wing of HAMAS is "crucial to Hamas's success" because, among other things, it "helps win the 'hearts and minds' of Palestinians while promoting its anti-Israel agenda and indoctrinating the populace in [HAMAS's] ideology"; "supports the families of Hamas prisoners and suicide bombers, thereby providing incentives for bombing"; and "launders money for all of Hamas's activities."

¶ 645 - A 2009 Report by the Israel Security Agency ("ISA"):[3]

> Since 1989, a gradual process began whereby Hamas took over charitable associations, which .... became completely identified with Hamas, and so, in effect, Hamas today controls a tangled web of charitable associations....

> Hamas is actually funding institutions, which are not strictly used for charitable activities, and in effect they **encourage terrorism**. This is done by supporting religious, welfare, and educational institutions which are controlled by the movement. **These institutions preach for "Jihad" and strongly incite against Israel. They encourage the perpetration of terrorist attacks against Israel, and support the terrorists (deceased, prisoners and wounded) and their families, who are receiving benefits that include grants and monthly allowances.** (Emphasis in original.)

¶ 662 - A June 30, 2002 research paper issued by the Israeli Coordinator of Government Activities in the Territories … found that:

> The Da'wa's informal education system, kindergartens, summer day camps and private schools – the younger generation, from pre-school children to teenagers, are educated in all these (and later also in the university institutions such as the Islamic University in Gaza) to support Jihad and martyrdom operations – the holy war and "death in the name of Allah." There is open and outright indoctrination in these institutions. Children from kindergarten age are educated to revere the suicide attackers and they receive a message according to which, when they grow up, they can fulfill themselves best by carrying out a suicide attack against Israelis.... From the publications of the societies themselves (on the Internet) and from confiscated documents it emerges that they enjoy financial support from various bodies, including Islamic charitable societies throughout the Arab and Western worlds....

---

[3]     Attached to the AC as <u>Exhibit H</u>, with translation.

¶ 658 - The Palestinian Authority's ("PA") Intelligence Assessment noted that:

> It is not a coincidence that Hamas officials tend to search for suicide operatives[] among their schools' students or their sport groups and teams. Hamas pays monthly stipends to families of martyrs and the wounded.

**D.    The AC Plausibly Alleges That CAB Was Aware It Was Providing Material Support to Hamas.**

The R&R held, relying on *Kaplan,* that "[a]llegations that a defendant bank was generally aware it was playing a role is [sic] terrorist activities by virtue of media and non-U.S. governmental designations that its account holders supported or were terrorist organizations are insufficient absent allegations that the defendant actually read or was aware of the designations and media reports." R&R at *12. As noted below, the Second Circuit has previously held—on the same facts pleaded in *Kaplan*—that "LCB knew that the bank accounts between which it facilitated transfers were owned and controlled by Shahid, an integral part of Hezbollah." *Licci VI*, 834 F.3d at 218. *See also id.* (crediting allegations that "LCB had 'actual knowledge' that 'Shahid is an integral part of [Hezbollah] and constitutes part of [Hezbollah's] financial arm'"). Setting aside the proper legal standard for assessing scienter in a pleading,[4] the AC sets forth a significant number of new allegations that further support the inference of CAB's knowledge.

**1.    Both the Government of Israel and the Palestinian Authority Repeatedly Took Actions Against CAB Customers and Publicly Identified Them as Belonging to Hamas.**

The AC alleges that the Government of Israel met with senior CAB officials as far back as 1988 and warned them that CAB "was a conduit for funds financing the Intifada," AC, ¶ 910. The R&R previously discounted the notice implications of those designations, R&R at *13 n.16.

---

[4]      "Since the information relating to state of mind generally is within the exclusive knowledge of one of the litigants and can be evaluated only on the basis of circumstantial evidence, the other parties normally should have an opportunity to engage in discovery before a summary judgment is rendered," but, even then, "summary judgment often will be an inappropriate means of resolving an issue of this character." Wright & Miller, 10B Fed. Prac. & Proc. Civ. §2730 (4th ed.).

However, the AC also makes clear that designations made by the Israeli military of unlawful or terrorist organizations (*see* Appendix 1 to this brief) were published and publicized in the Palestinian Territories (as were all relevant Israeli laws as of June 8, 1967). AC, ¶ 585; *see also* Exhibit D to the AC. *Compare* R&R at *13 n.16.[5]

The R&R stated that the "closest that Plaintiffs come to pleading facts supporting an inference that CAB had knowledge that any of the Account Holders were tied to Hamas are their allegations of a freeze by the Palestinian Monetary Authority ("PMA") on August 24, 2003…. But, notably, the PMA's action took place well after any of the fund transfers through the correspondent accounts identified in the Complaint and after most of the Attacks." R&R at *12.

However, the AC sets forth multiple occasions prior to 2003 when the PA took actions against CAB customers. *See, e.g.*, AC, ¶ 724 (describing PA's June 30, 1995 raid of the Islamic Society of Gaza's (a/k/a Al-Jam'iya Al-Islamiya) offices followed by media identification of the CAB customer with Hamas); ¶ 842 (describing PA's March 17, 1996 raid on several institutions, including CAB customer RBZC); ¶ 828 (describing the PA's 1996 closure of JZC's offices); ¶¶ 586, 621-23, 746 (describing September 25, 1997 PA closure of 16 Hamas institutions, including HLF's Gaza offices, Islamic Center of Gaza, Islamic Society of Gaza, and Al Salah Islamic Society in the Gaza Strip ("Al-Salah"), and detailing how "representatives of the international media were … invited to accompany the operation," leading Agence France-Presse to describe the closure as the PA's "most devastating blow on the infrastructure of the Islamic Resistance Movement

---

[5]     Defendant's brief is studiously silent on the subject, but in its response to Plaintiffs' Rule 72 objections to the R&R, CAB effectively conceded that Plaintiffs have plausibly alleged the bank had knowledge of Israeli designations before and during the relevant period, instead arguing to the District Court that there was nevertheless "no allegation in the Complaint that Israel (or CAB's regulator in the Palestinian Territories, the Palestinian Monetary Authority) took any enforcement action against the Bank during the time period relevant to the Complaint (2001-2003) as a result of this alleged designation." Def. Resp. to Rule 72 Objs., ECF No. 59, at 8 n.5. Plaintiffs responded that CAB omitted that "[w]ith the exception of Al-Salah Islamic Society-Gaza, the funds in the accounts of these HAMAS institutions were seized by the Israel Defense Forces during its February 2004 raids of the Ramallah branches of Arab Bank and CAB." Plaintiffs' Rule 72 Reply, ECF No. 60, at 7 (citing original Complaint).

(Hamas) in the Gaza Strip"); and ¶¶ 814, 855, 884, 964 (describing December 2001 PA closure of Islamic Society of Gaza, Al-Tadamun Charitable Society in Nablus ("Al-Tadamun"), Muslim Youth Association – Hebron ("MYAH"), and Al-Islah).

The AC also describes actions taken by the PMA on multiple occasions prior to 2003. *See, e.g.*, *id.*, ¶ 965 (describing December 23, 2001 PMA instructions to Palestinian banks not to allow funds to be drawn on accounts controlled by the Union of Good, Al-Salah, Islamic Center of Gaza, or Islamic Society of Gaza, without its prior approval); ¶ 748 (describing the PMA's freeze of Al-Salah's accounts in December 2001); ¶¶ 870, 966 (describing January 6, 2002 PMA directive to Palestinian banks to report on the sums of money held in the accounts of Beit Fajar Zakat Committee ("BFZC") and the Islamic Society of Gaza, and requiring banks to consult the PMA prior to withdrawing funds from those accounts).

In addition to supporting the inference of CAB's knowledge that its customers were affiliated with Hamas, these allegations support the inference that CAB knew the PA and PMA were not taking these actions because the customers were entirely "charitable."

### 2. The AC Provides Concrete Examples of the Public Identification of CAB Customers with Hamas and Its Terrorist Activities.

The Second Circuit has held that "[a]ctual knowledge may be proven or disproven by direct evidence, circumstantial evidence, or a combination of the two. Publicly available information may provide relevant circumstantial evidence of actual knowledge." *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 122 (2d Cir. 2017) (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003)). The R&R, however, found that the original Complaint lacked sufficient "allegations that the defendant actually read or was aware of [non-U.S.] designations and media reports." R&R at *12. But while the AC continues to cite a plethora of Palestinian and Western media to provide relevant circumstantial evidence of CAB's

knowledge, it also cites—and provides concrete examples of—evidence of what the R&R described as the "public facing" aspect of CAB's customers and their open connections to Hamas and to the propagation of violence. *See, e.g.*, AC, ¶ 781 (citing a 2004 Government of Israel report describing board member of CAB customer ICSH as an individual *already* "known as the most senior Hamas activist in Hebron and is **considered by the public** as the head of the movement and its representative in the district….");[6] ¶ 711 & Exhibit J to the AC (noting Islamic Center of Gaza brochure featuring photographs of both Hamas's iconic founder and spiritual leader, Sheikh Yassin, and the organization's bank account numbers at CAB).[7]

In addition, the AC attaches Exhibit K and Exhibit M, which provide photographic excerpts of two videos of events immediately preceding and during the spree of attacks at issue here. The first video captures a kindergarten graduation ceremony held at Islamic Society in Gaza with children marching with toy rifles or "toy" suicide belts.[8] AC, ¶¶ 735-36. The second video records a speech given by the Chairman and Vice-Chairman, respectively, of the Hamas-controlled "charities" and CAB customers Al-Tadamun and Nablus Zakat Committee ("NZC"), Sheikh Hamid al-Bitawi. During the event, which was held in Nablus before an audience of 150,000 people, he brandished an assault rifle and led the crowd in reciting an oath "to avenge the souls of the martyrs."[9] AC, ¶ 807. The videos support Plaintiffs' allegations that organizations like the

---

[6]    This notorious Hamas activist, who "moved through the city accompanied by bodyguards," admitted to holding an account at CAB. *Id*., ¶ 781 & n.28.

[7]    Hamas's prominence and ubiquity in Palestinian society was such that a prominent Hamas operative previously deported to Lebanon in 1992 joined CAB and eventually became a deputy branch manager before moving on to become the accountant for the Hamas-controlled RBZC. *Id*., ¶¶ 849-50.

[8]    The video can be viewed at https://www.osenlaw.com/sites/default/files/uploaded/Counter-Terrorism/Arab_ Bank/hamas_org/PX1132.mp4.

[9]    Images from the video are attached as Exhibit M to the AC. The video of the Nablus event is available at https://www.youtube.com/watch?v=KKma5eW7_sw (12:12-14:18).

Islamic Society of Gaza, Al-Tadamun in Nablus, and NZC, during the relevant period, acted openly on behalf of Hamas and were widely (if not universally) understood to support terrorism.

E.     **CAB Processed Payments for Designated Entities.**

As noted above, although the U.S. Treasury Department designated HLF a Specially Designated Global Terrorist ("SDGT") in December 2001, as of December 2004 CAB maintained account no. 4883 at CAB's Islamic Bank branch in Hebron with "'[t]ransactions amounting to hundreds of thousands of dollars … found in the Foundation's current account.'" *Id.*, ¶ 949. Moreover, throughout the relevant period, CAB's account holders received funds transfers from the Al Aqsa Foundation, CBSP and Interpal—all of which were formally designated as terrorist organizations and fundraisers for Hamas by Israel as of 1998, *id.*, ¶¶ 540, 543, 553. *See, e.g.*, *id.*, ¶¶ 867-68 (BFZC received funding from the Al Aqsa Foundation in Germany, Interpal, the World Assembly of Muslim Youth ("WAMY"), and a variety of other Union of Good institutions "[d]uring the relevant period"); ¶¶ 888-89 (noting payments to Al-Islah from CBSP, Interpal, Al Aqsa Foundation, and WAMY "[d]uring the relevant period"); and ¶ 902 (noting payments to Quran and Sunnah Society – Qalqilya ("QSS")  from the Al Aqsa Foundation, Interpal, and WAMY "[d]uring the relevant period").

CAB even processed transfers for those entities *after* the U.S. designated them as SDGTs. For example, in October 2003, CAB processed a transfer from the Al Aqsa Foundation (designated an SDGT in May 2003 as a "critical part of Hamas' terrorist support infrastructure," AC, ¶¶ 559-60), to WAMY's CAB account no. 6255/1 at its Gaza branch, and in 2004, CAB processed multiple funds transfers from the Al Aqsa Foundation to WAMY's CAB account no. 6255/1 at its Gaza branch. *Id.*, ¶¶ 687-89. These post-attack transfers demonstrate that CAB knowingly and willingly provided financial services to SDGTs. This provides a strong inference that—as with

prior Israeli or Palestinian efforts to counter Hamas—CAB's awareness of U.S. designations did not deter it from continuing to knowingly provide material support to Hamas. In fact, CAB was *still* providing martyr and prisoner payments until Spring 2020.[10]

The R&R found it significant that "[n]one of the charity Account Holders were designated by the United States government as terrorists or terrorist organizations when the identified fund transfers took place." R&R at *13. This was, of course, true of the same Hamas-controlled organizations at issue in *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) (*Boim III*), *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015), and *United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011). *See also* Appendix 2 to this brief.

### F.   CAB's Funds Transfers for Hamas Leaders Indicated Highly Unusual Activity and Were Far From Routine.

The R&R previously held that "all the transfers alleged in the Complaint were small and occurred before any of the Attacks," and "[n]one of the services provided were pleaded to have indicators that anything unusual was going on." R&R at *15. But the AC makes clear that prior to the outbreak of the Second Intifada, the Gross National Income ("GNI") per capita in the Palestinian Authority was $1,730 U.S. dollars in 1999 and fell to $1,070 by the end of 2003. AC, ¶ 986. Thus, when Hamas Qassam Brigades commander Abbas Al-Sayed received $69,000 over the span of four months in 2001[11] from Lebanon, that sum constituted approximately 40 times the

---

[10]    Adam Rasgon and Mohammed Najib, *Israel Cracks Down on Banks Over Payments to Palestinian Inmates*, N.Y. Times, May 9, 2020, available at https://www.nytimes.com/2020/05/09/world/middleeast/israel-palestinian-inmates-banks.html.

[11]    Of course, CAB's material support to Al-Sayed was not limited to a handful of transactions that became publicly available by virtue of them clearing through New York. *See id.*, ¶ 922 (stating that Abbas al-Sayed maintained account number 150027961600 at CAB "at least until his arrest in July 2002"); nor is CAB's "substantial assistance" limited to the 23 account transfers "through [U.S. dollar] correspondent bank accounts" identified by the R&R in its Appendix D for personal jurisdiction purposes. R&R at *17. The CAB financial services identified in Appendix 3 attached hereto, which are not limited to transfers routed through CAB's correspondent accounts, also support Plaintiffs' claims, regardless of whether they are relevant to personal jurisdiction. The Supreme Court in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 773, 775, 781 (1984) concluded that the plaintiff "suffered … a small proportion of her total claimed injury within the State" but could seek damages for all injuries she suffered by virtue of the

average *yearly* income in the Palestinian Territories at that time. *Id.*, ¶ 923. Likewise, Ghazi Hamad, editor of Hamas's newspaper, *Al-Risala,* received more than $50,000 in the span of seven months—at least 29 times the average yearly income in the Palestinian Territories at that time. *Id.*, ¶ 942. In the context when and where they occurred, these payments were neither "small" nor typical enough to be deemed "usual" as a matter of law.

### G.   CAB Aided and Abetted Multiple "Martyr Payment Programs" That Benefited Hamas Operatives and Encouraged Hamas Terrorist Attacks.

The R&R held that "[t]here are no facts showing that CAB was administering a 'martyr payment' scheme," and "no indication that CAB knew that its services were being used for martyr payments." R&R at *14-15. But the AC makes clear that CAB actively helped Saddam Hussein's regime launder money through Jordan using Western Union accounts at CAB to bypass sanctions on the Hussein regime, AC, ¶¶ 976-83, and it describes in detail the local and international media coverage of the Arab Liberation Front's ("ALF") martyr payment "ceremonies." *Id.*, ¶¶ 988-1004.

The R&R also found that "while Plaintiffs allege that the Arab Liberation Front ('ALF') provided 'awards' to those who participate in terrorist attacks during the Second Intifada generally, *see* Compl. ¶¶ 787-97, there is no allegation that ties ALF's activities to the Attacks and to Hamas." R&R at *15 n.17. But the AC makes clear that the Hussein regime's reward program covered *all* successful suicide bombers and terrorists—including Hamas operatives. AC, ¶ 983 ("Seeking broad Palestinian support for Saddam Hussein, ALF made payments to families of martyrs affiliated with *any* terror organization and paid higher amounts than most martyr funding groups.") (emphasis added). Further, the AC quotes a BBC news report stating that a "***Hamas*** suicide

---

defendant's distribution of its magazine nationwide. *See also Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264, 282 (E.D.N.Y. 2016) ("There is no requirement under § 302(a)(1) that a plaintiff's claim must arise exclusively from New York conduct. To the contrary, as long as there is a relatedness between a plaintiff's claim and the defendant's New York transaction, § 302(a)(1) confers jurisdiction even if some, or all, of the acts constituting the breach sued upon occurred outside New York.").

bomber's family got $25,000 while the others – relatives of militants killed in fighting or civilians killed during Israeli military operations – all received $10,000 each." *Id.*, ¶ 1002 (emphasis added).

The R&R also found that "[t]here is no allegation that ties [Hezbollah martyr payment organization] Shahid to CAB or the Attacks." R&R at *15 n.17. The AC does "tie Shahid to CAB" by alleging two CAB accounts Shahid's Gazan proxy al-Ansar Charitable Society ("Al-Ansar") publicized. AC, ¶ 1017. The AC also ties Shahid "to the Attacks" by showing that Al-Ansar provided payments to "martyrs" from all Palestinian terrorist organizations including Hamas, even noting that the "*Shahid* Foundation website openly identified prominent HAMAS operatives as martyrs whose families received payments via accounts controlled by *al-Ansar,*" including terrorists responsible for three of the attacks at issue. *Id.*, ¶¶ 1009-11."[12]

## II.   THE COURT'S RELIANCE ON *KAPLAN* IS MISPLACED BECAUSE IT WAS WRONGLY DECIDED AND IS CURRENTLY ON APPEAL.

The R&R cites and relies upon the reasoning in *Kaplan*, 405 F. Supp. 3d at 535-36, to find that (1) "there are no non-conclusory allegations from which the Court can infer that Hamas actually received the funds transferred through the correspondent accounts," R&R at *16; (2) Plaintiffs must provide evidence at the pleading stage that CAB "actually read or was aware of the [non-U.S.] designations and media reports," *id.* at *12 and (3) a bank's (3) "failure … to adhere to sanctions and counter-terrorism laws" is insufficient to plead knowledge, *id.*

At the same time, the R&R correctly notes that the "*Kaplan* decision is part of the same case as the *Licci* opinions and involves the same core parties and facts." R&R at *12 n.13. Those *Licci* opinions include *Licci VI*, which addressed the aiding and abetting claims of the foreign

---

[12]     *See id.*, ¶ 1010 (Shahid payment to Basel al-Qawasmeh (commander of the Hamas cell responsible for the Jerusalem Egged Bus #2 bombing and the Jaffa Road Bus #14A bombing)); ¶ 1011 (Shahid payment to family of Basem Takruri, suicide bomber responsible for the Commuter Bus # 6 bombing). *See also id.*, ¶ 1012 ("In yet another example, the family of Iyad Awda Mahmud Taqi, a Qassam Brigades activist killed on November 6, 2001 during an attack on Israeli soldiers, received a 'martyr' payment from the Shahid Foundation. His father also received a reward payment from the ALF to his CAB Account No. 393501.").

plaintiffs in *Licci* whose claims were predicated on the Alien Tort Statute, 28 U.S.C. §1350 ("ATS"). The Second Circuit reviewed the district court's determination that "the complaint's allegations of LCB's intent are merely 'conclusory'" and that the complaint was "devoid of any factual allegations supporting LCB's specific intent, in executing the wire transfers, to promote or engage in Hezbollah's coercive actions against the Israeli government and public." *Licci VI*, 834 F.3d at 218 (quoting *Licci v. Lebanese Canadian Bank, SAL*, No. 08-cv-7253 (GBD), 2015 WL 13649462, *4 (S.D.N.Y. Apr. 14, 2015)).

The Second Circuit found that defendant "LCB knew that the bank accounts between which it facilitated transfers were owned and controlled by Shahid, an integral part of Hezbollah." *Id*. Moreover, on the same allegations later rejected in *Kaplan*, *Licci VI* found the complaint in that case had plausibly pleaded that:

> LCB had actual knowledge that (1) [Hezbollah] is a violent terrorist organization [that] carried out numerous terrorist attacks against Israeli civilians and American targets and which planned and intended to carry out additional such terrorist attacks; (2) Shahid is an integral part of [Hezbollah] and constitutes part of [Hezbollah's] financial arm; (3) Hezbollah's bank accounts at various LCB branches and the funds therein were owned and controlled by [Hezbollah]; (4) the wire transfers made and received by Hezbollah leading up to the 2006 rocket attacks were being carried out by and at the direction of [Hezbollah]; and (5) Hezbollah require[d] wire transfer services ... in order to plan, to prepare for and to carry out terrorist attacks.

*Id.* at 218-19 (internal citations and quotation marks omitted). When subsequently reviewing the U.S.-national plaintiffs' ATA claims, the district court in *Kaplan* discounted *Licci VI*'s detailed analysis of the allegations against LCB solely on the basis that the underlying ATS claim alleged that LCB aided and abetted Hezbollah's violation of the law of nations under customary international law. *Kaplan*, 405 F. Supp. 3d at 536 n.6. This Court should not make the same error,

particularly where the ATA's *mens rea* requirement is *lower* than the ATS's,[13] and a litany of courts have previously rejected the central premise that payments to an FTO's charitable fronts do not support the inference that the FTO actually received the funds transferred. *See*, *e.g.*, *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 432-33 (E.D.N.Y. 2009); *Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 264 (E.D.N.Y. 2019); *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 576 (E.D.N.Y. 2005); *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 47 (E.D.N.Y. 2019); *Strauss v. Crédit Lyonnais, S.A.*, No. 06-cv-0702 (CPS), 2006 WL 2862704, *10-11 (E.D.N.Y. Oct. 5, 2006); *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 622-23 (E.D.N.Y. 2006).

While the district court in Kaplan was correct that *Licci VI's* ruling on the ATS plaintiffs' claims did not bind it in the *res judicata* sense, the Second Circuit's extensive discussion of the sufficiency of the scienter allegations and its rejection of the district court's analysis merits this court's further consideration.

Here, Plaintiffs were not required to plead that CAB had the specific intent to facilitate the commission of terrorism crimes, as under the ATS. *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018). Instead, they plausibly alleged that CAB maintained 19[14] accounts for Hamas-controlled entities (as opposed to the three described in *Kaplan*) and for five[15] senior Hamas leaders (as opposed to the two mentioned in *Kaplan*). Like the Shahid Foundation in Lebanon which the Second Circuit found was plausibly alleged to be "an integral part of [Hezbollah] and

---

[13]     The Second Circuit's *mens rea* for aiding and abetting under the ATS is higher than the *mens rea* under §2333(d)(2), requiring "purpose rather than knowledge alone." *Licci VI*, 834 F.3d at 217 (citations omitted). *See also Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 34-38 (D.C. Cir. 2011) (noting that the Second Circuit adopted a higher *mens rea* standard for the ATS than the *mens rea* standard set forth in *Halberstam*), *vac'd on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013).

[14]     In Appendix B to CAB's motion purporting to list CAB's Hamas "charity" customers, CAB omitted Al-Islah, AC, ¶ 914, and WAMY, *id.*, ¶¶ 566, 681.

[15]     In Appendix C to CAB's motion purporting to list CAB's Hamas individual customers, CAB omitted ICSH senior manager Abd al-Khaleq Hasan Shadli al-Natshe. *Id.*, ¶ 781 n.28.

constitutes part of [Hezbollah's] financial arm," the 19 Hamas-controlled entities identified in the AC are an integral part of Hamas and form the backbone of the organization. Like the bank accounts LCB allegedly held for Hezbollah, CAB held many more for Hamas, and like the wire transfers received by Hezbollah leading up to the 2006 rocket attacks, the AC is replete with transactions made and received by Hamas before and during the onslaught of terrorist attacks that injured Plaintiffs here. *See Licci VI*, 834 F.3d at 218-19.

## III.   PLAINTIFFS HAVE PLAUSIBLY ALLEGED PRIMARY LIABILITY FOR VIOLATIONS OF 18 U.S.C. §2339B.

In *Weiss v. Nat'l Westminster Bank PLC*, the Second Circuit expressly held that "through [a] complex series of statutory incorporation … a defendant may be liable for civil remedies under §2333(a) for providing material support to an organization that solicits funds for an FTO." 768 F.3d 202, 209 (2d Cir. 2014). *See also Boim III*, 549 F.3d at 690. To properly plead liability under §2333(a) for criminal violations of 18 U.S.C. §2339B, plaintiffs must plausibly allege that a defendant (1) knowingly (2) provided material support to an FTO that (3) proximately caused their injuries and that (4) defendant's unlawful conduct satisfies the definitional requirements of "international terrorism" under 18 U.S.C. §2331(1). That definition requires that the act at issue (1) involve violence or endanger human life; (2) violate federal or state criminal law had it been committed in the United States; (3) appear intended to intimidate or coerce a civilian population, influence government policy, or affect government conduct by specified means; and (4) occur primarily outside the United States or transcend national boundaries. *Linde*, 882 F.3d at 326 (citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 68 (2d Cir. 2012)). CAB only disputes Plaintiffs' allegations that it committed an act of international terrorism and that it proximately caused their injuries. Def. Mem. at 18.

### A.   Defendant Tacitly Concedes That Plaintiffs Have Plausibly Alleged That CAB Knowingly Provided Material Support to Hamas.

Defendant argues that Plaintiffs have not plausibly alleged CAB perpetrated "an act of international terrorism" or proximately caused their injuries, but does *not* argue that Plaintiffs have failed to plausibly allege CAB knowingly violated 18 U.S.C. §2339B. That is presumably because of the mountain of plausible allegations that CAB knew who its dozens of Hamas customers were. *See, e.g.*, AC, ¶¶ 578, 724, 767, 792, 803, 832, 842, 859, 873, 955, 972-73 (detailing raids between 1995 and 2004 by Israel and the PA on CAB customers HLF, Islamic Society of Gaza, Tulkarem Zakat Committee ("TZC"), Al-Ansar, NZC, JZC, RBZC, ICSH, Al-Tadamun, MYAH, BFZC, Al-Wafa Charitable Society ("Al Wafa"), and Al-Islah); ¶¶ 583, 586, 621, 716, 725, 727, 746, 772, 814, 828, 855, 857, 884, 960, 964 (detailing closures between 1996 and 2001 by Israel and the PA of the offices of CAB's customers HLF, Islamic Society of Gaza, Islamic Center of Gaza, Al-Salah,  ICSH, Al-Tadamun, JZC, MYAH, and Al-Islah); ¶¶ 584, 593, 685, 718, 728, 749, 752, 758, 766, 774, 793, 806, 815, 829, 844, 856, 874, 886, 950-51, 967, 1018 (detailing designations between 1997 and 2007 as unlawful or terrorist organizations by Israel and/or the U.S. of CAB customers HLF, WAMY, Islamic Center of Gaza, Islamic Society of Gaza, Al-Salah, Al Wafa, ICSH, TZC, NZC, Al-Tadamun, JZC, RBZC, MYAH, Welfare Association for Palestinian and Lebanese Families, BFZC, Al-Islah, and Al-Ansar); ¶¶ 731-35 (describing U.S. and international publications reporting on Islamic Society of Gaza's identification with Hamas since the 1980s and 90s; its organization of large, publicized events demonstrating its support for Hamas, including the aforementioned graduation ceremony held in the Gaza Strip for 1,650 children from its 41 kindergartens in the summer of 2001 in which the children wore the headbands of Hamas suicide bombers, toy rifles, and toy suicide belts, and a 1999 mass wedding in Gaza during which Hamas distributed cash gifts, and the Qassam Brigades distributed fliers that called for a renewal of the

Jihad against Israel); ¶¶ 776-80 (describing the ICSH's role in organizing parades and confrontations, renting houses for the families of suicide terrorists, and hosting "mourning houses" on its own premises in honor of those killed in terrorist operations); ¶¶ 807 and n.29, 818 and Exhibit M to the AC (describing two public speeches given by NZC and Al-Tadamun Chairman Sheikh al-Bitawi: the first following a suicide bombing at a Tel Aviv café in March 1997, during which he told a crowd of 10,000 Hamas supporters, "I have good news. There is a suicide bombing in Tel Aviv," and the aforementioned second one, on August 1, 2001 in Nablus before 150,000 people at an event commemorating two senior Hamas operatives recently killed by Israel, during which he brandished an assault rifle and led the crowd in reciting an oath "to avenge the souls of the martyrs"); ¶¶ 1008-17 (describing publicity of Al-Ansar's "martyr" payments, including advertisements and public celebration in the summer of 2001).

**B.    Whether Defendant's Knowing Violations of 18 U.S.C. §2339B Satisfy the Definitional Requirements of 18 U.S.C. §2331 is Ultimately a Fact Question for the Jury.**

CAB asserts that Plaintiffs fail to sufficiently allege that it provided anything more than "routine banking services" to Hamas. Def. Mem. at 19. First, the point is irrelevant—the Second Circuit "conclude[d] *only* that providing routine financial services to members and associates of terrorist organizations is not so akin to providing a loaded gun to a child as to *excuse the charging error here* and *compel a finding that as a matter of law*, the services were violent or life-endangering acts that appeared intended to intimidate or coerce civilians or to influence or affect governments." *Linde*, 882 F.3d at 327 (emphasis added). Purportedly "routine" banking is not itself a basis for a Rule 12(b)(6) dismissal.

Second, and as discussed above, the AC's highly detailed allegations demonstrate that CAB's services were not "routine." *See supra* at 12-13. Furthermore, despite CAB's reliance on *Kaplan*, 405 F. Supp. 3d 525 (which is currently on appeal), the Second Circuit has held that

whether "financial services to Hamas should not be viewed as routine … raises questions of fact for a jury to decide." *Linde*, 882 F.3d at 327. Ignoring *Linde*, CAB argues that "Plaintiffs cannot contort CAB's provision of routine banking services into violent, terrorist conduct." Def. Mem. at 19. In *Miller*, the court noted that *Boim III*, "a persuasive opinion that the Second Circuit described at length in *Linde II*," explained that a defendant who provides financial support to an organization like Hamas would augment Hamas's resources and enable Hamas to commit acts of terrorism. 372 F. Supp. 3d at 45 (citing *Boim III*, 549 F.3d at 694). Someone who did so knowing (or even deliberately indifferent to) "the aims and activities of the organization" would sufficiently plead appearance of intent under §2331. *Id.* The court went on to observe that "[p]roviding financial services like wire transfers under these circumstances is also dangerous to human life since 'financial services increase Hamas' ability to carry out attacks in the same way, and Congress made no distinction between these different forms of material support in criminalizing them.'" *Id.* (citing *Linde*, 97 F. Supp. 3d at 323).

As Judge Weinstein also explained in *Gill v. Arab Bank, PLC*:

> Given that section 2333(a) provides to plaintiffs injured by acts of terrorism a highly unusual private cause of action—one that is tied expressly to the criminal law []—and the  fact that the ATA's definitional provision suggests that recovery on some theory (or  theories) of secondary liability may be available, see 18 U.S.C. § 2331(1)(A) (noting that 'the term 'international terrorism means activities that ... *involve* violent acts or acts  dangerous to human life'"), wariness in extending the reasoning of *Central Bank* to circumscribe ATA liability seems warranted, especially in ruling on a motion to dismiss directed at the pleadings.

893 F. Supp. 2d 474, 482 (E.D.N.Y. 2012).

CAB next argues that primary liability under the ATA can be imposed only on the entity or person that perpetrated the terrorist attack, and not "secondary actors, such as banks," because their purportedly "routine banking services … do not involve inherently violent acts or acts dangerous to human life and are not undertaken to intimidate or coerce a civilian population." Def.

Mem. at 20. Again, this argument is explicitly foreclosed by the Second Circuit's decision in *Linde*, which expressly recognized that ATA primary liability can be imposed on a bank which provided even routine financial services to a terrorist group which carried out an attack. *Linde*, 882 F.3d at 327 ("conclude[ing] only" that "routine" transactions do not *compel* the finding that the material support constituted an act of international terrorism). *See also Boim III*, 549 F.3d at 693; *Miller*, 372 F. Supp. 3d at 44-45. CAB's support for its position is inapposite—apart from *Kaplan*, a decision at odds with *Licci VI* even as to LCB's knowledge, and *Weiss*, a summary judgment decision immunizing support for "charitable" alter egos of an FTO (and under appeal). The three cases CAB cited involved conspiracies with a State Sponsor of Terrorism to violate §§2339A and 2339B.[16] As previously noted to this Court, *see* Plaintiffs' Mem. of Law in Opp. to CAB's Mot. to Dismiss Compl., ECF No. 50, at 20, the *O'Sullivan* decision explicitly distinguished the allegations in that case from the allegations of supporting an FTO, as here:

> Congress found, in enacting other provisions of the ATA, that a total prohibition on financial support to terrorist organizations was justified because "money earmarked for peaceful activities donated directly to a terrorist organization nevertheless furthers the organization's violent ends." Congress, however, made no similar findings with respect to state sponsors of terrorism, even permitting certain financial transactions with the appropriate licenses.

*O'Sullivan*, 2019 WL 1409446, at *6 (quoting *Owens v. BNP Paribas*, 897 F.3d 266, 276 (D.C. Cir. 2018)). *See also Lelchook v. Commerzbank AG*, No. 10-cv-5795 (AKH), 2011 WL 4087448, at *1 (S.D.N.Y. Aug. 2, 2011) (the FTO "distinction takes the case outside the rule of *Rothstein*, for a terrorist front organization has no legitimate function that the United States recognizes").

---

[16]     Def. Mem. at 20. The three cases cited are *O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019); *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67 (E.D.N.Y. 2019); and *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 392 (7th Cir. 2018) ("Kemper does not allege that Deutsche Bank ever serviced a terrorist group directly.").

**C.     Plaintiffs Have Plausibly Alleged That Defendant's Conduct Was a Proximate Cause of Their Injuries.**

According to CAB, the proper proximate cause standard for primary liability under 18 U.S.C. §2333(a) for violations of 18 U.S.C. §2339B was set forth in *Kaplan* and requires that (1) Defendant provided money directly to an FTO *to carry out the attacks*, (2) any funds transferred through the [the Defendant] were then used by the FTO to perpetrate the attacks at issue, or (3) that the FTO would not have been able to carry out the attacks absent those specific funds. Def. Mem. at 22. To the extent that this formulation accurately reflects *Kaplan*'s articulation of the proximate cause standard for violations of §2339B, it misstates the law.

The standard for proximate causation in the Second Circuit is set forth in *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013), which requires a showing that defendant's conduct was a "substantial factor in the sequence of responsible causation" and that the plaintiff's "injury was reasonably foreseeable or anticipated as a natural consequence." (internal quotation marks and italics omitted). *Rothstein* did not require the direct link between the funds and attacks that CAB claims is necessary. Instead, the Court found that no non-conclusory allegation in the complaint plausibly showed that the funds UBS AG "transferred to Iran were in fact sent to Hizbollah or Hamas or that Iran would have been unable to fund the attacks by Hizbollah and Hamas without the cash provided by [defendant]." *Id.* at 97. Here, the transfers alleged and the bank accounts held were for Hamas alter-egos or Hamas-controlled organizations or were transfers made directly to families of suicide bombers and other terrorists.

CAB's reliance on *In re Terrorist Attacks on Sept. 11, 2001 (Al Rajhi)*, 714 F.3d 118 (2d Cir. 2013) is likewise misplaced. Def. Mem. at 21. Those plaintiffs pleaded that Al Rajhi Bank ("ARB") maintained accounts for certain "charities" that it knew (or should have known) supported al-Qaeda. But the complaint never alleged that the "charities" were controlled by or

alter-egos of al-Qaeda, only that they sent funds to al-Qaeda among other recipients. The Second Circuit therefore held that the plaintiffs had failed to assert non-conclusory allegations that the specific accounts *held by ARB* for those "charities" were ever in fact used to transmit funds to al-Qaeda. 714 F.3d at 124. Indeed, for this reason, Defendant's many citations to *Siegel v. HSBC N. Am. Holdings*, 933 F.3d 217 (2d Cir. 2019) are irrelevant: the *Siegel* plaintiffs failed to identify *any* transfers HSBC processed on behalf of, or any accounts it held for, alter-egos or front organizations for al-Qaeda in Iraq.

As noted above, *O'Sullivan v. Deutsche Bank AG* is also inapposite because the court in that case found that the complaint "does not even allege that Defendants provided money directly to the IRGC-QF, Hezbollah, or Al-Qaeda, but rather alleges that Defendants indirectly supported those organizations by providing financial services to Iranian banks, airlines, shipping and oil companies with relationships to those organizations." *O'Sullivan*, 2019 WL 1409446, at *5.[17] Where a bank directs money to a terrorist group or its fronts, as the *Gill* court observed:

> The money used need not be shown to have been used to purchase the bullet that struck the plaintiff. A contribution, if not used directly, arguably would be used indirectly by substituting it for money in Hamas' treasury; money transferred by Hamas' political wing in place of the donation could be used to buy bullets. The problem can be solved by considering relative amounts of contributions and intentions. Thus, a major recent contribution with a malign state of mind would— and should—be enough, as the *Boim* en banc majority contended. But a small contribution made long before the event—even if recklessly made—would not be. The concept of proximate cause is central in imposing a balance.

*Gill v. Arab Bank, PLC*, 891 F. Supp. 2d 335, 367 (E.D.N.Y. 2012) (internal citations omitted).

Similarly, the court in *Weiss v. National Westminster Bank PLC* held:

> While the lapse of time may factor into the proximate cause inquiry, given the fungible nature of money and the fact that it is difficult to say when the particular dollar given to a terrorist is actually used, I cannot conclude as a matter of law that

---

[17]      Defendants also cite *Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342, 356 (E.D.N.Y. 2019), and *Stutts v. De Dietrich Grp.*, No. 03-cv-4058 (ILG), 2006 WL 1867060, at *4 (E.D.N.Y. June 30, 2006)—neither of which alleges knowing material support to an FTO in violation of §2339B.

> NatWest's transaction in 2000 could not be the proximate cause of an attack that occurred less than two years later in 2002. While defendant is correct that a transaction which occurred after a terrorist attack cannot be the proximate cause of that attack, because each attack was preceded by at least one relevant transaction by NatWest, plaintiffs have sufficiently alleged that each attack was proximately caused by NatWest.

453 F. Supp. 2d at 632 (footnotes omitted).

None of the trial evidence in *Linde* for the three Hamas attacks on appeal identified funds transfers that were used directly *to carry out the attacks,* and the plaintiffs never argued that Hamas would not have been able to carry out the attacks absent the specific funds provided by Arab Bank. Yet, *Linde* was remanded for new jury instructions, not dismissed for failure to meet the evidentiary standard for proximate cause. 882 F.3d at 332-33. *See also Miller*, 372 F. Supp. 3d at 46 ("However, a showing that defendant's conduct was the '[b]ut for' cause [of plaintiff's injuries] cannot be required in the section 2333(a) context.") (citing *Gill*, 893 F. Supp. 2d at 507). The reason for this is that "[r]equiring a showing of but-for causation would eviscerate Section 2333(a) of the ATA because money is fungible." *Id.* (citing *Linde*, 97 F. Supp. 3d at 324).

In sum, the AC plausibly pleads that CAB knowingly provided material support to Hamas in violation of 18 U.S.C. §2339B; that its actions constituted "acts of international terrorism" within the definition of 18 U.S.C. §2331(1); and that CAB's conduct was a proximate cause of Plaintiffs' injuries.

## IV.  PLAINTIFFS JULIE AVERBACH, MATANYA NATHANSEN, AND NEVENKA GRITZ HAVE STANDING TO SUE.

The R&R concluded that Plaintiff Julie Averbach, an Israeli national who lost a husband who was a U.S. national, and Plaintiffs Matanya Nathansen and Nevenka Gritz, foreign nationals who lost children who were U.S. nationals, do not have standing to bring solatium claims for their

personal injuries.[18] The District Court agreed, holding that the "R&R correctly determined that Plaintiffs Julie Averbach, Matanya Nathansen, and Nevenka Gritz lack standing to bring claims on their own behalf under JASTA because they are foreign nationals bringing claims for personal injuries." *Averbach for Estate of Averbach v. Cairo Amman Bank*, No. 19-cv-00004 (GHW) (KHP), 2020 WL 1130733, at *2 (S.D.N.Y. Mar. 9, 2020). The statute requires an injury to a U.S. national, but it does not limit recovery to that injured party or, if he or she died, his or her estate—it includes claims for survivors or heirs, irrespective of citizenship: "18 U.S.C. § 2333(a) contains no requirement that the survivors or heirs of a United States national killed by an act of international terrorism must themselves be citizens of the United States, and this court will not read such a requirement into the statute." *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 271 (D.R.I. 2004). *See also Weinstock v. Abu Marzook*, No. 17-cv-23202 (RNS), 2019 WL 1470245, at *4 (S.D. Fla. Apr. 3, 2019) ("Even Dov Weinstock, who was not a United States citizen, is included among those permitted to bring claims under Section 2333. As Yitzchak's father, Dov, was a 'survivor' of a United States national who was murdered in the terrorist attack."). In fact, in permitting *these very Plaintiffs*' claims to proceed, the *Weiss* court held that "it is sufficient for plaintiffs to allege a familial relationship, such as that of child, parent, spouse, or sibling of a U.S. national." *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d at 620 (citing *Ungar*, 304 F. Supp. 2d at 264). Plaintiffs simply note the case law contrary to the Court's holding and preserve their rights on appeal.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion to dismiss.

---

[18]     Defendants also move to dismiss the claims of Arie Miller because his name was inadvertently retained in the caption and the body of the AC. Defendants are correct that Mr. Miller's claims were previously dismissed, and Plaintiffs confirm that they are not being pursued herein.

Dated: June 25, 2020
       Hackensack, NJ

                                     Respectfully submitted,

                                     By:    /s/ Gary M. Osen
                                                **OSEN LLC**
                                              Gary M. Osen, Esq.
                                                Ari Ungar, Esq.
                                                Michael J. Radine, Esq.
                                                Dina Gielchinsky, Esq.
                                              Aaron Schlanger, Esq.
                                              2 University Plaza, Suite 402
                                              Hackensack, NJ 07601
                                              Telephone (201) 265-6400

                                              **TURNER & ASSOCIATES, P.A.**
                                              C. Tab Turner, Esq.
                                              4705 Somers Avenue, Suite 100
                                              North Little Rock, AR 72116
                                              Telephone (501) 791-2277

                                              **KOHN, SWIFT & GRAF, P.C.**
                                              Steven M. Steingard, Esq.
                                              Stephen H. Schwartz, Esq.
                                              Neil L. Glazer, Esq.
                                              1600 Market Street, Suite 2500
                                              Philadelphia, PA 19103
                                              Telephone (215) 238-1700

                                              Attorneys for Plaintiffs

**APPENDIX 1**

**Government Designations of CAB Customers and Transferors**

| CAB Customers | Israeli Designations as Unlawful or Terrorist Organization | U.S. Treasury SDGT Designations |
|---|---|---|
| Beit Fajar Zakat Committee AC ¶¶ 868, 914 | February 28, 2005 AC ¶ 874 | |
| Holy Land Foundation AC ¶ 587 | May 6, 1997 AC ¶ 584 | December 4, 2001 AC ¶ 593 |
| Al-Islah Charitable Society in Ramallah & Al-Bireh AC ¶ 914 | February 25, 2002 AC ¶ 886 | |
| Islamic Charitable Society – Hebron AC ¶ 914 | February 25, 2002 AC ¶ 774 | |
| Islamic Society – Gaza (Al-Jam'iya Al-Islamiya) AC ¶ 914 | February 25, 2002 AC ¶ 728 | |
| Jenin Zakat Committee AC ¶ 914 | February 25, 2002 AC ¶ 829 | |
| Islamic Center – Gaza (Al-Mujama Al-Islami) AC ¶ 914 | February 25, 2002 AC ¶ 718 | |
| Muslim Youth Association – Hebron AC ¶ 914 | February 25, 2002 AC ¶ 856 | |
| Nablus Zakat Committee AC ¶ 914 | June 9, 2006 AC ¶ 806 | |

| CAB Customers | Israeli Designations as Unlawful or Terrorist Organization | U.S. Treasury SDGT Designations |
|---|---|---|
| Qalqilya Zakat Committee<br>AC ¶ 914 | | |
| Quran and Sunnah Society Qalqilya<br>AC ¶ 914 | | |
| Ramallah – Al Bireh Zakat Committee<br>AC ¶ 914 | February 25, 2002<br>AC ¶ 844 | |
| Al Salah Islamic Society - Gaza<br>AC ¶ 914 | February 25, 2002<br>AC ¶ 749 | August 7, 2007<br>AC ¶¶ 752, 758 |
| Al-Tadamun Charitable Society (Nablus)<br>AC ¶¶ 821, 914 | February 25, 2002<br>AC ¶ 815 | |
| Tulkarem Zakat Committee<br>AC ¶¶ 914, 800 | February 25, 2002<br>AC ¶ 793 | |
| Al-Wafa Charitable Society<br>AC ¶ 914 | February 25, 2002<br>AC ¶ 766 | |
| Welfare Association for Palestinian and Lebanese Families<br>AC ¶ 947 | | October 4, 2012<br>AC ¶¶ 950-51 |
| World Assembly of Muslim Youth<br>AC ¶¶ 566, 681 | February 25, 2002<br>AC ¶ 685 | |
| Al-Ihsan Charitable Society<br>AC ¶ 914 | | |

| CAB Transferors | Israeli Designations as Unlawful or Terrorist Organization | U.S. Treasury SDGT Designations |
|---|---|---|
| Al Aqsa Foundation AC ¶ 552 | January 17, 1998 AC ¶ 553 | May 29, 2003 AC ¶¶ 559-60 |
| Comité de Bienfaisance et de Secours aux Palestiniens ("CBSP") AC ¶¶ 539, 548 | January 17, 1998 AC ¶ 540 | August 22, 2003 AC ¶¶ 544-46, 548 |
| Palestinian Relief and Development Funds ("Interpal") AC ¶¶ 541, 547 | January 17, 1998 AC ¶ 543 | August 22, 2003 AC ¶¶ 544-57 |
| Holy Land Foundation AC ¶¶ 574-76 | May 6, 1997 AC ¶ 584 | December 4, 2001 AC ¶ 593 |
| Palestinian Association in Austria ("PVOE") AC ¶ 549 | | August 22, 2003 AC ¶¶ 544-46, 549 |
| Union of Good AC ¶¶ 668, 676 | February 25, 2002 AC ¶ 675 | November 12, 2008 AC ¶ 676 |
| World Assembly of Muslim Youth AC ¶ 682 | February 25, 2002 AC ¶ 685 | |

3

**APPENDIX 2**

**Hamas-Controlled Entities Common to *Averbach v. Cairo Amman Bank*, *Linde v. Arab Bank*, the *Boim* Cases, and the *HLF* Criminal Case**

| CAB Customers | Arab Bank Customers[1] | *Boim* Cases[2] | Charged in *HLF* Criminal Case[3] | Unindicted Co-Conspirators in *HLF* Criminal Case[4] |
|---|---|---|---|---|
| Beit Fajar Zakat Committee AC ¶¶ 868, 914 | | | | |
| Holy Land Foundation AC ¶ 587 | | ✓ | ✓ | |
| Al-Islah Charitable Society Ramallah & Al-Bireh AC ¶ 914 | ✓ | | | |
| Islamic Charitable Society – Hebron AC ¶ 914 | ✓ | ✓ | ✓ | ✓ |
| Islamic Society – Gaza (Al-Jam'iya Al-Islamiya) AC ¶ 914 | ✓ | | | ✓ |
| Jenin Zakat Committee AC ¶ 914 | ✓ | ✓ | ✓ | ✓ |

[1] *See Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 350 n.5 (E.D.N.Y. 2015), *vacated on other grounds*, 882 F.3d 314 (2d Cir. 2018).

[2] As listed in *Boim v. Quranic Literacy Inst.*, No. 00-cv-2905, 2012 WL 13171764, at *6 (N.D. Ill. Aug. 31, 2012).

[3] *See United States v. El-Mezain*, 664 F.3d 467, 579 n.1 (5th Cir. 2011).

[4] *See* List of Unindicted Co-Conspirators and/or Joint Venturers, *United States v. Holy Land Found. for Relief and Dev.*, No. 04-cr-240 (N.D. Tex. May 29, 2007), ECF No. 656-2.

| CAB Customers | Arab Bank Customers | *Boim* Cases | Charged in *HLF* Criminal Case | Unindicted Co-Conspirators in *HLF* Criminal Case |
|---|---|---|---|---|
| Islamic Center – Gaza (Al-Mujama Al-Islami) AC ¶ 914 | ✓ | | | ✓ |
| Muslim Youth Association – Hebron AC ¶ 914 | | | | ✓ |
| Nablus Zakat Committee AC ¶ 914 | ✓ | ✓ | ✓ | ✓ |
| Qalqilya Zakat Committee AC ¶ 914 | | ✓ | ✓ | ✓ |
| Quran and Sunnah Society Qalqilya AC ¶ 914 | | | | |
| Ramallah – Al Bireh Zakat Committee AC ¶ 914 | ✓ | ✓ | ✓ | ✓ |
| Al Salah Islamic Society - Gaza AC ¶ 914 | ✓ | | | ✓ |
| Al-Tadamun Charitable Society (Nablus) AC ¶¶ 821, 914 | ✓ | | | |
| Tulkarem Zakat Committee AC ¶¶ 914, 800 | ✓ | ✓ | ✓ | ✓ |

| CAB Customers | Arab Bank Customers | *Boim* Cases | Charged in *HLF* Criminal Case | Unindicted Co-Conspirators in *HLF* Criminal Case |
|---|---|---|---|---|
| Al-Wafa Charitable Society AC ¶ 914 | | | | |
| Welfare Association for Palestinian and Lebanese Families AC ¶ 947 | | | | |
| World Assembly of Muslim Youth AC ¶¶ 566, 681 | | | | |
| Al-Ihsan Charitable Society AC ¶ 914 | | | | |

**APPENDIX 3**

**CAB Transfers to Its Accountholders Known to Plaintiffs Before Discovery**

| CAB Transferees | Number of Transfers | Period of Transfers | Amount | Account Maintained During Relevant Period | Amended Complaint Cite(s) |
|---|---|---|---|---|---|
| *Individual Accountholders* | | | | | |
| Wife of Ayd Abdalla Musleh | multiple "prisoner rewards payments" | Post-1992 arrest | | ✓ | AC ¶ 660 |
| Wife of Ayman Shaaban al-Shawa | multiple "prisoner rewards payments" | Post-1993 arrest | | ✓ | AC ¶ 659 |
| Ghazi Hamad | "at least six" | October 2000 - April 2001 | $50,985 | ✓ | AC ¶ 942 |
| Mohamad Saleh Taha | "at least five" | December 2000 - September 2001 | $9,870 | ✓ | AC ¶ 938 |
| Abbas al-Sayed | "at least seven" | February 2001 - May 2001 | $69,000 | ✓ [1] | AC ¶¶ 922-23 |
| Sayed Salem Abu Musameh | 3 | February 2001 - September 2001 | $6,000 | ✓ | AC ¶ 946 |

---

[1]     "Throughout the relevant time period (at least until his arrest in July 2002), CAB knowingly maintained account number 150027961600 for Abbas al-Sayed, one of HAMAS's most senior political and military leaders in the West Bank." AC ¶ 922.

| CAB Transferees | Number of Transfers | Period of Transfers | Amount | Account Maintained During Relevant Period | Amended Complaint Cite(s) |
|---|---|---|---|---|---|
| *Individual Accountholders* | | | | | |
| Family of Mahmud Marmash | "martyrdom" payments | Post-May 18, 2001 | | ✓ | AC ¶¶ 743, 932-33 |
| Family of Fawaz Bashir Badran | "martyrdom" payments | Post-July 2001 | | ✓ | AC ¶ 935 |
| Family of Iyad Taqi | 1 | Post-November 6, 2001 | $5,100 | ✓ | AC ¶¶ 666, 1012 |
| Father of Amjad Tubasi | "reward payment" | Post-December 4, 2001 | | ✓ | AC ¶ 823 |
| Brother of Hamed Abu Hijla | "multiple payments" | Post-January 1, 2002 | | ✓ | AC ¶ 665 |
| Father of Shadi al-Tubasi | "multiple reward payments" | Post-March 31, 2002 | | ✓ | AC ¶ 661 |
| Abd al-Khaleq Hasan Shadli al-Natshe | | | | ✓[2] | AC ¶ 781 n.28 |

---

[2]     "According to al-Natshe's police statement on October 30, 2002, he also held a personal account at CAB." AC ¶ 781 n.28.

| CAB Transferees | Number of Transfers | Period of Transfers | Amount | Account Maintained During Relevant Period | Amended Complaint Cite(s) |
|---|---|---|---|---|---|
| *Organizational Accountholders* | | | | | |
| Beit Fajar Zakat Committee | | | | ✓ | AC ¶¶ 868, 914 |
| Holy Land Foundation | 2 | December 1999-January 2001 | $420,026 | ✓ | AC ¶¶ 587, 591-92 |
| Al-Islah Charitable Society in Ramallah & Al-Bireh | | | | ✓ | AC ¶ 914 |
| Islamic Charitable Society – Hebron | | | | ✓ | AC ¶ 914 |
| Islamic Society – Gaza (Al-Jam'iya Al-Islamiya) | | | | ✓ | AC ¶ 914 |
| Jenin Zakat Committee | "multiple" | February 2000-May 2004 | | ✓ | AC ¶¶ 561-64, 830-31, 914 |
| Islamic Center – Gaza (Al-Mujama Al-Islami) | | | | ✓ | AC ¶ 914 |
| Muslim Youth Association – Hebron | | | | ✓ | AC ¶ 914 |
| Nablus Zakat Committee | | | | ✓ | AC ¶ 914 |
| Qalqilya Zakat Committee | | | | ✓ | AC ¶ 914 |

| CAB Transferees | Number of Transfers | Period of Transfers | Amount | Account Maintained During Relevant Period | Amended Complaint Cite(s) |
|---|---|---|---|---|---|
| *Organizational Accountholders* | | | | | |
| Quran and Sunnah Society Qalqilya | | | | ✓ | AC ¶ 914 |
| Ramallah – Al Bireh Zakat Committee | | | | ✓ | AC ¶ 914 |
| Al Salah Islamic Society - Gaza | | | | ✓ | AC ¶ 914 |
| Al-Tadamun Charitable Society (Nablus) | | 2002 | "more than $50,000" | ✓ | AC ¶¶ 821, 914 |
| Tulkarem Zakat Committee | | | | ✓ | AC ¶¶ 914, 800 |
| Al-Wafa Charitable Society | | | | ✓ | AC ¶ 914 |
| Welfare Association for Palestinian and Lebanese Families | | | | ✓ | AC ¶ 947 |
| World Assembly of Muslim Youth | "multiple" | October 2003-2004 | | ✓ | AC ¶¶ 565-66, 681, 687-88 |
| Al-Ihsan Charitable Society | | | | ✓ | AC ¶ 914 |