UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

JULIE AVERBACH FOR THE ESTATE OF STEVEN   :
AVERBACH, *et al.*,   :
  :
      Plaintiffs,   :
  :   No. 19-cv-00004-GHW-KHP
   -against-   :
  :
CAIRO AMMAN BANK,   :
  :
      Defendant.   :

------------------------------------------------------------------------x

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CAIRO AMMAN BANK'S MOTION TO DISMISS THE <u>SECOND AMENDED COMPLAINT</u>

**<u>TABLE OF CONTENTS</u>**

I.  PRELIMINARY STATEMENT ........................................................................................... 1

II.  PLAINTIFFS HAVE SUFFICIENTLY PLEADED THEIR AIDING AND ABETTING
    CLAIM UNDER JASTA ................................................................................................. 4

  A.  PLAINTIFFS HAVE SUFFICIENTLY ALLEGED CAB AIDED THE PARTY WHO
      CAUSED INJURY ..................................................................................................... 7

  B.  PLAINTIFFS HAVE SUFFICIENTLY ALLEGED CAB'S GENERAL AWARENESS
      UNDER *HALBERSTAM* ........................................................................................... 8

  C.  PLAINTIFFS HAVE SUFFICIENTLY ALLEGED THAT CAB KNEW IT WAS
      ASSISTING HAMAS ORGANIZATIONS CLOSELY INTERTWINED WITH ITS
      VIOLENT ACTIVITIES ........................................................................................... 12

    1.  Plaintiffs Have Extensively Alleged CAB's Knowledge ......................................... 13

    2.  CAB Fails to Refute Plaintiffs' Extensive Allegations ............................................. 15

  D.  PLAINTIFFS HAVE SUFFICIENTLY ALLEGED THAT CAB KNOWINGLY
      PROVIDED SUBSTANTIAL ASSISTANCE ............................................................... 19

III.  PLAINTIFFS HAVE SUFFICIENTLY PLED A PRIMARY LIABILITY CLAIM ........ 23

IV.  THE NON-CITIZEN PLAINTIFFS HAVE COGNIZABLE CLAIMS............................. 24

V.  THIS COURT HAS PERSONAL JURISDICTION OVER CAB.................................... 25

CONCLUSION.................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Averbach v. Cairo Amman Bank*,
    No. 19-cv-0004-GHW-KHP, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020) ...................... *passim*

*Bartlett v. Société Générale de Banque au Liban SAL*,
    No. 19-cv-7-CBA-VMS, 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ................................ 23

*Chew v. Dietrich*,
    143 F.3d 24 (2d Cir. 1998) ..................................................................................... 25

*Conn. Nat'l Bank v. Fluor Corp.*,
    808 F.2d 957 (2d Cir. 1987) ................................................................................... 12

*Gelman v. Ashcroft*,
    372 F.3d 495 (2d Cir. 2004) ................................................................................... 25

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ..................................................................... 4, 8, 19

*Honickman v. BLOM Bank SAL*,
    6 F.4th 487 (2d Cir. 2021) .......................................................................... *passim*

*In re Terrorist Attacks on Sept. 11*,
    714 F.3d 118 (2d Cir. 2013) ................................................................................... 24

*Kaplan v. Lebanese Canadian Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021) ...................................................................... *passim*

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ................................................................................... 25

*Licci v. Lebanese Canadian Bank, SAL*,
    20 N.Y.3d 327 (2012) ............................................................................................ 25

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018) ............................................................... 3, 20, 23, 24

*Miller v. Arab Bank, PLC*,
    372 F. Supp. 3d 33 (E.D.N.Y. 2019) ..................................................................... 11

*Siegel v. HSBC N. Am. Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019) ..................................................................................... 6

*SPV Osus Ltd. v. UBS AG*,
   882 F.3d 333 (2d Cir. 2018) ........................................................................ 25

*Strauss v. Credit Lyonnais, S.A.*,
   175 F. Supp. 3d 3 (E.D.N.Y. 2016) .......................................................... 23

*Weiss v. Nat'l Westminster Bank PLC*,
   993 F.3d 144 (2d Cir. 2021) ...................................................................... 24

**Statutes**

Justice Against Sponsors of Terrorism Act, Pub. L. 114-222 ...................................... 7

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................... 3, 19

Fed. R. Civ. P. 54(b) ........................................................................................ 25

## I.    PRELIMINARY STATEMENT

For nearly two years, CAB has consistently criticized Plaintiffs for "attacking Judge Daniels's decision in *Kaplan v. Lebanese Canadian Bank*," and for urging this Court – in Defendant's words – "to write it off as wrongly decided." ECF No. 71 at 2. In its previous motion to dismiss, CAB insisted that this case should be dismissed for the same reasons as "Judge Daniels's recent decision in the 'near identical case' of *Kaplan*." ECF No. 68 at 19.

But now, CAB asks this Court to ignore the *Second Circuit's holdings* in *Kaplan* and instead conclude – against all logic – that dismissal of this "near identical case" is actually "mandated by its recent decision[] in *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021)." CAB at 1. In doing so, CAB retains and heavily relies upon arguments squarely rejected by the Second Circuit's *Kaplan* and *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021), decisions, mischaracterizing controlling law and ignoring or mischaracterizing much of the Second Amended Complaint ("SAC" (all ¶ citations herein refer to the SAC)).

And whereas previously the *Kaplan* complaint presented a "near identical case" to this one, now the SAC's allegations are purportedly "in marked contrast to *Kaplan*." CAB at 15.[1] But, in reality, the allegations here are, in most respects, far *stronger* than those in *Kaplan*. In *Kaplan*, the defendant allegedly provided financial services to the Martyrs Foundation, a Lebanese entity that was publicly identified with Hezbollah and acknowledged to have made "martyr payments" to families of suicide bombers to incentivize attacks (but, importantly, *not* the rocket attacks that injured the plaintiffs in that case). Here, CAB provided financial services to, among others, the Arab Liberation Front ("ALF"), a Palestinian organization that was not only publicly reported to have made "martyr payments" to families of suicide bombers during the relevant time, ¶¶ 1201-

---

[1]    CAB was evidently so convinced that this case was nearly "identical" to *Kaplan* that its prior Reply Brief referred to the attacks at issue here as "the rocket attacks." ECF No. 71 at 1. Rocket attacks were in *Kaplan*, not here.

Case 1:19-cv-00004-GHW-KHP   Document 101   Filed 11/01/21   Page 6 of 49

31, but was also repeatedly and *publicly* reported to have distributed checks to families of suicide bombers issued by CAB *itself*, ¶¶ 1223, 1228, 1230 & n.78.

Moreover, CAB is alleged to have provided financial services to multiple *additional* organizations that made well-publicized, contemporaneously-reported payments to families of Hamas suicide bombers and other Hamas "martyrs," including: the *same* Martyrs Foundation discussed in *Kaplan,* through its local agent, the *al-Ansar* Society, ¶¶ 1249-1262; the Holy Land Foundation ("HLF"), ¶¶ 624, 633, 645; Al-Mujama Al-Islami, ¶ 820; Al-Jam'iya Al-Islamiya, ¶ 820; al-Salah Charitable Society, ¶¶ 820, 864 & n.45, 875; Tulkarem Zakat Committee, ¶ 941; and the Islamic Charitable Society-Hebron, ¶¶ 912, 918. And, unlike *Kaplan*, Plaintiffs also alleged CAB provided financial services to a long list of Hamas entities and individuals, including several directly involved in Hamas's terror apparatus, *see e.g.*, ¶¶ 859, 709-710, 714-15, 859, 977 & Exhibit N, 996-98, 1129-30, 1257, 1270, such as the mastermind of one of the suicide bombings at issue in this case, ¶¶ 1136-37, 1142 (Abbas al-Sayed), and a Hamas organization whose chair and senior staff were "involved in planning" another attack at issue in this case and recruiting suicide bombers, ¶¶ 1059, 1062 (*al-Islah* Charitable Society in Ramallah).

And whereas in *Kaplan none* of the defendant Lebanese Canadian Bank's ("LCB") "Five Customers" were designated by *any* government prior to the attacks at issue there, here Plaintiffs have alleged that Israel—which exercised jurisdiction over CAB's branches in the Palestinian Territories that provided the services at issue here—designated 14 of CAB's customers and their transferors before and during the relevant period, ¶¶ 627, 746, 759, 824, 852, 877, 896, 914, 940, 980, 1000, 1017, 1032, 1070. Moreover, unlike *Kaplan*, Plaintiffs here allege that CAB continued to process transactions or provide account services for at least three Specially Designated Global Terrorists ("SDGTs") *after* the U.S. designated them. ¶¶ 605-07, 760-63, 1009 (Al-Aqsa

Foundation ("AAF")); ¶¶ 899, 928, 987, 1010, 1056, 1076 (Interpal); ¶ 1179 (HLF).

Understandably then, CAB spends much of its brief avoiding the Second Circuit's *Kaplan* and *Honickman* decisions, focusing instead on its preferred cases—*Weiss*, *Strauss*, *Linde*, and *Siegel*—all of which were distinguished in *Kaplan* and only one of which is a 12(b)(6) case. *See Kaplan*, 999 F.3d at 861 (distinguishing "*Linde* and *Weiss* [because they] were not decided on the basis of their pleadings").[2] Nevertheless, CAB recycles its past constructions of those cases despite those arguments having been flatly rejected by the Second Circuit in *Kaplan*.

For example, CAB again cites *Linde* for the proposition that "aiding and abetting an act of international terrorism requires more than the provision of material support to [what the bank knew was] a designated terrorist organization," CAB at 6 (quoting *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018)), but elides that the *Kaplan* court clarified that "that statement articulates the principle that knowingly providing material support to an FTO [Foreign Terrorist Organization], without more, does not *as a matter of law* satisfy the general awareness element. *Whether a defendant's material support to an FTO suffices to establish general awareness is a fact-intensive inquiry.*" 999 F.3d at 860 (citing *Linde*, 882 F.3d at 329-30 (emphasis added)). *See also id.* ("[n]othing in *Linde* repudiates the *Halberstam* standard"). *Kaplan* makes clear that *Linde* (in which the Circuit was reviewing jury instructions in the context of a full record) did *not* stand for the proposition that knowingly providing material support to an FTO could not satisfy the general awareness requirement, or mandate dismissal on a motion on the pleadings. *Id.*

Finally, again ignoring *Kaplan* and inviting this Court to err, CAB cites *Siegel* at length to suggest that assisting an entity "believed by some" to have links to terrorist groups is insufficient

---

[2]      CAB nevertheless cites *Weiss* (and its companion case, *Strauss*) a dozen times, despite it being decided at the summary judgment stage. *Kaplan* set it aside in a single paragraph, noting that it was "based on the undisputed factual record as to the state of the defendant bank's knowledge--developed during some 10 years of pretrial discovery," 999 F.3d at 861.

to plead a JASTA case; but LCB made this exact argument in *Kaplan*, which the Second Circuit rejected, pointing out that in *Siegel* (among other "conspicuous differences"), the defendant's "customer was another bank" and while "there were news articles and United States government studies that stated that [the customer] had terrorist organizations as clients, there was no suggestion in the *Siegel* complaint that [defendant] itself had any such clients…." 999 F.3d at 862.

But the SAC here, like the complaint in *Kaplan*, "alleged that the relevant customers of [defendant] were persons and entities who were in fact integral parts of [the FTO], and that [defendant] knew this was so because [the FTO] repeatedly publicized those relationships on [its] websites and in news media…." *Id*. As demonstrated in the Appendices attached hereto, allegations of CAB's customers' roles as integral parts of Hamas, including by directly incentivizing and rewarding Hamas suicide bombings, are both voluminous and significantly in excess of the allegations found sufficient in *Kaplan*, both quantitatively and qualitatively.

In sum, after urging this Court for years to adopt the wrong legal standards for JASTA liability, CAB's renewed invitation to do so should be declined.

## II.   PLAINTIFFS HAVE SUFFICIENTLY PLEADED THEIR AIDING AND ABETTING CLAIM UNDER JASTA

To plead an aiding and abetting claim under JASTA, Plaintiffs must meet the three elements set out in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983):

> "(1) the party whom the defendant aids must perform a wrongful act that causes an injury" (the "aiding party who causes injury" element); "(2) the defendant must be *generally aware* of his role as part of an overall illegal or tortious activity at the time that he provides the assistance" (the "general awareness" element); "(3) the defendant must *knowingly and substantially assist* the principal violation" (the "substantial assistance" element).

*Honickman*, 6 F.4th at 494 (quoting *Halberstam*, 705 F.2d at 477) (emphases added in *Honickman*). Plaintiffs have met all three here.

In making its assessment, the Court must find "whether there is a permissible relevant inference from '*all* of the facts alleged, taken collectively,' not whether an inference is permissible based on 'any individual allegation, scrutinized in isolation.'" *Kaplan*, 999 F.3d at 854 (emphasis in original) (citations omitted). As the Circuit noted, in *Halberstam*, "acts that are 'neutral standing alone ... must be evaluated in the context of the enterprise they aided,'" which in *Kaplan* was "Hizbollah's policy and practice of engaging in terrorist raids—and repeatedly publicizing that policy and practice—from the time of its founding" through the relevant period. *Kaplan*, 999 F.3d at 865. The Circuit went on to list the *Kaplan* complaint's nonconclusory allegations including "that Hizbollah has been a terrorist organization headquartered in Lebanon since 1982, that LCB was a Lebanese bank headquartered in Lebanon, that banking regulations require banks to know their customers, and that Shahid, Bayt al-Mal, and Yousser were customers of LCB in Lebanon since at least 2003 [three years prior to the attacks at issue.]" *Id.*

Here, the SAC's nonconclusory allegations include that (1) Hamas has been a terrorist organization headquartered in the Palestinian Territories since 1987, ¶ 1273, (2) CAB was at all relevant times a Jordanian bank with branches throughout the Palestinian Territories, ¶ 1274, (3) international banking standards and best practices require banks to know their customers, ¶¶ 1103-10, (4) HLF and many other Hamas-controlled entities were customers of CAB for many years prior to the attacks at issue ("Attacks"), *see, e.g.*, ¶¶ 631, 889, 898, 927, 948-50, 967, 1007, 1127, and (5) CAB knowingly provided financial services to Hamas-controlled entities and senior Hamas leaders, ¶¶ 1127, 1129-75, during and in the years leading up to an unprecedented terror campaign involving almost daily mass casualty attacks, public ceremonies in the Palestinian Territories (celebrating those attacks and mourning the deaths of the perpetrators), Palestinian Authority and Israeli arrests of Hamas leaders, Israeli military incursions, *see, e.g.*, ¶¶ 552, 684-89, 843, 947,

1030, 1111-20, 1141-43, 1156, 1201, 1223, and even the destruction of CAB's Jenin branch location because of its purported use as a bomb-manufacturing laboratory, ¶ 1101.

Considering all of the SAC's allegations as a whole, it beggars belief that CAB could have been ignorant of the tumultuous events transpiring literally outside of its doors or the role its Hamas customers played in fomenting and financing the violence engulfing the entire region where its branches operated. To cite just three examples, CAB held accounts for:

- **Abd al-Khaleq al-Natshe** – Hamas's senior leader in Hebron, ¶¶ 926 n.52, 1129, 1173, who was not only the featured speaker at Hamas rallies, and a frequent spokesman for the terrorist organization during the relevant period, but was also described as such by the *Jerusalem Post* in 1995, ¶ 926 n.51, the *BBC* in 1996, *id.*, the *Los Angeles Times* and *Associated Press* in December 2001, ¶¶ 912-13, and *Time Magazine* in September 2002, ¶ 915.

- **Abbas al-Sayed** – Hamas's senior leader in Tulkarem and mastermind of the Park Hotel suicide bombing in 2002 who openly delivered speeches and conducted phone interviews with various satellite channels as a Hamas spokesman during the relevant period, ¶¶ 1136-39, 1142.[3]

- **Holy Land Foundation** – Hamas organization established in 1989, ¶ 616, whose offices were raided by Israeli authorities in 1995, ¶ 620. *The New York Times* reported in 1996 that Israel identified HLF as a "key fundraising operation" for Hamas. ¶ 624. In May 1997, Israel designated HLF as a Hamas organization and declared that it "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks, or who were jailed in the wake of these attacks …." ¶ 627. In June 1997, the *Associated Press* reported on the designation, noting the Israeli government's finding that HLF has "become part of the communications and economic infrastructure of Hamas." ¶ 629. On January 26, 2001, the Palestinian daily newspaper *Al-Hayat al-Jadida* reported that HLF was paying $700 to martyrs' families and $2,000 to married martyrs' families during the Second Intifada. ¶ 633. Echoing Israeli government findings and widely published reports, the FBI concluded in 2001 that "evidence strongly suggests that the [HLF] has provided crucial financial support for families

---

[3]     If the *St. Louis Dispatch* could report in October 2001 that al-Sayed was a "spokesman for Hamas," ¶ 1141, it is highly plausible, if not certain, that his local bank branch where he held an account and transacted business (including receiving large sums of money from Lebanon) would be aware of that fact. This Court previously found CAB's assistance to al-Sayed insufficient because the identified transfers through New York occurred months prior to the attack, R&R at *14, but "knowing and substantial assistance to the actual injury-causing act—here, Hamas's attacks—is unnecessary." *Honickman*, 6 F.4th at 499. The Court relied on *Siegel*, in which HSBC *intentionally ended its relationship* with Al Rajhi Bank 10 months before the attacks and there were no allegations that the bank ever transferred funds to the FTO at issue. *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019).

of HAMAS suicide bombers, as well as the Palestinians who adhere to the HAMAS movement. It is believed that by providing these annuities to families of HAMAS members, the [HLF] assists HAMAS by providing a constant flow of suicide volunteers and buttresses a terrorist infrastructure heavily reliant on moral support of the Palestinian populace." ¶ 643.

In sum, Plaintiffs more than sufficiently alleged that CAB's customers included notorious Hamas leaders and entities and that CAB knowingly assisted Hamas, the terrorist group responsible for the Attacks.

## A. PLAINTIFFS HAVE SUFFICIENTLY ALLEGED CAB AIDED THE PARTY WHO CAUSED INJURY

CAB again asserts that Plaintiffs must allege "that the fifteen Hamas terrorists who committed the Attacks were customers of CAB or received transfers through the Bank," CAB at 3, and supports this by its inclusion of Appendices A-C from its prior two motions to dismiss to show that the SAC "contains no allegations connecting CAB to the Attacks." The assertion is flatly contrary to controlling law.

In *Kaplan*, the defendant made the exact same argument CAB makes here. The Second Circuit squarely rejected it, holding that "in arguing that the substantial assistance must be given 'to' the person who committed international terrorism, LCB disregards Congress's instruction that JASTA is to be read broadly and to reach persons who aid and abet international terrorism 'directly or indirectly.'" 999 F.3d at 855 (citing JASTA, Pub. L. No. 114-222, § 2(b)). It concluded:

> In sum, we reject LCB's contention that the SAC was deficient for not alleging that LCB's customers themselves committed actions of international terrorism. The language and purpose of JASTA are meant to allow an aiding-and-abetting claim where the defendant's acts aided and abetted the principal even where his relevant substantial assistance was given to an intermediary.

*Id*. at 856. Moreover, the Circuit could not have been clearer in *Honickman* that a bank's "[customers] do not themselves need to be 'engaged in ... violent or terrorist acts.'" 6 F.4th at 499 n.15 (citation omitted). And in both *Kaplan* and *Honickman*, the Circuit held that the defendant's

7

assistance need not even be made directly *to the terrorist group*, much less the individual terrorist. *See Kaplan*, 999 F.3d at 863-64 (holding that under JASTA, assistance may be given "whether directly to the FTO or indirectly through an intermediary"); *Honickman*, 6 F.4th at 495-96 (same).

## B. PLAINTIFFS HAVE SUFFICIENTLY ALLEGED CAB'S GENERAL AWARENESS UNDER *HALBERSTAM*

In *Honickman,* the Second Circuit clarified the general awareness element as follows:

> The "general awareness" element requires the defendant to be "generally aware" of its role in "an *overall illegal or tortious activity* at the time that [it] provides the assistance." The defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*.

6 F.4th at 496 (quoting *Halberstam*, 705 F.2d at 477, 488) (emphasis added in *Honickman*). *See also Kaplan*, 999 F.3d at 856, 863 (same and noting that "'general awareness' is less demanding than a requirement that they show awareness"). As the Circuit explained, terrorist attacks are a foreseeable risk of playing a role in providing illegal or tortious financial services to a customer when that customer is "closely intertwined" with a terrorist group's "violent terrorist activities." *Honickman*, 6 F.4th at 499 (quoting *Kaplan*, 999 F.3d at 860-61).

The "closely intertwined" standard is not a demanding one—as stated above, the "[customers] do not themselves need to be 'engaged in ... violent or terrorist acts'" to meet this standard. *Id.* at 499 n.15 (citation omitted). In *Kaplan*, LCB's customers included a putative charity (the "Martyrs Foundation" or "Shahid"), two corporations, and two of their officers. None had a direct role in any of the attacks at issue—indeed, the Martyrs Foundation was alleged to have made incentive payments to *suicide bombers*, whereas all of the attacks at issue in that case involved rockets launched over the Israel-Lebanon border. Nevertheless, the Circuit found LCB's customers

sufficiently intertwined with Hezbollah's violent terrorist activities.[4]

Here, most of CAB's identified customers were as closely intertwined with Hamas's violence as the customers in *Kaplan* were with Hezbollah's violence – and arguably more so. CAB provided financial services and maintained accounts during the relevant period for at least three senior Hamas leaders directly implicated in the organization's terror apparatus, ¶¶ 1136-51 (Abbas al-Sayed), ¶¶ 1152-57 (Mohamed Saleh Taha), and ¶¶ 926 & n.50, 1173 (Abd al-Khaleq al-Natshe). All three were contemporaneously identified in press reports as Hamas leaders and widely known to the Palestinian public as such. CAB also provided financial services and maintained accounts during the relevant period for HLF, an entity designated by Israel in 1997 and 1998 and the U.S. in 2001 as a Hamas institution which made payments to families of suicide bombers, as discussed further below. ¶¶ 631, 633, 646, 912, 1175, 1179.

During the relevant period, CAB also provided financial services to, and maintained accounts for, multiple Hamas-controlled entities that facilitated "martyr payments" to the families of Hamas and other terrorist operatives.[5] Many of these allegations were openly publicized in the media during the relevant period. *See, e.g.*, ¶¶ 633, 645, 820, 864 & n.45, 875, 912, 918, 941. Plaintiffs also detail CAB's other customers' core roles in Hamas's structure, voluminous examples of which were publicly described and identified as being part of Hamas's terrorist activities. *See, e.g.*, ¶¶ 805, 817, 844-47, 850-51 & n.43, 867, 910, 923, 978. CAB also provided

---

[4]      The Circuit in *Honickman* did not reach the question of intertwinement, but noted the difference in "alleged functions" between the Martyrs Foundation's subsidies to "the families of Hizbollah suicide bombers," and LCB's "violation of regulatory restrictions meant to hinder the ability of FTOs to carry out terrorist attacks," on the one hand, and the customers in *Honickman* which "were alleged *only* to have supported orphans in Palestinian refugee camps" in Lebanon, on the other. 6 F.4th at 503 n.21 (emphasis added).

[5]      Unlike the *Kaplan* complaint, the SAC contains a copy of an actual "martyr file" issued by CAB customer *al-Tadamun* Charitable Society for the "brave holy warrior" Amjad Abd al-Rahim Abd al-Razzaq Tubasi – a Hamas operative killed in a clash with the IDF on April 12, 2001. It includes his father's Palestinian Authority I.D. Card and bank account number at CAB. *See* <u>Exhibit N</u> to the SAC. *See also* ¶ 977.

financial services to two other entities not controlled by Hamas that nevertheless very publicly offered "martyr payments" to the families of Hamas suicide bombers and other "martyrs" of the "resistance." ¶ 1196 (ALF), ¶¶ 1254, 1262 (Martyrs Foundation). The SAC even quotes news articles and a published Israeli government report identifying CAB *by name* as the source of checks distributed at public ceremonies in the Palestinian Territories. ¶¶ 1223, 1228, 1230 & n.78.

Several of CAB's customers were also associated with the Union of Good ("UoG"), "Hamas's premier fundraising umbrella organization." ¶ 658 n.23. The UoG was established in October 2000 as a public fundraising campaign for the Second Intifada, ¶ 717, and was chaired by Sheikh Yusuf al-Qaradawi, "one of the most recognized and famous people in the Arab and Muslim world" who was featured on the organization's website from its inception, ¶¶ 722-28. He was also (contemporaneously) the highest-profile advocate for suicide bombing attacks on Israeli civilians. ¶¶ 729-43. The Palestinian Monetary Authority temporarily restricted CAB and other banks from processing UoG transfers in late 2001, ¶ 1113, and Israel designated it in February 2002 for strengthening Hamas's infrastructure, ¶ 746. The U.S. designated UoG an SDGT in 2008 for, *inter alia*, "providing payments to the families of suicide bombers." ¶ 748. Several CAB customers were member organizations within the Union of Good, ¶¶ 574 n.16, 720-21, 750, 1181-82, shared leadership with UoG, ¶¶ 751, 885, 926, 966, 971, and received payments from UoG organizations, ¶¶ 878, 883, 894, 942, 985-86, 995, 1023, 1044, 1054, 1085.

CAB essentially just ignores all of these allegations and makes factual counter-assertions that their customers were all purely charitable organizations,[6] CAB at 3-4, notwithstanding the fact

---

[6]     For examples of the "charitable" activities of CAB's customers, *see* Exhibits K and M to the SAC. Exhibit K constitutes still photos from a video taken from a graduation ceremony held for kindergarteners from CAB customer Islamic Society of Gaza where kindergarten children in uniforms and equipped with toy automatic weapons wore the headbands of Hamas suicide bombers. As noted in the SAC, the video can be viewed at https://www.osenlaw.com/ sites/default/files/uploaded/Counter-Terrorism/Arab_Bank/hamas_org/PX1132.mp4. Exhibit M constitutes still photos from a video taken at an August 1, 2001, public event in Nablus where Sheikh Hamed Bitawi, vice chairman and chairman, respectively, of CAB customers Nablus Zakat Committee and *al-Tadamun* Charitable Society, was the

that the Court "must accept as true all nonconclusory factual allegations in the complaint and draw all reasonable inferences in plaintiffs' favor." *Kaplan*, 999 F.3d at 854.[7] CAB also argues that Plaintiffs rely on a "da'wa theory" allegedly rejected by the Circuit. CAB at 2, 4. But the "theory" the Circuit rejected was that *any* knowing assistance to an FTO (without more) satisfies JASTA's general awareness standard ***per se***. Of course, each of LCB's "Five Customers" belonged to Hezbollah's "da'wa" and "social infrastructure"—the three entities were outwardly "legitimate" organizations providing financial services, loans, and social and medical assistance. *See Kaplan*, 999 F.3d at 849 (describing the Five Customers). Likewise, the Martyrs Foundation's payments to families of suicide bombers *was* a da'wa function. *See Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 39 n.1 (E.D.N.Y. 2019) ("One of Da'Wa's functions is to pay expenses for and assist the families of terrorists who were arrested, injured, or killed."). Whether a defendant is generally aware that a component of an FTO's da'wa is "closely intertwined" with the FTO's violent activities (but not necessarily "engaged in ... violent or terrorist acts"), is "a fact-intensive inquiry." *Honickman*, 6 F.4th at 498, 499 n.15. That question may depend on a number of circumstances, but as *Kaplan* explains, where the customer is involved in financing or incentivizing violence (*e.g.*, the Martyrs Foundation) or was "openly, publicly, and repeatedly acknowledged" as "integral constituent parts of" the FTO, 999 F.3d at 864, 865 (finding Bayt al-Mal and Yousser allegations sufficient, despite no alleged direct connection between those entities and violence), that requirement is satisfied.

---

featured speaker, holding an assault rifle and leading the vast crowd in a pledge "to avenge the souls of the martyrs." As noted in the SAC, the video of the Nablus event is available at https://www.youtube.com/ watch?v=KKma5eW7_sw (12:12-14:18).

[7]    CAB's brief is also rife with counter-assertions of "facts" not found in the SAC or its incorporated documents: *Weiss* records, the Oslo Accords, a "WorldCheck" service, and the Quran. CAB at 2, 3 nn.1-2, 12 n.4, 13 n.9, 15 n.11.

### C. PLAINTIFFS HAVE SUFFICIENTLY ALLEGED THAT CAB KNEW IT WAS ASSISTING HAMAS ORGANIZATIONS CLOSELY INTERTWINED WITH ITS VIOLENT ACTIVITIES

Establishing knowledge is a low burden at this stage. "A complaint is allowed to contain general allegations as to a defendant's knowledge, *see* Fed. R. Civ. P. 9(b), because 'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.'" *Kaplan*, 999 F.3d at 864 (quoting *Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987)). This Court must "consider all of the complaint's allegations, rather than considering each in isolation, and to accept as true all permissible inferences that could be drawn from the complaint as a whole." *Id.* at 865. Thus, plaintiffs may rely on "public sources" of information that could plausibly support the inference a bank was aware of its customers' affiliations with a terrorist group, but "Plaintiffs did not need to allege that [defendant] Bank *knew or should have known* of the public sources at the pleading stage. Such a requirement at this juncture would be too exacting." *Honickman*, 6 F.4th at 501 (citing *Kaplan*, 999 F.3d at 865) (emphasis added). In *Kaplan*, the Circuit rejected the requirement that plaintiffs allege the bank "read or was aware of such sources." 999 F.3d at 865.

In both cases, the Second Circuit identified several types of "public sources" of information that are sufficient in themselves (though not necessary) to show a bank's knowledge of its customers' affiliation with a terrorist group:

- The bank's operations in the FTO's territory. *See id.*, 999 F.3d at 865 ("[o]ther relevant nonconclusory allegations included that Hizbollah has been a terrorist organization headquartered in Lebanon since 1982, that LCB was a Lebanese bank headquartered in Lebanon, … and that Shahid, Bayt al-Mal, and Yousser were customers of LCB in Lebanon since at least 2003").

- "English-language articles that recounted the connection between Hizbollah and Shahid Martyrs." *Id.* at 850. *See also Honickman*, 6 F.4th at 502 n.18 (crediting "public sources such as media articles").

- "Statements" from a terrorist group relating to a customer, particularly with some information on when and how they were made, although "[a]ny further needed specificity can be sought in discovery." *Kaplan*, 999 F.3d at 864.

12

- Government designations of groups as affiliated with a terrorist group, although designations are **not** "a prerequisite for knowledge … and it would defy common sense to hold that such knowledge could be gained in no other way." *Id.* at 864.

- Due diligence rules and procedures "intended to prevent terrorist organizations such as Hizbollah from conducting banking activities, including wire transfers, and thereby limit their ability to operate and to carry out terrorist attacks," *id.* at 849, including by reviewing third parties that transfer funds to customers, where sufficiently supported, *see Honickman*, 6 F.4th at 502 & n.20.

- The customers' officers included Hamas leaders if that was "public knowledge during the relevant period." *Id.* at 501-02.

### 1.    Plaintiffs Have Extensively Alleged CAB's Knowledge

Plaintiffs here have alleged vast arrays of public sources of knowledge, far beyond those alleged in *Kaplan*. First, while *Kaplan* involved no designations of bank customers or their transferors before the attacks at issue, Plaintiffs here alleged that Israel designated CAB customer HLF an "illegal organization" in 1997 for "deal[ing] in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks, or who were jailed in the wake of these attacks" and a "terror organization" in 1998. ¶¶ 627, 1096, 1175, 1177. The SAC describes contemporaneous media reports linking HLF to Hamas and its role in financing Hamas's support for the families of suicide bombers.[8] Yet, CAB simply asserts (on a motion to dismiss) that it closed "the account" for HLF in December 2001[9] when the U.S. designated it as an SDGT, CAB at 12 n.4 – as if this (unsupported) factual assertion is exculpatory coming five years after HLF was publicly identified as a Hamas fundraiser and three after Israel designated it a terrorist organization.

---

[8]      *See, e.g.*, ¶ 624 (quoting *The New York Times* in 1996), ¶ 625 (quoting the *Dallas Morning News* in 1996), ¶ 626 (quoting the *Jerusalem* Post in 1996), ¶ 629 (quoting the *Associated Press* in 1997), ¶ 633 (citing Palestinian daily newspaper *Al-Hayat al-Jadida* in 2001).

[9]      Setting aside the fact that on a motion to dismiss all nonconclusory factual allegations in the complaint must be accepted as true and all reasonable inferences must be drawn in the Plaintiffs' favor, the SAC lists *seven* HLF accounts at CAB, not one. ¶ 1175.

In fact, the SAC details how in December 2001, the FBI concluded that "the zakat committees" that received financial support from HLF (at least six of them CAB customers at the time)[10] "are controlled by HAMAS" and that "*the civilian population is aware* that the services being provided by the zakat committees, whether it's the distribution of food, medical services or other social services, are being provided by HAMAS."[11] ¶ 642 (emphasis added).

In addition to designating HLF in 1997, Israel also designated many of CAB's institutional customers listed in the SAC in February 2002 as illegal organizations belonging to Hamas. ¶¶ 759, 824, 852, 877, 896, 914, 940, 980, 1000, 1017, 1032, 1070. The German government also issued public and contemporaneous statements to the media in 2002 linking the AAF to Hamas and support for the families of suicide bombers. *See, e.g.,* ¶¶ 592-94 (quoting *New York Newsday* article citing public statement by German Interior Minister). *See also* ¶¶ 595-96.

CAB also processed transactions into its customers' accounts from the AAF, Interpal, and CBSP *after* they were designated by Israel, and after Germany outlawed the AAF in 2002, ¶¶ 589-90. *See* ¶¶ 827, 860, 889, 894, 898, 927, 948, 967, 985, 1007, 1023, 1035, 1054, 1075, 1085, 1090, 1096. These designations and Israeli and German government concerns about the organizations' fundraising efforts for Hamas were repeatedly publicized in the media.[12] Moreover, CAB routinely processed transactions from the AAF, Interpal, and CBSP *after* they were designated as SDGTs

---

[10]     The FBI's 2001 Watson Memorandum, attached as <u>Exhibit G</u> to the SAC, identifies multiple CAB customers as belonging to Hamas, including the Islamic Charitable Society of Hebron ("ICSH"), at 28, and the Ramallah, Jenin, Nablus, Tulkarem, and Qalqilya Zakat Committees, at 32, 34, 36, 37, 39, respectively.

[11]     Taken at face value, CAB's claimed closure of an HLF account following its U.S. designation is *further* incriminating, given that, as noted above, HLF's primary function was to send funds to *other* Hamas institutions – many of whom were also CAB customers whose accounts remained active for years after HLF's designation.

[12]     *See, e.g.,* ¶ 569 (quoting 1996 *Financial Times* article discussing "Interpal and Al Aqsa, based in Germany" raised money for Hamas institutions; Interpal also "directly provided support to families of Hamas guerillas"), ¶ 583 (quoting 1997 *Agence France Presse* report on Israel's ban on HLF, Interpal and AAF), ¶ 584 (quoting 1997 *Deutsche Presse—Agentur* report on same), ¶ 585 (citing 1997 *AP* report). *See also* ¶¶ 586-88, 592-96.

by the United States. *See* ¶¶ 760-62, 899, 928, 987, 1009-10, 1056, 1076. *Compare Honickman*, 6 F.4th at 502 (finding "one transfer from Al-Aqsa to Sanabil the day after Al-Aqsa's designation," "standing alone … insufficient to suggest BLOM Bank was aware of Sanabil's links to Hamas").

In addition, the SAC lists in detail public sources showing that CAB customers ALF, HLF, and the Martyrs Foundation (through *al-Ansar*) were paying bounties to incentivize suicide bombers. ¶¶ 620-45, 1188-1232, 1233-64. These include *over two dozen* articles published in the Palestinian and international media during the relevant period, along with official U.S. and Israeli government statements, describing ALF payments for families of suicide bombers. ¶¶ 1202-30. An Israeli government report published in 2002 "identified CAB as a vehicle for these payments and listed eight public ceremonies between May and August 2002 during which the ALF distributed funds to the families of Palestinian terrorists." ¶ 1223. Checks issued from CAB accounts were presented at ALF ceremonies: "The certificates declared the gift from President Saddam Hussein; the checks were cut at a Gaza branch of the Cairo-Amman bank." ¶ 1230. *Al-Ansar*'s website advertised its martyr payment scheme and listed two CAB accounts. ¶¶ 1260-62. The Martyrs Foundation's website openly described its payments through *al-Ansar*. ¶¶ 1252, 1254.

Finally, as shown in the Appendices, the SAC also cites dozens of *contemporaneous* news articles, Hamas officials' statements, Israeli reports, and other sources published before and during the relevant period linking CAB's customers and counterparties to Hamas and its violent activities.

### 2.     CAB Fails to Refute Plaintiffs' Extensive Allegations

CAB dismisses Plaintiffs' allegations "regarding Israeli designations and alleged prisoner and martyr payments" by calling them "recycle[d] arguments … which this Court has already found unavailing." CAB at 16 (citing *Averbach v. Cairo Amman Bank*, No. 19-cv-0004-GHW-KHP, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020) ("R&R")). CAB fails to mention, of course, that the R&R pre-dated the Second Circuit's *Kaplan* decision and the R&R's analysis of Israeli

designations was premised on the assumption that Israel constituted a "foreign government" and that Plaintiffs did not allege that "CAB was aware of or received reports about other governments' designations" during the relevant period. R&R at *13 n.16. In their First Amended Complaint ("FAC"), Plaintiffs clarified that Israeli designations were publicized to CAB's branches in the Palestinian Territories, where Israel shares jurisdiction with the Palestinian Authority. *See* ¶ 628 & n.19 (FAC ¶ 585 & n.12). Plaintiffs have now added further media articles distributed by, among others, major wire services like the *Associated Press*, publicizing Israeli designations. *See* ¶¶ 583, 629. And as *Honickman* shows, Plaintiffs do not need to allege that CAB "received reports" of news events, only that they were found in "public sources." 6 F.4th at 501.

As for U.S. designations, CAB argues that it is *exonerating* that "16 of the 19 charities" it assisted "have never been designated by the U.S. government as terrorist entities or affiliates of Hamas." CAB at 11. Of course, that means three of CAB's charity customers *were* designated by the U.S. (as were several of its customers' founders and officers, *see* ¶¶ 510-14, 521-23, 579, 798 & n.36, 821, 887, 966), which is precisely the same number of designated entities as in *Kaplan* (Martyrs Foundation, Bayt al-Mal, and Yousser). CAB rejects the significance of these U.S. designations by arguing that they did not occur pre-conduct—immediately after acknowledging that *Kaplan* held it would "defy common sense" to require pre-conduct designations. CAB at 12.[13] Incredibly, CAB also inverts *Kaplan*'s holding to argue that it would "defy common sense" to credit allegations about CAB's Hamas-affiliated customers unless the U.S. *eventually* designated them. *Kaplan* held no such thing. In any event, the U.S. has obviously not designated every single

---

[13]  But even this is disputed. CAB contends that it closed an HLF account in 2001, CAB at 12, n.4, but the SAC (citing an Israeli government report) notes that HLF's account no. 4883 appeared to retain a balance three years after the U.S. designated it. ¶ 1179. CAB points out that the R&R found no "services that CAB provided to HLF through the correspondent banks occur[ring] after that [U.S.] designation," but, as discussed *infra* at 23, Plaintiffs are not limited to the allegations establishing minimum contacts for personal jurisdiction purposes.

one of the thousands of subsidiaries, fronts, and affiliates that the dozens of designated FTOs have spawned or taken over.[14]

CAB's citation to the R&R to rebut allegations of its role in martyr payment schemes is likewise unavailing. This Court found the martyr payment scheme "too attenuated to give rise to an inference of general awareness under JASTA" and found "no indication that CAB knew its services were being used for martyr payments." R&R at *15. But the R&R's analysis was based on its erroneous view of the pleading standard, holding that:

> Allegations that a defendant bank was generally aware it was playing a role is [sic] terrorist activities by virtue of media and non-U.S. governmental designations that its account holders supported or were terrorist organizations are insufficient absent allegations that the defendant actually read or was aware of the designations and media reports.

R&R at *12 (citing *Kaplan* district court decision). The Second Circuit expressly rejected this requirement in *Kaplan*, 999 F.3d at 864-65.

This Court also previously rejected these allegations on the basis that they were insufficiently connected to Hamas, finding that "while Plaintiffs allege that the [ALF] provided 'awards' to those who participate in terrorist attacks during the Second Intifada generally, there is no allegation that ties ALF's activities to the Attacks and to Hamas." R&R at *15 n.17. Likewise, the Court found "no allegation that ties *Shahid* to CAB or the Attacks." *Id. But see* ¶¶ 1254-57 (listing the families of Hamas operatives who received payments into their CAB accounts). However, as *Kaplan* and *Honickman* make clear, Plaintiffs do not need to "tie" the payments "to the Attacks" or directly to Hamas, because the payments incentivized all terrorist attacks during

---

[14]   For example, in 2001, the U.S. government identified at least six of CAB's customers as belonging to Hamas. SAC Exhibit G. Subsequently, it named all six of them as unindicted co-conspirators in the criminal case of *United States v. Holy Land Foundation*, ¶¶ 936, 945, 969, 1011, 1024, 1084. And, as CAB points out, al-Sayed, convicted mastermind of the Park Hotel attack, was never designated by the United States. CAB Appendix C.

the Second Intifada, including those perpetrated by Hamas.[15] That is, CAB "knowingly provide[d] substantial assistance" to the person (Hamas) who committed the attacks by incentivizing Hamas attacks and facilitating payments to the families of Hamas operatives. The fact that CAB *also* facilitated payments to terrorists from *other* FTOs in the area (like Palestinian Islamic Jihad) does not *negate* CAB's liability. JASTA does not require defendant's assistance to an FTO be *to the exclusion of all other terrorist groups*. Plaintiffs do not even "need to … allege the FTO actually received the funds," *Honickman*, 6 F.4th at 500, as "it is a permissible inference that [defendant] understood that the money in those accounts either belonged to [the FTO], or would be received by [the FTO], or would be paid out as directed by [the FTO]." *Kaplan*, 999 F.3d at 866.

Moreover, the plaintiffs in *Kaplan* did not allege that the Martyrs Foundation made *any* payments through LCB to the Hezbollah operatives who fired rockets at Israeli targets from Lebanon, and *none* of the attacks in *Kaplan* involved suicide bombings. By contrast, here, Plaintiffs not only allege that CAB provided assistance to organizations that openly and notoriously rewarded the families of terrorists who committed the types of attacks at issue in this case but also that its assistance was instrumental in actually facilitating those widely publicized payments to specific "reward" recipients who were CAB customers. *See, e.g.,* ¶¶ 715, 1257 (Hamas operative Iyad Taqi's father received an ALF reward payment to his CAB Account No. 393501). Lastly, unlike the complaint in *Kaplan*, the SAC also identifies accounts and transactions for Hamas leaders directly involved in the organization's violent activities, including planning and financing attacks and harboring terror operatives. *See, e.g.*, ¶¶ 709-710, 714, 859, 977 & Exhibit N, 996-98, 1129-30, 1270.

---

[15]     The SAC nevertheless does plead that ALF coordinated payments with Hamas. *See* ¶ 986 n.63. Moreover, while ALF distributed payments to the families of terrorists from various FTOs, Hamas operatives were included in the scheme. *See, e.g.*, ¶¶ 715, 1257. *See also* ¶ 1270 (listing accounts at CAB used to pay the families of Hamas operatives).

CAB's response to these voluminous allegations, including dozens of articles and other public sources published during the relevant period describing Hamas's use of CAB customers to facilitate its violent terrorist activities, is to characterize them as "scoured [from] the internet." CAB at 2. Rather than confront this litany of sources, CAB points to books and government reports Plaintiffs cited to explain how Hamas uses charities to facilitate its terrorism (not as documents available contemporaneously). CAB bizarrely makes a counter-factual assertion that unspecified public source materials "do not appear in the online services used by banks worldwide to conduct customer due diligence," CAB at 13, but of course, the contents of CAB's "customer due diligence" files is properly the subject of discovery, not a Rule 12(b)(6) motion — and the assertion is wholly inapposite given that Plaintiffs are *not* required to allege CAB "should have known of the public sources," *Honickman*, 6 F.4th at 501.

### D.   PLAINTIFFS HAVE SUFFICIENTLY ALLEGED THAT CAB KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE

The substantial assistance element concerns whether a defendant, "knowingly provid[ed] assistance—whether directly to [the person that committed the attack] or indirectly—and whether that assistance was substantial." The standard is also not a demanding one: "The 'knowledge component is satisfied [i]f the defendant knowingly—and not innocently or inadvertently— gave assistance.'" *Honickman*, 6 F.4th at 499-500 (quoting *Kaplan*, 999 F.3d at 864). The Circuit observed that in *Halberstam*, the court only found that the defendant Hamilton knew that her boyfriend Welch "'had engaged in illegal acquisition of goods.' It did not require Hamilton to 'know' anything more about Welch's unlawful activities than what she knew for the general awareness element." *Id.* at 500 (quoting *Halberstam*, 705 F.2d at 488).[16]

---

[16]     It is a measure of CAB's desperation that it ignores the Second Circuit's detailed discussion of "substantial assistance" in *Kaplan* in favor of citing a district court case from the Northern District of California. CAB at 17.

"How much aid qualifies as substantial" is determined by considering the six *Halberstam* factors: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Id.* (quoting *Linde*, 882 F.3d at 329). The Circuit warned that "[n]o factor is dispositive; the weight accorded to each is determined on a case-by-case basis." *Id.* Plaintiffs have satisfied each of these factors except the third (which was not met in *Kaplan*, *Honickman*, or indeed *Halberstam* itself).

For the **nature of the act** factor, CAB argues that *Honickman* "squarely rejected the central premise of the SAC" because Plaintiffs purportedly rest the sufficiency of their complaint on the theory that "any dollar going to an entity affiliated with Hamas necessarily frees up a dollar for terrorism." CAB at 17. But setting aside that *Honickman* was addressing general awareness, not substantial assistance, when it discussed "fungibility," the SAC provides abundant evidence that CAB knowingly provided support to persons and entities "closely intertwined" with Hamas's violent activities. *See* Plaintiffs' Appendices. CAB also tries to suggest that *Kaplan* effectively requires allegations that a bank gave "special exemptions" to its customers, whereas "[n]o such facts are alleged in the SAC." CAB at 18. In reality, the Circuit in *Honickman* explained that "the factor requires assessing whether the alleged aid (facilitating the transfer of millions of dollars to the … Customers) would be important to the nature of the injury-causing act (Hamas's terrorist attacks)." *Honickman*, 6 F.4th at 500. And although neither *Kaplan* nor *Honickman* required special customer exemptions, it is worth noting that CAB *did* provide financial services to entities it knew were affiliated with Hamas, and in some cases were already designated, "thereby circumventing sanctions imposed in order to hinder terrorist activity," *Kaplan*, 999 F.3d at 866,

and participated in a process – issuing reward checks to the families of suicide bombers – that qualifies as grotesque by any standard, let alone banking industry standards.

For the **amount of assistance** factor, the Second Circuit explained:

> Plaintiffs did not need to allege the funds actually went to Hamas. Factual allegations that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the FTO would suffice. In other words, if a plaintiff plausibly alleges the general awareness element, she does not need to also allege the FTO actually received the funds. Instead, the inquiry should focus on the amount and type of aid the defendant provided.

*Honickman*, 6 F.4th at 500 (internal quotation marks and citations omitted). As explained above, Plaintiffs have sufficiently alleged that CAB was generally aware of its role in Hamas's illegal financing, and CAB does not meaningfully refute those allegations.

CAB once again attempts to argue that the allegations in *Kaplan* constitute some sort of pleading floor, which they do not, but Plaintiffs here have alleged that CAB moved millions of dollars for its Hamas customers. *See, e.g.*, ¶¶ 922 ($7 million in May 2002 for ICSH), 1102, 1282. Allegations show that "hundreds of thousands of dollars" remained in HLF's account at CAB even *after* it was designated an SDGT, ¶ 1179, and CAB transferred well over $100,000 for senior Hamas leaders who were its customers, ¶¶ 1137, 1157, 1168, 1172. As explained above, CAB also facilitated the transfer of martyr payments intended to incentivize brutal terrorist attacks; it is hard to imagine assistance that is more "qualitatively substantial" than that.

For **relationship to the principal**, CAB relies on this Court's finding that Plaintiffs "*have pleaded no relationship at all to Hamas except through the Account Holders.*" CAB at 19 (quoting R&R at *16). But, as CAB concedes, the Second Circuit rejected this standard, "teach[ing] that Plaintiffs need not 'plead a direct relationship' between CAB and Hamas to satisfy the requirement." *Id.* (quoting *Honickman*, 6 F.4th at 501). Instead, CAB points out that "commercial relationships" with customers "'several steps removed' from Hamas" would be insufficient under

*Siegel. Id.* Of course, the SAC alleges that CAB's customers included core Hamas institutions, such as *Al-Mujama Al-Islami*, which "transitioned into the central headquarters of [Hamas] in the Gaza Strip and was widely identified as being synonymous with HAMAS," ¶ 512, and individual Hamas leaders and operatives, ¶¶ 709-710, 714-15, 859, 977 & Exhibit N, 996-98, 1129-30, 1257, 1270. As set forth above, vast amounts of evidence support the plausible inference that CAB knew it was assisting Hamas institutions and did so over a long period of time.

For a defendant's "**state-of-mind**," CAB once again attempts to convert certain specific allegations in *Kaplan* into minimum pleading requirements, ignoring the holding of that case and *Honickman*. CAB misleadingly argues that "[i]n *Kaplan,* the Second Circuit cited allegations bearing on LCB's state of mind including its voicing of anti-Israeli statements." CAB at 20. In reality, the Second Circuit in *Kaplan* did not even address the factor, much less rely upon the allegation, but it *did* hold that knowing substantial assistance "concerns not whether LCB intentionally supported Hizbollah in perpetrating the rocket attacks, *or acted pursuant to [Hizbollah's] agenda* …." 999 F.3d at 866 (cleaned up, emphasis added).

CAB also points to LCB's "continued banking relationship with Hizbollah-linked customers *after* they were designated as SDGTs by the United States" and "its violation of its own internal policies on their behalf," and insists the SAC fails to allege the same. Once again, these are not requirements—but the SAC *meets them anyway*: as explained above, CAB continued providing financial services to multiple customers for years after Israel designated them, and several SDGTs after the U.S. designated them. CAB also assisted its Hamas customers despite due diligence policies and banking standards intended to prevent terror financing. ¶¶ 1104-07.

Finally, for the "**duration of assistance**" factor, CAB turns instead to the R&R, which limited Plaintiffs' allegations to the "the fund transfers through the correspondent bank accounts

[that] took place over a much shorter period of time." R&R at * 17. Again, Plaintiffs' allegations supporting their claims are *not* limited to the minimum contacts supporting personal jurisdiction. *See Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 24 (E.D.N.Y. 2016) ("claims also may arise from other transfers Defendant did not route through New York, including ones performed after the last of the New York Transfers was executed in July 2001"). Instead, Plaintiffs have alleged that CAB provided millions of dollars to Hamas entities for *years*. Plaintiffs are not required to list every specific transaction at the pleading stage; presumably no JASTA plaintiff could. *See Bartlett v. Société Générale de Banque au Liban SAL*, No. 19-cv-7-CBA-VMS, 2020 WL 7089448, at *15 (E.D.N.Y. Nov. 25, 2020) ("Given the specificity that is in the complaint, including temporal specificity, the paucity of specific allegations concerning when individual wire transfers occurred is a matter for discovery and, if appropriate, summary judgment.").

## III.   PLAINTIFFS HAVE SUFFICIENTLY PLED A PRIMARY LIABILITY CLAIM

CAB argues that "[*p*]*rimary* liability claims impose liability only on *direct* perpetrators of international terrorism—not secondary actors, such as banks…." CAB at 23. If that had any basis in reality, of course, the Circuit in *Linde* would have thrown out the plaintiffs' primary liability claims against Arab Bank (as that bank had urged), rather than remanding for a new trial with more complete jury instructions. Plaintiffs' claims here are almost entirely commensurate with those in *Linde*—both involve a Jordanian bank whose operations in the Palestinian Territories allegedly "held accounts, or processed wire transfers, for known Hamas leaders and operatives," moved money "on behalf of purported charities known to funnel money to Hamas, including the Al Salah Islamic Society, the Nablus Zakat Committee, [and] the Al-Tadamun Islamic Charitable Society," among others, and made "payments for suicide bombings." *Linde*, 882 F.3d at 321. Indeed, CAB not only facilitated "payments for suicide bombings" but did so under a highly publicized incentive program that explicitly rewarded *successful* terrorist attacks. ¶¶ 1197-98, 1215-18. In sum, both

cases also involved banks processing transactions for overtly "violent or terroristic purpose[s]," *Weiss v. Nat'l Westminster Bank PLC*, 993 F.3d 144, 161 (2d Cir. 2021), earmarked to reward and support the families of Hamas terrorists. There is no way, particularly at the pleading stage, to distinguish as a matter of law the allegations here from those remanded for retrial in *Linde*.

CAB's other citations are all to cases *less* analogous to the facts in *Linde*. For instance, CAB argues that "Plaintiffs' ATA claims are foreclosed by the Second Circuit's decision in *In re Terrorist Attacks on Sept. 11*," CAB at 22, suggesting that a case *discussed in Linde* somehow overrules *Linde*. The obvious distinction is that the jury in *Linde* found that Arab Bank proximately caused the plaintiffs' injuries whereas the Second Circuit in *In re Terrorist Attacks on Sept. 11*, 714 F.3d 118 (2d Cir. 2013) ("*Al Rajhi*"), held that Plaintiffs failed to adequately plead the proximate causation element for primary liability. Thus, in noting that *Al Rajhi* only held that "the mere provision of 'routine banking services to organizations and individuals said to be affiliated with' terrorists does not *necessarily* establish causation,'"[17] the *Linde* court observed that "plaintiffs argue that Arab Bank's financial services to Hamas should not be viewed as routine. But that raises questions of fact for a jury to decide." 882 F.3d at 327 (quoting *Al Rajhi*, 714 F.3d at 124) (emphasis added). Questions for a jury cannot be decided on a motion to dismiss.

The balance of CAB's citations is to lower court cases (including, incredibly, *Kaplan*, despite the Circuit's rejection of many of the same findings underlying its primary liability holding) and a Seventh Circuit case premised on *conspiracy*, not statutory aiding and abetting.

## IV.   THE NON-CITIZEN PLAINTIFFS HAVE COGNIZABLE CLAIMS

Plaintiffs preserve their rights as to their claims on behalf of Julie Averbach, Matanya Nathansen, and Nevenka Gritz, which were dismissed with prejudice, notwithstanding contrary

---

[17]   Plaintiffs' allegations in *Al Rajhi* were found insufficient because they did not plead that the defendant's own accounts were used to transfer funds to the FTO at issue. *See* 714 F.3d at 124.

law in numerous cases, including as to these Plaintiffs themselves. *See* ECF No. 58 at 8-11. However, CAB erroneously stated that "[t]he order was final as to them and not appealed." CAB at 25. Orders dismissing some but not all claims in a case, even with prejudice, are not appealable until reduced to final judgments pursuant to Rule 54(b).

## V.      THIS COURT HAS PERSONAL JURISDICTION OVER CAB

This Court already rejected CAB's personal jurisdiction defense. R&R at *9. Here, CAB only argues vaguely that given "the absence of any significant causal or temporal relationship between the transfers identified and the Attacks, … the Second Circuit [*sic*] subsequent decision in *SPV Osus Ltd. v. UBS AG,* 882 F.3d 333 (2d Cir. 2018) provides the proper analytic framework for analyzing long arm jurisdiction under the Due Process Clause" and negates personal jurisdiction here. CAB at 25. Of course, the "proper analytic framework" here is *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013). *See* R&R at *3. The *SPV Osus* panel did not—and could not—overrule the *Licci* panel's decision. *See Gelman v. Ashcroft*, 372 F.3d 495, 499 (2d Cir. 2004) (one panel cannot overrule another). Nor does it claim to—CAB presumably refers to a passage *SPV Osus* cited from a *pre-Licci* case, *Chew v. Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998), which remarked on the causal relationship of in-forum contacts to injury. But the New York Court of Appeals explained: "We have consistently held that causation is not required, and that the inquiry under the statute is relatively permissive." *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 339 (2012). The Second Circuit adopted this decision and did not introduce a causal requirement in its due process analysis, *Licci*, 732 F.3d at 170-73. In any event, CAB cannot argue both that *Licci* requires causation and that financial services from "secondary actors" cannot proximately cause terrorist attacks. *See supra* at 23-24.

## CONCLUSION

For the reasons set forth above, the Court should deny CAB's motion to dismiss.

Dated: November 1, 2021
        Hackensack, NJ

Respectfully submitted,

By:     /s/ Michael J. Radine
        **OSEN LLC**
        Michael J. Radine, Esq.
        Gary M. Osen, Esq.
        Ari Ungar, Esq.
        Dina Gielchinsky, Esq.
        Aaron Schlanger, Esq.
        190 Moore St., Suite 272
        Hackensack, NJ 07601
        Telephone (201) 265-6400

        **TURNER & ASSOCIATES, P.A.**
        C. Tab Turner, Esq.
        4705 Somers Avenue, Suite 100
        North Little Rock, AR 72116
        Telephone (501) 791-2277

        **KOHN, SWIFT & GRAF, P.C.**
        Steven M. Steingard, Esq.
        Stephen H. Schwartz, Esq.
        Neil L. Glazer, Esq.
        1600 Market Street, Suite 2500
        Philadelphia, PA 19103
        Telephone (215) 238-1700

        *Attorneys for Plaintiffs*

# Appendix A

**Representative Allegations of Public Sources During Relevant Period Showing
CAB Customers' and Counterparties' Affiliation with Hamas and other Terror Groups**

All ¶ citations are to the Second Amended Complaint (SAC). Terms have the meanings given in Plaintiffs' memorandum of law in opposition to CAB's motion to dismiss the SAC. Additional frequent abbreviations include:

PA: Palestinian Authority
PMA: Palestinian Monetary Authority
IDF: Israel Defense Forces
AP: Associated Press
AFP: Agence France-Presse
SDGT: Specially Designated Global Terrorist

| CAB Customers and/or Counterparties | International Media and Hamas Statements | Government Designations and Public Government Statements | Other Government Actions |
|---|---|---|---|
| **Holy Land Foundation ("HLF")**<br><br>CAB Customer, ¶¶ 631, 1175<br><br>CAB Counterparty, ¶¶ 827, 860, 883, 889, 898, 927, 948, 967, 985, 1007, 1023, 1035, 1085, 1096 | ¶¶ 570, 624 (1996 *New York Times* report on Israel's identification of HLF as "key fundraising operation" for Hamas which used charitable donations to "provide lifetime annuities to the families of suicide bombers"); ¶ 625 (1996 *Dallas Morning News* report that Hamas leader Mousa Abu Marzook provided more than 10% of all donations to HLF in 1992, according to IRS); ¶ 584 (1997 *Deutsche Presse-Agentur* report that Israel identified HLF as Hamas fundraiser); ¶ 586 (1997 *Jerusalem Post* report on same); ¶ 633 (2001 *Al-Hayat al-Jadida* report that HLF made martyr payments during Second Intifada); ¶ 712 (2002 Human Rights Watch report (citing 2001 FBI memorandum on HLF investigation) listed HLF as funder for Hamas organizations whose officials included Hamas operatives) | ¶¶ 627, 1177 (1997 designation by Israel as Hamas organization); ¶ 583 (1997 *AFP* report that Israel banned HLF); ¶ 629 (1997 *AP* report on Israel's designation of HLF); ¶ 860 (1998 designation by Israel as terror organization); ¶¶ 639-40, 645, 649 (designated an SDGT by the U.S. Treasury Department in 2001 and President Bush's announcement that HLF funds are "used by Hamas to support schools and indoctrinate children to grow up into suicide bombers [and] to recruit suicide bombers and support their families"); ¶ 650 (2001 *Al-Quds* report on U.S. designation of HLF) | ¶¶ 620-23 (1995 raid by Israel); ¶¶ 625-26 (office closures by Israel in 1996); ¶ 625 (1996 *Dallas Morning News* report on Israel's closure of HLF office); ¶¶ 630, 670 (1997 PA closure of 16 Hamas institutions including HLF's Gaza offices); ¶¶ 671-72 (*AFP* report on 1997 PA closures in front of "representatives of the international media, who were invited to accompany the operation"); ¶¶ 673-74 (PA closures covered by 1997 editions of *Al-Quds* and *Jerusalem Post*); ¶ 676 (2001 Israeli Military Intelligence Directorate Expert Opinion on PA closures, naming HLF); ¶¶ 641-43, 648, 1178, Exhibit G (2001 FBI investigation memo concluded that HLF "is the primary fund-raising entity for HAMAS" which "provided crucial financial support for families of HAMAS suicide bombers," and that senior members of HLF support Hamas ideology and activities); ¶ 644 (2001 *Los Angeles Times* report on FBI investigation of HLF); ¶ 651 and n.21 (2002 D.C. District Court decision upholding SDGT designation after HLF challenge); ¶ 652 (2002 *Dallas Morning News* report on the D.C. District Court's decision, noted finding that "HLF paid for Hamas leaders to travel to the United States on fund-raising trips") |

| CAB Customers and/or Counterparties | International Media and Hamas Statements | Government Designations and Public Government Statements | Other Government Actions |
|---|---|---|---|
| **Al Salah Islamic Society - Gaza ("*Al-Salah*")**<br><br>CAB Customer, ¶¶ 1127, 1175 | ¶ 867 (*al-Salah*'s website featured a certificate of appreciation from Hamas' student organization which served as a recruitment feeder for Hamas' Qassam Brigades); ¶ 868 (1995 *Jerusalem Report* identified *al-Salah* as Hamas charity and reported on its interview with a director of the society's kindergartens, who was proud of having served six months in an Israeli prison for Hamas activities); ¶¶ 873-74 (2001 *Reuters* report that Hamas claimed *al-Salah* "is part of its welfare arm"); ¶ 871 (2001 interview with senior Hamas leader published in *al-Watan* (Jordan), in which he referred to *al-Salah* as an integral part of Hamas); ¶ 875 (2001 *Al-Watan* (Oman) report quoted al-Kurd's description of *al-Salah*'s martyr payments); ¶ 872 (2001 *AP* report describing Hamas' successful fundraising efforts and citing *al-Salah* "head" al-Kurd); ¶ 864 n. 45 (2001 *Ain-Al-Yaqeen* report identified al-Kurd as chairman of *al-Salah* and quoted him describing how funding from Saudi relief committees are used for martyr payments); ¶ 879 (2002 *Salon* report citing senior Hamas leader saying "Of course, Salah and other Islamic foundations are identified with us") | ¶¶ 877, 1184 (declared an unlawful association by Israeli Minister of Defense on February 25, 2002 and by IDF on June 30, 2002); ¶¶ 882, 1183 (designated an SDGT by the U.S. Treasury Department on August 7, 2007, determined to have financed Hamas' "terrorist agenda") | ¶ 767 (1997 Palestinian newspaper *Al-Quds* report on PA closures of Hamas institutions and meeting with heads of the three most prominent institutions, *Al-Mujama*, *Al-Jam'iya* and *al-Salah*); ¶¶ 869, 1184 (closed by PA in September 1997); ¶¶ 671-72 (*AFP* report on September 25, 1997 PA closures in front of "representatives of the international media, who were invited to accompany the operation"); ¶¶ 673-74 (PA closures covered by 1997 edition of *Al-Quds* and 1997 edition of *Jerusalem Post*); ¶ 870 (1998 *Free Palestine News* report on arrest of chairman al-Kurd following Hamas terrorist attack); ¶¶ 876, 1113, 1184 (PA arrested *al-Salah* leaders in 2001, PMA froze its bank accounts in December 2001); ¶ 878 (May 10, 2002 report posted by Israeli Foreign Ministry on embassy website noting that Saudi Committee for the Support of the Intifada Al Quds (a Union of Good member organization) was transferring funds to *al-Salah*) |

| CAB Customers and/or Counterparties | International Media and Hamas Statements | Government Designations and Public Government Statements | Other Government Actions |
|---|---|---|---|
| **Islamic Center – Gaza (Al-Mujama Al-Islami) ("*Al-Mujama*")**<br><br>CAB Customer, ¶¶ 806, 825, 827, 1127 | Multiple media reports that *Al-Mujama* was founded by Sheikh Ahmed Yassin and used by Hamas to develop its networks, including for terrorism: ¶ 807 (1992 issue of *The Economist*); ¶ 808 (1992 *Le Monde* report); ¶ 809 (1993 *Le Monde* report); ¶ 810 (1993 *New York Times* report described Hamas as "a militant offshoot of Al-Mujama al-Islami"); ¶ 811 (1994 *Le Monde* report); ¶ 812 (1994 *Nouvel Obs* report); ¶ 813 (1995 *Jerusalem Post* report); ¶ 814 (1996 AP report); ¶ 815 (1997 *Chicago Tribune* report); ¶ 560 n.13 (1998 interview in official Hamas newspaper *Filastin al-Muslima* identifying Ibrahim al-Yazuri as one of the founders of Hamas); ¶ 816 (2001 *Le Monde* report); ¶ 819 (2003 report by the Int'l Crisis Group); ¶¶ 805-06 (2000 *Al-Mujama* brochure promising that donors "are committing Jihad with your monies" ); ¶ 806 (*Al-Mujama* brochure featuring Yassin directly above A*l-Mujama*'s CAB account information); ¶ 817 (2002 *San Francisco Chronicle* report quoted Hamas leader describing *Al-Mujama*'s encouragement for children to become martyrs and kill Jews); ¶ 818 (2002 *Newsday* (NY) report quoted *Al-Mujama* head discussing sources of its Hamas funding) | ¶ 821 (U.S. Treasury Department designated founder Sheikh Yassin a Specially Designated Terrorist (SDT) on January 25, 1995); ¶ 824 (declared an unlawful association by Israeli Minister of Defense on February 25, 2002 and by IDF on June 30, 2002); ¶ 821 (founder Sheikh Yassin and administrative board member and branch founder Abd al-Aziz Al-Rantisi designated SDGTs by the U.S. Treasury Department on August 22, 2003) | ¶ 821 n.40 (1995 *AFP* report on PA arrest of two board members of *Al-Mujama*); ¶ 822 (PA closed office on September 25, 1997); ¶¶ 671-72 (*AFP* report on September 25, 1997 PA closures in front of "representatives of the international media, who were invited to accompany the operation"); ¶¶ 673-74 (PA closures covered by September 26, 1997 edition of *Al-Quds* and September 28, 1997 edition of *Jerusalem Post*); ¶ 767 (1997 Palestinian newspaper *Al-Quds* report on PA closures of Hamas institutions and meeting with heads of the three most prominent institutions, *Al-Mujama*, *Al-Jam'iya* and *al-Salah*); ¶ 1113 (PMA froze bank accounts in 2001); ¶ 823 (PMA froze accounts in 2003); |

| CAB Customers and/or Counterparties | International Media and Hamas Statements | Government Designations and Public Government Statements | Other Government Actions |
|---|---|---|---|
| **Islamic Society – Gaza (Al-Jam'iya Al-Islamiya) ("*Al-Jam'iya*")** <br><br> CAB Customer, ¶¶ 1119-20, 1127 | ¶ 832 (society's website has featured image of Sheikh Yassin for many years); ¶ 836 (1988 *Financial Times* report identified society as part of Hamas); ¶ 834 (1993 *Independent* report described Gaza kindergarten "run by the Islamic Society which is controlled by Hamas"); ¶ 834 n.42 (1993 *International Labour Review* reported society as Hamas' social wing); ¶ 835 (1993 *Boston Globe* report cited society's head discussing Hamas activism against the PA); ¶ 836 (November 27, 1994 *New York Times* report identified society as part of Hamas); ¶ 837 (December 18, 1994 *Jerusalem Post* report on Hamas rally featuring banner with Qassam Brigades operative performing jihad and Sheikh Ahmed Bahar, "head of the Islamic Society," as a speaker); ¶ 838 (1995 *Jerusalem Report* article described chairman Bahar as a "senior Hamas ideologue," and society's kindergartens, where "teachers regale [children] with stories of the armed struggle"); ¶ 839 (1995 *Le Monde* report cited Bahar's rationalization for Hamas-perpetrated terrorist attacks); ¶ 840 (1995 *AFP* report referenced society's leadership by Bahar, "a senior figure in Hamas"); ¶ 841 (1997 *The Guardian* (UK) report | ¶ 852 (declared an unlawful association by Israeli Minister of Defense on February 25, 2002 and by IDF on June 30, 2002) | ¶ 821 n.40 (1995 *AFP* report on PA arrest of Sheikh Bahar); ¶ 840 (June 30, 1995 *AFP* report described 1995 PA raid of society); ¶ 785 (1996 *Los Angeles Times* report on the arrest of Ahmed Bahar identified as a "co-founder of Hamas"); ¶ 842 (PA closed offices in September 1997); ¶ 767 (1997 Palestinian newspaper *Al-Quds* report on PA closures of Hamas institutions and meeting with heads of the three most prominent institutions, *Al-Mujama*, *Al-Jam'iya* and *al-Salah*); ¶¶ 671-72 (*AFP* report on September 25, 1997 PA closures in front of "representatives of the international media, who were invited to accompany the operation"); ¶¶ 673-74 (PA closures covered by September 26, 1997 edition of *Al-Quds* and September 28, 1997 edition of *Jerusalem Post*); ¶¶ 560, 843 (PA arrested Sheik Bahar and other senior personnel following Hamas terrorist attack in Israel in October 1998); ¶ 855 (2002 *Mail on Sunday* (London) report described Sheikh Bahar's 1998 arrest, adding that "the Islamic Society makes no secret of its support for the terrorists"); ¶ 1113 (PMA froze accounts on December 23, 2001); ¶¶ 848, 1114 (December 2001 closure by PA and January 6, 2002 PMA order instructing Palestinian banks to report on account balances of organization and requiring consultation before withdrawing funds from those accounts); ¶ 1115 (following Hamas suicide bombing of Egged Bus #2 (listed in |

| CAB Customers and/or Counterparties | International Media and Hamas Statements | Government Designations and Public Government Statements | Other Government Actions |
|---|---|---|---|
| | described society's kindergarten, "one of more than 10 controlled by Hamas," as "one of the best-funded" in the Gaza Strip); ¶¶ 844-45 (1999 *Knight Ridder* report described Hamas mass wedding hosted by society, "the social arm of Hamas," in which Hamas distributed cash, and Qassam Brigades distributed fliers that called for jihad against Israel and the U.S.); ¶ 846 (2000 *Dallas Morning News* interview with Hamas leader and spokesman who was also a co-founder of the society, "the social services wing of Hamas"); ¶ 847 (2000 description by Hamas official website of ceremony in honor of martyrs' families hosted by society and attended by Yassin and Bahar, at which Bahar advocated for martyrdom); ¶¶ 853-54 (2002 *BBC* report translated Hamas report claiming "a large-scale campaign" by Palestinian police forces "closing a number of Hamas Islamic Resistance Movement and Islamic Jihad-backed institutions and societies," identifying *Al-Jam'iya* as one); ¶¶ 850-51 & n.43 (2002 media coverage of graduation ceremony for society's kindergartens, during which children were dressed in martyr uniforms and pledged to pursue jihad) | | SAC), Palestinian Minister of Security identified society as part of Hamas on August 23, 2003; the next day, PMA froze its bank accounts); ¶ 1116 (on August 24, 2003, Prime Minister Mahmoud Abbas justified freeze in order forwarded to the Palestinian Prosecutor General as matter of "security issues" and "requirements for the public interest"); ¶ 1117 (Palestinian Minister of Internal Security wrote letter to Minister of Economy describing steps taken against "Hamas organizations") |

| CAB Customers and/or Counterparties | International Media and Hamas Statements | Government Designations and Public Government Statements | Other Government Actions |
|---|---|---|---|
| **Arab Liberation Front ("ALF")**<br><br>CAB Customer, ¶ 1196 | ¶ 1202 (2001 *Al Hayat al-Jadida* report on ALF payment increase to families of suicide terrorists from $10,000 to $15,000); ¶ 1203 (2001 *Al Quds* report on payment increase to $15,000 "to emphasize the continuation of the national struggle to restore the Palestinian right"); ¶ 1205 (2001 *San Francisco Chronicle* report that ALF handed the families of martyrs a poster of Saddam Hussein and a $10,000 check, "equal to years of annual income for many Palestinian families"); ¶ 1206 (2001 *United Press International* report); ¶ 1207 (2001 *AFP* report); ¶ 1209 (2001 *The Daily Telegraph* report described Ramallah rally where almost $4 million was paid to families of martyrs and the wounded); ¶ 1210 (2001 *AP* report that Saddam Hussein ordered the donation of $5.3 million to martyrs' families); ¶ 1212 (2002 announcement by Saddam Hussein of another increase in payments – families of suicide terrorists would receive $25,000, while families of "ordinary" terrorists would receive $10,000); ¶¶ 1213-14 (2002 *Sydney Morning Herald* report described a meeting of 200 members of 47 families who gathered to collect checks, during which ALF secretary-general Rakad Salem publicized that as | ¶ 1216 (April 2002 *CBS News* report that Defense Secretary Donald Rumsfeld announced that Saddam Hussein increased payments to families of suicide bombers from $10,000 to $25,000); ¶ 1217 (April 2002 White House statement regarding Saddam Hussein's increased payments to families of Palestinian suicide/ homicide bombers from $10,000 to $25,000, with the rule that "only someone who blows himself up with a belt of explosives gets the full payment"); ¶ 1222 (September 12, 2002 White House issuance of Background Paper on Iraq noting Saddam Hussein's increased payments to families of Palestinian suicide/homicide bombers from $10,000 to $25,000) ¶ 1223 (2002 published report by Israeli Ministry of Foreign Affairs concerning Saddam Hussein's financial incentive program for Palestinian terrorists, identifying **CAB** as a vehicle for these payments and listing eight public ceremonies between May and August 2002 during which ALF distributed funds to the families of Palestinian terrorists) | ¶ 1226 (2002 *AFP* report that Israeli forces arrested ALF secretary-general Rakad Salem, described how ALF "distributes Iraqi aid to the families of Palestinians killed by Israeli soldiers and also gives Iraqi handouts to relatives of suicide bombers who blow themselves up in Israel") |

| CAB Customers and/or Counterparties | International Media and Hamas Statements | Government Designations and Public Government Statements | Other Government Actions |
|---|---|---|---|
| | of late March 2002, more than 800 families of martyrs had received $10,000 payments with funds transferred from the Iraqi banks to the banks in Palestine); ¶ 1215 (2002 *Fox News* report on the *Sydney Morning Herald* report, publicized increase in ALF payments to $15,000); ¶ 1218 (2002 *Boston Globe* report on ALF announcement that families whose "dwelling in the camp was destroyed" would receive $25,000); ¶ 1219 (2002 *Reuters* report that according to ALF, Iraq provided $20 million since September 2000, quoted Gaza-based ALF official stating that "President Saddam made clear that [suicide] attacks must be considered the utmost act of martyrdom"); ¶ 1220 (2002 *New York Times* report that Iraq sent large cash payments, including U.S. dollar-denominated banknotes, to the families of Palestinian suicide bombers); ¶ 1224 (2002 *AFP* report on $15 million in funds transferred by Saddam Hussein to the families of Palestinian suicide bombers according to Israel, and identifying Rakad Salam, secretary general of the ALF, as responsible for these transfers); ¶ 1225 (2002 *Los Angeles Times* report on ALF's distribution of $25,000 to families of | | |

| CAB Customers and/or Counterparties | International Media and Hamas Statements | Government Designations and Public Government Statements | Other Government Actions |
|---|---|---|---|
| | suicide bombers, and noting that ALF "has been very public in its activities for nearly two years" and that the "checks are typically distributed with much fanfare at public rallies in the West bank and Gaza Strip"); ¶ 1227 (2003 *AP* report that ALF announced it disbursed $35 million to "relatives of Palestinians killed or wounded in the confrontations in Israel"); ¶ 1228 (2003 *Guardian* report on **CAB** accounts for ALF from which martyr checks were distributed with "a large certificate decorated with the Iraqi and Palestinian flags"); ¶ 1229 (2003 *BBC News* report on public event in Gaza City in which ALF distributed payments to at least 21 families); ¶ 1230 (2003 reporting by the *San Jose Mercury News* and *Miami Herald* that ALF checks were cut at a **Gaza branch of CAB** and distributed with a certificate from Saddam Hussein); ¶ 1230 n.78 (2003 *National Post* (Canada) report that checks paid to martyrs' families were from **CAB**); ¶ 1231 (2002 *CBS* report on statement by ALF officer that "people stop me on the street, saying if you increase the payment to $50,000, I'll do it immediately," and that "support payments for relatives make it easier for some potential bombers to make up their minds") | | |

| CAB Customers and/or Counterparties | International Media and Hamas Statements | Government Designations and Public Government Statements | Other Government Actions |
|---|---|---|---|
| **Martyrs Foundation**<br><br>CAB Counterparty<br>¶¶ 1254, 714<br><br>**Al-Ansar Society ("*al-Ansar*")**<br><br>CAB Customer<br>¶ 1262 | ¶ 1243 (Hezbollah's acknowledgement that the Martyrs Foundation belongs to it, including on its official websites, press releases, television station and radio station, and in press conferences and news media interviews conducted by senior Hezbollah officials); ¶ 1244 (1991 *The Independent* report that the Foundation pays families of Hezbollah terrorists); ¶ 1245 (2000 *The Irish Times* report on Hezbollah personnel from the Foundation); ¶ 1247 (Foundation website quoted Hezbollah secretary-general Hassan Nasrallah praising donations to the "martyrs' children who are truthful to their covenant with Allah"); ¶ 1258 (2001 *al-Ansar* ads in *Al-Hayat Al-Jadida* called martyrs' families to come to its headquarters to receive payments); ¶ 1259 (2001 *Al-Hayat Al-Jadida* report on *al-Ansar*'s public ceremony in honor of martyrs' families); ¶ 1260 (*al-Ansar* website invited families seeking to "register their martyrs"); ¶ 1254 (Foundation's website openly identified *al-Ansar* as vehicle for martyr payments); ¶ 1261 (Foundation website published list of Palestinian martyrs who received support from it, and noting their affiliations, including with Hamas) | ¶ 1263 (*al-Ansar* declared an unlawful association by Israel on October 25, 2003) | |

| CAB Customers and/or Counterparties | International Media and Hamas Statements | Government Designations and Public Government Statements | Other Government Actions |
|---|---|---|---|
| **Islamic Charitable Society – Hebron ("ICSH")**<br><br>CAB Customer, ¶¶ 1119-20, 1127 | ¶ 905 (1994 *Miami Herald* report cited ICSH spokesperson acknowledging that president and many employees "were active Hamas supporters"); ¶ 926 n. 51 (1995 *Jerusalem Post* and 1996 *BBC* reports that ICSH administrative manager Abd al-Khaleq al-Natshe was part of Hamas); ¶ 908 (al-Natshe appeared at public Hamas gatherings before thousands of people alongside Sheikh Yassin); ¶ 907 (2001 report published on Hamas website identified al-Natshe as ICSH administrative director and Hamas spokesman in Hebron); ¶ 909 (2001 *AP* report identified ICSH with Hamas); ¶ 910 (Hamas website reported in 2001 on Hamas parade led by al-Natshe, the "Hamas representative of Hebron"); ¶ 911 (2001 Hamas website report identified al-Natshe as Hamas representative in Hebron); ¶¶ 912, 918 (2001 *Los Angeles Times* report that some ICSH funding from HLF is used for martyr payments); ¶ 913 (2001 *AP* report quoted al-Natshe on behalf of Hamas); ¶ 915 (2002 *Time Magazine* report identified al-Natshe as the head of ICSH who provided funding for Qassam Brigades and helped plan a Hamas attack before being arrested) | ¶ 914 (declared an unlawful association by Israeli Minister of Defense on February 25, 2002 and by IDF on June 30, 2002) | ¶ 906 (March 5, 1996 office closure by Israel); ¶ 906 n.49 (office closure reported in March 5, 1996 *AP*, March 6, 1996 *Mideast Mirror*, March 7, 1996 *Daily Telegraph* (Australia), March 6, 1996 *St. Louis Post-Dispatch*); ¶ 915 (September 8, 2002 *Time Magazine* report described ICSH administrative head al-Natshe's arrest by Israeli soldiers after planning an April Hamas attack); ¶ 916 (*BBC* and *Voice of Palestine* reports on March 24, 2003 headquarters closure and arrest of director by Israel) |

| CAB Customers and/or Counterparties | International Media and Hamas Statements | Government Designations and Public Government Statements | Other Government Actions |
|---|---|---|---|
| **Nablus Zakat Committee ("NZC")**<br><br>CAB Customer,<br>¶¶ 1119-20, 1127 | ¶ 954 (1994 *Jerusalem Post* report on NZC deputy chairman Sheikh Hamed al-Bitawi as Hamas appointee to Palestinian religious courts); ¶ 955 (1997 *AP* report on group wedding organized by "leading Hamas figure in Nablus" al-Bitawi); ¶ 956 (1997 *IPS-Inter Press Service* report stated that "Bitawi's name is synonymous with Hamas"); ¶ 957 (1998 *Christian Science Monitor* report called Sheikh al-Bitawi, "a known figure in the social wing of Hamas here in Nablus"); ¶ 958 (1998 *AP* report cited statements made by al-Bitawi on behalf of Hamas); ¶ 959 (2000 *AP* report on al-Bitawi's pledge to commit more car bombings made at funeral of senior Hamas operative and bombmaker); ¶ 960 (2001 *AP* report described fatwa by al-Bitawi against Muslims cooperating with U.S. in wake of 9-11 attacks); ¶ 966 and n.58 (publicized 2001 speech by al-Bitawi before an audience of 150,000 people calling for jihad against Israel) | ¶ 965 (declared an unlawful association by Israeli Minister of Defense on June 9, 2006 and by IDF on September 3, 2006) | ¶ 961 (2002 *New York Sun* report noted that Deputy chairman Sheikh al-Bitawi was on "Israel's wanted list since the beginning of the intifada"); ¶ 966 (leadership included prominent Hamas leaders, including two members who also served on executive management for Hamas' treasury which was designated an SDGT by the U.S. Treasury Department in December 2001); ¶¶ 962-63 (2002 raid by IDF yielding incitement materials encouraging jihad) |
| **Al-Tadamun Charitable Society (Nablus) ("Al-Tadamun")**<br><br>CAB Customer,<br>¶¶ 986, 1127 | ¶ 954 (1994 *Jerusalem Post* report that Al-Tadamun chairman Sheikh al-Bitawi was Hamas appointee to Palestinian religious courts); ¶ 983 & nn.59 and 62 (1995 *Voice of Palestine* interview identified Al-Tadamun board member Jamal Salim as "a member of … | ¶ 980 (declared an unlawful association by Israeli Minister of Defense on February 25, 2002 and by IDF on June 30, 2002) | ¶ 961 (Chairman al-Bitawi placed on Israel's wanted list since the beginning of the intifada); ¶ 979 (2001 PA office closure); ¶¶ 853, 1031 (2001 closures reported on Hamas' official websites and translated and published by the *BBC* in 2002, which described "a large-scale campaign" by the PA "closing a number of |

| CAB Customers and/or Counterparties | International Media and Hamas Statements | Government Designations and Public Government Statements | Other Government Actions |
|---|---|---|---|
|  | Hamas"; 1995 *AP* interview identified Salim as "a Hamas leader;" 1997 and 1998 *AP* reports identified Salim as Hamas leader); ¶ 955 (1997 *AP* report on group wedding organized by "leading Hamas figure in Nablus" al-Bitawi); ¶ 956 (1997 *IPS-Inter Press Service* report on Hamas group: in Nablus, "Bitawi's name is synonymous with Hamas"); ¶ 957 (1998 *Christian Science Monitor* report called al-Bitawi "a known figure in the social wing of Hamas here in Nablus"); ¶ 958 (1998 *AP* report on Palestinian rallies and citing statements made by al-Bitawi on behalf of Hamas); ¶ 959 (2000 *AP* report on al-Bitawi's pledge to commit more car bombings made at funeral of senior Hamas operative and bombmaker); ¶ 960 (2001 *AP* report described fatwa by Sheikh al-Bitawi against Muslims cooperating with U.S. in wake of 9-11 attacks); ¶ 961 (2002 *New York Sun* report on al-Bitawi's encouragement of suicide attacks and that he has been on Israel's wanted list since the beginning of the intifada); ¶ 966 and n.58 (publicized 2001 speech by al-Bitawi before 150,000 people calling for jihad against Israel) |  | Hamas … institutions and societies"); ¶ 983 n.61 (1996 *AFP* report on Jamil Salim's arrest by the PA) |

| CAB Customers and/or Counterparties | International Media and Hamas Statements | Government Designations and Public Government Statements | Other Government Actions |
|---|---|---|---|
| **Al-Islah Charitable Society in Ramallah & Al-Bireh ("Al-Islah")**<br><br>CAB Customer, ¶ 1127 | ¶ 1064 (1998 Dutch *NRC Handelsblad* report identified Al-Islah Chairman Jamal Tawil as Hamas leader in Ramallah); ¶ 1065 (2000 *AFP* arreportticle identified Tawil as Hamas leader); ¶ 1066 (2000 *Baltimore Sun* report identified Tawil as "Ramallah representative of Hamas"); ¶ 1067 (2001 *AP* report identified Tawil as "Hamas spokesman" who "vowed more suicide bombers") | ¶ 1070 (declared an unlawful association by Israeli Minister of Defense on February 25, 2002 and by IDF on June 30, 2002) | ¶ 1068 (2001 closure by PA); ¶ 1069 (2001 letter from PA's General Intelligence Service in Ramallah confirming Al-Islah's closure as it was a "Hamas-affiliated" institution); ¶¶ 853, 1031 (2001 closures reported on Hamas' official websites and translated and published by the *BBC* in a 2002 report describing "a large-scale campaign" by Palestinian police forces "closing a number of Hamas … institutions and societies"); ¶ 1062 n. 69 (*AP* reported on Israeli arrest of Al-Islah Chairman Jamal Tawil in 2002); ¶ 1072 (IDF raid in July 7, 2003, reported in *Voice of Palestine* report) |
| **Tulkarem Zakat Committee ("TZC")**<br><br>CAB Customer, ¶¶ 950, 1127 | ¶ 947 (1996 *AFP* and (Palestinian daily newspaper) *Al Quds* report on the PA's arrests of multiple TZC leaders by Palestinian police during ongoing crackdown of Hamas); ¶ 947 (2001 *Reuters* report that board member Fathi Muhammad Qar'awi delivered eulogy praising suicide attack); ¶¶ 1142-43 (2002 *Al-Hayat Al-Jadida* report that Abbas al-Sayed, mastermind of Park Hotel attack, was arrested while working at the TZC) | ¶ 940 (declared an unlawful association by Israeli Minister of Defense on February 25, 2002 and by IDF on June 30, 2002) | ¶ 947 (1996 *AFP* and *Al Quds* reports on the PA's arrests of multiple TZC leaders by Palestinian police during crackdown of Hamas); ¶ 941 (2002 *Baltimore Sun* report on Israeli raid and seizure of documents from TZC indicating the Saudis sent millions of dollars to Palestinian organizations, "including a group called the Tulkarm Charity committee, which Israel said is identified with Hamas" and also "including the names of reported recipients, including the families of suicide bombers and of well-known Palestinian militants killed by Israeli troops"); ¶ 942 (2002 Israeli Foreign Ministry report issued regarding funds transferred to TZC which described TZC as "identified with Hamas" and "also has ties with the operational apparatus of the Hamas which recruits youths in order to perpetrate suicide attacks and is engaged in |

| CAB Customers and/or Counterparties | International Media and Hamas Statements | Government Designations and Public Government Statements | Other Government Actions |
|---|---|---|---|
| | | | carrying out terrorist attacks") ¶ 939 (April 2002 raid by Israeli forces uncovering incitement materials encouraging jihad); |
| **Palestinian Relief and Development Fund ("Interpal")** <br><br> CAB Counterparty, ¶¶ 827, 860, 883, 898-99, 927-28, 948, 967, 985, 987, 1007, 1010, 1023, 1035, 1054, 1056, 1075-76, 1090, 1096 | ¶ 565 (Hamas's most important fundraising organization in the UK); ¶ 566 and n.14 (1994 *The Guardian* report described Interpal as "a principal conduit of funds for the Palestinian Hamas movement," and reported Israel finding that "much of the money is spent on weapons"); ¶¶ 570, 624 (1996 *New York Times* report on Israel's identification of Interpal as "key fundraising operation" for Hamas which used charitable donations to "provide lifetime annuities to the families of suicide bombers"); ¶ 571 (1996 *U.S. News & World Report* described Saudi organization's transfer of funds to Interpal, some of which was converted to "unsupervised cash grants" and "winds up financing Hamas activities, from funding the families of suicide bombers to bankrolling the suicide units"); ¶ 584 (1997 *Deutsche Presse-Agentur* report that Israel linked Interpal to Hamas); ¶ 585 (1997 *AP* report on same); ¶ 586 (1997 *Jerusalem Post* report on same) | ¶ 572 (outlawed by Israel in 1997, designated a terrorist organization in 1998); ¶ 583 (1997 *AFP* report that Israel banned Interpal); ¶¶ 573-74, 576 (designated an SDGT by the U.S. Treasury Department in 2003 in announcement that it is "a principal charity utilized to hide the flow of money to HAMAS") | ¶ 568 (1996 *The Observer* report described British freeze of Interpal's assets pending investigation); ¶ 569 (1996 *Financial Times* report on British freeze of Interpal's assets after Israeli intelligence claimed Interpal had "raised money for Hamas institutions and directly provided support to families of Hamas guerillas and suicide bombers") |

| CAB Customers and/or Counterparties | International Media and Hamas Statements | Government Designations and Public Government Statements | Other Government Actions |
|---|---|---|---|
| **Al-Aqsa Foundation ("Al Aqsa")**<br><br>CAB Counterparty, ¶¶ 603-07, 827, 883, 889, 898, 927, 948, 967, 985, 1007-09, 1023, 1035, 1054, 1075, 1090, 1096 | ¶ 581 (a major fundraiser for Hamas founded in July 1991 in Germany); ¶ 584 (1997 *Deutsche Presse-Agentur* report that Israel linked Al Aqsa to Hamas); ¶ 585 (1997 *AP* report on same); ¶ 586 (1997 *Jerusalem Post* report on same); ¶ 588 (2002 *Die Welt* report described connection between Al Aqsa and Hamas) | ¶ 582 (outlawed by Israel in 1997, designated a terrorist organization in 1998); ¶ 583 (1997 *AFP* report that Israel banned Al Aqsa); ¶¶ 601-02 (designated an SDGT by the U.S. Treasury Department on May 29, 2003, in announcement that "Al Aqsa is a critical part of Hamas' terrorist support infrastructure") | ¶ 569 (1996 *Financial Times* report that British police identified Al Aqsa as the source of funds given to "families of Hamas guerillas"); ¶ 587 (2001 published German report linking Al Aqsa and "the extremist activities of Hamas under the guise of humanitarian aid for Palestine"); ¶¶ 589-91 (2002 closure of Al Aqsa offices in Germany); ¶¶ 592-94 (German closure of Al Aqsa reported in 2002 *Newsday* report which described Al Aqsa's solicitation of "donations to support 'martyr families'"); ¶ 595 (2002 *AP* report on German raids yielding evidence of support for Hamas); ¶ 596 (2002 *Wall Street Journal* report on German actions against Al Aqsa, which "is accused of sending money to the families of suicide bombers"); ¶ 597 (2002 published Dutch Intelligence report on Al Aqsa investigation, concluded that "funds collected here by the Al Aqsa foundation have been used for violent activities in the Middle East"); ¶¶ 598-99 (April 3, 2003 freeze of Al Aqsa accounts in the Netherlands); ¶ 600 (2003 Dutch daily newspaper *Trouw* report on Dutch government actions against Al Aqsa) |

# Appendix B

## Representative Allegations of Individual Accountholders During Relevant Period Affiliated with Hamas and other Terror Groups

All ¶ citations are to the Second Amended Complaint (SAC). Terms have the meanings given in Plaintiffs' memorandum of law in opposition to CAB's motion to dismiss the SAC.

| CAB Customer | International Media and Hamas Statements | Government Actions and Reports |
|---|---|---|
| **Abd al-Khaleq Hasan Shadli al-Natshe**, ¶¶ 926 n.52, 1129, 1173 | ¶ 926 n. 51 (1995 *Jerusalem Post* and 1996 *BBC* reports that Islamic Charitable Society – Hebron ("ICSH") administrative manager Abd al-Khaleq al-Natshe was part of Hamas); *id.* (1996 *BBC* and *Al-Quds* reports that Hamas was conditioning dialogue with the PA regarding a cease-fire on the release of al-Natshe, among other operatives); ¶ 908 (al-Natshe appeared at public Hamas gatherings alongside Sheikh Ahmed Yassin and lectured, including before thousands of people at Hebron University in 2001); ¶ 907 (2001 Hamas website report identified al-Natshe as ICSH administrative director and Hamas spokesman in Hebron); ¶ 910 (2001 Hamas website report on Hebron parade attended by thousands of Hamas supporters commemorating assassination of two Hamas leaders and demanding that Hamas and the Qassam Brigades avenge their deaths, led by al-Natshe, the "HAMAS representative of Hebron"); ¶ 926 (2001 *al-Hayat al-Jadida* | ¶ 926 (arrested several times in Israel in the 1980s and 1990s, convicted in July 1997 for his Hamas activities); ¶ *id.* (arrested by Israel in 2002 and sentenced to 10 years' imprisonment); ¶ 926 n.50 (2002 arrest covered by Palestinian media and reported on by Hamas website); ¶ 915 (2002 *Time Magazine* report described ICSH administrative head al-Natshe's arrest by Israeli soldiers after he planned an April Hamas attack); ¶ 922 (after his arrest in 2002, al-Natshe gave a statement confirming that he was the representative of Hamas' political wing in Hebron and was in charge of caring for the families of Hamas prisoners); ¶ 926 (2004 Government of Israel Report described how "Al-Natshe is known as the most senior Hamas activist in Hebron and is considered by the public as the head of the movement and its representative in the district.… Prior to his arrest, he frequently appeared on and was interviewed by the media as a Hamas representative and disseminated the movement's ideology. Al-Natshe moved through the city accompanied by bodyguards") |

| CAB Customer | International Media and Hamas Statements | Government Actions and Reports |
|---|---|---|
| | report identified al-Natshe as a member of the Hamas Political Bureau); ¶ 911 (2001 Hamas website report identified al-Natshe as Hamas representative in Hebron); ¶ 912 (2001 *Los Angeles Times* report identified al-Natshe with ICSH and noted its receipt of money from HLF, some of which "goes into the bank accounts of relatives of Palestinians killed or wounded or to those whose homes have been destroyed in Israeli raids"); ¶ 913 (2001 *AP* report identified al-Natshe as the "Hamas leader in the West Bank town of Hebron … who also heads the Islamic Charitable Society"); ¶ 915 (2002 *Time Magazine* report identified al-Natshe as the head of ICSH who provided funding for Qassam Brigades and helped plan a Hamas attack before being arrested) | |
| **Abbas al-Sayed**, ¶¶ 1129, 1136 | ¶ 1141 (2001 *St. Louis Dispatch* report on mass protest of arrest of al-Sayed, "spokesman for Hamas"); ¶ 1143 (2002 *Al-Hayat Al-Jadida* report that al-Sayed was arrested while working at the Tulkarem Zakat Committee) | ¶ 1140 (al-Sayed claimed that his name was published as a person wanted by Israel in 2001); ¶ 1141 (arrested in October 2001, reported on by 2001 *St. Louis Dispatch* article); ¶ 1136 (arrested in July 2002); ¶¶ 1142, 1144 (convicted and sentenced to 35 life sentences for role in March 27, 2002 Park Hotel bombing and other attacks) |
| **Mohamad Saleh Taha**, ¶¶ 1129, 1152 | ¶ 1154 (*BBC* summarized 1995 *Haaretz* report describing mass Hamas rally in Gaza in which "30,000 people repeated the words of Muhammad Taha, a founder of the Muslim Brotherhood in the Gaza Strip, who read out the official announcement of the Islamic rejectionist movement [Hamas]. He repeated the declaration three times against the background noise of | ¶ 1153 (arrested many times by Israel and PA, Marj al-Zuhur deportee); ¶ 1155 (Palestinian police arrested Taha in September 1997; released by Arafat two weeks later at the request of Sheikh Yassin); ¶ 1155 (1997 Israeli television Channel 1 report on arrest and subsequent release of Taha by Arafat at the request of Sheikh Yassin); ¶ 1156 (2003 Israeli raid of Taha's home, and his arrest, reported on by *CNN*, which referred to Taha as "one of the co-founders of Hamas and a senior figure in the group's political and military wings in Gaza." He |

| CAB Customer | International Media and Hamas Statements | Government Actions and Reports |
|---|---|---|
| | recorded shootings, and the crowd applauded him.") | and his son were reported to have been lightly wounded in shootout and then arrested and transferred to an Israeli hospital.) |
| **Ghazi Hamad**, ¶¶ 1129, 1158 | ¶ 1160 (1994 *New York Times* report referred to Hamad as "a Hamas leader in Rafah" describing group's attack strategy); ¶ 1163 (1997 *The Guardian* report identified Hamad as a Hamas spokesman); ¶ 1166 (2000 *AP* report cited Hamad, "a Hamas spokesman," discussing prisoner release including Qassam Brigades leaders); ¶ 1167 (2001 *Daily Mirror* report on prospective Palestinian suicide bombers and describing a young man who "turned to Hamas and its unrelenting message of hostility to the Jews. He listened to the words of Hamas leaders like Ghazi Hamad, who has said: 'There will be no peace. The Jews hate us and we hate them. Israel is a cancer, it should be uprooted'") | ¶ 1159 (arrested twice by PA in 1990s); ¶ 1160 (1994 *New York Times* report that Hamad recently completed five-year prison sentence); ¶ 1161 (1995 *AP* report noted that Hamad "served five years in Israeli prisons for membership in the Muslim militant group Hamas"); ¶ 1162 (1995 *United Press International* report that Hamad was arrested as part of "sweeps" against Hamas in the Gaza Strip); ¶¶ 1164-65 (multiple detentions by Palestinian security in 1999, reported on in 1999 *Agence France Presse* article stating that Hamad, the editor of "the weekly *Al-Rissala* newspaper, the mouthpiece" of Hamas, was detained by Palestinian security forces in connection with a criminal investigation, and 1999 *AP* report on detention that week of Hamad, referring to him as "editor of HAMAS' official newspaper *al-Risala*" and noting that he had been "detained several times in the past under similar circumstances") |
| **Sayed Salem Abu Musameh**, ¶¶ 1129, 1169 | ¶ 1171 (1996 *Independent* report identified Musameh as "a prominent Hamas leader") | |
| **Family of Mahmud Marmash** ¶¶ 859, 1149, 1270 | ¶¶ 858, 1148 (During Al-Jam'iya Al-Islamiya graduation ceremony for 1,650 children from 41 kindergartens, chairman Ahmed Bahar delivered a closing speech praising Marmash as a "shining example for the children") | |