USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _4/11/2022___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AVERBACH et al.,

                                    Plaintiffs,

              -against-

CAIRO AMMAN BANK,

                                    Defendant.

**REPORT AND
RECOMMENDATION ON
MOTION TO DISMISS**

**19-cv-0004-GHW-KHP**

**TO:     HONORABLE GREGORY H. WOODS, UNITED STATES DISTRICT JUDGE**
**FROM: KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

This case arises out of a series of terrorist attacks in Israel perpetrated by *Harakat al-Muqawama al-Islamiya* ("Hamas"), designated by the United States as a Palestinian terrorist organization, during the Second Intifada—a period of intense Israeli-Palestinian violence between 2000 and 2004 that included attacks on Israeli civilian centers, military installations, and buses. Plaintiffs include United States nationals injured in the attacks, as well as the estates, heirs, and families of U.S. nationals killed or injured in the attacks. Before this Court is Defendant's motion to dismiss Plaintiff's Second Amended Complaint ("SAC") for lack of personal jurisdiction, failure to allege standing with respect to certain Plaintiffs and failure to state a claim. For the following reasons, I recommend that Defendant's motion to dismiss be GRANTED in part and DENIED in part.

**PROCEDURAL HISTORY**

On January 1, 2019, Plaintiffs brought suit against Defendant Cairo Amman Bank ("CAB") pursuant to the Anti-Terrorism Act ("ATA"), as amended by the Justice Against Sponsors of

Terrorism Act ("JASTA"), alleging that CAB aided and abetted terrorist attacks by providing financial services to Hamas through affiliated charities and prominent members of Hamas.  18 U.S.C. § 2333, as amended by JASTA, Pub. L. No. 114-222, 130 Stat. 852 (Sept. 28, 2016).  (ECF No. 1.)  On July 17, 2019, Defendants filed a motion to dismiss the Complaint.  (ECF Nos. 46, 47.)  On January 21, 2020, this Court issued a report and recommendation recommending the dismissal of Plaintiffs' initial Complaint because they inadequately pleaded two JASTA elements, which are also at issue in this motion.  *See Averbach v. Cairo Amman Bank*, 2020 WL 486860, at *2 (S.D.N.Y. Jan. 21, 2020) (hereinafter, "the R&R").  On March 9, 2020, the Honorable Gregory H. Woods adopted the R&R in its entirety but allowed Plaintiffs an opportunity to replead.  *Averbach for Estate of Averbach v. Cairo Amman Bank*, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020)).

On April 8, 2020, Plaintiffs filed a First Amended Complaint ("FAC") adding a claim for primary liability under the ATA.  (ECF No. 63.)  Defendant filed a motion to dismiss the FAC, but thereafter the case was placed on suspense pending the issuance of decisions on four appeals from the Second Circuit that would impact the pending motion to dismiss:  *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021), *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021), *Weiss v. Nat'l Westminster Bank, PLC.*, 993 F.3d 144 (2d Cir. 2021) and *Strauss v. Credit Lyonnais*, S.A., 842 F. App'x 701 (2d Cir. 2021).  (ECF Nos. 67, 78.)  After the Second Circuit cases were decided, Plaintiffs were given another opportunity to replead.

On September 3, 2021, Plaintiffs filed a Second Amended Complaint ("SAC") alleging two causes of action against CAB:  one for aiding-and-abetting liability under JASTA, and the other for committing acts of terrorism in violation of the ATA.  (ECF No. 96.)  Defendant's

instant motion to dismiss followed. (ECF Nos. 97-100.) The crux of Defendant's motion is that, again, Plaintiffs fail to state a claim under JASTA for failing to sufficiently plead two JASTA elements – general awareness and substantial assistance. Defendant argues Plaintiffs claim for primary liability under the ATA fails because Plaintiffs fail to plausibly allege that CAB's own conduct constituted an act of international terrorism or proximately caused Plaintiffs' injuries. Defendants also assert that Plaintiffs Julie Averbach, Matanya Nathansen, Nevenka Gritz, and Arie Miller lack standing and that this Court lacks personal jurisdiction over CAB.

## FACTUAL BACKGROUND

The Court draws the below recitation of relevant facts from the SAC. For the purposes of the instant motion, the Court treats the well-pleaded factual content in the Complaint as true.

Plaintiffs or their family members were killed or injured in one of twelve terrorist attacks that occurred in Israel between December 1, 2001 through August 19, 2003 during the Second Intifada (collectively, the "Attacks[1]"). (SAC ¶¶ 9-498.) Plaintiffs allege that these Attacks were committed by terrorists affiliated with Hamas. (*See* SAC ¶¶ 9, 68, 199, 262, 295, 314, 334-335, 386, 403, 409, 410, 481, 486.) CAB is a financial institution incorporated and headquartered in Amman, Jordan. (SAC ¶ 499.) CAB operates branches in Jordan and in the Palestinian

---

[1] The twelve Attacks are: (1) Ben Yehuda Street Bombing on December 1, 2001; (2) Passover Massacre at the Park Hotel in Netenaya on March 27, 2002; (3) Sheffield Club Bombing on May 7, 2002; (4) Patt Junction Bus #32A Bombing on June 18, 2002; (5) Hebrew University Cafeteria Bombing on July 31, 2002; (6) Ariel Bombing on October 27, 2002; (7) Shooting Attack on Route #60 on January 29, 2003; (8) Mike's Place Bombing in Tel Aviv on April 30, 2003; (9) Commuter Bus #6 Bombing on May 18, 2003; (10) Jaffa Road Bus #14A Bombing on June 11, 2003; (11) Shooting Attack on Route #60 on June 20, 2003; and (12) Jerusalem Egged Bus #2 Bombing on August 19, 2003.

territories and is subject to the regulations promulgated by the Palestinian Monetary Authority and the Palestinian Authority, which is vested with supervision over all banks between Israel and the Palestinian Authority.  (*Id.*)  Plaintiffs allege that during the relevant time period CAB facilitated the flow of money used by Hamas to finance terrorism in the Palestinian Territories.  (SAC ¶ 1097.)

The following factual allegations pleaded in the SAC are provided for context.  Hamas was established in the Gaza Strip in 1987.  (SAC ¶ 504.)  It consists of both a civilian infrastructure known as the *da'wa*,[2] that provides for religious and social work, and an operational militant arm, the *Izz al-Din al-Qassam* Brigades ("Qassam Brigades"), which engages in terrorist activities.  (SAC ¶¶ 506, 509, 523.)[3]  Hamas's civilian infrastructure is made up of charities and other organizations including mosques, hospitals, religious schools, clinics, and other institutions that provide social services.  (SAC ¶¶ 509, 522, 525, 546-48, 551, 624.)  Plaintiffs allege that Hamas's civil infrastructure plays a central role in funding Hamas's terrorist activities by allocating funds received for Hamas's civilian infrastructure to Hamas's militant arm.  *Id*.  Plaintiffs also allege that Hamas's civil infrastructure further supports the militant arm by providing payments to operatives (including "martyr payments"),[4] recruitment support, and propaganda support.  (*Id.* SAC ¶¶ 593, 627, 633, 638.)

---

[2] The word "da'wa," means "the call to the believers to shelter beneath the faith – return to the faith," and is used to refer to "the civilian infrastructure of Hamas."  (SAC ¶ 506, n. 5.)

[3] The Court refers to the two branches, respectively, as the civilian infrastructure and the militant arm.

[4] "Martyr payments" are payments made to the families of terrorist operatives who have been killed, injured, or imprisoned as a result of their terrorist activities.  (SAC ¶¶ 1265-1270.)

The U.S. government designated Hamas as a Specially Designated Terrorist ("SDT") in 1995.  (SAC ¶ 677.)  In 1997, Hamas was designated as a Foreign Terrorist Organization ("FTO") and continues to carry the FTO designation to this day.[5]  (SAC ¶ 677.)  In 2001, Hamas also was designated as a Specially Designated Global Terrorist ("SDGT"), making it illegal for any person within the United States or subject to its jurisdiction to provide material support to Hamas.  *Id.*; *see* 18 U.S.C. § 2339B (prohibiting the knowing provision of "material support or resources to a foreign terrorist organization, or attempts or conspir[acy] to do so").

The SAC provides a detailed overview of Hamas's global fundraising network that includes various organizations all over the world including: Comité de Bienfaisance et de Secours aux Palestiniens in France ("CBSP"), Palestinian Relief and Development Fund in the United Kingdom ("Interpal"), Holy Land Foundation in the United States ("Holy Land" or "HLF"), Association de Secours Palestinien in Switzerland ("ASP"), Palestinian Association in Austria ("PVOE") and Sanabil Association for Relief and Development in Lebanon ("Sanabil").  The SAC further alleges that each of these groups are primary fundraisers for Hamas by collecting large amounts of money from mosques and Islamic centers and then transferring that money to sub-organizations of Hamas – thereby acting as proxies to Hamas.  (SAC ¶¶ 574-578.)  One of the sub-organizations described in the SAC is Al-Aqsa Foundation, which has branch offices all over the world, was integrated into the financial infrastructure of Hamas, and supports the extremist activities of Hamas under the guise of humanitarian aid for Palestine.  (SAC ¶¶ 576, 581, 587.)  Of these global organizations, HLF was the first to be designated by the United States as a

---

[5] *See* 8 U.S.C. § 1189 (a) (authorizing the Secretary of State to designate foreign organizations that engage in terrorist activity that threatens the security of U.S. nationals or the national security of the United States as foreign terrorist organizations).

Specially Designated Global Terrorist in 2001.  Subsequently, on August 21, 2003 (two days after the last Attack at issue in this case), the designation of the rest of the organizations followed.  Importantly, Plaintiffs pleaded that during the relevant period, the various individuals and organizations noted below received funding through their CAB account from these global fundraising organizations, before and after their designation as SDGTs.

Generally, Plaintiffs allege that CAB aided and abetted Hamas's terrorism by providing millions of dollars to Hamas by knowingly:  (1) maintaining accounts and/or facilitating payments for prominent Hamas leaders; (2) maintaining accounts for Hamas charities/organizations in the West Bank and Gaza Strip; (3) maintaining accounts and/or providing financial services for groups openly affiliated with or belonging to Hamas; and (4) facilitating reward payments to the families of Hamas suicide bombers and other "martyrs," and Hamas prisoners.  (SAC ¶ 1102.)

With regard to prominent Hamas leaders, Plaintiffs allege that CAB knowingly maintained accounts for five well-known Hamas leaders:  Abbas al-Sayed (SAC ¶¶ 1136-1151), Mohamad Saleh Taha (SAC ¶¶ 1152-1157), Abd al-Khaleq Hasan Shadli al-Natshe (SAC ¶¶ 1173-1174), Ghazi Hamad (SAC ¶¶ 1158-1168), and Sayed Salem Abu Musameh (SAC ¶¶ 1169-1172). (SAC ¶ 1129.)  The SAC alleges that all five Hamas leaders were among more than 40 beneficiaries of funds transferred from Hamas operatives in Lebanon.  (SAC ¶ 1131.) Collectively, the SAC pleads that a total of approximately $135,855.00 in U.S. dollars was transferred to these individuals in twenty-three fund transfers made through New York-based Correspondent Banks from December 1999 through September 2001 (all prior to the Attacks at issue in this case).  (SAC ¶¶ 636-637, 1137, 1157, 1168, 1172.)  The SAC also alleges that three

of the five — al-Sayed, Taha, and al-Natshe — were at the center of Hamas's violent terrorist activities, including serving as senior members of Hamas' militant arm, the Qassam Brigades, planning attacks, and recruiting and encouraging others to do so.  (SAC ¶ 1130.)  Importantly, the SAC also added references to numerous statements from Hamas officials and press articles documenting not only the notoriety of these prominent Hamas leaders, but also evidence of what was occurring on the ground in the Palestinian Territories.  For example, the SAC pleads that al-Sayed, a prominent Hamas spokesman and one of the planners of the Park Hotel Bombing in March of 2002, was arrested in the fall of 2001 and that there was a 1,000-person demonstration in Palestine (where CAB maintains a branch) demanding he be released.  (SAC ¶¶ 1139, 1142, 1143.)  Similarly, for Mohamad Saleh Taha and Ghazi Hamad, Plaintiffs cited numerous articles dating from May 31, 1994 to March 2, 2003 that documented their notoriety as Hamas leaders and their subsequent arrests (SAC ¶¶ 1154-1156, 1160-67), as well as an October 8, 1997Israeli television Channel 1 report that Yasir Arafat, the Palestinian Authority Chairman, ordered the release of Saleh Taha when he was arrested.  (SAC ¶ 1155.)  Additionally, Plaintiffs allege that al-Natshe, the Hamas leader in the West Bank town of Hebron, appeared in public, lectured at gatherings, and led a parade in 2001 in Hebron (where CAB has a branch) that was attended by thousands of Hamas supporters commemorating the assassination of two prominent Hamas leaders and calling for the Qassam Brigades to avenge the death of their leaders.  (SAC ¶¶ 908-911.)

Plaintiffs also allege that CAB maintained accounts for seventeen Islamic charitable organizations in the West Bank[6] and Gaza Strip[7] that were integral parts of Hamas.  (SAC ¶¶ 766-1096.)  Plaintiffs allege that CAB knew these organizations were integral parts of Hamas because prior to the Attacks (or at least some of them) Hamas acknowledged the relationships in various Arab and western media channels and media outlets independently identified these organizations as being affiliated with Hamas.  (SAC ¶ 764.)  For example, Plaintiffs pleaded the Islamic Center (or Complex) of Gaza (Al-Mujama Al-Islami) had a fundraising brochure that explicitly linked this group to Al-Aqsa Foundation in Germany and referred to the "fragrance of the blood of the martyrs and wounded which watered the pure soil" and confirmed that donors to this group "are committing Jihad with your monies . . ." (SAC ¶¶ 798, 805.);  the Islamic Society – Gaza (Al-Jam'iya Al-Islamiya) organized ceremonies in honor of the "martyr" families and also organized a mass wedding in Gaza where the Qassam Brigades distributed fliers that called for a renewal of the Jihad against Israel (SAC ¶¶ 833, 836.); a senior leader of Hamas gave an interview to Jordanian newspaper, Al-Watan, saying that the Al-Salah Islamic Society (Jam'iyat al-Salah al-Islamiya) was an integral part of Hamas's social infrastructure and it serves as a key node in Hamas' finance and support which goes to the families of "martyrs" (SAC ¶¶

---

[6] Key Hamas Institutions in the West Bank include: (1) Islamic Charitable Society – Hebron (al-Jam'iya al-Khiriya al-Islamiya al-Khalil); (2) Tulkarem Zakat Committee (Lajnat al-Zakaa Tulkarem); (3) Nablus Zakat Committee (Lajnat al-Zakaa Nablus); (4) Al-Tadamun Charitable Society – Nablus (Jam'iyat al-Tadamun al-Khiriyah Al-Islamiya); (5) Jenin Zakat Committee (Lajnat al-Zakaa Jenin); (6) Ramallah – Al-Bireh Zakat Committee (Lajnat al-Zakaa Ramallah Wal-Bireh); (7) Muslim Youth Association – Hebron; (8) Beit Fajar Zakat Committee; (9) Al-Islah Charitable Society in Ramallah & Al-Bireh; (10) Qalqilya Zakat Committee; (11) Quran and Sunnah Society – Qalqilya; (12) Al-Ihsan Charitable Society – Hebron. (SAC ¶¶ 901-1096.)

[7] Key Hamas Institutions in the Gaza Strip include: (1) Islamic University of Gaza; (2) The Islamic Center (or Complex) – Gaza (Al-Mujama Al-Islami); (3) The Islamic Society – Gaza (Al-Jam'iya Al-Islamiya); (4) Al-Salah Islamic Society – Gaza (Jam'iyat al-Salah al-Islamiya); (5) Al-Wafa Charitable Society – Gaza (Jam'iyat Al-Wafa Liri'ayat Al-Musinnin). (SAC ¶¶ 766-900.)

863, 864, 865, 871, 882.); the Islamic Charitable Society (al-Jam'iya al-Khiriya al-Islamiya al-Khalil) received money from the HLF, which was designated by the United States as a Specially Designated Global Terrorist in 2001, and was run by Abd al-Khaleq al-Natshe a Hamas spokesman and one of the prominent Hamas individuals identified above (SAC ¶¶ 904, 907, 908, 912.); al-Sayed was a prominent Hamas leader for the Tulkarem Zakat Committee, which is a charity connected to the Hamas terrorist-operational apparatus  (SAC ¶¶ 937, 942, 1143.); the leader of the Nablus Zakat Committee (Lajnat al-Zakaa Nablus) Hamed al-Bitawi pledged revenge for death of Hamas operatives and also encouraged Hamas activities to go the way of Jihad and carry out suicide attacks against Israel (SAC ¶¶ 953, 956, 959, 961.); Al-Tadamun Charitable Society – Nablus (Jam'iyat al-Tadamun al-Khiriyah Al-Islamiya) supported Hamas terror activities by transferring funds to other zakat committees (SAC ¶¶ 971-2, 974.); the Jenin Zakat Committee (Lajnat al-Zakaa Jenin) is closely intertwined with terrorism because one of its core functions during 2000-2004 was to provide payments to the families of "martyred" Hamas operatives and other Palestinian "martyrs" (SAC ¶¶ 990, 993, 996-8.); the purpose of Ramallah – Al-Bireh Zakat Committee (Lajnat al-Zakaa Ramallah Wal-Bireh) is to transfer funds from abroad to Hamas and also help with the movement of Hamas activists (SAC ¶¶ 1015-16.); the Muslim Youth Association in Hebron served as a "breeding ground" for the recruitment of Hamas terrorists (SAC ¶¶ 1026-27.); Beit Fajar Zakat Committee is a prominent Hamas institution whose members are associated with the Qassam Brigades (SAC ¶¶ 1046, 1048.); Al-Islah Charitable Society in Ramallah & Al-Bireh is considered to be a pivotal civil institution of Hamas for the purpose of transferring the organization's funds to Hamas prisoners and for providing employment and operational cover to senior Hamas operatives involved in the

organization's terror activities, including recruiting suicide bombers, planning attacks, and harboring operatives (SAC ¶¶ 1057-59.); the founder of Qalqilya Zakat Committee was acknowledged by the Qassam Brigades as one of Hamas's prominent leaders (SAC ¶¶ 1079-80.); Al-Ihsan Charitable Society contains prominent Hamas leaders and the employees of this organization overlap with the other societies in other geographical areas (SAC ¶¶ 1093, 1095.); and lastly the Welfare Association for Palestinian and Lebanese Families (Al-Waqfiya) was a significant Hamas fundraising channel for the families of Hamas martyrs and prisoners.  (SAC ¶¶ 1134-35, 1182, n. 16.)

Plaintiffs also allege that many of these organizations'[8] made "martyr payments" to the families of terrorist operatives who were killed, injured, or imprisoned as a result of their terrorist activities.  (SAC ¶¶ 859, 918, 923, 975, 977, 993, 996-99, 1036, 1074, 1082.) Additionally, Plaintiffs allege that CAB knowingly facilitated payments made by Saddam Hussein's Arab Liberation Front ("ALF"), located in Iraq, to the families of suicide bombers during the Second Intifada.  (SAC ¶¶ 1188-1232.)  ALF's "martyr payment" ceremonies received widespread media coverage, particularly in the local Palestinian media.  (SAC ¶ 1201.)  The SAC also highlights that CAB knowingly facilitated reward payments to the families of Hamas "martyrs" made by Hezbollah, a designated FTO, through Martyrs Foundation (affiliated with Hezbollah), through the al-Ansar society, which maintained a bank account at CAB.  (SAC 1233-1264.)  Specifically, the SAC alleges that announcements in Palestinian papers called on the

---

[8] These include Islamic Society in Gaza (SAC ¶ 859.); Islamic Charitable Society (SAC ¶¶ 918, 923.); Al-Tadamun Charitable Society (SAC ¶¶ 975, 977.); Jenin Zakat Committee (SAC ¶¶ 993, 996-99.); Muslim Youth Association – Hebron (SAC ¶ 1036.); Al-Islah Charitable Society in Ramallah & Al-Bireh (SAC ¶ 1074.); Qalqilya Zakat Committee (SAC ¶ 1082.)

"honorable families of the martyrs of the Al-Aqsa Intifada" seeking payments from the al-Ansar society to produce documentation proving their claims.  (SAC ¶ 1253.)  Then, the Martyrs Foundation website would openly identify prominent Hamas operatives as "martyrs" whose families received payments via accounts controlled by al-Ansar.  (SAC ¶ 1254.)

Additionally, Plaintiffs allege that other governments and local governmental authorities took action against these organizations.  As pleaded, and as early as 1997 and 1998, the Israeli government designated 13 of the 17 organizations named in the SAC—all with CAB accounts— as affiliated with Hamas and/or as unlawful associations with Hamas.  *See, e.g.*, Islamic Center in Gaza, Al-Mujama Al-Islami (SAC ¶ 824); Islamic Society in Gaza, Al-Jam'iya Al-Islamiya (SAC ¶ 852); Al-Salah Islamic Society Gaza, Jam'iyat al-Salah al-Islamiya (SAC ¶ 877); Al-Wafa Charitable Society, Jam'iyat Al-Wafa Liri'ayat Al-Musinnin (SAC ¶ 896); Islamic Charitable Society Hebron, al-Jam'iya al-Khiriya al-Islamiya al-Khalil (SAC ¶ 914); Tulkarem Zakat Committee, Lajnat al-Zakaa Tulkarem (SAC ¶ 940); Nablus Zakat Committee, Lajnat al-Zakaa Nablus (SAC ¶ 965); Al-Tadamun Charitable Society, Jam'iyat al-Tadamun al-Khiriyah Al-Islamiya (SAC ¶ 980); Jenin Zakat Committee, Lajnat al-Zakaa Jenin (SAC ¶ 1000); Ramallah, Lajnat al-Zakaa Ramallah Wal-Bireh (SAC ¶ 1017); Muslim Youth Association Hebron (SAC ¶ 1032); Beit Fajar Zakat Committee (SAC ¶ 1051); and Al-Islah Charitable Society in Ramallah & Al-Bireh (SAC ¶ 1070).

Additionally, Plaintiffs allege that the Palestinian Authority ("PA") temporarily closed some of these organizations at various times and the Palestinian Monitory Authority ("PMA") issued orders to freeze their bank accounts to stop funding Hamas institutions.  For example, in March of 1996, the Israeli army "ordered shut Hamas-affiliated institutions suspected of channeling funds supporting Hamas." (SAC ¶¶ 906, n. 14., 992, 1028.)  In December 2001, the

PA closed various societies run by Hamas (SAC ¶¶ 848, 876, 979, 1031, 1068.)  Also, during the relevant time frame, on January 6, 2002, the PMA directed Palestinian banks to report on the sums of money held in the accounts of Al-Jam'iya Al-islamiya and required them to consult with it prior to withdrawing funds from those accounts.  (SAC ¶¶ 848, 1047.)  On August 24, 2003, the PMA issued an order to freeze Al-Mujama Al-Islami bank accounts in all banks in the Palestinian Territories in order to stop funding Hamas institutions.  (SAC ¶ 823.)  CAB acknowledges that it is subject to the laws of the PA and regulations of the PMA.  (ECF No. 100 at p. 7.)

Notably, none of these organizations nor prominent individuals identified in the SAC as having CAB accounts are alleged to have directly participated in any of the Attacks, except for al-Sayed who is alleged to have planned the Park Hotel bombing (which occurred on March 27, 2002).[9]  Instead, Plaintiffs claim that the charitable/social activities of the organizations provide support and funds to Hamas's militant arm, which in turn is responsible for the attacks.  The services that CAB provided to the Account Holders included regular banking services and the transfer of funds internationally.  To facilitate international money transfers in U.S. dollars, CAB maintained correspondent banking relationships with banks in New York, including Citibank, N.A., Bank of New York, and American Express Bank Ltd (the "Correspondent Banks") from 1999 through 2004.  (SAC ¶¶ 6, 7, 634, 636-37, 1137, 1157, 1168, 1172.)  Plaintiffs do not allege that CAB has any branches or employees in New York or any business relationships in New York other than with the Correspondent Banks.  The Complaint identifies a total of twenty-three fund transfers made in U.S. Dollars through CAB's New York-based Correspondent Banks for the

---

[9] Al-Sayed was convicted sometime after the last Attack at issue in this case.

benefit of five account holders identified in the Complaint.  Plaintiffs contend these transfers

are a sufficient basis for this Court's assertion of personal jurisdiction over CAB.

## LEGAL STANDARDS

Defendant argues that this court lacks personal jurisdiction over Defendant, certain

Plaintiffs lack standing to sue under JASTA or the ATA, and Plaintiffs fail to plausibly allege

claims for either primary or aiding and abetting liability under the ATA as amended by JASTA.

### a.  Personal Jurisdiction

"The requirement that a court have personal jurisdiction flows not from Art. III, but from

the Due Process Clause . . . It represents a restriction on judicial power not as a matter of

sovereignty, but as a matter of individual liberty."  *Ins. Corp. of Ir., Ltd. v. Compagnie des

Bauxites de Guinee*, 456 U.S. 694, 702 (1982).  "On a Fed. R. Civ. P. 12(b)(2) motion to dismiss

for lack of personal jurisdiction, [the] plaintiff bears the burden of showing that the court has

jurisdiction over the defendant."  *In re Magnetic Audiotape Antitrust Lit.*, 334 F.3d 204, 206 (2d

Cir. 2003).  As no discovery has yet taken place, to survive a motion to dismiss, the "plaintiff

may meet this burden 'by pleading in good faith . . . legally sufficient allegations of jurisdiction,

*i.e.*, by making a "prima facie showing" of jurisdiction.'"  *Gaymar Indus., Inc. v. FirstMerit Bank,

N.A.*, 2007 WL 894217, at *3 (W.D.N.Y. Mar. 21, 2007) (quoting *Jazini v. Nissan Motor Co., Ltd.*,

148 F.3d 181, 184 (2d Cir. 1998)).  "A plaintiff can make such a prima facie showing through

affidavits and supporting material containing sufficient facts which, if credited, would establish

personal jurisdiction over the defendant."  *Id.* (citing *Metro. Life Ins. Co. v. Robertson-Ceco*

*Corp.*, 84 F.3d 560, 567 (2d Cir. 1996)).  "[W]here the issue is addressed on affidavits, all

allegations are construed in the light most favorable to the plaintiff and doubts are resolved in

the plaintiff's favor, notwithstanding a controverting presentation by the moving party." *A.I.*

*Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993).


### b.   Standing

To demonstrate standing, a plaintiff must show that he or she "(1) suffered an injury in

fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely

to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–

48 (2016).  The most important of the three elements is injury in fact, which requires that the

plaintiff show "an invasion of a legally protected interest that is concrete and particularized and

actual or imminent, not conjectural or hypothetical."  *Id.* at 1548 (internal quotation marks

omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  The injury requirement is

a "low threshold" that can be satisfied by emotional harm.  *Miller v. Arab Bank, PLC*, 372 F.

Supp. 3d 33, 41 (E.D.N.Y. 2019) (citations omitted).  Pleading traceability merely requires that a

plaintiff "demonstrate a causal nexus between the defendant's conduct and injury."  *Rothstein*

*v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (citation omitted).  The traceability requirement

presents a relatively low bar for a plaintiff to meet.  *Id.* at 91-92.


### c.   Failure to State a Claim

When considering a motion to dismiss for failure to state a claim upon which relief can

be granted under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as

true and draw all inferences in the Plaintiff's favor. *Littlejohn v. City of New York*, 795 F.3d 297, 306-07 (2d Cir. 2015). To survive a motion to dismiss, the complaint must contain "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While detailed factual allegations are not required, the complaint must contain more than mere "labels and conclusions." *Iqbal*, 556 U.S. at 678. It must contain more than "naked assertion[s] devoid of further factual enhancement." *Id.* (internal citation and quotation marks omitted). And, it must contain more than a "formulaic recitation of the elements of a cause of action." *Id.* As the Supreme Court explained in *Iqbal*, the "plausibility standard" asks for "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir. 1995). Dismissal is appropriate only when it "appears beyond a doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir. 2000).

## **DISCUSSION**

### A.  Personal Jurisdiction

This Court previously held that Plaintiffs had adequately pleaded personal jurisdiction, relying on the framework articulated in *Licci ex rel. v. Lebanese Canadian Bank, SAL* ("*Licci II*"), 673 F.3d 50, 61 (2d Cir. 2012). The standards, along with numerous authorities and citations, are discussed at length in *Averbach v. Cairo Amman Bank*, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020), *report and recommendation adopted sub nom. Averbach for Est. of Averbach v. Cairo*

*Amman Bank*, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020), which discussion is hereby incorporated by reference.

Put simply, nothing has changed from the FAC to the SAC that affects the personal jurisdiction analysis this Court already undertook. The SAC identifies twenty-three fund transfers that were made through the Correspondent Banks in the two years immediately prior to the first of the Attacks. These transactions include: two transfers to HLF, one on December 28, 1999 in the amount of $190,743.00 and one on January 16, 2001 (at the beginning of the Second Intifada) in the amount of $229,283.00 (SAC ¶¶ 636-37); seven transfers to al-Sayed between February 2001 and May 2001 totaling $69,000.00 (SAC ¶ 1137); five transfers to Taha between December 2000 and September 2001 totaling $9,870.00 (SAC ¶ 1157); six transfers to Hamad between October 2000 and April 2001 totaling $50,985.00 (SAC ¶ 1168); and three transfers to Musameh between February 2001 and September 2001 totaling $6,000.00 (SAC ¶ 1172). The SAC also asserts that CAB provided access to "millions of U.S. dollars." (SAC ¶¶ 1102, 1282.) *See Strauss v. Credit Lyonnais, S.A.,* 175 F. Supp. 3d 3, 24 (E.D.N.Y. 2016) ("To establish personal jurisdiction, ATA claims do not necessarily have to correspond one-to-one with particular transfers, but instead may rest upon the alleged millions of dollars Defendant allegedly transferred to these front organizations and individuals."). The above transfers are still sufficient to establish personal jurisdiction over CAB.

Nevertheless, CAB argues that since the SAC identifies no additional transfers through New York and there is an absence of any significant causal or temporal relationship between the transfers identified and the Attacks, the proper analytic framework for analyzing long arm jurisdiction under the Due Process Clause is that set out in *SPV Osus Ltd. v. UBS AG*, 882, F.3d

333 (2d Cir. 2018), not the one set forth in *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 732 F.3d 161 (2d Cir. 2013).

The *Licci* framework requires the Court to first "look to the law of the forum state to determine whether personal jurisdiction will lie" and, if "jurisdiction lies, [to] consider whether the district court's exercise of personal jurisdiction over a foreign defendant comports with due process protections established under the United States Constitution." *Licci ex rel. Licci*, 732 F.3d at 168. Two requirements must be met to establish personal jurisdiction under New York law:  (1) the foreign bank's maintenance and use of the correspondent account was purposeful; and (2) there is a nexus or substantial relationship between the claim and use of the correspondent account." *Licci II*, 732 F.3d at 168-169 (applying test). Plaintiffs' reliance on *SPV Osus Ltd.* is misplaced, as that case did not overrule nor modify the *Licci* framework. (ECF No. 100.)

First, "'[a]s a general rule,' . . . 'one panel of [the Second Circuit] cannot overrule a prior decision of another panel.'" *Gelman v. Ashcroft*, 372 F.3d 495, 499 (2d Cir. 2004) ("We are 'bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court."). Given that the Second Circuit in *SPV Osus Ltd.* was not an en banc panel decision, nor did it mention the *Licci* framework or decision, it cannot be read to have overruled or modified *Licci*.

Second, the Second Circuit in *SPV Osus Ltd.* merely acknowledged that "[w]here the defendant has had only limited contacts with the state it *may* be appropriate to say that he will be subject to suit in that state only if the plaintiff's injury was proximately caused by those contacts." 882 F.3d at 344 (emphasis added) (quoting *Chew v. Dietrich*, 143 F.3d 24, 29 (2d Cir.

1998).  While *SPV Osus Ltd.* recognized that "[s]ome circuits require that the in-forum conduct to be the proximate cause of plaintiff's injuries, while others find the standard satisfied if the defendant's activities are the "but for" cause of those injuries," none of these out-of-circuit tests have been adopted by the Second Circuit, and *SPV Osus Ltd.* "did not set a definitive standard."  *See Imagine Solutions, LLC v. Medical Software Computer Sys.*, 2007 WL 1888309, at *20 n.3 (E.D.N.Y. June 29, 2007); *Poof-Slinky, LLC v. A.S. Plastic Toys Co.*, 2020 WL 5350537, at *15 (S.D.N.Y. Sep. 4, 2020); *see also CFTC v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371, 487 (S.D.N.Y. 2019) ("[i]t is not entirely clear that the Second Circuit has ever adopted the proximate causation standard").  Further, when answering questions about New York long-arm jurisdiction certified to it in *Licci*, the New York Court of Appeals clarified that causation is not required to establish long-arm jurisdiction, stating "[w]e have consistently held that causation is not required, and that the inquiry under the statute is relatively permissive."  *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 339-40 (2012) (repeated use of correspondent account showed transaction of business and an articulable nexus or substantial relationship), *adopted in* 732 F.3d at 166, 170-73 ("the Court of Appeals made clear that the 'arising from' prong of section 302(a)(1) does not require a causal link between the Defendant's New York business activity and a plaintiff's injury.").  Thus, the Second Circuit vacated the district court's dismissal on personal jurisdiction grounds, finding it had improperly required causation between the plaintiff's injury and the contacts with the state to establish personal jurisdiction.  *Licci*, 732 F.3d at 170.

Therefore, the *Licci* framework is still applicable and there is no reason to alter this Court's prior finding and that personal jurisdiction over CAB has been established.  *See*

*Averbach*, 2020 WL 486860 at *28.  In any event, even if the proximate cause standard applied, *SPV Osus Ltd.* is distinguishable on the facts as it involved "a handful of communications and transfers of funds" in support of a fraud action, whereas Plaintiffs here identify twenty-three fund transfers made over the course of almost two years for the benefit of five account holders and allege CAB provided "millions of dollars" more in fund transfers.  (SAC ¶ 1102); *SPV Osus Ltd.*, 882 F.3d at 345.  In other words, the contacts with New York in this case are more substantial than those in *SPV Osus Ltd*.

### B.  Standing

CAB argues that Plaintiffs Julie Averbach ("Averbach"), Matanya Nathansen ("Nathansen"), and Nevenka Gritz ("Gritz") lack standing to assert claims under the ATA.  This Court previously dismissed these particular Plaintiffs' claims *with prejudice*.  *Averbach v. Cairo Amman Bank*, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020), *report and recommendation adopted sub nom*. *Averbach for Est. of Averbach v. Cairo Amman Bank*, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020).  There are no additional substantive arguments made by either party that alter the Court's prior analysis.  Thus, I recommend that CAB's motion to dismiss the personal claims of Averbach, Nathansen, and Gritz for lack of standing be granted for the same reasons as before.

Plaintiffs rely on Rule 54(b) for the proposition that they were entitled to reassert these Plaintiffs' claims in the SAC and that their appeal rights on the standing issue are preserved.  Rule 54(b) provides an exception to the general principle that a final judgment is proper only after all claims have been adjudicated and empowers the district court to enter a final judgment "as to one or more, but fewer than all claims or parties," but "only upon an express

determination that there is no just reason for delay." Fed. R. Civ. P. 54(b).  Respect for the

"'historic federal policy against piecemeal appeals,'" *Curtiss-Wright Corp. v. General Electric Co*.,

446 U.S. 1, 8 (1980), requires that the court's power to enter such a final judgment before the

entire case is concluded, thereby permitting an aggrieved party to take an immediate appeal,

be exercised sparingly. *Id* at 8.  The determination of whether to grant Rule 54(b) certification

is committed to the discretion of the district court and will be set aside only for an abuse of

discretion. *Curtiss-Wright Corp. v. General Electric Co*. 446 U.S. at 8-10.

Further, a dismissed plaintiff may appeal an "interlocutory order of dismissal" only after

a "final judgment has been entered, disposing of all the claims of all the parties." *Hogan v.

Consol. Rail Corp.*, 961 F.2d 1021, 1025-26 (2d Cir. 1992) (dismissing appeal after improper

entry of Rule 54(b) judgment).  That the Plaintiffs' prior claims were dismissed for lack of

standing, does not defeat the dismissed Plaintiffs' ability to obtain appellate review of the

interlocutory dismissal once a final order is entered. *See* 7C Wright & Miller 1962 ("the

propriety of the substitution [under Federal Rule of Civil Procedure 25] can be raised on appeal

from a final judgment.")

Accordingly, since neither party made a motion under Rule 54(b) after the Court's prior

decision on the motion to dismiss, and the Court did not enter a final judgment as to these

Plaintiffs' accompanied by a determination that there is no just reason for delay, the Plaintiffs'

appeal rights are preserved.

### C.  Anti-Terrorism Act Claims

Plaintiffs initially asserted one claim against CAB—a claim for aiding-and-abetting Hamas-affiliated charities and individuals who in turn were alleged to have provided support to the Hamas operatives responsible for the terrorist Attacks that injured them or their relatives. Plaintiffs added significantly more allegations to the SAC—now 248 pages with 1300 numbered paragraphs--to bolster this claim.  The new allegations include references to many more news articles, from both local and international news agencies, as well as references to other public information, from before and during the Second Intifada.  These public sources state or suggest that at least some of the CAB customers identified in the SAC were involved in promoting Hamas's appeal to members of the community to become suicide bombers or join in the armed conflict against Israel, although Plaintiffs concede these customers also engaged in legitimate charitable or non-violent activities for which they might have appropriate use of a CAB bank account.

Plaintiffs assert that, based on their new allegations and recent guidance from the Second Circuit as to how to evaluate aiding-and-abetting claims at the pleading stage, they have now plausibly alleged that CAB was generally aware, by virtue of these public sources and for other reasons, that its customers were closely intertwined with Hamas's violent terrorist activities and that these customers were using their CAB bank accounts to aid Hamas such that the terrorist Attacks were foreseeable.  They also claim that the allegations sufficiently plead that CAB knowingly substantially assisted Hamas by providing banking services to these customers who it knew in turn were providing funds to or on behalf of Hamas for "martyr" payments or potentially to purchase weapons or otherwise for illegal, violent purposes.

In addition, Plaintiffs have added a claim for direct liability under the ATA, contending that their allegations now support a plausible inference that CAB itself committed an act of international terrorism by virtue of providing banking services to individuals and entities that were, at least with respect to some of their funds, supporting terror committed by Hamas operatives.

I first address the sufficiency of the pleading as to the aiding-and-abetting claim and then turn to the direct liability claim.

### 1.   Aiding-and-Abetting Liability Under JASTA

JASTA, passed in 2016, amended the ATA to add a cause of action against "any person who aids and abets, by knowingly providing substantial assistance" to "an act of international terrorism."  18 U.S.C. § 2333(d)(2).  Aiding-and-abetting liability is confined to "an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189)."  *Id.*

To successfully plead an aiding-and-abetting claim, Plaintiffs need to plead three statutory elements: (1) an injury arising from an act of international terrorism; (2) that the act was committed, planned, or authorized by a designated Foreign Terrorist Organization ("FTO"); and (3) that the defendant aided or abetted an act of international terrorism by knowingly providing substantial assistance.  *Id*.  The third element, the components of which are based on a case called *Halberstam v. Welch*, 705 F.2d 472 (D.D.C. 1983), requires a showing that:  (a) the person whom the defendant aided performed a wrongful act that caused injury, (b) the

defendant was "generally aware of his role as part of an overall illegal or tortious activity at the time that he provide[d] the assistance," and (c) "the defendant . . . "knowingly and substantially assist[ed] the principal violation." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (quoting *Halberstam*, 705 F.2d at 477)).

Plaintiffs' last complaint faltered on the third element of an aiding-and-abetting claim, specifically with respect to the general awareness and substantial assistance prongs of the *Halberstam* rubric. Since then, the Second Circuit clarified how a district court should evaluate a pleading asserting such a claim and what allegations are sufficient to satisfy both the knowledge and substantial assistance aspects of the claim. *See Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, (2d Cir. 2021); *Honickman*, 6 F.4th 487. Importantly, the Court made clear that the allegations are to be read as a whole. *Kaplan*, 999 F.3d at 865 (stating that a district court should not consider each allegation in isolation but "accept as true all permissible inferences that could be drawn from the complaint as a whole.").

The Court also made clear that references to contemporaneous public sources such as media reports and foreign designations can be considered when determining the plausibility of the knowledge component of the third element of an aiding-and-abetting claim. *Honickman*, 6 F.4th at 501. Importantly, it is not necessary at the pleading stage to allege that the defendant "knew or should have known of the public sources." *Honickman*, 6 F.4th at 501 (citing *Kaplan*, 999 F.3d at 865); *see also Bartlett v. Société Générale de Banque Au Liban SAL*, 2020 WL 7089448, *10 (E.D.N.Y. Nov. 25, 2020) ("Where Plaintiffs have plausibly alleged widespread public knowledge linking bank customers to a terrorist organization, there is no need to allege that the defendant necessarily read the specific media reports."). Thus, designations by

another country that a customer is affiliated with a terrorist organization, if in place during the relevant time period, as well as news articles pre-dating the acts that caused plaintiff's injuries, may contribute to a plausible inference that the defendant was generally aware it was aiding-and-abetting terrorism.  There also is no need at the pleading stage to show that particular funds were received by the FTO.  *Honickman*, 6 F.4th at 500.

Additionally, the Second Circuit emphasized that neutral acts (such as providing banking services) must be assessed "in the context of the enterprise they aided"—that is, against the historical background of the FTO's activities.  *Kaplan,* 999 F.3d at 867 (quoting *Halberstam*, 705 F.2d at 488).  Finally, that the aid was indirect, that is, that the aid was given to an intermediary, does not doom the claim.  JASTA contemplates liability for indirect as well as direct aid to an FTO.  *Kaplan*, 999 F.3d at 856.

CAB argues that notwithstanding the new factual allegations and clarifications of law from the Second Circuit, Plaintiffs still fail to plausibly allege that it was "generally aware" it was playing a role in Hamas's terrorist activities from which the Attacks on Plaintiffs were foreseeable or that it "knowingly and substantially assisted" Hamas in carrying out the Attacks.

### a.  Whether the SAC Sufficiently Pleads General Awareness

Determining general awareness is a fact-intensive inquiry.  *Honickman*, 6 F.4th at 499; *Kaplan,* 999 F.3d at 860.  When evaluating the sufficiency of the complaint as to the general awareness component of an aiding-and-abetting claim, the key question is whether Plaintiffs plausibly allege that CAB's customers "were so closely intertwined with [Hamas's] violent terrorist activities that one can reasonably infer that [it] was generally aware while it was

providing banking services to those [persons and] entities that it was playing a role in unlawful activities from which [Hamas's] attacks were foreseeable." *Honickman*, 6 F.4th at 499 (quoting *Kaplan*, 999 F.3d at 860-61).  There is no need for CAB to have been generally aware that it was playing a role in the specific terrorist Attacks that killed or injured the Plaintiffs or their relatives.  *Honickman*, 6 F.4th at 496.  All that must be pleaded is that CAB "was generally aware of its role in an 'overall illegal activity' from which an 'act of international terrorism' was a foreseeable risk." *Id*. (quoting *Kaplan*, 999 F.3d at 860).  Foreseeability is central to the inquiry.  *Id*.

Plaintiffs are required to include allegations of the facts or events they claim give rise to an inference of knowledge.  *See, e.g. Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir. 1985).  The general awareness standard does not require proof that defendant had a specific intent.  *Kaplan*, 999 F.3d at 863.  As noted above, Plaintiffs may rely on "public sources" of information that could plausibly support the inference the bank was aware of its customers' affiliations with a terrorist group.  *Honickman*, 6 F. 4th at 501 (citing *Kaplan*, 999 F.3d at 865).  Factual allegations that customers are involved in financing or incentivizing violence, or were "openly, publicly, and repeatedly acknowledge[d]" as "integral constituent parts of" the FTO will satisfy the requirement that the customer is "closely intertwined" with the FTO.  *Kaplan*, 999 F.3d at 864.  And where those facts are reported in the media and other public sources, they can support a plausible inference that the bank was generally aware of its customers' affiliation with the FTO's activities.  *Kaplan*, 999 F.3d at 865.  Finally, terrorist attacks like the ones that injured Plaintiffs are a foreseeable risk of FTO activities.  *Id*.

Having reviewed the SAC in light of the recent guidance from the Second Circuit, Plaintiffs have sufficiently pleaded general awareness.  I have evaluated the allegations as a whole and in the context of the Second Intifada (also called the Al-Aqsa Intifada), a period of intense violence in Israel between in or about September 2000 and 2004.  (SAC ¶¶ 552, n.12., 684-695.)  At all relevant times, Hamas was a designated FTO engaged in violent terrorist activities, and its policy and practice from the early 1990s of carrying out terrorist attacks against civilian targets was notorious and known to CAB because Hamas "openly, publicly, and repeatedly acknowledged having such a policy and carrying out such attacks."  (SAC ¶ 518.) Hamas's calls for violence, recruitment of individuals to commit acts of violence during the Second Intifada, and payment of so-called "martyrs" were public and widely reported in the media.  The SAC contains more than sufficient factual allegations to show that CAB was aware of Hamas's designation as an FTO and its illegal activities and that the Attacks were a foreseeable risk of Hamas's activities.

The SAC also contains sufficient factual allegations to support a plausible inference that CAB was generally aware that at least some of the charitable organization customers mentioned in the SAC were closely intertwined with Hamas's political and violent activities.  The SAC pleads that these charitable organizations operate for the purpose of, among other things, providing streams of income to Hamas operatives, generating and disseminating Hamas propaganda, facilitating martyr payments, and recruiting young Hamas operatives (though they also engage in legitimate charitable causes).  (SAC ¶¶ 699, 705.)

Only one of these customers--the Holy Land Foundation ("HLF") – was designated by the United States as a specially designated global terrorist ("SDGT") before any of the Attacks that

injured Plaintiffs.  HLF was designated on December 4, 2001, at which time then-President Bush

stated "money raised by the [HLF] is used by Hamas to support schools and indoctrinate

children to grow up into suicide bombers and to recruit suicide combers and support their

families." (SAC ¶ 645.)  In designating this group, the U.S. Department of Treasury found that

while Hamas may provide money for legitimate charitable work, this work is a primary

recruiting tool for the organization's militant causes  . . . money is often diverted or siphoned to

support terrorism."  (SAC ¶ 649.)  HLF was designated as an unlawful association by Israel in

1997—long before the U.S. designated it an SDGT.  (SAC ¶ 627.)  Plaintiffs identify two U.S.

dollar transfers CAB facilitated for HLF, one on December 28, 1999 in the amount of

$190,743.00 and one on January 16, 2001 (at the beginning of the Second Intifada) in the

amount of $229,283.00 (SAC ¶¶ 636-37).  More significantly, they allege that CAB continued to

process deposits of funds from HLF to 10 other CAB customers *after* HLF was designated an

SDGT.[10]  (*See* Islamic Center (or Complex) in Gaza (Al-Mujama Al-Islami) (SAC ¶ 827); Islamic

Society in Gaza (Al-Jam'iya Al-Islamiya) (SAC ¶ 860); Al-Salah Islamic Society (Jam'iyat al-Salah

al-Islamiya) (SAC ¶ 889); Islamic Charitable Society (al-Jam'iya al-Khiriya al-Islamiya al-Khalil)

(SAC ¶ 927); Tulkarem Zakat Committee (Lajnat al-Zakaa Tulkarem) (SAC ¶ 948); Nablus Zakat

Committee (Lajnat al-Zakaa Nablus) (SAC ¶ 967); Al-Tadamun Charitable Society – Nablus

(Jam'iyat al-Tadamun al-Khiriyah Al-Islamiya) (SAC ¶¶ 985-86); Jenin Zakat Committee (Lajnat

---

[10] Defendant maintains in their motion to dismiss that CAB closed HLF's account with them on December 5, 2001
(four days after the Ben Yehuda Street Bombing on December 1, 2001).  (ECF No. 100, p. 17, n.4.)  The Court
cannot accept this fact on a motion to dismiss, but rather must accept Plaintiffs' factual allegations as true.
Notably, the SAC does not state whether the transfers from HLF came from another bank.

al-Zakaa Jenin) (SAC ¶¶ 1007-10); Ramallah – Al-Bireh Zakat Committee (Lajnat al-Zakaa

Ramallah Wal-Bireh) (SAC ¶ 1023); and Muslim Youth Association – Hebron (SAC ¶ 1035)).

Six of the 10 CAB customers mentioned above were designated as unlawful

organizations by Israel prior to at least some of the Attacks.  (*See* Islamic Center (or Complex) in

Gaza (Al-Mujama Al-Islami) designated by Israel as an unlawful association on February 25,

2002, as an institution belonging to Hamas and by IDF's Central Command on June 30, 2002,

SAC ¶ 824; Al-Tadamun Charitable Society – Nablus (Jam'iyat al-Tadamun al-Khiriyah Al-

Islamiya) designated by Israel as an unlawful association on February 25, 2002, as an institution

belonging to Hamas and by IDF's Central Command on June 30, 2002, SAC ¶ 980; Jenin Zakat

Committee (Lajnat al-Zakaa Jenin) designated by Israel as an unlawful association on February

25, 2002, as an institution belonging to Hamas and by IDF's Central Command on June 30, 2002,

SAC ¶ 1000; Al-Islih Charitable Society in Ramallah & Al-Bireh designated by Israel as an

unlawful association on February 25, 2002, as an institution belonging to Hamas and by IDF's

Central Command on June 30, 2002, SAC ¶ 1070; Al-Salah Islamic Society (Jam'iyat al-Salah al-

Islamiya) designated by Israel as an unlawful association on February 25, 2002, as an institution

belonging to Hamas and by IDF's Central Command on June 30, 2002, SAC ¶ 877; Muslim Youth

Association – Hebron designated by Israel as an unlawful association on February 25, 2002, as

an institution belonging to Hamas and by IDF's Central Command on June 30, 2002, SAC ¶

1032.)  Thus, the following CAB customers, designated by Israel as unlawful associations during

the relevant time, were allowed by CAB to receive deposits into their CAB accounts from HLF

*after* it was designated an SDGT before at least some of the Attacks:  (1) Islamic Center (or

Complex) in Gaza (Al-Mujama Al-Islami); (2) Al-Salah Islamic Society (Jam'iyat al-Salah al-

Islamiya); (3) Jenin Zakat Committee (Lajnat al-Zakaa Jenin); (4) Al-Tadamun Charitable Society – Nablus (Jam'iyat al-Tadamun al-Khiriyah Al-Islamiya); and (5) the Muslim Youth Association – Hebron.

It is more than plausible that CAB was aware of U.S. and Israel designations, as well as comments by then-President Bush and the U.S. Treasury Department, which would be red flags that the above-mentioned customers were closely intertwined with Hamas and assisting with its violence agenda during the relevant period.  This is particularly so insofar as CAB was required to follow "know your customer" rules, as it not only maintained a correspondent banking relationship with U.S. banks, but it also was required to follow guidelines promulgated by the Financial Action Task Force ("FATF").  (SAC ¶¶ 1103-1120 and n.70.)  That the six Israel-designated CAB customers were receiving funds from HLF after it was designated an SDGT and before some of the Attack in this case, also contribute to a plausible inference that CAB was generally aware it was assisting unlawful activities of Hamas at least through these six customers.

Three of the six Israel-designated customers mentioned above are alleged to have made "martyr" payments into CAB accounts of "martyr" families.  (*See* Jenin Zakat Committee, SAC ¶¶ 990, 996, 997, 998, 990; Al-Tadamun Charitable Society – Nablus, SAC ¶ 977; Muslim Youth Association – Hebron, SAC ¶ 1036.)  It is unclear how Plaintiffs identify the payments as "martyr" payments, when the payments were made, whether they were internal transfers from the charities' CAB accounts to the families' CAB accounts, or whether there were objective indicia that these payments were marked in a way that would have alerted CAB to the fact that

it was processing "martyr" payments.  Nevertheless, the allegations are sufficient to plausibly

infer that these customers were potentially using CAB accounts to make "martyr payments."

Further, during the relevant time period, the Palestinian Authority ("PA") and

Palestinian Monetary Authority ("PMA"), which promulgates rules and laws that CAB must

abide, closed and froze some of CAB's customers' accounts to stop funding to Hamas.  These

included three of the six Israel-designated charities named above.  (*See* Islamic Center (or

Complex) in Gaza (Al-Mujama Al-Islami) (SAC ¶ 827); Al-Tadamun Charitable Society – Nablus

(Jam'iyat al-Tadamun al-Khiriyah Al-Islamiya) (SAC ¶ 979); Jenin Zakat Committee (Lajnat al-

Zakaa Jenin) (SAC ¶ 992)).  Starting in December 2001 (the month when the first Attack

occurred), CAB also was required to consult with the PMA prior to permitting the withdrawal of

funds from some of its customer's accounts because of suspicions the funds might be used for

Hamas's violence campaign during the Second Intifada (the time when the Attacks on Plaintiffs

occurred).  These customers included some of the Israel-designated charities mentioned above,

including the Muslim Youth Association and the Al-Salah Islamic Society.  (Islamic Society in

Gaza (Al-Jam'iya Al-Islamiya) (SAC ¶ 848); Al-Salah Islamic Society (Jam'iyat al-Salah al-Islamiya)

(SAC ¶¶ 869, 876); Muslim Youth Association – Hebron (SAC ¶¶ 1031, 1033); and Beit Fajar

Zakat Committee (SAC ¶ 1047.  That these customers' accounts were frozen or flagged by local

Palestinian authorities as possibly sources of funds for Hamas contributes to a plausible

inference that CAB was generally aware that these customers were closely intertwined with

Hamas and that banking transactions for them might assist in funding Hamas's violent activities.

Further bolstering the plausibility that CAB was generally aware that certain customers

were closely intertwined with Hamas' violent activities are citations to numerous media reports

prior to the Attacks and during the relevant time period about these customers' affiliation with Hamas's violent or political arm, provision "martyr" payments and payments to "prisoners," and recruitment and indoctrination of future soldiers for the cause.  Just by way of example, news reports from the 1990s stated that a founder of the Islamic Center in Gaza (Al-Mujama Al-Islami), Sheikh Ahmad Yassin, used this organization, for which CAB maintained an account during the relevant period, to coordinate and conduct Hamas activities, not just to help the poor but also for terrorism and the recruitment of future terrorists.  (SAC ¶¶ 812, 816, 817, 838.)  Yassim was convicted of organizing terrorist cells and operations.  (SAC ¶ 838.)  A brochure about this group's social welfare activities included Yassin's photo directly above one of the organization's CAB bank account numbers.  (SAC ¶ 806.)  Another prominent Hamas leader, Abd Al-Aziz al-Rantisi, head of the Qassam Brigades, was a board member of the Islamic Center.  (SAC ¶ 821.)  The Jenin Zakat Committee is alleged to have made "martyr" payments to CAB accounts of individuals responsible for planning or carrying out terror attacks.  (SAC ¶¶ 996, 997.)  A local newspaper reported in January 2001, prior to the Attacks at issue in this case, that the Al-Salah Islamic Society was planning to give $5,300 to the family of every Palestinian "martyr" and the same amount to every paralyzed person.  (SAC ¶ 875.)  Before the Attacks at issue in this case, international press reported that the Muslim Youth Association – Hebron was a breeding ground for terrorists.  (SAC ¶ 1029.)  It is alleged to have maintained video tapes glorifying Hamas terrorists (presumably as a recruitment tool) and to have funded "martyr" payments.  (SAC ¶¶ 1030, 1036.)  That the above-referenced CAB customers were designated by Israel during prior to some of the Attacks at issue and reported in the press during the relevant period to be supporting Hamas' terror activities contributes to a plausible inference

that CAB was generally aware it may have been aiding Hamas by processing certain money transfers for these customers.

CAB also maintained accounts for several individuals (Abbas al-Sayed, Mohamad Saleh Taha, Ghazi Hamad, and Abd al-Khaleq Hasan Shadli al-Natsche) who are alleged to have been integral leaders of Hamas and intertwined with Hamas' terrorist apparatus.  The SAC cites to various public sources showing that these individuals were closely intertwined with Hamas, rendering it plausible that CAB was generally aware of their affiliation.  (SAC ¶¶ 1141, 1143, 1149, 1153-54, 1156, 1158, 1160-61, 1166, 1173-74.)  For example, the SAC details al-Sayed's involvement in the March 27, 2002 Park Hotel Bombing (one of the Attacks at issue in this case) and points to press reports before that attack that discussed his affiliation to the Tulkarem Zakat Committee (a charity identified with Hamas' terrorist-operational apparatus) and detailing a thousand-person demonstration protesting his arrest.  (SAC ¶¶ 1142, 1141-43.) These allegations plausibly support an inference that he was a famous leader in the community and that CAB was generally aware of his stature and role in Hamas.  Similarly, Plaintiffs plead that Taha was a prominent Hamas leader in the group's political and military wings, founder of the Muslim Brotherhood in the Gaza Strip, and founder of Al-Mujama Al-Islami – a group purportedly created to carry out Muslim proselytism and promotion of violence.  (SAC ¶¶ 1154, 1156.)  Highlighting Taha's importance, one public media report stated that Yasir Arafat himself spoke out on Taha's behalf after Taha was arrested during the Second Intifada.  (SAC ¶ 1155.) This supports the plausibility that CAB was generally aware of his stature and role in Hamas. The SAC pleads that Hamad was widely identified as a spokesman for Hamas with seniority in the organization since the mid-1990s and cites to multiple local press reports about his arrest

for membership in Hamas. (SAC ¶¶ 1158-61.)  The SAC further pleads that al-Natshe was a leading Hamas spokesman and the most senior leader in Hebron who worked closely with the terrorism operational wing, the Qassam Brigades, was the featured speaker at Hamas rallies, and was the director of the Islamic Charitable Society (al-Jam'iya al-Khiriya al-Islamiya al-Khalil). (SAC ¶¶ 907-08, 911-12, 1173-74.)  The allegations regarding the seniority of these individuals within Hamas, connection to Hamas' terrorist apparatus, and their notoriety support a plausible inference that CAB was generally aware of these customers' intertwinedness with Hamas's violent activities.

Further, Plaintiffs have identified various U.S. dollar transfers facilitated by CAB for these individual customers that occurred at the start of and during the Second Intifada and in sums that were significant for individuals, given that the Gross National Income per capita in the Palestinian Authority at the time was around $1,000-$1,100.  (SAC ¶¶ 1182, 1265.)  These included seven transfers to al-Sayed between February 2001 and May 2001 totaling $69,000.00 (SAC ¶ 1137); five transfers to Taha between December 2000 and September 2001 totaling $9,870.00 (SAC ¶ 1157); and six transfers to Hamad between October 2000 and April 2001 totaling $50,985.00 (SAC ¶ 1168).   Thus, it is plausible that both the timing and amount of these transfers to these Hamas-affiliated customers raised a red flag as to the purpose of these transactions and bolster an inference of general awareness.

The SAC also provides details about two groups outside of the Palestinian Territories that provided martyr payments to Palestinian martyrs to support Hamas during the Second Intifada.  The SAC alleges that the Arab Liberation Front ("ALF") used its CAB account to distribute funds in support of the Second Intifada, payments that were publicized widely to the

population to incentivize suicide attacks.  (SAC ¶ 1197.)  The United Press International and the Washington Post reported on January 30, 2001 that Iraqi president Saddam Hussein was giving $10,000 to the family of every Palestinian injured or "martyred" in the latest round of clashes with Israel.  (SAC ¶ 1206-7.)  The SAC attributes the U.S. dollar denominated funds to accounts at CAB in the Palestinian Territories and states that payments to "martyrs" came with certificates stating that the payment was a gift from Hussein.  (SAC ¶¶ 1196, 1228.)  The ALF even held public ceremonies where checks were cut from CAB bank and were distributed to "martyrs'" families.  (SAC ¶ 1230.)  These allegations render it plausible that CAB was generally aware it was assisting Hamas through ALF's CAB account (with funding from Hussein) to carry out violence.

The SAC also alleges that the Martyrs' Foundation, based in Lebanon and affiliated with the designated FTO Hezbollah, made payments to "martyrs" in the Second Intifada via the al-Ansar society, a CAB customer.  (SAC ¶ 1233.)  Specifically, the Martyrs' Foundation listed "martyrs" on its website who received payments through CAB accounts held by the al-Ansar society.  (SAC ¶¶ 1254, 1255, 1256.)  For its part, the al-Ansar society, which was declared an unlawful terrorist association by Israel on October 25, 2003 (just after the last Attack at issue in this case), is alleged to have published paid ads in local newspapers in May 2001, prior to the Attacks, calling on families of "martyrs" to come to its headquarters to receive payments and to have publicized on its website that it supported the families of "martyrs" and held two accounts at CAB.  (SAC ¶¶ 1258, 1260, 1262.)  These allegations render it plausible that CAB was generally aware it was assisting Hamas through the al-Ansar society's CAB account (allegedly funded by the Martyr's Foundation via Hezbollah) to carry out violence.

The allegations in the SAC are far less robust than the factual allegations in *Kaplan*, where the Second Circuit vacated the dismissal of the aiding-and-abetting claim.  In *Kaplan*, a U.N. report linked the defendant bank with a Hezbollah-linked money-laundering gang comprised of the bank's customers.  The complaint alleged the bank nevertheless increased credit limits for these customers and gave them special-treatment such as exempting them from submitting cash transaction slips (which allowed them to hide the purpose of the transactions from regulators).  It alleged that Hezbollah itself publicized its relationship with these customers.

However, the allegations in this case are more robust than in *Siegel* and *Honickman* that were insufficient to state an aiding-and-abetting claim under JASTA.  (*Cf. Kaplan*, 999 F.3d 842 (2d Cir. 2021), with *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 222 (2d Cir. 2019) and *Honickman*, 6 F.4th 487 (2d Cir. 2021).  In *Siegel* the bank defendant ceased doing business with the customer alleged to have been involved in the terrorist attacks at issue 10 months before the attacks.  Further, its customer was another bank whose customer in turn was alleged to have links to al-Qaeda in Iraq.  Thus, the relationship was more attenuated and the relationship not contemporaneous with the attacks.  In *Honickman*, like here, the defendant bank was alleged to have aided and abetted Hamas by providing bank accounts to three customers allegedly affiliated with Hamas.  But the complaint failed to state a claim on the general awareness prong of the aiding-and-abetting claim because the public sources linking the bank's customers to Hamas post-dated the attacks at issue, and the complaint failed to allege that it was public knowledge that Hamas leaders were board members of the customers, rendering it implausible that the bank could have been aware at the relevant time that it might have been

assisting Hamas through these customers.   Here, unlike in *Honickman*, Plaintiffs cite to public

sources prior to and during the Attacks at issue linking Hamas leaders with CAB customers and

indicating that the customers were assisting Hamas.

When taken against the backdrop of the Second Intifada, the violence and

demonstrations happening all around CAB's branches, and the public sources linking the

customers to Hamas, the allegations are sufficient to render it plausible that at least some of

CABs customers—particularly those designated by Israel that received funds from HLF after it

was designated an SDGT, ALF,  al-Ansar and some of the individual customers -- were so closely

intertwined with Hamas's violent terrorist activities that one can reasonably infer that CAB was

generally aware while it was providing banking services to those persons and entities that it was

playing a role in unlawful activities from which Hamas's Attacks were foreseeable.


### b.   Whether the SAC Sufficiently Pleads Knowing and Substantial Assistance

Of course, general awareness is not the end of the inquiry.  Plaintiffs also must plausibly

allege that CAB "knowingly and substantially assist[ed] the principal violation." *Halberstam*, 705

F.2d at 477.  The "principal violation" – that is, the Attacks that injured Plaintiffs--must be

foreseeable from the illegal activity that the defendant assisted.  However, knowing and

substantial assistance to the actual injury-causing act – here, the Attacks that injured Plaintiffs –

is unnecessary.  *Honickman*, 6 F.4th at 488 (citing *Halberstam*, 705 F.2d at 488).  That is,

substantially assisting Hamas's violent activities, either directly or indirectly, is all that is

required.

To determine how much aid qualifies as substantial assistance, the court must analyze six factors: (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance. *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 484-85); *Honickman*, 6 F.4th at 500. No factor is dispositive, and the weight accorded to each is determined on a case-by-case basis. *Kaplan*, 999 F.3d at 856; *Honickman*, 6 F.4th at 500. What is required is that, on balance, the relevant considerations plausibly show that CAB substantially assisted the acts of terrorism that ultimately harmed Plaintiffs. *See, e.g., Halberstam*, 705 F.2d at 483-84, 488.

The Second Circuit's decision in *Honickman* clarified that the first factor – the nature of the act encouraged. This factor "requires assessing whether the alleged aid (facilitating the transfer of money to the [customers]) would be important to the nature of the injury-causing act (Hamas' terrorist attacks)." *Honickman*, 6 F.4th at 500. Where the assistance went to customers who also performed non-terrorist activities – as we have here – then it is more difficult to determine whether the aid was important to the terror activities as opposed to the legitimate charitable activities. *See Bartlett*, 2020 WL 7089448, *12. Therefore, the court must evaluate whether the allegations in the complaint "plausibly bridge the gap" between the banking services and Hamas's terrorist attacks. *Id*. The allegations that CAB processed transfers of money from HLF, after it was designated an SDGT, into the accounts of customers who at the time were also designated by Israel as Hamas-affiliated entities and publicly reported to be making martyr payments from CAB accounts, together with public information that HLF was using its money to fund terrorism, while not as strong and direct as the allegations

in *Kaplan* or *Bartlett*, render it at least plausible at the pleading stage that CAB's assistance was

important to the nature of Hamas' terrorist attacks.  CAB is alleged to have facilitated the

transfer of significant sums of money to individuals who were alleged to be military leaders for

Hamas, (al-Sayed SAC ¶ 1136); to senior leaders in the group's military wings in Gaza (Saleh

Taha SAC ¶ 1156), and to organizations whose role was to provide financial services, at least in

part, in support of Hamas's terrorism including the Islamic Center, Jenin Zakat Committee, Al-

Tadamun Charitable Society – Nablus, the Muslim Youth Association – Hebron, and the Al-Salah

Islamic Society.  (SAC ¶¶ 798, 805, 990, 993, 996-98, 863, 864-5, 871, 882, 1036.)  Similarly, its

customer ALF was alleged to have publicly been involved in ceremonies in which is presented

checks from its CAB account accompanied by a certificate honoring the "martyr" for whom the

payment was made.  Courts have recognized that a terror organization like Hamas cannot carry

out its activities without money.  *Bartlett*, 2020 WL 7089448, \*12; *Siegel*, 993 F.3d at 225

(implicit in *Siegel's* reasoning is the suggestion that processing millions of dollars in bank

transfers for an FTO constitutes substantial assistance); *Boim v. Holy Land Found. For Relief &*

*Dev.,* 549 F.3d 685, 690 (7th Cir. 2008) (noting that "[g]iving money to Hamas [is] like giving a

loaded gun to a child").  Courts also have recognized that transactions through purported

charities at actual financial institutions rather than under-the-table cash transactions are

important to both soliciting and tracking funds ultimately used for terror-related purposes.  *See*

*generally*, *Miller v. Arab Bank*, PLC, 372 F. Supp. 3d 33, 45 (E.D.N.Y. 2019); *see also Schansman*

*v. Sberbank of Russia PJSC,* 2021 WL 4482172, at \*6 (S.D.N.Y. Sept. 30, 2021) (where Plaintiffs

allege that Defendants provided financial services to fundraisers and individuals who supported

the terrorist group, and these fundraisers and individuals then provided the funds to the

terrorist group before and after the attack at issue.).  Taken together as a whole, the allegations

plausibly assert that the banking services provided by CAB through at least some of its Hamas-

affiliated customers was important to Hamas' illegal activities, because Hamas could not recruit

individuals to commit violence on its behalf without promising them money in the form of

"martyr" payments or money to indoctrinate youth to grow up to become terrorists.

       *Honickman* also clarified the second *Halberstam* factor – the amount of assistance.

Plaintiffs do not need to allege the funds actually went directly to Hamas.  *Honickman*, 6 F.4th

at 500.  JASTA authorizes claims against a Defendant who provides "support, directly or

indirectly," to [terrorists]," and in doing so eschewed any directness requirement.  18 U.S.C. §

2333(d)(2).  So long as the factual allegations permit a reasonable inference that the defendant

recognized the money it transferred to its customers would be received by the FTO, this

element is satisfied.  *Honickman*, 6 F.4th at 500.  *Honickman* explained that if a plaintiff

plausibly alleges the general awareness element, which Plaintiffs do here, the inquiry on this

factor should focus on the amount and type of aid the defendant provided."  *Id*.  Here, the type

of aid CAB provided was maintaining bank accounts for Hamas-affiliated charities and

organizations, giving them facial legitimacy, and facilitating the transfer of millions of U.S.

dollars during the Second Intifada.  (*See e.g*., SAC ¶ 922 ($7 million in May 2002 for CAB

customer – ICSH); ¶¶ 1102, 1282).  On behalf of its individual customers, it transferred at least

$129,855 during the relevant period.  As noted above, these amounts are significant based on

both the average earnings of individuals in the Palestinian territories and given the amounts

given to "martyrs" (between $700 to $2000 per family, and later higher amounts).  (*See* SAC ¶

633; 1198.)  Also, the aid provided is alleged to have taken place leading up to and during the

Second Intifada, both before, during, and after the Attacks at issue.  That the aid occurred over a lengthy timespan bolsters the plausibility that the amount of aid was substantial.

For the third *Halberstam* factor – defendant's presence or absence at the time of the tort—weighs against a finding of substantial assistance.  There is no evidence that CAB was actually present for the Attacks on Plaintiffs, and neither party presented any analysis for this factor.

The fourth *Halberstam* factor – relationship to the principal – "is useful for determining the defendant's capacity to assist."  *Honickman*, 6 F.4th at 500 (citing *Halberstam*, 705 F.2d at 484).  Importantly, the plaintiff need not plead any direct relationship between the defendant and the FTO.  *Id*. at 500-501.  The greater that attenuation between the defendant and the FTO, the less likely this factor is satisfied, however.  *Id*. at 501.  "This factor recognizes that one's encouragement of a tort may be more effective or less effective depending on one's relationship to the person being encouraged."  *Bartlett*, at *14.  This factor is less important than other factors in the analysis.  *Id*. (citing *Halberstam*, 705 F.2d at 488).  CAB argues that Plaintiffs have pleaded no relationship at all to Hamas except through the individual account holders.  (ECF No. 100.)  That is true.  CAB is not alleged to be Hamas's official banker.  CAB suggests its relationship is more like that of the bank in *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019).  In *Siegel,* the defendant-bank's "relation to the principal" was several steps removed: it allegedly had a commercial relationship with another bank that was linked to various terrorist organizations including the FTO that caused the plaintiffs' injuries.  *Id*. at 220-21.  Here, the relationship between CAB and Hamas is less attenuated, its relationship is through its customers, not another bank's customers.  Furthermore, the standard is such that

indirect assistance, so long as it is substantial, is enough.  Here, Plaintiffs plausibly plead that

CAB had the capacity to assist Hamas by facilitating financial transactions for Hamas' cause

through its Hamas-affiliated customers.

The fifth *Halberstam* factor – state of mind – requires a determination of whether or not

the defendant knowingly assumed a role in Hamas's terrorist activities or otherwise knowingly

or intentionally supported Hamas.  *Siegel*, 933 F.3d at 225.  To the extent CAB was aware it was

enabling fundraising for Hamas's terror activities, this factor will be satisfied.  *Bartlett*, 2020 WL

7089448, *14.  Neither Plaintiffs nor Defendant provide any helpful argument on this factor.

The only basis on which one can infer that CAB had knowledge that some of its customers were

using their CAB accounts for "martyr" payments are public sources suggesting this was

occurring.  There is no evidence, like in *Linde*, that actual transactions were marked for the

purpose of "martyr payments."  Nevertheless, on balance, due to the fact that CAB held

accounts and processed high dollar transactions for senior military leaders of Hamas and to

Hamas-affiliated organizations, including some transactions that may have been "martyr"

payments based on public reporting at the time, the allegations are sufficient to push this factor

in favor of finding the plausibility that CAB providing knowing substantial assistance.  That CAB

allegedly processed multiple transfers originating from HLF after it was designated an SGDT to

CAB account holders who were designated unlawful associations by Israel and known to

support Hamas' terrorist activities and that it processed payments for ALF when it was holding

public ceremonies for "martyrs" and it was publicly reported checks were coming from CAB

contribute to the plausibility that this factor is met.

The sixth *Halberstam* factor – duration of assistance – assesses "the length of time an alleged aider-abettor has been involved with a tortfeasor" and goes to the "quality and extent of their relationship and probably influences the amount of aid provided as well . . ." *Halberstam,* 705 F.2d at 484.  The parties dispute whether this factor is limited to the fund transfers through the correspondent bank accounts that took place over a much shorter period of time or the allegations that CAB has assisted in providing millions of dollars to Hamas-affiliated entities for years.  The specific fund transfers identified are not the measure.  The SAC alleges that CAB maintained relationships with Hamas-affiliated customers from the years "1990s to 2004." (SAC ¶¶ 797, 827, 860, 889, 898, 927, 948, 967, 985, 1007, 1023, 1035, 1283.) Importantly, Plaintiffs are not required to list every specific transaction at the pleading stage or when every transaction was made.  *See Bartlett,* 2020 WL 7089448, at *15 ("Given the specificity that is in the complaint, including temporal specificity, the paucity of specific allegations concerning when individual wire transfers occurred is a matter for discovery and, if appropriate, summary judgment.")  It is likely that there were many more transactions than those identified in the SAC as those records are in the possession of CAB and its customers, not Plaintiffs.  At the pleading stage, Plaintiffs' allegations are sufficient to tip this factor in favor of finding substantial assistance.

On balance, at least at the pleading stage, Plaintiffs have plausibly alleged that CAB knowingly and substantially assisted Hamas' terror activities.   Thus, I recommend that CAB's motion to dismiss Plaintiffs' aiding-and-abetting claim under JASTA be denied.

### 2.  Primary Liability

The ATA recognizes a private right of action in tort for United States nationals injured "by reason of" acts of international terrorism.  18 U.S.C. § 2333 (a).  To plead a claim of primary liability under 18 U.S.C. § 2333(a), Plaintiffs must plausibly allege "(1) an injury to a U.S. national, (2) an act of international terrorism, and (3) causation."  *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, at *4 (S.D.N.Y. Mar. 28, 2019) (internal citations omitted).  The Second Circuit has explained with respect to the second element that a plaintiff "must prove that the defendant's act not only violated United States law or a State law . . ., but that the act 'also involve[d] violence or endanger[ed] human life,' and '[f]urther . . . appear[ed] to be intended to intimidate or coerce a civilian population or to influence or affect a government."  *Weiss*, 993 F.3d 144, 153 (2d Cir. 2021) (citing *Linde*, 882 F.3d at 326) (citing 18 U.S.C. §§ 2331(1)(A) and (1)(B)).  With respect to the third element, the Second Circuit has stated there must be evidence of a causal connection between the act of international terrorism and the plaintiff's injury.[11]  *Linde v. Arab Bank, PLC,* 882 F.3d 314, 326 (2d Cir. 2018).  The Court in *Linde* noted that a violation of 18 USC § 2339B (alleged here), which prohibits provision of material support to a designated terrorist organization, could satisfy this sub-element, but that such a violation is insufficient in and of itself to equate to an act of international terrorism as a matter of law. Citing *Boim*, 549 F.3d 685, 693-94 (7th Cir. 2008), *Linde* noted that financial donations to Hamas and Hamas-affiliated charities made while knowing that the monies were used to kill could be sufficient for a jury to conclude the donations constituted international terrorism but that such

---

[11] The Court noted by contrast, "aiding and abetting focuses on the relationship between the act of international terrorism and the secondary actor's alleged supportive conduct."  *Id*. at 331.  However, some of the same evidence may have a bearing on both causation under a direct liability theory and on the issue of whether the aider and abettor "knowingly and substantially assist[ed] the principal violation."  *Id*.

a conclusion was not legally compelled, as the trial court had instructed.  *Linde* at 327.  So too, such conduct does not necessarily establish causation.  *Id*.

CAB argues that Plaintiffs have failed to plead a primarily liability claim because it is alleged only to have provided banking services to charities and persons who were affiliated with Hamas and they fail to plead facts plausibly showing any banking services were designated for terroristic purposes or that CAB's actions were a proximate cause of Plaintiffs' injuries within the meaning of the ATA.  CAB relies on multiple cases rejecting primary liability cases against banks alleged to have provided banking services to affiliates of FTOs.  Plaintiffs, relying primarily on *Linde*, which also involved a bank providing financial services to charities known to funnel money to Hamas, contend they have adequately pleaded that CAB facilitated payments for the Attacks that injured them or their relatives.  The first and second elements of this claim—that is, whether CAB committed an act of international terrorism that proximately caused Plaintiffs' injuries-- are the only elements at issue in this motion.

### a.  Whether the Complaint Sufficient Pleads an Act of International Terrorism

The ATA defines an act of "international terrorism" at 18 U.S.C. § 2331(1) to mean activities that:

> (1) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

> (2) appear to be intended - - (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

> (3) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

18 U.S.C. § 2331(1). The Second Circuit has explained that the Defendant's actions must "involve violence or endanger human life" and "appear to be intended to intimidate or coerce a civilian population or to influence or affect a government" to satisfy the second element of a claim for direct liability under the ATA. *Linde*, 882 F.3d at 326. The latter requirement is a question of what the defendant's "intent objectively appeared to be," which "depends on whether the consequences of the defendant's activities were reasonably foreseeable." *Weiss*, 993 F.3d at 161; *see, e.g. Boim*, 549 F.3d 685, 693-94. This in turn "depends largely on what the defendant knew." *Id*. Thus, in *Weiss*, the district court was found to have properly granted summary judgment where the bank defendant's customers admittedly performed charitable work and there was no evidence that the customers had actually funded terrorist attacks or recruited persons to carry out such attacks. *Weiss,* 993 F.3d at 153. That is, "the absence of evidence to show that the charities themselves were engaged in terrorism" or to show that the transfers of money to those charities were designated for a terroristic purpose doomed the claim, because no rational juror could find that the bank's processing of the money transfers to the charities "objectively exhibited the appearance that [the bank] intended to intimidate or coerce a population or government." *Id*. at 161. The Second Circuit noted that the evidence in *Weiss* differed from that in *Linde*, where the evidence was sufficient to raise a triable issue on the second element of an ATA claim. In *Linde*, there was evidence that certain transfers of money made to charities known to funnel money to Hamas were "explicitly identified as

payments for suicide bombings." *Id.* at 162. (citing *Linde*, 882 F.3d at 321). Such explicit labeling of the purpose of the fund transfer was objective evidence that the bank intended to intimidate or coerce a population or government. *Id.*

Similarly, in *Miller v. Arab Bank*, the court denied a motion to dismiss a direct liability claim under the ATA. 372 F. Supp. 3d 33 (E.D.N.Y. 2019). In *Miller*, the complaint alleged, among other things, that Arab Bank administered an insurance scheme that made "martyr payments" to "martyrs" and their families through Hamas-affiliated entities. The bank received lists that identified violent causes of death, including explicitly from a "Martyr Operation," which was sufficient to put the bank on notice as to the purpose of the financial transactions it was facilitating. *Id.* at 45. In addition, the bank failed to investigate after it learned it had provided financial services to customers later designated as FTOs and when contemporaneous publications advertised Arab Bank's role in making "martyr" payments. *Id.* Based on these allegations, the court held that '[t]he most plausible inference from the complaint[s] is that Arab Bank knew it was doing business with terrorists who were going to use violence to attack civilians." *Id.* At the very least, the court found that the complaint pleaded deliberate indifference to major red flags. *Id.* (citing *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685, 693 (7th Cir. 2008) (stating one is deliberately indifferent when "one knows there is a substantial probability that the organization engages in terrorism but does not care")).

In *Schansman v. Sberbank of Russia PJSC*, the court also denied a motion to dismiss direct liability claim under ATA. 2021 WL 4482172 (S.D.N.Y. Sept. 30, 2021). In that case, the plaintiffs, who were passengers on a commercial airline flight, were killed in 2014 when a

missile fired by the Donetsk People's Republic ("DPR"), a terrorist organization based in Eastern Ukraine,[12] hit the plane.  The defendants were Russian State-owned Banks alleged to have provided material support and financing to the DPR while aware of its terrorist activities.  In the months immediately prior to the missile attack, the banks had "extensive operations in Ukraine, maintaining locations and providing global money transfer services."  *Id*. at *1 (S.D.N.Y. Sept. 30, 2021).  The DPR used the banks' financial services to raise money and advertised ways to donate money to accounts held with the banks.  *Id.*  The DPR used the funds to procure weapons and ammunition and to acquire control of the Donetsk region of Ukraine.  According to the complaint, major news sources reported on DPR's funding scheme and how the defendant banks facilitated payments to soldiers assisting Russian Separatists and financing terrorism.  *Id.*   The allegations about the DPR's public crowdsourcing campaign, international recognition of DPR's terror activities, the banks' funding of the DPR's leaders who identified their relation to the DPR, the DPR's publicizing its terror activities on websites, and an investigation by Ukrainian authorities just prior to the attack in question all rendered it plausible that the banks were at least deliberately indifferent that they were assisting terror activities.

     Other cases evaluating claims more similar to those asserted against CAB have dismissed them.  *See O'Sullivan*, 2019 WL 1409446, at *7-8 (on a motion to dismiss, the Court found  defendant-bank's provision of financial services to Iran and its "agents and proxies," to

---

[12] The DPR professes an ideology of Russian supremacy and its members have asserted control in the Eastern Ukraine and carried out violent acts intended to affect government policy and intimidate civilians.  *Id*., at *1 (S.D.N.Y. Sept. 30, 2021).

avoid U.S. sanctions did not satisfy § 2331(1)'s requirement that defendant's acts be

"dangerous to human life"); *Bartlett v. Societe Generale de Banque Au Liban SAL*, 2020 WL

7089448 (E.D.N.Y. Nov. 25, 2020) (in case where bank allegedly provided financial services to

customers affiliated with Hezbollah, court dismissed primary liability claim because provision of

financial services was not violent or dangerous to human life within the meaning of the ATA);

*Kaplan*, 405 F. Supp. 3d at 532 (dismissing primary liability claim where defendant bank did not

perpetrate the attacks that injured plaintiffs but rather provided financial services to customers

affiliated with Hezbollah); s*ee also Weiss v. Nat'l Westminster Bank, PLC.*, 993 F.3d 144 (2d Cir.

2021) (trial court did not err in granting summary judgment on primary ATA claim involving

provision of financial services to Hamas-affiliated charities*); Linde,* 882 F.3d 314, 327 (2d Cir.

2018) ("[P]roviding routine financial services to members and associates of terrorist

organizations [affiliated with Hamas] is not so akin to providing a loaded gun to a child as to . . .

compel a finding that as a matter of law, the services were violent or life-endangering acts[.]");

*Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018) (finding that defendant's

assistance to Iranian entities with terrorist connections in evading U.S. sanctions did not satisfy

§ 2331(1)'s requirement of conduct being "violent" or "dangerous to human life" and displaying

"terroristic intent," and distinguishing defendant's conduct from that alleged in *Boim III*, which

involved providing direct financial services to Hamas).

Unlike in *Linde*, there are no allegations that CAB processed payments explicitly

identified as payments for suicide bombings.  Unlike in *Miller*, there are no allegations that CAB

processed payments explicitly identified as martyr payments.  Unlike in *Schansman,* where the

bank directly assisted the terrorist organization DPR when its terror activities were widely

publicized and being investigated by the Ukrainian government, CAB is not alleged to have

directly held accounts for Hamas.  While the SAC does plead facts plausibly suggesting CAB was

generally aware some of its customers were, in addition to other charitable work, supporting

martyrdom and funding martyr payments, the SAC falls short on specific acts in which CAB

engaged that could fall within the definition of an act of international terrorism.   Rather, the

allegations more closely align with those in the cases dismissing the primary liability claims on

the second element.

### b.  Proximate Cause

Plaintiffs' SAC also fails to allege proximate causation.  Central to the notion of

proximate cause is the idea that:

> A person is not liable to all those who may have been injured by his conduct, but only to
> those with respect to whom his acts were a substantial factor in the sequence of
> responsible causation and whose injury was reasonably foreseeable or anticipated as a
> natural consequence.

*Rothstein v. UBS AG,* 708 F.3d 82, 91 (2d Cir. 2013).

In *Rothstein*, the plaintiffs alleged that UBS engaged in unlawful financial transactions

with Iran, that Iran subsequently used various entities to transfer funds to Hezbollah and

Hamas, and that those Iranian funds substantially increased Hezbollah's and Hamas's ability to

carry out terrorist attacks that injured the plaintiffs.  708 F.3d at 85-87.  Based on these

allegations, the Second Circuit stated that it was "reasonable to infer that Iran's ability to amass

U.S. currency was increased by UBS's transfers," that "the more U.S. currency Iran possessed,

the great its ability to fund H[e]zbollah and Hamas for the conduct of terrorism," and that "the

greater the financial support H[e]zbollah and Hamas received, the more frequent and more

violent the terrorist attacks they could conduct" would be.  *Id*. at 93.  Nevertheless, applying

the proximate cause requirement to state a claim under § 2333(a), the Circuit rejected the

*Rothstein* plaintiffs' arguments that UBS's violations were a proximate cause of their injuries.

UBS's knowledge of Iran's connection to terrorist organizations and its status as a state sponsor

of terrorism was insufficient to render its banking activities a proximate cause of the terrorist

attacks at issue.  *Id*. at 96-97.  The Court noted the absence of any nonconclusory allegations

that UBS provided money directly to Hezbollah or Hamas, that money transferred to Iran was

given to Hezbollah or Hamas, or that the attacks would not have occurred if UBS had not

transferred US currency (that is, that Iran would have been unable to fund the attacks without

the cash provided by UBS).  *Id*. at 97.

In contrast, the court in *Miller* found the plaintiffs sufficiently pleaded causation by

virtue of allegations that a martyr payment scheme administered by Arab Bank itself

"incentivized terrorists to commit acts of violence and also enhanced Hamas's reputation

among potential recruits."  *Miller*, 372 F. Supp. 3d at 46.  Important to the court's conclusion

was that Hamas identified a person responsible for one of the attacks on the plaintiffs as being

eligible for a martyr payment.  *Id*.  In addition, it found that Arab Bank's role in the martyr

payment scheme – which was explicitly labeled as such in bank documents -- enabled donors to

ensure their payments went to martyrs, avoiding under-the-table means of money transfers.

*Id*.  Finally, the court noted that the bank was alleged to have maintained accounts for terrorist

organizations and routed payments to terrorist organizations, which helped to fund terrorists,

further bolstering the plausibility that it was reasonably foreseeable that the bank's provision of

financial services to Hamas-affiliated customers would lead to plaintiffs' injuries from Hamas-sponsored terror attacks.  *Id*.

Similarly, in *Atchley v. AstraZeneca UK Limited*, 22 F.4th 204 (D.D.C. 2022), the Court reversed the district court's dismissal of a direct liability claim under the ATA on the ground that proximate causation was not adequately pled.  The plaintiffs in *Atchley* were victims of terrorist attacks in or around 2005 committed by a group called Jaysh al-Mahdi, which was established and equipped by Hezbollah, an FTO.  Jaysh al-Mahdi openly controlled Iraq's Ministry of Health during the relevant time period.  AstraZeneca was allegedly aware of Jaysh al-Mahdi's command of the Ministry but nevertheless used local agents to deliver cash kickbacks to the terrorists who gave it business and delivered extra, off-the-books batches of valuable medical goods that Jaysh al-Mahdi monetized on the black market to fund its operations, including to pay terrorist fighters.  Critical factual allegations included that the company's agents finalized contracts at in-person meetings at the Ministry where Jaysh al-Mahdi weaponry, fighters, propaganda, and other indicia made it clear who was in charge, as well as contemporaneous reports in mainstream media that Jaysh al-Mahdi controlled the Ministry.  The D.C. Circuit Court found that proximate causation was adequately pled because the complaint described how Jaysh al-Mahdi controlled the Ministry and used it as a terrorist headquarters rendering it plausible that defendant was knowingly dealing directly with a terrorist organization, not a legitimate government Ministry.

In this case, Plaintiffs' allegations suffer from the same problems as those in *Rothstein*.  There are no allegations that CAB participated in the Attacks, recruited the Hamas operatives that perpetrated them, or provided the funds for the Attacks.  Furthermore, there are no

allegations that specific funds processed by CAB were designated for terrorist purposes rather than some more benign or legitimate purpose, that CAB was on actual notice that funds its was processing were in fact going to Hamas operatives, and no plausible allegations that the Attacks that injured Plaintiffs were only possible due to Defendant's actions.  Indeed, there are no facts connecting the CAB customers named in the SAC to any of the Attacks, except for the Park Hotel Bombing that occurred on March 27, 2002 by al-Sayed.  (SAC ¶ 1142.)  However, even the allegations against al-Sayed fail for direct liability purposes.  The SAC asserts that al-Sayed received at least seven transfers through CAB's correspondent account between February 2001 and May 2001 totaling $69,000.  (SAC ¶ 1137.)  Plaintiffs state al-Sayed was arrested in 2001, but it is unclear for how long he was imprisoned or when he was arrested and tried specifically for the hotel bombing.  (See SAC ¶¶ 1138-39, 1141, 1143.)  There are also no facts to suggest CAB could have known that this individual was using his CAB account to plan that terrorist attack or other attacks.

While the Court credits Plaintiffs' allegations that Defendant provided services to individuals and organizations, and that it may have been generally aware that some of those individuals and entities have associations or relationships with Hamas, which in turn was responsible for the Attacks, they do not allege that these intermediary persons and entities solely exist for terrorist purposes.  As pleaded, the organizations also engaged in a myriad of legitimate functions and activities.  (*See, e.g.*, SAC, ¶ 809 (noting that Al-Mujama al-Islami developed sports clubs, youths and women organizations, day care centers, clinics, and Qur'anic schools); ¶ 973 (Al-Tadamun Charitable Society – Nablus activities focus on social welfare, education and leisure, health, and other special activities); ¶ 990 (Jenin Zakat

Committee operations were in areas of health and education, services for children, and employment).  Without a more direct connection between Defendant's conduct and the Attacks that injured Plaintiffs, the provision of financial services to individuals and organizations on its own is insufficient to support a plausible inference that the financial services facilitated by Defendant proximately caused the Attacks that injured Plaintiffs.

Accordingly, I respectfully recommend that Defendant's motion be granted as to Plaintiffs' primary liability claims.

### CONCLUSION

For the reasons set forth above, I respectfully recommend that CAB's motion to dismiss be GRANTED without prejudice with respect to Plaintiffs' primary liability claims under the ATA and GRANTED with prejudice as to Plaintiffs Julie Averbach, Matanya Nathansen, Nevenka Gritz, and Arie Miller for lack of standing.  I recommend that CAB's motion be DENIED with respect to Plaintiffs' aiding-and-abetting claims under JASTA.

Dated: April 11, 2022
        New York, New York

Respectfully submitted,

*Katharine H Parker*

KATHARINE H. PARKER
United States Magistrate Judge

### NOTICE

Plaintiffs shall have fourteen days from the service of this Report and Recommendation to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving

with the clerk), or (F) (other means consented to by the parties)).  Defendants shall have fourteen days to file written objections.

If Defendants file written objections to this Report and Recommendation, Plaintiff may respond to the objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). If Plaintiff files written objections, defendant may respond to the objections within fourteen days.  Objections and responses to objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Gregory H. Woods at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140 (1985).