# Exhibit A

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                         Docket #19cv0004
AVERBACH, et al.,                   : 19-cv-00004-GHW-KHP

                    Plaintiffs,     :

   - against -                      :

CAIRO AMMAN BANK,                   : New York, New York
                                         October 25, 2022
                    Defendant.      :

------------------------------------ :

                        PROCEEDINGS BEFORE
                THE HONORABLE KATHARINE H. PARKER,
                   UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:          OSEN LLC
                         BY:  MICHAEL RADINE, ESQ.
                              DINA GIELCHINSKY, ESQ.
                              ARI UNGAR, ESQ.
                         190 Moore Street, Suite 272
                         Hackensack, New Jersey 07601


For Defendant:           DLA PIPER US LLP
                         BY:  JONATHAN SIEGFRIED, ESQ.
                              ANDREW PECK, ESQ.
                              ERIN COLLINS, ESQ.
                              MARGARET CIVETTA, ESQ.
                         1251 Avenue of the Americas
                         New York, New York 10020




Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None    |        |       |           |          |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None           |             |    |    |           |

```
 1                        PROCEEDINGS               3

 2            THE CLERK:  Calling case 19cv004, Averbach

 3   versus Cairo Amman Bank.  Beginning with the counsel for

 4   the plaintiffs, please make your appearance for the

 5   record.

 6            MR. MICHAEL RADINE:  Good morning, Your Honor,

 7   I'm Michael Radine for the plaintiffs.  Do you mind if I

 8   sit to speak?

 9            THE COURT:  No, go right ahead.

10            MR. RADINE:  Thank you.  I'm joined by Dina

11   Gielchinsky and Ari Ungar.

12            THE COURT: Hi, nice to see you.

13            MR. RADINE:  Nice to see you, Your Honor.

14            THE CLERK:  And counsel for the defendants,

15   please make your appearance for the record.

16            MR. JONATHAN SIEGFRIED:  Good morning, Your

17   Honor, Jonathan Siegfried, Andrew Peck, Erin Collins, and

18   Margaret Civetta.

19            THE COURT:  Nice to see everyone.  Thank you for

20   coming in on this rainy day, and I have your status

21   letter from October 20.  I thought we could go over some

22   of the issues in more detail.  The bank has been strongly

23   contesting the basis for jurisdiction, and it seems from

24   the letter that plaintiffs believe that the evidence

25   exchanged thus far supports jurisdiction, but I'd like to
```

```
 1                         PROCEEDINGS                    4
 2  hear a little bit more on that.
 3         MR. RADINE:   Sure, so, well, I can start there.
 4  What we've produced to them so far is 118 transactions,
 5  our records evidencing those transactions, and then we
 6  have about a dozen more that we located that we have
 7  informed them of that we are processing to give them
 8  shortly, in the next day or so.  Of those 118, 101 of
 9  those are direct transactions that Cairo Amman Bank
10  processed through its correspondent account at Citibank
11  in New York, and 17 are transactions that appear to have
12  been processed through a nested account they held at Arab
13  Bank where Arab Bank uses its correspondent account in
14  New York to process the transaction.
15         That structure of using a nested account to
16  process a transaction through New York, the
17  jurisdictional relevance of that structure is currently
18  sub judice before the Second Circuit in Spetner v.
19  Palestine Investment Bank as to whether that meets the
20  Licci standard given that another bank is interposed in
21  that flow.
22         But, again, of the 118 we've produced so far,
23  that constitutes 17 of those transactions.  The rest are
24  direct transactions.
25         So they are transactions of significant amounts.
```

1                              PROCEEDINGS                           5

2   We've produced a spreadsheet to them.  I have a copy if

3   Your Honor would like to see it here.

4            THE COURT:   Sure.  If you have it, I'll take a

5   look.

6            MR. SIEGFRIED:   Your Honor, we have objections

7   to that since we haven't actually been able to even

8   verify anything regarding these transactions.

9            THE COURT:   Okay, I mean this is not evidence,

10   in any case.

11            MR. SIEGFRIED:   I understand it.

12            THE COURT:   So I'm not taking it for any

13   purpose other than this conversation.

14            MR. SIEGFRIED:   Sure.

15            MR. RADINE:   So this is the spreadsheet we

16   produced to them, so it does not include the last dozen

17   that we've located.

18            THE COURT:   Okay.

19            MR. RADINE:   So the way to read this, obviously

20   printing Excels is always a bit of a pain.

21            THE COURT:   Right.

22            MR. RADINE:   It goes, if you will, to the right

23   and down to the right and then down to the right and then

24   down.  So an entire row is expressed over a page and the

25   next page, if that makes sense.

```
 1                          PROCEEDINGS                    6

 2              THE COURT:   Uh huh.

 3              MR. RADINE:   So on the top half of the first

 4   page here we start with the nested account transactions.

 5   So you'll see there should be about 17 of them, and you

 6   have the first half of the information on page 1 and the

 7   second half on page 2.  And then below that with the

 8   direct transactions, again, first half on page 1, second

 9   half on page 2, and then repeating in that pattern

10   through the other pages.

11              So we've asked them if they dispute the accuracy

12   of this, but obviously we're not asking them if they

13   think this is jurisdictionally sufficient, just whether

14   this reflects the evidence we've produced to them.

15              THE COURT:   Okay.

16              MR. RADINE:   Now, we understand from them that

17   they do not think that transactional information is

18   sufficient to prove personal jurisdiction on its face.

19   They've asked us what information or evidence we intend

20   to put in at this stage and so on.  We're at a bit of a

21   loss as to what that would be under Licci.  The evidence

22   that relates to personal jurisdiction is transactions

23   for, relating to the terrorist group in question from

24   which the claims arise.

25              So we understand that they've argued that the
```

1                          PROCEEDINGS                    7

2   evidence, we have not - I'll just quote so I don't

3   misstate it - that we have, quote, "not provided evidence

4   sufficient under the Due Process Clause," close quote, to

5   show, quote, "that the claims in this action arise out of

6   or relate to any transfers processed through its

7   correspondent accounts in New York," close quote,

8   because, they argue, last quote, "transfers involving

9   routine banking transactions and for humanitarian

10  services, for example, do not give rise to claims under

11  JASTA."

12          So our position is that's a merits question.

13  The law in this case, as Your Honor pointed out in two

14  reports and recommendations, is that the Second Circuit

15  noted that the use of a correspondent account standing

16  alone could be grounds to find personal jurisdiction so

17  long as the use is purposeful.  That's from Your Honor's

18  2020 opinion.

19          THE COURT:   Right.

20          MR. RADINE:   And purposeful, as this Court

21  explained, means repeated and volitional as we argued

22  these were and I think as this chart suggests.

23          THE COURT:   Can I ask you something about - I'm

24  sorry to interrupt, but I'm just looking at the dates of

25  these various transactions.  Is there relevance to the

1                              PROCEEDINGS                    8

2   dates, I mean when was, I see a bunch are Holy Land

3   Foundation, some Interpal, some others.  Were any of

4   these Holy Land Foundation transactions after this

5   designation?

6          MR. RADINE:   They were all after the Israeli

7   designation of Holy Land Foundation which we alleged was

8   publicized and, therefore, sufficient under *Honickman*.

9   They're not after the U.S. designation because that

10  would've prevented the correspondent banks from

11  processing these transactions.

12         THE COURT:   Okay.  Okay.  So none of these are

13  post-U.S. designation?

14         MR. RADINE:   Right, there wouldn't be U.S.

15  dollar transactions post-U.S. designations.  So for HLF

16  that's the end of 2001, but for Interpal, of course,

17  that's 2003.  And then some entities weren't designated.

18         THE COURT:   Right, but you have Interpal

19  transactions from prior to the violence at issue.

20         MR. RADINE:   Yeah.  So anyway, the personal

21  jurisdiction, so obviously *Kaplan* and *Linde* make clear

22  that what constitutes routine banking is for a jury to

23  decide.  Whether it's knowledge is sufficiently—or,

24  general awareness is sufficiently established from a

25  humanitarian purpose of a transactions is a merits

1                              PROCEEDINGS                        9

2   question that we'll obviously arrive to when we get into

3   merits discovery, but there's not been a court that's

4   held that a defendant's knowledge has to be evident on

5   the face of each transfer.  That could be proven in any

6   number of ways.

7              THE COURT:  At least for jurisdiction you're

8   saying.

9              MR. RADINE:  At least for jurisdiction, right.

10  So arising out of, which is their argument is on the due

11  process version of "arising out of."  There's the New

12  York version of "arising out of" and the due process

13  version.  According to their letter, they're contesting

14  the due process version.  Of course, as this Court noted,

15  they had not contested the New York "arising out of"

16  version in a motion to dismiss.  In any event, the Second

17  Circuit has never, they note this in *Licci*, found a case

18  where plaintiff satisfied the New York rule but not the

19  due process rule.

20             As this Court noted, under the New York rule,

21  quote, "the foreign bank's use of its correspondent

22  accounts is not completely unmoored from the legal claim

23  regardless of the ultimate merits of the claim" is the

24  standard that Your Honor set out correctly.  And then as

25  for whether the – whether due process could operate

 1

 2  differently, Your Honor noted, quote, "CAB offered no on-

 3  point case authority supporting this argument." The

 4  Second Circuit does not appear to have seen it either.

 5  So we think that's that for personal jurisdiction.

 6          Now, we want to come to understand more about

 7  how the bank operated that we think bears on the

 8  transactional element and the documents they could have,

 9  and that's where the 30(b)(6) deposition notice comes in.

10  And I can speak on that briefly, Your Honor.

11          THE COURT:   Yes.

12          MR. RADINE:   So we've noticed three issues to

13  them.  The first relates to the IT systems that the bank

14  used during the relevant period as they relate to

15  transaction processing.  So they have explained to us

16  before a little bit about their understanding of their

17  systems at the time.  They explained that they used the

18  Kindle Banking System in the relevant period.  That's

19  been taken offline, and they don't have – the system is

20  not supported anymore nor is the associated OS and

21  hardware.  And they mentioned they don't have backups and

22  archives.

23          It's been our experience working with banks in

24  these cases that what is not currently usable by the

25  bank's IT staff is not necessarily unrecoverable.

```
 1                         PROCEEDINGS                    11
 2   Relevant data may sit on multiple systems, it may have
 3   been transferred to another system, recovery may be
 4   possible.  It may necessitate a vendor who specializes in
 5   recovery work.  In any event, we won't know until we
 6   ascertain what systems were used.  I'd also point out
 7   that that's a single system.  So in our experience banks
 8   use multiple systems.  We've seen that the system that
 9   runs the SWIFT database which its transactions are
10   processed through and other banks is not the same as
11   their core banking system which is what I believe the
12   Kindle system likely is.  There may not be more to draw
13   from this line of inquiry, but we can't know until we
14   begin to have it.
15             The second issue is that of the CAB's use of
16   correspondent accounts and nested accounts.  As Your
17   Honor raised at our last conference, it's worth knowing
18   how the bank used its correspondent accounts generally,
19   it gives a sense of the jurisdictional contacts they had
20   when processing the transactions.  And then in the nested
21   account which is sub judice, the impact of that, in
22   Spetner, I would imagine the bank, just as much as us,
23   would like to know if CAB used its nested account in a
24   way that was similar or different than the defendant in
25   that case.
```

```
 1                        PROCEEDINGS                    12
 2            THE COURT:   And how did the defendant use the
 3   nested account in the cases pending before the Second
 4   Circuit?
 5            MR. RADINE:   So those transactions, when a
 6   customer of the bank wants to push a transaction, they
 7   will indicate who the ultimate beneficiary is.  And then
 8   those are instructions that the originator bank, the
 9   defendant, would then give to their bank where they hold
10   their nested account for further credit down the line
11   ultimately through New York and then to the opposing
12   party, the counterparty to the transaction.
13            So in a sense that when a bank holds a
14   correspondent account in New York, when they send a
15   transaction through New York, they're providing
16   instructions to each bank down the line as to moving it
17   along.  This just adds another bank.  So the question
18   would be, for instance, like what control does the
19   defendant have --
20            THE COURT:   Why does it go through a nested
21   account versus just going through its own, why would it
22   add a party instead of minimize the parties?
23            MR. RADINE:   So --
24            THE COURT:   What's the purpose of being --
25            MR. RADINE:   Sure, banks hold nested accounts
```

1
2  for different reasons.  That's something we'd certainly
3  get into with them.  Sometimes they're unable to hold, a
4  New York bank won't offer them an account or at least an
5  account with terms they want --
6          THE COURT:  But we know that CAB did have some
7  correspondent accounts.
8          MR. RADINE:  Right.  It could be a legacy
9  account that they had from before they had access to New
10  York accounts that they were still using.  These are all
11  things we would get into with them and see whether or not
12  that's a fruitful topic to understand.
13          The last issue relates to their sale of relevant
14  branches to Palestine Islamic Bank.  They informed us
15  that whatever records were at those branches in the
16  Palestinian territories were transferred to the buyer
17  bank when they bought those branches because possession,
18  custody, and control can relate to whether or not you
19  have the right to demand records back.  We just want to
20  understand what the agreement was as to those records,
21  document sharing, however that operated, whether
22  documents were transferred back to CAB at all.
23          Now, on these topics we have a corresponding set
24  of document requests, we have four document requests that
25  relate to these topics.  CAB in a meet and confer told us

1                           PROCEEDINGS                    14

2   maybe those records will answer our questions without the

3   need for deposition.  We're, of course, open to that, to

4   see those records and to see if that makes sense.  We

5   think we'd likely, at least from our experience in the IT

6   process that we've gone through with other banks, I

7   imagine we would have follow-up questions.  But, of

8   course, you know, we are happy to look at the documents

9   first and talk to them about that.

10             THE COURT:   Okay.

11             MR. RADINE:   So the big takeaway, Your Honor,

12  is that between the continuing work of the banks that

13  we've issued subpoenas to and the deposition process,

14  we'd like to extend the discovery period.  We propose 90

15  days in part to get us past the holidays from which we

16  imagine we'll have a little bit less responsiveness from

17  the banks and so on, and that would put us on February 2.

18             THE COURT:   Right, well, we had November 14 as

19  completion of jurisdictional discovery.  So you want a

20  90-day extension on that.

21             MR. RADINE:   Yeah, I think November 4 is the

22  deadline, and the --

23             THE COURT:   Maybe I have a typo in my notes.

24             MR. RADINE:   Sure, November – so 90 days from

25  November 4 would be February 2.  Of course, we don't have

1                        PROCEEDINGS                    15

2   the Court's decision on the R&R, so our feeling is is

3   that this is time we can use productively to do this

4   work.

5          THE COURT:   Okay.  I'll hear from defendants

6   next about these issues and also the extension of

7   discovery.

8          MR. SIEGFRIED:   Thank you, Your Honor.  Dealing

9   about nesting, which is in your mind at the moment,

10  having looked at that chart, I don't want to - and you

11  also said before you're not deciding merits --

12         THE COURT:   No.

13         MR. SIEGFRIED:   -- at a status conference.  So

14  I'm not going to argue a great deal about the merits

15  other than to note a couple of things.  One, the very

16  beginning of their chart is replete with these so-called,

17  what they're now calling, nesting transfers.  Now, it's

18  interesting actually because the plaintiffs like to keep

19  changing their theory in this case.  First of all,

20  there's absolutely nothing in the complaint about

21  nesting.  In fact, as you may recall, what we brought to

22  the Court's attention is that allegations in the

23  complaint regarding these transfers, that they were all

24  through Citibank, were incorrect when made, when the

25  complaint was drafted.  And then when you inquired of Mr.

| | |
|---|---|
| 1 | PROCEEDINGS                    16 |

2  Osen about that issue when he was here, he said, oh,

3  well, but we're not sure because the transfer slips don't

4  necessarily show us whether it went through Citibank, and

5  we don't have the complete transfer slips, so it may have

6  gone through Citibank.

7        I gather they've now, because they should, have

8  retreated from that argument to now talk about it as a

9  nesting argument.  And as far as a nesting argument is

10 concerned, Your Honor, since they raised it and since I

11 assume it will come up again, the case is *Spetner v.*

12 *Palestinian Investment Bank*, 495 F. Supp. 3d 96, a 2020

13 decision, in which not just any plaintiff but these

14 Plaintiffs represented by Mr. Osen and his firm, the same

15 counsel that you have before you, made every conceivable

16 argument under the sun to Judge, I think it's Komitee is,

17 is that --

18        THE COURT:   Who?

19        MR. SIEGFRIED:   K-O-M-I-T-T --

20        THE COURT:   Oh, Komitee.

21        MR. SIEGFRIED:   Komitee.  I don't know where

22 you put the accent on that.  Mad a whole bunch of

23 arguments because the situation was even more involved

24 than it is here.  They had three different nesting

25 theories.  And he carefully reviewed each one, and he

```
 1                        PROCEEDINGS                    17

 2  said there was no personal jurisdiction.  That is the law

 3  as it stands right now.  Mr. Radine is correct that they

 4  have appealed to the Second Circuit.  Obviously, I

 5  wouldn't say anything about how you might judge the

 6  matter, but I think that if you read the decision, it's a

 7  fairly thorough, careful, detailed decision as to why

 8  that theory simply doesn't hold water.

 9            THE COURT:  Of course, that's only with respect

10  to 17 transactions.  The other ones are through --

11            MR. SIEGFRIED:  And let's go to the others.

12            THE COURT:  Yeah.

13            MR. SIEGFRIED:  Then we have a whole bunch of

14  NatWest transactions that, of course, didn't go through

15  New York.  A lot of them are in Sterling, some of them

16  are in (indiscernible), but they're not through Citibank

17  in New York.  There are --

18            THE COURT:  None of these are through New York?

19            MR. SIEGFRIED:  No, I'm not saying that, Your

20  Honor.  I've got a large sheet here, but I think that the

21  last time we looked, they keep making ongoing

22  productions, but the last time we looked, there were

23  maybe only a couple, two or three, that went through

24  Citibank.  So, again, this is why, when I objected

25  before, I said there was much to be said about this.
```

1              PROCEEDINGS                    18

2   Then we have issues regarding this contention by Mr.

3   Radine, by the plaintiffs, that this is somehow a merits

4   issue.  Your Honor, we will have the opportunity

5   obviously to brief, and for you to consider, this issue,

6   but the Due Process clause, insofar as this is concerned,

7   is not a fifth grade math class in which you say how many

8   transfers were there and, therefore, oh, there must be

9   jurisdiction.  Not any transaction will do.

10           The Due Process clause, and everyone from the

11  Supreme Court to the Second Circuit have been quite

12  clear, that the second part of this analyis, beyond the

13  number of transfers, which may be relevant to the issue

14  of purposefulness, the main part of due process is that

15  the claim must arise out of or relate to the transaction.

16  It's the nature of the transaction that is

17  extraordinarily important, and when we get to the merits

18  of this topic, we will address it, and, indeed, I think

19  you'll see that these claims do not, cannot relate to or

20  arise out of any of the transactions that they're listing

21  here.

22           You can – if it were otherwise, it would be the

23  case, I believe, that there'd be no distinction between

24  the maintenance of an account and a use account.  It's

25  hard to imagine that anybody has a correspondent account

1                            PROCEEDINGS                    19

2   and doesn't use it.  So the question is what is it using

3   it for?  What is the transaction?  And that is where I

4   think their case falls apart, and it is rather

5   interesting if, and I think plaintiffs understand this

6   because, quite frankly, if they had 110 transactions that

7   really stood for what they would like to report in court

8   today, then I'm not sure why we're going through seven

9   more subpoenas to a whole bunch of banks or what further

10  evidence they need other than what they have today.

11          So now let me turn to the rest of the - if I've

12  answered that question.

13          THE COURT:   Well, let me stop you for one

14  second --

15          MR. SIEGFRIED:   Sure.

16          THE COURT:   -- because there's - I see here,

17  looks like four transactions through New York in CAB's

18  New York correspondent accounts involving use of Al-

19  Hayek.  If the court - so the ones from Bank One, from

20  Texas, there's a bunch of those, and that's Holy Land

21  Foundation was founded out of Texas.  So I guess my

22  question is sort of a do you, is it your position that if

23  anything that the jurisdiction would be, or venue would

24  be appropriate in Texas versus New York, assuming there

25  was jurisdiction, assuming jurisdiction was established

1

2   through this correspondent bank accounts, how does that

3   impact where this case is being litigated now?

4           MR. SIEGFRIED:   It's --

5           THE COURT:   Right?  Because there's four New

6   York and there's a lot of Texas.  So, and if it were, if

7   Texas were appropriate, do you want to be there versus is

8   this a more convenient venue for everyone?  I mean how

9   does that factor into the analysis?

10          MR. SIEGFRIED:   I would say New York is not a

11  convenient factor nor is Texas for purposes of a foreign

12  bank, and I'd rather, instead of responding off the cuff

13  to your comment, come back to you on it.

14          THE COURT:   Okay.

15          MR. SIEGFRIED:   But I think that, I don't think

16  we really get there because whether we talk about, as I

17  said, those Hayek transactions, which I cannot believe

18  ultimately you will find differently than Judge Komitee

19  has, or with respect to these Bank One transactions which

20  also have issues around them, quite frankly, separate and

21  apart from their use.  I don't think we're going to end

22  up reaching that issue.  I just don't think they're

23  jurisdictionally sufficient either for purposes of Texas

24  or for New York, quite frankly.

25          THE COURT:   Okay.  You can address the

1                        PROCEEDINGS                    21

2    remaining issues.

3             MR. SIEGFRIED:   Okay, thank you.  And, by the

4    way, I should add, Your Honor, or maybe the last point I

5    should make is we did have a meet and confer with Mr.

6    Osen in which he said, well, we'd like you to confirm the

7    content of the transactions, and, frankly, I'll have that

8    conversation further with him offline.  I don't actually

9    understand the question, what the content of the

10   transaction is.

11            THE COURT:   Well, I assume they want to know do

12   you dispute that these transactions actually occurred

13   with these parties on these dates.

14            MR. SIEGFRIED:   If that's what they're asking

15   now, it has its own set of issues.  So we'll have that

16   discussion with them.

17            With respect to the subpoenas, you know, at the

18   August 25 hearing, you set the deadline of November 4,

19   and you said I want you to really focus on the

20   jurisdictional issues.  And Mr. Osen said in response,

21   well, with respect to jurisdictional discovery, the

22   deadline for third-party banks, we'll obviously abide by

23   that.  You asked for the status of discovery at that

24   point, he gave you the status of discovery, there was not

25   a word mentioned about, oh, we want to issue more

1                            PROCEEDINGS                        22

2   subpoenas.  There wasn't – then we have somewhere

3   between, somewhere in the middle of September to late

4   September, I'm not even sure they say they served them

5   during that period.  I know that the subpoenas are dated.

6   But supposedly they served something knowing what your

7   discovery deadline was, and these subpoenaed banks are

8   not any of the correspondent banks in New York.  They're

9   not referred to in the complaint which identified the

10  correspondent accounts.  So this is – so we have

11  subpoenas going out to seven banks, close to within a

12  month or so of your discovery deadline, to banks which,

13  with whom we do not have any correspondent account in New

14  York.  And the subpoenas, as I read them, are for in each

15  case  23 years of records and for 74 or more individuals

16  and entities, notwithstanding the fact that the complaint

17  that is before us talks about five individuals and 16 --

18          THE COURT:   So the subpoenas are covering more

19  than what's mentioned in the complaint?

20          MR. SIEGFRIED:   Absolutely, and, Your Honor, if

21  you look at the joint status report, what you see in the

22  plaintiff's section is that, I think the term they use is

23  BNY, Bank of New York, has balked at the request for 23

24  years of, I don't know whether they say the 23 years, but

25  balked at the request, that they rejected multiple

```
 1                      PROCEEDINGS                    23

 2   compromises, and they only hope that it can be resolved

 3   without judicial intervention.

 4            In the meet and confer I asked Mr. Osen whether

 5   the Bank of New York had any position as to whether it

 6   even had documents going back to the relevant time

 7   period, and I believe he told me  that at least for the

 8   Bank of New York, he said we don't even know that we have

 9   them going back that far.  Citibank had no documents,

10   none, zero, there's none produced by them.  And Standard

11   Charter, the earliest document that they have that

12   involves CAB, a CAB transfer, is 2005.

13            So the idea that seven subpoenas are now going

14   out for this breadth, one thing for sure, if Your Honor

15   is inclined to let this part of it go forward and to

16   extend on this basis, we certainly don't want to be back

17   here in 30 days, 60 days, or 90 days hearing that there

18   are yet another six subpoenas or that we are still in

19   negotiation trying to get records from banks over a 23-

20   year period, etc.

21            And that's relevant to another point regarding

22   this chart and to what's happened today.  There was a,

23   what seems to have happened with some of these banks, it

24   happened with Standard Charter, happened with HSBC with

25   whom also CAB had no correspondent account, is when they
```

1
2  get the subpoena, which, yes, it says transactions with
3  CAB, then has a list of 74 individuals for 23 years.  As
4  a practical matter, I think we all know what the bank
5  does.  It takes the list, the exhibit B list and it
6  produces documents, transactions involving where those
7  identified entities appear.  So for HSBC which did
8  something like five productions over the last couple of
9  months, and produced a lot of documents, not a single one
10 refers to CAB.

11          So this subpoena of the seven banks seems to be,
12 as a reason for extension, seems to rest on a rather thin
13 reed.  Again, we want to get past this discovery, we want
14 to get this motion, we think it's a good motion based
15 upon everything we've seen.  So if Your Honor's inclined
16 to give them some leeway, we understand, but we certainly
17 - this starts to become a real stretch late in the game
18 to try to develop evidence.

19          On the - with respect to the 30(b)(6), again, I
20 thought we had a very practical conversation in the meet
21 and confer with Mr. Osen who, in all fairness, was the
22 only one who spoke at the meet and confer, but it's
23 curious because you had directed that we provide
24 plaintiffs with a letter regarding the sale of the
25 branches --

1                          PROCEEDINGS                    25

2              THE COURT:   Yes.

3              MR. SIEGFRIED:   -- regarding the IT platforms.

4    I think at one point there was an exchange where you

5    asked Mr. Osen something to the effect of and what is the

6    source codes or what's the operating systems going to

7    have to do with all of this.  But we provided that

8    information.  We provided that information, as Mr. Osen

9    acknowledged last time, back in July about the sale,

10   about the fact we didn't have transaction records, with

11   respect to the system.  It wasn't terribly vague.  It

12   said the bank is currently using Temenos, T-E-M-E-N-O-S,

13   T24 Core Banking System under IBM UNIX OS.  The system

14   was implemented during the period 2011 to 2013.  The

15   prior operating system was the Kindle Banking System.

16   The bank cancelled the license in 2013.  The Kindle

17   System is not supported anymore nor is the associated OS

18   and hardware.

19              Now, that's on July 29 they had that

20   information.  On Sunday evening, October, if I'm off by a

21   date, October 7 or 8, Sunday evening, they serve a

22   30(b)(6) deposition notice.  Between July and October

23   there is no follow-up, there's no request for any

24   documents relating to those issues.  And I asked Mr.

25   Osen, number one, why would this be an efficient way to

PROCEEDINGS                        26

1

2   proceed.  I said if I come in with a 30(b)(6) witness in

3   2022 about a system that hasn't been in effect since

4   2013, regarding documents that are no longer retained,

5   that's not supported, that was a licensed system, and the

6   witness says what do you want me to tell you, I said then

7   you're going to tell me I gave you the wrong 30(b)(6)

8   witness.

9           THE COURT:   Well --

10          MR. SIEGFRIED:   So the point is, I said why

11  don't we – and I can't even tell you that we have the

12  documents, right, this is, again, a conversation that

13  occurred at the end of last week.  If we had the

14  documents, we'll give them to him --

15          THE COURT:   Right.

16          MR. SIEGFRIED:   -- and if he wants to go run

17  off to some expert and ask some expert, well, if that's

18  what they had and it was under a license and they no

19  longer have the thing, can you, I don't know what you can

20  do, but in any event somebody wants to say they think

21  they want to revive a system that's no longer there --

22          THE COURT:   You already confirmed that the data

23  from the relevant time period was not transferred --

24          MR. SIEGFRIED:   Absolutely.

25          THE COURT:   -- from Kindle to your system, the

1

2   current system, is that correct?

3          MR. SIEGFRIED:   Yes.

4          THE COURT:   Okay, so what I'm hearing gives me

5   concern, Mr. Radine, that what you're doing is outside of

6   the scope of Rule 26(b) which confines discovery to

7   information that's relevant to the claims and defenses

8   and proportional to the needs of the case.  Why would you

9   be subpoenaing banks that, you know, with which CAB

10  didn't have correspondent bank accounts?  That doesn't

11  make any sense.

12         And further why would CAB have knowledge about

13  the Kindle system?  Wouldn't the appropriate inquiry be

14  of Kindle if it even still exists as to what's going on

15  with its system and did it ever retain any information?

16  I doubt that it would've retained sensitive banking

17  information.  I doubt that the bank, any bank would allow

18  that.  But isn't a proper inquiry of Kindle rather than

19  CAB since it was merely licensing that program?  I'm not

20  really understanding what you're doing or looking for or

21  why this is relevant to jurisdiction.

22         MR. RADINE:   Sure, well, I'll take those in

23  parts.  I'll start with the banks.  Right, those are not

24  CAB's correspondent banks.  Those are the banks that are

25  on the other side of the transaction.  Every --

1                          PROCEEDINGS                      28

2              THE COURT:   Other side of what transaction?   It

3    seems like a fishing expedition, that you're just

4    subpoenaing random banks with which CAB doesn't have any

5    existing relationships to see, hey, did you ever have any

6    kind of transaction that somehow made its way to CAB?   I

7    mean how is that going to jurisdiction?

8              MR. RADINE:   Sure.   So this chart, Your Honor,

9    is consisting entirely of records produced by banks that

10   they don't have a correspondent banking relationship with

11   CAB except for the nested account at Arab Bank.

12             THE COURT:   Right, but this is – what defendant

13   is saying is this is not even helping you.   It doesn't

14   even have New York except for these four transactions

15   with use of Al-Hayek.

16             MR. RADINE:   I'm at a little bit of a loss as

17   to what that means.   So, again, just to walk through how

18   this works.   The – so let's look at the direct transfers

19   that start on page 1, go to page 2.   So the column, so

20   the beneficiary bank in these is Cairo Amman Bank.   You

21   can see that in that column.   And the beneficiary's

22   correspondent bank is in the first column on page 2, 4,

23   and 6.   So in every --

24             THE COURT:   Well, 1 of 6 goes with 2 of 6, is

25   that right?

```
 1                        PROCEEDINGS                    29

 2            MR. RADINE:   Correct, so --

 3            THE COURT:   And so the originating bank we

 4   have, let's just take Holy Land Foundation with Texas

 5   because that's at least in the United States as opposed

 6   to the U.K.  Okay?  So the originating bank says Bank One

 7   Texas.

 8            MR. RADINE:   Right.

 9            THE COURT:   And then there's a blank for

10   originator's correspondent bank.

11            MR. RADINE:   Right.

12            THE COURT:   And then - I'm just looking at the

13   third line on page 1, and that says the beneficiary party

14   is the Halul Zakat Committee, and the beneficiary bank is

15   CAB.  So that's, CAB didn't, as I understand it, didn't

16   originate this transaction.  It received money from Holy

17   Land Foundation that was deposited into the account of

18   its customer Halul Zakat Committee.  Is that how I'm to

19   interpret this?

20            MR. RADINE:   Yes.

21            THE COURT:   Okay.

22            MR. RADINE:   So --

23            THE COURT:   And there's no intermediary --

24            MR. RADINE:   No.

25            THE COURT:   -- bank listed for this.  Where is
```

 1 

 2  New York in this picture?

 3          MR. RADINE:   That is in column, the first

 4  column on page 2.  That is the, if you look at the column

 5  name, beneficiary's correspondent bank, it's beneficiary

 6  bank's correspondent bank.  I believe that's clear --

 7          THE COURT:   Well, okay, so I don't think

 8  there's a dispute that CAB had a correspondent account

 9  with Citi.  But this transaction – is this – I don't

10  understand this transaction to have gone through Citi.

11  Are you saying that it did go through Citi?

12          MR. RADINE:   Yes --

13          THE COURT:   You're saying that – are you saying

14  that Bank One in Texas transferred the money to Citi in

15  New York, then transferred the money to CAB in wherever

16  this was, Lebanon or Israel or some place, where?

17          MR. RADINE:   Yeah.  There's not a word on this

18  that's our assumption.  The bank would've done it through

19  their correspondent account.  That means on the face of

20  the transfer record that we have that it says Citibank

21  New York for further credit of Cairo Amman Bank, Hebron,

22  etc.  That's true for every single one of these

23  transactions.  In fact, it's wherever a document might be

24  missing a piece of information, we might have a blank,

25  but in every instance these are coming through the

```
 1                         PROCEEDINGS                    31
 2   Citibank account.  That's in the beneficiary's
 3   correspondent bank column, in every single instance.
 4   Some of them are through Amex in New York.
 5              THE COURT:   So the - so Holy Land Foundation
 6   says, hey, we want to send money to Halul Zakat
 7   Committee, and they say, well, our account is at CAB in
 8   Lebanon, and so NatWest initiates it and it gets
 9   deposited.  And what I'm hearing CAB say is how is it
10   engaging in anything volitional I guess, simply receiving
11   the money through this mechanism.
12              MR. RADINE:   Yes, Your Honor already ruled on
13   that issue --
14              THE COURT:   Right.
15              MR. RADINE:   -- and held correctly that under
16   Arcapita and Amigo Foods receiving a transaction rather
17   than rejecting it qualifies as volitional for personal
18   jurisdiction purposes.
19              All of the transactions, including all the
20   NatWest ones, I don't know why he's suggesting otherwise,
21   went through New York.  Again, you can see the NatWest
22   ones because they say NatWest in the originator bank, and
23   then if you look at the corresponding row in the
24   beneficiary's correspondent bank where it says Citi
25   throughout, that's not an assumption we're making.  We're
```

```
 1                        PROCEEDINGS                    32

 2   taking that off of the transaction records we have.

 3              THE COURT:   I see, so --

 4              (interposing)

 5              THE COURT:   So for the U.K., just taking the

 6   first, well, just taking the first NatWest Interpal

 7   transaction, so NatWest in the U.K., Interpal says we

 8   want to give money to the Beit Fajjar's Zakat Committee -

 9   -

10              MR. RADINE:   Yes.

11              THE COURT:   So they, NatWest then goes through

12   NatWest U.K. --

13              MR. RADINE:   Well, they had a branch in New

14   York which is why I think it's not listed.  So they

15   would've cleared it themselves through New York.  They

16   would transfer it across the books of the Federal Reserve

17   Bank in New York --

18              THE COURT:   Oh, because it was U.S. dollar

19   transaction --

20              MR. RADINE:   Correct.

21              THE COURT:   -- they go through their own U.S.

22   account and then switch it to Citi.  Oh, no, here they

23   switch it to Amex Bank.

24              MR. RADINE:   Yes.

25              THE COURT:   And then to CAB where the recipient
```

PROCEEDINGS                        33

 1
 2   has the account.

 3         MR. RADINE:    Correct.  This is the same

 4   structure as in *Licci*, precisely.  In fact, Amex is the

 5   exact correspondent bank in *Licci*.

 6         MR. SIEGFRIED:   Your Honor, may I jump in for

 7   one second --

 8         THE COURT:   Yes.

 9         MR. SIEGFRIED:   -- because it's relevant to

10   your question.

11         THE COURT:   Yes.

12         MR. SIEGFRIED:   We didn't have a correspondent

13   account at Amex.  So the very first example that you're

14   using is NatWest has actually - I'll back up for one

15   second and try not to get into merits of the argument.

16   But NatWest either chose, for whatever reason, to send

17   the transfer through Amex, fine, but that has nothing to

18   do with us, or sometimes, Your Honor, under the system

19   that actually happens under Swift, the bank, as I think

20   you probably know, doesn't even make the originating

21   bank, NatWest in this case, for an Interpal transaction,

22   doesn't even make the decision.  It puts it into Swift,

23   and the Swift computers do whatever they do --

24         THE COURT:   System just does its stuff.

25         MR. SIEGFRIED:   -- and they send something

1                          PROCEEDINGS                        34

2   through.  So I don't see how that gets to be the

3   volitional use of a correspondent, of its correspondent

4   account in New York.

5              THE COURT:   But you did have a correspondent

6   account with Citi.

7              MR. SIEGFRIED:   We did have a correspondent

8   account with Citi, but I think the way we got into this

9   line of questioning was you posed a simple question which

10  is with respect to these seven new subpoenas that they

11  want to serve which are not to the CAB correspondent

12  banks, what is the relevance of that, why is that a Rule

13  26(b) request --

14             THE COURT:   Right, right.

15             MR. SIEGFRIED:   -- and I'm actually not sure I

16  heard the answer to that question.

17             THE COURT:   Yes, well, let's go back to that,

18  Mr. Radine, what is the relevance?

19             MR. RADINE:   Sorry, if I just - I want a, just

20  a clean record.  A bank can't force a transaction through

21  an intermediate bank that doesn't have a correspondent

22  relationship.  Of these seven transactions with Amex - I

23  don't know sitting here, the story, what appears to be

24  the case is they did have a correspondent account with

25  that bank.  Sitting here I don't know.  We're pulling

1

2  this from the face of the transaction.  We've been

3  through the - that's not something I think is

4  controversial or obviously --

5         THE COURT:   Well, it is because CAB is saying

6  they didn't have a correspondent bank with, they didn't

7  have a correspondent banking relationship with Amex or

8  here's Bank of New York --

9         MR. RADINE:   Bank of New York I think they

10  concede.  But, Your Honor, this sounds like grounds all

11  the more to have a 30(b)(6) because they're denying

12  having an account that we have on paper.  They're denying

13  it here in court.  It's not under oath.  It's a great

14  question to ask them in a 30(b)(6) context.

15         THE COURT:   Okay, but that answers the question

16  about why you might want to have a 30(b)(6), you might

17  want to have a witness explain what the different

18  relationships were, but that doesn't go to the subpoenas

19  onto these other banks.

20         MR. RADINE:   So these are banks that we

21  understand would be likely on the other side of the

22  transactions because they are, for instance, either the

23  biggest players in the markets where a lot of these Hamas

24  affiliated entities are or because we have other records

25  that have attached them to entities like that.  They have

```
 1                        PROCEEDINGS                    36
 2   not moved, of course, to quash.
 3           THE COURT:   So you're trying to get reverse
 4   information essentially.
 5           MR. RADINE:   Sure, this whole chart --
 6           THE COURT:   These other banks – so these other
 7   – you are speculating that these other banks have
 8   accounts with Hamas entities, not all of which are even
 9   listed in your complaint, and those entities might have
10   asked their banks to send money to somebody who had an
11   account with Cairo Amman Bank.  So it sounds like a
12   fishing expedition is really what it sounds like.
13           MR. RADINE:   Or they're the correspondent bank
14   for – they don't have to have the accounts themselves.
15   They can also be in a correspondent position.  These
16   banks have New York branches which is why --
17           THE COURT:   But you don't know, as you sit here
18   today, whether – you don't know who the customers of
19   these subpoena recipients are or whether they ever
20   initiated a banking transaction that went to a customer
21   of CAB.  You don't even know that.
22           MR. RADINE:   But these banks are the choke
23   points essentially, rather than, for instance,
24   subpoenaing all 10,000 banks in Germany, you have
25   Commerzbank, the largest sort of clearing bank for
```

1                           PROCEEDINGS                    37

2   Germany, and I believe we recently got a transaction hit

3   on that.  So so far it's been productive.

4           THE COURT:  You got one hit out of how many

5   subpoenas and how many records and years?  I mean this is

6   really excessive it seems, and really how are you going

7   to demonstrate jurisdiction through this?

8           MR. RADINE:  I'm not sure how it's to the

9   defendant's prejudice that we reach out with subpoenas.

10  They've produced nothing --

11          THE COURT:  Well, the prejudice is they keep

12  coming into court.  They're waiting to brief the

13  jurisdictional issue on the merits as opposed to under a

14  Rule 12 standard, and they're spending attorney's fees

15  involving this, and then they're going to have to prepare

16  a witness for a 30(b)(6) deposition on a topic that it

17  seems, I don't know understand why they would have any

18  knowledge of it at all.  Why would they have knowledge on

19  this other company's system that they no longer use?

20          MR. RADINE:  I'll turn to the 30(b)(6) thing.

21  My understanding is, first, a party can't object to the

22  relevance of a subpoena.  That's something that the

23  subpoena recipient --

24          THE COURT:  Well, that is true, but at the same

25  time you're asking for an extension of discovery based on

PROCEEDINGS                                38

that, and you are bound by Rule 26(g) and 26(b) to seek

discovery that is consistent with the rules relevant to

the claims and defenses and proportional to the needs of

the case.  So, yes, that is true that CAB may not have

standing to object on relevance grounds, but you as an

officer of the court have an obligation to utilize the

Federal Rules consistent with what they say.

MR. RADINE:   So far, Your Honor, we have only

gotten records from third-party banks that don't have a

correspondent relationship with CAB.  If we didn't have

access to records like those, we'd be at zero instead of

101 on this list right here.  We are meeting and

conferring with those banks, we take their objections

seriously, and work on narrowing the subpoena with each

of them.  They're obviously free to move to quash, but so

far we've had productive conversations with them, and

some of them have been producing already, some are still

working on it, as he mentioned, Standard Chartered Bank,

which, by the way, owned Amex or now owns Amex Bank,

(indiscernible) that bank, produced records that went

back to '05.  We're obviously asking them to look back

further.

I don't think with the defendant producing

nothing that we shouldn't be allowed to reach out to

1                           PROCEEDINGS                    39

2  banks that we have at least a reason to believe can run a

3  search --

4           THE COURT:   What is the reasonable belief?  It

5  sounds – you're not even including entities that are

6  mentioned in the complaint.

7           MR. RADINE:   The company, Your Honor, I --

8           THE COURT:   It's really speculation.  Has

9  somebody told you, oh, Standard Chartered has an account

10 with this particular entity that's listed in the

11 complaint, has somebody told you that?

12          MR. RADINE:   They're likely to be – well,

13 they're likely to be, to have the role rather of a

14 correspondent bank.  We subpoenaed their New York

15 branches for each of these banks rather than casting

16 about around the world.  There's only so many banks which

17 do dollar clearing at all, and any transaction from

18 around the world that comes through their bank for dollar

19 clearing is something that they would have a record of or

20 at least would have had a record of at the time.  So --

21          THE COURT:   Yes, that may all be true, but it

22 is still speculation that you're going to have a hit on

23 anything that is relevant.

24          MR. RADINE:   And as for the list – well, I

25 think, Your Honor, that we are, again, targeting a

1

2    limited set of banks that we think have the most

3    likelihood of being in that position.  Obviously, the

4    names are names that we understand as Hamas customers and

5    entities.  We didn't understand the complaint has a

6    necessity to be a directory of every Hamas operative or

7    entity.  That's something that expands during discovery

8    that we are seeking with those banks.

9             If I could turn to the deposition --

10            MR. SIEGFRIED:   Your Honor, sorry, can I jump

11   in on that for a moment?  Apart from everything you've

12   just said, the last statement is an extraordinary

13   statement.  So your – we are arguing or will be arguing

14   that the Court doesn't have personal jurisdiction with

15   respect to the claims asserted in the complaint.  This

16   was no tiny complaint.  This was a very long complaint

17   which listed five individuals, sixteen or seventeen

18   entities, a lot of detail about it.  And now the argument

19   is, well, we think there may be some banks out there, we

20   know they're not the correspondent accounts, they may

21   have had customers or sent money to 70 some odd other

22   individuals, and maybe we'll find a hit that actually

23   went through CAB.  And then what?  So they did a transfer

24   to somebody who's not even in the complaint.  So now

25   they're going to argue, well, that's a Hamas person and,

```
 1                         PROCEEDINGS                    41

 2  therefore, there's jurisdiction even though those persons

 3  and entities aren't referenced in the complaint.

 4           And this is all coming, we haven't heard, A,

 5  when they, whether they even effected the service.  This

 6  is all coming close to your discovery deadline when they

 7  said they would abide by the discovery deadline.  And it,

 8  you know, I don't normally want to use the word fishing

 9  expedition, I'm glad that you did, in this circumstance,

10  but this is the problem, and, again, when we get into

11  this chart eventually, you'll see that, I mean there are

12  transfers to entities that they refer to aren't, again,

13  aren't in the complaint.

14           So I understand they want to use the

15  jurisdictional discovery to do all kinds of things, but

16  that's not what this is about.  The 30(b)(6), again, what

17  I said, I'm not even sure why that's a 30(b)(6).  If what

18  they want is a representation or a statement as to who

19  the correspondent accounts were, we could do that.  That

20  hardly requires a 30(b)(6) deposition to do that.

21  Actually, Mr. Osen said I will work with you efficiently

22  on that.

23           But I think you're getting a sense of the

24  problem that we have.  This is costly, this is, we're not

25  the ones who brought an action 22 years after the events.
```

```
 1                      PROCEEDINGS                    42
```

 2   They're stuck with the fact that having waited so long,

 3   these banks don't have records --

 4            THE COURT:   Well, to be fair, the law changed,

 5   and --

 6            MR. SIEGFRIED:   And it's within --

 7            THE COURT:   -- allowed the aiding and abetting

 8   claim.

 9            MR. SIEGFRIED:   It does, but to be equally

10   fair, these plaintiffs, it's not just any plaintiff,

11   these plaintiffs sued Arab Bank, they sued NatWest, they

12   sued Credit Lyonnais.  It's the same plaintiffs, the same

13   claims, the same attacks, the same injuries.  They just

14   discovered 20 years after the fact CAB?

15            So they get the discovery, they have their

16   complaint.  But it has to be – this is why we're pushing

17   back.  Again, we want to be reasonable, but we don't want

18   to be doing this months and months.  And there's an

19   additional prejudice, as I said, which is it is costly

20   because when they go and they subpoena somebody like

21   HSBC, as I used as an example before, HSBC produces

22   thousands of pages of documents which we then have to

23   review.

24            THE COURT:   Right.

25            MR. SIEGFRIED:   And for nothing, for zero, zero

```
 1                          PROCEEDINGS                    43

 2   transactions.

 3            THE COURT:   Well, it seems to me that there's

 4   really not a basis to extend discovery by 90 days.  I'll

 5   extend discovery to December 9.  And if you are seeking

 6   to move to compel compliance with these subpoenas, those

 7   have to be filed in November by November 11, any motions

 8   to compel.

 9            MR. RADINE:   Okay.  Did Your Honor want to be

10   address the 30(b)(6) statements discussion?

11            THE COURT:   Well, for the 30(b)(6) you all

12   still have to meet and confer.  It sounds like you're not

13   done with that process from what I've heard, and I

14   understand why you may want some testimony about exactly

15   how the correspondent banking relationship worked, have

16   something under oath about what were the correspondent

17   banking relationships at the relevant time period.  So I

18   understand that, but it seems to me that you can further

19   meet and confer on that.

20            MR. RADINE:   That's fine.  We heard a number of

21   inaccuracies about the description of the IT systems and

22   so on, but that can be the subject of the meet and confer

23   process.

24            THE COURT:   Yeah, I'm not limiting right now

25   the 30(b)(6) topics.  I'm just expressing some skepticism
```

PROCEEDINGS                    44

1

2    about the need for some of the topics, but you should

3    still meet and confer on those.  Because it seems to me

4    there's a real question of what was happening with some

5    of these transactions that you're listing here.  I mean

6    how many of these transactions even involve entities

7    listed in the complaint?

8         MR. RADINE:   I believe this list should

9    correspond to the complaint.  I don't --

10        THE COURT:   Obviously, I recognize some of the

11   names.

12        MR. RADINE:   Yeah, I mean Holy Land Foundation

13   is on most of, a lot of these.  Interpal is on a lot.  I

14   think there'd be very few that aren't.

15        THE COURT:   Right, but the point is what does

16   CAB have to do with it?  So what if Holy Land Foundation

17   has an account with Bank One in Texas?  What does that

18   have to do with CAB?  The question is is it going to, in

19   these transactions, is it going to a CAB client that is

20   mentioned in the complaint?  That would be relevant.  So

21   my question is really the beneficiary parties because

22   that's what we're looking at here, what the beneficiary

23   parties, how many of these are named in the complaint?

24   Has anybody taken stock of that?

25        MR. RADINE:   Sure.  I can tell you I see mostly

1                        PROCEEDINGS                    45

2  look in the beneficiary column, Your Honor, I see, again,

3  mostly, a lot of Holy Land Foundation.  The Zakat

4  Committees were all in the complaint, I'm sure of that.

5  Taha's in the complaint, Mohamed Salah Taha is in the

6  complaint.  So I don't see, excuse me, any, yeah, I don't

7  know about every single one, but it looks like the

8  overwhelming - Al-Mujama is the central headquarters

9  institution of Hamas.  So I think that would certainly

10 qualify.  WAMY is in the complaint.  I don't see any that

11 aren't, which isn't to say my eyes aren't skipping over

12 one looking at this list now, and obviously I don't

13 understand the law to suggest that evidence that's

14 outside the complaint isn't sufficient on summary

15 judgment.  Discovery often will --

16         THE COURT:  Well, it has to be - discovery has

17 to be relevant to the claims and defenses, and so, yes,

18 discovery may involve information that's not included,

19 facts that are not included in the complaint, but they

20 still have to be facts relevant to the claims and

21 defenses.  So that's the limitation.

22         MR. SIEGFRIED:  I might be able to help Mr.

23 Radine out with his eyes on page 2 which is going no

24 further than page 2.  The Halul Zakat Committee is not

25 mentioned in the complaint.  The Silwad Municipality is

```
 1                       PROCEEDINGS                    46
 2   not mentioned in the complaint --
 3           THE COURT:   Okay.  Well, there's some and
 4   there's some not.  Okay.
 5           MR. SIEGFRIED:   Exactly.
 6           THE COURT:   So this is supposed to be related
 7   to jurisdiction as opposed to this general awareness
 8   which may potentially be slightly broader, and that's
 9   what you're, that's the – so it sounds to me like maybe
10   some of these subpoenas are going beyond jurisdictional
11   discovery and going into potentially this general
12   awareness element.  There's some argument that you don't
13   want to subpoena banks twice if they're going to look for
14   documents.  At the same time it seems like they're quite
15   broad.
16           I'm going to direct you to meet and confer on
17   the Rule 30(b)(6).  I'm not going to extend
18   jurisdictional discovery any further beyond the December
19   11 date.
20           MR. RADINE:   December 11?
21           THE COURT:   Isn't that what I said?
22           ATTORNEY:  December 9.
23           THE COURT:   December 9, sorry.  November 11 is
24   the date for any motions to compel.  And I'll issue an
25   order with that revised schedule.  Are there other items
```

2  that plaintiffs wanted to raise today?

3          MR. RADINE:   I believe that is it for us, Your

4  Honor.

5          THE COURT:   Anything else defense counsel would

6  like to raise?  Yes.

7          MR. SIEGFRIED:   The one item that you didn't

8  touch upon, but I mention it not for purposes of a ruling

9  because it falls under the meet and confer issue that Mr.

10  Osen and I agreed to have, but which Mr. Radine also

11  raised at least tangentially today, regarding witnesses.

12  I asked Mr. Osen, since he has the burden of proof once

13  you have jurisdictional discovery.  To make out his

14  jurisdictional argument, I asked him whether he saw this

15  as a documents case and then the law as applied to the

16  documents, or whether he saw this as a case in which he

17  would require, in which he anticipated or potentially

18  anticipated using witness testimony, whether it's by

19  affidavit, deposition, whatever.

20          And when I first raised it several weeks ago or

21  over a month ago, He said he hadn't really given it any

22  thought, let him think about it, he understood the issue.

23  When we had the meet and confer, I raised it again

24  because we had received a letter in the interim that,

25  well, we don't know what to put in until we see your

1                          PROCEEDINGS                    48

2   papers, and we wrote back you have the burden of proof.

3   It's not a question of what we put in; it's a question of

4   what, because we have the right to depose a person if

5   you're planning to call a witness.  And it's your burden.

6   You're going to set forth the facts that you think are

7   relevant and why you think any transactions that the bank

8   may have engaged in through New York relate to, or that

9   your claims arise or relate to those transactions.

10          So we in the meet and confer, I think Mr. Osen

11  said he was inclined to believe that this was going to be

12  a documents and law case, that's fine.  We agreed to talk

13  about it further.  But I just wanted to put that on your

14  radar because clearly if we don't have an agreement about

15  that, I don't think this is all about hiding the ball.

16  This is about --

17          THE COURT:  No, you have to have an exchange of

18  information and perhaps there's going to be testimony

19  from a 30(b)(6) witness about some of these transactions

20  on the sheet or, I don't know, maybe somebody from one of

21  these banks.  I assume there's no dispute that these are

22  authentic records produced by the bank or the bank will

23  say these are real records that they have, but you may

24  dispute the, what they mean.  But that would be the

25  subject of testimony potentially, how they are

| | PROCEEDINGS                                          49 |
|---|---|
| 1 | |

1      interpreted.

2              Okay, well, I'm --

3      MR. SIEGFRIED:   I don't think there's an

4      authentication issue with respect to anything that's been

5      subpoenaed.

6              THE COURT:   Yes, right.

7              MR. SIEGFRIED:   But --

8              THE COURT:   Okay, so I'm just going to put a

9      pin on that and ask you to meet and confer, and I think

10     we do have a date for a next conference.  Is that right,

11     Chris?  We do, okay.  All right, well, have a Happy

12     Halloween, everyone.  Nice to see you.  We're adjourned.

13             MR. SIEGFRIED:   Thank you, Your Honor.

14             THE CLERK:   November 15.

15             THE COURT:   November 15, okay, well, then

16     that's good because if there's any motions to compel,

17     we'll know.  You can invite the banks to that, if there

18     are any motions to compel, you can invite the banks to

19     that conference.  Okay?  Thank you.

20             (Whereupon the matter was adjourned to November

21         15, 2022.)

1                                    PROCEEDINGS                                    50

2

3

4

51

C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, Averbach, et al.

versus Cairo Amman Bank, Docket #19cv0004, was prepared

using digital electronic transcription equipment and is a

true and accurate record of the proceedings.

Signature _____

CAROLE LUDWIG

Date:  October 26, 2022