# Exhibit B

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:                            :
                                  :  Docket #19cv0004
AVERBACH, et al.,                 :  19-cv-00004-GHW-KHP

                  Plaintiffs,     :

   - against -                    :

CAIRO AMMAN BANK,                 :  New York, New York
                                     October 25, 2022
                  Defendant.      :

------------------------------------ :

                      PROCEEDINGS BEFORE
              THE HONORABLE KATHARINE H. PARKER,
                 UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:          OSEN LLC
                         BY:  MICHAEL RADINE, ESQ.
                              DINA GIELCHINSKY, ESQ.
                              ARI UNGAR, ESQ.
                         190 Moore Street, Suite 272
                         Hackensack, New Jersey 07601


For Defendant:           DLA PIPER US LLP
                         BY:  JONATHAN SIEGFRIED, ESQ.
                              ANDREW PECK, ESQ.
                              ERIN COLLINS, ESQ.
                              MARGARET CIVETTA, ESQ.
                         1251 Avenue of the Americas
                         New York, New York 10020




Transcription Service:  Carole Ludwig, *Transcription Services*
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

```
1                          PROCEEDINGS                    3
2              THE CLERK:  Calling case 19cv004, Averbach
3   versus Cairo Amman Bank.  Beginning with the counsel for
4   the plaintiffs, please make your appearance for the
5   record.
6              MR. MICHAEL RADINE:  Good morning, Your Honor,
7   I'm Mike Michael Radine for the plaintiffs.  Do you mind
8   if I sit to speak?
9              THE COURT:   No, go right ahead.
10             MR. RADINE:   Thank you.  I'm joined by Dina
11  Gielchinsky and Ari Ungar.
12             THE COURT:  Hi, nice to see you.
13             MR. RADINE:   Nice to see you, Your Honor.
14             THE CLERK:  And counsel for the defendants,
15  please make your appearance for the record.
16             MR. JONATHAN SIEGFRIED:  Good morning, Your
17  Honor, Jonathan Siegfried, Andrew Peck, Erin Collins, and
18  Margaret Civetta.
19             THE COURT:  Nice to see everyone.  Thank you for
20  coming in on this rainy day, and I have your status
21  letter from October 20.  I thought we could go over some
22  of the issues in more detail.  The bank has been strongly
23  contesting the basis for jurisdiction, and it seems from
24  the letter that plaintiffs believe that the evidence
25  exchanged thus far supports jurisdiction, but I'd like to
```

```
 1                    PROCEEDINGS                    4
 2   hear a little bit more on that.
 3             MR. RADINE:   Sure, so, well, I can start there.
 4   What we've produced to them so far is 118 transactions,
 5   our records evidencing those transactions, and then we
 6   have about a dozen more that we located that we have
 7   informed them of̶n that we are processing to give them
 8   shortly, in the next day or so.  Of those 118, 101 of
 9   those are direct transactions that Cairo Amman Bank
10   processed through its correspondent account at Citibank
11   in̶o̶f̶ New York, and 17 are transactions that appear to
12   have been processed through a nested account they held at
13   Arab̶o̶u̶r Bb̶ank where Arab̶o̶u̶r Bb̶ank uses its correspondent
14   account in New York to process the transaction.
15             That structure of using a nested account to
16   process a transaction through New York, the
17   jurisdictional relevance of that structure is currently
18   sub judice before the Second Circuit in *Spetner v.*
19   *Palestine Investment Bank* as to whether that meets the
20   *Licci̶h̶e̶e* standard given that another bank is interposed
21   in that flow.
22             But, again, of the 118 we've produced so far,
23   that constitutes 17 of those transactions.  The rest are
24   direct transactions.
25             So they are transactions of significant amounts.
```

**Formatted:** Font: Italic

**Formatted:** Font: Italic

```
 1                    PROCEEDINGS            5
 2  We've produced a spreadsheet to them.  I have a copy if
 3  Your Honor would like to see it here.
 4          THE COURT:  Sure.  If you have it, I'll take a
 5  look.
 6          MR. SIEGFRIED:   Your Honor, we have objections
 7  to that since we haven't actually been able to even
 8  verify anything regarding these transactions actors.
 9          THE COURT:  Okay, I mean this is not evidence,
10  in any case.
11          MR. SIEGFRIED:  I understand it.
12          THE COURT:  So I'm not taking it for any
13  purpose other than this conversation.
14          MR. SIEGFRIED:  Sure.
15          MR. RADINE:  So this is the spreadsheet we
16  produced to them, so it does not include the last dozen
17  that we've located.
18          THE COURT:  Okay.
19          MR. RADINE:  So the way to read this, obviously
20  printing Excels is always a bit of a pain.
21          THE COURT:  Right.
22          MR. RADINE:  It goes, if you will, to the right
23  and down to the right and then down to the right and then
24  down.  So an entire row is expressed over a page and the
25  next page, if that makes sense.
```

```
 1                    PROCEEDINGS                    6
 2          THE COURT:   Uh huh.
 3          MR. RADINE:   So on the top half of the first
 4  page here we start with the nested account transactions.
 5  So you'll see there should be about 17 of them, and you
 6  have the first half of the information on page 1 and the
 7  second half on page 2.  And then below that with the
 8  direct transactions, again, first half on page 1, second
 9  half on page 2, and then repeating in that pattern
10  through the other pages.
11             So we've asked them if they dispute the accuracy
12  of this, but obviously we're not asking them if they
13  think this is jurisdictionally sufficient, just whether
14  this reflects the evidence we've produced to them.
15             THE COURT:   Okay.
16          MR. RADINE:   Now, we understand from them that
17  they do not think that transactional information is
18  sufficient to prove personal jurisdiction on its face.
19  They've asked us what information or evidence we intend
20  to put in at this stage and so on.  We're at a bit of a
21  loss as to what that would be under *Licci*.  The
22  evidence that relates to personal jurisdiction is
23  transactions for, relating to the terrorist group in
24  question from which the claims arise.
25             So we understand that they've argued that the
```

Formatted: Font: Italic

```
 1                        PROCEEDINGS                 7
 2  evidence, we have not – I'll just quote so I don't
 3  misstate it – that we have, quote, "not provided evidence
 4  sufficient under the Ddue Pprocess Cclause," close quote,
 5  to show, quote, "that the claims in this action raise
 6  arise out of or relate to any transfers processed through
 7  its correspondent accounts in New York," close quote,
 8  because, they argue, last quote, "transfers involving
 9  routine banking transactions and for humanitarian
10  services, for example, do not give rise to claims under
11  JASTA."
12          So our position is that's a merits question.
13  The law in this case, as Your Honor pointed out in two
14  reports and recommendations, is that the Second Circuit
15  noted that the use of a correspondent account standing
16  alone could be grounds to find personal jurisdiction so
17  long as the use is purposeful.  That's from Your Honor's
18  2020 opinion.
19          THE COURT:   Right.
20          MR. RADINE:   And purposeful, as this Court
21  explained, means repeated and volitional as we argued
22  these were and I think as this chart suggests.
23          THE COURT:   Can I ask you something about – I'm
24  sorry to interrupt, but I'm just looking at the dates of
25  these various transactions.   Is there relevance to the
```

```
 1                    PROCEEDINGS                 8
 2  dates, I mean when was, I see a bunch are Holy Land
 3  Foundation, some Interpal, some others.  Were any of
 4  these Holy Land Foundation transactions after this
 5  designation?
 6          MR. RADINE:   They were all after the Israeli
 7  designation of Holy Land Foundation which we alleged was
 8  publicized and, therefore, sufficient under Honickman.
 9  They're not after the U.S. designation because that
10  would've prevented the correspondent banks from
11  processing these transactions.
12          THE COURT:  Okay.  Okay.  So none of these are
13  post-U.S. designation?
14          MR. RADINE:   Right, there wouldn't be U.S.
15  dollar transactions post-ing U.S. designations.  So for
16  HLF that's the end of 2001, but for Interpal, of course,
17  that's 2003.  And then some entities weren't designated.
18          THE COURT:   Right, but you have Interpal
19  transactions from prior to the violence at issue.
20          MR. RADINE:   SIEGFRIED:  Yeah.  So anyway, the
21  personal jurisdiction, so obviously Kaplan and Lindey
22  make clear that what constitutes routine banking is for a
23  jury to decide.  Whether it's knowledge is sufficiently—
24  or, general awareness is sufficiently established from a
25  humanitarian purpose of a transactions and is a merits
```

```
                              PROCEEDINGS                   9
```

1

2  question that we'll obviously arrive to when we get into

3  merits discovery, but there's not been a court that's

4  held that a defendant's knowledge has to be evident on

5  the face of each transfer.  That could be proven in any

6  number of ways.

7           THE COURT:   At least for jurisdiction you're

8  saying.

9           MR. RADINE:   At least for jurisdiction, right.

10  So arising out of, which is their argument is on the due

11  process version of "arising out of."  There's the New

12  York version of "arising out of" and the due process

13  version.  According to their letter, they're contesting

14  the due process version.  Of course, as this Court noted,

15  they had not contested the New York "arising out of"

16  version in a motion to dismiss.  In any event, the Second

17  Circuit has never, they note this in *Licci* (phonetic),

18  found a case where plaintiff satisfied the New York rule

19  but not the due process rule.

20           As this Court noted, under the New York rule,

21  quote, "the foreign bank's use of its correspondent

22  accounts is not completely unmoored from the legal claim

23  regardless of the ultimate merits of the claim" is the

24  standard that Your Honor set out correctly.  And then as

25  for whether the – whether due process could operate

```
 1                          PROCEEDINGS                    10
 2   differently, Your Honor noted, quote, "CAB offered no on-
 3   point case authority supporting this argument." The
 4   Second Circuit does not appear to have seen it either."
 5   So we think that's that's for personal jurisdiction.
 6           Now, we want to come to understand more about
 7   how the bank operated that we think bears on the
 8   transactional element and the documents they could have,
 9   and that's where the 30(b)(6) deposition notice comes in.
10   And I can speak on that briefly, Your Honor.
11           THE COURT:  Yes.
12           MR. RADINE:  So we've noticed three issues to
13   them.  The first relates to the IT systems that the bank
14   used during the relevant period as they relate to
15   transaction processing.  So they have explained to us
16   before a little bit about their understanding of their
17   systems at the time.  They explained that they used the
18   Kindle Banking System in the relevant period.  That's
19   been taken offline, and they don't have – the system is
20   not supported anymore nor is the associated OS and
21   hardware.  And they mentioned they don't have backups and
22   archives.
23           It's been our experience working with banks in
24   these cases that what is not currently usable by the
25   bank's IT staff is not necessarily unrecoverable.
```

```
 1                    PROCEEDINGS              11
 2   Relevant data may sit on multiple systems, it may have
 3   been transferred to another system, recovery may be
 4   possible.  It may necessitate a vendor who specializes in
 5   recovery work.  In any event, we won't know until we
 6   ascertain what systems were used.  I'd also point out
 7   that that's a single system.  So in our experience banks
 8   use multiple systems.  We've seen that the system that
 9   runs the SWIFT database which its transactions are
10   processed through and other banks is not the same as
11   their core banking system which is what I believe the
12   Kindle system —likely is.  There may not be more to draw
13   from this line of inquiry, but we can't know until we
14   begin to have it.
15            The second issue is that of the CAB's use of
16   correspondent accounts and nested accounts.  As Your
17   Honor raised at our last conference, it's worth knowing
18   how the bank used its correspondent accounts generally,
19   it gives a sense of the jurisdictional contacts they had
20   when processing the transactions.  And then in the nested
21   account which is sub judice, the impact of that, in
22   Spetner, I would imagine the bank, just as much as us,
23   would like to know if CAB used its nested account in a
24   way that was similar or different than the defendant in
25   that case.
```

Formatted: Font: Italic

```
 1                          PROCEEDINGS                    12

 2            THE COURT:   And how did the defendant use the

 3   nested account in the cases pending before the Second

 4   Circuit?

 5            MR. RADINE:   So those transactions, when a

 6   customer of the bank wants to push a transaction, they

 7   will indicate who the ultimate beneficiary is.  And then

 8   those are instructions that the originator bank, the

 9   defendant, would then give to their bank where they hold

10   their nested account for further credit down the line

11   ultimately through New York and then to the opposing

12   party, the counterparty to the transaction.

13            So in a sense that when a bank holds a

14   correspondent account in New York, when they send a

15   transaction through New York, they're providing

16   instructions to each bank down the line as to moving it

17   along.  This just adds another bank.  So the question

18   would be, for instance, like what control does the

19   defendant have --

20            THE COURT:   Why does it go through a nested

21   account versus just going through its own, why would it

22   add a party instead of minimize the parties?

23            MR. RADINE:   So --

24            THE COURT:   What's the purpose of being --

25            MR. RADINE:   Sure, banks hold nested accounts
```

PROCEEDINGS                    13

for different reasons.  That's something we'd certainly

get into with them.  Sometimes they're unable to hold, a

New York bank ~~will~~ won't offer them an account or at

least an account with terms they want --

          THE COURT:   But we know that CAB did have some

correspondent accounts.

          MR. RADINE:   Right.  It could be a legacy

account that they had from before they had access to New

York accounts that they were still using.  These are all

things we would get into with them and see whether or not

that's a fruitful topic to understand.

          The last issue relates to their sale of relevant

branches to Palestine Islamic Bank.  They informed us

that whatever records were at those branches in the

Palestinian territories were transferred to the buyer

bank when they b~~r~~ought those branches because possession,

custody, and control can relate to whether or not you

have the right to demand records ba~~cn~~ck.  We just want to

understand what the agreement was as to those records,

document sharing, however that operated, whether

documents were transferred back to CAB at all.

          Now, on these topics we have a corresponding set

of document requests, we have four document requests that

relate to these topics.  CAB in a meet and confer told us

```
 1                   PROCEEDINGS                14
 2  maybe those records will answer our questions without the
 3  need for deposition.  We're, of course, open to that, to
 4  see those records and to see if that makes sense.  We
 5  think we'd likely, at least from our experience in the
 6  IT process that we've gone through with other banks, I
 7  imagine we would have follow-up questions.  But, of
 8  course, you know, we are happy to look at the documents
 9  first and talk to them about that.
10          THE COURT:   Okay.
11          MR. RADINE:   So the big takeaway, Your Honor,
12  is that between the continuing work of the banks that
13  we've issued subpoenas to and the deposition process,
14  we'd like to extend the discovery period.  We propose 90
15  days in part to get us past the holidays from which we
16  imagine we'll have a little bit less responsiveness from
17  the banks and so on, and that would put us on February 2.
18          THE COURT:   Right, well, we had November 14 as
19  completion of jurisdictional discovery.  So you want a
20  90-day extension on that.
21          MR. RADINE:   Yeah, I think November 4 is the
22  deadline, and the --
23          THE COURT:   Maybe I have a typo in my notes.
24          MR. RADINE:   Sure, November - so 90 days from
25  November 4 would be February 2.  Of course, we don't have
```

```
 1                    PROCEEDINGS              15

 2  the Court's decision on the R&R, so our feeling is is

 3  that this is time we can use productively to do this

 4  work.

 5          THE COURT:  Okay.  I'll hear from defendants

 6  next about these issues and also the extension of

 7  discovery.

 8          MR. SIEGFRIED:  Thank you, Your Honor.  Dealing

 9  about nesting, which is in your mind at the moment,

10  having looked at that chart, I don't want to - and you

11  also said before you're not deciding merits --

12          THE COURT:  No.

13          MR. SIEGFRIED:  -- at a status conference.  So

14  I'm not going to argue a great deal about the merits

15  other than to note a couple of things.  One, the very

16  beginning of their chart is replete with these so-called,

17  what they're now calling, nesting transfers.  Now, it's

18  interesting actually because the plaintiffs like to keep

19  changing their theory in this case.  First of all,

20  there's absolutely nothing in the complaint about

21  nesting.  In fact, as you may recall, what we brought to

22  the Court's attention is that allegations in the

23  complaint regarding these transfers, that they were all

24  through Citibank, were incorrect when made, when the

25  complaint was drafted.  And then when you inquired of Mr.
```

```
 1                      PROCEEDINGS                  16
 2   Osen about that issue when he was here, he said, oh,
 3   well, but we're not sure because the transfer slips don't
 4   necessarily show us whether it went through Citibank, and
 5   we don't have the complete transfer slips, so it may have
 6   gone through Citibank.
 7            I gather they've now, because they should, have
 8   retreated from that argument to now talk about it as a
 9   nesting argument.  And as far as a nesting argument is
10   concerned, Your Honor, since they raised it and since I
11   assume it will come up again, the case is Spetner v.
12   Palestinian Investment Bank, 495 F. Supp. 3d 96, a 2020
13   decision, in which not just any plaintiff but these
14   Pplaintiffs representeding by Mr. Osen and his firm, the
15   same counsel that you have before you, made every
16   conceivable argument under the sun to Judge, I think it's
17   Komitee is, is that --
18            THE COURT:   Who?
19            MR. SIEGFRIED:  K-O-M-I-T-T --
20            THE COURT:   Oh, Komitee.
21            MR. SIEGFRIED:  Komitee.  I don't know where
22   you put the accent on that.  Mad a whole bunch of
23   arguments because the situation was even more involved
24   than it is here.  They had three different nesting
25   theories.  And he carefully reviewed each one, and he
```

```
 1                    PROCEEDINGS                17
 2  said there was no personal jurisdiction.  That is the law
 3  as it stands right now.  Mr. Radine is correct that they
 4  have appealed to the Second Circuit.  Obviously, I
 5  wouldn't say anything about how you might judge the
 6  matter, but I think that if you read the decision, it's a
 7  fairly thorough, careful, detailed decision as to why
 8  that theory simply doesn't hold water.
 9            THE COURT:  Of course, that's only with respect
10  to 17 transactions.  The other ones are through --
11            MR. SIEGFRIED:  And let's go to the others.
12            THE COURT:  Yeah.
13            MR. SIEGFRIED:  Then we have a whole bunch of
14  NatWest transactions that, of course, didn't go through
15  New York.  A lot of them are in Sterling, some of them
16  are in (indiscernible), but they're not through Citibank
17  in New York.  There are --
18            THE COURT:  None of these are through New York?
19            MR. SIEGFRIED:  No, I'm not saying that, Your
20  Honor.  I've got a large sheet here, but I think that the
21  last time we looked, they keep making ongoing
22  productions, but the last time we looked, there were
23  maybe only a couple, two or three, that went through
24  Citibank.  So, again, this is why, when I objected
25  before, I said there was much to be said about this.
```

```
 1                        PROCEEDINGS                 18
 2   Then we have issues regarding this contention, by Mr.
 3   Radine, by the plaintiffs, that this is somehow a merits
 4   issue.  Your Honor, we will have the opportunity
 5   obviously to brief, and for you to consider, this issue,
 6   but the Ddue Pprocess clause, insofar as this is
 7   concerned, is not a fifth grade math class in which you
 8   say how many transfers were there and, therefore, oh,
 9   there must be jurisdiction.  Not any transaction will do.
10        The dDue pProcess clause, and everyonething from
11   the Supreme Court to the Second Circuit have been quite
12   clear, that the second part of this analyis, beyond the
13   number of transfers, which may be relevant to the issue
14   of purposefulness, the main part of due process is that
15   the claim must arise out of or relate to the transaction.
16   It's the nature of the transaction that is
17   extraordinarily important, and when we get to the merits
18   of this topic, we will address it, and, indeed, I think
19   you'll see that these claims do not, cannot relate to or
20   arise out of any of the transactions that they're listing
21   here.
22        You can - if it were otherwise, it would be the
23   case, I believe, that there'd be no distinction between
24   the maintenance of an account and a use account.  It's
25   hard to imagine that anybody has a correspondent account
```

```
1                        PROCEEDINGS                    19
2   and doesn't use it.  So the question is what is it using
3   it for?  What is the transaction?  And that is where I
4   think their case falls apart, and it is rather
5   interesting if, and I think plaintiffs understand this
6   because, quite frankly, if they had 110 transactions that
7   they really stood for what they would like to report in
8   court today, then I'm not sure why we're going through
9   seven more subpoenas to a whole bunch of banks or what
10  further evidence they need other than what they have
11  today.
12          So now let me turn to the rest of the - if I've
13  answered that question.
14          THE COURT:  Well, let me stop you for one
15  second --
16          MR. SIEGFRIED:  Sure.
17          THE COURT:  -- because there's - I see here,
18  looks like four transactions through New York in CAB's
19  New York correspondent accounts involving use of Al-
20  Hayeak (phonetic).  If the court - so the ones from Bank
21  One, from Texas, there's a bunch of those, and that's
22  Holy Land Foundation was founded out of Texas.  So I
23  guess my question is sort of a do you, is it your
24  position that if anything that the jurisdiction would be,
25  or venue would be appropriate in Texas versus New York,
```

1                         PROCEEDINGS                    20

2  assuming there was jurisdiction, assuming jurisdiction

3  was established through this correspondent bank accounts,

4  how does that impact where this case is being litigated

5  now?

6           MR. SIEGFRIED:  It's --

7           THE COURT:   Right?  Because there's four New

8  York and there's a lot of Texas.  So, and if it were, if

9  Texas were appropriate, do you want to be there versus is

10 this a more convenient venue for everyone?  I mean how

11 does that factor into the analysis?

12          MR. SIEGFRIED:  I would say New York is not a

13 convenient factor nor is Texas for purposes of a foreign

14 bank, and I'd rather, instead of responding off the cuff

15 to your comment, come back to you on it.

16          THE COURT:   Okay.

17          MR. SIEGFRIED:  But I think that, I don't think

18 we really get there because whether we talk about, as I

19 said, those Hayeek transactions, which I cannot believe

20 ultimately you will find differently than Judge Komitee

21 has, or with respect to these Bank One transactions which

22 also have issues around them, quite frankly, separate and

23 apart from their use.  I don't think we're going to end

24 up reaching that issue.  I just don't think they're

25 jurisdictionally sufficient either for purposes of Texas

```
 1                    PROCEEDINGS                21
 2  or for New York, quite frankly.
 3           THE COURT:  Okay.  You can address the
 4  remaining issues.
 5           MR. SIEGFRIED:   Okay, thank you.  And, by the
 6  way, I should add, Your Honor, or maybe the last point I
 7  should make is we did have a meet and confer with Mr.
 8  Osen in which hethey said, well, we'd like you to confirm
 9  the content of the transactions, and, frankly, I'll have
10  that conversation further with himthem offline.  I don't
11  actually understand the question, what the content of the
12  transaction is.
13           THE COURT:  Well, I assume they want to know do
14  you dispute that these transactions actually occurred
15  with these parties on these dates.
16           MR. SIEGFRIED:   If that's what they're asking
17  now, , iIt has its own set of issues.  So we'll have
18  that discussion with them.
19           With respect to the subpoenas, you know, at the
20  August 25 hearing, you set the deadline of November 4,
21  and you said I want you to really focus on the
22  jurisdictional issues.  And Mr. Osen said in response,
23  well, with respect to jurisdictional discovery, the
24  deadline for third-party banks, we'll obviously abide by
25  that.  You asked for the status of discovery at that
```

```
 1                    PROCEEDINGS                22
 2  point, he gave you the status of discovery, there was not
 3  a word mentioned about, oh, we want to issue more
 4  subpoenas.  There wasn't - then we have somewhere
 5  between, somewhere in the middle of September to late
 6  September, I'm not even sure they say they served them
 7  during that period.  I know that the subpoenas are dated.
 8  But supposedly they served something knowing what your
 9  discovery deadline was, and these subpoenaed banks are
10  not any of the correspondent banks in New York.  They're
11  not referred to in the complaint which identified the
12  correspondent accounts.  So this is - so we have
13  subpoenas going out to seven banks, close to within a
14  month or so of your discovery deadline, to banks which,
15  with whom we do not have any correspondent account in New
16  York.  And the subpoenas, as I read them, are for in each
17  case are for 23 years of records and for 74 or more
18  individuals and entities, notwithstanding the fact that
19  the complaint that is before us talks about five
20  individuals and 16 --
21            THE COURT:  So the subpoenas are covering more
22  than what's mentioned in the complaint?
23            MR. SIEGFRIED:  Absolutely, and, Your Honor, if
24  you look at the joint status report, what you see in the
25  plaintiff's section is that, I think the term they use is
```

```
1                    PROCEEDINGS              23
2    BNY, Bank of New York, has balked at the request for 23
3    years of, I don't know whether they say the 23 years, but
4    balked at the request, that they rejected multiple
5    compromises, and they only hope that it can be resolved
6    without judicial intervention.
7            In the meet and confer I asked Mr. Osen whether
8    the Bank of New York had any position as to whether it
9    even had documents going back to the relevant time
10   period, and I believe he told me  that at least for the
11   Bank of New York, he said we don't even know that we have
12   them going back that far.  Citibank had no documents,
13   none, zero, there's none produced by them.  And Standard
14   Charter, the earliest document that they have that
15   involves CAB, a CAB transfer, is 2005.
16           So the idea that seven subpoenas are now going
17   out for this breadth, one thing for sure, if Your Honor
18   is inclined to let this part of it go forward and to
19   extend on this basis, we certainly don't want to be back
20   here in 30 days, 60 days, or 90 days hearing that there
21   are yet another six subpoenas or that we are still in
22   negotiation trying to get records from banks over a 23-
23   year period, etc.
24           And that's relevant to another point regarding
25   this chart and to what's happened today.  There was a,
```

PROCEEDINGS                    24

what seems to have happened with some of these banks, it

happened with Standard Charter, happened with HSBC with

whom also CAB had no correspondent account, is when they

get the subpoena, which, yes, it says transactions with

CAB, then has a list of 74 individuals for 23 years.  As

a practical matter, I think we all know what the bank

does.  It takes the list, the exhibit B list and it

produces documents, transactions involving where those

identified entities appear.  So for~~the~~ HSBC which did

something like five productions over the last couple of

months, and produced a lot of documents, not a single one

refers to CAB.

        So this subpoena of the seven banks seems to be,

as a reason for extension, seems to rest on a rather thin

reed.  Again, we want to get past this discovery, we want

to get this motion, we think it's a good motion based

upon everything we've seen.  So if Your Honor's inclined

to give them some leeway, we understand, but we certainly

– this starts to become a real stretch late in the game

to try to develop evidence.

        On the – with respect to the 30(b)(6), again, I

thought we had a very practical conversation in the meet

and confer with Mr. Osen who, in all fairness, was the

only one who spoke at the meet and confer, but it's

```
 1                   PROCEEDINGS                25
 2  curious because you had directed that we provide
 3  plaintiffs with a letter regarding the sale of the
 4  branches --
 5            THE COURT:   Yes.
 6            MR. SIEGFRIED:   -- regarding the IT platforms.
 7  I think at one point there was an exchange where you
 8  asked Mr. Osen something to the effect of and what is the
 9  source codes or what's the operating systems going to
10  have to do with all of this.  But we provided that
11  information.  We provided that information, as Mr. Osen
12  acknowledged last time, back in July about the sale,
13  about the fact we didn't have transaction records, with
14  respect to the system.  It wasn't terribly vague.  It
15  said the bank is currently using Temenos, T-E-M-E-N-O-S,
16  T24 Core Banking System under IBM UNIX OS.  The system
17  was implemented during the period 2011 to 2013.  The
18  prior operating system was the Kindle Banking System.
19  The bank cancelled the license in 2013.  The Kindle
20  System is not supported anymore nor is the associated OS
21  and hardware.
22            Now, that's on July 29 they had that
23  information.  On Sunday evening, October, if I'm off by a
24  date, October 7 or 8, Sunday evening, they serve a
25  30(b)(6) deposition notice.  Between July and October
```

```
 1                      PROCEEDINGS                26
 2   there is no follow-up, there's no request for any
 3   documents relating to those issues.  And I asked Mr.
 4   Osen, number one, why would this be an efficient way to
 5   proceed.  I said if I come in with a 30(b)(6) witness in
 6   2022 about a system that hasn't been in effect since
 7   2013, regarding documents that are no longer retained,
 8   that's not supported, that was a licensed system, and the
 9   witness says what do you want me to tell you, I said then
10   you're going to tell me I gave you the wrong 30(b)(6)
11   witness.
12            THE COURT:  Well --
13            MR. SIEGFRIED:  So the point is, I said why
14   don't we - and I can't even tell you that we have the
15   documents, right, this is, again, a conversation that
16   occurred at the end of last week.  If we had the
17   documents, we'll give them to him --
18            THE COURT:  Right.
19            MR. SIEGFRIED:  -- and if he wants to go run
20   off to some expert and ask some expert, well, if that's
21   what they had and it was under a license and they no
22   longer have the thing, can you, I don't know what you can
23   do, but in any event somebody wants to say they think
24   they want to revive a system that's no longer there --
25            THE COURT:  You already confirmed that the data
```

```
 1                    PROCEEDINGS                   27
 2  from the relevant time period was not transferred --
 3           MR. SIEGFRIED:   Absolutely.
 4           THE COURT:   -- from Kindle to your system, the
 5  current system, is that correct?
 6           MR. SIEGFRIED:   Yes.
 7           THE COURT:   Okay, so what I'm hearing gives me
 8  concern, Mr. Radine, that what you're doing is outside of
 9  the scope of Rule 26(b) which confines discovery to
10  information that's relevant to the claims and defenses
11  and proportional to the needs of the case.  Why would you
12  be subpoenaing banks that, you know, with which CAB
13  didn't have correspondent bank accounts?  That doesn't
14  make any sense.
15           And further why would CAB have knowledge about
16  the Kindle system?  Wouldn't the appropriate inquiry be
17  of Kindle if it even still exists as to what's going on
18  with its system and did it ever retain any information?
19  I doubt that it would've retained sensitive banking
20  information.  I doubt that the bank, any bank would allow
21  that.  But isn't a proper inquiry of Kindle rather than
22  CAB since it was merely licensing that program?  I'm not
23  really understanding what you're doing or looking for or
24  why this is relevant to jurisdiction.
25           MR. RADINE:   Sure, well, I'll take those in
```

```
1                         PROCEEDINGS                28
2   parts.  I'll start with the banks.  Right, those are not
3   CAB's correspondent banks.  Those are the banks that are
4   on the other side of the transaction.  Every --
5             THE COURT:  Other side of what transaction?  It
6   seems like a fishing expedition, that you're just
7   subpoenaing random banks with which CAB doesn't have any
8   existing relationships to see, hey, did you ever have any
9   kind of transaction that somehow made its way to CAB?  I
10  mean how is that going to jurisdiction?
11            MR. RADINE:  Sure.  So this chart, Your Honor,
12  is consisting entirely of records produced by banks that
13  they don't have a correspondent banking relationship with
14  CAB except for the nested account at Arab Bank.
15            THE COURT:  Right, but this is - what defendant
16  is saying is this is not even helping you.  It doesn't
17  even have New York except for these four transactions
18  with use of Al-Hayeak.
19            MR. RADINE:  I'm at a little bit of a loss as
20  to what that means.  So, again, just to walk through how
21  this works.  The - so let's look at the direct transfers
22  that start on page 1, go to page 2.  So the column, so
23  the beneficiary bank in these is Cairo Amman Bank.  You
24  can see that in that column.  And the beneficiary's
25  correspondent bank is in the first column on page 2, 4,
```

```
 1                    PROCEEDINGS                  29
 2  and 6.  So in every --
 3           THE COURT:   Well, 1 of 6 goes with 2 of 6, is
 4  that right?
 5           MR. RADINE:   Correct, so --
 6           THE COURT:   And so the originating bank we
 7  have, let's just take Holy Land Foundation with Texas
 8  because that's at least in the United States as opposed
 9  to the U.K.  Okay?  So the originating bank says Bank One
10  Texas.
11           MR. RADINE:   Right.
12           THE COURT:   And then there's a blank for
13  originator's correspondent bank.
14           MR. RADINE:   Right.
15           THE COURT:   And then – I'm just looking at the
16  third line on page 1, and that says the beneficiary party
17  is the Halul Zakat Committee, and the beneficiary bank is
18  CAB.  So that's, CAB didn't, as I understand it, didn't
19  originate this transaction.  It received money from Holy
20  Land Foundation that was deposited into the account of
21  its customer Halul Zakat Committee.  Is that how I'm to
22  interpret this?
23           MR. RADINE:   Yes.
24           THE COURT:   Okay.
25           MR. RADINE:   So --
```

```
 1                          PROCEEDINGS                    30
 2              THE COURT:   And there's no intermediary --
 3              MR. RADINE:   No.
 4              THE COURT:   -- bank listed for this.   Where is
 5    New York in this picture?
 6              MR. RADINE:   That is in column, the first
 7    column on page 2.   That is the, if you look at the column
 8    name, beneficiary's correspondent bank, it's beneficiary
 9    bank's correspondent bank.   I believe that's clear --
10              THE COURT:   Well, okay, so I don't think
11    there's a dispute that CAB had a correspondent account
12    with Citi.   But this transaction - is this - I don't
13    understand this transaction to have gone through Citi.
14    Are you saying that it did go through Citi?
15              MR. RADINE:   Yes --
16              THE COURT:   You're saying that - are you saying
17    that Bank One in Texas transferred the money to Citi in
18    New York, then transferred the money to CAB in wherever
19    this was, Lebanon or Israel or some place, where?
20              MR. RADINE:   Yeah.   There's not a word on this
21    that's our assumption.   I bet Tthe bank would've done it
22    through their correspondent account.   That means on the
23    face of the transfer record that we have that it says
24    Citibank New York for further credit of Cairo Amman Bank,
25    Hebron, etc.   That's true for every single one of these
```

```
 1                    PROCEEDINGS                    31
 2   transactions.  In fact, it's wherever a document might be
 3   missing a piece of information, we might have a blank,
 4   but in every instance these are coming through the
 5   Citibank account.  That's in the beneficiary's
 6   correspondent bank column, in every single instance.
 7   Some of them are through Amex in New York.
 8            THE COURT:  So the - so Holy Land Foundation
 9   says, hey, we want to send money to Halul Zakat
10   Committee, and they say, well, our account is at CAB in
11   Lebanon, and so NatWest initiates it and it gets
12   deposited.  And what I'm hearing CAB say is how is it
13   engaging in anything volitional I guess, simply receiving
14   the money through this mechanism.
15            MR. RADINE:  Yes, Your Honor already ruled on
16   that issue --
17            THE COURT:  Right.
18            MR. RADINE:  -- and held correctly that under
19   Arcapita and Amigo Foods receiving a transaction rather
20   than rejecting it qualifies as volitional for personal
21   jurisdiction purposes.
22            All of the transactions, including all the
23   NatWest ones, I don't know why he's suggesting otherwise,
24   went through New York.  Again, you can see the NatWest
25   ones because they say NatWest in the originator bank, and
```

```
 1                    PROCEEDINGS                32
 2   then if you look at the corresponding row in the
 3   beneficiary's correspondent bank where it says Citi
 4   throughout, that's not an assumption we're making.  We're
 5   taking that off of the transaction records we have.
 6             THE COURT:   I see, so --
 7             (interposing)
 8             THE COURT:   So for the U.K., just taking the
 9   first, well, just taking the first NatWest Interpal
10   transaction, so NatWest in the U.K., Interpal says we
11   want to give money to the Beiate Fajjar's Zakat Committee
12   --
13             MR. RADINE:   Yes.
14             THE COURT:   So they, NatWest then goes through
15   NatWest U.K. --
16             MR. RADINE:   Well, they had a branch in New
17   York which is why I think it's not listed.  So they
18   would've cleared it themselves through New York.  They
19   would transfer it across the books ofto the Federal
20   Reserve Bank in New York --
21             THE COURT:   Oh, because it was U.S. dollar
22   transaction --
23             MR. RADINE:   Correct.
24             THE COURT:   -- they go through their own U.S.
25   account and then switch it to Citi.  Oh, no, here they
```

```
 1                    PROCEEDINGS                  33
 2  switch it to Amex Bank.
 3          MR. RADINE:   Yes.
 4          THE COURT:   And then to CAB where the recipient
 5  has the account.
 6          MR. RADINE:   Correct.  This is the same
 7  structure as in Litcchi, precisely.  In fact, Amex is the
 8  exact correspondent bank in Lictchi.
 9          MR. SIEGFRIED:   Your Honor, may I jump in for
10  one second --
11          THE COURT:   Yes.
12          MR. SIEGFRIED:   -- because it's relevant to
13  your question.
14          THE COURT:   Yes.
15          MR. SIEGFRIED:   We didn't have a correspondent
16  account at Amex.  So the very first example that you're
17  using is NatWest has actually - I'll back up for one
18  second and try not to get into merits of the argument.
19  But NatWest either chose, for whatever reason, to send
20  the transfer through Amex, fine, but that has nothing to
21  do with us, or sometimes, Your Honor, under the system
22  that actually happens under Swift, the bank, as I think
23  you probably know, doesn't even make the originating
24  bank, NatWest in this case, for an Interpal transaction,
25  doesn't even make the decision.  It puts it into Swift,
```

**Formatted:** Font: Italic

**Formatted:** Font: Italic

```
 1                   PROCEEDINGS                34
 2  and the Swift computers do whatever they do --
 3            THE COURT:   System just does its stuff.
 4            MR. SIEGFRIED:   -- and they send something
 5  through.  So I don't see how that gets to be the
 6  volitional use of a correspondent, of its correspondent
 7  account in New York.
 8            THE COURT:   But you did have a correspondent
 9  account with Citi.
10            MR. SIEGFRIED:   We did have a correspondent
11  account with Citi, but I think the way we got into this
12  line of questioning was you posed a simple question which
13  is with respect to these seven new subpoenas that they
14  want to serve which are not to the CAB correspondent
15  banks, what is the relevance of that, why is that a Rule
16  26(b) request --
17            THE COURT:   Right, right.
18            MR. SIEGFRIED:   -- and I'm actually not sure I
19  heard the answer to that question.
20            THE COURT:   Yes, well, let's go back to that,
21  Mr. Radine, what is the relevance?
22            MR. RADINE:   Sorry, if I just - I want a, just
23  a clean record.  A bank can't force a transaction through
24  an intermediate bank that doesn't have a correspondent
25  relationship.  Of these seven transactions with Amex - I
```

```
 1                    PROCEEDINGS                35
 2  don't know sitting here, the story, what appears to be
 3  the case is they did have a correspondent account with
 4  that bank.  Sitting here I don't know.  We're pulling
 5  this from the face of the transaction.  We've been
 6  through the - that's not something I think is
 7  controversial or obviously --
 8            THE COURT:  Well, it is because CAB is saying
 9  they didn't have a correspondent bank with, they didn't
10  have a correspondent banking relationship with Amex or
11  here's Bank of New York --
12            MR. RADINE:  Bank of New York I think they
13  concede.  But, Your Honor, this sounds like grounds all
14  the more to have a 30(b)(6) because they're denying
15  having an account that we have on paper.  They're denying
16  it here in court.  It's not under oath.  It's a great
17  question to ask them in a 30(b)(6) context.
18            THE COURT:  Okay, but that answers the question
19  about why you might want to have a 30(b)(6), you might
20  want to have a witness explain what the different
21  relationships were, but that doesn't go to the subpoenas
22  onto these other banks.
23            MR. RADINE:  So these are banks that we
24  understand would be likely on the other side of the
25  transactions because they are, for instance, either the
```

```
 1                    PROCEEDINGS                36
 2  biggest players in the markets where a lot of these Hamas
 3  affiliated entities are or because we have other records
 4  that have attached them to entities like that.  They have
 5  not moved, of course, to quash.
 6            THE COURT:   So you're trying to get reverse
 7  information essentially.
 8            MR. RADINE:   Sure, this whole chart --
 9            THE COURT:   These other banks - so these other
10  - you are speculating that these other banks have
11  accounts with Hamas entities, not all of which are even
12  listed in your complaint, and those entities might have
13  asked their banks to send money to somebody who had an
14  account with Cairo Amman Bank.  So it sounds like a
15  fishing expedition is really what it sounds like.
16            MR. RADINE:   Or they're the correspondent bank
17  for - they don't have to have the accounts themselves.
18  They can also be in a correspondent position.  These
19  banks have New York branches which is why --
20            THE COURT:   But you don't know, as you sit here
21  today, whether - you don't know who the customers of
22  these subpoena recipients are or whether they ever
23  initiated a banking transaction that went to a customer
24  of CAB.  You don't even know that.
25            MR. RADINE:   But these banks are the choke
```

```
 1                    PROCEEDINGS                    37
 2   points essentially, rather than, for instance,
 3   subpoenaing all 10,000 banks in Germany, you have
 4   Commerzbank, the largest sort of clearing bank for
 5   Germany, and I believe we recently got a transaction hit
 6   on that.  So so far it's been productive.
 7            THE COURT:   You got one hit out of how many
 8   subpoenas and how many records and years?  I mean this is
 9   really excessive it seems, and really how are you going
10   to demonstrate jurisdiction through this?
11            MR. RADINE:   I'm not sure how it's to the
12   defendant's prejudice that we reach out with subpoenas.
13   They've produced nothing --
14            THE COURT:   Well, the prejudice is they keep
15   coming into court.  They're waiting to brief the
16   jurisdictional issue on the merits as opposed to under a
17   Rule 12 standard, and they're spending attorney's fees
18   involving this, and then they're going to have to prepare
19   a witness for a 30(b)(6) deposition on a topic that it
20   seems, I don't know understand why they would have any
21   knowledge of it at all.  Why would they have knowledge on
22   this other company's system that they no longer use?
23            MR. RADINE:   I'll turn to the 30(b)(6) thing.
24   My understanding is, first, a party can't object to the
25   relevance of a subpoena.  That's something that the
```

```
 1                    PROCEEDINGS                38
 2  subpoena recipient --
 3           THE COURT:  Well, that is true, but at the same
 4  time you're asking for an extension of discovery based on
 5  that, and you are bound by Rule 26(g) and 26(b) to seek
 6  discovery that is consistent with the rules relevant to
 7  the claims and defenses and proportional to the needs of
 8  the case.  So, yes, that is true that CAB may not have
 9  standing to object on relevance grounds, but you as an
10  officer of the court have an obligation to utilize the
11  Federal Rules consistent with what they say.
12           MR. RADINE:  So far, Your Honor, we have only
13  gotten records from third-party banks that don't have a
14  correspondent relationship with CAB.  If we didn't have
15  access to records like those, we'd be at zero instead of
16  101 on this list right here.  We are meeting and
17  conferring with those banks, we take their objections
18  seriously, and work on narrowing the subpoena with each
19  of them.  They're obviously free to move to quash, but so
20  far we've had productive conversations with them, and
21  some of them have been producing already, some are still
22  working on it, as he mentioned, Standard Chartered Bank,
23  which, by the way, owned Amex or now owns Amex Bank,
24  (indiscernible) that bank, produced records that went
25  back to '05.  We're obviously asking them to look back
```

```
 1                     PROCEEDINGS                    39
 2   further.
 3             I don't think with the defendant producing
 4   nothing that we shouldn't be allowed to reach out to
 5   banks that we have at least a reason to believe can run a
 6   search --
 7             THE COURT:   What is the reasonable belief?  It
 8   sounds - you're not even including entities that are
 9   mentioned in the complaint.
10             MR. RADINE:   The company, Your Honor, I --
11             THE COURT:   It's really speculation.  Has
12   somebody told you, oh, Standard Chartered has an account
13   with this particular entity that's listed in the
14   complaint, has somebody told you that?
15             MR. RADINE:   They're likely to be - well,
16   they're likely to be, to have the role rather of a
17   correspondent bank.  We subpoenaed their New York
18   branches for each of these banks rather than casting
19   about around the world.  There's only so many banks which
20   do dollar clearing at all, and any transaction from
21   around the world that comes through their bank for dollar
22   clearing is something that they would have a record of or
23   at least would have had a record of at the time.  So --
24             THE COURT:   Yes, that may all be true, but it
25   is still speculation that you're going to have a hit on
```

```
 1                      PROCEEDINGS                40
 2  anything that is relevant.
 3          MR. RADINE:   And as for the list – well, I
 4  think, Your Honor, that we are, again, targeting a
 5  limited set of banks that we think have the most
 6  likelihood of being in that position.  Obviously, the
 7  names are names that we understand as Hamas customers and
 8  entities.  We didn't understand the complaint has a
 9  necessity to be a directory of every Hamas operative or
10  entity.  That's something that expands during discovery
11  that we are seeking with those banks.
12          If I could turn to the deposition --
13          MR. SIEGFRIED:   Your Honor, sorry, can I jump
14  in on that for a moment?  Apart from everything you've
15  just said, the last statement is an extraordinary
16  statement.  So your – we are arguing or will be arguing
17  that the Court doesn't have personal jurisdiction with
18  respect to the claims asserted in the complaint.  This
19  was no tiny complaint.  This was a very long complaint
20  which listed five individuals, sixteen or seventeen
21  entities, a lot of detail about it.  And now the argument
22  is, well, we think there may be some banks out there, we
23  know they're not the correspondent accounts, they may
24  have had customers or sent money to 70 some odd other
25  individuals, and maybe we'll find a hit that actually
```

```
 1                        PROCEEDINGS                    41
 2  went through CAB.  And then what?  So they did a transfer
 3  to somebody who's not even in the complaint.  So now
 4  they're going to argue, well, that's a Hamas person and,
 5  therefore, there's jurisdiction even though those persons
 6  and entities aren't referenced in the complaint.
 7            And this is all coming, we haven't heard, A,
 8  when they, whether they even effected the service.  This
 9  is all coming close to your discovery deadline when they
10  said they would abide by the discovery deadline.  And it,
11  you know, I don't normally want to use the word fishing
12  expedition, I'm glad that you did, in this circumstance,
13  but this is the problem, and, again, when we get into
14  this chart eventually, you'll see that, I mean there are
15  transfers to entities that they refer to aren't, again,
16  aren't in the complaint.
17            So I understand they want to use the
18  jurisdictional discovery to do all kinds of things, but
19  that's not what this is about.  The 30(b)(6), again, what
20  I said, I'm not even sure why that's a 30(b)(6).  If what
21  they want is a representation or a statement as to who
22  the correspondent accounts were, ~~wethey~~ could do that.
23  That hardly requires a 30(b)(6) deposition to do that.
24  Actually, Mr~~s~~. Osen said I will work with you efficiently
25  on that.
```

```
1                        PROCEEDINGS                42

2              But I think you're getting a sense of the

3     problem that we have.  This is costly, this is, we're not

4     the ones who brought an action 22 years after the events.

5     They're stuck with the fact that having waited so long,

6     these banks don't have records --

7              THE COURT:   Well, to be fair, the law changed,

8     and --

9              MR. SIEGFRIED:   And it's within --

10             THE COURT:   -- allowed the aiding and abetting

11    claim.

12             MR. SIEGFRIED:   It does, but to be equally

13    fair, these plaintiffs, it's not just any plaintiff,

14    these plaintiffs sued Arab Bank, they sued NatWest, they

15    sued Credit Lyonnais.  It's the same plaintiffs, the same

16    claims, the same attacks, the same injuries.  They just

17    discovered 20 years after the fact CAB?

18             So they get the discovery, they have their

19    complaint.  But it has to be - this is why we're pushing

20    back.  Again, we want to be reasonable, but we don't want

21    to be doing this months and months.  And there's an

22    additional prejudice, as I said, which is it is costly

23    because when they go and they subpoena somebody like

24    HSBC, as I used as an example before, HSBC produces

25    thousands of pages of documents which we then have to
```

```
 1                    PROCEEDINGS                43
 2  review.
 3          THE COURT:   Right.
 4          MR. SIEGFRIED:   And for nothing, for zero, zero
 5  transactions.
 6          THE COURT:   Well, it seems to me that there's
 7  really not a basis to extend discovery by 90 days.  I'll
 8  extend discovery to December 9.  And if you are seeking
 9  to move to compel compliance with these subpoenas, those
10  have to be filed in November by November 11, any motions
11  to compel.
12          MR. RADINE:   Okay.  Did Your Honor want to be
13  address the 30(b)(6) statements discussion?
14          THE COURT:    Well, for the 30(b)(6) you all
15  still have to meet and confer.  It sounds like you're not
16  done with that process from what I've heard, and I
17  understand why you may want some testimony about exactly
18  how the correspondent banking relationship worked, have
19  something under oath about what were the correspondent
20  banking relationships at the relevant time period.  So I
21  understand that, but it seems to me that you can further
22  meet and confer on that.
23          MR. RADINE:   That's fine.  We heard a number of
24  inaccuracies about the description of the IT systems and
25  so on, but that can be the subject of the meet and confer
```

```
 1                      PROCEEDINGS              44
 2  process.
 3           THE COURT:   Yeah, I'm not limiting right now
 4  the 30(b)(6) topics.  I'm just expressing some skepticism
 5  about the need for some of the topics, but you should
 6  still meet and confer on those.  Because it seems to me
 7  there's a real question of what was happening with some
 8  of these transactions that you're listing here.  I mean
 9  how many of these transactions even involve entities
10  listed in the complaint?
11           MR. RADINE:   I believe this list should
12  correspond to the complaint.  I don't --
13           THE COURT:   Obviously, I recognize some of the
14  names.
15           MR. RADINE:   Yeah, I mean Holy Land Foundation
16  is on most of, a lot of these.  Interpal is on a lot.  I
17  think there'd be very few that aren't.
18           THE COURT:   Right, but the point is what does
19  CAB have to do with it?  So what if Holy Land Foundation
20  has an account with Bank One in Texas?  What does that
21  have to do with CAB?  The question is is it going to, in
22  these transactions, is it going to a CAB client that is
23  mentioned in the complaint?  That would be relevant.  So
24  my question is really the beneficiary parties because
25  that's what we're looking at here, what the beneficiary
```

```
 1                     PROCEEDINGS                45
 2  parties, how many of these are named in the complaint?
 3  Has anybody taken stock of that?
 4          MR. RADINE:   Sure.  I can tell you I see mostly
 5  look in the beneficiary column, Your Honor, I see, again,
 6  mostly, a lot of Holy Land Foundation.  The Zakat
 7  Committees were all in the complaint, I'm sure of that.
 8  Taha's in the complaint, Mohamed Salah Taha is in the
 9  complaint.  So I don't see, excuse me, any, yeah, I don't
10  know about every single one, but it looks like the
11  overwhelming - Al-Mujama~~Ombu Jama (phonetic)~~ is the
12  central headquarters~~,~~ institution of Hamas.  So I think
13  that would certainly qualify.  ~~Rami~~WAMY ~~(phonetic)~~ is in
14  the complaint.  I don't see any that aren't, which isn't
15  to say my eyes aren't skipping over one looking at this
16  list now, and obviously I don't understand the law to
17  suggest that evidence that's outside the complaint isn't
18  sufficient on summary judgment.  Discovery often will --
19          THE COURT:   Well, it has to be - discovery has
20  to be relevant to the claims and defenses, and so, yes,
21  discovery may involve information that's not included,
22  facts that are not included in the complaint, but they
23  still have to be facts relevant to the claims and
24  defenses.  So that's the limitation.
25          MR. SIEGFRIED:   I might be able to help Mr.
```

```
 1                        PROCEEDINGS                46
 2   Radine out with his eyes on page 2 which is going no
 3   further than page 2.  The ~~Halal~~ Halul Zakat Committee is
 4   not mentioned in the complaint.  The ~~Suwad~~ Silwad
 5   Municipality is not mentioned in the complaint --
 6              THE COURT:  Okay.  Well, there's some and
 7   there's some not.  Okay.
 8              MR. SIEGFRIED:  Exactly.
 9              THE COURT:  So this is supposed to be related
10   to jurisdiction as opposed to this general awareness
11   which may potentially be slightly broader, and that's
12   what you're, that's the - so it sounds to me like maybe
13   some of these subpoenas are going beyond jurisdictional
14   discovery and going into potentially this general
15   awareness element.  There's some argument that you don't
16   want to subpoena banks twice if they're going to look for
17   documents.  At the same time it seems like they're quite
18   broad.
19              I'm going to direct you to meet and confer on
20   the Rule 30(b)(6).  I'm not going to extend
21   jurisdictional discovery any further beyond the December
22   11 date.
23              MR. RADINE:  December 11?
24              THE COURT:  Isn't that what I said?
25              ATTORNEY:  December 9.
```

```
 1                      PROCEEDINGS               47

 2           THE COURT:   December 9, sorry.  November 11 is

 3  the date for any motions to compel.  And I'll issue an

 4  order with that revised schedule.  Are there other items

 5  that plaintiffs wanted to raise today?

 6           MR. RADINE:   I believe that is it for us, Your

 7  Honor.

 8           THE COURT:   Anything else defense counsel would

 9  like to raise?  Yes.

10           MR. SIEGFRIED:   The one item that you didn't

11  touch upon, but I mention it not for purposes of a ruling

12  because it falls under the meet and confer issue that Mr.

13  Osen and I agreed to have, but which Mr. Radine also

14  raised at least tangentially today, regarding witnesses.

15  I asked Mr. Osen, since he has the burden of proof once

16  you have jurisdictional discovery.  To make out his

17  jurisdictional argument, I asked him whether he saw this

18  as a documents case and then the law ~~i~~as applied to the

19  documents, or whether he saw this as a case in which he

20  would require, in which he anticipated or potentially

21  anticipated using witness testimony, whether it's by

22  affidavit, deposition, whatever.

23           And when I first raised it several weeks ago or

24  over a month ago, He said he hadn't really given it any

25  thought, let him think about it, he understood the issue.
```

```
 1                      PROCEEDINGS                48
 2   When we had the meet and confer, I raised it again
 3   because we had received a letter in the interim that,
 4   well, we don't know what to put in until we see your
 5   papers, and we wrote back you have the burden of proof.
 6   It's not a question of what we put in; it's a question of
 7   what, because we have the right to depose a person if
 8   you're planning to call a witness.  And it's your burden.
 9   You're going to set forth the facts that you think are
10   relevant and why you think any transactions that the bank
11   may have engaged in through New York relate to, or that
12   your claims arise or relate to those transactions.
13             So we in the meet and confer, I think Mr. Osen
14   said he was inclined to believe that this was going to be
15   a documents and law case, that's fine.  We agreed to talk
16   about it further.  But I just wanted to put that on your
17   radar because clearly if we don't have an agreement about
18   that, I don't think this is all about hiding the a ob all.
19   This is about --
20             THE COURT:   No, you have to have an exchange of
21   information and perhaps there's going to be testimony
22   from a 30(b)(6) witness about some of these transactions
23   on the sheet or, I don't know, maybe somebody from one of
24   these banks.  I assume there's no dispute that these are
25   authentic records produced by the bank or the bank will
```

```
1                    PROCEEDINGS                49
2  say these are real records that they have, but you may
3  dispute the, what they mean.  But that would be the
4  subject of testimony potentially, how they are
5  interpreted.
6            Okay, well, I'm --
7            MR. SIEGFRIED:   I don't think there's an
8  authentication issue with respect to anything that's been
9  subpoenaed.
10           THE COURT:   Yes, right.
11           MR. SIEGFRIED:   But --
12           THE COURT:   Okay, so I'm just going to put a
13 pin on that and ask you to meet and confer, and I think
14 we do have a date for a next conference.  Is that right,
15 Chris? We do, okay.  All right, well, have a Happy
16 Halloween, everyone.  Nice to see you.  We're adjourned.
17           MR. SIEGFRIED:   Thank you, Your Honor.
18           THE CLERK:   November 15.
19           THE COURT:   November 15, okay, well, then
20 that's good because if there's any motions to compel,
21 we'll know.  You can invite the banks to that, if there
22 are any motions to compel, you can invite the banks to
23 that conference.  Okay?  Thank you.
24           (Whereupon the matter was adjourned to November
25     15, 2022.)
```

1                           PROCEEDINGS                          50

2

3

4

5

6

7

```
 1                                              51

 2                    C E R T I F I C A T E

 3

 4         I, Carole Ludwig, certify that the foregoing

 5  transcript of proceedings in the United States District

 6  Court, Southern District of New York, Averbach, et al.

 7  versus Cairo Amman Bank, Docket #19cv0004, was prepared

 8  using digital electronic transcription equipment and is a

 9  true and accurate record of the proceedings.

10

11

12

13  Signature _____

14                    CAROLE LUDWIG

15  Date:  October 26, 2022

16

17

18

19

20

21

22

23

24

25
```