

OSEN LLC
ATTORNEYS AT LAW

Hackensack, New Jersey 07601
201 265 6400 F: 201 265 0303

ray, New York, New York 10018
T: 212 354 0111
www.osenlaw.com

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/02/2022

November 1, 2022

**VIA ECF**

Hon. Katharine H. Parker
United States Magistrate Judge
United States District Court, Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

The parties' proposed changes to the transcript for the October 25, 2022 case management conference are approved. The transcription service that prepared the transcript is respectfully directed to incorporate the changes. The parties shall send a copy of this order to the transcription service.

SO ORDERED:

*Katharine H. Parker*

HON. KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE 11/02/2022

Re:  ***Averbach et al. v. Cairo Amman Bank*, 19-cv-00004-GHW-KHP**
**Letter Motion Requesting Approval of October 25, 2022, Transcript Errata**

Dear Magistrate Judge Parker:

At Chambers' instruction, and at the request of the transcription service that prepared the transcript for the October 25, 2022, case management conference, we write jointly on behalf of the parties to request that the Court approve the proposed changes to the transcript attached hereto as a clean document in **Exhibit A** and a redline in **Exhibit B**.

Respectfully submitted,

/s/ Dina Gielchinsky

Encls.

cc:  All Counsel

# Exhibit A

```
                  UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                            :
                                    Docket #19cv0004
AVERBACH, et al.,                 : 19-cv-00004-GHW-KHP

                  Plaintiffs,     :

   - against -                    :

CAIRO AMMAN BANK,                 : New York, New York
                                    October 25, 2022
                  Defendant.      :

------------------------------------ :

                     PROCEEDINGS BEFORE
             THE HONORABLE KATHARINE H. PARKER,
               UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:          OSEN LLC
                         BY:  MICHAEL RADINE, ESQ.
                              DINA GIELCHINSKY, ESQ.
                              ARI UNGAR, ESQ.
                         190 Moore Street, Suite 272
                         Hackensack, New Jersey 07601

For Defendant:           DLA PIPER US LLP
                         BY:  JONATHAN SIEGFRIED, ESQ.
                              ANDREW PECK, ESQ.
                              ERIN COLLINS, ESQ.
                              MARGARET CIVETTA, ESQ.
                         1251 Avenue of the Americas
                         New York, New York 10020




Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

| | |
|---|---|
| 1 | PROCEEDINGS 3 |
| 2 | THE CLERK:  Calling case 19cv004, Averbach |
| 3 | versus Cairo Amman Bank.  Beginning with the counsel for |
| 4 | the plaintiffs, please make your appearance for the |
| 5 | record. |
| 6 | MR. MICHAEL RADINE:  Good morning, Your Honor, |
| 7 | I'm Michael Radine for the plaintiffs.  Do you mind if I |
| 8 | sit to speak? |
| 9 | THE COURT:  No, go right ahead. |
| 10 | MR. RADINE:  Thank you.  I'm joined by Dina |
| 11 | Gielchinsky and Ari Ungar. |
| 12 | THE COURT:  Hi, nice to see you. |
| 13 | MR. RADINE:  Nice to see you, Your Honor. |
| 14 | THE CLERK:  And counsel for the defendants, |
| 15 | please make your appearance for the record. |
| 16 | MR. JONATHAN SIEGFRIED:  Good morning, Your |
| 17 | Honor, Jonathan Siegfried, Andrew Peck, Erin Collins, and |
| 18 | Margaret Civetta. |
| 19 | THE COURT:  Nice to see everyone.  Thank you for |
| 20 | coming in on this rainy day, and I have your status |
| 21 | letter from October 20.  I thought we could go over some |
| 22 | of the issues in more detail.  The bank has been strongly |
| 23 | contesting the basis for jurisdiction, and it seems from |
| 24 | the letter that plaintiffs believe that the evidence |
| 25 | exchanged thus far supports jurisdiction, but I'd like to |

1  
2  hear a little bit more on that.

3      MR. RADINE:   Sure, so, well, I can start there.

4  What we've produced to them so far is 118 transactions,

5  our records evidencing those transactions, and then we

6  have about a dozen more that we located that we have

7  informed them of that we are processing to give them

8  shortly, in the next day or so.  Of those 118, 101 of

9  those are direct transactions that Cairo Amman Bank

10 processed through its correspondent account at Citibank

11 in New York, and 17 are transactions that appear to have

12 been processed through a nested account they held at Arab

13 Bank where Arab Bank uses its correspondent account in

14 New York to process the transaction.

15     That structure of using a nested account to

16 process a transaction through New York, the

17 jurisdictional relevance of that structure is currently

18 sub judice before the Second Circuit in *Spetner v.*

19 *Palestine Investment Bank* as to whether that meets the

20 *Licci* standard given that another bank is interposed in

21 that flow.

22     But, again, of the 118 we've produced so far,

23 that constitutes 17 of those transactions.  The rest are

24 direct transactions.

25     So they are transactions of significant amounts.

1                              PROCEEDINGS                          5

2   We've produced a spreadsheet to them.  I have a copy if

3   Your Honor would like to see it here.

4           THE COURT:   Sure.  If you have it, I'll take a

5   look.

6           MR. SIEGFRIED:   Your Honor, we have objections

7   to that since we haven't actually been able to even

8   verify anything regarding these transactions.

9           THE COURT:   Okay, I mean this is not evidence,

10  in any case.

11          MR. SIEGFRIED:   I understand it.

12          THE COURT:   So I'm not taking it for any

13  purpose other than this conversation.

14          MR. SIEGFRIED:   Sure.

15          MR. RADINE:   So this is the spreadsheet we

16  produced to them, so it does not include the last dozen

17  that we've located.

18          THE COURT:   Okay.

19          MR. RADINE:   So the way to read this, obviously

20  printing Excels is always a bit of a pain.

21          THE COURT:   Right.

22          MR. RADINE:   It goes, if you will, to the right

23  and down to the right and then down to the right and then

24  down.  So an entire row is expressed over a page and the

25  next page, if that makes sense.

1                         PROCEEDINGS                        6

2            THE COURT:  Uh huh.

3            MR. RADINE:   So on the top half of the first

4    page here we start with the nested account transactions.

5    So you'll see there should be about 17 of them, and you

6    have the first half of the information on page 1 and the

7    second half on page 2.  And then below that with the

8    direct transactions, again, first half on page 1, second

9    half on page 2, and then repeating in that pattern

10   through the other pages.

11           So we've asked them if they dispute the accuracy

12   of this, but obviously we're not asking them if they

13   think this is jurisdictionally sufficient, just whether

14   this reflects the evidence we've produced to them.

15           THE COURT:   Okay.

16           MR. RADINE:   Now, we understand from them that

17   they do not think that transactional information is

18   sufficient to prove personal jurisdiction on its face.

19   They've asked us what information or evidence we intend

20   to put in at this stage and so on.  We're at a bit of a

21   loss as to what that would be under *Licci*.  The evidence

22   that relates to personal jurisdiction is transactions

23   for, relating to the terrorist group in question from

24   which the claims arise.

25           So we understand that they've argued that the

1
2    evidence, we have not – I'll just quote so I don't
3    misstate it – that we have, quote, "not provided evidence
4    sufficient under the Due Process Clause," close quote, to
5    show, quote, "that the claims in this action arise out of
6    or relate to any transfers processed through its
7    correspondent accounts in New York," close quote,
8    because, they argue, last quote, "transfers involving
9    routine banking transactions and for humanitarian
10   services, for example, do not give rise to claims under
11   JASTA."
12           So our position is that's a merits question.
13   The law in this case, as Your Honor pointed out in two
14   reports and recommendations, is that the Second Circuit
15   noted that the use of a correspondent account standing
16   alone could be grounds to find personal jurisdiction so
17   long as the use is purposeful.  That's from Your Honor's
18   2020 opinion.
19           THE COURT:   Right.
20           MR. RADINE:   And purposeful, as this Court
21   explained, means repeated and volitional as we argued
22   these were and I think as this chart suggests.
23           THE COURT:   Can I ask you something about – I'm
24   sorry to interrupt, but I'm just looking at the dates of
25   these various transactions.  Is there relevance to the

```
 1                      PROCEEDINGS                    8

 2   dates, I mean when was, I see a bunch are Holy Land

 3   Foundation, some Interpal, some others.  Were any of

 4   these Holy Land Foundation transactions after this

 5   designation?

 6        MR. RADINE:   They were all after the Israeli

 7   designation of Holy Land Foundation which we alleged was

 8   publicized and, therefore, sufficient under Honickman.

 9   They're not after the U.S. designation because that

10   would've prevented the correspondent banks from

11   processing these transactions.

12        THE COURT:   Okay.  Okay.  So none of these are

13   post-U.S. designation?

14        MR. RADINE:   Right, there wouldn't be U.S.

15   dollar transactions post-U.S. designations.  So for HLF

16   that's the end of 2001, but for Interpal, of course,

17   that's 2003.  And then some entities weren't designated.

18        THE COURT:   Right, but you have Interpal

19   transactions from prior to the violence at issue.

20        MR. RADINE:   Yeah.  So anyway, the personal

21   jurisdiction, so obviously Kaplan and Linde make clear

22   that what constitutes routine banking is for a jury to

23   decide.  Whether it's knowledge is sufficiently—or,

24   general awareness is sufficiently established from a

25   humanitarian purpose of a transactions is a merits
```

```
 1                     PROCEEDINGS                      9

 2   question that we'll obviously arrive to when we get into

 3   merits discovery, but there's not been a court that's

 4   held that a defendant's knowledge has to be evident on

 5   the face of each transfer.  That could be proven in any

 6   number of ways.

 7             THE COURT:  At least for jurisdiction you're

 8   saying.

 9             MR. RADINE:  At least for jurisdiction, right.

10   So arising out of, which is their argument is on the due

11   process version of "arising out of."  There's the New

12   York version of "arising out of" and the due process

13   version.  According to their letter, they're contesting

14   the due process version.  Of course, as this Court noted,

15   they had not contested the New York "arising out of"

16   version in a motion to dismiss.  In any event, the Second

17   Circuit has never, they note this in *Licci*, found a case

18   where plaintiff satisfied the New York rule but not the

19   due process rule.

20             As this Court noted, under the New York rule,

21   quote, "the foreign bank's use of its correspondent

22   accounts is not completely unmoored from the legal claim

23   regardless of the ultimate merits of the claim" is the

24   standard that Your Honor set out correctly.  And then as

25   for whether the – whether due process could operate
```

1                        PROCEEDINGS                    10

2   differently, Your Honor noted, quote, "CAB offered no on-

3   point case authority supporting this argument." The

4   Second Circuit does not appear to have seen it either.

5   So we think that's that for personal jurisdiction.

6            Now, we want to come to understand more about

7   how the bank operated that we think bears on the

8   transactional element and the documents they could have,

9   and that's where the 30(b)(6) deposition notice comes in.

10  And I can speak on that briefly, Your Honor.

11            THE COURT:   Yes.

12            MR. RADINE:   So we've noticed three issues to

13  them.  The first relates to the IT systems that the bank

14  used during the relevant period as they relate to

15  transaction processing.  So they have explained to us

16  before a little bit about their understanding of their

17  systems at the time.  They explained that they used the

18  Kindle Banking System in the relevant period.  That's

19  been taken offline, and they don't have – the system is

20  not supported anymore nor is the associated OS and

21  hardware.  And they mentioned they don't have backups and

22  archives.

23            It's been our experience working with banks in

24  these cases that what is not currently usable by the

25  bank's IT staff is not necessarily unrecoverable.

2  Relevant data may sit on multiple systems, it may have

3  been transferred to another system, recovery may be

4  possible.  It may necessitate a vendor who specializes in

5  recovery work.  In any event, we won't know until we

6  ascertain what systems were used.  I'd also point out

7  that that's a single system.  So in our experience banks

8  use multiple systems.  We've seen that the system that

9  runs the SWIFT database which its transactions are

10 processed through and other banks is not the same as

11 their core banking system which is what I believe the

12 Kindle system likely is.  There may not be more to draw

13 from this line of inquiry, but we can't know until we

14 begin to have it.

15        The second issue is that of the CAB's use of

16 correspondent accounts and nested accounts.  As Your

17 Honor raised at our last conference, it's worth knowing

18 how the bank used its correspondent accounts generally,

19 it gives a sense of the jurisdictional contacts they had

20 when processing the transactions.  And then in the nested

21 account which is sub judice, the impact of that, in

22 *Spetner*, I would imagine the bank, just as much as us,

23 would like to know if CAB used its nested account in a

24 way that was similar or different than the defendant in

25 that case.

1

2       THE COURT:   And how did the defendant use the

3  nested account in the cases pending before the Second

4  Circuit?

5       MR. RADINE:   So those transactions, when a

6  customer of the bank wants to push a transaction, they

7  will indicate who the ultimate beneficiary is.  And then

8  those are instructions that the originator bank, the

9  defendant, would then give to their bank where they hold

10  their nested account for further credit down the line

11  ultimately through New York and then to the opposing

12  party, the counterparty to the transaction.

13       So in a sense that when a bank holds a

14  correspondent account in New York, when they send a

15  transaction through New York, they're providing

16  instructions to each bank down the line as to moving it

17  along.  This just adds another bank.  So the question

18  would be, for instance, like what control does the

19  defendant have --

20       THE COURT:   Why does it go through a nested

21  account versus just going through its own, why would it

22  add a party instead of minimize the parties?

23       MR. RADINE:   So --

24       THE COURT:   What's the purpose of being --

25       MR. RADINE:   Sure, banks hold nested accounts

1

2  for different reasons.  That's something we'd certainly

3  get into with them.  Sometimes they're unable to hold, a

4  New York bank won't offer them an account or at least an

5  account with terms they want --

6         THE COURT:  But we know that CAB did have some

7  correspondent accounts.

8         MR. RADINE:  Right.  It could be a legacy

9  account that they had from before they had access to New

10 York accounts that they were still using.  These are all

11 things we would get into with them and see whether or not

12 that's a fruitful topic to understand.

13        The last issue relates to their sale of relevant

14 branches to Palestine Islamic Bank.  They informed us

15 that whatever records were at those branches in the

16 Palestinian territories were transferred to the buyer

17 bank when they bought those branches because possession,

18 custody, and control can relate to whether or not you

19 have the right to demand records back.  We just want to

20 understand what the agreement was as to those records,

21 document sharing, however that operated, whether

22 documents were transferred back to CAB at all.

23        Now, on these topics we have a corresponding set

24 of document requests, we have four document requests that

25 relate to these topics.  CAB in a meet and confer told us

1

2  maybe those records will answer our questions without the

3  need for deposition.  We're, of course, open to that, to

4  see those records and to see if that makes sense.  We

5  think we'd likely, at least from our experience in the IT

6  process that we've gone through with other banks, I

7  imagine we would have follow-up questions.  But, of

8  course, you know, we are happy to look at the documents

9  first and talk to them about that.

10            THE COURT:   Okay.

11            MR. RADINE:   So the big takeaway, Your Honor,

12  is that between the continuing work of the banks that

13  we've issued subpoenas to and the deposition process,

14  we'd like to extend the discovery period.  We propose 90

15  days in part to get us past the holidays from which we

16  imagine we'll have a little bit less responsiveness from

17  the banks and so on, and that would put us on February 2.

18            THE COURT:   Right, well, we had November 14 as

19  completion of jurisdictional discovery.  So you want a

20  90-day extension on that.

21            MR. RADINE:   Yeah, I think November 4 is the

22  deadline, and the --

23            THE COURT:   Maybe I have a typo in my notes.

24            MR. RADINE:   Sure, November – so 90 days from

25  November 4 would be February 2.  Of course, we don't have

```
 1                    PROCEEDINGS                    15

 2   the Court's decision on the R&R, so our feeling is is

 3   that this is time we can use productively to do this

 4   work.

 5            THE COURT:   Okay.  I'll hear from defendants

 6   next about these issues and also the extension of

 7   discovery.

 8            MR. SIEGFRIED:   Thank you, Your Honor.  Dealing

 9   about nesting, which is in your mind at the moment,

10   having looked at that chart, I don't want to - and you

11   also said before you're not deciding merits --

12            THE COURT:   No.

13            MR. SIEGFRIED:   -- at a status conference.  So

14   I'm not going to argue a great deal about the merits

15   other than to note a couple of things.  One, the very

16   beginning of their chart is replete with these so-called,

17   what they're now calling, nesting transfers.  Now, it's

18   interesting actually because the plaintiffs like to keep

19   changing their theory in this case.  First of all,

20   there's absolutely nothing in the complaint about

21   nesting.  In fact, as you may recall, what we brought to

22   the Court's attention is that allegations in the

23   complaint regarding these transfers, that they were all

24   through Citibank, were incorrect when made, when the

25   complaint was drafted.  And then when you inquired of Mr.
```

 2  Osen about that issue when he was here, he said, oh,

 3  well, but we're not sure because the transfer slips don't

 4  necessarily show us whether it went through Citibank, and

 5  we don't have the complete transfer slips, so it may have

 6  gone through Citibank.

 7          I gather they've now, because they should, have

 8  retreated from that argument to now talk about it as a

 9  nesting argument.  And as far as a nesting argument is

10  concerned, Your Honor, since they raised it and since I

11  assume it will come up again, the case is *Spetner v.*

12  *Palestinian Investment Bank*, 495 F. Supp. 3d 96, a 2020

13  decision, in which not just any plaintiff but these

14  Plaintiffs represented by Mr. Osen and his firm, the same

15  counsel that you have before you, made every conceivable

16  argument under the sun to Judge, I think it's Komitee is,

17  is that --

18          THE COURT:  Who?

19          MR. SIEGFRIED:  K-O-M-I-T-T --

20          THE COURT:  Oh, Komitee.

21          MR. SIEGFRIED:  Komitee.  I don't know where

22  you put the accent on that.  Mad a whole bunch of

23  arguments because the situation was even more involved

24  than it is here.  They had three different nesting

25  theories.  And he carefully reviewed each one, and he

1

2   said there was no personal jurisdiction.  That is the law

3   as it stands right now.  Mr. Radine is correct that they

4   have appealed to the Second Circuit.  Obviously, I

5   wouldn't say anything about how you might judge the

6   matter, but I think that if you read the decision, it's a

7   fairly thorough, careful, detailed decision as to why

8   that theory simply doesn't hold water.

9           THE COURT:   Of course, that's only with respect

10  to 17 transactions.  The other ones are through --

11          MR. SIEGFRIED:   And let's go to the others.

12          THE COURT:   Yeah.

13          MR. SIEGFRIED:   Then we have a whole bunch of

14  NatWest transactions that, of course, didn't go through

15  New York.  A lot of them are in Sterling, some of them

16  are in (indiscernible), but they're not through Citibank

17  in New York.  There are --

18          THE COURT:   None of these are through New York?

19          MR. SIEGFRIED:   No, I'm not saying that, Your

20  Honor.  I've got a large sheet here, but I think that the

21  last time we looked, they keep making ongoing

22  productions, but the last time we looked, there were

23  maybe only a couple, two or three, that went through

24  Citibank.  So, again, this is why, when I objected

25  before, I said there was much to be said about this.

1

2   Then we have issues regarding this contention by Mr.

3   Radine, by the plaintiffs, that this is somehow a merits

4   issue.  Your Honor, we will have the opportunity

5   obviously to brief, and for you to consider, this issue,

6   but the Due Process clause, insofar as this is concerned,

7   is not a fifth grade math class in which you say how many

8   transfers were there and, therefore, oh, there must be

9   jurisdiction.  Not any transaction will do.

10           The Due Process clause, and everyone from the

11  Supreme Court to the Second Circuit have been quite

12  clear, that the second part of this analyis, beyond the

13  number of transfers, which may be relevant to the issue

14  of purposefulness, the main part of due process is that

15  the claim must arise out of or relate to the transaction.

16  It's the nature of the transaction that is

17  extraordinarily important, and when we get to the merits

18  of this topic, we will address it, and, indeed, I think

19  you'll see that these claims do not, cannot relate to or

20  arise out of any of the transactions that they're listing

21  here.

22           You can – if it were otherwise, it would be the

23  case, I believe, that there'd be no distinction between

24  the maintenance of an account and a use account.  It's

25  hard to imagine that anybody has a correspondent account

PROCEEDINGS                    19

and doesn't use it.  So the question is what is it using

it for?  What is the transaction?  And that is where I

think their case falls apart, and it is rather

interesting if, and I think plaintiffs understand this

because, quite frankly, if they had 110 transactions that

really stood for what they would like to report in court

today, then I'm not sure why we're going through seven

more subpoenas to a whole bunch of banks or what further

evidence they need other than what they have today.

So now let me turn to the rest of the – if I've

answered that question.

THE COURT:   Well, let me stop you for one

second --

MR. SIEGFRIED:   Sure.

THE COURT:   -- because there's – I see here,

looks like four transactions through New York in CAB's

New York correspondent accounts involving use of Al-

Hayek.  If the court – so the ones from Bank One, from

Texas, there's a bunch of those, and that's Holy Land

Foundation was founded out of Texas.  So I guess my

question is sort of a do you, is it your position that if

anything that the jurisdiction would be, or venue would

be appropriate in Texas versus New York, assuming there

was jurisdiction, assuming jurisdiction was established

```
 1  │              PROCEEDINGS                          20
 2  │  through this correspondent bank accounts, how does that
 3  │  impact where this case is being litigated now?
 4  │          MR. SIEGFRIED:   It's --
 5  │          THE COURT:   Right?  Because there's four New
 6  │  York and there's a lot of Texas.  So, and if it were, if
 7  │  Texas were appropriate, do you want to be there versus is
 8  │  this a more convenient venue for everyone?  I mean how
 9  │  does that factor into the analysis?
10  │          MR. SIEGFRIED:   I would say New York is not a
11  │  convenient factor nor is Texas for purposes of a foreign
12  │  bank, and I'd rather, instead of responding off the cuff
13  │  to your comment, come back to you on it.
14  │          THE COURT:   Okay.
15  │          MR. SIEGFRIED:   But I think that, I don't think
16  │  we really get there because whether we talk about, as I
17  │  said, those Hayek transactions, which I cannot believe
18  │  ultimately you will find differently than Judge Komitee
19  │  has, or with respect to these Bank One transactions which
20  │  also have issues around them, quite frankly, separate and
21  │  apart from their use.  I don't think we're going to end
22  │  up reaching that issue.  I just don't think they're
23  │  jurisdictionally sufficient either for purposes of Texas
24  │  or for New York, quite frankly.
25  │          THE COURT:   Okay.  You can address the
```

PROCEEDINGS                    21

1   remaining issues.

2         MR. SIEGFRIED:   Okay, thank you.  And, by the

3   way, I should add, Your Honor, or maybe the last point I

4   should make is we did have a meet and confer with Mr.

5   Osen in which he said, well, we'd like you to confirm the

6   content of the transactions, and, frankly, I'll have that

7   conversation further with him offline.  I don't actually

8   understand the question, what the content of the

9   transaction is.

10        THE COURT:   Well, I assume they want to know do

11  you dispute that these transactions actually occurred

12  with these parties on these dates.

13        MR. SIEGFRIED:   If that's what they're asking

14  now, it has its own set of issues.  So we'll have that

15  discussion with them.

16        With respect to the subpoenas, you know, at the

17  August 25 hearing, you set the deadline of November 4,

18  and you said I want you to really focus on the

19  jurisdictional issues.  And Mr. Osen said in response,

20  well, with respect to jurisdictional discovery, the

21  deadline for third-party banks, we'll obviously abide by

22  that.  You asked for the status of discovery at that

23  point, he gave you the status of discovery, there was not

24  a word mentioned about, oh, we want to issue more

1

2    subpoenas.  There wasn't – then we have somewhere

3    between, somewhere in the middle of September to late

4    September, I'm not even sure they say they served them

5    during that period.  I know that the subpoenas are dated.

6    But supposedly they served something knowing what your

7    discovery deadline was, and these subpoenaed banks are

8    not any of the correspondent banks in New York.  They're

9    not referred to in the complaint which identified the

10   correspondent accounts.  So this is – so we have

11   subpoenas going out to seven banks, close to within a

12   month or so of your discovery deadline, to banks which,

13   with whom we do not have any correspondent account in New

14   York.  And the subpoenas, as I read them, are for in each

15   case  23 years of records and for 74 or more individuals

16   and entities, notwithstanding the fact that the complaint

17   that is before us talks about five individuals and 16 --

18        THE COURT:   So the subpoenas are covering more

19   than what's mentioned in the complaint?

20        MR. SIEGFRIED:   Absolutely, and, Your Honor, if

21   you look at the joint status report, what you see in the

22   plaintiff's section is that, I think the term they use is

23   BNY, Bank of New York, has balked at the request for 23

24   years of, I don't know whether they say the 23 years, but

25   balked at the request, that they rejected multiple

1

2  compromises, and they only hope that it can be resolved

3  without judicial intervention.

4         In the meet and confer I asked Mr. Osen whether

5  the Bank of New York had any position as to whether it

6  even had documents going back to the relevant time

7  period, and I believe he told me  that at least for the

8  Bank of New York, he said we don't even know that we have

9  them going back that far.  Citibank had no documents,

10 none, zero, there's none produced by them.  And Standard

11 Charter, the earliest document that they have that

12 involves CAB, a CAB transfer, is 2005.

13        So the idea that seven subpoenas are now going

14 out for this breadth, one thing for sure, if Your Honor

15 is inclined to let this part of it go forward and to

16 extend on this basis, we certainly don't want to be back

17 here in 30 days, 60 days, or 90 days hearing that there

18 are yet another six subpoenas or that we are still in

19 negotiation trying to get records from banks over a 23-

20 year period, etc.

21        And that's relevant to another point regarding

22 this chart and to what's happened today.  There was a,

23 what seems to have happened with some of these banks, it

24 happened with Standard Charter, happened with HSBC with

25 whom also CAB had no correspondent account, is when they

2  get the subpoena, which, yes, it says transactions with

3  CAB, then has a list of 74 individuals for 23 years.  As

4  a practical matter, I think we all know what the bank

5  does.  It takes the list, the exhibit B list and it

6  produces documents, transactions involving where those

7  identified entities appear.  So for HSBC which did

8  something like five productions over the last couple of

9  months, and produced a lot of documents, not a single one

10  refers to CAB.

11         So this subpoena of the seven banks seems to be,

12  as a reason for extension, seems to rest on a rather thin

13  reed.  Again, we want to get past this discovery, we want

14  to get this motion, we think it's a good motion based

15  upon everything we've seen.  So if Your Honor's inclined

16  to give them some leeway, we understand, but we certainly

17  - this starts to become a real stretch late in the game

18  to try to develop evidence.

19         On the - with respect to the 30(b)(6), again, I

20  thought we had a very practical conversation in the meet

21  and confer with Mr. Osen who, in all fairness, was the

22  only one who spoke at the meet and confer, but it's

23  curious because you had directed that we provide

24  plaintiffs with a letter regarding the sale of the

25  branches --

1                          PROCEEDINGS                    25

2          THE COURT:   Yes.

3          MR. SIEGFRIED:   -- regarding the IT platforms.

4   I think at one point there was an exchange where you

5   asked Mr. Osen something to the effect of and what is the

6   source codes or what's the operating systems going to

7   have to do with all of this.  But we provided that

8   information.  We provided that information, as Mr. Osen

9   acknowledged last time, back in July about the sale,

10  about the fact we didn't have transaction records, with

11  respect to the system.  It wasn't terribly vague.  It

12  said the bank is currently using Temenos, T-E-M-E-N-O-S,

13  T24 Core Banking System under IBM UNIX OS.  The system

14  was implemented during the period 2011 to 2013.  The

15  prior operating system was the Kindle Banking System.

16  The bank cancelled the license in 2013.  The Kindle

17  System is not supported anymore nor is the associated OS

18  and hardware.

19          Now, that's on July 29 they had that

20  information.  On Sunday evening, October, if I'm off by a

21  date, October 7 or 8, Sunday evening, they serve a

22  30(b)(6) deposition notice.  Between July and October

23  there is no follow-up, there's no request for any

24  documents relating to those issues.  And I asked Mr.

25  Osen, number one, why would this be an efficient way to

 1

 2    proceed.  I said if I come in with a 30(b)(6) witness in

 3    2022 about a system that hasn't been in effect since

 4    2013, regarding documents that are no longer retained,

 5    that's not supported, that was a licensed system, and the

 6    witness says what do you want me to tell you, I said then

 7    you're going to tell me I gave you the wrong 30(b)(6)

 8    witness.

 9              THE COURT:   Well --

10              MR. SIEGFRIED:   So the point is, I said why

11    don't we - and I can't even tell you that we have the

12    documents, right, this is, again, a conversation that

13    occurred at the end of last week.  If we had the

14    documents, we'll give them to him --

15              THE COURT:   Right.

16              MR. SIEGFRIED:   -- and if he wants to go run

17    off to some expert and ask some expert, well, if that's

18    what they had and it was under a license and they no

19    longer have the thing, can you, I don't know what you can

20    do, but in any event somebody wants to say they think

21    they want to revive a system that's no longer there --

22              THE COURT:   You already confirmed that the data

23    from the relevant time period was not transferred --

24              MR. SIEGFRIED:   Absolutely.

25              THE COURT:   -- from Kindle to your system, the

1

2 current system, is that correct?

3          MR. SIEGFRIED:   Yes.

4          THE COURT:   Okay, so what I'm hearing gives me

5 concern, Mr. Radine, that what you're doing is outside of

6 the scope of Rule 26(b) which confines discovery to

7 information that's relevant to the claims and defenses

8 and proportional to the needs of the case.  Why would you

9 be subpoenaing banks that, you know, with which CAB

10 didn't have correspondent bank accounts?  That doesn't

11 make any sense.

12          And further why would CAB have knowledge about

13 the Kindle system?  Wouldn't the appropriate inquiry be

14 of Kindle if it even still exists as to what's going on

15 with its system and did it ever retain any information?

16 I doubt that it would've retained sensitive banking

17 information.  I doubt that the bank, any bank would allow

18 that.  But isn't a proper inquiry of Kindle rather than

19 CAB since it was merely licensing that program?  I'm not

20 really understanding what you're doing or looking for or

21 why this is relevant to jurisdiction.

22          MR. RADINE:   Sure, well, I'll take those in

23 parts.  I'll start with the banks.  Right, those are not

24 CAB's correspondent banks.  Those are the banks that are

25 on the other side of the transaction.  Every --

|   |   |   |
|---|---|---|
| 1 | PROCEEDINGS | 28 |

2      THE COURT:  Other side of what transaction?  It

3   seems like a fishing expedition, that you're just

4   subpoenaing random banks with which CAB doesn't have any

5   existing relationships to see, hey, did you ever have any

6   kind of transaction that somehow made its way to CAB?  I

7   mean how is that going to jurisdiction?

8      MR. RADINE:   Sure.  So this chart, Your Honor,

9   is consisting entirely of records produced by banks that

10  they don't have a correspondent banking relationship with

11  CAB except for the nested account at Arab Bank.

12     THE COURT:   Right, but this is – what defendant

13  is saying is this is not even helping you.  It doesn't

14  even have New York except for these four transactions

15  with use of Al-Hayek.

16     MR. RADINE:   I'm at a little bit of a loss as

17  to what that means.  So, again, just to walk through how

18  this works.  The – so let's look at the direct transfers

19  that start on page 1, go to page 2.  So the column, so

20  the beneficiary bank in these is Cairo Amman Bank.  You

21  can see that in that column.  And the beneficiary's

22  correspondent bank is in the first column on page 2, 4,

23  and 6.  So in every --

24     THE COURT:   Well, 1 of 6 goes with 2 of 6, is

25  that right?

```
 1                       PROCEEDINGS                    29

 2            MR. RADINE:   Correct, so --

 3            THE COURT:   And so the originating bank we

 4   have, let's just take Holy Land Foundation with Texas

 5   because that's at least in the United States as opposed

 6   to the U.K.  Okay?  So the originating bank says Bank One

 7   Texas.

 8            MR. RADINE:   Right.

 9            THE COURT:   And then there's a blank for

10   originator's correspondent bank.

11            MR. RADINE:   Right.

12            THE COURT:   And then – I'm just looking at the

13   third line on page 1, and that says the beneficiary party

14   is the Halul Zakat Committee, and the beneficiary bank is

15   CAB.  So that's, CAB didn't, as I understand it, didn't

16   originate this transaction.  It received money from Holy

17   Land Foundation that was deposited into the account of

18   its customer Halul Zakat Committee.  Is that how I'm to

19   interpret this?

20            MR. RADINE:   Yes.

21            THE COURT:   Okay.

22            MR. RADINE:   So --

23            THE COURT:   And there's no intermediary --

24            MR. RADINE:   No.

25            THE COURT:   -- bank listed for this.  Where is
```

1

2    New York in this picture?

3           MR. RADINE:   That is in column, the first

4    column on page 2.  That is the, if you look at the column

5    name, beneficiary's correspondent bank, it's beneficiary

6    bank's correspondent bank.  I believe that's clear --

7           THE COURT:   Well, okay, so I don't think

8    there's a dispute that CAB had a correspondent account

9    with Citi.  But this transaction – is this – I don't

10   understand this transaction to have gone through Citi.

11   Are you saying that it did go through Citi?

12          MR. RADINE:   Yes --

13          THE COURT:   You're saying that – are you saying

14   that Bank One in Texas transferred the money to Citi in

15   New York, then transferred the money to CAB in wherever

16   this was, Lebanon or Israel or some place, where?

17          MR. RADINE:   Yeah.  There's not a word on this

18   that's our assumption.  The bank would've done it through

19   their correspondent account.  That means on the face of

20   the transfer record that we have that it says Citibank

21   New York for further credit of Cairo Amman Bank, Hebron,

22   etc.  That's true for every single one of these

23   transactions.  In fact, it's wherever a document might be

24   missing a piece of information, we might have a blank,

25   but in every instance these are coming through the

```
 1                        PROCEEDINGS                  31

 2   Citibank account.  That's in the beneficiary's

 3   correspondent bank column, in every single instance.

 4   Some of them are through Amex in New York.

 5            THE COURT:   So the - so Holy Land Foundation

 6   says, hey, we want to send money to Halul Zakat

 7   Committee, and they say, well, our account is at CAB in

 8   Lebanon, and so NatWest initiates it and it gets

 9   deposited.  And what I'm hearing CAB say is how is it

10   engaging in anything volitional I guess, simply receiving

11   the money through this mechanism.

12            MR. RADINE:   Yes, Your Honor already ruled on

13   that issue --

14            THE COURT:   Right.

15            MR. RADINE:   -- and held correctly that under

16   Arcapita and Amigo Foods receiving a transaction rather

17   than rejecting it qualifies as volitional for personal

18   jurisdiction purposes.

19            All of the transactions, including all the

20   NatWest ones, I don't know why he's suggesting otherwise,

21   went through New York.  Again, you can see the NatWest

22   ones because they say NatWest in the originator bank, and

23   then if you look at the corresponding row in the

24   beneficiary's correspondent bank where it says Citi

25   throughout, that's not an assumption we're making.  We're
```

```
 1                          PROCEEDINGS                      32

 2   taking that off of the transaction records we have.

 3             THE COURT:   I see, so --

 4             (interposing)

 5             THE COURT:   So for the U.K., just taking the

 6   first, well, just taking the first NatWest Interpal

 7   transaction, so NatWest in the U.K., Interpal says we

 8   want to give money to the Beit Fajjar's Zakat Committee -

 9   -

10             MR. RADINE:   Yes.

11             THE COURT:   So they, NatWest then goes through

12   NatWest U.K. --

13             MR. RADINE:   Well, they had a branch in New

14   York which is why I think it's not listed.  So they

15   would've cleared it themselves through New York.  They

16   would transfer it across the books of the Federal Reserve

17   Bank in New York --

18             THE COURT:   Oh, because it was U.S. dollar

19   transaction --

20             MR. RADINE:   Correct.

21             THE COURT:   -- they go through their own U.S.

22   account and then switch it to Citi.  Oh, no, here they

23   switch it to Amex Bank.

24             MR. RADINE:   Yes.

25             THE COURT:   And then to CAB where the recipient
```

```
 1                      PROCEEDINGS                    33

 2   has the account.

 3            MR. RADINE:   Correct.  This is the same

 4   structure as in *Licci*, precisely.  In fact, Amex is the

 5   exact correspondent bank in *Licci*.

 6            MR. SIEGFRIED:   Your Honor, may I jump in for

 7   one second --

 8            THE COURT:   Yes.

 9            MR. SIEGFRIED:   -- because it's relevant to

10   your question.

11            THE COURT:   Yes.

12            MR. SIEGFRIED:   We didn't have a correspondent

13   account at Amex.  So the very first example that you're

14   using is NatWest has actually – I'll back up for one

15   second and try not to get into merits of the argument.

16   But NatWest either chose, for whatever reason, to send

17   the transfer through Amex, fine, but that has nothing to

18   do with us, or sometimes, Your Honor, under the system

19   that actually happens under Swift, the bank, as I think

20   you probably know, doesn't even make the originating

21   bank, NatWest in this case, for an Interpal transaction,

22   doesn't even make the decision.  It puts it into Swift,

23   and the Swift computers do whatever they do --

24            THE COURT:   System just does its stuff.

25            MR. SIEGFRIED:   -- and they send something
```

PROCEEDINGS                                                    34

1

2    through.  So I don't see how that gets to be the

3    volitional use of a correspondent, of its correspondent

4    account in New York.

5           THE COURT:   But you did have a correspondent

6    account with Citi.

7           MR. SIEGFRIED:   We did have a correspondent

8    account with Citi, but I think the way we got into this

9    line of questioning was you posed a simple question which

10   is with respect to these seven new subpoenas that they

11   want to serve which are not to the CAB correspondent

12   banks, what is the relevance of that, why is that a Rule

13   26(b) request --

14          THE COURT:   Right, right.

15          MR. SIEGFRIED:   -- and I'm actually not sure I

16   heard the answer to that question.

17          THE COURT:   Yes, well, let's go back to that,

18   Mr. Radine, what is the relevance?

19          MR. RADINE:   Sorry, if I just - I want a, just

20   a clean record.  A bank can't force a transaction through

21   an intermediate bank that doesn't have a correspondent

22   relationship.  Of these seven transactions with Amex - I

23   don't know sitting here, the story, what appears to be

24   the case is they did have a correspondent account with

25   that bank.  Sitting here I don't know.  We're pulling

1
2  this from the face of the transaction.  We've been

3  through the - that's not something I think is

4  controversial or obviously --

5          THE COURT:   Well, it is because CAB is saying

6  they didn't have a correspondent bank with, they didn't

7  have a correspondent banking relationship with Amex or

8  here's Bank of New York --

9          MR. RADINE:   Bank of New York I think they

10 concede.  But, Your Honor, this sounds like grounds all

11 the more to have a 30(b)(6) because they're denying

12 having an account that we have on paper.  They're denying

13 it here in court.  It's not under oath.  It's a great

14 question to ask them in a 30(b)(6) context.

15         THE COURT:   Okay, but that answers the question

16 about why you might want to have a 30(b)(6), you might

17 want to have a witness explain what the different

18 relationships were, but that doesn't go to the subpoenas

19 onto these other banks.

20         MR. RADINE:   So these are banks that we

21 understand would be likely on the other side of the

22 transactions because they are, for instance, either the

23 biggest players in the markets where a lot of these Hamas

24 affiliated entities are or because we have other records

25 that have attached them to entities like that.  They have

```
 1                          PROCEEDINGS                    36
 2  not moved, of course, to quash.
 3            THE COURT:   So you're trying to get reverse
 4  information essentially.
 5            MR. RADINE:   Sure, this whole chart --
 6            THE COURT:   These other banks – so these other
 7  – you are speculating that these other banks have
 8  accounts with Hamas entities, not all of which are even
 9  listed in your complaint, and those entities might have
10  asked their banks to send money to somebody who had an
11  account with Cairo Amman Bank.  So it sounds like a
12  fishing expedition is really what it sounds like.
13            MR. RADINE:   Or they're the correspondent bank
14  for – they don't have to have the accounts themselves.
15  They can also be in a correspondent position.  These
16  banks have New York branches which is why --
17            THE COURT:   But you don't know, as you sit here
18  today, whether – you don't know who the customers of
19  these subpoena recipients are or whether they ever
20  initiated a banking transaction that went to a customer
21  of CAB.  You don't even know that.
22            MR. RADINE:   But these banks are the choke
23  points essentially, rather than, for instance,
24  subpoenaing all 10,000 banks in Germany, you have
25  Commerzbank, the largest sort of clearing bank for
```

PROCEEDINGS                                    37

1

2   Germany, and I believe we recently got a transaction hit

3   on that.  So so far it's been productive.

4          THE COURT:   You got one hit out of how many

5   subpoenas and how many records and years?  I mean this is

6   really excessive it seems, and really how are you going

7   to demonstrate jurisdiction through this?

8          MR. RADINE:   I'm not sure how it's to the

9   defendant's prejudice that we reach out with subpoenas.

10  They've produced nothing --

11         THE COURT:   Well, the prejudice is they keep

12  coming into court.  They're waiting to brief the

13  jurisdictional issue on the merits as opposed to under a

14  Rule 12 standard, and they're spending attorney's fees

15  involving this, and then they're going to have to prepare

16  a witness for a 30(b)(6) deposition on a topic that it

17  seems, I don't know understand why they would have any

18  knowledge of it at all.  Why would they have knowledge on

19  this other company's system that they no longer use?

20         MR. RADINE:   I'll turn to the 30(b)(6) thing.

21  My understanding is, first, a party can't object to the

22  relevance of a subpoena.  That's something that the

23  subpoena recipient --

24         THE COURT:   Well, that is true, but at the same

25  time you're asking for an extension of discovery based on

PROCEEDINGS                          38

1

2   that, and you are bound by Rule 26(g) and 26(b) to seek

3   discovery that is consistent with the rules relevant to

4   the claims and defenses and proportional to the needs of

5   the case.  So, yes, that is true that CAB may not have

6   standing to object on relevance grounds, but you as an

7   officer of the court have an obligation to utilize the

8   Federal Rules consistent with what they say.

9            MR. RADINE:   So far, Your Honor, we have only

10  gotten records from third-party banks that don't have a

11  correspondent relationship with CAB.  If we didn't have

12  access to records like those, we'd be at zero instead of

13  101 on this list right here.  We are meeting and

14  conferring with those banks, we take their objections

15  seriously, and work on narrowing the subpoena with each

16  of them.  They're obviously free to move to quash, but so

17  far we've had productive conversations with them, and

18  some of them have been producing already, some are still

19  working on it, as he mentioned, Standard Chartered Bank,

20  which, by the way, owned Amex or now owns Amex Bank,

21  (indiscernible) that bank, produced records that went

22  back to '05.  We're obviously asking them to look back

23  further.

24            I don't think with the defendant producing

25  nothing that we shouldn't be allowed to reach out to

1

2 banks that we have at least a reason to believe can run a

3 search --

4          THE COURT:   What is the reasonable belief?  It

5 sounds – you're not even including entities that are

6 mentioned in the complaint.

7          MR. RADINE:   The company, Your Honor, I --

8          THE COURT:   It's really speculation.  Has

9 somebody told you, oh, Standard Chartered has an account

10 with this particular entity that's listed in the

11 complaint, has somebody told you that?

12          MR. RADINE:   They're likely to be – well,

13 they're likely to be, to have the role rather of a

14 correspondent bank.  We subpoenaed their New York

15 branches for each of these banks rather than casting

16 about around the world.  There's only so many banks which

17 do dollar clearing at all, and any transaction from

18 around the world that comes through their bank for dollar

19 clearing is something that they would have a record of or

20 at least would have had a record of at the time.  So --

21          THE COURT:   Yes, that may all be true, but it

22 is still speculation that you're going to have a hit on

23 anything that is relevant.

24          MR. RADINE:   And as for the list – well, I

25 think, Your Honor, that we are, again, targeting a

| 1 | PROCEEDINGS                           40 |

2   limited set of banks that we think have the most

3   likelihood of being in that position.  Obviously, the

4   names are names that we understand as Hamas customers and

5   entities.  We didn't understand the complaint has a

6   necessity to be a directory of every Hamas operative or

7   entity.  That's something that expands during discovery

8   that we are seeking with those banks.

9           If I could turn to the deposition --

10          MR. SIEGFRIED:   Your Honor, sorry, can I jump

11  in on that for a moment?  Apart from everything you've

12  just said, the last statement is an extraordinary

13  statement.  So your – we are arguing or will be arguing

14  that the Court doesn't have personal jurisdiction with

15  respect to the claims asserted in the complaint.  This

16  was no tiny complaint.  This was a very long complaint

17  which listed five individuals, sixteen or seventeen

18  entities, a lot of detail about it.  And now the argument

19  is, well, we think there may be some banks out there, we

20  know they're not the correspondent accounts, they may

21  have had customers or sent money to 70 some odd other

22  individuals, and maybe we'll find a hit that actually

23  went through CAB.  And then what?  So they did a transfer

24  to somebody who's not even in the complaint.  So now

25  they're going to argue, well, that's a Hamas person and,

PROCEEDINGS                                41

therefore, there's jurisdiction even though those persons
and entities aren't referenced in the complaint.

And this is all coming, we haven't heard, A,
when they, whether they even effected the service.  This
is all coming close to your discovery deadline when they
said they would abide by the discovery deadline.  And it,
you know, I don't normally want to use the word fishing
expedition, I'm glad that you did, in this circumstance,
but this is the problem, and, again, when we get into
this chart eventually, you'll see that, I mean there are
transfers to entities that they refer to aren't, again,
aren't in the complaint.

So I understand they want to use the
jurisdictional discovery to do all kinds of things, but
that's not what this is about.  The 30(b)(6), again, what
I said, I'm not even sure why that's a 30(b)(6).  If what
they want is a representation or a statement as to who
the correspondent accounts were, we could do that.  That
hardly requires a 30(b)(6) deposition to do that.
Actually, Mr. Osen said I will work with you efficiently
on that.

But I think you're getting a sense of the
problem that we have.  This is costly, this is, we're not
the ones who brought an action 22 years after the events.

```
 1                     PROCEEDINGS                    42
 2  They're stuck with the fact that having waited so long,
 3  these banks don't have records --
 4          THE COURT:   Well, to be fair, the law changed,
 5  and --
 6          MR. SIEGFRIED:   And it's within --
 7          THE COURT:   -- allowed the aiding and abetting
 8  claim.
 9          MR. SIEGFRIED:   It does, but to be equally
10  fair, these plaintiffs, it's not just any plaintiff,
11  these plaintiffs sued Arab Bank, they sued NatWest, they
12  sued Credit Lyonnais.  It's the same plaintiffs, the same
13  claims, the same attacks, the same injuries.  They just
14  discovered 20 years after the fact CAB?
15          So they get the discovery, they have their
16  complaint.  But it has to be - this is why we're pushing
17  back.  Again, we want to be reasonable, but we don't want
18  to be doing this months and months.  And there's an
19  additional prejudice, as I said, which is it is costly
20  because when they go and they subpoena somebody like
21  HSBC, as I used as an example before, HSBC produces
22  thousands of pages of documents which we then have to
23  review.
24          THE COURT:   Right.
25          MR. SIEGFRIED:   And for nothing, for zero, zero
```

PROCEEDINGS          43

1   transactions.

2

3        THE COURT:  Well, it seems to me that there's

4 really not a basis to extend discovery by 90 days.  I'll

5 extend discovery to December 9.  And if you are seeking

6 to move to compel compliance with these subpoenas, those

7 have to be filed in November by November 11, any motions

8 to compel.

9        MR. RADINE:  Okay.  Did Your Honor want to be

10 address the 30(b)(6) statements discussion?

11        THE COURT:  Well, for the 30(b)(6) you all

12 still have to meet and confer.  It sounds like you're not

13 done with that process from what I've heard, and I

14 understand why you may want some testimony about exactly

15 how the correspondent banking relationship worked, have

16 something under oath about what were the correspondent

17 banking relationships at the relevant time period.  So I

18 understand that, but it seems to me that you can further

19 meet and confer on that.

20        MR. RADINE:  That's fine.  We heard a number of

21 inaccuracies about the description of the IT systems and

22 so on, but that can be the subject of the meet and confer

23 process.

24        THE COURT:  Yeah, I'm not limiting right now

25 the 30(b)(6) topics.  I'm just expressing some skepticism

```
 1                     PROCEEDINGS              44

 2   about the need for some of the topics, but you should

 3   still meet and confer on those.  Because it seems to me

 4   there's a real question of what was happening with some

 5   of these transactions that you're listing here.  I mean

 6   how many of these transactions even involve entities

 7   listed in the complaint?

 8           MR. RADINE:   I believe this list should

 9   correspond to the complaint.  I don't --

10           THE COURT:   Obviously, I recognize some of the

11   names.

12           MR. RADINE:   Yeah, I mean Holy Land Foundation

13   is on most of, a lot of these.  Interpal is on a lot.  I

14   think there'd be very few that aren't.

15           THE COURT:   Right, but the point is what does

16   CAB have to do with it?  So what if Holy Land Foundation

17   has an account with Bank One in Texas?  What does that

18   have to do with CAB?  The question is is it going to, in

19   these transactions, is it going to a CAB client that is

20   mentioned in the complaint?  That would be relevant.  So

21   my question is really the beneficiary parties because

22   that's what we're looking at here, what the beneficiary

23   parties, how many of these are named in the complaint?

24   Has anybody taken stock of that?

25           MR. RADINE:   Sure.  I can tell you I see mostly
```

PROCEEDINGS                                                45

1   

2   look in the beneficiary column, Your Honor, I see, again,

3   mostly, a lot of Holy Land Foundation.  The Zakat

4   Committees were all in the complaint, I'm sure of that.

5   Taha's in the complaint, Mohamed Salah Taha is in the

6   complaint.  So I don't see, excuse me, any, yeah, I don't

7   know about every single one, but it looks like the

8   overwhelming – Al-Mujama is the central headquarters

9   institution of Hamas.  So I think that would certainly

10   qualify.  WAMY is in the complaint.  I don't see any that

11   aren't, which isn't to say my eyes aren't skipping over

12   one looking at this list now, and obviously I don't

13   understand the law to suggest that evidence that's

14   outside the complaint isn't sufficient on summary

15   judgment.  Discovery often will --

16       THE COURT:   Well, it has to be – discovery has

17   to be relevant to the claims and defenses, and so, yes,

18   discovery may involve information that's not included,

19   facts that are not included in the complaint, but they

20   still have to be facts relevant to the claims and

21   defenses.  So that's the limitation.

22       MR. SIEGFRIED:   I might be able to help Mr.

23   Radine out with his eyes on page 2 which is going no

24   further than page 2.  The Halul Zakat Committee is not

25   mentioned in the complaint.  The Silwad Municipality is

| | PROCEEDINGS                                          46 |
|---|---|

2   not mentioned in the complaint --

3           THE COURT:   Okay.  Well, there's some and

4   there's some not.  Okay.

5           MR. SIEGFRIED:   Exactly.

6           THE COURT:   So this is supposed to be related

7   to jurisdiction as opposed to this general awareness

8   which may potentially be slightly broader, and that's

9   what you're, that's the - so it sounds to me like maybe

10  some of these subpoenas are going beyond jurisdictional

11  discovery and going into potentially this general

12  awareness element.  There's some argument that you don't

13  want to subpoena banks twice if they're going to look for

14  documents.  At the same time it seems like they're quite

15  broad.

16          I'm going to direct you to meet and confer on

17  the Rule 30(b)(6).  I'm not going to extend

18  jurisdictional discovery any further beyond the December

19  11 date.

20          MR. RADINE:   December 11?

21          THE COURT:   Isn't that what I said?

22          ATTORNEY:  December 9.

23          THE COURT:   December 9, sorry.  November 11 is

24  the date for any motions to compel.  And I'll issue an

25  order with that revised schedule.  Are there other items

1

2  that plaintiffs wanted to raise today?

3          MR. RADINE:   I believe that is it for us, Your

4  Honor.

5          THE COURT:   Anything else defense counsel would

6  like to raise?  Yes.

7          MR. SIEGFRIED:   The one item that you didn't

8  touch upon, but I mention it not for purposes of a ruling

9  because it falls under the meet and confer issue that Mr.

10  Osen and I agreed to have, but which Mr. Radine also

11  raised at least tangentially today, regarding witnesses.

12  I asked Mr. Osen, since he has the burden of proof once

13  you have jurisdictional discovery.  To make out his

14  jurisdictional argument, I asked him whether he saw this

15  as a documents case and then the law as applied to the

16  documents, or whether he saw this as a case in which he

17  would require, in which he anticipated or potentially

18  anticipated using witness testimony, whether it's by

19  affidavit, deposition, whatever.

20          And when I first raised it several weeks ago or

21  over a month ago, He said he hadn't really given it any

22  thought, let him think about it, he understood the issue.

23  When we had the meet and confer, I raised it again

24  because we had received a letter in the interim that,

25  well, we don't know what to put in until we see your

1                          PROCEEDINGS                        48

2   papers, and we wrote back you have the burden of proof.

3   It's not a question of what we put in; it's a question of

4   what, because we have the right to depose a person if

5   you're planning to call a witness.  And it's your burden.

6   You're going to set forth the facts that you think are

7   relevant and why you think any transactions that the bank

8   may have engaged in through New York relate to, or that

9   your claims arise or relate to those transactions.

10         So we in the meet and confer, I think Mr. Osen

11  said he was inclined to believe that this was going to be

12  a documents and law case, that's fine.  We agreed to talk

13  about it further.  But I just wanted to put that on your

14  radar because clearly if we don't have an agreement about

15  that, I don't think this is all about hiding the ball.

16  This is about --

17         THE COURT:  No, you have to have an exchange of

18  information and perhaps there's going to be testimony

19  from a 30(b)(6) witness about some of these transactions

20  on the sheet or, I don't know, maybe somebody from one of

21  these banks.  I assume there's no dispute that these are

22  authentic records produced by the bank or the bank will

23  say these are real records that they have, but you may

24  dispute the, what they mean.  But that would be the

25  subject of testimony potentially, how they are

```
 1                        PROCEEDINGS                    49

 2   interpreted.

 3             Okay, well, I'm --

 4        MR. SIEGFRIED:   I don't think there's an

 5   authentication issue with respect to anything that's been

 6   subpoenaed.

 7        THE COURT:   Yes, right.

 8        MR. SIEGFRIED:   But --

 9        THE COURT:   Okay, so I'm just going to put a

10   pin on that and ask you to meet and confer, and I think

11   we do have a date for a next conference.  Is that right,

12   Chris?  We do, okay.  All right, well, have a Happy

13   Halloween, everyone.  Nice to see you.  We're adjourned.

14        MR. SIEGFRIED:   Thank you, Your Honor.

15        THE CLERK:   November 15.

16        THE COURT:   November 15, okay, well, then

17   that's good because if there's any motions to compel,

18   we'll know.  You can invite the banks to that, if there

19   are any motions to compel, you can invite the banks to

20   that conference.  Okay?  Thank you.

21             (Whereupon the matter was adjourned to November

22        15, 2022.)

23

24

25
```

1                                          PROCEEDINGS                                          50

2

3

4

51

<u>C E R T I F I C A T E</u>

I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, Averbach, et al.

versus Cairo Amman Bank, Docket #19cv0004, was prepared

using digital electronic transcription equipment and is a

true and accurate record of the proceedings.

Signature _____

CAROLE LUDWIG

Date:  October 26, 2022

# Exhibit B

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:                          :
                                    Docket #19cv0004
AVERBACH, et al.,               : 19-cv-00004-GHW-KHP

                Plaintiffs,     :

  - against -                   :

CAIRO AMMAN BANK,               : New York, New York
                                    October 25, 2022
                Defendant.      :

------------------------------------ :

                    PROCEEDINGS BEFORE
            THE HONORABLE KATHARINE H. PARKER,
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:         OSEN LLC
                        BY:  MICHAEL RADINE, ESQ.
                             DINA GIELCHINSKY, ESQ.
                             ARI UNGAR, ESQ.
                        190 Moore Street, Suite 272
                        Hackensack, New Jersey 07601


For Defendant:          DLA PIPER US LLP
                        BY:  JONATHAN SIEGFRIED, ESQ.
                             ANDREW PECK, ESQ.
                             ERIN COLLINS, ESQ.
                             MARGARET CIVETTA, ESQ.
                        1251 Avenue of the Americas
                        New York, New York 10020




Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

```
 1                        PROCEEDINGS                 3
 2           THE CLERK:  Calling case 19cv004, Averbach
 3   versus Cairo Amman Bank.  Beginning with the counsel for
 4   the plaintiffs, please make your appearance for the
 5   record.
 6           MR. MICHAEL RADINE:  Good morning, Your Honor,
 7   I'm Mike Michael Radine for the plaintiffs.  Do you mind
 8   if I sit to speak?
 9           THE COURT:   No, go right ahead.
10           MR. RADINE:   Thank you.  I'm joined by Dina
11   Gielchinsky and Ari Ungar.
12           THE COURT:  Hi, nice to see you.
13           MR. RADINE:   Nice to see you, Your Honor.
14           THE CLERK:  And counsel for the defendants,
15   please make your appearance for the record.
16           MR. JONATHAN SIEGFRIED:  Good morning, Your
17   Honor, Jonathan Siegfried, Andrew Peck, Erin Collins, and
18   Margaret Civetta.
19           THE COURT:  Nice to see everyone.  Thank you for
20   coming in on this rainy day, and I have your status
21   letter from October 20.  I thought we could go over some
22   of the issues in more detail.  The bank has been strongly
23   contesting the basis for jurisdiction, and it seems from
24   the letter that plaintiffs believe that the evidence
25   exchanged thus far supports jurisdiction, but I'd like to
```

```
1                    PROCEEDINGS                4

2   hear a little bit more on that.

3             MR. RADINE:   Sure, so, well, I can start there.

4   What we've produced to them so far is 118 transactions,

5   our records evidencing those transactions, and then we

6   have about a dozen more that we located that we have

7   informed them of~n~ that we are processing to give them

8   shortly, in the next day or so.  Of those 118, 101 of

9   those are direct transactions that Cairo Amman Bank

10  processed through its correspondent account at Citibank

11  in~of~ New York, and 17 are transactions that appear to

12  have been processed through a nested account they held at

13  Arab~our~ B~b~ank where Arab~our~ B~b~ank uses its correspondent

14  account in New York to process the transaction.

15            That structure of using a nested account to

16  process a transaction through New York, the

17  jurisdictional relevance of that structure is currently

18  sub judice before the Second Circuit in *Spetner v.*

19  *Palestine Investment Bank* as to whether that meets the

20  *Licci~hee~* standard given that another bank is interposed

21  in that flow.

22            But, again, of the 118 we've produced so far,

23  that constitutes 17 of those transactions.  The rest are

24  direct transactions.

25            So they are transactions of significant amounts.
```

**Formatted:** Font: Italic

**Formatted:** Font: Italic

```
 1                    PROCEEDINGS                    5
 2  We've produced a spreadsheet to them.  I have a copy if
 3  Your Honor would like to see it here.
 4            THE COURT:  Sure.  If you have it, I'll take a
 5  look.
 6            MR. SIEGFRIED:   Your Honor, we have objections
 7  to that since we haven't actually been able to even
 8  verify anything regarding these transactions actors.
 9            THE COURT:  Okay, I mean this is not evidence,
10  in any case.
11            MR. SIEGFRIED:  I understand it.
12            THE COURT:  So I'm not taking it for any
13  purpose other than this conversation.
14            MR. SIEGFRIED:  Sure.
15            MR. RADINE:  So this is the spreadsheet we
16  produced to them, so it does not include the last dozen
17  that we've located.
18            THE COURT:  Okay.
19            MR. RADINE:  So the way to read this, obviously
20  printing Excels is always a bit of a pain.
21            THE COURT:  Right.
22            MR. RADINE:  It goes, if you will, to the right
23  and down to the right and then down to the right and then
24  down.  So an entire row is expressed over a page and the
25  next page, if that makes sense.
```

1                          PROCEEDINGS                    6

2          THE COURT:  Uh huh.

3          MR. RADINE:   So on the top half of the first

4    page here we start with the nested account transactions.

5    So you'll see there should be about 17 of them, and you

6    have the first half of the information on page 1 and the

7    second half on page 2.  And then below that with the

8    direct transactions, again, first half on page 1, second

9    half on page 2, and then repeating in that pattern

10   through the other pages.

11          So we've asked them if they dispute the accuracy

12   of this, but obviously we're not asking them if they

13   think this is jurisdictionally sufficient, just whether

14   this reflects the evidence we've produced to them.

15          THE COURT:   Okay.

16          MR. RADINE:   Now, we understand from them that

17   they do not think that transactional information is

18   sufficient to prove personal jurisdiction on its face.

19   They've asked us what information or evidence we intend

20   to put in at this stage and so on.  We're at a bit of a

21   loss as to what that would be under *Licci*.  The

22   evidence that relates to personal jurisdiction is

23   transactions for, relating to the terrorist group in

24   question from which the claims arise.

25          So we understand that they've argued that the

```
 1                    PROCEEDINGS              7
 2   evidence, we have not – I'll just quote so I don't
 3   misstate it – that we have, quote, "not provided evidence
 4   sufficient under the Ddue Pprocess Cclause," close quote,
 5   to show, quote, "that the claims in this action raise
 6   arise out of or relate to any transfers processed through
 7   its correspondent accounts in New York," close quote,
 8   because, they argue, last quote, "transfers involving
 9   routine banking transactions and for humanitarian
10   services, for example, do not give rise to claims under
11   JASTA."
12             So our position is that's a merits question.
13   The law in this case, as Your Honor pointed out in two
14   reports and recommendations, is that the Second Circuit
15   noted that the use of a correspondent account standing
16   alone could be grounds to find personal jurisdiction so
17   long as the use is purposeful.  That's from Your Honor's
18   2020 opinion.
19             THE COURT:   Right.
20             MR. RADINE:   And purposeful, as this Court
21   explained, means repeated and volitional as we argued
22   these were and I think as this chart suggests.
23             THE COURT:   Can I ask you something about – I'm
24   sorry to interrupt, but I'm just looking at the dates of
25   these various transactions.   Is there relevance to the
```

```
 1                    PROCEEDINGS                8
 2  dates, I mean when was, I see a bunch are Holy Land
 3  Foundation, some Interpal, some others.  Were any of
 4  these Holy Land Foundation transactions after this
 5  designation?
 6          MR. RADINE:   They were all after the Israeli
 7  designation of Holy Land Foundation which we alleged was
 8  publicized and, therefore, sufficient under Honickman.
 9  They're not after the U.S. designation because that
10  would've prevented the correspondent banks from
11  processing these transactions.
12          THE COURT:  Okay.  Okay.  So none of these are
13  post-U.S. designation?
14          MR. RADINE:   Right, there wouldn't be U.S.
15  dollar transactions post U.S. designations.  So for
16  HLF that's the end of 2001, but for Interpal, of course,
17  that's 2003.  And then some entities weren't designated.
18          THE COURT:   Right, but you have Interpal
19  transactions from prior to the violence at issue.
20          MR. RADINE:   Yeah.  So anyway, the
21  personal jurisdiction, so obviously Kaplan and Linde
22  make clear that what constitutes routine banking is for a
23  jury to decide.  Whether it's knowledge is sufficiently
24  or, general awareness is sufficiently established from a
25  humanitarian purpose of a transactions is a merits
```

```
 1                    PROCEEDINGS              9
 2   question that we'll obviously arrive to when we get into
 3   merits discovery, but there's not been a court that's
 4   held that a defendant's knowledge has to be evident on
 5   the face of each transfer.  That could be proven in any
 6   number of ways.
 7            THE COURT:   At least for jurisdiction you're
 8   saying.
 9            MR. RADINE:   At least for jurisdiction, right.
10   So arising out of, which is their argument is on the due
11   process version of "arising out of."  There's the New
12   York version of "arising out of" and the due process
13   version.  According to their letter, they're contesting
14   the due process version.  Of course, as this Court noted,
15   they had not contested the New York "arising out of"
16   version in a motion to dismiss.  In any event, the Second
17   Circuit has never, they note this in Licchi (phonetic),
18   found a case where plaintiff satisfied the New York rule
19   but not the due process rule.
20            As this Court noted, under the New York rule,
21   quote, "the foreign bank's use of its correspondent
22   accounts is not completely unmoored from the legal claim
23   regardless of the ultimate merits of the claim" is the
24   standard that Your Honor set out correctly.  And then as
25   for whether the – whether due process could operate
```

Formatted: Font: Italic

```
 1                    PROCEEDINGS                    10
 2  differently, Your Honor noted, quote, "CAB offered no on-
 3  point case authority supporting this argument." The
 4  Second Circuit does not appear to have seen it either."
 5  So we think that's that is for personal jurisdiction.
 6            Now, we want to come to understand more about
 7  how the bank operated that we think bears on the
 8  transactional element and the documents they could have,
 9  and that's where the 30(b)(6) deposition notice comes in.
10  And I can speak on that briefly, Your Honor.
11            THE COURT:  Yes.
12            MR. RADINE:  So we've noticed three issues to
13  them.  The first relates to the IT systems that the bank
14  used during the relevant period as they relate to
15  transaction processing.  So they have explained to us
16  before a little bit about their understanding of their
17  systems at the time.  They explained that they used the
18  Kindle Banking System in the relevant period.  That's
19  been taken offline, and they don't have – the system is
20  not supported anymore nor is the associated OS and
21  hardware.  And they mentioned they don't have backups and
22  archives.
23            It's been our experience working with banks in
24  these cases that what is not currently usable by the
25  bank's IT staff is not necessarily unrecoverable.
```

```
 1                   PROCEEDINGS              11
 2  Relevant data may sit on multiple systems, it may have
 3  been transferred to another system, recovery may be
 4  possible.  It may necessitate a vendor who specializes in
 5  recovery work.  In any event, we won't know until we
 6  ascertain what systems were used.  I'd also point out
 7  that that's a single system.  So in our experience banks
 8  use multiple systems.  We've seen that the system that
 9  runs the SWIFT database which its transactions are
10  processed through and other banks is not the same as
11  their core banking system which is what I believe the
12  Kindle system —likely is.  There may not be more to draw
13  from this line of inquiry, but we can't know until we
14  begin to have it.
15          The second issue is that of the CAB's use of
16  correspondent accounts and nested accounts.  As Your
17  Honor raised at our last conference, it's worth knowing
18  how the bank used its correspondent accounts generally,
19  it gives a sense of the jurisdictional contacts they had
20  when processing the transactions.  And then in the nested
21  account which is sub judice, the impact of that, in
22  Spetner, I would imagine the bank, just as much as us,
23  would like to know if CAB used its nested account in a
24  way that was similar or different than the defendant in
25  that case.
```

```
 1                       PROCEEDINGS              12

 2          THE COURT:  And how did the defendant use the

 3  nested account in the cases pending before the Second

 4  Circuit?

 5          MR. RADINE:  So those transactions, when a

 6  customer of the bank wants to push a transaction, they

 7  will indicate who the ultimate beneficiary is.  And then

 8  those are instructions that the originator bank, the

 9  defendant, would then give to their bank where they hold

10  their nested account for further credit down the line

11  ultimately through New York and then to the opposing

12  party, the counterparty to the transaction.

13          So in a sense that when a bank holds a

14  correspondent account in New York, when they send a

15  transaction through New York, they're providing

16  instructions to each bank down the line as to moving it

17  along.  This just adds another bank.  So the question

18  would be, for instance, like what control does the

19  defendant have --

20          THE COURT:  Why does it go through a nested

21  account versus just going through its own, why would it

22  add a party instead of minimize the parties?

23          MR. RADINE:  So --

24          THE COURT:  What's the purpose of being --

25          MR. RADINE:  Sure, banks hold nested accounts
```

PROCEEDINGS                    13

for different reasons.  That's something we'd certainly

get into with them.  Sometimes they're unable to hold, a

New York bank ~~will~~ won't offer them an account or at

least an account with terms they want --

        THE COURT:   But we know that CAB did have some

correspondent accounts.

        MR. RADINE:   Right.  It could be a legacy

account that they had from before they had access to New

York accounts that they were still using.  These are all

things we would get into with them and see whether or not

that's a fruitful topic to understand.

        The last issue relates to their sale of relevant

branches to Palestine Islamic Bank.  They informed us

that whatever records were at those branches in the

Palestinian territories were transferred to the buyer

bank when they b~r~ought those branches because possession,

custody, and control can relate to whether or not you

have the right to demand records ba~ck~ck.  We just want to

understand what the agreement was as to those records,

document sharing, however that operated, whether

documents were transferred back to CAB at all.

        Now, on these topics we have a corresponding set

of document requests, we have four document requests that

relate to these topics.  CAB in a meet and confer told us

```
 1                    PROCEEDINGS              14
 2   maybe those records will answer our questions without the
 3   need for deposition.  We're, of course, open to that, to
 4   see those records and to see if that makes sense.  We
 5   think we'd likely, at least from our experience in the
 6   IT process that we've gone through with other banks, I
 7   imagine we would have follow-up questions.  But, of
 8   course, you know, we are happy to look at the documents
 9   first and talk to them about that.
10             THE COURT:  Okay.
11             MR. RADINE:  So the big takeaway, Your Honor,
12   is that between the continuing work of the banks that
13   we've issued subpoenas to and the deposition process,
14   we'd like to extend the discovery period.  We propose 90
15   days in part to get us past the holidays from which we
16   imagine we'll have a little bit less responsiveness from
17   the banks and so on, and that would put us on February 2.
18             THE COURT:  Right, well, we had November 14 as
19   completion of jurisdictional discovery.  So you want a
20   90-day extension on that.
21             MR. RADINE:  Yeah, I think November 4 is the
22   deadline, and the --
23             THE COURT:  Maybe I have a typo in my notes.
24             MR. RADINE:  Sure, November - so 90 days from
25   November 4 would be February 2.  Of course, we don't have
```

```
 1                    PROCEEDINGS                   15
 2   the Court's decision on the R&R, so our feeling is is
 3   that this is time we can use productively to do this
 4   work.
 5            THE COURT:  Okay.  I'll hear from defendants
 6   next about these issues and also the extension of
 7   discovery.
 8            MR. SIEGFRIED:  Thank you, Your Honor.  Dealing
 9   about nesting, which is in your mind at the moment,
10   having looked at that chart, I don't want to – and you
11   also said before you're not deciding merits --
12            THE COURT:  No.
13            MR. SIEGFRIED:  -- at a status conference.  So
14   I'm not going to argue a great deal about the merits
15   other than to note a couple of things.  One, the very
16   beginning of their chart is replete with these so-called,
17   what they're now calling, nesting transfers.  Now, it's
18   interesting actually because the plaintiffs like to keep
19   changing their theory in this case.  First of all,
20   there's absolutely nothing in the complaint about
21   nesting.  In fact, as you may recall, what we brought to
22   the Court's attention is that allegations in the
23   complaint regarding these transfers, that they were all
24   through Citibank, were incorrect when made, when the
25   complaint was drafted.  And then when you inquired of Mr.
```

```
 1                    PROCEEDINGS                    16
 2   Osen about that issue when he was here, he said, oh,
 3   well, but we're not sure because the transfer slips don't
 4   necessarily show us whether it went through Citibank, and
 5   we don't have the complete transfer slips, so it may have
 6   gone through Citibank.
 7             I gather they've now, because they should, have
 8   retreated from that argument to now talk about it as a
 9   nesting argument.  And as far as a nesting argument is
10   concerned, Your Honor, since they raised it and since I
11   assume it will come up again, the case is Spetner v.
12   Palestinian Investment Bank, 495 F. Supp. 3d 96, a 2020
13   decision, in which not just any plaintiff but these
14   Pplaintiffs representeding by Mr. Osen and his firm, the
15   same counsel that you have before you, made every
16   conceivable argument under the sun to Judge, I think it's
17   Komitee is, is that --
18             THE COURT:   Who?
19             MR. SIEGFRIED:   K-O-M-I-T-T --
20             THE COURT:   Oh, Komitee.
21             MR. SIEGFRIED:   Komitee.  I don't know where
22   you put the accent on that.  Mad a whole bunch of
23   arguments because the situation was even more involved
24   than it is here.  They had three different nesting
25   theories.  And he carefully reviewed each one, and he
```

```
 1                    PROCEEDINGS                 17
 2  said there was no personal jurisdiction.  That is the law
 3  as it stands right now.  Mr. Radine is correct that they
 4  have appealed to the Second Circuit.  Obviously, I
 5  wouldn't say anything about how you might judge the
 6  matter, but I think that if you read the decision, it's a
 7  fairly thorough, careful, detailed decision as to why
 8  that theory simply doesn't hold water.
 9            THE COURT:  Of course, that's only with respect
10  to 17 transactions.  The other ones are through --
11            MR. SIEGFRIED:  And let's go to the others.
12            THE COURT:  Yeah.
13            MR. SIEGFRIED:  Then we have a whole bunch of
14  NatWest transactions that, of course, didn't go through
15  New York.  A lot of them are in Sterling, some of them
16  are in (indiscernible), but they're not through Citibank
17  in New York.  There are --
18            THE COURT:  None of these are through New York?
19            MR. SIEGFRIED:  No, I'm not saying that, Your
20  Honor.  I've got a large sheet here, but I think that the
21  last time we looked, they keep making ongoing
22  productions, but the last time we looked, there were
23  maybe only a couple, two or three, that went through
24  Citibank.  So, again, this is why, when I objected
25  before, I said there was much to be said about this.
```

```
 1                        PROCEEDINGS                18
 2   Then we have issues regarding this contention, by Mr.
 3   Radine, by the plaintiffs, that this is somehow a merits
 4   issue.  Your Honor, we will have the opportunity
 5   obviously to brief, and for you to consider, this issue,
 6   but the Due Process clause, insofar as this is
 7   concerned, is not a fifth grade math class in which you
 8   say how many transfers were there and, therefore, oh,
 9   there must be jurisdiction.  Not any transaction will do.
10           The Due Process clause, and everyone thing from
11   the Supreme Court to the Second Circuit have been quite
12   clear, that the second part of this analyis, beyond the
13   number of transfers, which may be relevant to the issue
14   of purposefulness, the main part of due process is that
15   the claim must arise out of or relate to the transaction.
16   It's the nature of the transaction that is
17   extraordinarily important, and when we get to the merits
18   of this topic, we will address it, and, indeed, I think
19   you'll see that these claims do not, cannot relate to or
20   arise out of any of the transactions that they're listing
21   here.
22           You can - if it were otherwise, it would be the
23   case, I believe, that there'd be no distinction between
24   the maintenance of an account and a use account.  It's
25   hard to imagine that anybody has a correspondent account
```

```
 1                    PROCEEDINGS                19
 2  and doesn't use it.  So the question is what is it using
 3  it for?  What is the transaction?  And that is where I
 4  think their case falls apart, and it is rather
 5  interesting if, and I think plaintiffs understand this
 6  because, quite frankly, if they had 110 transactions that
 7  they really stood for what they would like to report in
 8  court today, then I'm not sure why we're going through
 9  seven more subpoenas to a whole bunch of banks or what
10  further evidence they need other than what they have
11  today.
12           So now let me turn to the rest of the - if I've
13  answered that question.
14           THE COURT:   Well, let me stop you for one
15  second --
16           MR. SIEGFRIED:   Sure.
17           THE COURT:   -- because there's - I see here,
18  looks like four transactions through New York in CAB's
19  New York correspondent accounts involving use of Al-
20  Hayeak (phonetic).  If the court - so the ones from Bank
21  One, from Texas, there's a bunch of those, and that's
22  Holy Land Foundation was founded out of Texas.  So I
23  guess my question is sort of a do you, is it your
24  position that if anything that the jurisdiction would be,
25  or venue would be appropriate in Texas versus New York,
```

```
 1              PROCEEDINGS              20
 2  assuming there was jurisdiction, assuming jurisdiction
 3  was established through this correspondent bank accounts,
 4  how does that impact where this case is being litigated
 5  now?
 6          MR. SIEGFRIED:  It's --
 7          THE COURT:   Right?  Because there's four New
 8  York and there's a lot of Texas.  So, and if it were, if
 9  Texas were appropriate, do you want to be there versus is
10  this a more convenient venue for everyone?  I mean how
11  does that factor into the analysis?
12          MR. SIEGFRIED:   I would say New York is not a
13  convenient factor nor is Texas for purposes of a foreign
14  bank, and I'd rather, instead of responding off the cuff
15  to your comment, come back to you on it.
16          THE COURT:   Okay.
17          MR. SIEGFRIED:   But I think that, I don't think
18  we really get there because whether we talk about, as I
19  said, those Hayeak transactions, which I cannot believe
20  ultimately you will find differently than Judge Komitee
21  has, or with respect to these Bank One transactions which
22  also have issues around them, quite frankly, separate and
23  apart from their use.  I don't think we're going to end
24  up reaching that issue.  I just don't think they're
25  jurisdictionally sufficient either for purposes of Texas
```

```
 1                    PROCEEDINGS              21
 2  or for New York, quite frankly.
 3            THE COURT:  Okay.  You can address the
 4  remaining issues.
 5            MR. SIEGFRIED:   Okay, thank you.  And, by the
 6  way, I should add, Your Honor, or maybe the last point I
 7  should make is we did have a meet and confer with Mr.
 8  Osen in which hethey said, well, we'd like you to confirm
 9  the content of the transactions, and, frankly, I'll have
10  that conversation further with himthem offline.  I don't
11  actually understand the question, what the content of the
12  transaction is.
13            THE COURT:  Well, I assume they want to know do
14  you dispute that these transactions actually occurred
15  with these parties on these dates.
16            MR. SIEGFRIED:   If that's what they're asking
17  now, ,  iIt has its own set of issues.  So we'll have
18  that discussion with them.
19            With respect to the subpoenas, you know, at the
20  August 25 hearing, you set the deadline of November 4,
21  and you said I want you to really focus on the
22  jurisdictional issues.  And Mr. Osen said in response,
23  well, with respect to jurisdictional discovery, the
24  deadline for third-party banks, we'll obviously abide by
25  that.  You asked for the status of discovery at that
```

```
 1                    PROCEEDINGS                22
 2   point, he gave you the status of discovery, there was not
 3   a word mentioned about, oh, we want to issue more
 4   subpoenas.  There wasn't – then we have somewhere
 5   between, somewhere in the middle of September to late
 6   September, I'm not even sure they say they served them
 7   during that period.  I know that the subpoenas are dated.
 8   But supposedly they served something knowing what your
 9   discovery deadline was, and these subpoenaed banks are
10   not any of the correspondent banks in New York.  They're
11   not referred to in the complaint which identified the
12   correspondent accounts.  So this is – so we have
13   subpoenas going out to seven banks, close to within a
14   month or so of your discovery deadline, to banks which,
15   with whom we do not have any correspondent account in New
16   York.  And the subpoenas, as I read them, are for in each
17   case are for 23 years of records and for 74 or more
18   individuals and entities, notwithstanding the fact that
19   the complaint that is before us talks about five
20   individuals and 16 --
21            THE COURT:   So the subpoenas are covering more
22   than what's mentioned in the complaint?
23            MR. SIEGFRIED:   Absolutely, and, Your Honor, if
24   you look at the joint status report, what you see in the
25   plaintiff's section is that, I think the term they use is
```

```
 1                    PROCEEDINGS                23
 2   BNY, Bank of New York, has balked at the request for 23
 3   years of, I don't know whether they say the 23 years, but
 4   balked at the request, that they rejected multiple
 5   compromises, and they only hope that it can be resolved
 6   without judicial intervention.
 7           In the meet and confer I asked Mr. Osen whether
 8   the Bank of New York had any position as to whether it
 9   even had documents going back to the relevant time
10   period, and I believe he told me  that at least for the
11   Bank of New York, he said we don't even know that we have
12   them going back that far.  Citibank had no documents,
13   none, zero, there's none produced by them.  And Standard
14   Charter, the earliest document that they have that
15   involves CAB, a CAB transfer, is 2005.
16           So the idea that seven subpoenas are now going
17   out for this breadth, one thing for sure, if Your Honor
18   is inclined to let this part of it go forward and to
19   extend on this basis, we certainly don't want to be back
20   here in 30 days, 60 days, or 90 days hearing that there
21   are yet another six subpoenas or that we are still in
22   negotiation trying to get records from banks over a 23-
23   year period, etc.
24           And that's relevant to another point regarding
25   this chart and to what's happened today.  There was a,
```

```
 1                    PROCEEDINGS                 24
 2   what seems to have happened with some of these banks, it
 3   happened with Standard Charter, happened with HSBC with
 4   whom also CAB had no correspondent account, is when they
 5   get the subpoena, which, yes, it says transactions with
 6   CAB, then has a list of 74 individuals for 23 years.  As
 7   a practical matter, I think we all know what the bank
 8   does.  It takes the list, the exhibit B list and it
 9   produces documents, transactions involving where those
10   identified entities appear.  So for the HSBC which did
11   something like five productions over the last couple of
12   months, and produced a lot of documents, not a single one
13   refers to CAB.
14        So this subpoena of the seven banks seems to be,
15   as a reason for extension, seems to rest on a rather thin
16   reed.  Again, we want to get past this discovery, we want
17   to get this motion, we think it's a good motion based
18   upon everything we've seen.  So if Your Honor's inclined
19   to give them some leeway, we understand, but we certainly
20   - this starts to become a real stretch late in the game
21   to try to develop evidence.
22        On the - with respect to the 30(b)(6), again, I
23   thought we had a very practical conversation in the meet
24   and confer with Mr. Osen who, in all fairness, was the
25   only one who spoke at the meet and confer, but it's
```

```
 1                 PROCEEDINGS                25
 2  curious because you had directed that we provide
 3  plaintiffs with a letter regarding the sale of the
 4  branches --
 5          THE COURT:   Yes.
 6          MR. SIEGFRIED:   -- regarding the IT platforms.
 7  I think at one point there was an exchange where you
 8  asked Mr. Osen something to the effect of and what is the
 9  source codes or what's the operating systems going to
10  have to do with all of this.  But we provided that
11  information.  We provided that information, as Mr. Osen
12  acknowledged last time, back in July about the sale,
13  about the fact we didn't have transaction records, with
14  respect to the system.  It wasn't terribly vague.  It
15  said the bank is currently using Temenos, T-E-M-E-N-O-S,
16  T24 Core Banking System under IBM UNIX OS.  The system
17  was implemented during the period 2011 to 2013.  The
18  prior operating system was the Kindle Banking System.
19  The bank cancelled the license in 2013.  The Kindle
20  System is not supported anymore nor is the associated OS
21  and hardware.
22          Now, that's on July 29 they had that
23  information.  On Sunday evening, October, if I'm off by a
24  date, October 7 or 8, Sunday evening, they serve a
25  30(b)(6) deposition notice.  Between July and October
```

```
 1                    PROCEEDINGS                26
 2   there is no follow-up, there's no request for any
 3   documents relating to those issues.  And I asked Mr.
 4   Osen, number one, why would this be an efficient way to
 5   proceed.  I said if I come in with a 30(b)(6) witness in
 6   2022 about a system that hasn't been in effect since
 7   2013, regarding documents that are no longer retained,
 8   that's not supported, that was a licensed system, and the
 9   witness says what do you want me to tell you, I said then
10   you're going to tell me I gave you the wrong 30(b)(6)
11   witness.
12            THE COURT:   Well --
13            MR. SIEGFRIED:   So the point is, I said why
14   don't we – and I can't even tell you that we have the
15   documents, right, this is, again, a conversation that
16   occurred at the end of last week.  If we had the
17   documents, we'll give them to him --
18            THE COURT:   Right.
19            MR. SIEGFRIED:   -- and if he wants to go run
20   off to some expert and ask some expert, well, if that's
21   what they had and it was under a license and they no
22   longer have the thing, can you, I don't know what you can
23   do, but in any event somebody wants to say they think
24   they want to revive a system that's no longer there --
25            THE COURT:   You already confirmed that the data
```

```
 1                 PROCEEDINGS                  27
 2  from the relevant time period was not transferred --
 3         MR. SIEGFRIED:   Absolutely.
 4         THE COURT:   -- from Kindle to your system, the
 5  current system, is that correct?
 6         MR. SIEGFRIED:   Yes.
 7         THE COURT:   Okay, so what I'm hearing gives me
 8  concern, Mr. Radine, that what you're doing is outside of
 9  the scope of Rule 26(b) which confines discovery to
10  information that's relevant to the claims and defenses
11  and proportional to the needs of the case.  Why would you
12  be subpoenaing banks that, you know, with which CAB
13  didn't have correspondent bank accounts?  That doesn't
14  make any sense.
15         And further why would CAB have knowledge about
16  the Kindle system?  Wouldn't the appropriate inquiry be
17  of Kindle if it even still exists as to what's going on
18  with its system and did it ever retain any information?
19  I doubt that it would've retained sensitive banking
20  information.  I doubt that the bank, any bank would allow
21  that.  But isn't a proper inquiry of Kindle rather than
22  CAB since it was merely licensing that program?  I'm not
23  really understanding what you're doing or looking for or
24  why this is relevant to jurisdiction.
25         MR. RADINE:   Sure, well, I'll take those in
```

```
 1                    PROCEEDINGS                28
 2   parts.  I'll start with the banks.  Right, those are not
 3   CAB's correspondent banks.  Those are the banks that are
 4   on the other side of the transaction.  Every --
 5            THE COURT:  Other side of what transaction?  It
 6   seems like a fishing expedition, that you're just
 7   subpoenaing random banks with which CAB doesn't have any
 8   existing relationships to see, hey, did you ever have any
 9   kind of transaction that somehow made its way to CAB?  I
10   mean how is that going to jurisdiction?
11            MR. RADINE:  Sure.  So this chart, Your Honor,
12   is consisting entirely of records produced by banks that
13   they don't have a correspondent banking relationship with
14   CAB except for the nested account at Arab Bank.
15            THE COURT:  Right, but this is – what defendant
16   is saying is this is not even helping you.  It doesn't
17   even have New York except for these four transactions
18   with use of Al-Hayeak.
19            MR. RADINE:  I'm at a little bit of a loss as
20   to what that means.  So, again, just to walk through how
21   this works.  The – so let's look at the direct transfers
22   that start on page 1, go to page 2.  So the column, so
23   the beneficiary bank in these is Cairo Amman Bank.  You
24   can see that in that column.  And the beneficiary's
25   correspondent bank is in the first column on page 2, 4,
```

```
 1                    PROCEEDINGS                    29
 2  and 6.  So in every --
 3           THE COURT:   Well, 1 of 6 goes with 2 of 6, is
 4  that right?
 5           MR. RADINE:   Correct, so --
 6           THE COURT:   And so the originating bank we
 7  have, let's just take Holy Land Foundation with Texas
 8  because that's at least in the United States as opposed
 9  to the U.K.  Okay?  So the originating bank says Bank One
10  Texas.
11           MR. RADINE:   Right.
12           THE COURT:   And then there's a blank for
13  originator's correspondent bank.
14           MR. RADINE:   Right.
15           THE COURT:   And then - I'm just looking at the
16  third line on page 1, and that says the beneficiary party
17  is the Halul Zakat Committee, and the beneficiary bank is
18  CAB.  So that's, CAB didn't, as I understand it, didn't
19  originate this transaction.  It received money from Holy
20  Land Foundation that was deposited into the account of
21  its customer Halul Zakat Committee.  Is that how I'm to
22  interpret this?
23           MR. RADINE:   Yes.
24           THE COURT:   Okay.
25           MR. RADINE:   So --
```

```
1                    PROCEEDINGS                    30

2          THE COURT:   And there's no intermediary --

3          MR. RADINE:   No.

4          THE COURT:   -- bank listed for this.  Where is

5  New York in this picture?

6          MR. RADINE:   That is in column, the first

7  column on page 2.  That is the, if you look at the column

8  name, beneficiary's correspondent bank, it's beneficiary

9  bank's correspondent bank.  I believe that's clear --

10         THE COURT:   Well, okay, so I don't think

11 there's a dispute that CAB had a correspondent account

12 with Citi.  But this transaction – is this – I don't

13 understand this transaction to have gone through Citi.

14 Are you saying that it did go through Citi?

15         MR. RADINE:   Yes --

16         THE COURT:   You're saying that – are you saying

17 that Bank One in Texas transferred the money to Citi in

18 New York, then transferred the money to CAB in wherever

19 this was, Lebanon or Israel or some place, where?

20         MR. RADINE:   Yeah.  There's not a word on this

21 that's our assumption.  ~~I bet T~~the bank would've done it

22 through their correspondent account.  That means on the

23 face of the transfer record that we have that it says

24 Citibank New York for further credit of Cairo Amman Bank,

25 Hebron, etc.  That's true for every single one of these
```

```
 1                    PROCEEDINGS                    31

 2   transactions.  In fact, it's wherever a document might be

 3   missing a piece of information, we might have a blank,

 4   but in every instance these are coming through the

 5   Citibank account.  That's in the beneficiary's

 6   correspondent bank column, in every single instance.

 7   Some of them are through Amex in New York.

 8             THE COURT:   So the – so Holy Land Foundation

 9   says, hey, we want to send money to Halul Zakat

10   Committee, and they say, well, our account is at CAB in

11   Lebanon, and so NatWest initiates it and it gets

12   deposited.  And what I'm hearing CAB say is how is it

13   engaging in anything volitional I guess, simply receiving

14   the money through this mechanism.

15             MR. RADINE:   Yes, Your Honor already ruled on

16   that issue --

17             THE COURT:   Right.

18             MR. RADINE:   -- and held correctly that under

19   Arcapita and Amigo Foods receiving a transaction rather

20   than rejecting it qualifies as volitional for personal

21   jurisdiction purposes.

22             All of the transactions, including all the

23   NatWest ones, I don't know why he's suggesting otherwise,

24   went through New York.  Again, you can see the NatWest

25   ones because they say NatWest in the originator bank, and
```

```
 1                    PROCEEDINGS                 32

 2   then if you look at the corresponding row in the

 3   beneficiary's correspondent bank where it says Citi

 4   throughout, that's not an assumption we're making.  We're

 5   taking that off of the transaction records we have.

 6            THE COURT:   I see, so --

 7            (interposing)

 8            THE COURT:   So for the U.K., just taking the

 9   first, well, just taking the first NatWest Interpal

10   transaction, so NatWest in the U.K., Interpal says we

11   want to give money to the Beiate Fajjar's Zakat Committee

12   --

13            MR. RADINE:   Yes.

14            THE COURT:   So they, NatWest then goes through

15   NatWest U.K. --

16            MR. RADINE:   Well, they had a branch in New

17   York which is why I think it's not listed.  So they

18   would've cleared it themselves through New York.  They

19   would transfer it across the books ofto the Federal

20   Reserve Bank in New York --

21            THE COURT:   Oh, because it was U.S. dollar

22   transaction --

23            MR. RADINE:   Correct.

24            THE COURT:   -- they go through their own U.S.

25   account and then switch it to Citi.  Oh, no, here they
```

```
 1                    PROCEEDINGS                    33
 2   switch it to Amex Bank.
 3           MR. RADINE:   Yes.
 4           THE COURT:   And then to CAB where the recipient
 5   has the account.
 6           MR. RADINE:   Correct.  This is the same
 7   structure as in Litcchi, precisely.  In fact, Amex is the
 8   exact correspondent bank in Lictchi.
 9           MR. SIEGFRIED:   Your Honor, may I jump in for
10   one second --
11           THE COURT:   Yes.
12           MR. SIEGFRIED:   -- because it's relevant to
13   your question.
14           THE COURT:   Yes.
15           MR. SIEGFRIED:   We didn't have a correspondent
16   account at Amex.  So the very first example that you're
17   using is NatWest has actually – I'll back up for one
18   second and try not to get into merits of the argument.
19   But NatWest either chose, for whatever reason, to send
20   the transfer through Amex, fine, but that has nothing to
21   do with us, or sometimes, Your Honor, under the system
22   that actually happens under Swift, the bank, as I think
23   you probably know, doesn't even make the originating
24   bank, NatWest in this case, for an Interpal transaction,
25   doesn't even make the decision.  It puts it into Swift,
```

**Formatted:** Font: Italic

**Formatted:** Font: Italic

```
 1                     PROCEEDINGS                    34

 2  and the Swift computers do whatever they do --

 3           THE COURT:   System just does its stuff.

 4           MR. SIEGFRIED:   -- and they send something

 5  through.  So I don't see how that gets to be the

 6  volitional use of a correspondent, of its correspondent

 7  account in New York.

 8           THE COURT:   But you did have a correspondent

 9  account with Citi.

10           MR. SIEGFRIED:   We did have a correspondent

11  account with Citi, but I think the way we got into this

12  line of questioning was you posed a simple question which

13  is with respect to these seven new subpoenas that they

14  want to serve which are not to the CAB correspondent

15  banks, what is the relevance of that, why is that a Rule

16  26(b) request --

17           THE COURT:   Right, right.

18           MR. SIEGFRIED:   -- and I'm actually not sure I

19  heard the answer to that question.

20           THE COURT:   Yes, well, let's go back to that,

21  Mr. Radine, what is the relevance?

22           MR. RADINE:   Sorry, if I just - I want a, just

23  a clean record.  A bank can't force a transaction through

24  an intermediate bank that doesn't have a correspondent

25  relationship.  Of these seven transactions with Amex - I
```

```
 1                    PROCEEDINGS                    35
 2  don't know sitting here, the story, what appears to be
 3  the case is they did have a correspondent account with
 4  that bank.  Sitting here I don't know.  We're pulling
 5  this from the face of the transaction.  We've been
 6  through the - that's not something I think is
 7  controversial or obviously --
 8          THE COURT:   Well, it is because CAB is saying
 9  they didn't have a correspondent bank with, they didn't
10  have a correspondent banking relationship with Amex or
11  here's Bank of New York --
12          MR. RADINE:   Bank of New York I think they
13  concede.  But, Your Honor, this sounds like grounds all
14  the more to have a 30(b)(6) because they're denying
15  having an account that we have on paper.  They're denying
16  it here in court.  It's not under oath.  It's a great
17  question to ask them in a 30(b)(6) context.
18          THE COURT:   Okay, but that answers the question
19  about why you might want to have a 30(b)(6), you might
20  want to have a witness explain what the different
21  relationships were, but that doesn't go to the subpoenas
22  onto these other banks.
23          MR. RADINE:   So these are banks that we
24  understand would be likely on the other side of the
25  transactions because they are, for instance, either the
```

```
 1                    PROCEEDINGS                    36
 2   biggest players in the markets where a lot of these Hamas
 3   affiliated entities are or because we have other records
 4   that have attached them to entities like that.  They have
 5   not moved, of course, to quash.
 6            THE COURT:   So you're trying to get reverse
 7   information essentially.
 8            MR. RADINE:   Sure, this whole chart --
 9            THE COURT:   These other banks – so these other
10   – you are speculating that these other banks have
11   accounts with Hamas entities, not all of which are even
12   listed in your complaint, and those entities might have
13   asked their banks to send money to somebody who had an
14   account with Cairo Amman Bank.  So it sounds like a
15   fishing expedition is really what it sounds like.
16            MR. RADINE:   Or they're the correspondent bank
17   for – they don't have to have the accounts themselves.
18   They can also be in a correspondent position.  These
19   banks have New York branches which is why --
20            THE COURT:   But you don't know, as you sit here
21   today, whether – you don't know who the customers of
22   these subpoena recipients are or whether they ever
23   initiated a banking transaction that went to a customer
24   of CAB.  You don't even know that.
25            MR. RADINE:   But these banks are the choke
```

```
 1                    PROCEEDINGS                    37
 2  points essentially, rather than, for instance,
 3  subpoenaing all 10,000 banks in Germany, you have
 4  Commerzbank, the largest sort of clearing bank for
 5  Germany, and I believe we recently got a transaction hit
 6  on that.  So so far it's been productive.
 7          THE COURT:  You got one hit out of how many
 8  subpoenas and how many records and years?  I mean this is
 9  really excessive it seems, and really how are you going
10  to demonstrate jurisdiction through this?
11          MR. RADINE:  I'm not sure how it's to the
12  defendant's prejudice that we reach out with subpoenas.
13  They've produced nothing --
14          THE COURT:  Well, the prejudice is they keep
15  coming into court.  They're waiting to brief the
16  jurisdictional issue on the merits as opposed to under a
17  Rule 12 standard, and they're spending attorney's fees
18  involving this, and then they're going to have to prepare
19  a witness for a 30(b)(6) deposition on a topic that it
20  seems, I don't know understand why they would have any
21  knowledge of it at all.  Why would they have knowledge on
22  this other company's system that they no longer use?
23          MR. RADINE:  I'll turn to the 30(b)(6) thing.
24  My understanding is, first, a party can't object to the
25  relevance of a subpoena.  That's something that the
```

```
 1                    PROCEEDINGS                  38
 2  subpoena recipient --
 3          THE COURT:   Well, that is true, but at the same
 4  time you're asking for an extension of discovery based on
 5  that, and you are bound by Rule 26(g) and 26(b) to seek
 6  discovery that is consistent with the rules relevant to
 7  the claims and defenses and proportional to the needs of
 8  the case.  So, yes, that is true that CAB may not have
 9  standing to object on relevance grounds, but you as an
10  officer of the court have an obligation to utilize the
11  Federal Rules consistent with what they say.
12          MR. RADINE:   So far, Your Honor, we have only
13  gotten records from third-party banks that don't have a
14  correspondent relationship with CAB.  If we didn't have
15  access to records like those, we'd be at zero instead of
16  101 on this list right here.  We are ~~in~~ meeting and
17  conferring with those banks, we take their objections
18  seriously, and work on narrowing the subpoena with each
19  of them.  They're obviously free to move to quash, but so
20  far we've had productive conversations with them, and
21  some of them have been producing already, some are still
22  working on it, as he mentioned, Standard Chartered Bank,
23  which, by the way, owned Amex or now owns Amex Bank,
24  (indiscernible) that bank, produced records~~,~~ _that_ went
25  back to '05.  We're obviously asking them to look back
```

```
 1                    PROCEEDINGS                    39
 2  further.
 3          I don't think with the defendant producing
 4  nothing that we shouldn't be allowed to reach out to
 5  banks that we have at least a reason to believe can run a
 6  search --
 7          THE COURT:   What is the reasonable belief?   It
 8  sounds - you're not even including entities that are
 9  mentioned in the complaint.
10          MR. RADINE:   The company, Your Honor, I --
11          THE COURT:   It's really speculation.  Has
12  somebody told you, oh, Standard Chartered has an account
13  with this particular entity that's listed in the
14  complaint, has somebody told you that?
15          MR. RADINE:   They're likely to be - well,
16  they're likely to be, to have the role rather of a
17  correspondent bank.  We subpoenaed their New York
18  branches for each of these banks rather than casting
19  about around the world.  There's only so many banks which
20  do dollar clearing at all, and any transaction from
21  around the world that comes through their bank for dollar
22  clearing is something that they would have a record of or
23  at least would have had a record of at the time.  So --
24          THE COURT:   Yes, that may all be true, but it
25  is still speculation that you're going to have a hit on
```

```
 1                    PROCEEDINGS                 40
 2  anything that is relevant.
 3         MR. RADINE:   And as for the list - well, I
 4  think, Your Honor, that we are, again, targeting a
 5  limited set of banks that we think have the most
 6  likelihood of being in that position.  Obviously, the
 7  names are names that we understand as Hamas customers and
 8  entities.  We didn't understand the complaint has a
 9  necessity to be a directory of every Hamas operative or
10  entity.  That's something that expands during discovery
11  that we are seeking with those banks.
12         If I could turn to the deposition --
13         MR. SIEGFRIED:   Your Honor, sorry, can I jump
14  in on that for a moment?  Apart from everything you've
15  just said, the last statement is an extraordinary
16  statement.  So your - we are arguing or will be arguing
17  that the Court doesn't have personal jurisdiction with
18  respect to the claims asserted in the complaint.  This
19  was no tiny complaint.  This was a very long complaint
20  which listed five individuals, sixteen or seventeen
21  entities, a lot of detail about it.  And now the argument
22  is, well, we think there may be some banks out there, we
23  know they're not the correspondent accounts, they may
24  have had customers or sent money to 70 some odd other
25  individuals, and maybe we'll find a hit that actually
```

```
1                    PROCEEDINGS                41
2   went through CAB.  And then what?  So they did a transfer
3   to somebody who's not even in the complaint.  So now
4   they're going to argue, well, that's a Hamas person and,
5   therefore, there's jurisdiction even though those persons
6   and entities aren't referenced in the complaint.
7            And this is all coming, we haven't heard, A,
8   when they, whether they even effected the service.  This
9   is all coming close to your discovery deadline when they
10  said they would abide by the discovery deadline.  And it,
11  you know, I don't normally want to use the word fishing
12  expedition, I'm glad that you did, in this circumstance,
13  but this is the problem, and, again, when we get into
14  this chart eventually, you'll see that, I mean there are
15  transfers to entities that they refer to aren't, again,
16  aren't in the complaint.
17           So I understand they want to use the
18  jurisdictional discovery to do all kinds of things, but
19  that's not what this is about.  The 30(b)(6), again, what
20  I said, I'm not even sure why that's a 30(b)(6).  If what
21  they want is a representation or a statement as to who
22  the correspondent accounts were, we they could do that.
23  That hardly requires a 30(b)(6) deposition to do that.
24  Actually, Mr s. Osen said I will work with you efficiently
25  on that.
```

```
 1                    PROCEEDINGS                    42
 2            But I think you're getting a sense of the
 3  problem that we have.  This is costly, this is, we're not
 4  the ones who brought an action 22 years after the events.
 5  They're stuck with the fact that having waited so long,
 6  these banks don't have records --
 7            THE COURT:   Well, to be fair, the law changed,
 8  and --
 9            MR. SIEGFRIED:   And it's within --
10            THE COURT:   -- allowed the aiding and abetting
11  claim.
12            MR. SIEGFRIED:   It does, but to be equally
13  fair, these plaintiffs, it's not just any plaintiff,
14  these plaintiffs sued Arab Bank, they sued NatWest, they
15  sued Credit Lyonnais.  It's the same plaintiffs, the same
16  claims, the same attacks, the same injuries.  They just
17  discovered 20 years after the fact CAB?
18            So they get the discovery, they have their
19  complaint.  But it has to be - this is why we're pushing
20  back.  Again, we want to be reasonable, but we don't want
21  to be doing this months and months.  And there's an
22  additional prejudice, as I said, which is it is costly
23  because when they go and they subpoena somebody like
24  HSBC, as I used as an example before, HSBC produces
25  thousands of pages of documents which we then have to
```

```
 1                    PROCEEDINGS                43
 2  review.
 3           THE COURT:   Right.
 4           MR. SIEGFRIED:   And for nothing, for zero, zero
 5  transactions.
 6           THE COURT:   Well, it seems to me that there's
 7  really not a basis to extend discovery by 90 days.  I'll
 8  extend discovery to December 9.  And if you are seeking
 9  to move to compel compliance with these subpoenas, those
10  have to be filed in November by November 11, any motions
11  to compel.
12           MR. RADINE:   Okay.  Did Your Honor want to be
13  address the 30(b)(6) statements discussion?
14           THE COURT:   Well, for the 30(b)(6) you all
15  still have to meet and confer.  It sounds like you're not
16  done with that process from what I've heard, and I
17  understand why you may want some testimony about exactly
18  how the correspondent banking relationship worked, have
19  something under oath about what were the correspondent
20  banking relationships at the relevant time period.  So I
21  understand that, but it seems to me that you can further
22  meet and confer on that.
23           MR. RADINE:   That's fine.  We heard a number of
24  inaccuracies about the description of the IT systems and
25  so on, but that can be the subject of the meet and confer
```

```
 1                    PROCEEDINGS                44
 2  process.
 3          THE COURT:   Yeah, I'm not limiting right now
 4  the 30(b)(6) topics.  I'm just expressing some skepticism
 5  about the need for some of the topics, but you should
 6  still meet and confer on those.  Because it seems to me
 7  there's a real question of what was happening with some
 8  of these transactions that you're listing here.  I mean
 9  how many of these transactions even involve entities
10  listed in the complaint?
11          MR. RADINE:   I believe this list should
12  correspond to the complaint.  I don't --
13          THE COURT:   Obviously, I recognize some of the
14  names.
15          MR. RADINE:   Yeah, I mean Holy Land Foundation
16  is on most of, a lot of these.  Interpal is on a lot.  I
17  think there'd be very few that aren't.
18          THE COURT:   Right, but the point is what does
19  CAB have to do with it?  So what if Holy Land Foundation
20  has an account with Bank One in Texas?  What does that
21  have to do with CAB?  The question is is it going to, in
22  these transactions, is it going to a CAB client that is
23  mentioned in the complaint?  That would be relevant.  So
24  my question is really the beneficiary parties because
25  that's what we're looking at here, what the beneficiary
```

```
 1                    PROCEEDINGS                 45
 2  parties, how many of these are named in the complaint?
 3  Has anybody taken stock of that?
 4        MR. RADINE:   Sure.  I can tell you I see mostly
 5  look in the beneficiary column, Your Honor, I see, again,
 6  mostly, a lot of Holy Land Foundation.  The Zakat
 7  Committees were all in the complaint, I'm sure of that.
 8  Taha's in the complaint, Mohamed Salah Taha is in the
 9  complaint.  So I don't see, excuse me, any, yeah, I don't
10  know about every single one, but it looks like the
11  overwhelming - Al-Mujama Ombu Jama (phonetic) is the
12  central headquarters, institution of Hamas.  So I think
13  that would certainly qualify.  Rami WAMY (phonetic) is in
14  the complaint.  I don't see any that aren't, which isn't
15  to say my eyes aren't skipping over one looking at this
16  list now, and obviously I don't understand the law to
17  suggest that evidence that's outside the complaint isn't
18  sufficient on summary judgment.  Discovery often will --
19        THE COURT:   Well, it has to be - discovery has
20  to be relevant to the claims and defenses, and so, yes,
21  discovery may involve information that's not included,
22  facts that are not included in the complaint, but they
23  still have to be facts relevant to the claims and
24  defenses.  So that's the limitation.
25        MR. SIEGFRIED:   I might be able to help Mr.
```

```
 1                    PROCEEDINGS                  46

 2   Radine out with his eyes on page 2 which is going no

 3   further than page 2.  The Halal Halul Zakat Committee is

 4   not mentioned in the complaint.  The Suwad Silwad

 5   Municipality is not mentioned in the complaint --

 6              THE COURT:   Okay.  Well, there's some and

 7   there's some not.  Okay.

 8              MR. SIEGFRIED:   Exactly.

 9              THE COURT:   So this is supposed to be related

10   to jurisdiction as opposed to this general awareness

11   which may potentially be slightly broader, and that's

12   what you're, that's the - so it sounds to me like maybe

13   some of these subpoenas are going beyond jurisdictional

14   discovery and going into potentially this general

15   awareness element.  There's some argument that you don't

16   want to subpoena banks twice if they're going to look for

17   documents.  At the same time it seems like they're quite

18   broad.

19              I'm going to direct you to meet and confer on

20   the Rule 30(b)(6).  I'm not going to extend

21   jurisdictional discovery any further beyond the December

22   11 date.

23              MR. RADINE:   December 11?

24              THE COURT:   Isn't that what I said?

25              ATTORNEY:   December 9.
```

```
 1                    PROCEEDINGS                47
 2         THE COURT:   December 9, sorry.  November 11 is
 3  the date for any motions to compel.  And I'll issue an
 4  order with that revised schedule.  Are there other items
 5  that plaintiffs wanted to raise today?
 6         MR. RADINE:   I believe that is it for us, Your
 7  Honor.
 8         THE COURT:   Anything else defense counsel would
 9  like to raise?  Yes.
10         MR. SIEGFRIED:   The one item that you didn't
11  touch upon, but I mention it not for purposes of a ruling
12  because it falls under the meet and confer issue that Mr.
13  Osen and I agreed to have, but which Mr. Radine also
14  raised at least tangentially today, regarding witnesses.
15  I asked Mr. Osen, since he has the burden of proof once
16  you have jurisdictional discovery.  To make out his
17  jurisdictional argument, I asked him whether he saw this
18  as a documents case and then the law ₁as applied to the
19  documents, or whether he saw this as a case in which he
20  would require, in which he anticipated or potentially
21  anticipated using witness testimony, whether it's by
22  affidavit, deposition, whatever.
23         And when I first raised it several weeks ago or
24  over a month ago, He said he hadn't really given it any
25  thought, let him think about it, he understood the issue.
```

```
 1                     PROCEEDINGS                    48
 2   When we had the meet and confer, I raised it again
 3   because we had received a letter in the interim that,
 4   well, we don't know what to put in until we see your
 5   papers, and we wrote back you have the burden of proof.
 6   It's not a question of what we put in; it's a question of
 7   what, because we have the right to depose a person if
 8   you're planning to call a witness.  And it's your burden.
 9   You're going to set forth the facts that you think are
10   relevant and why you think any transactions that the bank
11   may have engaged in through New York relate to, or that
12   your claims arise or relate to those transactions.
13           So we in the meet and confer, I think Mr. Osen
14   said he was inclined to believe that this was going to be
15   a documents and law case, that's fine.  We agreed to talk
16   about it further.  But I just wanted to put that on your
17   radar because clearly if we don't have an agreement about
18   that, I don't think this is all about hiding the a eball.
19   This is about --
20           THE COURT:  No, you have to have an exchange of
21   information and perhaps there's going to be testimony
22   from a 30(b)(6) witness about some of these transactions
23   on the sheet or, I don't know, maybe somebody from one of
24   these banks.  I assume there's no dispute that these are
25   authentic records produced by the bank or the bank will
```

```
 1                      PROCEEDINGS              49
 2  say these are real records that they have, but you may
 3  dispute the, what they mean.  But that would be the
 4  subject of testimony potentially, how they are
 5  interpreted.
 6           Okay, well, I'm --
 7           MR. SIEGFRIED:  I don't think there's an
 8  authentication issue with respect to anything that's been
 9  subpoenaed.
10           THE COURT:  Yes, right.
11           MR. SIEGFRIED:  But --
12           THE COURT:  Okay, so I'm just going to put a
13  pin on that and ask you to meet and confer, and I think
14  we do have a date for a next conference.  Is that right,
15  Chris?  We do, okay.  All right, well, have a Happy
16  Halloween, everyone.  Nice to see you.  We're adjourned.
17           MR. SIEGFRIED:  Thank you, Your Honor.
18           THE CLERK:  November 15.
19           THE COURT:  November 15, okay, well, then
20  that's good because if there's any motions to compel,
21  we'll know.  You can invite the banks to that, if there
22  are any motions to compel, you can invite the banks to
23  that conference.  Okay?  Thank you.
24           (Whereupon the matter was adjourned to November
25      15, 2022.)
```

1                              PROCEEDINGS                    50

2

3

4

5

6

7

```
1                                                    51

2                    C E R T I F I C A T E

3

4        I, Carole Ludwig, certify that the foregoing

5  transcript of proceedings in the United States District

6  Court, Southern District of New York, Averbach, et al.

7  versus Cairo Amman Bank, Docket #19cv0004, was prepared

8  using digital electronic transcription equipment and is a

9  true and accurate record of the proceedings.

10

11

12

13  Signature _____

14                    CAROLE LUDWIG

15  Date:  October 26, 2022

16

17

18

19

20

21

22

23

24

25
```