UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

JULIE AVERBACH FOR THE ESTATE OF STEVEN   :
AVERBACH, *et al.*,   :
   :
       Plaintiffs,   :
   :   No. 19-cv-00004-GHW-KHP
      -against-   :
   :
CAIRO AMMAN BANK,   :
   :
       Defendant.   :

------------------------------------------------------------------------x


**PLAINTIFFS' OPPOSITION TO DEFENDANT CAIRO AMMAN BANK'S MOTION
TO DISMISS FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FEDERAL
RULE OF CIVIL PROCEDURE 12(b)(2) OR, IN THE ALTERNATIVE, RULE 56**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

ARGUMENT ................................................................................................................ 10

   I.     CAB'S "MOTION TO DISMISS" IS IN FACT AN UNSUPPORTABLE MOTION
        FOR RECONSIDERATION ........................................................................... 10

   II.    CAB'S ARGUMENT AGAINST PERSONAL JURISDICTION IS UNAVAILING . 14

       A.   CAB's Argument Mischaracterizes *Weiss* and the SAC ........................... 18

       B.   CAB's Argument Improperly Merges Merits and Personal Jurisdiction Issues ........ 19

       C.   Plaintiffs Are Not "Collaterally Estopped" from Relying on Transactions Involving
          Interpal ...................................................................................................... 21

       D.   CAB's Argument Mischaracterizes the HLF Evidence ............................ 22

       E.   The "Remaining Thirteen Transactions" Are Indistinguishable From the Other
          Transfers ................................................................................................... 24

CONCLUSION............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Al Rushaid v. Pictet & Cie*,
   28 N.Y.3d 316 (2016) ................................................................................................ 15

*Associated Press v. U.S. Dep't of Def.*,
   410 F. Supp. 2d 147 (S.D.N.Y. 2006) ..................................................................... 13

*Averbach v. Cairo Amman Bank*,
   No. 19-cv-0004-GHW-KHP, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020) ............................ 4

*Averbach v. Cairo Amman Bank*,
   No. 19-cv-0004-GHW-KHP, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020)............. 4, 10, 11, 17

*Averbach v. Cairo Amman Bank*,
   No. 19-cv-0004-GHW-KHP, 2022 WL 2530797 (S.D.N.Y. Apr. 11, 2022)................... *passim*

*Honickman v. BLOM Bank SAL*,
   6 F.4th 487 (2d Cir. 2021) ................................................................................. 12, 18

*In re Rationis Enterprises, Inc. of Panama*,
   261 F.3d 264 (2d Cir. 2001) ...................................................................................... 19

*Kaley v. United States*,
   571 U.S. 320 (2014) .................................................................................................. 18

*Kaplan v. Lebanese Canadian Bank SAL*,
   999 F.3d 842 (2d Cir. 2021) .......................................................................... 2, 16, 25

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013) ......................................................................... 4, 11, 17, 20

*Licci v. Lebanese Canadian Bank, SAL*,
   20 N.Y.3d 327, 984 N.E.2d 893, 960 N.Y.S.2d 695 (2012)................................... 17

*Marra v. Papandreou*,
   216 F.3d 1119 (D.C. Cir. 2000) ............................................................................... 19

*Shrader v. CSX Transp., Inc.*,
   70 F.3d 255 (2d Cir. 1995) ................................................................................. 11, 14

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998)..................................................................................................... 20

*Strauss v. Credit Lyonnais, S.A.*,
   175 F. Supp. 3d 3 (E.D.N.Y. 2016) ........................................................................... 21

*Waldman v. Palestine Liberation Org.*,
   835 F.3d 317 (2d Cir. 2016) .............................................................................. 18, 20

*Weiss v. Nat'l Westminster Bank PLC*,
   176 F. Supp. 3d 264 (E.D.N.Y. 2016) ................................................................ 16, 17

*Weiss v. Nat'l Westminster Bank PLC*,
   381 F. Supp. 3d 223 (E.D.N.Y. 2019) ...................................................................... 16

*Weiss v. Nat'l Westminster Bank, PLC*,
   993 F.3d 144 (2d Cir. 2021) ............................................................. 2, 12, 16, 21

**Statutes**

18 U.S.C. § 2333(d)(2) ................................................................................................. 3

Justice Against Sponsors of Terrorism Act, Pub. L. 114-222 .................................... 21

N.Y.C.P.L.R. § 302(a) ............................................................................................... 11

**Regulations**

66 F.R. 49079 ........................................................................................................... 23

## INTRODUCTION

This Court has twice denied Defendant Cairo Amman Bank's ("CAB") motions to dismiss for lack of personal jurisdiction, each time finding that 23 transactions Plaintiffs alleged the bank processed for its Hamas-affiliated customers are sufficient to establish jurisdiction over it. Now CAB has yet another motion to dismiss for lack of personal jurisdiction—but only one thing has materially changed since those two prior decisions: Plaintiffs have located and produced evidence of 133 transactions CAB processed for Hamas-affiliated customers, 114 of them through CAB's correspondent bank accounts in New York. Thus, the jurisdictional evidence now far exceeds the jurisdictional allegations already found sufficient.

CAB's present motion is not therefore predicated on a factual dispute but is instead a motion for reconsideration dressed up in another form. Apart from a subset of 19 transactions the Court can set aside for the purposes of this motion, CAB does not (and cannot) argue that the evidence fails to substantiate the allegations underlying the Court's prior reports and recommendations ("R&Rs"), as Exhibit 8 to CAB's motion indicates that there are (at a minimum) 114 jurisdictionally relevant transactions, not 23. Accordingly, CAB once again challenges the Court's prior *legal* determinations, not the underlying evidentiary facts. Specifically, CAB only argues (again) that Plaintiffs have not satisfied the "due process" element of personal jurisdiction—an argument this Court has explicitly rejected in each of its two prior R&Rs.

CAB's present motion does not meet the reconsideration requirements. Nor is CAB's newest due process argument any more cognizable this time around. Previously, CAB argued that "due process" requires showing the in-forum conduct—i.e., the New York transactions— proximately caused Plaintiffs' injuries. The R&R rejected the argument, pointing out that the governing *Licci* family of cases explicitly says the opposite. This time, CAB argues that "due process" requires that the contents of the in-forum transactions *themselves* "gave notice to CAB"

that they were intended for terroristic purposes by being "explicitly earmarked" for terrorism. Br. at 20.

Like its causation argument, CAB's latest take on due process is completely contrary to the *Licci* cases and contrary to basic common sense. CAB now concocts its argument from fragments of the Second Circuit's decision in *Weiss v. Nat'l Westminster Bank, PLC*, 993 F.3d 144 (2d Cir. 2021), which was not decided on personal jurisdiction (the district court's finding of jurisdiction was left undisturbed) and did not hold that knowledge can only be established from "indicators" on the face of the transactions. Not only do the *Licci* cases make clear knowledge need not be established with in-forum facts, but the Second Circuit's decision in *Kaplan v. Lebanese Canadian Bank SAL* observed that knowledge could be inferred from a variety of sources beyond U.S. designation and that it "would defy common sense to hold that such knowledge could be gained in no other way." 999 F.3d 842, 864 (2d Cir. 2021). Nowhere has the Second Circuit suggested that scienter under JASTA can only be proven by incriminating "indicators" on the face of transactions.

The reconsideration motion also impermissibly attempts to merge merits and personal jurisdiction issues by arguing that the in-forum transfers must in-and-of themselves "subject CAB to JASTA liability" to be "jurisdictionally relevant." Br. at 16, 20. Of course, Plaintiffs bear the burden of ultimately proving that the in-forum transfers did in fact go to Hamas operatives and Hamas-controlled entities, but that is a merits question. CAB's argument flies in the face of *Licci*, which only requires that "one of the elements" arise from the in-forum conduct and certainly did not require plaintiffs in that case to prove at the pleading stage that the defendant's customer in that case was controlled by Hezbollah. Moreover, this Court has already issued a report and recommendation stating that the SAC satisfied JASTA's pleading requirements. *See* 2022 WL

2

2530797, at *10-17 (S.D.N.Y. Apr. 11, 2022) ("Second R&R"). CAB successfully argued that the parties should not enter into merits discovery; thus the R&R remains the operative ruling on the merits.

For these reasons, the Court should once again deny CAB's seriatim attempts to bring the same motion to dismiss. It should also take note of another problem: after CAB repeatedly stated it had no relevant records in its possession, limiting the initial phase of discovery to *Plaintiffs'* records, it admitted during a Rule 30(b)(6) deposition that it had retained account records for three U.S. dollar-denominated accounts for its customer Holy Land Foundation ("HLF"). Nor were these records incidental to its personal jurisdiction arguments—CAB relies on them in its brief at 4 n.4, 22 & n.16. In fact, CAB acknowledged during that deposition that they had relied on them in drafting their prior motion to dismiss—*before* telling this Court that it had no relevant records.

## FACTUAL BACKGROUND

After Plaintiffs commenced this case on January 1, 2019, the District Court on May 14, 2019, referred it to the Magistrate Judge to oversee general pretrial motion practice and to issue an R&R on an eventual motion to dismiss. *See* ECF No. 27. During the initial pretrial conference held five months after the case was initiated, CAB's counsel argued for a stay of discovery "without knowing whether there are any responsive documents or relevant documents that have been retained prior to the hold being issued." Tr. of 5/23/19 pretrial conference, ECF No. 38 at 23. The Court granted the stay pending a decision on the motion to dismiss and authorized Plaintiffs to send preservation requests to certain third-party banks. *See id.* at 35-36; ECF No. 34.

CAB filed its first motion to dismiss on July 17, 2019, pursuant to Fed. R. Civ. P. 12(b)(1), (2) and (6). *See* ECF No. 46. The Magistrate Judge issued the first R&R on January 21, 2020, finding that Plaintiffs had sufficiently pleaded a basis for personal jurisdiction, but failed to allege facts sufficient to state a claim for aiding and abetting under 18 U.S.C. § 2333(d)(2). In that R&R,

Magistrate Judge Parker found that Plaintiffs successfully satisfied New York's long-arm statute by demonstrating both purposeful availment by alleging CAB's use of its correspondent accounts in New York ("Plaintiffs have pleaded sufficient use of the correspondent accounts in New York to demonstrate purposeful availment") and articulable nexus ("Plaintiffs also have properly alleged that the aid provided to Hamas came about, in part, via money transfers through CAB's New York correspondent accounts. These allegations are sufficient to establish the second prong of New York's long-arm inquiry."). 2020 WL 486860, at *6-7 (S.D.N.Y. Jan. 21, 2020) ("First R&R"). The Court also found constitutional due process satisfied, paraphrasing the Second Circuit's comment that "[i]t is the rare case when constitutional due process principles prohibit the exercise of personal jurisdiction that is otherwise permissible under New York's long-arm statute." *Id.* at *8 (citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) ("*Licci IV*"). The District Court adopted the R&R in its entirety. *See* 2020 WL 1130733, *1 (S.D.N.Y. Mar. 9, 2020).

Plaintiffs filed their Amended Complaint on April 7, 2020, ECF No. 62 ("FAC"), which CAB again moved to dismiss, ECF No. 68. The parties briefed the motion, but the Court suspended decision until the Second Circuit issued decisions in (1) *Weiss*, (2) its companion case, *Strauss v. Crédit Lyonnais S.A.*, No. 19-865, (3) *Kaplan*, and (4) *Honickman v. BLOM Bank SAL*, No. 20-575, ECF No. 82—over the objections of CAB's counsel who insisted that it was "highly unlikely" that these decisions would have any effect on the outcome of this case. Tr. of 12/18/20 status conference, ECF No. 80, at 7-8.

Once these cases were issued, the Court denied CAB's motion to dismiss as moot and ordered a new briefing schedule to follow Plaintiffs' filing of a Second Amended Complaint ("SAC"). *See* ECF Nos. 87, 89. Plaintiffs filed the SAC on September 3, 2021, *see* ECF No. 96,

and CAB moved to dismiss it on October 8, 2021, *see* ECF No. 97. Although the newly-issued

Second Circuit decisions did not address personal jurisdiction, CAB renewed the personal

jurisdiction argument that the Court denied in its dismissal ruling. *See* ECF No. 100, at 25.

Magistrate Judge Parker filed the second R&R on April 11, 2022, this time recommending that

CAB's motion be denied with respect to Plaintiffs' aiding and abetting claims, in light of how "the

Second Circuit clarified how a district court should evaluate a pleading asserting such a claim and

what allegations are sufficient to satisfy both the knowledge and substantial assistance aspects of

the claim." *See* Second R&R, 2022 WL 2530797, at *9. The Second R&R also recommended that

the District Court again find it had personal jurisdiction over CAB for the same reasons described

in the previous R&R, stating: "Put simply, nothing has changed from the FAC to the SAC that

affects the personal jurisdiction analysis this Court already undertook." *Id.* at *6.

     During the subsequent case management conference on June 14, 2022, CAB's counsel

stated that the bank has no records from the time period at issue:

> MR. SIEGFRIED: And I try to be, my colleagues certainly try to be very, very
> careful when we come into court in terms of anything we're going to represent, so
> what I'm about to say, I still want the caveat of we're dotting the I and crossing the
> T --
>
> THE COURT: Sure.
>
> MR. SIEGFRIED: But essentially I don't believe there are going to be any
> transaction documents --

Tr. of 6/14/22 case management conference, ECF No. 134, at 7. The Court commented that "this,

of course, presents a dilemma for plaintiffs who do have the burden of proof on the case," *id.* at

11, and instructed Plaintiffs to serve "an initial tranche of third-party subpoenas" by June 30, 2022,

and for *CAB* to serve *Plaintiffs* with jurisdictional discovery by July 29, 2022. *See* ECF No. 129.

     On July 29, 2022, CAB's counsel confirmed in writing to Plaintiffs' counsel that: "The

Bank has no transaction records for any customer accounts for the period 2001 to 2003. Pursuant

to its document retention policy, such records are maintained only for a period of 10 years." *See*

**Exhibit A** to the accompanying Declaration of Michael J. Radine ("Radine Declaration").

Thereafter, CAB raised its plan to "revisit jurisdiction" during the August 25, 2022, case management conference, following jurisdictional discovery. Tr. of 8/25/22 case management conference, ECF No. 137, at 8. CAB insisted that it was "not here to argue the merits of jurisdiction," *id.* at 18, and countered any suggestion that the parties engage in merits discovery. *See id.* at 24-25 ("MR. SIEGFRIED: I understand that plaintiffs would like to go to merits discovery. We believe there is a very, very, very serious jurisdictional issue here."). The Court ordered the parties to proceed with jurisdictional discovery with a November 4, 2022 deadline, *see* ECF No. 139, extended to December 9, 2022, *see* ECF No. 144.

In response to Plaintiffs' request for more information regarding how CAB intended to "revisit jurisdiction," CAB sent counsel a letter dated October 10, 2022, stating that:

> CAB intends to argue that Plaintiffs have not provided evidence sufficient under the Due Process Clause to support their jurisdictional contention that the claims in this action arise out of or relate to any transfers processed through its correspondent accounts in New York. Transfers involving routine banking transactions and for humanitarian services, for example, do not give rise to claims under JASTA.

10/10/22 Ltr. from CAB to Plaintiffs, attached to Radine Decl. as **Exhibit B**. Plaintiffs responded that these were "key merits questions," and not jurisdictional. 10/18/22 Ltr. from Plaintiffs to CAB, Radine Decl. **Ex. C**. And during the October 25, 2022, case management conference, CAB's counsel wondered at why Plaintiffs would need a Rule 30(b)(6) deposition "regarding documents that are no longer retained." Tr. of 10/25/22 case management conference, ECF No. 145, at 26.

Also at that conference, Plaintiffs pointed out that CAB's description of its motion raises merits question beyond the scope of the *Licci* requirements for personal jurisdiction:

> [MR. RADINE:] So, our position is that's a merits question. The law in this case, as Your Honor pointed out in two reports and recommendations, is that ["]the

> Second Circuit noted that the use of a correspondent account standing alone could
> be grounds to find personal jurisdiction so long as the use is purposeful.["]

*Id.* at 7 (quoting First R&R, 2020 WL 486860, at *5). Still maintaining that it was not arguing the merits, CAB's counsel responded that "the nature of the transaction is extraordinarily important, and when we get to the merits of this topic, we will address it, and indeed, I think you'll see that these claims do not, cannot relate to or arise out of any of the transactions that they're listing here." *Id.* at 18.

Magistrate Judge Parker also commented that CAB's proposed motion appeared to be "intertwined with the merits," and that "there seems to be no economy in moving before Judge Woods addresses the R&R." Tr. of 11/15/22 case management conference, ECF No. 159, at 28, 31. Plaintiffs' counsel agreed, pointing out that the motion was "in a sense a motion to reconsider," as it "reads the law differently than your Honor interpreted it," *id.* at 23, and that it made the most sense for them to "amend the complaint to match the transactions that are produced[; o]therwise, the Court is reading a complaint that's at variance with the transactions." *Id.* CAB conceded that "there are aspects perhaps of it that go to merit discovery," but protested that "merits discovery is much, much broader." *Id.* at 31. The Court countered this assertion:

> [THE COURT:] What I'm hearing you say is that due process requires, for jurisdiction requires the plaintiff to show that transaction was money used for the bombing. That's what I'm hearing you say. So that's going into a broader kind of merits discovery, merits question than what's happening right here because I don't believe that plaintiffs are searching for that answer right now. And then that leads me back to my question about summary judgment. Is this really appropriate as a renewed Rule 12 motion versus a Rule 56 motion? Because at the pleading stage there's a plausibility for the jurisdiction, and maybe some of the proof that you're demanding is really the merits issue on this subject matter jurisdiction.

*Id.* at 32.

However, at the next status conference, and despite CAB's Rule 72 objections still pending before the District Court and the Magistrate Judge's confirmation that the R&R was not being

withdrawn, the Magistrate Judge concluded that there was no "reason procedurally why this motion shouldn't be teed up," noting that "[i]t can be teed up as a Rule 12 and/or Rule 56 motion, frankly." Tr. of 1/19/23 case management conference, ECF No. 180, at 17. The Magistrate Judge ordered a briefing schedule for CAB's motion, notwithstanding that the second R&R remained *sub judice*, *see id.* at 18-19.

On December 5, 2022, Plaintiffs conducted the deposition of CAB's Rule 30(b)(6) corporate designee, Khalid Mahmoud al-Qassem. During that deposition, Plaintiffs asked Mr. Qassem to "confirm [that] all account statements and relevant records from the relevant period in the Palestinian Territories have been destroyed?" Mr. Qassem answered "Yes." Radine Decl., **Ex. D** at 52. Plaintiffs then noted that in CAB's October 8, 2021, brief in support of its prior motion to dismiss, it wrote that "CAB closed the [HLF] account on December 5, 2001." *Id.* at 77-78. Plaintiffs asked, given Mr. Qassem's prior testimony that the bank retained no "account statements and relevant records," "what other depositories at the bank of records from 2001 to 2003 exists that would provide the bank with this information that it closed the Holy Land Foundation account on December 5, 2001?" *Id.* at 78. Mr. Qassem admitted that CAB had in fact retained "**account statements**" for CAB customer HLF as part of a 2004 request for records from the U.S. through the Central Bank of Jordan. *Id.* He further admitted that CAB still had possession of the records requested in 2004 and that they related not just to one "account," as suggested in CAB's brief, but "three accounts." *Id.* at 80.

On December 7, 2022, Plaintiffs served a document request on CAB for "All Documents Concerning the three Holy Land Foundation accounts referenced and identified in the deposition testimony of Khalid Al-Qassem on December 5, 2022." Radine Dec., **Ex. E**. CAB produced records in response to the request on January 11, 2023. These records included, as Mr. Qassem

stated, account statements for three HLF U.S. dollar-denominated accounts—and they indicate that the three accounts remained open well after the December 4, 2001, U.S. designation of HLF, as discussed further below.[1]

Plaintiffs also conducted third-party discovery through subpoenas to two categories of banks: CAB's own correspondent banks and banks that perform significant amounts of international dollar-clearing in New York. One of the latter banks, BNP Paribas, produced a record of an August 13, 2001, transaction for $703,699.77 from the Islamic University of Gaza's account at CAB to Al-Osama Trading Co Ltd. *See* CAB Exhibit 8, p.4, row 099. The transaction is significant not just because of its size, but because it establishes that Islamic University of Gaza, a "Hamas stronghold" where Hamas "stor[ed] weapons" and "develop[ed] and manufactur[ed] weapons," held an account at CAB. SAC ¶¶ 773, 793. *Contra* ECF No. 100 at 3 n.3 (CAB arguing that Plaintiffs had failed to establish that CAB held accounts for or processed transactions for Islamic University of Gaza). Al-Osama Trading Co Ltd. has since been designated by the United States Department of the Treasury, *see* 80 F.R. 55414, as "a Saudi Arabia-based company … used … to finance Hamas."[2]

Finally, CAB brought the present motion, regurgitating legal arguments this Court already rejected but now also arguing that personal jurisdiction requires making merits determinations. It also divides the transactions into four categories: (1) those produced by the U.K. bank National Westminster Bank, PLC ("NatWest"), the defendant in *Weiss*, and involving its customer Interpal,

---

[1]     The SAC lists additional HLF account numbers beyond the three U.S. dollar-denominated accounts. CAB presumably no longer has records of their existence, given its stated retention policies. SAC ¶ 1175.

[2]     Press Release, U.S. Treasury Dep't, "Treasury Sanctions Major Hamas Leaders, Financial Facilitators and a Front Company," September 10, 2015, *available at*: https://home.treasury.gov/news/press-releases/jl0159; *see also* https://home.treasury.gov/policy-issues/financial-sanctions/recent-actions/20150910.

(2) those involving CAB's customer Holy Land Foundation, (3) those processed by Arab Bank for the benefit of CAB customers, and (4) "The Remaining Thirteen Transactions."[3]

## ARGUMENT

### I.   CAB'S "MOTION TO DISMISS" IS IN FACT AN UNSUPPORTABLE MOTION FOR RECONSIDERATION

This Court has already ruled on personal jurisdiction twice—definitively, rather than pending jurisdictional discovery. The only question now at the close of the initial phase of discovery is whether the evidence gathered by Plaintiffs substantiates the Court's analysis of the complaint's legal sufficiency as to personal jurisdiction. Before discovery, this Court found sufficient for personal jurisdiction allegations that CAB made "twenty-three fund transfers through the Correspondent Banks in the two years immediately prior to the first of the Attacks." First R&R, 2020 WL 486860, at *5. Now, Plaintiffs have proffered 114 funds transfers through the same correspondent banks and from the relevant period, totaling $7,348,915.90.

CAB does not contest that Plaintiffs have produced evidence of *many more* transactions than they alleged in their complaints or (setting aside the indirect transfers), or that they differ *in any material way* from the transactions alleged in the complaints. Instead, it attempts to convince the Court that there is another *legal* requirement for proving personal jurisdiction that Plaintiffs cannot meet—a variant on a legal argument this Court has twice rejected.

Raising legal arguments after a motion to dismiss is denied constitutes a motion for reconsideration. *See* Opinion, *Bartlett*, No. 19-cv-7 (CBA) (TAM), ECF No. 291 at *2-3 (E.D.N.Y.

---

[3]   As indicated in the chart prepared by Plaintiffs' counsel and submitted by CAB as Exhibit 8 to its motion, some of the Arab Bank transfers received by CAB customers were processed through Arab Bank's correspondent account in New York and credited to Arab Bank's Ramallah branch before being forwarded to CAB. Whether and how those transfers are jurisdictionally relevant will be impacted by the Second Circuit's anticipated decision in *Spetner v. Palestine Investment Bank*, No. 20-3849, but personal jurisdiction over CAB is easily satisfied by the 114 transactions that moved through CAB's own correspondent accounts in New York. Therefore, <u>this brief does not rely upon or otherwise reference those 19 transactions</u>.

June 17, 2022) (explaining that where defendants only repeat rejected arguments, "[i]n effect, they are seeking reconsideration of my earlier order"). A motion for reconsideration "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). CAB has not done that.[4]

Specifically, of the three prongs of personal jurisdiction (service, a statutory basis, which here is N.Y.C.P.L.R. § 302(a), and constitutional due process), "CAB challenges Plaintiffs' ability to satisfy the third prong—*i.e.,* the requirement that the plaintiff 'demonstrate that the exercise of personal jurisdiction comports with due process.'" Br. at 10-11. That is, CAB does not challenge service or that Plaintiffs met the requirements of § 302(a). CAB made this same argument twice before, and the Court explicitly rejected it each time.

CAB first made it in its motion to dismiss the FAC. The Court wrote: "CAB argues that, even if the Court were to find that the requirements of New York's long-arm statute are met, the Court should refuse to exercise of personal jurisdiction for due process reasons. CAB offers no on-point case authority supporting this argument." First R&R, 2020 WL 486860, at *8. Indeed, the Court reviewed the due process requirements as set forth in the governing *Licci* family of cases and found that the SAC met them: "For the same reasons articulated in *Licci*, the exercise of personal jurisdiction over CAB in this case does not offend fair play and substantial justice and is thus consistent with constitutional due process guarantees." *Id.* (citing *Licci IV*, 732 F.3d at 173–74).

---

[4]     CAB writes: "The parties agree that the existence of personal jurisdiction over CAB hinges on whether the 133 wire transfers Plaintiffs identified in Exhibit 8 suffice to satisfy constitutional due process." Br. at 12. Given the Court's two prior R&Rs and controlling Second Circuit precedent, personal jurisdiction does not "hinge" on the due process analysis of 100+ wire transfers – they are self-evidently sufficient.

CAB moved to dismiss the SAC after the Second Circuit issued its decisions in *Kaplan* and *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021), again arguing that 23 transactions for Hamas-controlled entities and operatives failed to meet due process requirements for personal jurisdiction. As the Court observed: "Put simply, nothing has changed from the FAC to the SAC that affects the personal jurisdiction analysis this Court already undertook…. The [23] transfers are still sufficient to establish personal jurisdiction over CAB." Second R&R, 2022 WL 2530797, at *6. That time, CAB argued that the due process prong introduced a causal requirement to personal jurisdiction, despite the fact that the *Licci* cases explicitly held causation was not necessary. *See id.* at *7. The Court rejected CAB's argument: "the *Licci* framework is still applicable and there is no reason to alter this Court's prior finding and that personal jurisdiction over CAB has been established." *Id.* at *8. CAB repeated this objection in its Rule 72 objections to the Second R&R: "CAB objects to the R&R's failure to follow Second Circuit precedent requiring a causal link between a foreign defendant's forum-related conduct and a plaintiff's injuries when conducting the due process analysis. This legal error resulted in a flawed analysis of the allegations in the SAC and an erroneous finding of specific jurisdiction." ECF No. 121, at 4.

Now CAB is back with yet another variation on its due process argument. Whereas it previously argued "due process" requires showing that the in-forum conduct caused a plaintiff's injuries, CAB now argues that "due process" requires showing that the in-forum conduct establishes knowledge—in essence, that the New York transactions must indicate a terroristic purpose on their face, which CAB contends is a requirement to establish knowledge, citing *Weiss*, 993 F.3d at 153.

Of course, *Weiss* did not hold that transactions (in-forum or otherwise) must indicate their terroristic purposes to establish liability, much less personal jurisdiction.[5] First of all, Plaintiffs have *never* alleged that the CAB transactions did indicate any terroristic purpose on their face, nor did this Court hold otherwise. Indeed, the SAC's anodyne description of the nature of the jurisdictionally relevant transactions is unsurprisingly consistent with transactional evidence Plaintiffs have now produced. Moreover, CAB raised *Weiss* in its prior motion to dismiss—but for *liability* reasons, and the Court discussed the case in its subsequent R&R, also for liability reasons. CAB did not previously argue that *Weiss* somehow created a personal jurisdiction rule, presumably because *Weiss* is not a personal jurisdiction decision. Thus, even if CAB's absurd argument were plausible, it is now untimely: "A motion for reconsideration allows a party to bring to the Court's attention an argument the party has previously raised and the Court has overlooked; but it does not allow a party to use the guise of 'reconsideration' to raise what is effectively a new argument or one never meaningfully developed previously." *Associated Press v. U.S. Dep't of Def.*, 410 F. Supp. 2d 147, 152 (S.D.N.Y. 2006).

In fact, the motion is transparently a motion for reconsideration, because it also contests liability on grounds this Court has rejected. Specifically, CAB now argues that "as the Second Circuit has repeatedly affirmed—in *Weiss*, *Credit Lyonnais*, and *Honickman*—wire transfers made for humanitarian purposes do not constitute a basis for imposing either primary or secondary liability under the ATA and JASTA." Br. at 20. CAB already made this argument in its prior motion to dismiss, *see* ECF No. 100 at 8, ECF No. 102 at 5, but the allegations concerning HLF, for example, which are predicated on U.S. government findings (and a criminal conviction)

---

[5]     As the Second Circuit explained in *Kaplan*, "[w]e affirmed [in *Weiss*] because the record was insufficient to show that the bank had been knowingly providing substantial assistance to the FTO Hamas." 999 F.3d at 861.

involve actions that were no more or less "humanitarian" than those of the Martyrs Foundation in Lebanon which the Second Circuit found sufficient in *Kaplan*.

In sum, despite its protests at prior conferences and the captioning it employs here, CAB has moved for reconsideration without even attempting to "point to controlling decisions or data that the court overlooked …." *Shrader*, 70 F.3d at 257.

## II.   CAB'S ARGUMENT AGAINST PERSONAL JURISDICTION IS UNAVAILING

Even if CAB's latest submission was not a motion for reconsideration masquerading as a motion for summary judgment,[6] its theory would fail. CAB essentially argues that Plaintiffs must show that the transfers processed in New York for the benefit of its customers indicate on their face that they served a terroristic purpose. As noted above, CAB divides the transactions into four categories. For the three at issue here, transactions involving Interpal, HLF, and the "Remaining Thirteen Transactions," CAB argues:

- "There is simply no evidence … that the transfers gave notice to CAB that they were for any purpose other than the purpose explicitly stated on the Interpal transfer requests" and thus "their claims [do not] arise out of or relate to these transfers."

- "The HLF transfers similarly are insufficient to subject CAB to JASTA liability and are thus likewise jurisdictionally irrelevant. That is because, like the Interpal transfers discussed above, they were explicitly earmarked for charitable purposes."

- "Plaintiffs have produced no documents or evidence that any of these [Remaining Thirteen] transfers gave notice of a terroristic purpose to CAB or that the funds were used for an unlawful purpose."

Br. at 20, 23.[7]

---

[6]    CAB seems unsure if its motion is a motion to dismiss or a motion for summary judgment. *See* Br. at 9-10. It appears to be the latter, albeit a partial one. Its first motion to dismiss was denied and thus extinguished. Its second motion to dismiss is still pending before the District Court, but now CAB has raised the same issues in a post-initial discovery posture. Plaintiffs note that the Magistrate Judge has not withdrawn the R&R and the District Court has not vacated it or referred this motion to the Magistrate Judge for a report and recommendation. It is therefore unclear what procedural basis exists for this motion.

[7]    CAB suggests that all of these transactions indicated "charitable" purposes. *See* Br. at 19-20 (Interpal transfers), 21 (HLF transfers). The argument is both legal irrelevant and factually untrue—many of the transfers do not indicate their purported purpose at all. CAB also cites to a UN report, Br. at 21 n.15, as well as a variety of

14

Obviously, the requirement that transactions be explicitly earmarked for terrorism is found nowhere in *Licci*, and CAB cites no personal jurisdiction case that supports it. Nor does *Licci* suggest that knowledge must be established through in-forum conduct. Such a rule would be bizarre. For example, if a bank was informed in a contemporaneous meeting that certain customers' transfers were supporting terrorism, that would presumably suffice for liability—but under CAB's theory, the bank would be immune from the court's jurisdiction unless that meeting *occurred in New York*. CAB cites no case to support this novel theory. Moreover, the case law very much suggests the opposite. For example, the New York Court of Appeals found jurisdiction in *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 327-28 (2016), even though the transactions processed through New York did not indicate they were for "bribe money" on their face—indeed, they were meant to "conceal[] the bribes." *Id.* at 320 n.3, 323.

CAB sources its urged rule from the Second Circuit's *Weiss* opinion. But *Weiss* is not a personal jurisdiction decision (nor did it fashion any such knowledge requirement)—in fact, the district court in *Weiss* found that the plaintiffs *had* established personal jurisdiction premised on some of the same transactions at issue here, and when the defendant appealed that ruling, the Second Circuit left it in place (as shown below, CAB goes to absurd lengths to argue this collaterally estops *Plaintiffs*).

The *Weiss* plaintiffs alleged that NatWest violated the Anti-Terrorism Act by knowingly providing material support to Hamas by transferring funds from its customer, the Hamas fundraiser Interpal, to Hamas-affiliated charities in the Palestinian Territories. NatWest processed some of these transfers through New York, which the district court held was sufficient to establish personal

---

"articles," factual assertions, and other information in its "Appendix," that are not in the record nor in the complaint, but does not ask the Court to judicially notice them—nor should it, as they only consist of cursory references to documents that, in the light most favorable to CAB, would be arguably relevant to merits discovery, which the bank has steadfastly opposed and the court has not granted..

jurisdiction under *Licci*: "[I]n executing the New York Transfers, Defendant allegedly used New York's banking system to effect the very financial support of Hamas that is the basis for Plaintiffs' claims." *Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264, 279 (E.D.N.Y. 2016).

Later, the district court granted the defendant's motion for summary judgment on the merits—not personal jurisdiction—and held that amending the complaint to include a JASTA claim would be futile after 10 years of pretrial discovery. *See Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp. 3d 223, 238 (E.D.N.Y. 2019). The plaintiffs appealed, and the defendant cross-appealed on the grounds that the district court's personal jurisdiction analysis was incorrect. The Circuit "dismiss[ed] the cross-appeal as moot," *Weiss*, 993 F.3d at 151, leaving the lower court decision in place. Instead, given that NatWest was a British bank removed a considerable distance from the alleged Hamas recipients in the Palestinian Territories, it held that "the record was insufficient to show that the bank had been knowingly providing substantial assistance to the FTO Hamas …." *Kaplan*, 999 F.3d at 861.

Knowledge is plainly a merits issue, not a jurisdictional issue and it is highly fact-intensive. In *Licci*, the knowledge allegations generally related to Hezbollah's alleged affiliation with the Martyrs Foundation *in Lebanon*. Likewise, here, CAB's customers included HLF, which, like Martyrs Foundation, is alleged to have rewarded the families of suicide bombers and was affiliated with the relevant terrorist group in the area CAB operated. For example, Plaintiffs alleged that Israel had designated HLF and publicized that fact in the Palestinian Territories before the attacks and transfers at issue, *see* SAC, ¶¶ 627-29 and SAC Ex. D.[8] Other CAB customers were designated

---

[8]     There is one significant difference between HLF and the Martyrs Foundation's roles here and in *Licci*: while both entities made payments to families of suicide bombers, only this case actually involved suicide bombings as attacks; *Licci* involved rocket attacks.

by Israel and temporarily shut down by the Palestinian Authority for their links to Hamas, including HLF.

As this Court already held, "[s]o long as Plaintiffs have adequately pleaded that at least *one of the elements* of their claims arose from CAB's use of the New York correspondent accounts, Plaintiffs will have met their burden." First R&R, 2020 WL 486860, at *7 (citing *Licci IV*, 732 F.3d at 169-70) (emphasis added). *Licci IV* explained that "section 302(a)(1) 'does not require that every element of the cause of action pleaded must be related to the New York contacts; rather, where at least one element arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under the statute.'" 732 F.3d at 169 (quoting *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 341, 984 N.E.2d 893, 901, 960 N.Y.S.2d 695, 703 (2012)). In any event, this Court *already* found that Plaintiffs met the knowledge requirements of JASTA. Second R&R, 2022 WL 2530797, at *14.

In *Licci*, it was the actus reus—that is, the transactions were the "instrument to achieve the wrong complained of," *Licci IV*, 732 F.3d at 173. The defendant did not assist Hezbollah by providing rockets or intelligence—it provided banking services. The defendant's *knowledge* that it was providing that "instrument" was alleged through other means, largely statements Hezbollah made in Lebanon (discussed above). Likewise, here, the instrument of CAB's alleged assistance to Hamas were banking services and transfers, many of which it processed through CAB's correspondent bank accounts in New York. *See Weiss*, 176 F. Supp. 3d at 282 ("There is no requirement under § 302(a)(1) that a plaintiff's claim must arise *exclusively* from New York conduct.").

Although it is not entirely clear, CAB appears to argue that personal jurisdiction operates differently in the "[i]n the ATA context." Br. at 16. CAB acknowledges that claims only need

"arise out of or relate to" in-forum conduct, but argues that, "[i]n the ATA context, that means *'conduct that could have subjected [a foreign defendant] to liability under the ATA.'*" Br. at 16 (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 335 (2d Cir. 2016) (emphasis added by CAB)).[9] Working backwards from that proposition (quoted out-of-context), CAB reasons that, because the *Weiss* plaintiffs could not establish NatWest's liability based on the transactions at issue in that case, then those transactions could not have "subjected" a bank "to liability under the ATA," and thus fail Plaintiffs' claims do not "arise out of or relate" to those transactions.[10]

The argument is deeply flawed for three reasons.

## A.    CAB's Argument Mischaracterizes *Weiss* and the SAC

First, *Weiss* did not hold that the transactions themselves must each facially indicate a terroristic purpose—instead, the decision was listing possible evidentiary bases for knowledge that the plaintiffs could have, but did not, establish *in that case*. Knowledge in this or any other JASTA case can be established by other means—as this Court has held Plaintiffs have done here. *See* Second R&R, 2022 WL 2530797, at *14.

Indeed, NatWest is a British bank and the "the charities to which NatWest transferred funds" were not its customers, *Weiss*, 999 F.3d at 166 —**those were *CAB's* customers**, as well as the customers of other banks operating in the Palestinian Territories. The SAC plausibly alleges that CAB had information relating to its own customers that NatWest did not have. For example,

---

[9]    CAB provides the citation for *Kaley v. United States*, 571 U.S. 320 (2014), but presumably did so in error.

[10]    CAB in fact states that "the Second Circuit has repeatedly affirmed—in *Weiss*, *Credit Lyonnais*, and *Honickman*—[that] wire transfers made for humanitarian purposes do not constitute a basis for imposing either primary or secondary liability under the ATA and JASTA." Br. at 20. *Weiss* and *Strauss* (which CAB calls *Credit Lyonnais*) are companion cases that were heard together. Neither case held that the wire transfers involved were "made for humanitarian purposes"—only that the record was insufficient to show that the Western banks knew the funds were going to Hamas and not to the charitable purposes their customer claimed. The Circuit in *Honickman* never mentioned what the transfers "indicated"—instead it noted knowledge allegations lacking in that case that are found in abundance here. *See Honickman*, 6 F.4th at 501-02.

CAB could see that Hamas officials had signatory authority over the accounts and could view suspicious movements of money in or out of accounts. Likewise, given where it operates, CAB was conducting its business in a conflict zone—in one case described in the complaint, its branch was housed in the same building as a bomb factory. SAC, ¶ 1101.

Furthermore, Plaintiffs here have alleged other indicia of knowledge that were not nearly as relevant to the British bank in *Weiss*. For example, Plaintiffs alleged that Israel designated 14 CAB customers for supporting or being a part of Hamas, including HLF, before and during the period the transfers and attacks at issue occurred—and publicized those designations in the Palestinian Territories where CAB operated. It also cited Palestinian Authority closures of several of these same CAB customers. *See, e.g.*, SAC, ¶¶ 558, 627, 628 & n.19, 630, 670-72, 746, 759, 822, 824, 842-52, 869, 877, 896, 914, 940, 979-80, 992, 1000, 1017, 1031-32, 1068-70, 1112, 1184. The U.K., where NatWest operated, did not designate any of these charities. Indeed, in a rather transparent sleight of hand, CAB complains that some of the transfers produced in evidence were for entities "not designated by either Israel or the U.S. at the time of the transfers," Br. at 23-24, but then quietly drops Israeli designations when contesting the HLF transactions, *id.* at 22.

### B.   CAB's Argument Improperly Merges Merits and Personal Jurisdiction Issues

CAB's argument attempts to merge merits and personal jurisdiction, by arguing that conduct supporting personal jurisdiction is "'conduct that could have subjected [a foreign defendant] to liability under the ATA.'" Br. at 12, 16. Thus, according to CAB, if a claim failed on its merits, then it must not have arisen from the defendant's conduct, including the in-forum conduct, and thus fails the relatedness prong of specific personal jurisdiction. But it is a fundamental rule that personal jurisdiction is a "threshold question" that "'must precede merits.'"! *In re Rationis Enterprises, Inc. of Panama*, 261 F.3d 264, 268 (2d Cir. 2001) (quoting *Marra v. Papandreou*, 216 F.3d 1119, 1122 (D.C. Cir. 2000)). *See also Steel Co. v. Citizens for a Better*

*Env't*, 523 U.S. 83, 94-95 (1998). Indeed, this Court in the First R&R found that Plaintiffs satisfied personal jurisdiction but failed on the merits.

Even to the extent that merits and personal jurisdiction issues may be intertwined in this case, this Court has already ruled that the SAC states a claim under JASTA. *See* Second R&R, 2022 WL 2530797, at *21. No merits discovery has taken place, and it was CAB that demanded to "move to dismiss" on personal jurisdiction now, rather than waiting to conduct merits discovery.

And notwithstanding CAB's suggestive quotation, *Waldman* did not create a special personal jurisdiction rule for ATA cases. As the very next sentence makes clear (omitted by CAB), *Waldman* only rejected jurisdiction because, "[o]n its face, the conduct in this case did not involve the defendants' conduct in the United States in violation of the ATA," *at all*. 835 F.3d at 335. The plaintiffs in that case alleged that the Palestine Liberation Organization provided material support to terrorists, who injured the plaintiffs in terrorist attacks in Israel. But "the connections the defendants do have with the United States—the [PLO's] Washington, D.C. and New York [diplomatic] missions—revolve around lobbying activities that are not proscribed by the ATA and are not connected to the wrongs for which the plaintiffs here seek redress." *Id.* at 342.

Indeed, *Waldman* specifically distinguished the *Licci* doctrine, under which "'[i]t should hardly be unforeseeable to a bank that selects and makes use of a particular forum's banking system that it might be subject to the burden of a lawsuit in that forum for wrongs *related to*, and *arising from*, that use.*" Id.* (quoting *Licci IV*, 732 F.3d at 171-72). The "relating to" and "arising from" elements do *not* require that all of the elements of a claim occur in-forum, and *Waldman* never suggested otherwise.[11]

---

[11]     The bulk of the plaintiffs' argument in *Waldman* was in support of the "effects test" of personal jurisdiction (wherein a defendant is "subject to jurisdiction 'if the defendant expressly aimed its conduct' at the United States"), not the "purposeful availment" test from *Licci. Id.* at 337 (quoting *Licci IV*, 732 F.3d at 173).

**C.**     **Plaintiffs Are Not "Collaterally Estopped" from Relying on Transactions Involving Interpal**

CAB's desperation leads it to its strangest argument—that because *Weiss* held that the NatWest record failed to establish the bank's knowledge in that case, Plaintiffs are "collaterally estopped" from relying on any transaction derived from that case for personal jurisdiction purposes. Br. at 16. This argument, however, runs smack into the *Weiss* lower court's finding that it *had* personal jurisdiction over the bank due to its transfers through New York, including some of the same transactions that are at issue here.

CAB's solution is to suggest in two rambling footnotes that the Circuit *sub silentio* reversed the district court decision. In the first, it argues that the decision was somehow eviscerated because it was conditionally cross-appealed, and although the Second Circuit "did not address that aspect of the Court's ruling on appeal," it also "did not affirm any aspect of the district court's jurisdictional ruling." *Id.* at 17 n.13. To be sure, "not affirming" is hardly a reversal—but CAB mischaracterizes the record. In fact, the Circuit "dismiss[ed] the cross-appeal as moot," *Weiss*, 993 F.3d at 151, leaving the lower court decision in place. Indeed, this Court quoted from its companion decision, *Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 24 (E.D.N.Y. 2016), in its latest R&R. *See* Second R&R, 2022 WL 2530797, at *6.

The second footnote argues that the *Weiss* district court decision finding personal jurisdiction does not count because it pre-dated *Linde* and JASTA. Of course, *Linde* is not a personal jurisdiction decision and JASTA does not have a personal jurisdiction section (although it does state that anyone who violates it "should reasonably anticipate being brought to court in the United States to answer for such activities," JASTA § 2(a)(6)). But CAB nevertheless argues that because *Weiss*, relying on *Linde*, dismissed "both the ATA and JASTA claims" on their merits, that somehow undoes the personal jurisdiction determination. Br. at 19 n.14. By the end of the

footnote, CAB seems to lose interest in collateral estoppel, and resigns itself to arguing that *Weiss* left "the correctness of the District Court's earlier decision on jurisdiction open to question given the change in law." *Id.* But again—there is no change of law on personal jurisdiction.

### D.    CAB's Argument Mischaracterizes the HLF Evidence

CAB's greatest misstatements relate to its HLF accounts. CAB argues that the HLF account statements it produced—after telling the Court repeatedly it had no relevant documents at all—show that it "closed HLF's accounts within days of its designation by the U.S. in December 2001." *Id.* at 1. Indeed, its corporate designee made this assertion under oath: "Mr. Qassem testified that the HLF accounts were, in fact, closed in December 2001—following HLF's designation by the United States." *Id.* CAB suggests these purported "closures" shows that it would never process a transfer if it knew it was for terrorism. However (and setting aside that its narrative wholly ignores *Israel's* designation of HLF on May 6, 1997 and all the public source evidence of HLF's notoriety as a HAMAS fundraiser), CAB has produced **<u>zero</u>** records indicating it closed any of HLF's multiple U.S. dollar-denominated accounts—if anything, they show the opposite.

CAB's own records indicate that HLF's accounts remained open after the U.S. designated it on December 4, 2001. For example, CAB00000051-54 are account statements for HLF's U.S. dollar-denominated account at CAB's Ramallah branch and show that the account was still open at least through the end of *2004*, with a $73.60 balance. *See* Radine Decl., **<u>Ex. F</u>**. Notably, of these four pages, CAB only attaches the first, which only reflects HLF's account statement for 2001, *see* ECF No. 191, omitting the other three, which show that the account remained open with a balance through all of 2003 and 2004.

CAB did not produce post-2001 account statements for the other two accounts at issue in that production, but the evidence they did provide is nevertheless inculpatory. Both sets of account statements show a series of withdrawals on December 5, 2001, suggesting CAB permitted HLF to

drain the account *after* it was designated on December 4, 2001. ECF No. 191 at CAB00000081 and CAB00000103. HLF's account at CAB's Gaza branch shows a withdrawal on December 9, 2001, *another* one on December 13, 2001, 9 days after HLF was designated, and then an account management charge on December 21, 2001, weeks after HLF was designated. *See id.* at CAB00000081. Going into 2002 (the account statement runs to the end of the year), the account still had a balance of $33.57. *See id.*

These transfers themselves refute CAB's suggestion that it took action to "close" HLF accounts once it "learned" of its Hamas affiliations from the U.S. designation. Indeed, the account statements indicate that, as the pressure ratcheted up on HLF in the U.S., particularly after September 11, 2001,[12] *HLF employees* began to drain the accounts in checks payable to individuals and commercial interests. The records showed that HLF employees withdrew substantial sums from the Hebron and Ramallah accounts and moved them into its Gaza account, *see* Radine Decl. **Ex. G**, and then drained all three accounts, *see* ECF No. 191 at CAB00000051, 81, 103. For example, on the day after the U.S. designated HLF, CAB permitted HLF employees to withdraw $1,500 from the Hebron account, $80,189.50 from the Ramallah account, and over the course of two and a half weeks after the designation, $46,912.50 from the Gaza account. *See id.* Other than facilitating these highly irregular transactions, there is no documentary evidence of CAB taking any steps to "close" any HLF account.

Moreover, the fact that CAB relies on these records at all is striking because CAB's counsel repeatedly informed the Court and Plaintiffs that the Defendant had no relevant records from the relevant period. *See See* Tr. of 6/14/22 case management conference, ECF No. 134, at 7, putting the onus for discovery on *Plaintiffs*. As explained above, CAB's counsel argued a Rule 30(b)(6)

---

[12] The 9/11 attacks are explicitly given as the impetus for issuing Executive Order 13224, *see* 66 F.R. 49079, under which HLF was designated a Specially Designated Global Terrorist three months later.

deposition was unnecessary for that reason, and its deponent stated under oath CAB had retained no "account statements" from the relevant period. But when asked during that deposition how CAB could state in its prior motion to dismiss that "CAB closed the [HLF] account on December 5, 2001," *see* ECF No. 100, at 12 n.4, its deponent Mr. Qassem admitted that the bank *had* retained account statements and other records relating to HLF—and not just one U.S. dollar-denominated "account," as suggested in its prior motion, but ***three***. Indeed, it evidently relied on those records *before* telling the Court it had no relevant records on June 14, 2022 (it filed ECF No. 100 on October 8, 2001).

CAB attempts to draw the sting of its misrepresentation to the Court by giving a cursory reference to it in a footnote, writing that "the only exception" to its statement that it destroyed all relevant documents "was CAB's preservation of certain HLF account information that had been requested by the Central Bank of Jordan following CAB's closure of the HLF accounts in December 2001." Br. at 3 n.2. But, again, these HLF documents are not incidental. CAB not only relies on them repeatedly, it relies on them to attack *Plaintiffs*, claiming incorrectly that "discovery proved" SAC allegations that HLF accounts remained open after its December 4, 2001 designation "to be false as well." Br. at 4 n.4. *See also id.* at 22 & n.16.[13]

### E. The "Remaining Thirteen Transactions" Are Indistinguishable From the Other Transfers

CAB argues that the "Remaining Thirteen Transactions" do not satisfy its own hand-crafted "due process" test, either. These transactions relate to three individuals alleged in the SAC as prominent Hamas leaders and operatives, SAC ¶¶ 1131-35, 1152-57, 1158-68; seven entities alleged in the SAC to be organizations declared unlawful by Israel (and, in the case of Al-Aqsa

---

[13]     To the extent CAB refers to paragraph 1179 of the SAC, that allegation did not specifically refer to HLF's U.S. dollar-denominated accounts.

Foundation, by Germany and the U.S., as well) because of their association with Hamas, *id.* ¶¶ 582, 759, 896, 914, 965, 1000, 1032; a Saudi organization reported (and determined by the CIA) to fund Hamas, as alleged in the SAC, *id.* ¶¶ 571, 752; and the Islamic University of Gaza, alleged in the SAC to serve as a breeding ground for Hamas recruits and as storage for its weapons, ¶¶ 768-97.[14]

These transactions do not differ from the HLF or Interpal transactions in any meaningful way. CAB complains that "the only evidence that exists regarding these transfers … is the routing messages produced by other subpoenaed," and thus lack "notice of a terroristic purpose," Br. at 23, but, as explained above, CAB has simply invented this "requirement," which appears nowhere in *Licci*. CAB also argues that some of its customers were not designated by Israel or the U.S. at that time (despite ignoring the Israeli designations of its other customers, including HLF), but this likewise goes to knowledge, which is a liability issue. Moreover, designations are not required to establish knowledge, as the Second Circuit already explained: "The [district] court cited no authority for [designations as] a prerequisite for knowledge, and we know of none; and it would defy common sense to hold that such knowledge could be gained in no other way." *Kaplan*, 999 F.3d at 864.

## CONCLUSION

For the reasons given above, and in Plaintiffs' prior briefs on personal jurisdiction, and this Court's two R&Rs on personal jurisdiction one of which remains *sub judice* before the District Court, this Court should deny CAB's motion for reconsideration (however styled).

---

[14] The other transactions in this category relate to two individuals and two entities (including SDGT Al Osama Trading Co. Ltd., described above) regarding which, if the opportunity arises, Plaintiffs will add information into a further amended complaint, but they too are not necessary to establish personal jurisdiction.

Dated: March 10, 2023
        Hackensack, NJ

Respectfully submitted,

By:     /s/ Michael J. Radine
        **OSEN LLC**
        Michael J. Radine, Esq.
        Gary M. Osen, Esq.
        Ari Ungar, Esq.
        Dina Gielchinsky, Esq.
        Aaron Schlanger, Esq.
        190 Moore St., Suite 272
        Hackensack, NJ 07601
        Telephone (201) 265-6400

        **TURNER & ASSOCIATES, P.A.**
        C. Tab Turner, Esq.
        4705 Somers Avenue, Suite 100
        North Little Rock, AR 72116
        Telephone (501) 791-2277

        **KOHN, SWIFT & GRAF, P.C.**
        Stephen H. Schwartz, Esq.
        Neil L. Glazer, Esq.
        1600 Market Street, Suite 2500
        Philadelphia, PA 19103
        Telephone (215) 238-1700

        **ZUCKERMAN SPAEDER LLP**
        Shawn P. Naunton, Esq.
        485 Madison Avenue
        10th Floor
        New York, NY 10022
        Telephone (212) 704-9600

        *Attorneys for Plaintiffs*