USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/30/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AVERBACH et al.,

Plaintiffs,

-against-

CAIRO AMMAN BANK,

Defendant.

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS**

**19-cv-0004-GHW-KHP**

**TO: HONORABLE GREGORY H. WOODS, UNITED STATES DISTRICT JUDGE**
**FROM: KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE.**

This case arises out of a series of terrorist attacks (the "Attacks") in Israel between 2000 and 2004 that were perpetrated by *Harakat al-Muqawama al-Islamiya* ("Hamas"). Plaintiffs include United States ("U.S.") nationals injured in the attacks, as well as the estates, heirs, and families of U.S. nationals killed or injured in the attacks. The parties have taken jurisdictional discovery but have not yet conducted merits discovery. Before this Court is Defendant Cairo Aman Bank's ("CAB") post-jurisdictional discovery motion to dismiss the Second Amended Complaint ("SAC") for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(2), or in the alternative Rule 56. For the following reasons, I recommend that the motion be DENIED.

## BACKGROUND

### 1. Summary of Pertinent Allegations in the SAC[1]

CAB is a financial institution incorporated and headquartered in Amman, Jordan, with branches in Jordan and the Palestinian territories. (SAC ¶ 499.) The SAC alleges that in the years immediately preceding and during the Attacks, i.e. from 1999 through 2004 (the "Relevant Period"), CAB facilitated the flow of money used by Hamas to finance terrorism, thus aiding and abetting Hamas's terrorism. (*Id.* ¶ 1097.) The SAC alleges that CAB provided U.S. dollars to Hamas by knowingly maintaining accounts for and providing financial services for individuals and organizations that were associated with Hamas and that in turn provided support to Hamas; and by facilitating reward payments to families of Hamas suicide bombers, other "martyrs," and Hamas prisoners. (*Id.* ¶ 1102.)

The SAC alleges that CAB knowingly maintained accounts for well-known Hamas leaders, including Abbas al-Sayed, Mohamad Saleh Taha, and Abd al-Khaleq Hasan Shadli al-Natshe. (*Id.* ¶ 1129, 1136-77.) The SAC alleges that al-Sayed, Taha, and al-Natshe were at the center of Hamas's violent terrorist activities, including serving as senior members of Hamas' militant arm, planning attacks, and recruiting others to do so. (*Id.* ¶ 1130.) The SAC alleges that CAB knew of these individuals' ties to Hamas and refers to numerous public statements by Hamas officials and press articles documenting these individuals' ties to and contributions to Hamas' terrorism.

As to organizations, the SAC alleges that CAB maintained accounts for 17 charities and organizations in the West Bank and Gaza Strip that were integral parts of Hamas' operations.

[1] A detailed account of the SAC's factual allegations is provided at *Averbach v. Cairo Amman Bank*, 2022 WL 2530797, at *2-5 (S.D.N.Y. Apr. 11, 2022) ("*Averbach III*"), which is incorporated here by reference.

(*Id.* ¶¶ 766-1096.) One such account holder was the Holy Land Foundation ("HLF"), which was designated as an unlawful association by Israel in 1997, and as a specially designated global terrorist ("SDGT") by the U.S. on December 4, 2001. The SAC documents findings by the U.S. that money raised by HLF was used by Hamas to support its terrorist activities, including through recruitment of suicide bombers. (*Id.* ¶ 645-49.) The SAC also documents findings by the FBI that funds raised by HLF "are clearly being used by" Hamas and that HLF "is acting for or on behalf of" Hamas. (*Id.* ¶ 648.) The FBI report, which is attached as Exhibit G to the SAC, notes that HLF sent money to ostensibly charitable committees in the West Bank and Gaza that were controlled by Hamas, and that Hamas used these committees to indoctrinate the populace, recruit suicide bombers, support the families of Hamas prisoners and suicide bombers, and siphon money for terrorist attacks. (*Id.* Exh. G.)

Another such account holder is the Palestinian Relief and Development Fund ("Interpal"), which the SAC describes as Hamas' "most important fundraising organization in the United Kingdom." (*Id.* ¶ 565.) Interpal was designated by Israel as a terrorist organization in 1998 and as an SDGT by the U.S. in 2003. (*Id*. ¶ 827.) The SAC cites press articles identifying Interpal as "a principal conduit of funds for" Hamas. (*Id.* ¶ 566.) The SAC also asserts that Interpal and other account holders used CAB to transfer U.S. dollars to other known Hamas affiliates such as the Beit Fajar Zakat Committee ("BFZC"), which openly identified as part of the civilian infrastructure of Hamas and was itself a CAB customer. (*Id.* ¶¶ 1044, 1056, 1103-06.)

Plaintiffs allege that CAB knew of these organizations' affiliation with Hamas because Hamas openly acknowledged the relationships in the media, and because the relationships were publicized by the media. (*Id.* ¶ 764.) Plaintiffs also allege that during the Relevant Period,

the Palestinian Monetary Authority ("PMA") issued orders to CAB and other banks in the area to freeze these organizations' accounts to prevent funding Hamas institutions. (*Id.* ¶¶ 823, 848, 1047.)

Notably, none of the organizations or individuals identified in the SAC as having CAB accounts are alleged to have directly participated in the Attacks, except for al-Sayed, who is alleged to have planned one of the Attacks. Instead, Plaintiffs claim that the ostensibly charitable, social, and general activities of the account holders provided support and funds to Hamas's militant arm, which in turn was responsible for the attacks.

The services CAB provided to its Hamas-affiliated customers included regular banking services and the transfer of funds internationally, including the provision of U.S. dollars. The SAC asserts that to facilitate international money transfers in U.S. dollars, CAB maintained correspondent banking relationships with banks in New York, including Citibank, N.A., Bank of New York, and American Express Bank Ltd. (the "Correspondent Banks") during the Relevant Period. (*Id.* ¶¶ 6, 7, 634, 636-37, 1137, 1157, 1168, 1172.) Plaintiffs do not allege that CAB has any business relationships in New York other than with the Correspondent Banks.

The SAC identifies twenty-three fund transfers made in U.S. dollars through the Correspondent Banks for the benefit of five Hamas-affiliated customers, including two transfers to HLF on December 28, 1999 in the amount of $190,743.00 and on January 16, 2001 in the amount of $229,283.00; seven transfers to al-Sayed between February 2001 and May 2001 totaling $69,000.00; and five transfers to Taha between December 2000 and September 2001 totaling $9,870.00. (*Id.* ¶¶ 636-37, 1137, 1157, 1168, 1172.)

**2. Procedural History**

Plaintiffs filed the initial complaint against CAB on January 1, 2019, asserting claims pursuant to the Anti-Terrorism Act ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"). (ECF No. 1.) CAB moved to dismiss the initial complaint for lack of personal jurisdiction and for failure to state a claim. This Court issued a Report and Recommendation ("R&R") recommending that the motion to dismiss be denied to the extent it challenged the Court's personal jurisdiction over CAB, and granted in part for failure to adequately plead two elements of a JASTA claim. *Averbach v. Cairo Amman Bank*, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020) ("*Averbach I*").

In the R&R, this Court explained that the jurisdictional issue was similar to another case that had been considered by the United States Court of Appeals for the Second Circuit ("Second Circuit") – *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013). Like this case, *Licci* involved allegations that a foreign bank had assisted terrorism in part through money transfers that were routed through New York correspondent banks. There, the Second Circuit held that the use of in-forum correspondent accounts constituted purposeful in-forum conduct and personal jurisdiction existed over the bank. This Court explained in its R&R that, as in *Licci*, the initial complaint adequately pleaded the existence of personal jurisdiction over CAB under New York's applicable long arm statute, New York Civil Practice Law and Rules ("C.P.L.R.") § 302(a), because it alleged that CAB had transacted business within the state through its purposeful use of correspondent accounts in the state, and Plaintiffs' claims arose from that business activity because the claims involved allegations that CAB's aid to Hamas came about in

part via transfers through the New York correspondent accounts. *Averbach I*, 2020 WL 486860, at *6-7.

This Court also found that the exercise of personal jurisdiction comported with the Constitution's due process protections, because CAB's "'selection and repeated use of New York's banking system' to allegedly assist Hamas constituted 'purposeful availment' sufficient to permit the assertion of specific jurisdiction." *Id.* at *8 (quoting *Licci*, 732 F.3d at 161). The Court found that the exercise of jurisdiction did not offend traditional notions of fair play and substantial justice because "modern communication and transportation" would ease any burden on CAB of defending this case in New York and because the state has an "interest in monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism." *Id.* (quoting *Licci*, 732 F.3d at 173-74).

On March 9, 2020, the Honorable Gregory H. Woods adopted the R&R in its entirety and allowed Plaintiffs the opportunity to replead. *Averbach for Estate of Averbach v. Cairo Amman Bank*, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020) ("*Averbach II*").

On April 8, 2020, Plaintiffs filed a First Amended Complaint adding a claim for primary liability under the ATA. (ECF No. 63.) After the Second Circuit issued a series of relevant decisions, Plaintiffs were given another opportunity to replead, and filed the SAC on September 3, 2021. (ECF No. 96.)

On October 8, 2021, CAB moved to dismiss the SAC for lack of personal jurisdiction and for failure to state a JASTA claim. (ECF Nos. 97-100.) On April 11, 2022, this Court issued a R&R recommending that CAB's motion be granted with respect to Plaintiffs' primary liability claims under the ATA and as to certain plaintiffs for lack of standing, but that CAB's motion be denied

with respect to Plaintiffs' aiding-and-abetting claims under JASTA. *Averbach III*, 2022 WL 2530797, at *1. As to personal jurisdiction, this Court explained in the R&R that nothing had changed from the FAC to the SAC that affected the Court's earlier personal jurisdiction analysis. The R&R noted that the SAC, like the FAC, identified numerous transfers made through New York Correspondent Banks in the years immediately prior to the Attacks, and that these transfers were "still sufficient to establish personal jurisdiction over CAB." *Id.* at *6. Accordingly, this Court again recommended that the Court find it has personal jurisdiction over CAB. Judge Woods has not yet issued an order regarding the R&R.

Following the issuance of the R&R, the parties engaged in jurisdictional discovery but not merits discovery. As a result of jurisdictional discovery in this case and discovery in other cases, Plaintiffs located and produced evidence of 114 wire transfers that CAB processed for its Hamas-affiliated customers through its New York Correspondent Banks. Plaintiffs produced a chart, submitted as Exhibit 8 to CAB's motion, setting forth the dates, amounts, routes, and parties to these transfers.[2] Plaintiffs assert that the evidence of these 114 transfers "easily satisf[ies]" their burden to show personal jurisdiction over CAB. (Pls.' Opp. 10.) CAB produced contemporaneous transfer documents for many of these transfers that were prepared by the

[2] Plaintiffs' chart includes a total of 133 wire transfers, 19 of which were not made through CAB's correspondent accounts but were processed through Arab Bank's correspondent account in New York and credited to Arab Bank's Ramallah branch before being forwarded to CAB. Plaintiffs have explicitly foreclosed reliance on these 19 transfers as a basis for personal jurisdiction, and rest on the remaining 114 transfers. At the time Plaintiffs filed their opposition brief, a court in the Eastern District of New York had held that use of another bank's correspondent account was insufficient for asserting personal jurisdiction under the long arm statute, but that decision was recently vacated by the Second Circuit. *Spetner v. Palestine Inv. Bank*,. 495 F. Supp. 3d 96 (E.D.N.Y. 2020), *vacated and remanded*, 2023 WL 4035924 (2d Cir. June 16, 2023). Plaintiffs reaffirmed at oral argument, which occurred after the Second Circuit decided *Spetner*, that they continue to rely only on the 114 transfers for personal jurisdiction. Accordingly, this R&R focuses on the 114 transfers that formed the basis of the parties' briefing and does not consider the jurisdictional implications of the 19 transfers that were processed through Arab Bank's correspondent accounts.

CAB customer seeking the monetary transfer. Many of these documents provide a space for the customer to list the purpose of the requested transfer, and stated purposes include, for example, "Education, General and Social Services," "Aid to Needy Families," and "Community Development." (Def. Br. at 21.)

On February 17, 2023, following the conclusion of jurisdictional discovery, CAB filed the instant motion to dismiss, arguing that Plaintiffs' jurisdictional evidence is insufficient to support their prima facie showing of jurisdiction, and again requesting that the Court dismiss the action for lack of personal jurisdiction over CAB. (ECF No. 188-190.) Plaintiffs filed an opposition brief on March 10, 2023 (ECF No. 195) and CAB filed a reply brief on March 24, 2023 (ECF No. 201.) The Court denied Plaintiffs' request to file a sur-reply. (ECF No. 204.) On June 29, 2023, the Court held an oral argument on the motion.

## LEGAL STANDARDS

### 1. Principles Governing Post-Discovery Motions to Dismiss for Lack of Personal Jurisdiction

The plaintiff bears the burden of establishing that the court has jurisdiction over the defendant. *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (citation omitted). The showing a plaintiff must make to defeat a defendant's challenge to the court's personal jurisdiction over it "varies depending on the procedural posture of the litigation" and the motion brought by the defendant. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (*quoting Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).

Before jurisdictional discovery, the plaintiff need only make a prima facie showing of jurisdiction, and it can make this showing "solely by allegations." *Id.* at 85. Where jurisdictional

discovery has been conducted, a plaintiff must make a prima facie showing that is "factually supported," *i.e.*, the showing must "include an averment of facts that, if credited by [the factfinder], would suffice to establish jurisdiction over the defendant." *Id.* (quoting *Ball*, 902 F.2d at 197).

Following jurisdictional discovery, the defendant can challenge the plaintiff's averment of jurisdictional facts in one of three ways:

> (1) by a Rule 12(b)(2) motion, which assumes the truth of the plaintiff's factual allegations for purposes of the motion and challenges their sufficiency, (2) by a Rule 56 motion, which asserts that there are undisputed facts demonstrating the absence of jurisdiction, or (3) by a request for an adjudication of disputed jurisdictional facts, either at a hearing on the issue of jurisdiction or in the course of trial on the merits.

*Id.* (quoting *Ball*, 902 F.2d at 197).

In response to a post-jurisdictional discovery Rule 12(b)(2) motion, "the plaintiff need persuade the court only that its factual allegations constitute a prima facie showing of jurisdiction." *Id.* (quoting *Ball*, 902 F.2d at 197). In response to a post-jurisdictional discovery Rule 56 motion, the plaintiff need only show that there are not undisputed facts demonstrating the absence of jurisdiction. *Id.* (quoting *Ball*, 902 F.2d at 197). For either motion, the court must "construe the pleadings and affidavits in the light most favorable to plaintiffs," and resolve all doubts, including factual disputes, in the plaintiff's favor. *Id.*; *see also S. Oil of Louisiana Inc. v. Saberioon*, 2021 WL 5180056, at *3 (S.D.N.Y. Nov. 8, 2021). If the court conducts an evidentiary hearing, or if the defendant challenges personal jurisdiction at trial, then — and only then — must the plaintiff prove the existence of jurisdiction by a preponderance of the evidence. *Dorchester*, 722 F.3d at 85.

Where the underlying merits of the case are relevant to the jurisdictional issue and are in dispute, it is appropriate to deny a motion to dismiss for lack of jurisdiction and to defer the question until after merits discovery has been taken. *Dorchester*, 722 F.3d at 87 (explaining that if "a decision of the jurisdictional issue requires a ruling on the underlying substantive merits of the case, the decision should await a determination of the merits either by the district court on a summary judgment motion" following merits discovery, "or by the fact finder at the trial.") (citation omitted).

**2. Principles Governing Personal Jurisdiction**

Personal jurisdiction is a "threshold question" that "must precede merits." *In re Rationis Enterprises, Inc. of Panama*, 261 F.3d 264, 268 (2d Cir. 2001). For a federal court to lawfully exercise personal jurisdiction over a party, three primary requirements must be met: the plaintiff's service of process on the defendant must have been procedurally proper; there must be a statutory basis for personal jurisdiction that renders such service of process effective; and an exercise of personal jurisdiction must be consistent with federal due process requirements. *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005).[3]

There are two types of personal jurisdiction: general and specific. *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017). A court may exercise "general" jurisdiction over a defendant in the forum that could fairly be regarded as that defendant's "home," and in such cases, the court can hear any claim against that defendant. *Id.* (citation omitted). Where, as here, the forum state cannot fairly be considered

[3] As CAB only challenges whether the exercise of personal jurisdiction comports with due process, the below discussion focuses on the federal due process requirements. The Court refers to and incorporates here the fulsome discussion of personal jurisdiction principles in *Averbach I*, 2020 WL 486860 at *4-9.

the defendant's home, a court must have "specific" jurisdiction over the defendant, meaning "there must be an affiliation between the forum and the underlying controversy." *Id.* (citation omitted). That is, the plaintiff's claim must "arise out of or relate to the defendant's contacts" with the forum. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) (citation omitted).

The applicable New York long arm statute provides, in relevant part, that a court may exercise personal jurisdiction over any non-domiciliary that (1) "transacts any business within the state" when (2) "the plaintiff's claim arises from the business that the non-domiciliary transacted in New York." N.Y.C.P.L.R. 302(a)(1); *Licci*, 732 F.3d at 168. Where personal jurisdiction is premised on the maintenance and use of in-forum correspondent bank accounts, the plaintiff must show that the foreign bank's maintenance and use of the correspondent account was purposeful; and that there is a nexus or substantial relationship between the plaintiff's claim and use of the correspondent account. *Licci*, 732 F.3d at 168-69.

To assess whether exercise of specific personal jurisdiction comports with federal due process, the court must determine whether the defendant has "minimum contacts" with the forum state. *Licci*, 673 F.3d at 60 (citations omitted). "[M]inimum contacts exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being [hauled] into court there." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (quotation marks and citations omitted). Accordingly, the minimum contacts inquiry in this context looks at whether the defendant purposefully availed itself of the privilege of doing business in the forum, and whether the plaintiff's claim arises out of, or relates to, the defendant's contacts with the forum. The

Second Circuit has held that "the selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress, constitutes 'purposeful[ ] avail[ment] . . . of the privilege of doing business in [New York]." *Licci*, 732 F.3d at 171.[4]

Once the court has determined that the defendant had "minimum contacts" with the forum, the court must consider whether the assertion of personal jurisdiction comports "with fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (citation omitted). Relevant factors include the burden that the exercise of jurisdiction will impose on the defendant; the interests of the forum state in adjudicating the case; and the plaintiff's interest in obtaining convenient and effective relief. *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996). This inquiry "rarely defeats jurisdiction where a defendant has sufficient forum contacts, and is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 645 (S.D.N.Y. 2017) (Woods, J.) (citation omitted).

## DISCUSSION

### 1. Plaintiffs Have Made a Factually Supported Prima Facie Showing of Jurisdiction.

This Court already found that Plaintiffs met their pre-discovery burden of establishing that the Court has specific personal jurisdiction over CAB. *Averbach II*, 2020 WL 1130733;

---

[4] Certain cases cited by the parties reference various "theories" for demonstrating minimum contacts, such as the "effects test" and the "concerted action theory." *See, e.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 2430381, at *13 (S.D.N.Y. Mar. 9, 2023) (considering whether plaintiffs made a prima facie showing of jurisdiction based on either the effects test or concerted action theory). Such theories are used to demonstrate "minimum contacts" when the defendant acts entirely outside the forum. As the Second Circuit explained in *Licci*, where, as here, jurisdiction is premised on the use of in-forum correspondent banks, the conduct on which jurisdiction is based has occurred within the forum and theories such as the effects test and concerted action theory are inapplicable. 732 F.3d at 173.

*Averbach III*, 2022 WL 2530797. Because jurisdictional discovery had not yet been taken when the Court made that finding, Plaintiffs were able to meet their burden solely by the allegations in the SAC, which the Court assumed to be true.

As discussed above, Plaintiffs established a prima facie showing of personal jurisdiction under the New York long arm statute. Plaintiffs' allegations regarding CAB's use of in-forum Correspondent Banks "constituted repeated, and thus purposeful, use of the New York-based accounts" and were "sufficient to satisfy the transaction of business requirement of New York's long-arm statute." *Averbach I,* 2020 WL 486860, at *5. Additionally, Plaintiffs alleged "an articulable nexus" between the claim asserted and CAB's in-forum contacts because their claims involved allegations that CAB provided monetary aid to Hamas in part via these money transfers. *Id.* at *6. As this Court explained, CAB's use of correspondent accounts "is not completely unmoored from the [legal claim], regardless of the ultimate merits of the claim." *Id.* at *7 (citing *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339 (2012)).

Plaintiffs' prima facie case of personal jurisdiction also comported with constitutional due process. Plaintiffs alleged that CAB engaged in a repeated use of New York's banking system through its use of correspondent accounts such that it had "minimum contacts" with the state. *Id.* Plaintiffs' claims arose, in part, out of these contacts for the same reason that the Court found an "articulable nexus" between the claims and CAB's contacts with New York; that is, the claims involved allegations that CAB provided aid to Hamas in part via these transfers. As this Court explained, CAB's use of correspondent accounts was "sufficiently related" to Plaintiffs' claims because such use was "an instrument for accomplishing the alleged wrongs."

*Id.* Finally, the Court determined that exercise of jurisdiction was reasonable because it would not be unduly burdensome for CAB to litigate this action in New York, among other reasons.

Now that jurisdictional discovery is complete, Plaintiffs' burden is different, but it is not heavy. *Dorchester*, 722 F.3d at 85.[5] To defeat the Rule 12(b)(2) motion, Plaintiffs need only show that their prima facie showing of jurisdiction is factually supported. *Id.* To defeat CAB's alternative Rule 56 motion, Plaintiffs need only show that there are not undisputed facts that demonstrate the absence of jurisdiction. *Id.*

Plaintiffs have met the Rule 12(b)(2) burden with documents produced in discovery that prove that many of the transfers alleged in the SAC, and others, in fact occurred and were routed through New York Correspondent Banks. Plaintiffs' evidence shows the existence of over 100 transfers in the Relevant Period, totaling over seven million U.S. dollars, that were facilitated by CAB through New York for its Hamas-affiliated customers. These include numerous transfers for organizations and individuals listed in the SAC such as HLF, Interpal, and Taha. The SAC cites findings by the U.S. government as to the affiliations of these customers with Hamas and the extent to which these customers aided Hamas' terrorist efforts. CAB has not submitted controverting evidence showing that these transfers did not occur or that they were not routed through New York, and in fact CAB concedes that these transfers occurred and were routed through New York. Plaintiffs' evidence thus provides factual support for its

---

[5] Plaintiffs argue that CAB's motion constitutes an impermissible motion for reconsideration of the Court's prior R&R, which recommended a finding that Plaintiffs established a prima facie showing of jurisdiction. Because Plaintiffs' burden is different at this post-jurisdictional-discovery stage, CAB's motion does not constitute a motion for reconsideration. Plaintiffs also suggest that this motion was not referred to the undersigned for a R&R, but Judge Woods has referred the undersigned for "all motions," which includes this one. (ECF No. 27.) Plaintiffs have not pointed to any rule precluding a magistrate judge from issuing a R&R on a post-discovery motion where an earlier R&R remains before the district judge. Accordingly, CAB's motion is procedurally proper and is properly before me for an R&R.

jurisdictional allegations that CAB used New York accounts to provide the banking services to Hamas-affiliated entities that are at issue in this case.

CAB does not dispute that Plaintiffs' evidence suffices to establish jurisdiction under New York's long arm statute or that Plaintiffs have met the "reasonableness" prong required by due process. CAB only contests whether the "minimum contacts" prong of the due process analysis is met. Specifically, CAB argues that Plaintiffs failed to show that exercise of specific personal jurisdiction over it comports with the "minimum contacts" prong of the due process analysis because Plaintiffs have not shown that their claims "arise out of or relate to" the transfers in question. (Def. Br. 25.) [6] However, Plaintiffs' posited connection between the transfers in question and their JASTA claims is far more than theoretical or attenuated. In this case, as in *Licci,* 732 F.3d at 171, the correspondent accounts at issue are alleged to have been used "as an instrument to achieve the very wrong alleged"—that is aiding and abetting terrorism by facilitating Hamas's access to money, including U.S. dollars. 732 F.3d at 171; *see also Spetner*, 2023 WL 4035924, at *8. To be clear, and as discussed in more detail below, Plaintiffs are not required to make factual averments at this stage that CAB is liable under JASTA based on these transfers; on a post-jurisdictional discovery 12(b)(2) motion, the plaintiff need only aver "jurisdictional facts" and the court does not consider the "underlying merits." *Dorchester*, 722 F.3d at 87.

Plaintiffs have similarly met their burden under Rule 56, because there is no meaningful dispute that these transfers occurred, and there is no undisputed fact in this case that is

[6] To the extent CAB argues Plaintiffs failed to meet the "purposeful availment" prong, this argument only applies to the 19 transfers that Plaintiffs are not relying on for purposes of this motion. (Def. Br. 10.)

sufficient to warrant dismissal for lack of personal jurisdiction. As discussed below, the only factual disputes that CAB raises are questions going to the merits of Plaintiffs' claims, specifically (i) whether any of these transfers actually funded the Attacks, and (ii) whether CAB knew the transfers may have funded the Attacks. These questions do not need to be resolved at this threshold stage because they are merits-based questions for which merits discovery is needed. *See Spetner*, 2023 WL 4035924, at *8 (arguments going to defendant bank's general awareness of its involvement in aiding and abetting terrorism was a merits question)*; Axginc Corp. v. Plaza Automall, Ltd.*, 2021 WL 1030228, at *9 (E.D.N.Y. Mar. 2, 2021), *report and recommendation adopted*, 2021 WL 1026497 (E.D.N.Y. Mar. 17, 2021) (defendant's argument that there was an "innocent explanation" for the monetary transfer was a "merits argument" that did not defeat the connection between that money transfer to the state of New York for purposes of personal jurisdiction). In any event, these factual disputes must be resolved in Plaintiffs' favor at this juncture. *Dorchester*, 722 F.3d at 85.

Accordingly, Plaintiffs have produced sufficient evidence at this threshold stage to support their prima facie showing of personal jurisdiction and to defeat CAB's motion.

**2. CAB's Arguments to the Contrary are Merits-Based.**

The crux of CAB's argument in support of its motion is that Plaintiffs did not provide sufficient evidence to show that that their claims "arise out of or relate to" the transfers in question, as required in order to exercise specific personal jurisdiction over CAB in accordance with due process. (Def. Br. 25.) CAB argues that for jurisdiction to comport with due process, the conduct that constitutes "minimum contacts" with the forum must be "conduct that could have subjected [a foreign defendant] to liability under" JASTA. (Def. Br. 12, 16). CAB argues

that these 114 transfers fail to support personal jurisdiction because the transfers did not, on their face, give CAB notice that they would be used to support terrorism, and in fact CAB's evidence indicates that most of the transfers were made for humanitarian or general rather than terroristic purposes.[7] CAB further argues that Plaintiffs failed to "rebut" CAB's evidence showing that these transfers were made for humanitarian or general rather than terroristic purposes, that is, the underlying transfer documentation for many of the transfers, which stated purposes of transfers such as "Aid to Needy Families," "Education, General and Social Services," and "Community Outreach." Accordingly, CAB argues, these transfers cannot subject them to JASTA liability and thus do not support the exercise of specific personal jurisdiction.

This argument relies on circular logic in an effort to conflate the merits of Plaintiffs' case with the threshold issue of personal jurisdiction. CAB's misleading articulation of the due process standard implies that a plaintiff must prove its case on the merits before jurisdiction can be found and before merits discovery has been taken. This contradicts the well-established principle that personal jurisdiction is a threshold question that is separate from, and must be resolved before, the merits. *In re Rationis*, 261 F.3d at 268. As only jurisdictional discovery has been taken, the question before this Court remains limited to a personal jurisdiction inquiry; "[a]t this juncture, we are interested only in the question of personal jurisdiction and the nature of the contacts that would support such exercise." *Spetner*, 2023 WL 4035924, at *8. Arguments going to the merits of Plaintiffs' claims are not properly raised on this motion.

---

[7] Thirteen of the transfers in question did not have any accompanying documentation providing a purported "purpose." Some of these transfers were made by prominent Hamas leaders, and others by entities alleged in the SAC to be affiliated with Hamas. As to these transfers, CAB argues that there is insufficient evidence showing it was generally aware that these transfers would have supported terrorism.

*Averbach I*, 2020 WL 486860, at *5 (noting that the issue of personal jurisdiction is resolved "regardless of the ultimate merits of the claim.").

The question whether CAB had notice that the 114 transfers may have been made to facilitate terrorism is squarely a merits issue that goes to the *mens rea* element of a JASTA aiding and abetting claim – that is, the JASTA requires a showing that the defendant had "general awareness" that its actions were aiding and abetting terrorism. *Spetner*, 2023 WL 4035924, at *8 (arguments going to defendant bank's general awareness of its involvement in aiding and abetting terrorism was a merits question); *Averbach I*, 2020 WL 486860, at *12 (treating CAB's "general awareness" as a merits question that did not impact the jurisdictional analysis). Similarly, the question of whether or not these transfers actually aided and abetted terrorism in violation of the JASTA is clearly a merits issue. Accordingly, Plaintiffs are not required at this juncture to provide evidence showing that these transfers were earmarked for a terroristic purpose or that they actually were used to aid and abet terrorism. At this stage, Plaintiffs can rely on the allegations in the SAC, which the Court already found are sufficient to support a JASTA claim.

In arguing to the contrary, CAB drastically overstates what factual averments are necessary to support a prima facie showing of personal jurisdiction. Prior to discovery, Plaintiffs were not required to allege, and did not allege, that the transfers in question were earmarked for terroristic purposes or were explicitly made solely to fund terroristic activities. Rather, it was sufficient that Plaintiffs alleged that the transfers were connected to CAB's indirect provision of aid to Hamas. That is, Plaintiffs alleged that funds earmarked for humanitarian or general purposes were in fact used toward terrorist efforts such as recruiting

suicide bombers. For example, regarding the HLF transfers, Plaintiffs alleged that money raised by HLF through charitable donations was used as a tool for recruiting individuals in the communities served by the donations to join Hamas' militant causes, and that HLF siphoned funds from its charitable endeavors to directly support terrorism. (SAC ¶ 649.) Similarly, Plaintiffs did not plead that specific transfers to individual Hamas leaders such as Taha were earmarked for terroristic activities such as purchasing bombs. Rather, it was sufficient for jurisdictional purposes that Plaintiffs alleged that CAB provided general banking services to Taha and that through these general services, Taha received funds from Hamas operatives that aided the funding of Hamas' terrorism. (SAC ¶¶ 1129-35.)

JASTA does not require that money transfers be specifically earmarked as being for a terroristic purpose in order for jurisdiction or liability to lie. CAB argues that the Second Circuit in *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 498-99 (2d Cir. 2021), foreclosed Plaintiffs from relying on transfers that are made for an ostensibly charitable purpose. In making this argument, CAB misstates both Plaintiffs' legal theory and *Honickman*. In *Honickman*, the court did not hold that monetary transfers must be earmarked as terroristic on their face, nor did the Court find that the monetary transfers at issue in that case did not in fact aid or abet terrorism. (Def. Br. 20.) Rather, the Second Circuit rejected a "fungibility of money" theory for proving the "general awareness" element of a JASTA violation. Specifically, the court found that the plaintiffs had not sufficiently pleaded "general awareness" where the complaint relied on news articles that reported *only* that the bank's customers engaged in charitable endeavors and plaintiffs did not cite any other sources from which the foreign bank would have learned that their actions may have been aiding terrorism. *Id.* at 502. The Court did not say anything about

whether transfers that are ostensibly earmarked for a charitable or general purpose can or cannot support JASTA liability, and it certainly did not comment on whether such transfers can support personal jurisdiction.

Here, Plaintiffs are not relying on the "fungibility of money" theory that was rejected in *Honickman* for showing general awareness. Rather, Plaintiffs pleaded (and will be required to prove following merits discovery) that CAB was generally aware that these transfers were supporting terrorism through other means, including the designation of its customers as terrorist organizations by the U.S. and Israel, news publications discussing its customers' connections to Hamas and describing how their charitable and general endeavors were used to support Hamas and further terrorism, and activities in and around the bank branches such as demonstrations and payments to martyrs funded by CAB customers about which local branch authorities would be aware. As CAB's "general awareness" is a merits question, Plaintiffs can continue to rest on the allegations in the SAC as to "general awareness" for purposes of this motion. *See Spetner*, 2023 WL 4035924, at *8.[8] Plaintiffs also are not relying on a theory that the monetary transfers in question "free[d] up" other money that could be used for terrorism. (Def. Br. 20.) Rather, as the Court understands it, Plaintiffs' theory is that some or all of the U.S. dollars that CAB routed through New York Correspondent Banks for Hamas-affiliated clients was in fact used to fund terrorism, directly and indirectly, despite any general or charitable purpose listed on the underlying transfer documents. Indeed, it is not surprising that CAB's

[8] CAB acknowledges that Plaintiffs do not need to prove that CAB's alleged general awareness arose from its in-forum conduct. (Reply 3.) Plaintiffs may attempt to prove general awareness through other evidence outside of these bank transfers such as, for example, news articles and publicized government findings. *See Licci*, 732 F.3d at 169-70.

customers did not list "funding Hamas" as the stated purpose of these transfers, as this would likely have caused such transfers to be flagged by the U.S. banks processing the transfers in light of the fact that Hamas was a designated terrorist organization throughout the Relevant Period. In any event, Plaintiffs have pointed to specific facts that create a question of fact (at least at this stage) as to whether the stated purpose of the HLF transfers through CAB's correspondent bank accounts were their true purpose, including FBI findings that HLF funded terrorism via money raised in the U.S. and sent to Hamas-controlled entities that were actively working to support Hamas and recruit suicide bombers. (SAC Exh. G and SAC ¶¶ 641-44.)

*In re Terrorist Attacks on September 11, 2001*, 2023 WL 2430381 (S.D.N.Y. Mar. 9, 2023), cited by CAB, is also inapposite on the jurisdictional issue. There, following jurisdictional and merits discovery, the court found that there was no evidence to support the plaintiffs' jurisdictional allegations. In that case, the defendant bank had not used in-forum correspondent accounts and had not engaged in any other in-forum conduct. Accordingly, the plaintiffs' prima facie case of jurisdiction relied on the "effects test" and "concerted action" theories of personal jurisdiction, which respectively require a showing of intent on the part of the foreign bank to cause the in-forum effects complained of, and a showing that the foreign bank knowingly participated in a conspiracy. *Id.* at *11, 13. Following jurisdictional *and merits* discovery, the plaintiffs were unable to show evidence of intent or knowledge on the part of the foreign bank and thus were unable to provide factual support for either theory of personal jurisdiction on which they were relying. Here, jurisdiction is based on in-forum conduct by CAB (*i.e.* the use of correspondent accounts), and Plaintiffs are thus not required to meet the "prerequisite[s]" of either the effects test or the concerted action theory, and do not need to

show intent or knowledge to assert a prima facie case of personal jurisdiction. *Licci*, 732 F.3d at 173.

CAB's evidence of underlying transfer documentation does not change the equation because such documents go to the merits issues of whether these transfers actually aided terrorism, and whether CAB was generally aware of such aid. Because the evidence goes to the merits, there is no need for Plaintiffs to "rebut" the evidence at this stage. Indeed, it certainly is not the case that in light of CAB's evidence, the "burden of proof" shifted to Plaintiffs to submit admissible evidence demonstrating by a "preponderance" that the transfers were not used toward charitable or general purposes or raising a genuine issue of fact in dispute regarding their purpose and use. (Def. Br. at 8; Reply at 3.) This argument by CAB misstates Plaintiffs' burden at this stage. On a post-jurisdictional discovery motion brought pursuant to Rule 12(b)(2) or Rule 56, where no party has requested an evidentiary hearing, Plaintiffs do not have a burden to prove anything by a "preponderance of the evidence" or to rebut evidence. *Dorchester*, 722 F.3d at 85-86 (holding that although the defendant's evidence tended to show that the documents on which the plaintiff relied for its prima facie showing of jurisdiction were forgeries, it was error for the district court to resolve that factual dispute in the defendant's favor on a post-jurisdictional discovery motion to dismiss). The Second Circuit has long held that, until an evidentiary hearing is held, "a prima facie showing [of personal jurisdiction] suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981).

In their briefing and at oral argument, CAB cited to *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d Cir. 2010), for the proposition that a plaintiff is required to prove personal

jurisdiction by a preponderance of the evidence at this stage, but that case says nothing about a "preponderance" standard or any obligation by the plaintiff to rebut evidence. Rather, the Second Circuit in *Chloe* explained—as this Court has done here—that, following jurisdictional discovery, the plaintiff "need only make a prima facie showing of personal jurisdiction" that is supported by "an averment of facts." *Id.* at 163 (vacating the district court's decision granting a post-jurisdictional discovery motion to dismiss because the district court had taken "too narrow" a view of the requirement that the claims relate to the defendant's contacts with the forum, and finding that evidence of sales of designer handbags in New York could be used to support personal jurisdiction even though the plaintiff had not shown that those sales were of counterfeit Chloe bags).

The only case cited by CAB that refers to a "preponderance of the evidence" standard is *Paroni v. Gen. Elec. UK Holdings Ltd.*, 2021 WL 3501234 (S.D.N.Y. Aug. 9, 2021). But, that case did not hold that a "preponderance of the evidence" showing was required, as such a holding would have contradicted Second Circuit precedent. Rather, the court merely noted that a factual showing was not made at all, let alone by a preponderance of the evidence, to support the plaintiff's jurisdictional allegations. *Id.*

In *Paroni*, the plaintiff argued that the court had specific jurisdiction over General Electric UK Holdings ("GEUKH"), a foreign company. As the factual basis for the jurisdictional argument, the plaintiff posited that GEUKH's corporate parent, General Electric ("GE"), had purchased the liabilities of a company called Alstom and later transferred the liabilities to GEUKH in a transaction that took place in New York. *Id.* at *9. The plaintiff asserted that her claims arose out of this alleged transaction, which she posited must have occurred in New York

because GE maintains headquarters there. After jurisdictional discovery, the plaintiff produced no evidence showing that this transaction ever occurred, let alone that it occurred in New York. *Id.* The defendants' evidence clearly contradicted the plaintiff's entirely unsupported allegation because it showed that Alstom was not a separate company from GEUKH, but was simply renamed GEUKH in 2020, and there was thus no occasion for GE to hold the Alstom liabilities or transfer them to GEUKH. *Id*. In stark contrast to *Paroni*, Plaintiffs in this case have shown evidence that the alleged transactions that give rise to their claims occurred, and that they occurred in New York. Accordingly, CAB's reliance on *Paroni* is misplaced.

CAB also argues that to the extent relevant merits-based evidence is "intertwined" with jurisdiction, Plaintiffs should have sought such evidence during the limited jurisdictional discovery phase and must prove the merits-based issues now rather than waiting for merits discovery. (Reply 4.) This misstates the procedural posture of this case and the applicable law. To start, it was CAB that requested to take jurisdictional discovery before merits discovery, and the Court granted that request. Accordingly, Plaintiffs appropriately did not seek discovery as to CAB's general awareness or other merits issues during the jurisdictional discovery phase. Had they done so, their requests may have been deemed overly broad. *See, e.g.*, *Doe 1 v. Congregation of the Sacred Hearts of Jesus & Mary*, 2022 WL 2901403, at *3 (S.D.N.Y. July 22, 2022) ("Requests for limited discovery to help establish components of jurisdiction should be denied where the discovery goes as much to the heart of [the] plaintiff['s] claims on the merits as it does the jurisdictional issues.") (quotation marks and citation omitted). To the extent CAB argues that this Court permitted or directed Plaintiffs to take merits discovery during the

limited jurisdictional discovery phase, this assertion is belied by the various case management conference transcripts and Court orders on the docket.[9]

Moreover, the Second Circuit has held that on a post-jurisdictional discovery motion to dismiss, if "a decision of the jurisdictional issue requires a ruling on the underlying substantive merits of the case, the decision should await a determination of the merits" at the appropriate time, after merits discovery is taken. *Dorchester*, 722 F.3d at 87.

For the same reason, the parties' discussion regarding whether or not CAB "closed" the HLF accounts after the U.S. designated HLF as an SDGT is not relevant for purposes of this motion. The SAC asserts that CAB continued to transfer funds from HLF accounts after HLF was recognized by the U.S. as an SDGT until 2004, which the Court found relevant in permitting an inference as to CAB's general awareness. CAB now asserts that its 30(b)(6) corporate designee's deposition testimony rebuts this allegation. Plaintiffs assert that other discovery contradicts the witness' testimony and confirms that at least one HLF account remained open with a low balance through 2004, and that CAB permitted HLF to make withdrawals from the account *after* HLF's SDGT designation.

The Court need not resolve this factual dispute as this issue is only significant to the extent it supports (or does not support) an inference of CAB's general awareness that transfers facilitated on behalf of HLF may have aided terrorism. *See Spetner*, 2023 WL 4035924, at *8

---

[9] For example, at the oral argument, CAB directed the Court's attention to page 27 of the transcript from the November 16, 2022 case management conference, which is available on the docket at ECF No. 158. In that portion of the transcript, the Court was addressing Plaintiffs' argument that CAB's anticipated motion to dismiss would be more appropriately brought at the end of merits discovery as a motion for summary judgment. The Court explained to Plaintiffs' counsel that CAB's anticipated motion did not need to wait until the end of merits discovery, but rather could be brought following jurisdictional discovery. This discussion certainly was not a direction by the Court to Plaintiffs to conduct merits discovery. As discussed at length in this R&R, it is now clear that merits discovery is needed in order to address the key issues CAB has raised here.

(defendant bank's argument that HLF was not designated a terrorist organization until several months into the relevant period was a question that went to the merits of the claim and thus was not appropriately raised on a Rule 12(b)(2) motion). In any event, the Court at this stage must resolve factual disputes, including this one, in Plaintiffs' favor. *Dorchester*, 722 F.3d at 84.

Accordingly, CAB's arguments that Plaintiffs have not provided sufficient evidence to show that CAB will be subject to JASTA liability based on the transfers in question, or to rebut CAB's evidence supporting the theory that these transfers will not support a finding of JASTA liability, are unavailing at this stage.

**3. Plaintiffs Are Not Barred From Relying on the Interpal Transactions.**

CAB argues that the 42 Interpal transfers listed in Plaintiffs' chart of 114 relevant transactions should not be considered for purposes of personal jurisdiction because "Plaintiffs are collaterally estopped from arguing" that these transfers could subject CAB to liability under JASTA. This is because, CAB argues, the Second Circuit considered these very transactions in another case, *Weiss v. Nat'l Westminster Bank PLC*, and found that these transactions did not subject the originating bank, National Westminster Bank ("NatWest"), to JASTA liability. 993 F.3d 144 (2d Cir. 2021). Specifically, the Court found that Plaintiffs could not point to any evidence showing that NatWest was "generally aware" it was providing material assistance to Hamas when it facilitated these transfers. *Id.* at 166.

CAB's argument is unavailing. To start, the Court in *Weiss* dismissed the JASTA claims on the merits and not for lack of personal jurisdiction. Because personal jurisdiction is a threshold question that must be resolved before the merits are reached, it is necessarily the case that, in reaching the merits, the Second Circuit found that it *had* personal jurisdiction over NatWest.

*See In re Rationis*, 261 F.3d at 268 (personal jurisdiction is a "threshold question" that "must precede merits"); *Mones v. Com. Bank of Kuwait, S.A.K.*, 204 F. App'x 988, 990 (2d Cir. 2006) (explaining that the court must determine whether it has valid personal jurisdiction over a defendant before proceeding to the merits of the claim).[10] If the Second Circuit had doubts as to personal jurisdiction, it would have discussed that issue before reaching the merits. Accordingly, these 42 Interpal transfers were sufficient to establish personal jurisdiction over the defendant in *Weiss*, and they are sufficient for jurisdictional purposes here.

Moreover, the *Weiss* decision rested on the plaintiffs' ability to establish the general awareness element of a JASTA claim as to NatWest, i.e. whether NatWest was "generally aware that it was playing a role in Hamas's acts of terrorism." *Weiss*, 993 F.3d at 166-67. The court did not hold that the transfers were used solely for humanitarian purposes and therefore could not support a JASTA claim; rather, the court held that the record was insufficient to show that NatWest knew these funds may have been used for something other than their stated charitable purpose. CAB argues that because Plaintiffs could not show NatWest's knowledge, they should not be given the opportunity to try to prove CAB's knowledge. NatWest's knowledge and CAB's knowledge are two entirely separate and fact-intensive inquiries. *See Averbach II*, 2022 WL 2530797, at *10 ("Determining general awareness is a fact-intensive inquiry."). As this is not a case where Plaintiffs are attempting to relitigate an identical issue, the doctrine of collateral estoppel does not apply.

[10] Courts have recognized "limited circumstances" in which it is appropriate for a court to adjudicate merits issues without first resolving challenges based on personal jurisdiction, *In re Terrorist Attacks on Sept. 11, 2001*, 2021 WL 1164087, at *3 (S.D.N.Y. Mar. 26, 2021), but these circumstances were not present in *Weiss*.

In any event, the Interpal transactions only constitute approximately a third of the relevant transfers on which Plaintiffs rely to establish jurisdiction, and thus even without these 42 transfers, Plaintiffs have established a factually supported prima facie showing of personal jurisdiction.

## CONCLUSION

For the reasons set forth above, I respectfully recommend that CAB's motion to dismiss and alternative motion for summary judgment on jurisdictional grounds be DENIED. To the extent CAB's motion is one for summary judgment, I recommend the motion be denied without prejudice to renewal following merits discovery.

Dated: June 30, 2023
New York, New York

Respectfully submitted,

*Katharine H Parker*

KATHARINE H. PARKER
United States Magistrate Judge

## NOTICE

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)).

If any party files written objections to this Report and Recommendation, the other parties may respond to the objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Objections and responses to objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Gregory H. Woods at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Woods. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140 (1985).