USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/14/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AVERBACH et al.,

                          Plaintiffs,

        -against-

CAIRO AMMAN BANK,

                          Defendant.

ORDER ON MOTION TO COMPEL

19-CV-0004-GHW-KHP

**KATHARINE H. PARKER, United States Magistrate Judge.**

This case arises out of a series of terrorist attacks (the "Attacks") in Israel between 2000 and 2004 that were perpetrated by *Harakat al-Muqawama al-Islamiya* ("Hamas"). Plaintiffs include United States ("U.S.") nationals injured in the attacks, as well as the estates, heirs, and families of U.S. nationals killed or injured in the attacks.

Before the Court is Plaintiffs' motion to compel production of documents related to the 66 accounts referenced in Khalid Mahmoud Al Qassem's March 28, 2024 supplemental declaration ("Motion to Compel"). (ECF No. 289.) Defendant opposes production, arguing that producing the records and information sought by Plaintiffs would violate Jordanian and Palestinian bank secrecy laws. For the reasons set forth below, Plaintiffs' Motion to Compel is granted.

**BACKGROUND**

Defendant Cairo Amman Bank ("CAB") is a financial institution incorporated and headquartered in Amman, Jordan, with branches in Jordan and the Palestinian territories. (Third Amended Complaint ("TAC") ¶¶ 500-01.) The TAC alleges that in the years immediately preceding and during the Attacks, i.e. from 1999 through 2004, CAB facilitated the flow of

1

money used by Hamas to finance terrorism, thus aiding and abetting Hamas's terrorism. (*Id.* ¶ 1, 6-7.) The TAC alleges that CAB provided U.S. dollars to Hamas by knowingly maintaining accounts for and providing financial services for individuals and organizations that were associated with Hamas and that in turn provided support to Hamas; and by facilitating reward payments to families of Hamas suicide bombers, other "martyrs," and Hamas prisoners. (*Id.*)

## PROCEDURAL HISTORY

During a discovery conference in December of 2023, Plaintiffs informed the Court that the parties were at an impasse regarding the production of bank records. Plaintiffs specifically sought bank records that would reflect CAB's provision of financial services to individuals or entities involved in terrorist activity. CAB's position was that the production of bank records and identification of particular accounts would implicate foreign bank secrecy laws, and that in any case, such a production may not be worthwhile because CAB had not retained any transaction records prior to 2009. To simplify matters, Plaintiffs' counsel proposed that CAB simply provide the number of accounts it held during the relevant period for individuals or entities named in the Second Amended Complaint, as well as those involved in the Attacks. Plaintiffs reasoned that if CAB had very few such accounts, Plaintiffs might decide it was not worthwhile to engage in briefing on bank secrecy to compel production. After discussion, the Court agreed this was an efficient approach and directed the parties to proceed. Accordingly, Plaintiffs provided CAB with two lists: the first included individuals and entities named in the Second Amended Complaint, and the second included alleged Hamas operatives identified in Plaintiffs' production as related to the Attacks. When CAB ultimately searched the names from Plaintiffs' lists to determine how many such accounts CAB held during the relevant period, the search returned 66 accounts – 57

from the first list and 9 from the second list. (*See* Declaration of Khalid Mahmoud Al Qassem ("Qassem Decl."), ECF No.291-1, at ¶¶ 7-9.) CAB also clarified that although it was not in possession of transaction records prior to 2009 (other than a limited number already produced to Plaintiffs), CAB did possess account-opening documents for those accounts that remained open after 2009. (*Id.* at ¶ 7.) Of the 66 accounts CAB identified from Plaintiffs' lists, 34 remained open as of 2009. (*Id.* at ¶ 10.) This means that there will be account-opening documents for 34 of the accounts and likely minimal other records given the age of the records sought and CAB's representations regarding the non-existence of transaction records predating 2009.

The parties subsequently appeared for a discovery conference before the undersigned in May of 2024, and Plaintiffs represented to the Court that absent further issues, Plaintiffs did not intend to move to compel the bank records. However, in July of 2024, Plaintiffs took the deposition of Khalid Mahmoud Al Qassem, CAB's Deputy Chief Executive Officer, and during the deposition, defense counsel instructed Mr. Al Qassem not to answer several questions relating to CAB accountholders, asserting that answering such questions would require that Mr. Al Qassem violate foreign bank secrecy laws. Plaintiffs thereafter requested that CAB produce all documents and information it possessed relating to the 66 accounts CAB had identified from Plaintiffs two lists and CAB declined to do so. On October 10, 2024, Plaintiffs filed the instant Motion to Compel, seeking the production of all information and communications CAB possesses related to the 66 accounts. (ECF No. 289.) CAB opposed the Motion to Compel on November 14, 2024. (ECF No. 303.)

**LEGAL STANDARD**

Plaintiffs bring claims against CAB pursuant to the Anti-Terrorism Act ("ATA") as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d), which provides a civil cause of action for damages to any "national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs...." 18 U.S.C. § 2333(a). Liability may be imposed on "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). "Aiding and abetting liability under the ATA requires that: '(1) the party whom the defendant aids must perform a wrongful act that causes an injury, (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance, and (3) the defendant must knowingly and substantially assist the principal violation.'" *Miller v. Arab Bank, PLC*, No. 118CV2192HGPK, 2023 WL 2731681, at *3 (E.D.N.Y. Mar. 31, 2023).

The Federal Rules of Civil Procedure "provide the court with authority to issue discovery orders requiring the disclosure of information protected by foreign bank secrecy laws." *Linde v. Arab Bank, PLC*, 463 F. Supp. 2d 310, 314 (E.D.N.Y. 2006) (citing *Societe Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 204-06 (1958)); see *Societe Nationale Industrielle Aerospatiale & Societe de Construction d'Avions de Tourisme v. U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987) (A foreign jurisdiction's bank secrecy laws "do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that [foreign] statute.").

4

The party opposing production on the basis of foreign law, in this case, CAB, bears the burden of demonstrating that production should be denied. *See Miller*, 2023 WL 2731681, at *9. To meet that burden, CAB must describe the relevant provisions of the foreign law, the basis for its relevance, and the application of the foreign law to the facts of the case. *Id.* (internal citations omitted). Here, CAB has established, and Plaintiffs do not dispute, that the discovery sought by Plaintiffs would require violation of the bank secrecy laws of Jordan and Palestine. (*See* Declaration of Lubna Katbeh, ECF No. 301 and Declaration of Aiman Y. Odeh, ECF No. 302 (expert reports describing bank secrecy law of Jordan and Palestine respectively and explaining how production of records requested by Plaintiff would require violation of such laws).)

Once the party opposing production has demonstrated that the requested documents are in fact protected by foreign law, the Court undertakes a comity analysis. *Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d 409, 413 (S.D.N.Y. 2016). In *Société Nationale Industrielle Aérospatiale,* the Supreme Court held that in the context of a request for foreign discovery, "international comity" requires a "particularized analysis of the respective interests of the foreign nation and the requesting nation[.]" 482 U.S. at 543–44. When evaluating whether to order the production of information or documents in contravention of foreign law, courts consider the following factors, drawn from the Restatement (Third) of Foreign Relations Law § 442: (1) the importance to the investigation or litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of

the state where the information is located. *Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 552–53 (S.D.N.Y. 2012). Courts in the Second Circuit also consider: (6) the hardship of compliance on the party or witness from whom discovery is sought; and (7) the good faith of the party resisting discovery. *Id.* The fifth factor, consideration of the interests of the United States and the foreign state, is generally deemed to be the most important factor. *Bartlett v. Societe Generale de Banque au Liban SAL*, No. 19-CV-7 (CBA) (TAM), 2023 WL 2734641, at *10 (E.D.N.Y. Mar. 31, 2023). Accordingly, the Court will consider this factor first.

## DISCUSSION

### 1. Interests of the United States and the Foreign State

Plaintiffs contend that the U.S. interest in combatting terrorism outweighs a foreign nation's interest in shielding financial records from disclosure in federal court proceedings. Indeed, courts in the Second Circuit that have analyzed this question have agreed that "[w]hen the U.S. interest in fully and fairly adjudicating matters before its courts is combined with its interest in combating terrorism, the U.S. interest is elevated to nearly its highest point, and diminishes any competing interests of the foreign state." *Wultz*, 910 F. Supp. 2d at 559 (internal quotations omitted); *Bartlett*, 2023 WL 2734641, at *11 (same).

CAB argues that even if combatting terrorism is a strong U.S. interest, production of the records Plaintiffs seek here is unlikely to advance such interests. CAB distinguishes the *Wultz* case by asserting that *Wultz* involved primary liability under the ATA (i.e. assertions that the bank provided direct support to terrorist activities), whereas the present case involves a secondary liability JASTA claim, and therefore, according to CAB, Plaintiffs have not shown how the production of Plaintiffs' requested records would combat terrorism. But CAB ignores

Plaintiffs' citation to several cases that did include allegations of secondary liability where courts found that it is "indisputable that the United States has a strong interest in combating terrorism *and* compensating victims of terrorist attacks" and denied the defendant bank's motion for a protective order on bank secrecy grounds. *Miller*, 2023 WL 2731681, at *12; *Bartlett*, 2023 WL 2734641, at *11 (observing that Congress' purpose in enacting JASTA was to provide U.S. nationals with "'the broadest possible basis ... to seek relief against persons, entities and foreign countries' that have provided material support to terrorists.") (internal citations omitted). To the extent Plaintiffs' requested records reveal that CAB facilitated payments to terrorist organizations or individuals involved in terrorism, the production of such records would further the U.S.'s interests in compensating victims of terrorist attacks. Further, and more fundamentally, that this case involves aiding and abetting rather than direct liability is not a persuasive argument on the "national interest" factor of the *Aérospatiale* analysis. JASTA aims to provide a cause of action against persons or entities "that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of" U.S. nationals or national security. JASTA § 2(a)(6). Thus, JASTA reflects a strong national interest in combatting terrorism by exposing even those who indirectly substantially assist a terrorist organization or conspire with a person who commits acts of terrorism. *See* 18 U.S.C. § 2333(d)(2). This broad liability combats terrorism by discouraging people and entities from helping others commit acts of terrorism. Requiring production of bank records that might reveal funding sources or indicators that the person or entity was engaged in terrorist activities is consistent with the goals of JASTA and the national interest in combatting terrorism.

CAB further argues that the U.S.'s interest in the production of the banking records "pales in comparison" to Jordan's and the Palestinian Authority's interest in the enforcement of their financial privacy laws. CAB asserts that the sovereign's understanding of national interests should control the inquiry, citing to amicus briefs filed by the U.S. and Jordan in *Linde* before the U.S. Supreme Court in which both nations asserted that sanctioning a Jordanian bank for not complying with a discovery order threatened the vital U.S. interest in maintaining a close relationship with Jordan. But these assertions by the U.S. and Jordan were made in the context of opposing sanctions ordered against the bank for failure to comply with the discovery orders, rather than with the discovery orders themselves. *See Miller*, 2023 WL 2731681, at *12.

The Court certainly recognizes that enforcing bank secrecy is an important interest. However, that interest is outweighed by the U.S.'s vital interest in combatting terrorism and compensating victims of terrorist attacks. *See Linde*, 463 F.Supp.2d at *315 (holding that although maintaining bank secrecy is an important interest of the foreign jurisdiction, that interest "must yield to the interests of combating terrorism and compensating its victims" and observing that, as a member of the Middle East and North Africa Financial Action Task Force, Jordan has expressly adopted a policy not to rely on bank secrecy laws as a basis for protecting information relating to money laundering and terrorist financing.); *Linde v. Arab Bank, PLC*, 706 F.3d 92, 112 (2d Cir. 2013) (dismissing appeal and holding the district court "appropriately recognized the important U.S. interests at stake in arming private litigants with the 'weapons available in civil litigation' to deter and punish the support of terrorism."); *Miller*, 2023 WL 2731681, at *13 (denying defendant's motion for a protective order on bank secrecy grounds and observing that Congress's decision to amend the ATA to encompass aiding-and-abetting

8

liability "re-emphasizes the United States' commitment to combatting international terrorism."). It is also worth noting that Jordan has shown an interest in combatting terrorism and, indeed, has partnered with the U.S. in efforts to root out and prevent terrorism. It is also a member of the Middle East and North Africa Financial Action Task Force and has taken steps to counter the financing of terrorism. See *Linde*, 463 F. Supp. 2d at 315-16; Country Reports on Terrorism 2022: Jordan, U.S. Dep't State, https://www.state.gov/reports/country-reports-on-terrorism-2022/jordan/ (last visited February 13, 2025). The Palestinian Authority is not a recognized state and its interests are not accorded the same level of deference as "states" in the comity analysis. *Linde*, 463 F. Supp. 2d at 316.

Accordingly, this factor weighs in favor of production.

2. **Remaining Factors**

   a. ***The Information's Importance to the Litigation and The Degree of Specificity of the Request[1]***

Plaintiffs seek production of all information and documents, including know your customer documents, related to the 66 accounts CAB identified from the two lists provided by Plaintiffs. Plaintiffs contend that the importance of the requested documents to the litigation is self-evident because the documents relate to accounts CAB may have held for Hamas. Plaintiffs further argue that the records sought are highly specific as they correspond to accounts CAB has already acknowledged to holding, all of which are associated with either terrorist activity as described in the Second Amended Complaint, or as identified in Plaintiffs' production. CAB

---

[1] The Court considers these factors together because the parties make overlapping arguments that relate to both.

responds that a conclusory assertion that the importance of the records is "self-evident" fails to show that the records are critical to litigating this action.

In order to succeed on its aiding and abetting claim, Plaintiffs must demonstrate that CAB was "generally aware" that its customers or account transfers were tied to terrorist activity. While CAB argues that the existence of any particular account would not render a bank liable for aiding and abetting terrorism, cumulative evidence showing CAB held many accounts for individuals known to be involved in terrorist activity may tend to demonstrate CAB's general awareness, particularly if accounts were maintained open after the accountholders were designated as foreign terrorist organizations or identified in other ways to CAB officers as being involved in Hamas terror activities. *See Miller*, 2023 WL 2731681, at *5 (holding that the bank records sought by plaintiffs were critical to establishing that the defendant bank was aware that either its customers or the transfers it was processing were tied to terrorism). Mr. Al Qassem stated in his declaration that although CAB does not possess transaction records prior to 2009 (other than documents already produced to Plaintiffs), CAB is in possession of account-opening documents for accounts that remained open after 2009. (Qassem Decl., ECF No.291-1, at ¶¶ 7, 10.) Of the 66 accounts CAB identified from Plaintiffs' first and second lists, 34 remained open as of 2009, while the remaining closed before 2009. (*Id.* at ¶ 10.) Mr. Qassem further stated that for accounts that were closed before 2009, CAB would only possess the dates on which the account was opened and closed. (*Id.* at ¶ 7.) Thus, while the Court acknowledges that the records CAB has retained related to the 66 accounts are limited, such records are still important to the litigation because they may tend to show CAB's general awareness that it was providing financial services to individuals or entities involved in terrorism. *See Miller*, 2023 WL 2731681,

at *5 (finding that records such as account opening documents could shed light on what the bank did or did not know about its customers).

CAB cites *Bartlett* and asserts that the court in that case "denied all requests for discovery of records more than one year after the last alleged attack in that case." But, in *Bartlett*, the plaintiffs sought discovery concerning 687 individuals and entities, 592 of which were listed in the complaint. *Bartlett*, 2023 WL 2734641, at *7. Given the breath of such requests, the *Bartlett* court concluded that discovery regarding nine years of records after the alleged terrorist attacks was overbroad. The request for records in the present case is much narrower than in *Bartlett*, and concerns only 66 accounts CAB has already acknowledged to holding, 57 of which correspond to individuals or entities named in the Second Amended Complaint. *See also Miller*, 2023 WL 2731681, at *11 (holding that the records, which sought information as to over 400 individuals/entities, were sufficiently tailored because they were specific to "named individuals whom Plaintiffs have identified as terrorists, martyrs, operatives, FTO leaders, agents, or the family members of these individuals, and charitable organizations and institutions that are or are linked to terrorist organizations."). Moreover, CAB has represented that there will be minimal responsive documents, meaning that responding will not be unduly burdensome.

Accordingly, these factors weigh in favor of production.

### b. Origin of the Information

The parties do not dispute that the requested records originated outside the United States, which weighs against production. *See Wultz*, 910 F. Supp. 2d at 556.

### c. *Availability of Alternative Means*

Plaintiffs argue that the only conceivable alternative means of obtaining the requested records is through the accountholders themselves, who are unlikely to still possess the records after 20 years, and even if they had kept them, would be unlikely to turn over such records for fear that doing so would expose them to retaliation. CAB asserts in its briefing that it has offered to submit letters rogatory to Jordanian and Palestinian regulators requesting authorization to produce the records. But during a recent Case Management Conference, defense counsel conceded that the letters rogatory process is typically initiated once a court had already ordered production, rather than before the court has ruled on bank secrecy issues.

CAB cites to *Bartlett* and *Miller*, suggesting that alternative means were permitted in those cases. But the court in *Bartlett* overruled the defendant's foreign bank secrecy objections and *subsequently* gave the defendant an opportunity to submit letters rogatory before providing a deadline for responding to Plaintiffs' requests for production. 2023 WL 2734641, *15. In *Miller*, the court did issue letters rogatory to Jordan, Lebanon and the Palestinian National Authority before ruling on defendant's motion for a protective order on bank secrecy grounds, but the foreign governments declined to grant such authorization. Indeed, given both parties' representations at the recent Conference, the Court is skeptical that alternative means will result in production, particularly in the absence of a court order.

Accordingly, this factor weighs in favor of production.

### d. Hardship of Compliance

CAB states that production of the bank records would expose CAB to civil suits by its customers, as well as criminal and civil penalties including fines and potential revocation of its banking licenses. Plaintiffs assert that these purported consequences are purely speculative.

Although CAB's experts opined that the text of Jordanian and Palestinian bank secrecy laws make clear that penalties are possible, CAB does not cite to any instance in which CAB, or any other bank, was punished for complying with a discovery order from a U.S. court. Further, courts undertaking this inquiry have reached similar conclusions regarding the speculative nature of potential penalties for production of bank records. *See Miller*, 2023 WL 2731681, at *13-14 (concluding that the bank's cited consequences for producing records are "purely speculative"); *Wultz*, 910 F.Supp.2d at 559 (concluding that the hardship factor weighed in favor of production because the bank had not produce evidence it had been "meaningfully sanctioned" for complying with two previous U.S. court orders to produce documents in contravention of China's bank secrecy laws); *Laydon*, 183 F. Supp. 3d at 425-26 (concluding defendants had failed to establish they would actually suffer a hardship for complying with the discovery demands).

CAB's citation to *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542 (E.D.N.Y. 2012), is inapposite, because in that case, the court was considering whether an adverse inference instruction was appropriate in light of the bank's withholding of potentially relevant evidence, rather than considering bank secrecy objections themselves.

Accordingly, this factor weighs in favor of production.

### *e. Good Faith*

As for good faith, Plaintiffs argue that CAB's good faith is "questionable" because CAB previously represented to the Court that it had no relevant records prior to 2009 and has since qualified that representation. For example, Mr. Al Qassem stated in his declaration that CAB does in fact have account-opening documents for accounts opened prior to 2009, that remained open after 2009. (Qassem Decl. ¶ 7.) In response, CAB asserts that it has acted in good faith and simply seeks to comply with foreign law.

Having reviewed the record and both parties' positions, there is insufficient evidence to ascribe bad faith to CAB. *See Wultz*, 910 F.Supp.2d at 560 (declining to find bad faith even where the defendant bank denied plaintiffs access to inspect relevant documents). Accordingly, this factor is neutral.

### CONCLUSION

On balance, after considering the five *Aérospatiale* factors, as well as the two additional factors of hardship and good faith, Plaintiffs' Motion to Compel is granted and CAB's bank secrecy objections are overruled.

Because the Court has ruled that neither Jordanian nor Palestinian bank secrecy laws are a bar to the discovery sought, CAB may now be given an opportunity to obtain permission to produce the requested records from the relevant foreign authorities through letters rogatory. *See e.g., Linde*, 463 F.Supp.2d at 316 (concluding that now that the court had overruled the defendant's bank secrecy objections, the defendant should be given a specified time period to

attempt to obtain permission to disclose the records from relevant government authorities).[2]

Accordingly, CAB shall have until **August 15, 2025** to obtain permission from Jordanian and Palestinian authorities and/or to produce the records related to the 66 accounts.

**The Clerk of Court is respectfully directed to terminate the motion at ECF No. 289.**

**SO ORDERED.**

Dated: February 14, 2025
New York, New York

_____
KATHARINE H. PARKER
United States Magistrate Judge

---

[2] Although CAB has suggested it be permitted to seek waiver from individual accountholders, the Court finds that this process is not likely to bear fruit insofar as the accountholders are all being accused of being affiliated with Hamas. See *Linde*, 463 F. Supp. 2d at 315; *Bartlett*, 2023 WL 2734641 at *14.