UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| AVERBACH et al.,<br><br>                              Plaintiffs,<br><br>             -against-<br><br>CAIRO AMMAN BANK,<br><br>                              Defendant. | **ORDER ON MOTION TO EXCLUDE<br>EXPERTS**<br><br>**19-CV-0004-GHW-KHP** |

**HON. KATHARINE H. PARKER, United States Magistrate Judge:**

This case arises out of a series of terrorist attacks in Israel perpetrated by *Harakat al-Muqawama al-Islamiya* ("Hamas"), designated by the United States as a Palestinian terrorist organization, during the Second Intifada—a period of intense Israeli-Palestinian violence between 2000 and 2004 that included attacks on Israeli civilian centers, military installations, and buses.  Plaintiffs include United States nationals injured in the attacks, as well as the estates, heirs, and families of U.S. nationals killed or injured in the attacks.

Before this Court is Plaintiffs' motion to preclude Defendant Cairo Amman Bank ("CAB") from relying on the reports and/or testimony of 17 expert witnesses.  This motion seeks to exclude all reports and proposed testimony of 10 experts, and portions of the reports and proposed testimony of 4 others, arguing that the challenged evidence is inadmissible under the Federal Rules of Evidence and related case law.  The parties elected to brief this motion before summary judgment for the purposes of narrowing the scope of depositions in discovery.  For the following reasons, Plaintiffs' motion is GRANTED in part and DENIED in part.

**BACKGROUND**

The Court previously set forth the operative facts in detail in its Report and Recommendation on Defendant's Motion to Dismiss the Second Amended Complaint (ECF No. 114), which it now incorporates by reference. *Averbach v. Cairo Amman Bank*, No. 19-cv-0004 (GHW) (KHP), 2022 WL 2530797, at *2-5 (S.D.N.Y. April 11, 2022), *report and recommendation adopted in part and deferred in part by*, 2024 WL 3677339 (S.D.N.Y. Aug. 6, 2024).[1]

Due in part to the length of time between the events giving rise to the cause of action in this case and the date the action was brought, few documents have survived, providing a limited factual record on which the parties can base their respective claims and defenses.  At trial, Plaintiffs intend to call three witnesses:  (1) Dr. Ehud Levi, a senior Israeli counterterrorism official during the relevant period; (2) Yazid Mufti, CAB's Chairman of the Board, and (3) Khalid Qassem, a CAB senior manager.

Dr. Levi will testify to "(friendly) warnings" he provided to CAB, beginning in 1995 in a meeting with a senior CAB official (possibly Mr. Mufti) about money being funneled through charitable societies, called *zakat* committees, to Hamas for purposes of funding terrorism. (ECF No. 315-15, at 51:1-55:1.)  Dr. Levi will testify he met again with CAB officials in 1997 to inform it that Israel had designated HLF, the Al Aqsa Foundation, Interpal, and CBSP as "Unlawful Associations" because they were raising funds for Hamas terror activities.  (*Id.* at 66:5-75:3.)  He will further testify that in 2003, he met with CAB officials warning them that by servicing certain

---

[1]  Although it was filed after the Report and Recommendation, the Third Amended Complaint filed on August 27, 2024, by Plaintiffs did not substantively alter the factual nucleus at the heart of this case.  Rather, it dropped the Anti-Terrorism Act ("ATA") claims for primary liability, focusing on the Justice Against Sponsors of Terrorism Act claims for aiding and abetting.  (*See generally* ECF No. 280.)  Accordingly, there is no need to modify the essential facts in the April 11, 2022 Report and Recommendation.

designated groups or processing money for them banks were assisting in the funding of Hamas terror activities. (*Id.* at 88:21-89:25, 92:5-93:25.)

Mr. Mufti is expected to testify that he does not recall those warnings from Dr. Levi (or, for that matter, from other officials). (ECF No. 315-17, at 48:1-23.)  (CAB denies receiving these warnings and further disputes that any such warnings could have given rise to its liability in this case.)  Mr. Qassem is expected to testify that account statements and relevant records from the period were destroyed (except for those pertaining to HLF). (ECF No. 315-19, at 52:17-21; ECF No. 322-4, at 78:4-25.)  Furthermore, he is expected to testify that the Know Your Customer ("KYC") policy at CAB required "cross-check[ing] the name of the client with international lists." (ECF No. 315-20, at 36:12-24.)  He stated CAB closed the HLF account after it was designated by the United States as a Specially Designated Global Terrorist ("SDGT") within days of its designation as an SDGT. (ECF No. 315-20, at 44:5-17.)  Further, CAB says Mr. Mufti and Mr. Qassem will testify to CAB's "[compliance] policies, procedures, and their implementation." (ECF No. 321, at 11.)  CAB also says it has produced "circulars it received during the relevant period, and [its] fact witnesses will testify as to the bank's communications with its regulators during that time." (*Id.*)

Plaintiffs move to exclude in their entirety the expert reports and testimony of:  Dr. George Tewfic Al Abed, Dr. Amin Haddad, Kholoud Saqqaf, Muhanad Assaf, Raanan Meyer, Jonathan Kuttab, Arthur D. Middlemiss, Sepideh Rowland, Addy "Jack" de Kluiver, and Dr. Max Abrahms.  Plaintiffs move to partially exclude the expert reports and testimony of Pinhas Shmilovich, Dr. Matti Steinberg, Martha Myers, and Jonathan Benthall.

Expert discovery closed in this case on July 31, 2025, though the depositions of the ten experts challenged by Plaintiffs have been postponed pending resolution of this motion. (ECF Nos. 298, 345.)

I.    *The Experts*

A.    Dr. Abed

Dr. Abed holds a bachelor's degree in social science from Oregon State University and a Ph.D. in economics from the University of California Berkeley. He taught Economics at Berkeley and California State University in 1971 and 1972. He has held a variety of positions at the International Monetary Fund ("IMF") and similar organizations worldwide, with an emphasis in Middle Eastern economic development. After the Palestinian Authority ("PA") was established in 1993, he headed a team of experts to facilitate transfer of authority from the Palestinian Liberation Organization ("PLO") to the PA. The Palestinian Monetary Authority ("PMA") was established in 1994, and Dr. Abed was appointed as Governor and Chairman of the Board of the PMA in 2005. He resigned due to a family matter at the end of 2007 but continued to advise an incoming Governor. He continued to work in roles which emphasized Middle Eastern economic development through 2015, when he retired. Throughout his career, he maintained a close association with the PMA as an advisor. (ECF No. 315-1 ¶¶ 3-14.)

Dr. Abed is offered to convey opinions regarding "PMA law and international practices," including those relating to terrorist financing. Specifically, he will opine that banks which complied with PMA standards and practices were "taking reasonable and responsible actions to counter the financing of terrorism." (ECF No. 315-1 ¶ 15.)

4

B. <u>Dr. Haddad</u>

Dr. Haddad holds a bachelor's degree in accounting and business administration from Najah University, which he obtained in 1982. He earned a master's degree in business administration from Angelo State University in Texas in 1985 and a Ph.D. in business administration from Southern Illinois University in Carbondale, Illinois in 1989. He was appointed Assistant Professor at the University of Massachusetts, North Dartmouth, in the Accounting and Finance Department. He served in various roles as a Deputy Governor, Governor, and Chairman of the Board of Directors of the PMA from 2000 to 2005. He also served as an appointed member of the Board and General Member of the Palestinian Banking Corporation from 2006 to 2015, when he retired. Prior to working at the PMA, he had a long career working in roles at various economic development and related organizations in the Palestinian Territories. He has also served on various civic organization committees dedicated to economic development in the Territories. (ECF No. 315-2 ¶¶ 1-11.)

Dr. Haddad is offered to opine on the establishment and purpose of the PMA, its regulations and supervisory policies, including money laundering and terrorist financing policies during the relevant period. Specifically, he will testify that the PMA would not allow banks operating within the Territories to do business with customers that were identified by the PMA or other regulators as supporting terrorism. Further, he will opine that banks could not "make determinations on their own as to whether or not certain transactions or accounts were being used for money laundering or terrorist financing." In his opinion, "it would not have been reasonable for regulated banks to take independent actions with respect to any such transactions or accounts without the PMA's guidance and instruction." (ECF No. 315-2, ¶ 12).

C.  Mr. Saqqaf

Mr. Saqqaf studied at the University of Jordan, earning a Bachelor of Science degree in Economics, Statistics, and Accounting in 1988 and a master's degree in Economics in 1993.  He worked at the Central Bank of Jordan ("CBJ"), eventually attaining the role of Deputy Governor, in which he served from 2008 to 2012.  He then worked as Executive Vice President, Regional Manager of Jordan & Palestine, for Arab Bank.  He was promoted to Executive Vice President of Global Risk Management and served in that role until 2018, at which time he was appointed to be Chief Executive Officer of the Kingdom of Jordan's Social Security Investment fund, which manages $21 billion in assets.  He worked this position until 2022, when he was appointed Minister of Investment for the Kingdom of Jordan, in which he served until September 2024.  In his work, he attended trainings on bank supervision, including with U.S. agencies, and worked closely with the World Bank as Minister of Investment. (ECF No. 315-3 ¶ 3-9.)

He is offered to opine that "any bank complying with the CBJ's requirements during the relevant period acted reasonably and took appropriate measures to prevent and detect the use of its banking services to engage in money laundering or terrorist financing."  Further, he will offer his opinion "that it was reasonable and appropriate for CBJ-regulated banks to defer to the CBJ in determining which transactions were or were not permissible under applicable blacklists during the relevant period."  (ECF No. 315-3 ¶¶ 10-11.)

D.  Mr. Assaf

Mr. Assaf earned a Bachelor of Laws degree from Al Ahliyya Amman University in 1994 and master's degrees in law from Birzeit University in 2003 and Wake Forest University in 2006.

He practices law in both Jordan and the Palestinian Territories.  He served as in-house counsel at

CAB from 1997 to 2007.  Since then, he has worked at Ittqan Consulting Services, a corporate

and banking law firm operating in Jordan and the Palestinian Territories.  He also advises

multiple banks operating in the Territories and serves as legal advisor to the Palestine Banks

Association. (ECF No. 315-4 ¶¶ 3-10.)

Mr. Assaf is offered to opine that banks in the Territories during the relevant period had

to return account balances to clients upon the closure of an account and did not refuse such

requests to do so as a matter of practice.  He will further opine that CAB could not take any

"active steps" to stop a specially designated global terrorist ("SDGT") organization under the

laws of the time and that banks did not have discretion to seize or freeze funds belonging to a

customer.  (ECF No. 315-4 ¶¶ 11.)

E.  Mr. Meyer

Mr. Meyer worked at Bank Hapoalim BM—one of the largest banks in Israel—from 1971

to 2013.  From 1994 to 1999, he served as Chief Auditor and Head of the Internal Audit Unit in

BH North America (SVP).  From 2000 to 2013, he served as Chief Compliance Officer for

Branches and Banking Subsidiaries Abroad, and worked on anti-money laundering ("AML")

issues in Israel.  His work on AML issues required familiarity with then-prevailing standards and

practices in the Israeli banking sector.  (ECF No. 315-5 ¶¶ 9-14.)

He is offered to opine that Israeli banks would act appropriately and reasonably by

following well known AML regulations and Israel's Prevention of Terrorist Financing Law, and

that banks in Israel did not have the tools or technology—and were not expected or required—

to identify terrorist financing activity.  Further, he will opine that Israeli financial sector "did not

follow or apply the Israeli [Ministry of Defense's 'blacklist'] until at least 2005." (ECF No. 315-5

¶¶ 15-16.)

F.  Mr. Kuttab

Mr. Kuttab practices as an international human rights attorney in the United States,

Israel, and the Palestinian Territories.  He obtained his law degree from the University of Virginia

Law School in 1977.  He has co-founded several human rights groups, each of which is organized

around humanitarian causes in the Palestinian Territories and/or around the world.  Further, he

has represented or advised many other humanitarian organizations serving the Territories.  He

taught law at Bethlehem University, Al Quds Law School, and Bethlehem Bible College, and was

a Visiting Scholar at Duke University in Toronto, Canada, teaching on international law and the

Israeli-Palestinian conflict.  He has also been a Nonresident Fellow at the Arab Washington

Center in Washington, D.C., providing policy analysis, among other tasks. (ECF No. 315-6 ¶¶ 8-

20.)

He is offered to rebut testimony from Plaintiffs' experts' "reliance on IDF and MOD

declarations of certain organizations as 'unlawful associations' or 'terrorist organizations.'"

Inasmuch as Plaintiffs' experts "imply" that such declarations "are persuasive evidence that

organizations were, in fact supporting terrorism, and that people in the Palestinian Territories—

including employees of CAB—knew as much," Mr. Kuttab will opine to the contrary.  He offers

his opinion that "IDF and MOD declarations were not adequately disseminated during the

Relevant Period such that an institution, such as a bank like CAB, would not have received

notice," and otherwise generally offers opinions that suggest that "few people even knew about

these declarations, and those who did know about them did not understand them to reflect

that an organization was actually involved in terrorism." (ECF No. 315-6 ¶¶ 21-22.)

G. Mr. Middlemiss

Mr. Middlemiss received a Bachelor of Arts degree from Lafayette College and a Juris

Doctor from Boston University School of Law.  He worked as a prosecutor in the New York

County District Attorney's office, in part prosecuting "banking and securities frauds" with

international reach.  He later became the head of AML/CTF surveillance for Bear, Stearns & Co.

He subsequently worked as the Director of the Global Anti-Bribery and Corruption Program at

JPMorgan Chase Bank.  In 2013, he joined a boutique law firm now known as Lewis Baach

Kaufmann Middlemiss pllc and serves currently as Managing Partner of the New York office.  He

provides AML/CTF-related advice to multiple U.S. and international financial institutions around

the world. (ECF No. 315-7, at 10-13.)

He is offered to opine on various AML and CTF requirements under U.S. law and that

CAB's compliance measures and beliefs regarding the routine nature of the challenged

transactions in this action were reasonable.

H. Ms. Rowland

Ms. Rowland is Senior Managing Director at FTI Consulting, Inc.  She obtained a Bachelor

of Arts degree from The George Washington University and a Juris Doctorate from Michigan

State University School of Law.  She has developed and led financial crimes compliance

programs for several financial institutions over the years, including regarding AML/CTF regulations. (ECF No. 315-8 ¶¶ 7-14.)

She is offered to opine that "a reasonable AML/CTF Compliance Officer at CAB applying routine, customary, and accepted practices during the relevant period (1) would not have concluded that any of the accounts or transactions identified in the reports of Mark S. Gottlieb and/or David Alfaro were being used to finance terrorist activities, and (2) would not have taken any action to stop the transactions or close the accounts." (ECF No. 315-8 ¶ 15.)

I.    <u>Mr. de Kluiver</u>

Mr. de Kluiver obtained a Bachelor of Science degree in Psychology in 1986 and a Juris Doctor degree in 1990, each from Louisiana State University.  He has twenty-seven years of experience analyzing, interpreting, and implementing the Financial Action Task Force's ("FATF") international standards on AML/CTF. (ECF No. 315-9 § II.)

He is offered to opine that the FATF Recommendations are the "international standards" for AML/CTF, though they have never been legally binding.  He will also testify that national laws, regulations, supervisory advice, and government-issued guidance should define best practices and legal obligations for AML/CTF compliance.  In his view, because FATF's Recommendations had not been adopted by the relevant authorities to this case, the FATF Recommendations are inappropriate to apply their AML/CTF Compliance.  Nor, he believes, should the Basel Committee on Banking Supervision ("BCBS") standards apply. (ECF No. 315-9 §§ IV.A-G.)

J.  Dr. Abrahms

Dr. Abrahms is an Associate Professor of Political Science at Northeastern University, researching and teaching about terrorism, particularly "causal arguments about terrorism." He received a bachelor's degree in History and Political Science from the University of Pennsylvania in 2000. He earned a master's degree in 2002, studying International Relations of the Middle East and U.S. Foreign Policy from the University of Oxford. Finally, he received a Ph.D. in political science from University of California at Los Angeles in 2010, studying terrorism. He has an extensive resume of publications, speaking engagements, and fellowships regarding international relations and terrorism in the Middle East. (ECF No. 315-10 ¶¶ 6-14.)

He is offered to opine that financial incentives, such as martyr payments, were not causally related to the terrorist attacks during the Second Intifada, and that "an outside observer of the Israeli-Palestinian conflict could have reasonably believed that providing banking services to charities associated with members of Hamas would not promote terrorism." (ECF No. 315-10 ¶ 15.)

K.  Mr. Shmilovich

Mr. Shmilovich has nearly 30 years of experience working in Israeli intelligence with the Israel Defense Forces ("IDF") and Israel Security Agency ("ISA"). He has bachelor's and master's degrees in Social Science from Haifa University, with an emphasis on National Security and Political Violence. (ECF No. 315-11 § II.)

He is offered to opine regarding Israel's counterterrorism efforts, intelligence apparatus, and coordination with Palestinian and Jordanian intelligence agencies during the relevant

period.  Further, he will testify to Israel's approach to monitoring and intercepting transactions or taking other action against banks suspected of facilitating terrorist activity.  He will also convey views on Israel's process for communicating with banks regarding AML and CTF, Israel's understanding of the *zakat* humanitarian missions in the Palestinian Territories during the relevant period, and "Israel's rationale for permitting banks in Israel and the Palestinian Territories to process payments to *zakats*, prisoners, and martyrs' families." (ECF No. 315-11 § I.)

L.  Dr. Steinberg

Dr. Steinberg received bachelor's and master's degrees from the Hebrew University of Jerusalem in 1973 and 1974, studying Middle Eastern and Islamic Studies, Arabic Language and Literature, and Political Science.  He also received a Ph.D. in 2004 from Hebrew University of Jerusalem, and his dissertation focused on trends in Palestinian nationalism.  Throughout his career, he has held academic and intelligence research and advisory roles within the Israeli government. (ECF No. 315-12 § II.)

Dr. Steinberg is offered, in part, to rebut the expert reports of Dr. Matthew Levitt and Mr. Arieh Dan Spitzen, as well as testimony by Dr. Ehud Levi, countering their assessments regarding (1) the organizational structure of Hamas, (2) the role of charities in the Palestinian Territories during the relevant time period, (3) the distinction between antagonistic views regarding Israel or expressions of support for Hamas and actual involvement with acts of terrorism, and (4) specific individuals alleged to be involved with Hamas during the relevant time period. (ECF No. 315-12 § I.)

M.  Ms. Myers

12

Ms. Myers received bachelor's degrees in anthropology and Spanish language in 1974 and a master's in education and applied linguistics in 1978, each from Indiana University. She has four decades of experience working in humanitarian and development assistance in the Palestinian Territories and significant first-hand experience working with Palestinian charities. She has done research regarding the historical and current humanitarian and development situation—and frequently lectures and gives interviews regarding humanitarian aid and development—in the Palestinian Territories. (ECF No. 315-13 ¶¶ 8-13.)

She is offered, in part, to opine that Social Sector Organizations like the charities at issue in this case "played an indispensable role in mitigating the humanitarian crisis before, during, and after the Relevant Period." She will further opine that the challenged charities provided legitimate and needed humanitarian assistance in the Palestinian Territories and had no obvious or obscure links to terrorism. Finally, she will opine on/critique the methodologies of Plaintiffs' Experts, Dr. Levitt and Mr. Spitzen. (ECF No. 315-13 ¶¶ 14-20.)

N.  <u>Mr. Benthall</u>

Mr. Benthall holds a degree in English Language and Literature from the University of Cambridge. Since then, he has developed an extensive career studying humanitarian aid, including research in Jordan and the Palestinian Territories. He has written several books and other publications about Middle Eastern charities and those serving the Palestinian Territories. (ECF No. 315-14 ¶¶ 8-20.)

He is offered to opine that "Islamic Charities contributing to or operating in the Palestinian West Bank provided genuine and much-needed charitable services and did not

appear to be instruments of terrorism or political movements like Hamas." He will offer specific

opinions regarding the charities identified by Plaintiffs or their experts and testify that when

CAB provided banking services to each, they did not have overt links to (or otherwise appear to

support) terrorism, and did not appear to be controlled by Hamas. He will also address

purported flaws in the methodology of Plaintiffs' experts. (ECF No. 315-14 ¶¶ 30-36.)

## LEGAL STANDARDS

I.    *Liability under the Justice Against Sponsors of Terrorism Act ("JASTA")*

In order to show liability under JASTA, a plaintiff must show three elements: "(1) the

party whom the defendant aids must perform a wrongful act that causes an injury; (2) the

defendant must be generally aware of his role as part of an overall illegal or tortious activity at

the time that he provides the assistance; (3) the defendant must knowingly and substantially

assist the principal violation." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). These

elements were first set forth in *Halberstam*, a non-JASTA case, and then adopted for JASTA,

which similarly provides a cause of action for aiding and abetting. *See* JASTA, Pub. L. No. 114-

222 at Statutory Note § 2(a)(5). Regarding substantiality, the *Halberstam* court identified six

factors, none singularly dispositive, and weighed on a case-by-case basis, which can help courts

to determine whether assistance is substantial, which are: "(1) the nature of the act

encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or

absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of

mind, and (6) the period of defendant's assistance." *Honickman v. BLOM Bank SAL*, 6 F.4th 487,

500 (2d Cir. 2021) (quoting *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018)). A more

developed statement of the requirements of this standard (and analysis of the Second Amended

Complaint) is included in the Court's prior Report and Recommendation ("R&R") on CAB's

motion to dismiss and incorporated here by reference. *See Averbach v. Cairo Amman Bank*, 19-

cv-0004 (GHW) (KHP), 2022 WL 2530797, at *9-17 (S.D.N.Y. April 11, 2022).

Shortly after this Court issued its R&R, the Supreme Court clarified the standard in its

ruling in *Twitter v. Taamneh*, 598 U.S. 471 (2023), a JASTA case brought by individuals injured by

an ISIS terrorist attack carried out in Turkey against social media platforms Twitter, Facebook,

and Google for allowing/not removing the ISIS's posts on the platform. The Court analyzed the

meaning of "aids and abets, by knowingly providing substantial assistance," as well as "what

precisely a defendant must aid and abet" within the JASTA framework. *Id.* at 484, 493.  As to the

meaning of "aiding and abetting," the Supreme Court situated *Halberstam* within the context of

common law when it developed its factor-based test to determine if a defendant's assistance

qualified as "substantial." *Id.* at 486.  However, the Supreme Court also noted that by its own

terms, *Halberstam* "cautioned . . . that its formulations should 'not be accepted as immutable

components.'" *Id.* at 487 (citing *Halberstam*, 705 F.2d at 489).

Turning to the use of "aid and abet," the Court noted that in criminal cased, the standard

involved "'helping' in the commission of a crime," though what qualifies as "helping" is not

"boundless." *Id.* at 488.  The Supreme Court observed that "criminal law thus requires that a

defendant in some sort associate himself with the venture, that he participate in it as in

something that he wishes to bring about, that he seek by his action to make it succeed before

he could be held liable." *Id.* at 490 (citing *Nye & Nissen v. United States*, 336 U.S. 613, 619

(1949)) (internal quotation marks omitted).  "Similar principles and concerns have shaped

aiding-and-abetting doctrine in tort law." *Id.*  Thus, the Court concluded, "[t]he phrase 'aids and

abets' in [JASTA], as elsewhere, refers to a conscious, voluntary, and culpable participation in another's wrongdoing." *Id.* at 493.

The Court next addressed "what precisely a defendant must aid and abet." *Id.* As the Court noted, aiding and abetting liability "is inherently a rule of secondary liability for specific wrongful acts." *Id.* at 494. Thus, the Court summarized that the operative phrase in § 2333(d)(2) "points to the elements and factors articulated by *Halberstam.* But[] those elements and factors should not be taken as inflexible codes; rather, they should be understood in light of the common law and applied as a framework designed to hold defendants liable when they consciously and culpably 'participate[d] in' a tortious act in such a way as to help 'make it succeed.'" *Id.* at 497 (quoting *Nye & Nissen*, 336 U.S. at 619). Thus, a defendant must "have aided and abetted the act of international terrorism that injured the plaintiffs—though that requirement does not always demand a strict nexus between the alleged assistance and the terrorist act." *Id.*

Applying these principles to the case before it, the Court noted that the allegations underlying the *Twitter* case did not support that the social media companies who had been sued "culpably 'associate[d themselves] with'" the terrorist attack at issue or "'participate[d] in it as something that [they] wishe[d] to bring about,'" or "sought 'by [their] action to make it succeed.'" *Id.* at 498. "At bottom, then, the claim [in the *Twitter* case] rest[ed] less on affirmative misconduct and more on an alleged failure to stop ISIS from using the[] platforms." *Id.* at 500. But "mere passive nonfeasance" was not enough to render Twitter liable. *Id.* Critical to the Court's reasoning was the "lack of any concrete nexus between defendants' services and the [terrorist] attack." *Id.* at 501.

The Court reserved the possibility, however, that "some set of allegations involving aid to a known terrorist group would justify holding a secondary defendant liable for all of the group's actions or perhaps some definable subset of terrorist acts." *Id.* at 502. The Court provided the example of providing "routine services . . . in an unusual way or provid[ing] such dangerous wares that selling those goods to a terrorist group could constitute aiding and abetting a foreseeable terror attack." *Id.* (citing *Direct Sales Co. v. United States*, 319 U.S. 703, 707 (1943)). Alternatively, "if a platform consciously and selectively chose to promote content provided by a particular terrorist group, perhaps it could be said to have culpably assisted the terrorist group." *Id.* (citing *Passaic Daily News v. Blair*, 308 A.2d 649, 656 (N.J. 1973)).

In examining the Ninth Circuit's decision to allow the claims to proceed past a motion to dismiss, the Court observed, "[t]he Ninth Circuit framed the issue of substantial assistance as turning on defendants' assistance to [the terrorists'] activities in general." *Id.* at 503. But the question was "whether defendants gave substantial assistance to [the terrorists] with respect to the . . . attack" which injured the plaintiffs. *Id.* Further, the Court said that "the Ninth Circuit misapplied the 'knowing' half of 'knowing and substantial assistance,'" in that the Ninth Circuit separated the two sub-elements and considered the companies' knowledge to be coextensive with the other *Halberstam* element requiring "general awareness." *Id.* The Court concluded that "the 'knowing' part of the inquiry is . . . designed to capture the defendants' state of mind with respect to their actions and the tortious conduct (even if not always the particular terrorist act), not the same general awareness that defines *Halberstam*'s second element." *Id.* at 504. The Court upheld the Ninth Circuit to the extent it concluded Google's revenue sharing from advertisements was not sufficient to state a claim where the complaint was "'devoid of any

allegations about how much assistance Google provided,'" thus failing to plead that the assistance was substantial. *Id.* at 505. Finally, the Supreme Court emphasized that the *Halberstam* factors are related considerations with "a common conceptual core," the point of which "is to help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Id.* at 504.

Applying *Twitter*, the Second Circuit has observed that "it is not enough to say that facilitating [a terrorist organization's] money laundering operations, which are not themselves [the terrorist organization], results in substantial support to the [terrorist organization]." *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 444 (2d Cir. 2025). Nor is it sufficient to allege a defendant "assisted the terrorist organization's 'activities in general'"—rather, the complaint should offer a discernable nexus between the alleged "money laundering and the attacks committed against Plaintiffs." *Id.* On the other hand, "[w]hen a 'concrete nexus' to the terrorist attack is lacking, it is possible for a plaintiff to instead allege that the defendant aided and abetted 'a broad category of misconduct.'" *Id.* at 445 (citations omitted). Even so, "the defendant's participation must be correspondently pervasive, systemic, and culpable such that we can say the defendant aided every wrongful act." *Id.* (internal quotation marks omitted). In such a scenario, liability for "aiding and abetting" and "conspiracy" will blur. *Id.* (quoting *Twitter*, 598 U.S. at 496). Showing such pervasive, systemic, and culpable conduct is a "high bar." *Id.*

II.     *Federal Rules of Evidence*

A.   <u>Rules 401 and 403</u>

Under Federal Rule of Evidence 401, evidence is deemed relevant where "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Relevant evidence is generally admissible, unless there is law requiring its exclusion. Conversely, irrelevant evidence is not admissible. Fed. R. Evid. 402. On the flip side, Rule 403 permits courts to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

B. Rule 702

The admissibility of expert testimony is governed principally by Rule 702 of the Federal Rules of Evidence, which provides in relevant part that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his or her opinion if:

> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)    the testimony is based on sufficient facts or data;
> (c)    the testimony is the product of reliable principles and methods; and
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under Rule 702, the district court is "the ultimate gatekeeper" of expert testimony. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal quotation marks omitted).

The threshold question under Rule 702 is whether the witness is qualified to provide expert testimony on the subject matter at hand. *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005). To make this determination, a court must "ascertain whether the proffered expert has the educational background or training in a relevant field." *Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*, 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003) (citation omitted.) A witness may be qualified based on any one or more of the qualities listed in Rule 702—knowledge, skill, experience, training, or education. *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007) (citation omitted). The court then "compare[s] the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

If the expert is qualified, the court must ascertain whether the testimony is reliable. *Nimely*, 414 F.3d at 396. "[R]eliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between" the expert's methodology and conclusions. *Id*. The analysis must be reliable "at every step." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached," the opinion testimony must be excluded. *Id*. at 266.

Finally, if an expert is qualified and his or her testimony is reliable, the court must determine whether the testimony "will 'assist the trier of fact.'" *Nimely*, 414 F.3d at 397 (quoting Fed. R. Evid. 702). In order to assist the trier of fact, the testimony must be relevant, and it may not be directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help. *United States v. Mulder*, 273 F.3d 91, 104 (2d Cir. 2001).

If an expert's testimony falls within "the range where experts might reasonably differ," the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court. *Kumho Tire*, 526 U.S. at 153. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 537, 596 (1993) (citation omitted). "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements under Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert*, 509 U.S. at 593 n. 10).

Still, testimony that is admissible under Rule 702 may be excluded under Federal Rule of Evidence 403 if the court finds that "the probative value of the evidence is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Expert testimony is particularly susceptible to these dangers, "given to the unique weight such evidence may have in a jury's deliberations." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than lay witnesses." *Daubert*, 509 U.S. at 595 (quotations omitted).

The inquiry under Rule 702 is "flexible." *Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 233 n.8 (2d Cir. 2021) (citation omitted). When experts must be considered who will not opine based on "the hard sciences," the inquiry changes. *In re Terrorist Attacks on Sept. 11,*

*2001*, No. 03-md-1570 (GBD) (SN), 2023 WL 3116763, at *2 (S.D.N.Y. Apr. 27, 2023).  For experts

such as "security officials, social scientists, accountants or historians," courts look to "other

factors to analyze an expert's reliability, such as: whether the expert will testify about . . .

independent research . . . or whether the opinion was developed expressly for purposes of

testifying; whether she has unjustifiably extrapolated from an accepted premise to an

unfounded conclusion; whether she has adequately accounted for obvious alternative

explanations; whether she is as careful as [s]he would be in h[er] regular professional work; and

whether her field of expertise . . . is known to reach reliable results for the type of opinion

offered." *Id.* at *2-3 (quoting *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 426

(E.D.N.Y. 2011)).

III.    *Motion in Limine*

Evidence challenged on a motion *in limine* "should only be precluded when it is 'clearly

inadmissible on all possible grounds.'" *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013)

(quoting *Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc.*, No. 01-cv-3796

(PKL), 2005 WL 1026515, at *3 (S.D.N.Y. May 2, 2005)).  "The purpose of an *in limine* motion is

'to aid the trial process by enabling the Court to rule in advance of trial on the relevance of

certain forecasted evidence, as to issues that are definitely set for trial, without lengthy

argument at, or interruption of, the trial.'" *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996)

(citation omitted).

## DISCUSSION

Some discussion of two cases, each arising in the primary liability context under the Anti-Terrorism Act ("ATA"), is pertinent before addressing the parties' specific arguments. In their submissions, the parties rely heavily upon these two decisions, which were closely related: *Linde v. Arab Bank, PLC*, 920 F. Supp. 2d 282 (E.D.N.Y. 2011) (Gershon, J.), and *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 537 (E.D.N.Y. 2012) (Weinstein, J.). These cases featured some of the same experts and issues as this case and appear, at least superficially, to have reached divergent rulings in part regarding the admissibility of those experts' opinions. *Compare Linde*, 920 F. Supp. 2d at 285-286 (discussing Mr. Shmilovich and Dr. Abed), *with Gill*, 893 F. Supp. 2d at 537-38, 539-40, 541-42 (discussing Mr. Shmilovich, Dr. Abed, and Mr. Benthall).

Regarding Dr. Abed, Judge Weinstein denied the motion to exclude Dr. Abed's testimony, noting "[t]he report and testimony of [D]r. Abed is probative, but not dispositive, of the Bank's state of mind." *Gill*, 893 F. Supp. 2d at 537. He further concluded, "Mr. Abed's testimony about increasingly restrictive banking regulations in the Palestinian Territories—discussing the effect on banking by the advent of the Oslo Accords in 1993 and Hamas's takeover of Gaza in 2007— will help establish the Bank's state of mind in context, particularly in the years prior to the attack. The witness's background will not prevent adequate cross-examination" or rebuttal via expert opinion. *Id.* at 538. On the other hand, Judge Gershon concluded Dr. Abed's opinions were inadmissible as they were "not relevant because questions of foreign law are not to be determined through a proffer of expert testimony given to the jury." *Linde*, 920 F. Supp. 2d at 286 (citing Fed. R. Civ. P. 44.1). Thus, Judge Gershon stated, "nothing in these reports will assist the trier of fact." *Id.*

The parties' briefs do not aid the Court in resolving this discrepancy. While CAB says that Judge Gershon incorrectly applied Rule 44.1, it cites largely to separate provisions of that rule which establish a notice requirement and urge the Court to conclude their expert reports satisfy the notice requirement. Even if that is true, this point does not settle the question of whether evidence of foreign law should go to a jury. Regarding the part of Rule 44.1 to which Plaintiffs cite—that an "issue" of foreign law is for the court to resolve—CAB argues that this applies only to "determinative" issues of foreign law. But it cites no cases to support that contention, and the citation to Judge Weinstein's treatise on evidence does not address foreign law or the construction of Rule 44.1 with the Federal Rules of Evidence. On the other hand, Plaintiffs do cite several cases which deal with expert analysis of foreign law, largely excluding those opinions on grounds that they were either not relevant, were prejudicial, or would not assist the trier of fact. *See, e.g.*, *In re Mirena IUD Products Liability Litig.*, 169 F. Supp. 3d 396, 455 (S.D.N.Y. 2016); *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 69 (S.D.N.Y. 2001). "In acting under Rule 44.1, a court may reject even uncontradicted expert testimony and reach its own decisions on the basis of independent examination of foreign legal authorities." *Faggionato v. Lerner*, 500 F. Supp. 2d 237, 244 (S.D.N.Y. 2007).

At least as it pertains to foreign law, the Court concludes that rulings as to what foreign law controls or requires is not properly before the Court on this motion. First, that authority rests with the trial judge (though this Court will make a Report and Recommendation at the appropriate time pursuant to its referral for dispositive motions (ECF No. 27)).

Moreover, there is no briefing whatsoever as to what elements of foreign law are disputed, rendering any determination premature. Plaintiffs devote no portion of their sizable

briefs to explaining what CAB's experts get wrong about foreign law.  Rather, they assert that any discussion of foreign law should be excluded, and treat discussion of specific legal requirements, statutes, and regulations as no different than a general discussion of applicable laws that provide a context for the complex and evolving regulatory environment in which CAB operated during the relevant time period.  This blanket assertion is inadequate to persuade the Court that all discussion of foreign law should be excluded.  The Court agrees with Plaintiffs that issues of foreign law must be determined by the Court, but disagrees that all testimony touching on foreign law must be excluded.  Rather, the Court agrees with CAB that some historical context and background regarding foreign law may be necessary to understand the expert opinions and would assist the jury.  Additionally, some information about foreign law may be relevant to an evaluation of CAB's defenses.

As to Mr. Shmilovich, both Judge Gershon and Judge Weinstein agreed to exclude most or all of his report and testimony, but on different grounds.  Judge Gershon concluded Mr. Shmilovich could not opine on "the motivations of suicide bombers," but could opine on the meaning of "shahid." *Linde*, 920 F. Supp. 2d. at 285, 287.  Judge Weinstein concluded Mr. Shmilovich's report was "excluded under [Federal Rules of Evidence] 703 and 403." *Gill*, 893 F. Supp. 2d at 541.  He reasoned that "Plaintiff will be unable to cross-examine Mr. Shmilovi[]ch" because his "testimony is based on facts developed through confidential [Israeli Security Agency ("ISA")] investigations and investigatory methods," which would "excessive[ly]" skew the "weight" of his testimony. *Id.* at 541-42.  These decisions on Mr. Shmilovich's testimony are not particularly useful here, given Plaintiffs have placed the incentive structure of martyr payments

at issue and not yet deposed Mr. Shmilovich. Issues raised with Mr. Shmilovich's report (which Plaintiffs only move to exclude in part) are discussed in greater detail below.

As to Mr. Benthall, Judge Weinstein denied the motion to exclude, and he deemed Mr. Benthall qualified to opine on *zakat* committees, expressly noting Mr. Benthall "will testify as to the approval by regulatory authorities and international non-governmental organizations of *zakat* committees." *Gill*, 893 F. Supp. 2d at 539-40. Judge Weinstein reasoned "[d]etermination of whether the Bank provided material support to Hamas vis-à-vis *zakat* committees necessarily requires consideration of whether those *zakat* committees were actually terrorist front groups and reasonably perceived to be so during the relevant time period." *Id.* Mr. Benthall's report in this case is substantially similar in key ways in this case; the Court addresses his report more specifically below.

Finally, the Court notes that both cases were decided before the *Twitter* decision. This fact does appear to have some consequence. For example, Judge Gershon's review of Mr. Shmilovich's opinions involved noting that "Plaintiffs do not need to prove that the Bank, with the requisite mental state, 'provided services to the particular group responsible for the attacks giving rise to their injuries.'" *Linde*, 920 F. Supp. 2d at 286 n.2 (citing *Linde v. Arab Bank*, 384 F. Supp. 2d 571, 585 (E.D.N.Y. 2005)). It is doubtful that this assertion remains true in view of *Twitter*'s requirement that there be some nexus between the assistance and the particular attacks. 598 U.S. at 501. Judge Weinstein's view that opinion testimony is admissible if it supports informed inferences regarding state of mind and will assist the factfinder is more persuasive and consistent with *Twitter's* requirements. *Gill*, 893 F. Supp. 2d at 537. Plaintiffs' contention that *any* testimony supporting an inference regarding CAB's state of mind is

inadmissible is therefore unpersuasive.  The Court discusses the case law of state-of-mind

evidence further below.

In sum, the Court is generally not persuaded by Plaintiffs' reliance on the *Linde*

decision.[2]  The Court finds the *Gill* opinion to be both clearer and more specific in its analysis,

while *Linde* summarily dismisses experts without clearly stating its reasons.  That is not to say

that *Linde* is wholly wrong; some portions of the *Linde* decision remain appropriate to consider,

particularly regarding the interplay between the Federal Rules of Evidence and Rule 44.1 of the

Federal Rules of Civil Procedure.  But *Gill* remains persuasive on this point as well, as its analysis

of the admissibility of testimony regarding foreign legal and regulatory regimes permitted such

testimony to at least some limited extent.  On this point, the decisions can be harmonized

insofar as *Gill* supports admitting testimony regarding the broad strokes of foreign regulatory

regimes as they inform standards and practices in the relevant industries, whereas *Linde* is

somewhat persuasive in its holding that opinions regarding the specific requirements of foreign

law are not necessarily relevant or helpful. *See Gill*, 893 F. Supp. 2d at 539; *Linde*, 920 F. Supp.

2d 286.  The foreign law issues are discussed at greater length below.

Turning to the specific challenges raised by Plaintiffs, they divide the defense experts

into several groups.  First, they challenge CAB's "foreign law and banking experts," namely Dr.

Abed, Dr. Haddad, Mr. Saqqaf, Mr. Assaf, Mr. Meyer, and Mr. Kuttab.  Second, they challenge

CAB's "U.S. law and international banking experts," namely Mr. Middlemiss, Ms. Rowland, and

Mr. de Kluiver.  Third, they challenge the factual assertions made by Mr. Shmilovich and Dr.

---

[2] CAB's assertion that *Linde* was decided before JASTA was enacted is also unpersuasive, since *Gill* was also decided before JASTA, and CAB relies extensively on *Gill*.

Steinberg regarding "whether the Israeli intelligence community believed CAB was financing terrorism" along with similar opinions.  Fourth, they challenge CAB's opinions regarding the motivations of Hamas terrorists, namely those of Mr. Abrahams and Mr. Shmilovich.  Fifth, they challenge CAB's humanitarian experts' opinions in part, requesting the Court narrow the subject matter of Ms. Myers and Mr. Benthall.  The Court addresses each group in turn.

A.  *CAB's "Foreign Law and Banking Experts"*

First, the parties dispute certain applicable standards regarding issues of foreign law. Under Federal Rule of Civil Procedure 44.1,

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing.  In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law.

*See Bassis v. Universal Line, S.A.*, 436 F.2d 64, 68 (2d Cir. 1970).  In determining or interpreting the law of a foreign state or of international law, courts may seek the assistance of expert witnesses. *United States v. Jurado-Rodriguez*, 907 F. Supp. 568, 574 (E.D.N.Y. 1995).

Chiefly, "Rule 44.1 promulgates a notice requirement, not an argument requirement." *Bristol-Myers Squibb Company v. Matrix Labs. Ltd.*, 655 F. App'x 9, 12 (2d Cir. 2016) (citing *Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co.*, 426 F.3d 580, 585-86 (2d Cir. 2005)).  "[N]otice under Rule 44.1 differs from argument—notice merely call[s] attention to the fact that the issue will be raised, whereas argument lays out, *inter alia*, the provisions of foreign law, the basis for its relevance, and the application of the foreign law to the facts of the case." *Rationis Enters.*, 426 F.3d at 585-86.  "Indeed, the Advisory Committee distinguished between

notice and 'presentation of material on the foreign law.'" *Id.* (citing Fed. R. Civ. P. 44.1, Advisory Committee's Note, 39 F.R.D. 69, 118 (1966)). As a result, Rule 44.1 does not support Plaintiffs' position that evidence of (for example) a compliance regime, or an opinion that that compliance regime was reasonable, must necessarily be excluded from the jury in all cases. Nor does it support that an issue of foreign law cannot be presented in an expert report for ruling by the Court.

As discussed in general terms above, Plaintiff cites *Linde v. Arab Bank, PLC*, 920 F. Supp. 2d 282 (E.D.N.Y. 2011), in which the Court, applying Rule 44.1, concluded that "the opinions of . . . four experts addressing foreign law"—which included Dr. Abed, as noted *supra*—would be excluded because a determination of foreign law is not "an issue to be presented to the jury. Therefore, nothing in these reports will assist the trier of fact." Defendant counters that Rule 44.1 is not a rule governing admissibility of evidence but "determinative" rulings regarding foreign law.[3]

While Plaintiffs are correct that CAB's proffer of foreign law issues are generally inappropriate to go to a jury as evidence, it is not correct that they must be excluded from the case (or jury) entirely on these grounds. To get to their respective conclusions, the parties emphasize differently the separate elements of Rule 44.1. Plaintiffs point to the final sentence, reserving ruling on determinations of foreign law to the court. Defendants, however, point to

---

[3] On this point, it is important to consider the reasons CAB offers for why this evidence should be considered. Confusingly, CAB argues it has not asked the Court to decide issues of foreign law, but does not dispute that it proffers multiple experts who will opine on the legal requirements of various countries at the time. CAB therefore aims to have its cake and eat it too. It does not want this Court to determine any issue of foreign law, but it wants to place evidence of what foreign law requires before a jury. It cannot do so in the absence of this Court's ruling on any disputed issues of foreign law.

the purpose of the rule as a notice requirement.  To CAB's point, the sufficiency of its notice to

Plaintiffs is not the issue on this motion and is not presently before the Court.  Rather, it is true

that Rule 44.1 of the Federal Rules of Civil Procedure clearly indicates that issues of foreign law

are for determination by the Court.  CAB's insistence that this applies only to "determinative"

issues of law is not persuasive.  Rule 44.1 contains no such caveat.  And while CAB is correct that

Rule 44.1 is not strictly an evidentiary rule, it does inform the question of relevance, assistance

to the trier of fact, and prejudice.

To rebut Plaintiffs' reliance on *Linde*, CAB cites *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523

(E.D.N.Y. 2012).  In that case, Dr. Abed was also called to testify "about Palestinian money-

laundering regulations applicable to the Bank." *Gill*, 893 F. Supp. 2d at 537.  The Court

concluded such testimony was "probative, but not dispositive, of the Bank's state of mind." *Id.*

Indeed, testimony which establishes customs and practices in a given industry is generally

admissible when it does not opine as to a legal conclusion. *See Berckeley Inv. Grp., Ltd. v. Colkitt*,

455 F.3d 195, 218 (3d Cir. 2006) (noting relevant testimony which goes to customs and practices

but do not provide legal conclusions are generally admissible); *S.E.C. v. Ambassador Advisors,

LLC*, 576 F. Supp. 3d 250, 257 (E.D. Pa. 2021) (concluding testimony is admissible where it

refrains from framing opinions as legal conclusions).  However, there can be no doubt that an

expert may not opine on whether a party's conduct comports with law. *Berckeley Inv. Grp.*, 455

F.3d at 218; *Ambassador Advisors*, 576 F. Supp. 3d at 257.

It is premature to decide on this motion whether any specific requirement of foreign law

may be presented to a jury, either through expert testimony or jury instructions.  Without

doubt, defendants subject to foreign laws have in certain circumstances raised defenses based

on those laws, which defenses courts have considered. *See In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d 522, 542-50 (E.D.N.Y. 2011) (discussing the defenses of comity, foreign state compulsion, state action, and act of state doctrines).  That is not the precise situation here, of course, where CAB apparently intends to present evidence of its compliance regime to rebut the idea that it "knowingly and substantially assisted" the subject attacks.  With that said, however, the Court is aware of no reason—and Plaintiffs present none—why CAB may only raise foreign law in support of an affirmative defense, rather than to disprove the elements of Plaintiffs' claims.  Against this backdrop, it is premature to decide now that CAB may not introduce this evidence as a categorical rule.

Whether each individual expert's opinions are admissible is, of course, a specific question, which this Court will address to the extent it can at this posture.  But, as a general point, the Defendant has injected the question of foreign law into the case.  In these circumstances, the proper course, if any, is for the Court to conduct a hearing on any disputed foreign law issues and determine what foreign law requires in anticipation of any testimony that may relate to foreign law.  Indeed, it would hardly seem fair to preclude banking entities subject to a variety of national and international regulations from testifying (for example) to their customs and practices of compliance where they are relevant to the case.  And it will be helpful to the jury to hear some overview of the complex legal and regulatory framework applicable to banks like CAB during the relevant period, because the jurors are unlikely to have knowledge about the various ways different countries designate groups and persons and terrorists, notify banks of those designations, and the complex legal and regulatory schemes applicable to banks to ensure they do not facilitate terror financing.

The Court turns now to the specifics of Plaintiffs' challenges to Dr. Abed, Dr. Haddad, Mr. Saqqaf, Mr. Assaf, Mr. Meyer, and Mr. Kuttab.  The Court addresses the experts in turn.

1.  <u>Drs. Abed & Haddad</u>

Plaintiffs assert Dr. Abed's report and Dr. Haddad's report and anticipated testimony (1) are irrelevant; (2) offer opinions on foreign law; and (3) are unfairly prejudicial.  Dr. Abed's report is also challenged on the ground that it offers opinions on the PMA subsequent to the events of the relevant time period.  Dr. Haddad's report is also challenged for including facts within Dr. Haddad's personal knowledge and improper character evidence.

As to Dr. Abed, the Plaintiffs argue, in essence, that Dr. Abed's report cannot be relevant since he only offers a perspective on what took place at the PMA *after* the final attack mentioned in the Third Amended Complaint.  However, this argument falls flat.  Dr. Abed's proposed testimony is not especially wide-reaching, but in any event, virtually none of it pertains to the period following the attacks which are the subject of the TAC.  Accordingly, there is no proposed testimony related to subsequent events to exclude (though, if there were, the analysis might be different).

Neither is this argument successful to challenge Dr. Abed's qualifications.  Dr. Abed has institutional knowledge of the PMA, as well as many further years of experience working in economic development in the region, including in the period when the PMA was created and the subject attacks were carried out.  Thus, he is qualified to opine on at least some subject matter which is within the scope of the lawsuit.

As to Dr. Haddad's report, Plaintiffs argue that "the creation of the PMA, the PMA's development of industry standards and practices, and the standard practice for banks operating in the Palestinian Territories" are irrelevant. The Court disagrees. The standards of the banking industry operating in the Territories are relevant to this litigation. CAB intends to present testimony from a fact witness that it complied with applicable regulations. A jury will need to understand generally what the PMA was and how it regulated banks and what rules were imposed related to terror financing. An expert can provide this general background information, which a jury is not likely to know. CAB intends to argue that it followed standard practices to negate an inference that it was "generally aware" of its role or "knowingly and substantially assisted" the terrorist attacks. While Plaintiffs apparently regard compliance in banking as impermissible character evidence, evidence of habit is generally admissible. *See* Fed. R. Evid. 406. Here, CAB may wish to and may permissibly argue that it generally acted in a particular way with respect to those individuals and institutions known to be supporting terrorism. Such an argument would conform to the requirements for habit evidence, and not character evidence.

To be sure, only a CAB fact witness and not an expert can talk about how it customarily operated. But an expert can provide relevant background about general standards and practices of the banking industry in the Territories and can state whether any of the CAB customers at issue in this case were designated as being a front for (or a participant in) Hamas's terrorism. Drs. Abed and Haddad can provide helpful background information on the PMA and its oversight of CAB and other banks in the Territories that will help the jury understand fact

witness testimony.  It is premature at this point to strike their testimony altogether without a full understanding of the evidence Plaintiffs will seek to introduce to prove their claim.

Additionally, both Drs. Abed and Haddad discuss the "blacklists" promulgated by relevant authorities in and around the region at the time – lists of individuals or entities with whom banks were restricted from servicing. (*See* ECF No. 315-1 ¶¶ 27-29; ECF No. 315-2 ¶¶ 37-39, 44, 46.)  The Israeli blacklist is expressly mentioned in the TAC for purposes of asserting that CAB was aware that certain persons or entities were affiliated with Hamas. (ECF No. 280 ¶ 724.) The jury is unlikely to have familiarity with "blacklists," how they were promulgated and by whom, how they were distributed, and how they were updated or rescinded.  CAB is entitled to offer expert testimony about these subjects to the extent it disputes the evidence that Plaintiffs may seek to introduce about them.  It is premature at this point to preclude any such testimony without having an understanding of the precise evidence that Plaintiffs will seek to introduce about blacklists.

That said, paragraphs 26 and 27 of Dr. Haddad's opinion evidence about the PMA being a "respected partner" and the former governor of the Bank of Israel remarking that the PMA runs "a very professional outfit" is irrelevant, as the jury is not being asked to pass judgment on the PMA's oversight and regulation of bank in the Territories. (*See* ECF No. 315-2 ¶¶ 26-27.) Again, while it is important for the jury to understand what the PMA is and what it does vis-à-vis CAB and the prevention of terror financing, the generic, hearsay commentary about positive views of the PMA is irrelevant and improper.  Likewise, paragraph 20 of Dr. Abed's report notes in part that former United Kingdom Prime Minister Tony Blair and others "complimented" the PMA "for its performance."  This testimony is not relevant, and there is no context or foundation

for Blair's statement.  Compliments of the PMA are not helpful to the jury (nor are any critiques which Plaintiffs may wish their experts to express); rather, experts should simply explain what the PMA is and generally how it worked without such commentary.[4]

Further, while Plaintiffs are correct that compliance with the PMA's regulations does not absolve it from liability under JASTA, they are not correct about the relevance of general background information that there were regulations/rules enforced by the PMA that applied to CAB.  CAB's asserted compliance is relevant in rebutting Plaintiffs' allegation that it *knowingly* assisted the people and entities engaged in Hamas's terror activities insofar as compliance with applicable terror financing regulations would support an inference that CAB sought to avoid (or did avoid) aiding and abetting terrorist activities.  As noted above, only CAB fact witnesses can explain that CAB followed applicable regulations.  Jury instructions can be fashioned to address Plaintiffs' concerns that the jury is focused on the correct law, and the jury then can evaluate for itself whether CAB's asserted compliance with PMA regulations/rules bolsters its defense on JASTA's third element that it did not *knowingly* provide substantial assistance — but without hearing simplistic compliments and criticisms of PMA's oversight of banks.[5]

Notwithstanding the above, to the extent that Dr. Abed purports to opine on the "reasonableness" of following the PMA's guidelines, his opinion is irrelevant, and even if

---

[4]  Because these paragraphs are inadmissible on other grounds, the Court does not address the claim that this evidence constitutes "character evidence" within the meaning of Federal Rule of Evidence 404(a).

[5]  The Court notes that Plaintiffs' argument that the Palestinian Authority did not label Hamas a terrorist organization is irrelevant, as Dr. Abed's report states Hamas *was* a blacklisted entity and the *PMA* prohibited banking with Hamas—facts that do not appear to be disputed.  (ECF No. 315-1 ¶ 29.).  Testimony about the PMA rules are relevant only insofar as they governed how CAB conducted business in the Territories and the jury needs to understand only the general nature of the governing rules of the PMA.

relevant, the prejudice of such an opinion substantially outweighs any relevance insofar as it could confuse the jury on the standard it is evaluating (i.e., the JASTA standard). Thus, Dr. Abed's opinion that it was "reasonable" to follow PMA guidelines is excluded.[6]

To the extent Dr. Abed and Dr. Haddad are challenged as offering both fact and opinion evidence, Plaintiffs have not made a persuasive argument why fact evidence should be excluded. *See United States v. Velissaris*, No. 22-cr-105 (DLC), 2022 WL 17076747, at *3 (S.D.N.Y. Nov. 18, 2022) (noting "opinion testimony can be presented by either a lay or expert witness"); *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 182 (2d Cir. 2004) (quoting Fed. R. Evid. 701, Advisory Comm. Note). Moreover, "the fact that a witness has specialized knowledge . . . does not preclude him from testifying pursuant to Rule 701" as a fact witness. *Velissaris*, 2022 WL 17076747, at *3. Thus, these experts may be offered in part as a lay witness, subject (of course) to the Court's discretion on deciding whether a particular line of fact testimony may be

---

[6] Regarding Dr. Abed's assertion that "banks had no choice but to comply with the PMA's guidance and instructions," this Court does not in this opinion determine the issue of whether a "duress" defense (or any similar defense) is available to CAB. Certainly, a defense such as foreign sovereign compulsion has been raised and considered in certain contexts. *In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d 522, 544-45 (E.D.N.Y. 2011) (raising the foreign sovereign compulsion defense in the context of an antitrust dispute regarding a Chinese company). The Court does not assess the fitness of this or any defense to this case at this time (although it is not expressly asserted in CAB's answer (ECF No. 311, at 187-89)). To the extent CAB raises an argument regarding its defenses during summary judgment, if accepted by the Court, such a ruling may necessitate a ruling on issues of foreign law, further supporting that it is premature to exclude the proffered opinion evidence on foreign law now. The Court also notes that the Plaintiffs misstate the holding of *In re Chiquita Brands Int'l Inc.*, 284 F. Supp. 3d 1284 (S.D. Fla. 2018). There, the district judge questioned the applicability of a duress defense in ATA and JASTA cases but expressly did not reach the question. *Id.* at 1306. In assuming, *ad arguendo*, that the defense was available, the court concluded that the defendant had "not adduce[d] evidence sufficient to create a genuine issue of material fact on each element of its asserted duress defense," which is an issue not before this Court. *Id.* at 1325. Likewise, the Second Circuit case cited by the Plaintiffs is wholly outside the ATA/JASTA context and cannot support the inference that any controlling authority in this Circuit has concluded that a "duress" or similar defense (such as foreign sovereign compulsion) is unavailable here. *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011).

inadmissible for a more specific reason.  Plaintiffs will have an opportunity to depose both of these experts and can question both on any fact testimony.

Finally, Plaintiffs argue these two experts' testimony may be cumulative of or bolster one another.  The Court notes that the expert reports do not necessarily support this argument, as the scope of their testimony differs in part.  However, there is an open question whether both experts are truly needed in this case.  CAB has stated it does not intend to offer cumulative testimony and that it has identified two experts in the event one is unavailable.  Thus, it is premature to decide whether their testimony is needlessly cumulative or impermissible bolstering.

In sum, the Court concludes Dr. Abed's and Dr. Haddad's reports/opinions are inadmissible only insofar as (1) CAB offers their opinions that it was "reasonable" to follow PMA regulations; and (2) CAB offers their opinions that the PMA was "professional," "respected," and "complimented."  The motion as to these two witnesses is otherwise denied as premature.  Further, this opinion does not preclude CAB from utilizing Dr. Abed's or Dr. Haddad's reports and testimony in connection with resolving any issues of foreign law under Rule 44.1.

2.  Mr. Saqqaf

Plaintiffs attack Mr. Saqqaf's report and anticipated testimony on the grounds that it (1) is irrelevant, (2) offers opinions of foreign regulation and law, and (3) is unfairly prejudicial.

One threshold question of law for this Court, which has not yet been presented (though there appears to be agreement between the parties on this point), is whether and to what extent CAB is subject by law to the regulations of the Central Bank of Jordan (CBJ).  Plaintiffs

refer to CBJ as "CAB's principal regulator" in the TAC. (ECF No. 280 ¶ 1269.)  This assertion is made in Dr. Abed's report as well as Mr. Saqqaf's. (ECF Nos. 315-1 ¶ 27; 315-3 ¶ 22.)  That question has not been briefed on this motion, will not be decided now.

Assuming both sides agree that CBJ was CAB's principal regulator and that CAB had to comply with certain regulations promulgated by CBJ and take/not take certain actions regarding "blacklists" issued by CBJ/Jordanian authorities, then general background information about that regulatory scheme and industry standards practices and procedures for banks subject to CBJ-regulations may be helpful to the jury to understand the regulatory environment generally and whether CAB's actions were consistent or inconsistent with industry standards (assuming a CAB witnesses testifies as to what CAB's actions were).  For the same reasons discussed above, it also is premature to decide what precise portions of Mr. Saqqaf's testimony will be excluded, because it is unclear precisely what evidence Plaintiffs are presenting about Jordanian/CBJ "blacklists."

Plaintiffs' argument that Mr. Saqqaf's report is irrelevant because it rarely references CAB is not persuasive.  As with Drs. Abed and Haddad, Mr. Saqqaf's report is relevant to the extent he will opine on industry standards and practices of CBJ-regulated entities.

In sum, Plaintiff's motion with regard to Mr. Saqqaf is denied as premature.  This opinion does not preclude CAB from utilizing Mr. Saqqaf's report and testimony in connection with any Rule 44.1 issues.

3. <u>Mr. Assaf</u>

Plaintiffs challenge Mr. Assaf's report and proposed testimony on the grounds that it (1) is irrelevant, (2) offers opinions on foreign law, and (3) is unduly prejudicial.

Mr. Assaf's proposed opinion evidence centers on the regulations banks must follow regarding client instructions and the potential penalties a bank faces for failing to comply with those instructions. (ECF No. 315-4 ¶ 11.)  He opines that banks could not take "'active steps' to stop an SDGT-designated organization from withdrawing" funds.  He also opines that "banks did and do cease doing business with entities designated as SDGTs."  He says, though, that this fact "does not authorize a bank to seize or freeze funds that do not belong to it." (*Id.*)

It is unclear at this point whether Plaintiffs disagree with his opinions about applicable law and whether there is any issue of foreign law for the Court to resolve.  It is also unclear what evidence Plaintiffs will be presenting regarding CAB's conduct vis-à-vis any SDGT.  Plaintiffs have made allegations that CAB allowed the HLF to withdraw funds after it was designated an SDGT.  It is unclear whether Plaintiffs intend to introduce this evidence and whether such evidence will be challenged as inadmissible.  If Plaintiffs do contend that CAB should not have processed any transactions for HLF after its designations, CAB may seek to explain its action in light of regulations that applied to it, which could render Mr. Assaf's opinions relevant.

In sum, Plaintiffs' motion as to Mr. Assaf is denied as premature.  Additionally, this opinion does not preclude CAB from using Mr. Assaf's report/testimony in connection with any motion for determination of foreign law in connection with Rule 44.1.

4. <u>Mr. Meyer</u>

Plaintiffs argue Mr. Meyer's opinions should be excluded because they (1) are irrelevant, (2) offer opinions of foreign law, and (3) are unfairly prejudicial.

Mr. Meyer's report deals with banks operating in and under the laws of Israel. CAB wants to offer his testimony so it can argue that even Israeli banks did not have the sort of detection procedures in place to completely ensure they did not service individuals and institutions involved in terrorism and that it should not be held to a higher standard than Israeli banks.

But these are not the issues on trial, which are CAB's general awareness and knowing and substantial assistance. Even if the Court (or factfinder) were to credit Mr. Meyer's testimony in full, it may still be that an Israeli bank could also be held liable under JASTA. Mr. Meyer's opinions thus have little to no relevance to the liability of CAB, which was operating in the Palestinian Territories and, potentially under the regulatory authority of Jordan. Unlike the reports of Dr. Abed, Dr. Haddad, and Mr. Saqqaf, therefore, there is no antecedent question of whether CAB was subject to Israeli regulations giving rise to the Israeli blacklist. And, while Israel's blacklist is explicitly mentioned in the TAC, Israeli banking rules and regulations are not relevant here because neither side is arguing that CAB had to or did/did not comply with Israeli banking laws. It is irrelevant, therefore, to know whether Israeli banks followed the MOD or IDF blacklist(s). Injection of yet another country's regulatory regime into the case complicates the case unnecessarily, including as to the regulatory scheme applicable to CAB. Israeli banks are not similarly situated to CAB (and even if they were, testimony regarding Israeli regulations

would confuse the issues in the case), and reference to what they did or did not do does not inform any fact issue before the jury. Thus, Plaintiffs' motion is granted as to Mr. Meyer.

5. Mr. Kuttab

Plaintiffs argue Mr. Kuttab's testimony (1) is irrelevant, (2) offers opinions of foreign law, and (3) is unfairly prejudicial. They also raise an argument that Mr. Kuttab is not qualified to offer the opinions contained in his report.

There are problems with Mr. Kuttab's qualification as an expert witness. While it is true that Mr. Kuttab has considerable experience as a human rights scholar and international law attorney, only a portion of his opinions pertain to his scholarship and expertise as an attorney and scholar. Most of those portions are merely background and are not directly relevant to any issue in the case. Further, they do not form an adequate basis for the key opinion he offers, which is to opine "generally on the dissemination, use, and perception of IDF and MOD declarations from the Palestinian perspective," namely that few members of the Palestinian public "knew about" the IDF and MOD declarations. Further, opining on public perception in the Territories has little to do with his qualifications and is only tangentially related to his scholarship on the history and legal framework of the IDF and MOD declarations. He is neither a public opinion nor cultural researcher nor—as with Ms. Myers—an anthropologist.

The thrust of Mr. Kuttab's disjunct opinions and related evidence seems to stem from a misunderstanding about what "general awareness" is at issue in this case. JASTA requires a showing that *CAB* was "generally aware" of its role in the terrorist activity, *Halberstam*, 705 F.2d at 477, not that the public was "generally aware" of various terrorist or unlawful organization

designations.[7] (*See* ECF No. 315-6 ¶ 55.)  Only CAB's awareness of IDF and MOD declarations would be relevant to demonstrate CAB's general awareness of its role in the terrorist activity. Certainly, expert testimony regarding how IDF and MOD declarations were disseminated to banks generally is relevant and permissible testimony – but, as a human rights lawyer, he is not qualified to opine on how communications regarding these declarations were disseminated to the public in the Territories (much less their dissemination to banks), and his opinions on whether the Palestinian people were aware of the designations is not relevant.

The Court finds, furthermore, that his proposed testimony regarding Israel's designation (and international perspectives on that designation) of his own organization, Al-Haq, as a terrorist organization, does not bear upon the designations of the relevant individuals and institutions identified by Plaintiffs in this case.

Moreover, the probative value of Mr. Kuttab's proposed testimony is minimal and substantially outweighed by the risk of undue prejudice.  CAB may not attack the designations of the relevant individuals and institutions in this litigation by bringing in wholly unrelated designations of different institutions.  The question is what CAB knew regarding the specific CAB customers identified by Plaintiffs in *this* case.  While Mr. Kuttab's lay testimony could conceivably support an inference that a bank like CAB would not have automatically accepted an IDF or MOD designation at face value (assuming it knew of such a designation), that inference is tenuous in the extreme, particularly considering that by Mr. Kuttab's own

---

[7] As explained further, *infra*, regarding the humanitarian organization experts—Ms. Myers and Mr. Benthall—the question there is styled differently.  Because Plaintiffs seek to assert what the public perception of particular organizations was, Ms. Myers and Mr. Benthall are needed to rebut those specific assertions.  Such testimony does not go toward general awareness but to rebutting the inference of knowingly assisting the subject attacks.  As explained, however, as a lawyer, Mr. Kuttab has no special expertise regarding public perceptions.

admission, Al-Haq was designated a terrorist organization by Israel much later than the relevant period in this litigation, *i.e.*, in October 2021.

CAB has asserted no other basis for which Mr. Kuttab's opinion should be admitted. Thus, Plaintiffs' motion is granted as to Mr. Kuttab.[8]

### B. U.S. Law and Banking Experts

Plaintiffs challenge three expert witnesses who opine about U.S. law and banking regulations: Mr. Middlemiss, Ms. Rowland, and Mr. de Kluiver.

"In our adversarial system, lawyers make arguments, judges write legal opinions—and there is no such thing as an expert opinion when it comes to interpreting a statute unless that opinion belongs to a court." *In re Initial Pub. Off'ing Sec. Litig.*, 174 F. Supp. 2d 61, 69 (S.D.N.Y. 2001). "Judge Learned Hand once warned trial courts: 'Argument is argument whether in the [witness] box or at the bar, and its proper place is last.'" *Id.* (quoting *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 123 (2d Cir. 1930)). A court's "exclusive duty and province [is] 'to say what the law is.'" *Id.* (citing *Marbury v. Madison*, 5 U.S. 137, 177 (1803)). One court has observed, "Each courtroom comes equipped with a 'legal expert,' called a judge." *Burkhart v. Washington Metro. Area Trans. Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997). Indeed, "[e]xpert testimony is not helpful if it 'usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" *Lickteig v.*

---

[8] The Court notes, for the record, that in excluding Mr. Kuttab's proposed opinion evidence, it gave no weight to Plaintiffs' inappropriate and inflammatory footnote regarding Mr. Kuttab's other publications. In any event, the cited articles in Plaintiffs' footnote twelve (and the recent, widely reported events in the ongoing regional conflict) are utterly irrelevant to the substance of the claims interposed in this litigation.

*Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 329 (S.D.N.Y. 2022) (Woods, J.). Nor may an expert "'supplant the role of counsel in making argument at trial.'" *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (quoting *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001)). Accordingly, "'[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony.'" *Id.* at 469-70 (quoting *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004)).

Furthermore, "testimony encompassing an ultimate legal conclusion . . . may not be made" admissible by disguising it as testimony regarding industry practice. *United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991). That said, "state of mind is a central issue" in litigation under JASTA, and "[t]estimony as to the content of banking industry standards and practices—and the Bank's compliance with such standards and practices—will be valuable to a jury likely to be unfamiliar with such topics." *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 537 (E.D.N.Y. 2012). Thus, evidence which is "probative, but not dispositive, of . . . state of mind" is generally admissible. *See id.*

1. <u>Mr. Middlemiss</u>

Plaintiffs challenge the Middlemiss report on the grounds that Mr. Middlemiss (1) draws an improper inference about CAB's compliance based on American banking standards he admits are inapplicable; (2) opines improperly regarding (a) U.S. laws and (b) the legality of CAB's conduct under U.S. law; and (3) opines improperly as to CAB's state of mind.

Mr. Middlemiss offers opinions on a range of topics. His detailed recitation of U.S. law, including the Patriot Act and anti-money laundering ("AML") compliance, is improper. The Court

is able to instruct the jury on U.S. law, and the extraordinary detail Mr. Middlemiss provides regarding these laws and changes to the laws after September 11, 2001, is not particularly helpful and risks confusing the jury about the standards applicable to CAB (as opposed to U.S. banks) and the law it is evaluating – JASTA – which requires a focus on what *CAB* knew, not what its correspondent bank in the U.S. knew.

On the other hand, Plaintiffs intend introduce some information about correspondent bank transactions—a subject with which a jury is likely unfamiliar.  It is appropriate for Mr. Middlemiss to provide general background information regarding what a correspondent bank is and the manner in which a foreign bank conducts U.S. dollar transactions for its customers.  This information will be helpful for the jury.  It likewise will be helpful to the jury to hear testimony about the types of information provided to the U.S. correspondent bank by banks like CAB and by the customers whose transactions the correspondent bank was handling and what information the correspondent banks provided to banks like CAB, as well as the general procedures in place at the time at correspondent banks and banks like CAB to detect potential money laundering or terror financing.  And it will be helpful to the jury to understand industry standards at the time for banks like CAB that had correspondent banking relationships with regard to processes and procedures to detect and avoid facilitating money laundering and terror financing.  Mr. Middlemiss can opine as to whether, in light of the fact evidence in the case, the procedures in place at CAB and its correspondent banks were consistent with industry standards and whether the specific transactions identified by Plaintiffs raised any red flags under then prevailing standards that they were money laundering or terror financing transactions.

Mr. Middlemiss is qualified to evaluate the transactions identified by Plaintiffs and to opine on whether anything about those transactions would have raised a "red flag" or been indicative of terror financing to a bank like CAB or its correspondent bank under then existing standards/practices. His opinion in this regard is probative of whether CAB knowingly assisted the terrorist attacks in question and/or were generally aware that its customers were fronts for Hamas terror. There is limited prejudice because, as Mr. Middlemiss observes, U.S. banking standards were generally more sophisticated than those in the Palestinian Territories at the time. Plaintiffs are free to rebut this evidence with their own expert testimony or to undermine Mr. Middlemiss's credibility on a variety of grounds.

As to the challenged "state of mind" evidence, the Court finds that the proffered opinion that "CAB's execution of the [transactions at issue] was not motivated by an intent to knowingly or culpably assist or seek to bring about the terrorist attacks" is improper and should be excluded. (ECF No. 315-7, at 9.) This testimony directly opines as to CAB's state of mind – an issue for the jury to decide. CAB's counsel can argue that the evidence shows that CAB was not motivated by an intent to knowingly assist the terror attacks in this case, but Mr. Middlemiss cannot be used to supplant the role of counsel or the jury.

Plaintiffs have not persuaded the Court that other opinions of Mr. Middlemiss are improper state-of-mind evidence. For example, his opinion that "the fact that an entity was OFAC-designated does not necessarily show that a bank in CAB's position knew or should have known that pre- or post-designation transfers involving that entity were supporting terrorism," is not opining on CAB's state of mind. Rather, it is an inartful way of explaining that an OFAC designation does not pertain to specific transactions and thus says nothing about the purpose

46

of any particular banking transaction of an OFAC-designated entity/person.  This point is admissible to rebut an inference based on evidence which may be submitted by Plaintiffs that an OFAC designation automatically implies knowledge of the *use* to which transfers were applied. (ECF No. 315-7, at 32.)  As stated above, *Twitter* requires the assistance in some way be connected to the terrorist attacks involved in the case. *Twitter*, 598 U.S. at 501 (requiring a nexus between the terrorist attack and the assistance).  Similarly, his observation that banks did not have automated tools to search for news articles about their customers (ECF No. 315-7, at 36) is not state of mind evidence and will not be excluded for that reason.  Likewise, his observation that nothing about a payment to "the family of a person who died, even following the acts of terrorism," would raise a red flag that the payment involved "criminal proceeds" or was related to "terrorism" (ECF No. 315-7, at 40) is not state of mind evidence.  Thus, it will not be excluded for this reason.

Insofar as it is unclear exactly what evidence and arguments Plaintiffs are making about the correspondent banking transactions and how they inform the JASTA elements, it is premature to make any more specific rulings regarding portions of Mr. Middlemiss's testimony that will be excluded.  Thus, the motion is granted as to the one alleged "state of mind" opinion set forth above, granted generally insofar as Mr. Middlemiss's testimony regarding the details and history of U.S. anti-money laundering and terror financing laws will not be permitted, but otherwise denied.

2.  <u>Sepideh Rowland</u>

Ms. Rowland's report is criticized for (1) improperly attesting to the credibility of a witness (Mr. Qassem); (2) improperly opining that she would view Dr. Levi's warnings to CAB with skepticism; (3) being facially irrelevant; and (4) opining at length about U.S. laws.

The Court is not persuaded that Ms. Rowland's proposed opinions attest to the credibility of Mr. Qassem. Plaintiffs point to two paragraphs of Ms. Rowland's report which do not opine as to Mr. Qassem's credibility at all. (ECF No. 315-8 ¶¶ 92-93.) Nor do Plaintiffs further explain this purported attack on Mr. Qassem's credibility. Thus, this argument fails.

Plaintiffs next attack Ms. Rowland's report for indicating her skepticism of Dr. Levi's warnings to CAB. This testimony is relevant and admissible. Plaintiffs' presentation will rely heavily on Dr. Levi's testimony that he warned CAB of its assistance to Hamas terrorism to prove that CAB knowingly assisted Hamas terrorists. CAB is entitled to rebut this testimony by offering the testimony of Ms. Rowland (whose qualifications are not challenged) to assert that Dr. Levi's discussions with CAB officials alone, even if they took place, were insufficient to put CAB on notice that it was facilitating terror financing. Plaintiffs will be free to cross-examine Ms. Rowland and put their own expert forward to testify as to what standard practices would have been during the relevant period when someone like Dr. Levi alerts a bank of potential terrorist financing.

In challenging the facial relevance of Ms. Rowland's report, Plaintiffs point to the absence of documentary evidence supplied by CAB regarding their AML/CTF practices at the time. This argument fails. While it is true that CAB has not produced documents in this case

because the case was brought after much of the documentation was destroyed/became inaccessible, CAB can offer witnesses such as Mr. Mufti to testify as to what practices were in place generally.  Further, Ms. Rowland is qualified to provide testimony on general standards and practices in the banking industry and to opinion on whether the transaction at issue were indicative or terrorist financing or would have triggered reporting obligations.  This testimony is relevant to CAB's general awareness and knowledge.

Additionally, insofar as it is unclear precisely what evidence Plaintiffs plan to introduce in their case in chief, it is premature to rule on the admissibility of Rowland's testimony offered to rebut allegations in the TAC.

Plaintiffs contest various pieces of Ms. Rowland's opinion evidence as improperly opining on U.S. law.  The challenges to testimony at pages 8, 19, and 26 of her report do not pertain to opinions on the requirements of U.S. law, but rather to standards and practices of banks, as well as her opinion of what she would do in the situations with which CAB was presented.  On the other hand, her opinion at page 14 does opine in part on U.S. law.  Specifically, she opines that "OFAC requires both currently and during the Relevant Period that all U.S. persons must comply with OFAC regulations," and "[t]he terrorism regulations do not apply to foreign persons outside the U.S." (ECF No. 315-8 ¶ 49.)  This information is clearly relevant but should be provided to the jury by the Court, not an expert.  Thus, Ms. Rowland will not be able to opine on the specific requirements of U.S. law.

As a result, Plaintiffs' motion is denied, except to the limited extent discussed above with regard to opining on U.S. law.

3. <u>Mr. de Kluiver</u>

Plaintiffs challenge Mr. de Kluiver's report on the grounds that he "offer[s] legal and compliance opinions under the guise of an expert report."  They fail to explain their argument. As Plaintiffs note, the FATF and Basel Committee on Banking Supervision ("BCBS") are mentioned in the TAC because in "an ordinary case . . . evidence concerning CAB's handling of specific alleged Hamas accounts could be measured against various guidelines in drawing inferences concerning whether its employees knew, or were willfully blind to, certain facts." (*See* ECF No. 280 ¶¶ 1270-75, 1279.)  Moreover, it's unclear how this constitutes improper legal opinion.  Plaintiffs do not assert—and likely cannot assert—that FATF and BCBS guidelines constitute "law" in any meaningful sense (much less U.S. law as they appear to be international banking guidelines).  Nor does the absence of documentary evidence preclude the introduction of the evidence at trial for the purposes of rebutting Plaintiffs' allegations regarding FATF and BCBS guidelines that they acknowledge are in the Complaint.

With that said, the Plaintiffs in their brief represent that they "have not proffered any fact or expert evidence on CAB's compliance with FATF and BCBS recommendation—but instead explicit, specific, and repeated warnings." (ECF No. 314, at 44.)  Since Plaintiffs have represented that they will seek to admit no evidence of FATF or BCBS standards, and CAB has raised no purpose for admitting Mr. de Kluiver's testimony other than rebutting Plaintiffs' allegations regarding these standards, the Court deems Plaintiffs to have abandoned their allegations

regarding FATF and BCBS guidelines, making responsive testimony from CAB irrelevant.[9]  Thus, the motion is granted as to Mr. de Kluiver.

C.  *Intelligence Experts*

Plaintiffs challenge portions of both reports of Defendant's intelligence experts, Dr. Steinberg and Mr. Shmilovich.

First, the Plaintiffs argue that Mr. Shmilovich and Dr. Steinberg improperly opine as to Dr. Levi's "credibility."  The argument rests largely on the fact that the two experts opine that Dr. Levi's fact testimony that he warned CAB of its assistance to Hamas, including terrorist activities, would not have followed ordinary protocols at the ISA.  For example, Mr. Shmilovich states that "Mr. Levi's account of his independent outreach to Cairo Amman Bank falls well outside the normal process or approach of officials operating within the established chain of command at that time." (ECF No. 315-11, at 11.)  Likewise, Dr. Steinberg opines that Dr. Levi's testimony regarding the *zakat* committees "cannot be reconciled with logic." (ECF No. 315-12, at 25.)

Neither expert's opinions regarding Dr. Levi's testimony can be excluded at this point; in other words, the motion is premature on this issue.  If Plaintiffs present Dr. Levi in such a way that could give the impression that he followed protocols and went through the ordinary course, CAB is entitled to present experts to rebut that with reference to what the standard protocols were at the time.  Any other questions go to the weight of the evidence, not its admissibility.  While cross-examination will remain an important tool for CAB to rebut Dr. Levi's

---

[9] To be clear, this ruling also precludes Plaintiffs from introducing evidence regarding FATF and BCBS guidelines at trial without leave of the Court.

testimony, that does not mean that they are not free to present expert opinions to assert that his testimony does not resemble the relevant procedures of the agencies as they understand them.  This is especially true given that, as Plaintiffs acknowledge, only one party recalls the purported meetings taking place, and that party is Plaintiffs' witness.  If CAB acknowledged the meetings took place, they would not be entitled to offer experts saying they did not take place. But CAB denies the meetings took place.  They are entitled to offer opinion evidence that Dr. Levi did not follow industry practices for notifying CAB about suspected terrorist activities of CAB's customers. That said, the Court has considered this evidence only to the extent that it is proffered to rebut claims (or important omissions regarding protocols) made by Dr. Levi.  If Plaintiffs do not so claim (or omit), then the trial judge may reconsider whether the expert opinions should be excluded or are admissible for another purpose.

The Court turns to the other arguments raised regarding these proffered experts.

1. Dr. Steinberg

Plaintiffs contend Dr. Steinberg improperly "injects fact witness testimony into his expert testimony" and improperly "opines on CAB's state of mind."  However, as discussed in relation to the former PMA governors (Drs. Abed and Haddad), there is no bar to expert witnesses presenting lay testimony.  And, as is also the case regarding Drs. Abed and Haddad, Plaintiffs present no persuasive reason to exclude the portions of Dr. Steinberg's report indicating he will testify to the fact that during the relevant period, he did not see evidence to suggest that, for example, "*zakats* [i.e., charities in the Palestinian Territories] were systematically diverting funds

from charitable purposes to violent ones." (ECF No. 315-12, at 25.)  Thus, this lay testimony is not excluded.

Regarding testimony of CAB's state of mind, the Court agrees with Plaintiffs that Dr. Steinberg's opinion that "Al-Sayed's involvement in the violent activities prior to the 2002 Park Hotel bombing would not – and could not – have been known to CAB" is improper state of mind testimony.  (ECF No. 315-12, at 36.)  Thus, the statements on page 36 of Dr. Steinberg's Report as to CAB's ultimate state of mind will be excluded.  Accordingly, the motion is denied in part and granted in part as to Dr. Steinberg.

2.  Mr. Shmilovich

Plaintiffs challenge Mr. Shmilovich's assertions regarding the Israeli intelligence community's actions regarding CAB.  They again cite the *Linde* case for the proposition that his testimony is irrelevant. 920 F. Supp. 2d at 285.  However, after quoting from *Linde*, Plaintiffs' next sentence undercuts their argument:  In this case, as opposed to *Linde*, Plaintiffs will present "direct evidence that the Israeli government concluded that CAB was involved in assisting Hamas and repeatedly warned the bank." (ECF No. 314, at 46.)  As a result, CAB will need to rebut this testimony, which it may do with circumstantial evidence that the factual assertions made by Plaintiffs' witnesses are not correct.  The fact that this may be fairly characterized as lay testimony has no ultimate impact on the determination.  As has been emphasized throughout this opinion, Mr. Shmilovich and the other experts are not precluded from testifying to facts within their knowledge and whether in their experience they came

across information that was consistent/inconsistent with Plaintiffs' allegations.[10]  Thus, the

argument that Mr. Shmilovich's opinion on the Israeli intelligence community's actions regarding

CAB are irrelevant fails.

As with Dr. Steinberg, however, Plaintiffs find firmer footing where Mr. Shmilovich

ventures into opining as to state of mind.  The Court agrees that Mr. Shmilovich's parenthetical

statement on page 13 that "those outside the intelligence community – such as employees of a

bank – would <u>not</u> be expected to know about" the wrongdoing of certain accountholders that

led to the raid of CAB in 2004 is impermissible. (ECF No. 315-11, at 13.)  While Mr. Shmilovich

has artfully dressed this opinion as a generalized one, which otherwise might be permissible,

this particular statement is tied inexorably to a specific raid on CAB's Ramallah branch which

factually occurred, and thus constitutes state of mind evidence with respect to this raid.

Nor can Mr. Shmilovich rehabilitate this opinion by making it more general than he has

done here.  There are no clear grounds in his report to suggest that he can opine as to what the

intelligence community "expected" banks to know about their customers' activities, nor is the

opinion relevant given that Mr. Shmilovich reaches his conclusion regarding secondary liability

based on the IDF's assertion about CAB's lack of *primary* liability.  In the JASTA context, the

Court will focus on CAB's secondary liability for aiding and abetting, not for its primary liability

for "any of its workers having involvement in terror acts or financing terror." (*See* ECF No. 315-

11, at 13.)  Finally, this particular bit of testimony would substantially confuse the issues.

---

[10] Plaintiffs also contest Mr. Shmilovich's methodology as a roundabout way to attack his testimony regarding facts in his personal knowledge and experience.  This argument fails for the same reason.

Plaintiffs also challenge Mr. Shmilovich because his testimony is "based solely on his having worked at the ISA" and he "cites no documentation of any kind, no specific meetings, discussions or governmental determinations." However, this argument is tough to square with the substance of Mr. Shmilovich's report, which is overwhelmingly a rebuttal to Plaintiffs' witnesses and factual allegations. Moreover, Mr. Shmilovich is testifying to the absence of evidence within his knowledge, for which there can be no documentation (as is necessarily implied by the absence of evidence). Plaintiffs are certainly free to attack the credibility and weight of this evidence at trial. And to whatever extent Plaintiffs deploy this line of attack to assert, again, that he may not be a lay witness, the argument fails for the same reasons discussed above in connection with other experts.[11] Accordingly, these alleged failures are insufficient to exclude Mr. Shmilovich's testimony regarding the conduct of the Israeli Security Agency.

Finally, Plaintiffs challenge the introduction of evidence of "non-prosecution" of CAB. As an initial point, Mr. Shmilovich does not specifically opine on whether there were criminal

---

[11] Of note, Defendant asserts:

> the parties agreed in advance as to how they would handle experts who also have fact testimony based on personal knowledge. CAB first informed Plaintiffs in May 2024 . . . that some of its experts were likely to also have relevant personal knowledge. Plaintiff agreed that they would wait to depose the experts until after CAB served their expert reports, that they would depose them only once, and that CAB would serve amended Rule 26(a) disclosures describing the facts it anticipated the experts would present.

No direct evidence of an agreement is attached to Defendant's submissions, and Plaintiffs dispute any such agreement existed. However, the Defendant did attach its October 2024 amended Rule 26(a) disclosures, showing that the experts challenged were identified as lay witnesses were noticed in that disclosure. While the Court cannot enforce an agreement it hasn't seen, it has also not been presented with adequate grounds to exclude lay testimony based on the allegation that they were not disclosed as lay witnesses. (*See* ECF No. 322-9.) Further, there is no prejudice because Plaintiffs will be able to depose the witness.

prosecutions of CAB. Rather, he opines that when banks and other organizations were found to be supporting terrorism, they were commonly shut down. He further notes that in his experience he was not familiar with any evidence against CAB, and that CAB was never shut down. The issue with this line of testimony, however, is that it is not relevant: The fact that CAB was not shut down at the time of the subject attacks has no real bearing on whether CAB knowingly and substantially assisted or was generally aware of its role in the subject terrorist attacks. Furthermore, because it has the potential to generate the improper inference that because CAB was not shut down at that time, it cannot therefore be liable under JASTA, this testimony must be excluded. The risk of generating that inference would be unfairly prejudicial and substantially outweigh any probative value.

Accordingly, the motion is granted in part and denied in part as to Mr. Shmilovich (subject to additional findings below).

D. *Terrorism Experts*

Plaintiffs challenge two experts who opine on research regarding the "motives" of terrorists: Dr. Abrahms and Mr. Shmilovich. The argument centers on the relevance of these experts' opinions as to whether financial remuneration to family members of terrorists (such as so-called martyr payments) motivated terrorists and were significant causes of the subject terrorist attacks.

However, excluding the challenged opinions of Dr. Abrahms and Mr. Shmilovich is premature. The Court has little to no insight, beyond the TAC and very limited proffers on this motion, as to how Plaintiffs intend to introduce evidence of financial remuneration to terrorists

and/or their families at trial. Though they may do so at summary judgment or trial, the Plaintiffs have not yet clearly put forth evidence to support any theory of who paid whom on what dates or in connection with what attacks (much less whether and to what extent these payments involved CAB accounts). Plaintiffs have, of course, pleaded and discussed martyr payments at some length during this case, including to say that such payments "incentivized" attacks. (ECF No. 280, ¶¶ 1300, 1462, 1467.) But the precise contours of their proffered evidence is unclear. Accordingly, it is premature for the Court to rule on whether the financial remuneration testimony is irrelevant.[12]

Further, Plaintiffs raise no credible challenges to the qualifications of Dr. Abrahms or Mr. Shmilovich, and while their arguments may be understood to be challenging the logic behind these experts' reports, such arguments go to the weight of evidence and not its admissibility. Thus, the motion is denied as premature with respect to financial remuneration testimony of CAB's experts.

    *E. Humanitarian Experts*

---

[12] Plaintiffs' cited authority—*Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021)—offers them no help on this point. Certainly, the Second Circuit found that a party plausibly alleges substantial assistance against a bank when its customers, which included a martyr payment organization, "were so closely intertwined with Hizbollah's violent terrorist activities that one can reasonably infer that LCB was generally aware while it was providing banking services to those entities that it was playing a role in unlawful activities from which the rocket attacks were foreseeable." *Id.* at 860-61. And it may be true, as Plaintiffs say, that they need not prove whether terrorists are motivated by financial remuneration. But, critically, they have pleaded an incentive structure relating to such payments. As a result, Defendants have offered experts to opine that these payments do not cause terrorism. Whatever the relative merits of the parties' proffers, the Court cannot rule on this question yet. Such a specific allegation regarding incentives may not ultimately make it to the final proofs at trial, rendering any ruling premature.

Plaintiffs challenge two additional experts in part on the basis of their qualifications and other related bases:  Ms. Myers and Mr. Benthall.

First, they generally argue that testimony about "generalized humanitarian need in the Palestinian Territories is largely irrelevant (and often duplicative)." (ECF No. 314, at 59.)  While it is true to say that this is not a case about any particular humanitarian situation in the Territories, or even the humanitarian situation there generally, it is also generally true that the role played by charities and *zakat* committees in the Territories—specifically, whether they supported terrorism or merely performed legitimate humanitarian functions—will be relevant to ascertain CAB's knowledge of its alleged assistance of the Hamas attacks.  Indeed, Plaintiffs acknowledge that "*some* background on the origins and governance of Islamic charitable organizations and the needs to which they typically respond may provide background and context to more directly relevant opinions." (ECF No. 314, at 61.)  The Court agrees:  As Plaintiffs raise issues regarding these charities, at least some amount of historical background on the humanitarian situation will assist the trier of fact (subject to more specific evidentiary rulings on specific evidence offered at trial).  On the question of whether the testimony is duplicative or goes beyond the scope of what is necessary at the trial, it is premature to make a ruling at this time.

Plaintiffs raise a variety of issues regarding potential prejudice resulting from Ms. Myers' and Mr. Benthall's purported attempt to "justify Hamas's violence."  The Court does not read the reports as offering any justification of the subject attacks, but to contextualize patterns of violence within (as well as humanitarian need arising from) the conflict.  Regardless, on the question of potentially unfair prejudice resulting from the proffered context, which conceivably

could veer impermissibly into that territory, it is premature to make an evidentiary ruling at this time.

Plaintiffs also take issue with Ms. Myers' and Mr. Benthall's reference to Hamas as a "political movement." As it is stipulated that Hamas committed the acts of international terrorism that injured Plaintiffs, there is no need for any testimony to dispute the fact that Hamas is a terrorist organization. Indeed, Dr. Abed—CAB's expert—notes that Hamas was blacklisted as a terrorist organization by OFAC since 1997. (ECF No. 315-1 ¶ 29.) Whatever merits the term "political movement" may have, the Court agrees that referring to Hamas as a "political movement" is irrelevant and risks undue prejudice. The only relevant evidence for purposes of this case pertains to whether a given attack was a "terrorist attack" such that JASTA applies or whether a given individual or institution (including Hamas) was designated a terrorist organization by a relevant authority, not whether any attack or organization was part of a "political movement." At bottom, the term is vague, and risks conflating the nature of Hamas as a political and military organization which is also designated a terrorist organization—a fact about which there is no dispute—with political sentiments held by the public in the Palestinian Territories. (*See, e.g.*, ECF Nos. 315-13, at App'x ¶ 25; 315-14 ¶ 37.) The result of this largely irrelevant and vague term is the risk of unfair prejudice. Thus, CAB's experts shall not refer to Hamas as a "political movement."[13]

---

[13] That said, for clarity, the Court will not at this time require that CAB refer to Hamas in any specific way or use any particular term; the only proscription is that its experts must not use the term "political movement."

The Plaintiffs also attack Ms. Myers's report for stating that "without condoning the act of the suicide bomber, the international community is plainly in agreement that it is inappropriate to deprive a terrorist's elderly mother or dependent children of aid simply because they are related to a terrorist." (ECF No. 315-13 ¶¶ 49, 53.)  They cite 22 U.S.C. § 2378c-1, which prohibits making direct aid available to the Palestinian Authority unless the Authority or any successor or affiliate "ha[s] terminated payments for acts of terrorism against Israeli citizens and United States citizens to any individual, after being fairly tried, who has been imprisoned for such acts of terrorism and to any individual who died committing such acts of terrorism, including to a family member of such individuals."  While this law shows that the United States has taken a strong stance against these types of payments, Ms. Myers's testimony regards the agreement of the (admittedly vague) "international community," which necessarily invokes more than just the United States's position on these types of payments. [14]

With that said, the views of the international community regarding martyr payments are not relevant to the issues in this case.  As far as CAB's general awareness of its role, Ms. Myers's assessment has no bearing whatsoever.  The international community's views on "aid" to the family members of terrorists will not serve the factfinder to understand CAB's general

---

[14] Plaintiffs reach too far by saying "the PA's 'pay for slay' program has been *outlawed* in the U.S." (emphasis added).  The Court is aware of no power by which the U.S. can "outlaw" any practice in the Palestinian Territories. 22 U.S.C. § 2378c-1 merely places conditions on foreign aid.  Further, the *Kaplan* decision, 999 F.3d 842, which concluded that the bank customers "were so closely intertwined with Hizbollah's violent terrorist activities that one can reasonably infer" the defendant was "generally aware" of its role in the foreseeable attacks, does not help Plaintiffs argument for the irrelevance of this testimony (which, as the Court notes, is irrelevant for other reasons).  The *Kaplan* decision was made on a motion to dismiss posture.  Whether the payments at issue in this litigation mean CAB "knowingly and substantially assisted" Hamas is a fact question, and the Court is not clear on this motion what Plaintiffs' evidence for these "martyr payments" will be at trial.  Thus, an evidentiary ruling based on *Kaplan* is inapt and premature.

awareness or lack thereof.  As to the issue whether CAB knowingly and substantially assisted the subject attacks, there may be some small glimmer of relevance, but it is totally eclipsed by the risk of undue prejudice.  For one thing, Ms. Myers's reference to the "international community" is vague in the extreme.  There is no clear indication what she means by this term or on what facts or evidence she would base it.  Moreover, it is wholly unclear how Ms. Myers is qualified to opine on the views of the international community.  Finally, to the extent that the opinion addresses "aid," it is prejudicial in that Ms. Myers may mean for "aid" to encompass martyr payments, but in fact, it is not clear that these payments constitute "aid" in any meaningful sense; rather, the parties have consistently discussed them as a form of financial remuneration or benefit (not, as "aid" may imply, a form of national or international assistance offered to address humanitarian concerns) offered to terrorists (perhaps among others).  Finally, while there may be some minor relevance of this assessment to CAB's state of mind regarding these payments, it is highly attenuated given CAB's state-of-mind cannot be assumed haphazardly to be coextensive with that of the "international community."  Given these risks, any relevance of this evidence would be outweighed by the risk of undue prejudice.  This opinion evidence is excluded.

Plaintiffs assert that the opinions of Ms. Myers and Mr. Benthall should be excluded to the extent they opine on public perceptions of the charities and *zakat* committees at issue in this litigation.  CAB counters that Plaintiffs have placed the reputation of these institutions in evidence by calling one or more of these organizations "well-known Hamas institution[s]." (ECF No. 322-7, at 42-43; ECF No. 322-9, at 46, 60, 71.)  To that extent, it is premature for the Court

to rule on this public perception[15] evidence now.[16]  If Plaintiffs intend to introduce evidence that particular CAB customers were "well-known" by the public to be Hamas institutions, then CAB should have an opportunity to rebut that.

Plaintiffs also challenge the experts' opinions "regarding the state of mind of the Israeli intelligence community and the United States government" as irrelevant.  They assert it constitutes "state of mind" testimony.  The Court has reviewed the cited "representative examples" from each report (ECF Nos. 315-13 ¶¶ 55, 57, 58, 67, 82, 83, 85; 315-14 ¶¶ 50, 103, 121, 129, 139, 140, 143), and concludes these are generally not improper state of mind evidence as they do not clearly reference the Israeli intelligence community or U.S. government's states of mind.  However, Mr. Benthall's opinions that "[t]he fact that the US embassy . . . had 'no derogatory information' about the charity is indicative of what individuals actually thought of the organization during the relevant period" (*see, e.g.*, ECF No. 315-14 ¶¶ 121, 129, 143) is inappropriate to go to a jury.  The fact that there was no derogatory information is all Mr. Benthall will be permitted to say.  Thus, this argument fails except to the limited extent that Mr. Benthall may not draw the jury's conclusion for it.

---

[15] To the extent Plaintiffs challenge the reports as opining on CAB's state of mind (as opposed to the intelligence agencies' state of mind discussed *infra*), they do not point to any specific part of the reports which directly and clearly state what CAB knew to be true of the relevant individuals and institutions.  Nevertheless, the Court expects CAB will apply its rulings in this opinion consistently across each of its witnesses.  To be specific, this Court has found that making a statement which opines specifically and conclusively as to the state of mind CAB (or others) possessed in relation to the institutions and individuals which were accountholders at CAB (or other relevant matters) is impermissible.  However, opining in general as to factual evidence that may empower a jury to make an inference regarding state of mind will be permissible in certain circumstances. Again, it is premature to rule on the motion without a better understanding of the specific information that will be admitted by Plaintiffs.

[16]  As noted *supra* note 7, contrary to the evidence offered by Mr. Kuttab, Ms. Myers and Mr. Benthall are qualified to opine on public perception in the Territories as their expertise is on cultural matters in the Territories, not law. The Court thus rejects Plaintiffs' arguments that they are unqualified to opine on public perception.  At trial, Plaintiffs and their experts can certainly inquire into the methodology used to arrive at their conclusions.

As to the opinions the two experts render regarding the requirements and application of international and foreign law, they are not qualified.  Thus, the portions of the reports (and associated testimony, if any) which address international and foreign law should be stricken, but narrowly so that only the subsections of the paragraphs cited by Plaintiffs addressing international or foreign law are struck. (*See* ECF No. 315-13 ¶¶ 52, 123, 196, 211, 229, 234 and App'x ¶ 8 n.208; ECF No. 315-14 ¶¶ 40, 89.)  For example, the opinion evidence about the requirements of the Geneva Convention is subject to being struck on grounds of Ms. Myers' qualifications, but opinion evidence regarding the remainder of the paragraph may be admissible. (*See* ECF No. 315-13 ¶ 52.)

Cabined within Plaintiffs attack on Ms. Myers's and Mr. Benthall's "opinions regarding Israeli, U.S., and PA security policies," Plaintiffs argue that Ms. Myers and Mr. Benthall are not "qualified to opine on terrorism and security matters."[17]  The Court is not persuaded.  Some background discussion of widely known security policies may be relevant to understand Ms. Myers's and Mr. Benthall's opinions.  Moreover, the contested portions of Ms. Myers's report generally opine on issues affecting the social sector organizations, charities, and *zakat* committees (and public perception thereof) to rebut Plaintiffs' evidence that these organizations were fronts for Hamas. (*See, e.g.*, ECF No. 315-13 ¶¶ 96(6), 104, 110, 112-15, 121, 135, 145, 156, 178.)  On the other hand, Ms. Myers opines on the sufficiency of evidence of

---

[17]  Within this argument, Plaintiffs raise Ms. Myers' opinion that "[n]ot everyone in Hamas is an advocate of violence, and certainly not everyone is an advocate of terrorism." (ECF No. 315-13 ¶ 38.)  The Court struggles to understand how this qualifies as testimony on "security policies" or terrorism and counterterrorism; her observation is chiefly about what people within a given organization believe, which is within her expertise as an anthropologist.  The merits of this opinion have no bearing on this motion; Plaintiffs will be free to attack Ms. Myers's credibility or the weight of her opinions at trial.

funding diversion, on which she is not qualified. (ECF No. 315-13 ¶ 107.)  Her assertion

regarding the Al Ansar Charitable Association is within her expertise, and admissible, but

Plaintiffs may challenge her credibility and the weight her testimony should be given on that

issue. (ECF No. 315-13 ¶ 204.)  Mr. Benthall's citations to critiques of the thesis raised by Dr.

Levitt (ECF No. 315-14 ¶¶ 112, 179) are within his expertise and thus the Court rejects Plaintiffs'

arguments that he is unqualified in this respect.

To the extent Plaintiffs argue that any testimony of Ms. Myers or Mr. Benthall is

duplicative, cumulative, or bolstering of other experts, a ruling on these issues is premature.

In sum, Plaintiffs' motion as to Ms. Myers and Mr. Benthall is largely denied as

premature, but granted in small part as set forth above.

## Conclusion

In large part, the Court has concluded that many of the challenges raised by Plaintiffs are

premature.  To the extent certain allegations in the TAC or Plaintiffs' expert's reports do not

make it to trial or summary judgment, there will be no need for CAB to rebut those portions of

the allegations and evidence.  The Court has endeavored, consistent with the pertinent

standards to motions to exclude evidence at trial, only to rule upon portions of CAB's expert

reports which definitively should not subject to jury review.  Accordingly, the Court GRANTS IN

PART and DENIES IN PART Plaintiffs' motion.   To the extent the motion is denied as premature,

it is denied without prejudice.  In addition, nothing in this opinion precludes evidentiary

motions and arguments that were not expressly made in this motion.

Finally, the Court will set a schedule to resolve any Rule 44.1 issues and for summary judgment briefing.  The parties shall meet and confer regarding any disputed issues for the purposes of a Rule 44.1 hearing on foreign law.  Within sixty (60) days of the date this decision is issued, they shall file a joint letter proposing a procedure for resolving those issues.  The deadline to complete the depositions of the remaining expert witnesses shall be ninety (90) days from the date this decision is issued.

**SO ORDERED.**

Dated:     September 30, 2025
            New York, New York

_____
            KATHARINE H. PARKER
            United States Magistrate Judge