UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVERBACH et al., | |
| Plaintiffs, | **OPINION & ORDER ON MOTION TO COMPEL POST-2009 RECORDS** |
| -against- | |
| CAIRO AMMAN BANK, | |
| Defendant. | **19-cv-0004-GHW-KHP** |

**KATHARINE H. PARKER, United States Magistrate Judge:**

This case arises out of a series of terrorist attacks in Israel perpetrated by *Harakat al-Muqawama al-Islamiya* ("Hamas"), designated by the United States as a Palestinian terrorist organization, during the Second Intifada—a period of intense Israeli-Palestinian violence between 2000 and 2004 that included attacks on Israeli civilian centers, military installations, and buses.  Plaintiffs include United States nationals injured in the attacks, as well as the estates, heirs, and families of U.S. nationals killed or injured in the attacks.  They allege that Defendant Cairo Amman Bank ("CAB") is liable under the Justice Against Sponsors of Terrorism Act ("JASTA") for providing banking services to certain individuals who, and institutions which, had affiliations with Hamas during this period.

Before this Court is Plaintiffs' motion to compel CAB to produce documents responsive to its Third Request For Production (the "TRFP"). (ECF No. 422.)  For the reasons that follow, the motion is **denied**.

## BACKGROUND

General familiarity with the facts is assumed.  The Court recites only the facts necessary to determine this motion.

1

On July 18, 2023, the Court ordered that fact discovery would close April 30, 2024. (ECF No. 217.)  On August 7, 2023, Plaintiffs served their First Requests for Production ("FRFP"). (ECF No. 423-3.)  That request defined the relevant time period to be January 1, 1999, through August 20, 2003, unless otherwise specified. (*Id.* at 5 ¶ 12.)  Accordingly, some requests expressly asked for records post-dating the relevant time period, such as Requests 3, 4, 5, 6, 7, and 16 from the FRFP.  In specific, Plaintiffs wanted documents and communications from September 2013 to the present regarding (1) payments made through and/or facilitated by CAB through the Palestinian Authority/PLO Compensation Programs; (2) payments made to accounts belonging to a number of individuals and institutions allegedly connected to Hamas; and (3) payments made through and/or facilitated by CAB to ex-prisoners or the designees of prisoners currently or formerly imprisoned for perpetrating terrorist attacks, including monthly salary payments. (*Id.* at 6 ¶¶ 3-5.)  They also sought documents, communications, transaction records, account opening records, and compliance records concerning accounts at CAB "closed in response to the 2020 Israeli Military Law." (*Id.* at 6 ¶¶ 6-7.)  Finally, they sought documents concerning the Israeli police raid on the Ramallah branch of CAB in 2004. (*Id.* at 7 ¶ 16.)  Of note, Request 2—which sought account opening records regarding the individuals identified by Plaintiffs as having connections to Hamas—also included a qualification that the records were sought "regardless of whether Transactional Records for the relevant period still exist." (*Id.* at 6 ¶ 2.)

On October 12, 2023, CAB responded, noting a general objection that it would "not produce documents that post-date August 20, 2003." (ECF No. 433-2, at 7 ¶ 14.)  It further noted it would "not undertake to search for documents which are outside the relevant time

2

period." (*Id.* at 11-12, 14-16.)  CAB also objected on bank secrecy grounds to Requests 1 through 7. (*Id.* at 7-16.)

On December 11, 2023, the Court held a case management conference.  During that conference, the Court questioned the parties on the record regarding discovery issues, including some about whether certain records post-dating 2009 might be relevant. (*See, e.g.*, ECF No. 234, at 41:18-44:13.)  One result of the conference was that the Court required CAB to provide Plaintiffs with a declaration "regarding whether CAB processed any so-called martyr payments, prisoner payments, or salary payments, between 2001 and 2010 and the process put in place in 2011 for processing payments from the Palestinian Authority." (ECF No. 233.)  In January 2024, CAB provided Plaintiffs with the declaration of Mr. Khaled al-Qassem, stating "the earliest transaction records in CAB's possession for accounts generally date to 2009.  CAB does not possess transaction records for the 2001 to 2009 period other than the limited set already produced to Plaintiffs."  Further, he stated that when he was an employee during the relevant period, he "was not aware of any prisoner or martyr payments being processed." (ECF No. 339-1 ¶ 5.)  He also stated that "CAB sought to identify records responsive to the Court's broad instruction, which extends to any salary payments" for the 2009-10 period, and concluded after investigation that "payments from the Palestinian Authority" were processed "to only three individuals," which "were confirmed to be regular monthly salaries paid by the Palestinian Authority to employees." (*Id.* ¶ 6.)  He also testified to the bank's policy regarding the 2011 Palestinian Authority program of monthly payments and the Israeli Military Law Order of 2020. (*Id.* ¶¶ 7-13.)

3

On January 29, 2024, the undersigned conducted a Case Management Conference and extended the deadline for fact discovery regarding liability to May 31, 2024. (ECF No. 244.) Expert discovery was to continue thereafter. (*Id.*)

Plaintiffs asked CAB to search for additional individuals who may have held accounts at CAB, and the Court on February 26, 2024, required CAB to "search its post-2009 customer data to identify the number of accounts it held during the 2000-2003 period that belonged to individuals and/or entities" on Plaintiffs' lists and revise the al-Qassem declaration accordingly. (ECF No. 249, at 2.)  The Court agreed with Plaintiffs that their view of what the Court's prior order required was more accurate, but that the prior order was "unclear" on the point. (*Id.*) Mr. al Qassem's supplemental declaration stated he "identified 57 accounts" from Plaintiffs' first list and "9 accounts" from their second list which were "opened at any point during the relevant period of 2000 through 2003," or sixty-six total accounts. (ECF No. 291-1 ¶¶ 8-9.) Further, of those sixty-six accounts, thirty-four remained open as of 2009. (*Id.* ¶ 10.)  He identified only "two accounts that received recurring monthly payments," each "confirmed to be regular monthly salaries based on employment." (*Id.*)

On May 31, 2024, the deadline for fact discovery passed without request for extension.

On October 10, 2024, the Plaintiffs filed a motion to compel CAB to produce records for the period 2000-2003 relating to the sixty-six accounts identified and seeking a court order overruling CAB's bank secrecy objections. (ECF No. 289.)  On February 14, 2025, that request was granted. (ECF No. 325.)  Specifically, the Court considered the *Aérospatiale*[1] factors and

---

[1] *Société Nationale Industrielle Aérospatiale & Société de Construction d'Avions de Tourisme v. U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 543-44 & n.28 (1987)

concluded that CAB's bank secrecy objections were overruled. (*Id.* at 6-14.)  Of note, the Court concluded the good faith factor was "neutral." (*Id.* at 13.)  CAB was required to obtain permission from the Jordanian and Palestinian authorities and/or to produce the records related to the sixty-six accounts by August 15, 2025. (*Id.* at 15.)  On June 18, 2025, Judge Woods overruled CAB's objections to the undersigned's opinion and order regarding bank secrecy, in part concluding that CAB had not shown that this Court's determination of relevance was "clearly erroneous" or "contrary to law." (ECF No. 361, at 7-8.)  The letters rogatory issued from this Court in June and July 2025.

On September 22, 2025, Plaintiffs issued the TRFP to CAB. (ECF No. 423-1.)  The TRFP requested five sets of documents for the period post-dating January 1, 2009: (1) all transactional records for accounts held by eighteen[2] named customers of CAB (*i.e.*, for the "Post-2009 Accounts"); (2) all account opening records for each of those individuals; (3) all account statements, periodic statements, and other records of account activity for each of those individuals; (4) all compliance records regarding those individuals; and (5) all documents and communications regarding the Post-2009 Accounts, including those regarding freezing, restriction, or modification of any of the accounts for the relevant period running from January 1, 2009, to the present. (*Id.*)  The individuals and institutions named in the subpoena coincide with those individuals who returned waivers to CAB regarding the release of their bank records and whose accounts were still open as of 2009. (*Compare id.*, *with* ECF No. 409-1.)

---

[2] The parties' papers reference nineteen customers. (*See* ECF No. 426, at 1.)  However, the pertinent Schedule A to the subpoena only lists eighteen individuals and entities which held accounts at CAB. (*See* ECF No. 423-1.)  Plaintiffs assert in footnote seven to their opening brief that they "did not include Riyad Walwil in the [TRFP]," but "he is included in this motion to compel." (ECF No. 426, at 11.)  Given CAB does not seem to dispute this inclusion on the motion, the Court will treat the motion to compel as seeking information related to all nineteen accountholders.

On October 22, 2025, CAB responded to the TRFP, objecting to all requests and declining to produce responsive documents to Requests 1, 3, 4, and 5 on the grounds that the requests were (1) irrelevant; (2) untimely; (3) burdensome and disproportionate to the needs of the case, particularly in light of bank secrecy laws; and (4) privileged.  As to Request 2 (for account opening records), they said they had produced "all documents responsive to this Request." (ECF No. 433-1.)

On November 9, 2025, CAB sent a letter to Plaintiffs, noting that it had "produced documents . . . on October 17, 2025" which "included waivers from certain accountholders of Defendant for documents contained in their bank accounts at Defendant for the period 2000-2003." (ECF No. 397-7.)  That letter, sent pursuant to the parties' protective order entered in this case, requested a clawback of records post-dating December 31, 2003. (*Id.*)  And on November 10, 2025, CAB subsequently refined the number of relevant accountholders, stating the true total was fifty-nine accounts from both lists opened during the relevant period and twenty-nine accounts that remained open as of 2009. (ECF No. 408-1 ¶¶ 7-9.)  They had also engaged in a process of obtaining waivers from the relevant fifty-nine accountholders. (*Id.*)  That resulted in nineteen accountholders whose accounts remained open after 2009 returning waivers. (*Id.* ¶ 11.)  On the same date, Plaintiffs returned a letter to CAB noting that "objections predicated on foreign bank secrecy have already been rejected by the Court." (ECF No. 397-8.)

As of December 12, 2025, CAB had "secured the services of CSC Global, a document authentication and legalization vendor, to comp[l]ete formal service of process," which involved "the U.S. Department of State" and, CAB said, tended to be "slow." (ECF No. 408.)  The vendor was not able to complete process as the letters had not yet been certified by the

Department of Justice, which had returned them to the U.S. Department of State. (*Id.*)  CAB had

sent the letters directly to the relevant authorities "in an effort to obtain responses" by the

Court's deadline. (*Id.*)  Those authorities advised CAB "they are not able to comply with the

request to authorize the production of documents." (*Id.*)

**LEGAL STANDARDS**

The Federal Rules of Civil Procedure ("Rules") are designed to allow the parties in the

litigation to gather relevant facts necessary to prosecute and defend the action in the most

economic, efficient, and fair way.  *Brown v. Barnes and Noble, Inc.*, 474 F. Supp. 3d 637, 643

(S.D.N.Y. 2019); Fed. R. Civ. P. 1.  Motions to compel are "entrusted to the sound discretion of

the district court," *United States v. Sanders*, 211 F.3d 711, 720 (2d Cir. 2000), *cert. denied*, 531

U.S. 1015, and "[a] trial court enjoys wide discretion in its handling of pre-trial discovery," *In re*

*Finch, Inc.*, 330 F.3d 104, 108 (2d Cir. 2003) (citations and quotation marks omitted).

Rule 26(b)(1) provides that:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant
> to any party's claim or defense and proportional to the needs of the case,
> considering the importance of the issues at stake in the action, the amount in
> controversy, the parties' relative access to relevant information, the parties'
> resources, the importance of the discovery in resolving the issues, and whether
> the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1).

Since the 2015 amendments to the Rules, the scope of discovery permitted has

narrowed.  Nonetheless, relevance is still a broad concept under Rule 26(b)(1). *See, e.g., Villella*

*v. Chemical & Mining Co. of Chile Inc.*, 15-cv-2016, 2019 WL 171987, *2-3, (S.D.N.Y. Jan. 11,

2019); *New York v. United States Department of Commerce*, 18-cv-2921 & 5025, 2018 WL

7

5260467, *1 (S.D.N.Y. Aug. 17, 2018).  Additionally, this Court has broad discretion in determining relevance for discovery purposes. *Williams v. Rosenblatt Sec., Inc.*, 236 F. Supp. 3d 802, 803 (S.D.N.Y. 2017); *In re Air Crash Near Clarence Center, New York, on February 12, 2009*, 277 F.R.D. 251, 253 (W.D.N.Y. 2011); *In re PE Corp. Securities Litigation*, 221 F.R.D. 20, 23 (D. Under Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1).

"Proportionality focuses on the marginal utility of the discovery sought." *Vaigasi v. Solow Mgmt. Corp.*, 11-cv-5088 (RMB) (HBP), 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016). "Proportionality and relevance are 'conjoined' concepts; the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate." *Id.*  When assessing proportionality, courts weigh: (1) the importance of the issues at stake in the case, (2) the amount in controversy, (3) the parties' access to relevant information, (4) the parties' resources, (5) the importance of the requested discovery in resolving the issues in the case, and (6) whether the burden or expense of the requested discovery outweighs its likely benefit. *Id.* The court has broad discretion in weighing these Rule 26(b)(1) factors. *ValveTech, Inc. v. Aerojet Rocketdyne, Inc.*, 2021 WL 630910, at * 2 (W.D.N.Y. Feb. 18, 2021).  The Advisory Committee Notes indicate that all parties are obliged to consider proportionality "in making discovery requests, responses, or objections." Advisory Committee Note for 2015 Amendment to Rule 26. The party seeking discovery does not bear the sole burden of addressing all proportionality considerations. *Id.*  Rather, it is the "collective responsibility" of the court and parties to address "the proportionality of all discovery." *Id.*

The party seeking discovery has the initial burden of demonstrating relevance and proportionality. *See Winfield v. City of New York*, No. 15-CV-5236 (LTS) (KHP), 2018 WL 840085, at *3 (S.D.N.Y. Feb. 12, 2018); *Sheindlin v. Brady*, No. 21-CV-01124 (LJL) (SDA), 2021 WL 2075483, at *2 (S.D.N.Y. May 24, 2021) (citing *In re Subpoena to Loeb & Loeb LLP*, No. 19-MC-00241 (PAE), 2019 WL 2428704, at *4 (S.D.N.Y. June 11, 2019)), *aff'd*, 2021 WL 2689592 (S.D.N.Y. June 30, 2021).  The burden then shifts to the party resisting discovery to show undue burden (or a lack of proportionality). *Mortgage Resolution Servicing, LLC v. JPMorgan Chase Bank, N.A.*, 2016 WL 3906712, at *3 (S.D.N.Y. July 14, 2016).  The Advisory Committee Notes emphasize that courts must determine "the burden or expense of proposed discovery" in a "realistic way." Advisory Committee Note for 2015 Amendment to Rule 26.

In making rulings on the scope of discovery, a court "must limit the frequency or extent of discovery otherwise allowed by these rules" if:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
> (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Fed. R. Civ. P. 26(b)(2)(C).

A district court has "wide latitude to determine the scope of discovery" and "abuses its discretion only when the discovery is so limited as to affect a party's substantial rights."  *In re Agent Orange Prod. Liability Litig.*, 517 F.3d 76, 103 (2d Cir. 2008) (internal quotations and citations omitted).  Rule 37(a)(5) permits the Court to award attorneys' fees and expenses to the prevailing party. Fed. R. Civ. P. 26(c)(3), 37(a)(5)(B)-(C).

9

**DISCUSSION**

To start, Plaintiffs' requests are late.  Discovery is closed in this matter, and the parties have commenced summary judgment briefing.

Next, this Court has previously expressed skepticism that documents post-dating 2009 could be relevant to the period 2000-2003.  Nevertheless, the Court permitted some discovery to determine if review of post-2009 documents might reveal information for the 2000-2003 period such as the number of accounts held at CAB during that period by individuals and entities allegedly affiliated with Hamas and any account opening documents from that period or earlier that might include know-your-customer information that might reveal a Hamas affiliation.  The Court also held that documents reflecting so-called martyr payments in 2009 that were continuing from the 2000-2003 period were also potentially relevant to the issue under JASTA of CAB's general awareness that its customers might be affiliated with Hamas' terrorist activities and that it might be playing a role in terrorism.

However, the most recent, untimely request for additional documents post-dating 2009 are not proportional to the needs of the case. *See Bartlett v. Société Générale de Banque au Liban SAL*, No. 19-CV-7 (CBA) (TAM), 2023 WL 2734641, at *8 (E.D.N.Y. Mar. 31, 2023) (noting "discovery regarding nine years of" account opening records, transactional records, and compliance records from the period running from more than two years after the latest attack took place was "not sufficiently relevant or proportional").

These records are highly remote in time and have very limited relevance, if any. Plaintiffs present no compelling theory or reason why these transaction records could

conceivably show that during the relevant period – 2000 to 2003 – CAB was generally aware it was playing a role in terrorism, let alone knowingly and substantially assisting the terror attacks at issue. And they cite no case where a court has permitted discovery of records generated six years or more after the end of the underlying conduct in the complaint.

While Plaintiffs expressly link exemplar accountholders Abbas al-Sayed, Abd al-Khaleq al Natshe, and Qalqilya Zakat Committee to the subject terrorist attacks, they do not explain how post-2009 records will show that in 2000-2003 CAB knowingly and substantially assisted the subject attacks. If their theory is that the mere maintenance of any bank account for a person convicted of terrorism constitutes knowing and substantial assistance, this argument is all but foreclosed by *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 500 (2023) and *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 439-443 (2d Cir. 2025), which require an exceptionally high showing of scienter and assistance for passive nonfeasance to serve as the basis of a JASTA claim beyond provision of basic banking services (even in the presence of general awareness). Further, CAB has said it has already produced account opening records for the individuals in question. Plaintiffs have not explained what account opening records they believe still exist that have not been produced.

Plaintiffs' reliance on Federal Rule of Evidence 1004 also is misplaced. That rule permits the admissibility of secondary evidence. *See* Fed. R. Evid. 1004. Here, Plaintiffs seek two *different* sets of documents, not later copies or secondary *versions* of original documents from the relevant period. Plaintiff's citation to *Glew v. Cigna Grp. Ins.*, 590 F. Supp. 2d 395 (E.D.N.Y. 2008), is likewise not persuasive, given that by Plaintiffs' own admission, the Court in that case permitted a 1995 version of a policy to be admitted to prove the terms of the 1994 version. *Id.*

11

at 414.  If Plaintiffs sought different versions of the same document, rather than discrete and separate account and transaction records, this decision might have some applicability.  As it is, Plaintiffs seek wholly separate records, not later versions or copies of the same record or policy.[3]

Nor is Plaintiffs argument that "[e]vidence of subsequent acts of a party or subsequent events is admissible to prove a prior state of mind or intent" persuasive. *See Devonbrook, Inc. v. Lily Lynn, Inc.*, No. 70-cv-4687, 1977 WL 921, at *5 (S.D.N.Y. Jan. 10, 1977).  The *Devonbrook* decision was a post-trial opinion in which the relevant conduct took place within a span of three years, from a January 1967 loan agreement to a 1970 foreclosure on the stock against which the loan was secured. *Id.* at *1-2.  It is not clear that any subsequent evidence post-dated 1970.  The Court considered evidence offered "subsequent to the [subject] agreement." *Id.* at *5.  Moreover, the Court in that case expressly disavowed making an inference of intent based on that evidence.  After noting that evidence of Defendant's 1968-69 negotiations formed the basis of the alleged breach of the 1969 agreement, the Court said it "could infer" a number of things about defendant's intent, but that "such inferences of a present or post-transfer intent not to perform do not at all establish the existence of such an intent *at the time* the transaction was closed." *Id.*  Thus, *Devonbrook* supports the finding that the sought evidence in this case is unlikely to be relevant to whether CAB knowingly and substantially assisted the subject terrorist attacks and does not counsel a contrary result.

---

[3] To be clear, if CAB did possess copies or revised versions of documents from the relevant period in the files of the Post-2009 Accounts, it would ordinarily be expected to turn those documents over to Plaintiffs.  Plaintiffs have not raised the theory that CAB possesses such documents on this motion, and the Court has not considered it.

Nor do Plaintiffs' other cited cases counsel a different result because the degree of remoteness is wholly different. *See United States v. Whaley*, 786 F.2d 1229, 1232 (4th Cir. 1986) (noting the "other acts" took place merely three months after the events charged in an indictment, unlike here where the requested documents are six years or more after the subject terrorist attacks); *S.E.C. v. McGinnis*, No. 14-cv-6 (CR), 2015 WL 5643186, at *1-2, *12 (D. Vt. Sept. 23, 2015) (admitting 2013 forensic analysis of defendant's computer to prove state of mind relating to events taking place in 2010-2012 over propensity objection under Fed. R. Evid. 404(b)).  As in those cases, and in *Bartlett*, documents from 2004 and 2005 might have been at a much higher ebb of relevance regarding state of mind in this case, but there is no reason to believe that documents from six years later are probative of state of mind and/or knowledge close in time to the subject attacks.

Here, limited relevance and low importance of these documents is the paramount factor to the proportionality analysis.  Given these records have limited if any relevance to substantial and knowing assistance, and at best tangential relevance to general awareness, it is disproportionate to the needs of the case to re-open discovery at this stage and allow these additional inquiries.  Plaintiffs already know the individuals and institutions whose accounts remained open after 2009 through declarations provided.  And they have documentation regarding those individuals' accounts for the relevant period to whatever extent CAB may have still possessed those records, including account opening records.  Further, it is possible they may obtain additional records through the Hague process.

Plaintiffs' citations in support of their proportionality argument have no application to this case.  For example, Judge Gorenstein noted in an ATA case that "noncompliance with the

13

document requests would severely undermine important interests of the United States."

*Schansman v. Sberbank of Russia PJSC*, 768 F. Supp. 3d 619, 641 (S.D.N.Y. 2025).  While this

Court may agree with that assessment, that decision involved overruling bank secrecy

objections.  This Court has already overruled CAB's bank secrecy objections.  The issue on this

motion that Plaintiff cannot overcome is that the documents are not proportional to the needs

of the case, given the discovery that has already transpired and the limited relevance (if any) of

the documents sought.  Thus, the statement by Judge Gorenstein at most captures the stakes of

this litigation, but is otherwise not particularly helpful in disposing of this motion.

Likewise, Judge Kuo's reasoning that transaction records relating to martyr payments to

family members and account and transfer records concerning specified individuals has no

applicability to this motion. *Miller v. Arab Bank, PLC*, No. 18-cv-2192 (HG) (PK), 2023 WL

2731681, at *8 (E.D.N.Y. March 31, 2023).  The requests for production in that case were within

the relevant period—*i.e.*, 1998 to 2004 for terrorist attacks taking place in 2000 to 2004. *Id.* at

*2.  Thus, Plaintiffs' citations are unhelpful to the Court's proportionality analysis.

## CONCLUSION

For the above reasons, the motion at ECF No. 422 is **denied**.  The Clerk is respectfully

directed to terminate the motion at ECF No. 422.

**SO ORDERED.**

DATE:  March 30, 2026
       New York, New York

_____
Katharine H. Parker
U.S. Magistrate Judge