**DLA Piper LLP (US)**
500 Eighth Street, NW
Washington, DC 20004
www.dlapiper.com

David Horniak
savid.horniak@us.dlapiper.com
T 202.799.4361
F 202.799.5361

October 9, 2026

**VIA ECF**
Hon. Katharine H. Parker
United States Magistrate Judge
United States District Court, Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Re: *Averbach et al. v. Cairo Amman Bank*, 19-cv-00004-GHW-KHP

Dear Magistrate Judge Parker:

With deep regret, we write to inform the Court that, after exchanging drafts and multiple meet-and-confer calls, the parties were unable to reach agreement on a joint spreadsheet to submit to the Court today in response to this Court's order dated September 16, 2026 (ECF 498) ("Order"). The Order directed the parties to provide "an unlocked excel spreadsheet" of Plaintiffs' expert, Mr. Gottlieb's charts, with two additional columns: (1) a column indicating CAB's expert, David Alfaro's corrections or clarifications to the details of each transaction (if any), and (2) a column "identifying evidence produced in this litigation for each transaction, if any, as to whether the transaction was cancelled, blocked, or processed with a citation to that evidence." There are two primary reasons why the parties were unable to provide the requested joint spreadsheet by today's deadline.

*First*, the parties cannot submit a single, joint spreadsheet because Plaintiffs refuse to allow CAB to separately state its position when it disagrees with language Plaintiffs drafted. On September 30, Plaintiffs proposed to CAB a version of the spreadsheet that contains many entries with which CAB disagrees, and which do not accurately reflect CAB's position. CAB carefully vetted those proposed entries and, on Wednesday, October 7, sent Plaintiffs a revised spreadsheet identifying the entries with which CAB disagrees. CAB proposed that, where there is disagreement between the parties, each side should succinctly state its position separately inside the cell (just as the parties would do in any other joint submission to the Court). Plaintiffs rejected this approach, insisting that the only way CAB may inform the Court of its disagreement with Plaintiffs' statement of position is to describe that disagreement in a letter to the Court and submit its own, separate spreadsheet.

*Second*, the parties were unable to submit separate spreadsheets today because Plaintiffs announced at 10 AM today (the due date) that they were planning to make (but had not yet made) revisions to more than 1,200 entries that they drafted, and which CAB had already vetted and

DLA PIPER



accepted in an effort to compromise on a joint submission. Plaintiffs did not provide CAB with example revised proposed text for those entries until after 2 PM today. As of the time of submitting this letter, Plaintiffs have still not provided CAB with a revised spreadsheet reflecting how that example proposed text will be implemented as to each of the more than 1,200 affected cells. CAB was previously prepared to submit its own, separate version of the spreadsheet tonight containing the compromise language for these cells. But Plaintiffs' last-minute pivot means the version of the spreadsheet that CAB prepared is now outdated and needs to be heavily revised to accurately reflect the parties' positions. CAB cannot complete those revisions until it sees what Plaintiffs' position statement is as to each affected transaction.

Regarding the parties' differing views, they fall into the four categories discussed below.[1]

*First*, many entries drafted by Plaintiffs represent that a transaction was "processed" based on documents that were not produced by CAB, which CAB cannot authenticate, and which are not the subject of any stipulation. CAB cannot agree to Plaintiffs' proposed unequivocal statements that these documents show transactions were "processed." Some of these entries, as drafted by Plaintiffs, also purport to represent that the documents are "CAB . . . account statements" or other types of "CAB" records. Again, these documents did not come from CAB, and CAB does not believe that Plaintiffs can establish these are true and correct copies of CAB records. Accordingly, CAB cannot agree to Plaintiffs' representations that these are "CAB" documents. Plaintiffs, however, have refused to allow CAB to separately state its position as follows: "Evidence cannot establish transaction was processed. Evidence is not from CAB, and CAB cannot verify it is a CAB document."[2]

---

[1] Plaintiffs also objected to CAB's requests to include transaction memo fields from Mr. Alfaro's spreadsheet and statements identifying in Gottlieb's Exhibit 5 when a purported transaction with an "SDGT" occurred before the designation date. CAB withdrew those requests to reach agreement on a single, joint submission.

[2] Plaintiffs contend that any joint spreadsheet should be limited to opinions expressed by the parties' experts, and that Mr. Alfaro did not opine that transactions were <u>not</u> processed, or that documents were <u>not</u> authentic. But Plaintiffs have not limited their own statements that transactions were "processed," or that documents are what they purport to be, to opinions of the parties' experts. <u>Neither Mr. Alfaro nor Mr. Gottlieb opined that the transactions were processed or that the documents are authentic</u>. In fact, both expressly denied offering any such opinions. *See, e.g.*, Ex. A (Gottlieb Dep. Tr. Excerpt) at 45 (stating he was only retained to "[s]ummarize the content of voluminous source documents" and "wasn't retained to provide an opinion" regarding

DLA PIPER



*Second*, many entries drafted by Plaintiffs state "processed, then reversed," or similar language. These statements are inaccurate. "Processed" implies the transaction settled and funds were transferred, but when a transaction is reversed, or a check is returned, no funds are transferred. Accordingly, CAB requested that the parties use some term other than "processed" to describe these transactions. Plaintiffs refused, and also refused to allow CAB to separately state its position that these transactions were not "processed" and that no funds were transferred.

*Third*, CAB's expert, David Alfaro, reviewed Plaintiffs' draft spreadsheet and identified instances where he disagreed with Plaintiffs' characterization of his opinions. In consultation with Mr. Alfaro, CAB prepared revised language that accurately reflects his opinions. Plaintiffs rejected that revised language and insisted that CAB accept their language, which does not accurately reflect Mr. Alfaro's opinions.

*Fourth*, as discussed above, Plaintiffs informed CAB today that they planned to change more than 1,200 cells from stating that the evidence did "not indicate[]" whether a transaction had been cancelled, blocked, or processed (language which CAB had agreed to) to, "Third party production, no affirmative indication transaction was not processed." Plaintiffs' last-minute change is inappropriately argumentative, as it incorrectly suggests that the burden is on CAB to show these transactions were <u>not</u> processed, when in fact the burden is on Plaintiffs to show the transactions <u>were</u> processed. And again, Plaintiffs have refused to allow CAB to separately state its position as to these affected cells.[3]

CAB continues to believe that the simplest solution, and the one that would be most helpful to the Court, is for the parties to submit a joint spreadsheet in which their positions, when they differ, are separately reflected. In the absence of further guidance from the Court, CAB will prepare and submit such a spreadsheet as soon as Plaintiffs provide their recently announced revisions.

---

their contents), 49 ("Q. You haven't done anything to confirm that the activity reflected in those documents actually took place? A. Correct. Q. Or to confirm, even, that those documents are what they purport to be? A. Correct."); Ex. B (Alfaro Report Excerpt) at 9 n.17. Plaintiffs' proposed entries reflect Plaintiffs' litigation position. Plaintiffs are simply refusing to allow CAB to state its own position alongside Plaintiffs'.

[3] Changing each of these 1,200+ entries to reflect Plaintiffs' new position is not a simple task, as shown by Plaintiffs' inability to do so by this Court's deadline. Further, CAB agreed to the language in these cells solely as a compromise to advance the parties' efforts to submit a joint spreadsheet. As Plaintiffs have reneged on that agreement, CAB needs to reconsider and separately prepare its own position statements for each of the affected cells.

DLA PIPER



Respectfully submitted,

/s/ David Horniak
David Horniak

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JULIE AVERBACH, et al., Plaintiffs, | Case No. 19-cv-4(GWH)(KHP) |
| vs. | |
| CAIRO AMMAN BANK, Defendant. | |

VIDEOTAPED DEPOSITION OF

MARK S. GOTTLIEB

THURSDAY, MAY 15, 2025

9:48 a.m.

Reported by:

NICOLE KOCHY, CCR, RPR, CRR

Job No.: 10684



3a5bee26-9d84-4ade-90d4-6516fe8e7c17

provided you with in order to prepare your report, but to steer clear of any communications beyond that.
BY MR. HORNIAK:
Q. Any other information you can think of, other than instructions as to establish the subsets?
A. Not to my immediate recollection.
Q. Okay. Now, we've talked about the task a little bit already, but I just want to focus on how you've described it in the description of the assignment for a second.
First sentence, first paragraph. You state you were retained on behalf of the plaintiffs to independently review and compile specific bank statements belonging to HLF and other bank transaction activity from a variety of other sources that plaintiffs alleged to have financially supported the terrorist attacks perpetrated by Hamas.
I take it you still agree that's an accurate description of the task you were asked to perform?
A. Correct.
Q. So would it be fair to say that what you did here is summarize the content of voluminous writings?
A. What is voluminous writings?



3a5bee26-9d84-4ade-90d4-6516fe8e7c17

Q. The source documents. Summarized the content of voluminous source documents.
A. Fair.
Q. Have you ever been asked to do anything like this before in another engagement?
A. Well, as forensic accountants, we often assemble data for various different reasons. So the answer is yes.
Q. Are there any aspects of your report in which you are offering what you would consider to be opinions?
A. No. I wasn't -- I wasn't retained to provide an opinion.
Q. Okay. And in preparing these summaries or compilations that are in your report, were there any places where you needed to exercise independent judgment?
A. I'm not sure if -- if you would define the reconciliation process to be described by independent judgment, because the reconciliation process comes to a conclusion that's verified.
So the answer is no.
Q. So, no, sitting here today, you can't recall any instances where, in preparing this report, you needed to exercise independent judgment?



3a5bee26-9d84-4ade-90d4-6516fe8e7c17

A. I don't recall.
Q. Okay. Turn to appendix 1 of your report. It's page 16. And what is appendix 1 on page 16 of your report?
A. It's a listing of assumptions and limiting conditions.
Q. And by "assumptions and limiting conditions," you mean these are assumptions and limiting conditions that apply to your analysis reflected in this report?
A. Correct.
Q. So these are assumptions you relied on, or limits as to the information contained in the report or how it should be used?
You seem a little confused, so why don't we take it this way. When you say "assumptions" --
A. You asked a lot of things in that one question. I'm trying to digest each one.
Q. What is an assumption, as you've used that term here?
A. It is -- it is the basis of our report. So it's the -- it's how people should interpolate our responsibilities for the work that we've done, and any restrictions they should have. For instance, they shouldn't take this report and go -- use it and



3a5bee26-9d84-4ade-90d4-6516fe8e7c17

go get a mortgage for a house, right?

So it kind of lays out, really, any limiting conditions and any assumptions that we should -- that should be applied in using the information.

Q. Okay. So what you just described sounded more like a limiting condition, to me, than an assumption, so let's just start with that.

So a limiting condition, I take it, is a restriction or limitation you've imposed on how the report should be used.

MS. GIELCHINSKY: Objection to form.

A. Correct.

BY MR. HORNIAK:

Q. So, for example -- using your example, a limiting condition would be, "Don't go out and use this report to buy a house"?

A. Correct.

Q. And then assumptions, I think -- correct me if I'm wrong -- are facts or other circumstances that you have assumed for the purpose of your analysis, regardless of whether or not those are, in fact, the case; is that fair?

A. Why don't we more simply state it as it applies to this engagement, to make it easy for you?

Q. Sure.
A. So we don't dance around it.
I'm not taking any responsibility for the translation of the bank statements.
Q. Okay. Great.
A. So if the bank statement is -- I'm assuming that the translations in the bank statements, as provided to me, is correct.
Q. Okay. You have not done anything to check the accuracy of the translations?
A. That's correct.
Q. Or the completeness of the translations?
A. That's correct. But again, we did reconcile -- I don't want you to misstate it. We did reconcile the bank statements. But it's not my -- I was provided with translations, and I'm not responsible for those translations.
Q. Right. And then, I take it, another assumption would be the -- you are not -- you are assuming that the statements you're referring to, the bank statements, are, in fact, authentic bank statements?
A. You're referring to the original source?
Q. Correct.
A. The pre-translated documents?

Q. Correct.
A. Correct, sir.
Q. You haven't done anything to confirm that the activity reflected in those documents actually took place?
A. Correct.
Q. Or to confirm, even, that those documents are what they purport to be?
A. Correct.
Q. Okay. Now, No. 1 in your appendix 1 states you obtained information, estimates, and opinions from sources considered to be reliable.
What sources are considered to be reliable?
A. Well, what you just said. The bank statements and the translated bank statements, primarily, and any other documents we used to create the transaction analysis.
Q. Who considers them to be reliable?
A. I do.
Q. Why do you consider them to be reliable?
A. That's my assumption.
Q. Got it. So you are assuming they are reliable?
A. Correct.

# Exhibit B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**Case 1:19-cv-00004-GHW**

**AVERBACH, et al.,**
**Plaintiffs,**

***v.***

**CAIRO AMMAN BANK,**
**Defendant.**

**Expert Report of David Alfaro**

**October 2, 2024**

**Confidential**

EXHIBIT
Plaintiff 1
6/12/25

not find evidence on the face of these documents that shows an effort to obtain funds for terrorist attacks.

27. Second, based upon my review of the documents made available to me, including the Gottlieb Documents and the Produced Documents, the transactions summarized by Mr. Gottlieb as having occurred after the date on which he claims the beneficiary entities were designated by the United States as Specially Designated Global Terrorists ("SDGTs")[16] include non-USD transactions and transactions that were blocked by the originator bank and thus were not transactions actually processed through CAB.[17]

28. Third, based on my review of the MSG Report, I have determined that Mr. Gottlieb's conclusions are, incomplete, flawed, and unreliable for the below reasons:

a) Mr. Gottlieb's failure to enumerate or discuss transactional memo details results in an incomplete picture of each transaction.

b) Mr. Gottlieb has not provided evidence that all of the Other CAB Account transactions were processed.

c) Mr. Gottlieb's analysis contains errors.

## II. Basis and Reasons for Opinions

### A. I did not find evidence on the face of the Gottlieb Documents and Produced Documents that the transactions enumerated in the MSG Report were used for terrorist attacks or violence of any kind.

29. As noted above, I was requested by Counsel to (1) review the Gottlieb Documents and a subset of documents produced in the Lawsuit (*i.e.*, the Produced Documents subset); and to (2) identify documents with Keywords in accordance with the Document Review Protocol. Based on my review, I identified several documents that I categorized into four populations:

30. **Population One**: I identified documents with Keywords in contexts unrelated to terrorist or violent activity. For example, a translation of a letter to CAB by HLF for the request of a transfer of $11,721 to the Palestinian Red Crescent Society (a humanitarian organization associated with the Red

[16] *See* MSG Report, PDF p. 15; Subset #4 under Supplemental Data.

[17] I have not validated nor confirmed that that the transactions identified in Mr. Gottlieb's exhibits nor those that I recreated in my Transaction Summaries (*See* **Exhibit 3** and **Exhibit 4**) constitute determinative evidence that the transactions were in fact transacted through CAB.