USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/2/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVERBACH et al.,<br><br>Plaintiffs,<br><br>-against-<br><br>CAIRO AMMAN BANK,<br><br>Defendant. | **REPORT AND RECOMMENDATION ON MOTION FOR SUMMARY JUDGMENT**<br><br>**19-cv-0004-GHW-KHP** |

**TO: HONORABLE GREGORY H. WOODS, UNITED STATES DISTRICT JUDGE**
**FROM: KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE.**

This case is brought under the Justice Against Sponsors of Terrorism Act ("JASTA"). Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 853 (2016). Plaintiffs are United States ("U.S.") nationals and the estates, heirs, and families of U.S. nationals killed or injured in terrorist attacks in Israel perpetrated by *Harakat al-Muqawama al-Islamiya* ("Hamas") in the period between 2000 and 2004, often referred to as the Second Intifada. Hamas was designated by the United States as a Foreign Terrorist Organization ("FTO") in October 1997 and as a Specially Designated Global Terrorist ("SDGT") in October 2001. (ECF No. 474 ("Averbach Counter Statement") ¶¶ 19–21).

Plaintiffs allege that Defendant Cairo Aman Bank ("CAB") aided and abetted Hamas's violence, including the attacks in which they were injured, by maintaining bank accounts for and providing banking services to certain organizations that, although outwardly purporting to be charities or civic organizations, were actually fronts for Hamas to either assist it in building support through charitable work (e.g., medical services, schools, youth sports) or in laundering

money that went to militaristic and terror purposes. One of these organizations, the Holy Land Foundation ("HLF"), was convicted in the United States in 2008 for providing material support to Hamas, in violation of 18 U.S.C. § 2339B, after Hamas was designated as an FTO. (Averbach Counter Statement ¶ 255; ECF No. 450-22 ("HLF 2008 Verdict")). HLF itself was designated by the United States as an SDGT on December 4, 2001. (ECF No. 478 ("CAB Counter Statement") ¶ 104).

Plaintiffs also allege that CAB aided and abetted Hamas's violence and the attacks in which they were injured by maintaining bank accounts for individuals whom they claim were leaders of Hamas. One of these individuals, Abbas Al-Sayed, was convicted in Israel in 2006 for planning a 2002 bombing at the Park Hotel in Netanya that injured some of the Plaintiffs. Al-Sayed was never formally designated by the United States as an SDGT. (Averbach Counter Statement ¶ 151; CAB Counter Statement ¶¶ 205–08, 221; ECF No. 464-23 ("Al-Sayed Conviction")).

After extensive fact and expert discovery, the parties now bring cross-motions for summary judgment. For the following reasons, I recommend that the Plaintiffs' motion for summary judgment be DENIED, and the Defendant's motion for summary judgment be GRANTED.

## BACKGROUND

The following background information and facts are drawn from the Parties' 56.1 statements and the deposition testimony, declarations, and documents cited to therein.

### 1. The Attacks

Plaintiffs' injuries arise from twelve attacks that occurred during the Second Intifada ("the Attacks"). There is no dispute that the Attacks were acts of international terrorism perpetrated by Hamas. (ECF No. 464-9). The twelve Attacks are:

- the Ben Yehuda Street Bombing on December 1, 2001;
- the Park Hotel Bombing on March 27, 2002;
- the Sheffield Club Bombing on May 7, 2002;
- the Patt Junction Bus #32A Bombing on June 18, 2002;
- the Hebrew University Bombing on July 31, 2002;
- the Ariel Bombing on October 27, 2002;
- the Shooting Attack on Route #60 on January 29, 2003;
- the Mike's Place Bombing on April 30, 2003;
- the Commuter Bus #6 Bombing on May 18, 2003;
- the Jaffa Road Bus #14A Bombing on June 11, 2003;
- the Shooting Attack on Route #60 on June 20, 2003; and
- the Jerusalem Egged Bus #2 Bombing on August 19, 2003.

*Id.*

### 2. Organizational Accountholders

Plaintiffs identify 23 organizations that purportedly were CAB accountholders and for which CAB provided banking services.[1] Plaintiffs claim that these organizations, though outwardly providing charitable and social welfare services and education, also funded Hamas terror activity and that by providing banking services, CAB knowingly and substantially aided-and-abetted acts of terror, including the Attacks that injured Plaintiffs. The purported

[1] Sixteen of these organizations were referenced in Plaintiffs' brief, while the remainder were mentioned in Plaintiffs' Counter Statement to CAB's 56.1 Statement and expert reports.

organizational accountholders include: HLF, Islamic Charitable Society of Hebron ("ICSH"), Ramallah Zakat Committee, Jenin Zakat Committee, Nablus Zakat Committee, Tulkarem Zakat Committee, Qalqilya Zakat Committee, Hebron Zakat Committee, World Assembly of Muslim Youth ("WAMY"), Islamic Solidarity ("Al Tadamun") Charitable Society – Nablus, Al Salah Islamic Society – Gaza, Al Islah Charitable Society in Ramallah and Al-Bireh, Islamic University of Gaza, The Islamic Society – Gaza, Islamic Center (or Complex) – Gaza, Al-Wafa Charitable Society, Muslim Youth Association of Hebron / Young Men's Muslim Association – Hebron, Beit Fajar Zakat Committee, Quran and Sunnah Society, Union of Good, Islamic Society for Orphan Welfare – Yatta, Welfare Association for Palestinian and Lebanese Families ("Al-Waqfiya"), and Al Ansar Charitable Society. (Averbach Counter Statement ¶¶ 231, 305; CAB Counter Statement ¶¶ 101, 123, 191, 327, 330, 335, 356–57, 361, 431, 449, 460, 506, 515, 540, 590, 630–31, 638, 650, 674. *See generally* ECF Nos. 465-13 ("Gottlieb Report"); 450-78). There is no dispute that twelve of the organizations listed above were CAB accountholders.[2] With respect to the following organizations, however, CAB does not confirm or deny accountholder status, largely on bank secrecy grounds: the Jenin Zakat Committee, Al Islah Charitable Society in Ramallah and Al-Bireh, Hebron Zakat Committee, The Islamic Society – Gaza, Islamic Center (or Complex) – Gaza, Islamic University of Gaza, Al-Wafa Charitable Society, Al Tadamun Charitable Society – Nablus, World Assembly of Muslim Youth, Al Salah Islamic Society – Gaza, and Nablus Zakat

[2] The Court interchangeably refers to the organizations as zakats or charities. Zakats, as defined by Defendant's expert, Matti Steinberg, are "local Islamic charities" on which "the Palestinian economy was partially dependent" during the relevant period. They provided services and aid such as basic food, necessities, and healthcare to Palestinian people. (ECF No.464-43, at 22). There is no dispute that the zakats provided such aid and services; however, Plaintiffs contend the zakats also assisted Hamas terror activities.

Committee. (CAB Counter Statement ¶¶ 101, 123, 191, 267, 431, 449, 460, 540, 579, 590, 600, 650, 674).

Plaintiffs' forensic accounting expert, Mark Gottlieb, detailed transactions CAB processed involving twenty-one of the twenty-three organizations. (*See generally* Gottlieb Report).[3] The only two entities among the twenty-three purported organizational accountholders not included in Gottlieb's transaction summaries were Al-Ansar Charitable Society and the Quran and Sunnah Society. *Id.* Plaintiffs identified Al-Ansar Charitable Society in their response to CAB's 56.1 Statement, and CAB does not admit it was an account holder. (Averbach Counter Statement ¶¶ 51, 134, 136, 337). The only evidence Plaintiffs present that this organization was a CAB accountholder is a printed and undated screenshot of what purports to be the Al-Ansar Charitable Society website identifying a CAB bank account, without context.[4] (ECF No. 476-1). Plaintiffs do not introduce the website through a declaration from an individual with personal knowledge as to the authenticity of the website or its content, and CAB objects to reliance on websites on multiple evidentiary grounds. CAB is correct; the Court cannot rely on this document to conclude that Al-Ansar Charitable Society was an accountholder.[5] Fed. R. Evid. 901, 902; *see also Philpot v. Kos Media LLC*, No. 16 Civ. 1523, 2017

[3] The Court notes that many of the transaction records were not produced by CAB but through third-party subpoenas, and CAB has asserted that it cannot authenticate the records.

[4] The screenshot appears to capture a website as it existed in February 2004 based on a news item with that date referenced in it. (ECF No. 476-1). However, the Court cannot rely on this as accurately dating the screen shot.

[5] Plaintiffs state that Al-Ansar made martyr payments, but this assertion is based on unauthenticated screenshots or printed versions of webpages from seemingly local, but otherwise unidentified news sources, at least one of which appears to postdate the Attacks. (ECF Nos. 476-1; 476-2; 476-3; 476-4). Even if they could be authenticated, these websites are not admissible for the truth of the matter asserted. *See Philpot v. Kos Media LLC*, No. 16 Civ. 1523, 2017 WL 2270248, at *3 n.7 (S.D.N.Y. Apr. 21, 2017), *report and recommendation adopted* 2017 WL 2269531 (S.D.N.Y. May 23, 2017); *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 449 (E.D.N.Y. 2013) (finding that even where the court was assuming the websites could be authenticated, Hamas-affiliated websites purportedly claiming responsibility for attacks were inadmissible hearsay). There are no CAB transaction records or other evidence demonstrating the alleged martyr payments.

WL 2270248, at *3 n.7 (S.D.N.Y. Apr. 21, 2017) (finding that where a plaintiff provided an undated printout from a website with no other authenticating evidence, the printout could not be authenticated), *report and recommendation adopted* 2017 WL 2269531 (S.D.N.Y. May 23, 2017); *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 449 (E.D.N.Y. 2013) (finding that even assuming websites could be authenticated, Hamas-affiliated websites purportedly claiming responsibility for attacks were inadmissible hearsay).

Plaintiffs do not dispute that the identified organizational accountholders conducted charitable, civic or educational activities; rather, they assert that these non-violent activities assisted in growing public support for Hamas and/or that the organizations also were involved in Hamas terror activities such as indoctrination or making payments to family members of Hamas operatives who were killed or imprisoned. (Averbach Counter Statement ¶¶ 222, 256–58, 266–69, 285). Importantly, Plaintiffs do not provide any evidence connecting any of the organizational accountholders to the Attacks that injured Plaintiffs. (Averbach Counter Statement ¶¶ 152, 227).[6] There are no transactions involving these accountholders that are labelled or identified in any way that would suggest that CAB account funds were used in the

[6] Plaintiffs purport to dispute this; however, the only evidence cited relates to individual accountholder Abbas Al-Sayed's involvement in the Park Hotel Bombing Hamas's purported control of the organizations, not organizational involvement in any of the Attacks. (Averbach Counter Statement ¶ 152, 227). The evidence does not identify any organizational accountholder that is directly or indirectly tied to any of the Attacks. At best, Plaintiffs contend that certain Hamas leaders were involved in running the organizations and that in their role as leaders in Hamas they were involved in the Attacks. But they do not offer evidence that the organizational accountholders, as entities, funded or planned the Attacks or other violence through CAB accounts.

Attacks or, indeed, for any Hamas violence. *Id.* Nor is there any other evidence connecting the organizational accountholders to the Attacks that injured Plaintiffs. *Id.*

Nonetheless, there is evidence that many of the CAB organizational accountholders were considered by Israel and/or the United States as having ties to Hamas. Indeed, the bulk of Plaintiffs' submissions focus on the organizations' ties to Hamas. Israel designated fifteen of the organizations as being terrorist organizations or unlawful associations before some or all of the Attacks and designated another five of them after the Attacks. The United States designated one of the accountholders—HLF—as an SDGT before some of the Attacks. The United States designated three more of the organizational accountholders as SDGTs after the Attacks. (ECF Nos. 450-19 ("Certified List of Israeli Designations"); 450-76 ("List of Israeli Designations")).

One of the organizations, HLF, was convicted in the United States in 2008 of conspiracy to provide material support to an FTO, providing material support to an FTO in violation of 18 U.S.C. § 2339B, money laundering, and conspiracy to commit money laundering.[7] (CAB Counter Statement ¶ 110). HLF was alleged to have given money to Hamas through Hamas-controlled zakat committees and charitable societies, including some of the other CAB organizational accountholders identified in this action. (ECF No. 450-4 ("Superseding Indictment")). Although HLF contended at trial that its money went to promote peaceable, lawful conduct (i.e., the charitable activities of the zakat committees), the stated purpose of the money was irrelevant

[7] HLF was indicted on July 26, 2004. (ECF No. 450-4 ("Superseding Indictment"); ECF No. 450-21 ("Original Indictment")). Its 2008 conviction followed a mistrial in 2006. (Averbach Counter Statement ¶¶ 254–55). The 2008 conviction was affirmed on appeal in 2011. (CAB Counter Statement ¶ 113).

for liability under 18 U.S.C. § 2339B under a fungibility of money theory.[8] (Superseding Indictment; ECF No. 450-22 ("HLF Jury Verdict")); *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 16–17, 30–31 (2010). Eight of the CAB organizational accountholders were identified during the HLF trial as unindicted co-conspirators of HLF. (List of Israeli Designations; Certified List of Israeli Designations; HLF 2008 Verdict; ECF No. 450-42 ("List of Unindicted Co-Conspirators"); Averbach Counter Statement ¶¶ 232, 242; CAB Counter Statement ¶¶ 356, 435, 451, 578).

The organizational accountholder designations and dates of designations, as well as the entities identified as unindicted co-conspirators with HLF, are as follows:[9]

- *The Holy Land Foundation*
  - Designated by Israel on May 6, 1997, as an unlawful association.
  - Designated by the United States on December 4, 2001, as an SDGT.
  - Convicted by the United States of materially supporting terror on November 24, 2008.
- *The Islamic Charitable Society of Hebron ("ICSH")*
  - Designated by Israel on February 25, 2002, as an unlawful association.
  - Listed by the United States as an unindicted co-conspirator during the HLF trial in 2006 and retrial in 2008.
- *Ramallah Zakat Committee*
  - Designated by Israel on February 25, 2002, as an unlawful association.
  - Listed by the United States as an unindicted co-conspirator during the HLF trial in 2006 and retrial in 2008.
- *Jenin Zakat Committee*
  - Designated by Israel on February 25, 2002, as an unlawful association.
- *Nablus Zakat Committee*
  - Possibly designated by Israel in 2006.[10]

---

[8] Liability under JASTA, in contrast to 18 U.S.C. § 2339B, requires proof that the aider-and-abettor knowingly and substantially assisted an act of international terrorism, not merely that an entity provided material support to an FTO. *Honickman v. BLOM Bank Sal*, 6 F.4th 487, 497–99 (2d Cir. 2021) (discussing difference between liability under 18 U.S.C. §2339B and JASTA and recognizing that JASTA requires more than the provision of material support to an FTO and the non-applicability of the fungibility of money theory for JASTA claims): *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329–30 (2d Cir. 2018) (same)).

[9] There is no evidence that the Hebron Zakat Committee was ever designated by Israel or the United States.

[10] The page that Plaintiffs cite to indicate the designation of the Nablus Zakat Committee does not appear in the attached exhibit, and the Court is unable to verify this information. (*See generally* List of Israeli Designations; CAB

  - Listed by the United States as an unindicted co-conspirator during the HLF trial in 2006 and retrial in 2008.
- *Tulkarem Zakat Committee*
  - Designated by Israel on February 25, 2002, as an unlawful association.
- *Qalqilya Zakat Committee*[11]
  - Listed by the United States as an unindicted co-conspirator during the HLF trial in 2006 and retrial in 2008.
- *World Assembly of Muslim Youth ("WAMY")*
  - Designated by Israel on February 25, 2002, as an unlawful association.
- *Islamic Solidarity ("Al Tadamun") Charitable Society – Nablus*
  - Designated by Israel on February 25, 2002, as an unlawful association.
- *Al Salah Islamic Society – Gaza*
  - Designated by Israel on February 25, 2002, as an unlawful association.
  - Designated by the United States on August 7, 2007, as an SDGT.
  - Listed by the United States as an unindicted co-conspirator during the HLF trial in 2006 and retrial in 2008.
- *Al Islah Charitable Society in Ramallah and Al-Bireh*
  - Designated by Israel on February 25, 2002, as an unlawful association.
- *Islamic University of Gaza*[12]
  - Listed by the United States as an unindicted co-conspirator during the HLF trial in 2006 and retrial in 2008.
- *The Islamic Society – Gaza*
  - Designated by Israel on February 25, 2002, as an unlawful association.
  - Listed by the United States as an unindicted co-conspirator during the HLF trial in 2006 and retrial in 2008.
- *Islamic Center (or Complex) – Gaza*
  - Designated by Israel on February 25, 2002, as an unlawful association.
  - Listed by the United States as an unindicted co-conspirator during the HLF trial in 2006 and retrial in 2008.
- *Al-Wafa Charitable Society*
  - Designated by Israel on February 25, 2002, as an unlawful association.
- *Muslim Youth Association of Hebron / Young Men's Muslim Association – Hebron*

---

Counter Statement ¶ 578). Plaintiffs cite to page 74, however the exhibit ends on page 73. (CAB Counter Statement ¶ 578).

[11] Plaintiffs tie this accountholder to Hamas based on a letter dated June 10, 2002, sent by Qalqilya Zakat Committee to CAB, which stated that "Occupation Forces" had "seized all of the Committee's files" and requested additional account statements. (CAB Counter Statement ¶ 621; ECF No. 453-25). However, this letter does not state the full context of the seizure of the documents, nor does it mention terror activity or involvement with Hamas terror as grounds for the seizure.

[12] The Islamic University of Gaza was the focus of various Israeli military and Palestinian Authority operations due to purported intelligence and searches that revealed weapons and ammunition hidden throughout the University. (ECF No. 464-7 ("Spitzen Report"), at 86–87, 89–91). Plaintiffs do not assert that any of these weapons were purchased by the Islamic University of Gaza through funds in its CAB account, or that CAB had any knowledge of these occurrences prior to any of the Attacks.

    - Designated by Israel on February 25, 2002, as an unlawful association.
- *Beit Fajar Zakat Committee*
    - Designated by Israel on February 2, 2005, as an unauthorized association.
- *Quran and Sunnah Society*
    - Designated by Israel on February 25, 2002, as an unlawful association.
- *Union of Good*[13]
    - Designated by Israel on February 25, 2002, as an unlawful association.
    - Designated by the United States on November 12, 2008, as an SDGT.
- *Islamic Society for Orphan Welfare Yatta*
    - Possibly designated by Israel on December 28, 2008.[14]
- *Welfare Association for Palestinian and Lebanese Families*
    - Possibly designated by Israel on December 28, 2008.[15]
    - Designated by the United States on October 4, 2012.
- Al Ansar Charitable Society
    - Designated by Israel on October 24, 2003, as an unauthorized association.
    - Designated by the United States as an SDGT on some date unidentified by Plaintiffs.[16]

The parties do not dispute the official designations by Israel and/or the United States. Nor is there any dispute that CAB accountholder HLF was convicted in the United States in 2008 of providing material support to an FTO in violation of 18 U.S.C. § 2339B, among other crimes.[17] (CAB Counter Statement ¶ 110). CAB admits that it was aware of U.S. designations, because the Palestinian Monetary Authority ("PMA") mandated compliance with the U.S. Office of Foreign Assets Control ("OFAC") designations, as did the Central Bank of Jordan ("CBJ").

[13] The Union of Good appears on the List of Israeli Designations at ECF No. 450-76, but not on the Certified List of Israeli Designations at ECF No. 450-19.

[14] Plaintiffs' translation is incomplete on its list of entities designated by Israel. However, on page 92, it appears that the "Yatta [I]slamic society for orphans welfare" was designated, although the details are untranslated. (ECF No. 450-76 ("List of Israeli Designations"), at 92).

[15] Plaintiffs' translation is incomplete on its list of entities designated by Israel. However, on page 91, it appears that the "Palestinian and [L]ebanese families welfare trust" was designated, although the details are untranslated. *Id.* at 91.

[16] Plaintiffs state that Al Ansar was designated by the United States, but do not provide a date for the designation. (Averbach Counter Statement ¶¶ 51, 134, 136). Further, the link Plaintiffs cite does not provide a date for the designation. *Id.*

[17] HLF was indicted on July 26, 2004. (ECF No. 450-4 ("Superseding Indictment"); ECF No. 450-21 ("Original Indictment")). Its 2008 conviction followed a mistrial in 2006. (Averbach Counter Statement ¶¶ 254–55). The 2008 conviction was affirmed on appeal in 2011. (CAB Counter Statement ¶ 113).

(Averbach Counter Statement ¶¶ 382, 384–85, 407; CAB Counter Statement ¶ 125). Thus, it was aware of HLF's designation as an SDGT in December 2001. (CAB Counter Statement ¶ 125 (stating CAB became aware of the designation on December 5, 2001, due to the time difference)).[18]

CAB disputes that it was aware of Israel's designations. According to Plaintiffs' witness, Yitzchak Blum, former Director of the Department of International Affairs in the Office of the State Attorney in the Israel Ministry of Justice, Israel's designations were published in the Official Gazette of the State of Israel.[19] (List of Israeli Designations at 71; CAB Counter Statement ¶ 356, 652–53. *See generally* Certified List of Israeli Designations). Additionally, Plaintiffs' witness Shlomo Politis, a former legal advisor to the IDF, attests that he translated Israeli "laws, rules and regulations concerning the West Bank" into Arabic for general distribution to the public in the West Bank. (ECF No. 280-4 ("Declaration of Col. (ret.) Shlomo Politis") ¶ 8). According to Politis, Israeli designations that an entity was an "unlawful association" and/or a terrorist organization and not allowed to operate in the Palestinian territories were included on a list printed in Arabic at the Civil Administration of Judea and Samaria and distributed to the Israeli District Civil Liaison Offices ("DCLs").[20] *Id.* ¶¶ 24, 31. These DCLs in turn "made [the distributions] available to Palestinian DCLs during their frequent meetings." *Id.* ¶ 27. There is no evidence that CAB was on any distribution list identifying the

[18] The Parties disagree on when CAB became aware of HLF's designation (it was either December 4 or December 5, 2001). But this dispute is not material to the outcome of the motions.
[19] The evidence is unclear whether the Israeli designations of Qalqilya Zakat Committee, Hebron Zakat Committee, Al Ansar Charitable Society, and Islamic University of Gaza were ever published in this manner.
[20] DCLs deal with day-to-day civil affairs such as granting work permits, issuing business licenses, and authorizing permits for family visits and health treatments in Israel. (ECF No. 280-4 ("Declaration of Col. (ret.) Shlomo Politis") ¶ 25).

CAB accountholders as outlawed institutions, and there is no other evidence that CAB was aware that any of its customers were on Israel's outlawed institutions list. Khalid Mahmoud Al-Qassem, Deputy Chief Executive Officer & Chief Shared Services Group Officer at CAB,[21] testified during his deposition that during the relevant period CAB was "not aware of any Israeli sanctions lists" and that the PMA, its governing authority, did not publish Israeli lists. (ECF No. 453-1 ("Al-Qassem July 2024 Deposition"), at 30:13–31:4; Averbach Counter Statement ¶ 418). There also is no dispute that the PMA published a circular on November 11, 2001, instructing all banks in Palestine (which included CAB) to not "communicate with the official Israeli side or coordinate with the Bank of Israeli or Israeli banks . . . without prior coordination with the Palestinian Monetary Authority and obtaining its approval." (ECF No. 464-74; Averbach Counter Statement ¶ 402). All of this amounts to a lack of evidence that CAB had actual knowledge of any Israeli designations. Regardless, even if CAB was aware of the Israeli designations pre-dating the Attacks, this is not material to the outcome of the motions, as discussed below. Additionally, designations post-dating the Attacks are not relevant because they do not go to CAB's general awareness or knowledge about a customer's possible ties to Hamas during the relevant time period. *See, e.g.*, *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 442 (2d Cir. 2025) (finding that "any subsequently confirmed connection between the Companies and the intelligence agency did not taint the nature of SCB's services at the time it provided them"); *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 872 (D.C. Cir. 2022).

---

[21] Al-Qassem was employed by CAB between 1997 and 2003 and has been re-employed since 2008. (ECF No. 462 ("Al Qassem April 16, 2026 Declaration") ¶ 1).

Finally, there are three organizations designated by Israel and the United States that were not CAB accountholders but that sent funds to CAB accountholders. These accountholders were the Al Aqsa Foundation ("Al Aqsa"), Le Comité de Beinfaisance et de Secours aux Palestiniens ("CBSP"), and the Palestinian Relief Development Fund ("Interpal"). Israel designated all three on May 6, 1997, as unauthorized associations.[22] (List of Israeli Designations at 70; Certified List of Israeli Designations at 2–5). The U.S. designated Al Aqsa on May 29, 2003, and CBSP and Interpal on August 22, 2003. (Averbach Counter Statement ¶ 232). There is no dispute about these designations.

**3. Individual Accountholders**

Plaintiffs also assert that CAB aided and abetted Hamas in its violence and the Attacks in which they were injured by providing banking services to eleven individuals who they say are associated with Hamas in some capacity. These individual accountholders include, Abbas Al-Sayed, Mohamed Saleh Taha, Ghazi Hamad, Sayed Abu Musameh, Abdul Khaliq Al-Natsha, Nayef Rajoub, Abd Al-Rahim Al-Hanbali, Azam Nu'man Abd Al-Rahman Salhab Al-Tamimi, Muhammad Eid Misk, Bahjat Abd Muhammad Odeh, and Muhammad Mustafa Kharyush. They also identify three accountholders who Plaintiffs assert received prisoner or martyr payments: Jamal Hilmi Yaghmur, Abed El-Qader Ibrahim Mahmud Hijaz, and Aziz Hasan Arman. (Averbach Counter Statement ¶¶ 135, 305; CAB Counter Statement ¶¶ 213, 220, 222, 231, 245, 251, 275, 276, 282). There is no evidence that any of these individual accountholders were ever

[22] Israel again designated these entities on January 17, 1998, as terrorist organizations under the Prevention of Terrorism ordinance. (ECF No. 450-76 ("List of Israeli Designations") at 70). Of note, the List of Certified Israeli Designations lists this date as January 27, 1998, but as this is not a material dispute. (ECF No. 450-19 ("Certified List of Israeli Designations"), at 2–5).

designated or put on any sanctions list by Israel or the United States before the Attacks or during the Second Intifada. (Averbach Counter Statement ¶¶ 299–302). There is no evidence that CAB knew of these individuals' alleged involvement in Hamas or, in the case of the people who allegedly received prisoner or martyr payments, their alleged relationship to Hamas operatives prior to the Attacks.

The primary individual accountholder that Plaintiffs focus on is Abbas Al-Sayed. There is no dispute that Al-Sayed was convicted in Israel of planning the Park Hotel Bombing, one of the Attacks at issue in this case. (CAB Counter Statement ¶¶ 205–08, 210). Plaintiffs focus on seven transactions reflecting payments into Al-Sayed's CAB bank account. These payments, totaling 69,000 dollars, were made by an individual named Yousef El-Hayek from an account at Arab Bank. (CAB Counter Statement ¶¶ 192–93; ECF No. 450-36 ("Transactions Between El-Hayek and Al-Sayed")). The last of the seven transfers from El-Hayek is dated May 11, 2001, approximately ten months before the Park Hotel Bombing. (Averbach Counter Statement ¶ 127; CAB Counter Statement ¶¶ 192–93; Transactions Between El-Hayek and Al-Sayed). The transaction records provided do not contain any memo line or indication as to the purpose of the payments. (*See generally* Transactions Between El-Hayek and Al-Sayed). There is no information provided about El-Hayek.

Plaintiffs generally claim that the funds "deposited into al-Sayed's bank accounts were used to finance terror attacks, acquire weapons, and pay Hamas operatives in the field" but do not in fact provide any evidence that the money from El-Hayek or from Al-Sayed's CAB account generally was used for the Park Hotel Bombing or any of the other Attacks or, indeed, any violence at all. (CAB Counter Statement ¶ 194). All Plaintiffs cite to for their claim is their

expert Arieh Spitzen's report. Spitzen, a former officer and commander in the Palestinian Affairs Department ("PAD") in the Civil Administration in Judea and Samaria and a former commander of PAD in the Israeli Ministry of Defense, does state that Al-Sayed used his CAB account to conduct this terror activity; however, he only cites to the El-Hayek transactions, which contain no indication that the transactions were used for terror. (ECF No. 464-7 ("Spitzen Report"), at 182). Further, the basis for Spitzen's assertions about Al-Sayed's "accounts" being used to buy weapons, finance attacks, and pay Hamas operatives is a record from an Israeli police interrogation of Al-Sayed. *Id*. Spitzen does not state that he was present for the interrogation, and a copy of the interrogation record to which he refers was not attached to his report that was submitted to the Court.[23] *Id.* There is a copy of a police interrogation of Al-Sayed that was submitted to the Court, but it is unclear if this was the interrogation record to which Spitzen was referring. This document, assuming it could be authenticated, references only Arab Bank, not CAB. (ECF No. 464-22; Averbach Counter Statement ¶ 148). CAB rightly objects on evidentiary grounds to the Court's consideration of Spitzen's statement and the interrogation record for the truth of the matter asserted, among other evidentiary grounds. What Al-Sayed said to Israeli police interrogators as reflected in a record that was described by Spitzen is clearly inadmissible for the truth of the matter asserted, including that it is hearsay within hearsay. Fed. R. Evid. 801, 802; *see also United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (finding that although an expert may rely on hearsay, they may not "simply transmit that hearsay to the jury"). Thus, the Court does not consider Spitzen's statements about what Al-Sayed said in his police interrogation in connection with the motions. Accordingly, there is no

[23] There is a reference to an Appendix to the Spitzen's Report, but it was not provided in full to the Court.

evidence that Al-Sayed used his CAB account to fund or plan the Park Hotel bombing or any other terror activities.

Plaintiffs point to a CAB document from 2012 that shows CAB may have been aware that Al-Sayed was incarcerated in Israel for the Park Hotel Bombing. (ECF No. 453-8 ("Al-Sayed Account Documents"), at 28). They also point to documents from 2020 showing that Al-Sayed's wife[24] withdrew approximately 100,000 dollars from Al-Sayed's CAB account in 2020. (*Id*. at 30–33; CAB Counter Statement ¶¶ 214, 17). This information is not material to the outcome of the motions because it post-dates the Attacks and does not bear on CAB's awareness or knowledge during the relevant period.[25]

Plaintiffs identify three other individual CAB accountholders, Mohamad Taha,[26] Ghazi Hamad, and Sayed Musameh, who received money from El-Hayek. (ECF Nos. 450-41; 450-46; 450-47). But again, Plaintiffs do not provide any information about El-Hayek. They do not provide evidence of any money from these individual CAB accounts being linked to the Attacks at issue in this case or any terror. (Averbach Counter Statement ¶¶ 299–300, 302–04).

Similarly, although Plaintiffs' experts identify some of the individual accountholders, including Al-Natsha and Taha, as being leaders within Hamas, there is no evidence that any of the individual accountholders used their CAB accounts to plan, fund or carry out the Attacks at

[24] Plaintiffs allege that Al-Sayed's wife was a Hamas operative on the grounds that she was an employee of the Tulkarem Zakat Committee and ran for the Palestinian Legislative Counsel. (CAB Counter Statement ¶¶ 218–19; Spitzen Report, at 182 n.939). However, Plaintiffs provide no evidence that she was engaged in terror activity.

[25] Plaintiffs contend that two other CAB accountholders, Odeh and Kharyush, were perpetrators of the Park Hotel bombing, but do not cite to any evidence to support this statement. (Averbach Counter Statement ¶¶ 134–35, 440). Plaintiffs do not cite to any transactions involving the Odeh and Kharyush accounts or any transactions between and among al-Sayed, Odeh and Kharyush. (Averbach Counter Statement ¶ 138).

[26] Of note, CAB highlights that the documents supposedly supporting Plaintiffs' assertions regarding Taha's account were not produced by CAB and therefore their accuracy cannot be confirmed. (CAB Counter Statement ¶ 222).

issue in this case or any violence. (Averbach Counter Statement ¶¶ 299–300, 302–04; CAB Counter Statement ¶¶ 223, 252).

Plaintiffs rely primarily on two experts, Arieh Spitzen and Matthew Levitt, to contend that Al-Sayed, al-Natsha, Taha and others were involved in Hamas and in Hamas violence. CAB objects to Plaintiffs' experts' reports and proffered testimony as being premised on hearsay and used as a conduit for hearsay without opinion or analysis. The Court has examined all of the citations within the expert reports. In addition to citing to reports of interrogations that were not submitted to the Court and that are not admissible for the reasons set forth above,[27] they cite to newspaper articles, online news forums, books and translated and untranslated websites to make assertions that particular individual accountholders were involved in Hamas and did certain things related to Hamas. (*See generally* Spitzen Report; ECF No. 464-8 ("Levitt Report")). Although Plaintiffs' expert witnesses may rely on hearsay, a party generally may not rely on this type of evidence for the truth of the matter asserted. Fed. R. Evid. 703, 801; *Strauss*, 925 F. Supp. 2d at 449 (finding that claims of responsibility for terror attacks on websites were not admissible as hearsay, even assuming the websites were authenticated); *Mejia*, 545 F.3d at 197 (finding that although an expert may rely on hearsay, they may not "simply transmit that hearsay to the jury"); *see also In re Columbia Sec. Litig.*, 155 F.R.D. 466, 474 (S.D.N.Y. 1994) ("Often, when offered to prove that certain statements were made, newspaper and magazine articles are held inadmissible as hearsay"); *Mandal v. City of New York*, Nos. 2 Civ. 1234, 2 Civ.

---

[27] Plaintiffs repeatedly cite to Al-Natsha's 2002 interrogation by Israeli police to support his involvement in Hamas. (ECF No. 450-49 ("Al-Natsha Interrogation"); CAB Counter Statement ¶¶ 482–83). For the same reasons discussed above in connection with information allegedly conveyed by Al-Sayed in his interrogation, the Court does not consider any of the information supposedly conveyed during the interrogation of Al-Natsha for the truth of the matter asserted. Fed. R. Evid. 801, 803. And, in any event, there is no evidence that CAB was aware of information allegedly conveyed during any interrogation.

1367, 2 Civ. 6537, 2006 WL 3405005, at *1 (S.D.N.Y. Nov. 26, 2006) ("Newspaper articles are usually inadmissible hearsay.") (collecting cases).

Levitt also cites to an unverifiable Special Information Bulletin from the Intelligence and Terrorism Information Center at the Center for Special Studies that is provided via a terrorism.org archive link and a 2001 memorandum from the Federal Bureau of Investigation ("FBI") (the "Watson Memorandum"). (*See generally* Levitt Report). CAB objects to introduction of facts from these documents on hearsay grounds, among other evidentiary objections. The Special Information Bulletin appears to be a consolidation of information on recent terror activity with very few citations or information about where the information is from. (Levitt Report at 95 n. 605–06). The bulletin is only accessible to the Court through an archive website link that is not authenticated, and the information cited to within the bulletin is likely inadmissible hearsay within hearsay, because Plaintiffs do not identify any witness that could testify to the bulletin's creation or the information contained therein, which although Levitt may rely on it, cannot become admissible itself for the truth of the matter asserted through his testimony. (ECF No. 464-8, at 95 n. 605–06); Fed. R. Evid. 801, 703; *Strauss*, 925 F. Supp. 2d at 449; *Mejia*, 545 F.3d at 197. The Watson Memorandum, which Plaintiffs directly cite to a number of times, similarly contains hearsay.[28] (*See generally* CAB Counter Statement; ECF No. 450-5 ("Watson Memorandum")). But regardless, nothing in Plaintiffs' experts reports or the news articles, books, confidential intelligence reports and the like cited therein discusses *CAB's* involvement in or knowledge of these individual accountholders' Hamas terror activities

[28] Spitzen's report similarly relies on, among other things, inaccessible websites, an unattached letter from 2002 between ICSH and Arab Bank, and an unattached Israeli Security Agency ("ISA") expert opinion. (CAB Counter Statement ¶¶ 287–92; Spitzen Report at 124).

or use of CAB accounts in terror. Thus, the evidentiary disputes and the facts supposedly supported by the expert reports and cites therein—which go primarily to CAB's general awareness that certain customers were affiliated with Hamas—are not material to the outcome of the motions, and it is not necessary to resolve all of them, as discussed below.

There are several CAB individual accountholders that Plaintiffs assert received prisoner or martyr payments. These include Al-Hanbali, Jamal Hilmi Yaghmur, Abed el-Qader Ibrahim Mahmud Hijaz, and Aziz Hasan Arman. Starting with Al-Hanbali, Plaintiffs allege this individual was a martyr payment beneficiary for Muhammad Abd Al-Rahim Al-Hanbali, an alleged Hamas operative who carried out the Ariel Bombing—one of the Attacks at issue in this case. To support this assertion, Plaintiffs cite to: (1) a list they prepared during discovery that listed Al-Hanbali as a "Martyr payment beneficiary (father of Muhamad al-Hanali)" for purposes of having CAB seek customer waivers so it could produce account information; (2) a November 2025 Declaration of CAB witness Khalid Mahmoud Al Qassem describing steps CAB took to obtain the customer waivers; and (3) CAB account documents that are partially untranslated and do not, on their face, evidence any familial relation between the accountholder, Al-Hanbali, and his purported son, Muhammad Abd Al-Rahim Al-Hanbali. (ECF Nos. 453-24; 464-58; 475-6; 465-19; Averbach Counter Statement ¶¶ 68, 325, 330). Apart from having the same name, the basis for identifying the CAB accountholder Al-Hanbali as the father of the alleged Hamas operative Al-Hanbali is unclear, as is the basis for stating that the alleged Al-Hanbali son was a Hamas operative who carried out the Ariel Bombing. Furthermore, Plaintiffs do not point to any transactions that are identifiable as martyr or prisoner payments going into the Al-Hanbali CAB account. Turning to the remaining three individual accountholders, there similarly is no

evidence that their CAB accounts received martyr or prisoner payments. Rather, Plaintiffs again merely cite to the list they prepared during discovery and CAB's response to the inquiry as to whether it had an account under the names provided. (ECF Nos. 453-24; 464-58; Averbach Counter Statement ¶¶ 31, 78, 115, 125, 134, 305, 325). The account documents associated with these CAB accountholders that are translated do not demonstrate the familial relationship between the CAB accountholder and the alleged Hamas operative for whom they were allegedly a beneficiary or the basis for saying that the Hamas operative was in fact a Hamas operative. Nor do they show any indication that any payments into these individuals' CAB accounts were martyr or prisoner payments.[29] (ECF Nos. 465-20 ("Hijaz Account Documents"); 465-21 ("Arman Account Documents"); 465-22 ("Yaghmur Account Documents"); 475-6, 475-7; 475-8; Averbach Counter Statement ¶ 330).[30]

#### 4. CAB's conduct

Although CAB produced some information in this case, CAB did not have access to all of its account information due to the fact that CAB sold all its branches in the Palestinian territories between 2003 and 2005, and this case was not brought until 2019. (Averbach Counter Statement ¶ 13). Plaintiffs obtained many banking records pertaining to CAB through subpoenas to non-parties. They ultimately obtained and produced numerous transaction

[29] Plaintiffs attempt to shift the burden of proof repeatedly in their papers, suggesting that CAB cannot prove the absence of martyr or prisoner payments, only underscoring that they lack evidence. (Averbach Counter Statement ¶ 330).

[30] There is a dispute about whether two other documents reflect martyr payments. The documents are not on CAB letterhead and appear to have been seized in a raid of an unidentified Hamas-affiliated entity. They appear to be applications from individuals to the entity seeking martyr payments and indicating that payments should be made into a CAB account. It is unclear who the applicants are, and it is also unclear whether any payments were subsequently made into CAB accounts. There is no evidence that CAB would have been aware that payments it was receiving were martyr payments, if payments were made. (Averbach Counter Statement ¶¶ 332–37; ECF Nos. 464-67; 464-68).

records and account documents, many of which are detailed in their forensic accounting expert Gottlieb's report. (*See generally* Gottlieb Report). The transaction records provided show routine banking services to the accountholders; Plaintiffs provide no evidence that CAB provided any preferred terms, special services, or exemptions to the organizational and individual accountholders discussed above. (Averbach Counter Statement ¶ 343).[31]

Plaintiffs focus on the following transactions to suggest that CAB is liable for aiding-and-abetting Hamas: (1) a series of transactions from Yousef El-Hayek into Al-Sayed's account (discussed above), (2) transactions between the Al Aqsa and Interpal and CAB accountholders after Al Aqsa and Interpal were designated as SDGTs by the United States; and (3) transactions with the HLF accounts after HLF was designated as an SDGT by the U.S.. However, Plaintiffs do not provide any evidence tying any transaction, including the ones they focus on, to terror activity or the Attacks that injured Plaintiffs. I do not repeat the information about the Al-Sayed account transactions here, but describe the Al Aqsa, Interpal, and HLF transactions below.

a. <u>The Al Aqsa and Interpal Post-Designation Transactions</u>

As noted above, Al Aqsa was designated by the United States as an SDGT on May 29, 2003. (CAB Counter Statement ¶ 663). Plaintiffs, through their expert, identify five transactions postdating Al Aqsa's designation reflecting transfers of funds from Al-Aqsa to two CAB organizational accountholders: Jenin Zakat Committee and WAMY. (ECF No. 465-13 ("Gottlieb Report") at 109). Neither of the CAB accountholders were designated SDGTs at the time, although they had been designated by Israel as unlawful associations. *See supra.* David Alfaro,

[31] Plaintiffs purport to dispute this statement on the grounds that "knowingly offering Hamas-affiliated persons or entities with financial services is [] a form of special treatment or preferential terms" and that it is not routine. (Averbach Counter Statement ¶ 343). However, this is not a true or material dispute.

CAB's expert, reviewed underlying documents for the five transactions and noted that four of the five transactions were blocked or otherwise cancelled. (Averbach Counter Statement ¶ 290).[32] Plaintiffs indicated in their Rule 56.1 statement that they were "[a]ccepting, *arguendo*" Alfaro's corrections regarding the Al Aqsa transactions. (Averbach Counter Statement ¶ 166; CAB Counter Statement ¶ 658). The one transaction that purportedly was processed and not blocked or cancelled occurred on November 21, 2023, and reflects a transfer in the amount of 66,181.34 dollars from Al Aqsa to the Jenin Zakat Committee. (CAB Counter Statement ¶¶ 664–65; ECF No. 465-26 ("Alfaro Report") ¶ 44). This transaction occurred after the last Attack and is not relevant to the outcome of the motions for the reasons discussed below.

Plaintiffs identify approximately 30 transactions that CAB processed with Interpal following its designation by the United States on August 22, 2003 (which was after the Attacks at issue in this case). (Averbach Counter Statement ¶ 264; Gottlieb Report at 111). The transactions reflect transfers of money to CAB organizational accountholders ICSH, Jenin Zakat Committee, Nablus Zakat Committee, WAMY, Al Tadamun Charitable Society–Nablus, Al Wafa Charitable Society, Muslim Youth Association of Hebron / Young Men's Muslim Association–Hebron, Beit Fajar Zakat Committee, and Islamic Society for Orphan Welfare–Yatta. (Gottlieb Report at 111).[33] None of the CAB accountholders were designated by the U.S. as SDGTs at the time of the transactions, although some were designated as unlawful associations by Israel. *See*

[32] The parties did not provide the Court with the Al Aqsa transaction documents.
[33] Gottlieb's report also includes a transaction to CAB accountholder Ithna Zakat Committee; however, this committee is not identified as Hamas-controlled by Plaintiffs, nor do Plaintiffs implicate it in any of the Attacks. Therefore, the Court does not incorporate it in its discussion. (Gottlieb Report at 111).

*supra*. Of the transactions that postdate Interpal's designation by the U.S., two were incorrectly notated by Plaintiffs' expert, Gottlieb, as having occurred in 2007, when they actually occurred in 1997, a correction by Alfaro that the Plaintiffs have accepted for the sake of these motions. (Alfaro Report ¶ 42; Averbach Counter Statement ¶ 166; CAB Counter Statement ¶ 659). The remaining 28 transactions postdate the last Attack by at least a month. (Gottlieb Report at 111). Plaintiffs provide no evidence that the above transactions, or any transaction from Al Aqsa or Interpal to CAB accountholders, funded the Attacks or were used to fund violent activities as opposed to charitable activities. (Averbach Counter Statement ¶¶ 177, 261, 291, 294). The transactions post-dating the Attacks are not relevant to the outcome of the motions for reasons discussed below.

b. HLF Transactions Post-Designation

Plaintiffs cite to a series of transactions that occurred after the United States announced on December 4, 2001, that it was designating HLF as an SDGT. (CAB Counter Statement ¶¶ 104, 128–34. *See generally* Gottlieb Report). The transactions span from December 5, 2001, to approximately December 31, 2001, and, for the purposes of the motions, the Court assumes that CAB processed these transactions with knowledge of HLF's designation by the United States. Plaintiffs provide no evidence that these transactions funded any of the Attacks that injured them, or terror activity generally. (Averbach Counter Statement ¶¶ 177–78, 253, 448–49). Plaintiffs also do not provide evidence that HLF was connected in any way to the Attacks.[34]

[34] To the extent that Plaintiffs dispute this, they do not provide any evidence of tying HLF to any of the Attacks or any specific violence, but rather make vague assertions related to the HLF trial and its conviction of providing material support to Hamas, a designated FTO. (Averbach Counter Statement ¶ 448; (ECF No. 450-22 ("HLF Jury Verdict")). As noted above, although there is no doubt HLF was convicted for providing material support to

c. Warnings CAB Received

Plaintiffs identify a series of meetings that their witness, Ehud Levi purportedly had with CAB senior officers. Although these meetings are disputed—CAB asserts that they did not occur—as discussed in further detail below, the dispute is not material. Nevertheless, the Court provides a brief factual summary here of the purported meetings and their details.

Levi previously served in the Israeli Defense Forces ("IDF"), particularly in the Civil Administration of Judea and Samaria from 1991 to 1996, the Prime Minister's Office to the National Defense Council, and the Counter-Terrorism Bureau from 1997 to 2001,[35] and then subsequently served in the Mossad (intelligence and special missions) until 2016. (ECF No. 450-20 ("Levi Deposition") at 9:21–14:24). Levi testified in his deposition that he met with CAB senior managers on three different occasions, both in his role at the Prime Minister's Office and as a part of the Mossad, in 1995, 1997, and 2003. *Id.* at 47:19–55:2, 63:15–66:9, 69:8–74:24, 88:21–93:18). For each of these meetings, he does not recall the precise date and time of the meetings,[36] and for the 1997 and 2003 meetings, Levi was unable to recall who he met with from CAB. *Id.* at 49:6–55:2, 63:15–22, 68:14–70:10, 71:1–73:19, 74:10–75:3, 88:21–94:6. However, Levi did testify that the thrust of each of the meetings was to warn CAB generally

---

Hamas, the government was not required to prove that HLF knowingly and substantially assisted an act of international terrorism to prove liability under 18 U.S.C. § 2339B. *See supra*, n. 8. No evidence has been presented to this Court from that trial showing that HLF funded the Attacks in this case.

[35] It is unclear from Levi's deposition whether he left the Prime Minister's Office in 2002, 2003, or in 2001 as stated at the beginning of the deposition. (ECF No. 450-20 ("Levi Deposition") at 9:21–14:24, 75:4–77:3). However, this is not material or disputed.

[36] The lack of clarity presents an issue with the 2003 meeting, as it is unclear whether this meeting postdates or predates the last Attack at issue in this case. Although Levi was asked during his deposition whether the 2003 meeting "f[e]ll between the Second Intifada or Al-Aqsa Intifada," and answered "Yes. In 2003, yes," no specific date is provided, so it is unclear whether the meeting predates the last Attack here. (Levi Deposition at 92:19–92:22).

about money flowing through CAB from or to HLF, Interpal, Al Aqsa, and CBSP and funding terror through zakat committees. The third and final meeting included a warning that Israel "had decided to take aggressive action . . . against the banks." *Id.* at 47:19–55:2, 63:15–66:9, 69:8–75:3:24, 88:21–94:6. Levi testified that, based on his memory, he met with Yazid Adan al-Mufti, who Levi identified as "the regional manager of the Palestine region." Id. at 49:1–49:14. However, Al-Mufti disputes this assertion, stating that he denies having met with Levi in 1995, as well as in the subsequent years, and that he was not a regional manager for CAB, but a general manager of the bank based out of Jordan. (ECF No. 481 ("Al-Mufti Declaration") ¶¶ 9, 12–14). Levi does not state that he identified any specific CAB customers other than HLF who allegedly were funding terror. (Levi Deposition at at 47:19–55:2, 63:15–66:9, 69:8–74:24, 88:21–93:18).[37] At the time of the first two meetings, HLF was not a designated SDGT and U.S. banks were processing payments for HLF. By the time of the 2003 meeting, CAB appears to have ceased doing business with HLF, as the last transaction with it identified in the motion papers occurred in December 2001. *See supra.*

## LEGAL STANDARDS

### 1. Principles Governing Summary Judgment

"Summary judgment is warranted if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

[37] Although Levi indicated in his deposition that he emphasized the money being funneled through HLF and "the charitable associations and zakat committees that we mentioned earlier," he does not identify which of the zakat committees and charitable associations previously identified in his deposition were discussed with CAB specifically. (Levi Deposition at 31:7–35:2, 51:23–52:3)

judgment as a matter of law." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)). A fact is "material" if "it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). However, "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

In deciding the motion, the Court must resolve all ambiguities and draw all inferences in favor of the nonmoving party. *Jeffreys*, 426 F.3d at 553. However, a mere "scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat summary judgment; rather, "there must be evidence on which the jury could *reasonably* find" for the nonmoving party. *Id.* at 554. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (emphasis in original). "[M]ere speculation and conjecture" are not sufficient "to preclude the granting of the motion." *Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

On cross-motions for summary judgment, the court "evaluate[s] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences

against the party whose motion is under consideration." *Jingrong v. Chinese Anti-Cult World Alliance Inc.*, 16 F. 4th 47, 56 (2d Cir. 2021) (quoting *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)).

**2. Principles Governing Personal Jurisdiction**

"[T]he plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)). The showing a plaintiff must make to defeat a defendant's challenge to the court's personal jurisdiction over it "varies depending on the procedural posture of the litigation" and the motion brought by the defendant. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).

Before jurisdictional discovery, the plaintiff need only make a prima facie showing of jurisdiction, and it can make this showing "solely by allegations." *Id.* at 84–85. Where jurisdictional discovery has been conducted, a plaintiff must make a prima facie showing that is "factually supported," i.e., the showing must "include an averment of facts that, if credited by [the factfinder], would suffice to establish jurisdiction over the defendant." *Id*.

Following jurisdictional discovery, the defendant can challenge the plaintiff's averment of jurisdictional facts in one of three ways:

> (1) by a Rule 12(b)(2) motion, which assumes the truth of the plaintiff's factual allegations for purposes of the motion and challenges their sufficiency, (2) by a Rule 56 motion, which asserts that there are undisputed facts demonstrating the absence of jurisdiction, or (3) by a request for an adjudication of disputed

> jurisdictional facts, either at a hearing on the issue of jurisdiction or in the course of trial on the merits.

*Id* at 85. Here, Defendant challenges personal jurisdiction under Rule 56. Therefore, the Court must look to the undisputed facts when considering whether it may properly exercise personal jurisdiction. *Id.*

## DISCUSSION

### 1. Personal Jurisdiction

Personal jurisdiction is a "threshold question" that "must precede merits." *In re Rationis Enterprises, Inc. of Panama*, 261 F.3d 264, 268 (2d Cir. 2001). For a federal court to lawfully exercise personal jurisdiction over a party, there must be a statutory basis for personal jurisdiction under the laws of the forum state, and the exercise of personal jurisdiction must be consistent with federal due process requirements. *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005).

Where, as here, the defendant is a foreign corporation, a court must have "specific" jurisdiction over the defendant, meaning "there must be an 'affiliation between the forum and the underlying controversy.'" *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 262 (2017) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). That is, the plaintiff's claim "'must arise out of or relate to the defendant's contacts' with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) (citation omitted).

The applicable New York long arm statute provides, in relevant part, that a court may exercise personal jurisdiction over any non-domiciliary that (1) "transacts any business within

the state" when (2) "the plaintiff's claim arises from the business that the non-domiciliary transacted in New York." N.Y.C.P.L.R. 302(a)(1) (McKinney 2026); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013). Where personal jurisdiction is premised on the maintenance and use of in-forum correspondent bank accounts, the plaintiff must show that the foreign bank's maintenance and use of the correspondent account was purposeful and that there is a nexus or substantial relationship between the plaintiff's claim and use of the correspondent account. *Licci*, 732 F.3d at 165, 168–69 (emphasizing the defendant bank's "purposeful availment of the privilege of doing business in the New York forum" by using its New York correspondent account "'dozens' of times").

CAB asserts that Plaintiffs have not made the required showing for personal jurisdiction, contending there is no admissible evidence demonstrating the relationship between the Attacks and CAB's use of its New York correspondent accounts. However, CAB misconstrues the jurisdictional requirement. As this Court has previously found, CAB's undisputed use of its New York–based correspondent accounts satisfies the first prong of the New York long-arm statute. *Averbach v. Cairo Amman Bank*, No. 19 Civ. 4, 2023 WL 5016884, at *6–8 (S.D.N.Y. June 30, 2023), *report and recommendation adopted*, 2024 WL 3677339 (Aug. 6, 2024) ("Plaintiffs have similarly met their burden under Rule 56, because there is no meaningful dispute that these transfers occurred, and there is no undisputed fact in this case that is sufficient to warrant dismissal for lack of personal jurisdiction. As discussed below, the only factual disputes that CAB raises are questions going to the merits of Plaintiffs' claims . . . ."); *Licci*, 732 F.3d at 168 ("[T]he Court of Appeals found both the frequency and deliberate nature of [Lebanese Canadian Bank, SAL's] use of its correspondent account to be determinative. The Court focused

on the allegations that LCB used its New York correspondent account 'dozens' of times 'to effect its support of Shahid and shared terrorist goals,' not 'once or twice by mistake.'" (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339–40 (2012))); *Eldesouky v. Aziz*, No. 11 Civ. 6986, 2014 WL 7271219, at *6–7 (S.D.N.Y. Dec. 19, 2014) (finding that where plaintiffs demonstrated that one of the defendants maintained a New York bank account which received a subject transfer, the first prong of the New York long-arm statute was satisfied). Indeed, CAB witness, Al-Qassem, testified (and it is undisputed) that CAB frequently used its New York correspondent accounts to facilitate the opening of accounts in USD, execute payments, settle debit card obligations, and settle incoming and outgoing dollar-denominated transfers. (ECF No. 464-1 ("Al Qassem 2022 Deposition Part One") at 85:14–91:10, 97:5–100:4). This clearly shows purposeful use of New York correspondent bank accounts.

Additionally, Plaintiffs have identified 114 transactions through CAB's correspondent accounts, including transactions for HLF and Interpal during the relevant period, including some after these organizations were designated as SDGTs.[38] (Averbach Counter Statement ¶ 7; CAB Counter Statement ¶¶ 666, 680–82). There is no dispute that CAB generally processed transactions for HLF. (Averbach Counter Statement ¶ 7; CAB Counter Statement ¶¶ 666, 680–82. *See generally* Gottlieb Report; Alfaro Report). There is no dispute that CAB processed at least some banking transactions for HLF after it was designated an SDGT. (CAB Counter Statement ¶¶ 128–29). And there is no dispute that CAB learned of HLF's SDGT designation by

[38] The Court detailed the 114 transactions at length in its previous Report and Recommendation on CAB's second motion to dismiss. *Averbach v. Cairo Amman Bank*, No. 19 Civ. 4, 2023 WL 5016884, at *3 (S.D.N.Y. June 30, 2023), *report and recommendation adopted*, 2024 WL 3677339 (Aug. 6, 2024). That discussion is incorporated by reference herein.

no later than December 5, 2001. (Averbach Counter Statement ¶ 244).[39] Further, Plaintiffs' claims are based on CAB's undisputed provision of banking services to HLF and the other accountholders described above, including by processing U.S. dollar denominated transactions through correspondent accounts in New York. This satisfies New York's long-arm statute at this stage.

To be sure, meeting the jurisdictional test is not equivalent to proving that the transactions or accounts identified were actually used to fund terrorist attacks or that CAB had knowledge that it was assisting Hamas by providing banking services to the identified accountholders. Rather, the jurisdictional analysis looks for a "relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim." *Licci*, 732 F.3d at 168–69 (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339–40 (2012)); *see also Eldesouky*, 2014 WL 7271219, at *7 (finding that where money was wired, through the New York account, related to the contract and was money the plaintiffs are seeking to be returned, the transaction establishing personal jurisdiction was sufficiently related to the underlying claim).

Additionally, for the reasons fully discussed in this Court's prior opinion rejecting CAB's motion to dismiss and/or for summary judgment for lack of personal jurisdiction, the exercise of jurisdiction over CAB comports with federal due process requirements. *Averbach*, 2023 WL 5016884, at *7; *Averbach v. Cairo Amman Bank*, 19 Civ. 4, 2020 WL 486860, at *8–9 (S.D.N.Y. Jan. 21, 2020), *report and recommendation adopted*, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020).

[39] Insofar as Plaintiffs purport to dispute CAB's assertion at ¶ 244 of its 56.1 Statement, Plaintiffs do not dispute that information of the designation reached the Palestinian Territories by December 5, 2001. (Averbach Counter Statement ¶ 244).

Accordingly, I recommend that the Court reject CAB's argument that this Court lacks personal jurisdiction over it and deny summary judgment on this basis.

**2. An Overview of JASTA's Elements**

JASTA was enacted to "provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons [and] entities . . . that have provided material support . . . to foreign organizations or persons that engage in terrorist activities against the United States," whether "directly or indirectly." Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 853 (2016). The statute provides for liability "as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person" who committed the act of international terrorism.[40] 18 U.S.C. § 2333(d)(2). Further, the "act of international terrorism" must have been "committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under [8 U.S.C. § 1189] as of the date on which such act of international terrorism was committed, planned, or authorized." *Id.*

In this case, Plaintiffs attempt to prove aiding-and-abetting by demonstrating that CAB knowingly providing substantial assistance, not by demonstrating that CAB conspired with the person who committed the act of international terrorism. This requires Plaintiffs to show that (1) the party whom CAB aided, directly or indirectly, must have performed a wrongful act that caused Plaintiffs' injury; (2) the wrongful act must have been an act of "international terrorism"

[40] "International terrorism" is defined as activities that (1) "involve violent acts or acts dangerous to human life"; (2) qualify as "a violation of the criminal laws of the United States or of any State" if committed within the United States or any State; (3) "appear to be intended" to "intimidate or coerce a civilian population," to "influence the policy of a government by intimidation or coercion," or to "affect the conduct of a government by mass destruction, assassination or kidnapping"; and (4) "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries." 18 U.S.C. § 2331(1).

committed, planned, or authorized by a designated FTO; (3) CAB must have been generally aware of its role as part of an overall illegal or tortious activity at the time that it provided the assistance;[41] and (4) CAB must have provided both knowing and substantial assistance to the principal, either directly or indirectly. 18 U.S.C. § 2333(d)(2); *see also Twitter, Inc. v. Taamneh*, 598 U.S. 471, 483–84 (2023); *Ashley*, 144 F.4th at 435–38; *Siegel v. HSBC North Am. Holdings, Inc.,* 933 F.3d 217, 223–24 (2d Cir. 2019); *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 531 (S.D.N.Y. 2019). There are six factors relevant to whether a defendant's assistance is "substantial," including "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Ashley*, 144 F.4th at 435–36 (quoting *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018)) (citing legal framework for assessing aiding-and-abetting claims set forth in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)).

There is no dispute that the first two elements have been met. Hamas carried out and approved the Attacks that injured Plaintiffs, and the Attacks qualify as acts of "international terrorism" within the meaning of JASTA. (CAB Counter Statement ¶¶ 1–7). The parties dispute whether Plaintiffs have demonstrated the third and fourth elements. Case law makes clear that "whether the defendant rendered *knowing* assistance" under the fourth JASTA element "is distinct from a defendant's general awareness of its role in a terrorist scheme" under the third

[41] General awareness does not require that a defendant "be aware of its role in a specific terrorist attack that caused the plaintiff's injury" but rather "aware of its role in some illegal activity from which the terrorist attack was foreseeable." *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 438 (2d Cir. 2025) (citing *Honickman*, 6 F.4th at 496).

JASTA element. *Ashley*, 144 F.4th at 438 (citing *Twitter*, 504 U.S. at 503–04) (emphasis in original). Thus, a plaintiff cannot succeed on a JASTA claim without evidence of both general awareness and knowing and substantial assistance. I address the fourth element first, because, as discussed below, there is insufficient evidence from which a reasonable jury could find that CAB gave knowingly and substantial assistance to Hamas, rendering it unnecessary to delve into the evidence of general awareness and the many disputes and evidentiary challenges related thereto.

**3. Knowing and Substantial Assistance**

Recently, in *Twitter, Inc. v. Taamneh,* the U.S. Supreme Court clarified what must be shown to state a cognizable claim for aiding-and-abetting terrorist activities by knowingly providing substantial assistance. 598 U.S. 471 (2023). Plaintiffs in that case were injured in a terrorist attack at a nightclub in Turkey carried out by ISIS and sought to hold social media companies liable for not removing social media accounts ISIS maintained to fundraise, recruit people to carry out acts of terrorism, and spread terrorist propaganda. *Id*. at 478–84. The Court found that Plaintiffs failed to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Id*. at 506–07.

Looking at both criminal and civil tort principles, the Court explained that aiding-and-abetting liability must be cabined "to cases of truly culpable conduct." *Id*. at 489. "[T]he defendant has to [have] take[n] some 'affirmative act' 'with the intent of facilitating the offense's commission.'" *Id*. at 490 (quoting *Rosemond v. United States*, 572 U.S. 65, 71 (2014)). And, the defendant must have acted consciously, i.e., with "some degree of knowledge" that it was aiding the primary violator (in this case, Hamas). *Id*. at 491, 500 (citation omitted). While noting that JASTA liability was based on the reasoning of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), the Court

emphasized that the contours of *Halberstam* and its elements are not "inflexible codes," but rather to be understood "in light of the common law and applied as a framework designed to hold defendants liable when they consciously and culpably 'participate in' a tortious act in such a way as to help 'make it succeed.'"[42] *Id.* at 497 (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)).

With respect to the fourth JASTA element, the Court characterized the scope of JASTA liability as falling within a common-law "framework" where substantial assistance and knowing assistance to the tortfeasor is required, but acknowledged that these concepts work "in tandem, with a lesser showing of one demanding a greater showing of the other." *Id*. at 491–92 (citations omitted). A close nexus between the assistance and the tort can help establish aiding-and-abetting liability, but remote support also can constitute aiding-and-abetting "in the right case." *Id*. at 496. Additionally, in some cases, a "defendant's role in an illicit enterprise can be so systemic that the secondary defendant is aiding-and-abetting every wrongful act committed by that enterprise," but such cases are ones in which "aiding-and-abetting liability blurs with conspiracy liability, which typically holds co-conspirators liable for all reasonably foreseeable acts taken to further the conspiracy." *Id*. (citing *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946)). *Twitter* instructs that courts must balance "the nature and amount of the assistance on the one hand and the defendant's scienter on the other." *Ashley*, 144 F.4th at 439 (quoting *Twitter*, 598 U.S. at 492–93.); *see also Strauss v. Credit Lyonnais, S.A.*, 379 F. Supp. 3d 148, 160–61 (E.D.N.Y. 2019) (finding that where plaintiffs did not provide evidence that defendant did

[42] Halberstam did not involve terrorism or terror financing, but rather civil liability for the defendant's role in a burglary that resulted in a murder. The Court references its discussion of *Halberstam* in its prior decision. *Averbach v. Cairo Amman Bank*, No. 19 Civ. 4, 2020 WL 486860, at *11 (S.D.N.Y. Jan. 21, 2020).

anything more than "provide[] banking services to CBSP for ostensibly charitable purposes," plaintiffs had not shown the defendant's intent to engage in terroristic activity).

The *Twitter* plaintiffs' claims failed at the motion to dismiss stage because there were not allegations that the social media platforms favored the content of ISIS or facilitated the planning of the specific attacks that injured the plaintiffs. *Twitter*, 598 U.S. at 498–505. Even though ISIS itself had posted content on the platforms, the Court found that the relationship between the social media companies and the attack in question was "highly attenuated" because of the vast nature of the platforms, the lack of preferential treatment for ISIS-run accounts, and the absence of any encouragement, solicitation, or advisement related to the subject attacks. *Id.* at 498–503 ("Plaintiffs do not claim that defendants intentionally associated themselves with ISIS' operations or affirmatively gave aid that would assist each of ISIS' terrorist acts. . . . These allegations are thus a far cry from the type of pervasive, systemic, and culpable assistance to a series of terrorist activities that could be described as aiding-and-abetting each terrorist act. . . . The fact that some bad actors took advantage of these platforms is insufficient to state a claim that defendants knowingly gave substantial assistance and thereby aided and abetted those wrongdoers' acts.").

The Second Circuit further distilled the contours of the fourth JASTA element in *Ashley v. Deutsche Bank Aktiengesellschaft*. 144 F.4th 420 (2d Cir. 2025). In that case, plaintiffs brought claims against Standard Chartered Bank, Deutsche Bank, and Danske Bank related to American service members and civilians who were victims of improvised explosive devices ("IEDs") attacks. *Id.* at 427. In bringing their claims against Standard Charter Bank, the plaintiffs alleged that the bank had provided financial services to Pakastani fertilizer companies ("the

Companies") that provided supplies used to manufacture the IEDs used in attacks against Americans. *Id.* at 428–34. The plaintiffs also asserted that the banks had all assisted in laundering money for the groups of terrorists responsible for the attacks (the "Syndicate"). *Id.* at 428–32. Plaintiffs alleged that the banks had provided banking services for organizations serving as fronts for the terrorist groups and/or their members, provided services for Russian organized crime that served the Syndicate, and provided services to individuals who had connections with the Syndicate. *Id.* Finally, the plaintiffs alleged that the banks facilitated value-added tax fraud that benefitted the Syndicate. *Id.* at 432–34. In drawing a distinction between a defendant's general awareness of terrorist activity and knowing and substantial assistance, the Court emphasized JASTA's last element is intended to specifically capture the defendant's "state of mind" as it relates to the conduct in question. *Id.* at 438. Furthermore, the court emphasized that although the defendant does not need to have precise knowledge of the plan and the terrorist act itself, "a close nexus between the assistance and the tort" helps to demonstrate that the defendant aided and abetted the principal (i.e., the FTO that committed the act of terrorism). *Id.* at 438–39 (quoting *Twitter*, 598 U.S. at 496).

Ultimately, the Second Circuit found that the plaintiffs did not sufficiently allege facts that closed the gap and demonstrated a close nexus between the banks' assistance and the terroristic acts. *Id.* at 448. Plaintiffs had only alleged that Standard Charter Bank provided routine, basic commercial banking services to the fertilizer companies after being told by the U.S. government that the Companies were supplying fertilizer to terrorist groups. *Id.* at 441. Although the plaintiffs alleged that the Companies were directly under terrorist control through rogue members of Pakistan's intelligence agency, there were not facts alleged that plausibly

suggested SCB reasonably foresaw "that its services to the Companies were supporting rogue members of that agency," rendering its assistance "incidental." *Id.* at 441–42. And, even though SCB was warned by the U.S. government that the Companies' product was being used in explosives by the Syndicate and that the Companies (SCB's customers) refused to cooperate with efforts to prevent smuggling of their product into Afghanistan, the court found that "any subsequently confirmed connection between the Companies and the intelligence agency did not taint the nature of SCB's services at the time it provided them." *Id*. at 442.

Notably, the court highlighted the absence of preferential treatment and stated that although the conduct on the part of SCB may amount to "carelessness," it was not equivalent to aiding-and-abetting. *Id.* The court found that the bank's alleged support was too far attenuated from the Syndicate's actions and activities to be considered aiding-and-abetting. *Id.* at 444–46. In reaching this conclusion, the court cited to the lack of specificity regarding the bank transactions, amorphous end points, and, specifically as it related to the value-added tax fraud, a lack of knowledge on the part of the banks. *Id.* at 444–48. Other courts have reached similar conclusions when evaluating JASTA claims against banks where there was no evidence that a bank provided anything more than routine banking services to customers alleged to be affiliated with terrorist groups. *See Bernhardt*, 47 F.4th at 867–72 (finding the connection between HSBC and al-Qaeda too attenuated; the complaints did not plausibly allege that HSBC was generally aware it was assuming role in al-Qaeda's terrorist activities because they did not show that HSBC's assistance benefited al-Qaeda, even though it allegedly defeated a screening process that circumvented OFAC rules to prevent money from flowing to terrorists); *Siegel v. HSBC North America Holdings, Inc.*, 933 F.3d 217, 223–26 (2d Cir. 2019) (dismissing complaint

that HSBC processed hundreds of millions of dollars to Al Rajhi Bank ("ARB") on the grounds it was not sufficient because there were no facts plausibly suggesting that those funds went to or were received by al-Qaeda; at most, the facts suggested "HSBC helped ARB violate banking regulations despite knowing that ARB supported [or had links to] terrorist organizations"); *Moses v. BNP Paribas, S.A.*, No. 24 Civ. 4938, 2026 WL 2925874, at *3–5 (S.D.N.Y. Sept. 29, 2026) (finding that even where the defendant had "intentionally and systematically flouted United States sanctions and counterterrorism protections," the connection between the bank's services and the "*infrastructure* used to commit attacks for many years" was far too remote and "lack[ing] a concrete nexus" (emphasis in original)); *see also Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 145 S.Ct. 1556, 1565–570 (2025) (finding that the plaintiff's aiding-and-abetting theory, under the Protection of Lawful Commerce in Arms Act, failed because the allegations failed to show that the gun manufacturers affirmatively assisted in sending arms to drug cartels; further, the manufacturers did not directly supply those dealers, and the complaint identified no particular criminal transaction they had assisted; ultimately, knowledge that some unidentified dealers routinely violated the law amounted to indifference, not aiding-and-abetting).

It is only in cases where banks are alleged to have overseen and coordinated martyr payments or where there is other evidence of conscious and culpable conduct where JASTA claims have survived. *See, e.g.*, *Force v. Palestinian Authority*, No. 25 Civ. 8582, 2026 WL 2295893, at *14–16 (SDNY Aug. 10, 2026) (allegations were that the defendant established eligibility criteria for a "Pay-for-Slay" policy; investigated whether those criteria were met; authorized payments to eligible attackers or their families; made and publicized a promise of

martyr payments; and encouraged terror through words, acts, encouragement, support, and presence) (citing *United States v. Hansen*, 599 U.S. 762, 771 (2023) and *Reves v. Ernst & Young*, 507 U.S. 170, 178 (1993)).

**4. Analysis of Evidence of Knowing and Substantial Assistance**

Applying the above-described case law to the undisputed facts in this case, it is clear that Plaintiffs have failed to proffer sufficient evidence from which a reasonable juror could find that CAB knowingly and substantially assisted Hamas in any violent attack, let alone the Attacks that injured Plaintiffs. The evidence shows that CAB did nothing other than provide routine banking services. (Averbach Counter Statement ¶ 343). There is no evidence that CAB gave special treatment to the accountholders, such as better loan terms. Although there is evidence that CAB processed some transactions for HLF after its designation as an SDGT, there is no evidence the money from those transactions were used for violent or terror purposes as opposed to funding non-violent activities such as provision of food aid or medical services. The same is true for the true for the transactions involving Al Aqsa and Interpal in which CAB apparently permitted funds from those entities to be transferred into CAB accountholders' CAB accounts even after Al Aqsa and Interpal were designated SDGTs. Further, the post-designation transactions involving Al Aqsa and Interpal that appear to have gone through (that is, they were not cancelled or reversed) occurred *after* all of the Attacks at issue, meaning that even if CAB was careless in allowing the transactions, they do not show that CAB knowingly assisted in the Attacks since they already had happened. *See supra.*

There is no evidence directly connecting any CAB accounts or CAB transaction to any specific act of violence, including the Attacks that injured Plaintiffs. Indeed, as in *Ashley*, there is

a lack of specificity about bank transactions and amorphous endpoints. Although Plaintiffs provide evidence that various of the CAB accountholders had ties to Hamas and that CAB was, or may have been, aware of at least some of these connections based on, for example, an SDGT designation, there is insufficient evidence showing CAB *knowingly* assisted the principal violation (i.e., the Attacks) or other wrongful conduct from which the Attacks would have been foreseeable.

I address the evidence of knowing and substantial assistance in more detail below.

a. <u>The Zakat Committees and Organizational Accountholders</u>

*i. Entities that Were Not Designated Prior to the Attacks*

It is undisputed that eight of the CAB organizational accountholders were not designated by the United States or the Government of Israel prior to any of the Attacks as being affiliated with Hamas or actively involved in terror activity at any time. These organizations included the Qalqilya Zakat Committee, Hebron Zakat Committee, Nablus Zakat Committee, Beit Fajar Zakat Committee, Islamic Society for Orphan Welfare — Yatta, Al Ansar Charitable Society,[43] Al-Waqfiya, and Islamic University of Gaza. It is undisputed that these accountholders conducted *some* degree of humanitarian work or work that did not involve violence or harm to others. (Averbach Counter Statement ¶¶ 163, 222). As the Second Circuit explained, it matters under JASTA whether the support is directed "to promote peaceable, lawful conduct" as opposed to terrorist activities. *Ashley*, 144 F.4th at 444 (citing *Honickman v. BLOM Bank Sal*, 6 F.4th 487, 498–99 (2d Cir. 2021)). There is no liability under JASTA unless the

---

[43] As noted above, Plaintiffs do not identify the date that Al Ansar was designated by the United States, so the Court includes it in its analysis of the entities never designated or designated after the attacks.

assistance can be linked to terrorist activities. *Twitter*, 598 U.S. at 506–07. Plaintiffs do not identify any specific CAB transaction to or from these accountholders that is connected to any wrongful act or violence from which the Attacks would have been foreseeable or to the subject Attacks themselves. (Averbach Counter Statement ¶¶ 177–78, 212, 261, 295, 448–49). There is no evidence that these accountholders were given special treatment. There is no evidence provided regarding CAB's specific knowledge of these entities' purported involvement with Hamas and engagement in terror activity during the relevant period. And, although there is no dispute that the Nablus Zakat Committee, Qalqilya Zakat Committee and the Islamic University of Gaza were identified as unindicted co-conspirators of HLF and the Nablus Zakat Committee, Beit Fajar Zakat Committee, Islamic Society for Orphan Welfare — Yatta, Al Ansar Charitable Society, and Al-Waqfiya were designated by Israel after the Attacks, information that came out about these accountholders during the HLF prosecution and after all of the Attacks is not relevant or material to CAB's JASTA liability because it does not show CAB's knowledge at the relevant time. (List of Unindicted Co-Conspirators, at 3); *Ashley*, 144 F.4th at 442.

*ii. Entities Designated by Israel Prior to the Attacks*

Fourteen other organizations identified by Plaintiffs as CAB accountholders were not designated by the United States as SDGTs or FTOs during the relevant period but were designated by the Government of Israel in February 2002, prior to at least some of the subject Attacks. These accounts include the ICSH, Jenin Zakat Committee, WAMY, Al-Tadamun Charitable Society, Al Wafa Charitable Society, Muslim Youth Association of Hebron / Young Men's Muslim Association–Hebron, Ramallah Zakat Committee, Tulkarem Zakat Committee, Al-Salah Islamic Society – Gaza, Al Islah Charitable Society in Ramallah & Al-Bireh, Islamic Center

(or Complex) – Gaza, The Islamic Society - Gaza, Quran and Sunnah Society, and Union of Good. (*See generally* List of Israeli Designations; Certified List of Israeli Designations. *See also* CAB Counter Statement ¶ 356).

Plaintiffs do not point to any CAB transaction involving these accountholders that funded any wrongful act or terror activity. (Averbach Counter Statement ¶¶ 177, 212, 295, 448). There is no evidence that these CAB accountholders used a CAB account in connection with the Attacks that injured Plaintiffs or any violence (as opposed to non-violent activity such as food aid or medical services). And Plaintiffs point to no evidence that CAB provided anything other than routine banking services to these accountholders. (Averbach Counter Statement ¶ 343).

CAB does not dispute the fact of the Israeli designations, but as noted above, disputes that it was *aware* of Israeli designations. Regardless, this dispute is not material because even if CAB were aware of the Israel designations, this goes at best to general awareness and does not show *knowing assistance or conscious, culpable conduct* on CAB's part. At most it shows indifference, which is not enough under applicable case law. *See Bernhardt*, 47 F.4th at 872; *O'Sullivan v. Deutsche Bank AG*, 17 Civ. 8709, 2019 WL 1409446, at *10 (S.D.N.Y. Mar. 28, 2019) (finding that the defendant bank's alleged evasion of U.S. sanctions was not sufficient, on its own, to plead even general awareness under JASTA); *Ashley*, 144 F.4th at 443 (finding that a bank's continued services after receipt of warning did not demonstrate "interested cooperation, stimulation, [and] instigation," but rather "knowledge, acquiescence, carelessness, indifference, [and a] lack of concern," which was not enough to plausibly show the bank's alleged willingness to aid terror activities (citation omitted)).

*iii. CAB Accountholders Who Received Funds from U.S. Designated SDGTs*

Nine CAB accountholders are identified as having received funds from Interpal and Al-Aqsa, designated by the United States as SDGTs on August 21, 2003, and May 29, 2003, respectively. (Gottlieb Report at 109, 111). The CAB accountholders who received the funds included the ICSH, the Jenin Zakat Committee, the Nablus Zakat Committee, WAMY, Al Tadamun Islamic Solidarity Charitable Society–Nablus, Al Wafa Charitable Society, Muslim Youth Association of Hebron / Young Men's Muslim Association–Hebron, the Beit Fajar Zakat Committee, and the Islamic Society for Orphan Welfare – Yatta.[44]

CAB does not dispute knowledge of U.S. SDGT designations of Al Aqsa on May 29, 2003, and Interpal on August 22, 2003. (Averbach Counter Statement ¶¶ 264; 286; CAB Counter Statement ¶¶ 663, 671). It also admits that it was not supposed to transact business for entities designated by the U.S. (Averbach Counter Statement ¶¶ 381–84, 387–88, 404, 407, 409). There are only a handful of transactions from Al Aqsa and Interpal to CAB customers that post-date their designations and, importantly, the transactions are deposits that largely occurred *after* the Attacks that injured Plaintiffs. Only three of the transactions postdating Al Aqsa's and Interpal's respective designations by the United States *predate* any of the Attacks that injured Plaintiffs, and, according to Defendant's expert, Alfaro, one of the three transactions was blocked, a correction Plaintiffs have accepted for the sake of this motion as outlined above. (Gottlieb Report at 109; *see supra*). The remaining two, are two transactions

[44] Of these accountholders several were designated with the previous organizational accountholders by Israel as unlawful associations on February 25, 2002, including ICSH, Jenin Zakat Committee, WAMY, Al Tadamun Charitable Society, Al Wafa Charitable Society, and Muslim Youth Association of Hebron / Young Men's Muslim Association – Hebron. *See supra*. However, this does not alter the Court's analysis to follow.

between CAB accountholders and Interpal that were processed in 1997, nearly four years before the earliest Attack. (Gottlieb Report at 111; *see supra*). Importantly, Plaintiffs do not connect these transactions to the Attacks or any violence. There is no indication of what the money was used for—there is only evidence that the transactions were deposited in the CAB customer's account. (Averbach Counter Statement ¶¶ 177, 212, 261, 295, 343, 448). In any event, a bank's evasion of U.S. sanctions is insufficient on its own to state a JASTA violation because at best it shows carelessness or indifference, not knowing assistance. *Bernhardt*, 47 F.4th at 872; *see also O'Sullivan*, 2019 WL 1409446, at *10 (finding that the defendant bank's alleged evasion of U.S. sanctions was not sufficient, on its own, to plead even general awareness under JASTA); *Strauss* 379 F. Supp. 3d at 160–61 (finding that even where a defendant knowingly provided financial services to a designated FTO, the scienter requirement of knowing and substantial assistance was not met).

Plaintiffs contend that CAB knew it was providing assistance to terrorist activities because Levi met with CAB senior managers on three different occasions, in 1995, 1997, and 2003, to warn CAB about HLF, Interpal, Al Aqsa, and Comité de Bienfaisance et de Secours aux Palestinians ("CBSP"), which Israel believed were funding terror activities. (Levi Deposition at 47:19–55:2, 63:15–66:9, 69:8–75:3, 88:21–94:6). CAB disputes that these meetings occurred. But even assuming they did occur, Levi did not identify any specific accountholders other than HLF; that is, there is no indication he told CAB the name of specific zakat committees that HLF, Al Aqsa, and Interpal were funding that in turn were aiding Hamas. *See supra*. HLF was not an SDGT at the time of the first two warnings, and there is no evidence that CAB was providing any services to HLF as of 2003, the year in which the last warning allegedly took place. The

transactions involving Interpal and Al Aqsa that occurred after their designations as SDGTs occurred after the Attacks. *See supra*. In any event, courts have found that general warnings like the ones Levi allegedly gave to CAB are insufficient to show knowing and substantial assistance when there is, as here, also a lack of evidence tying the customer and the customer's bank account to specific violence and a lack of evidence that a customer received special treatment. *See Ashley*, 144 F.4th at 429–30, 440–43 (finding that warnings that bank client was providing fertilizer for use by al-Qaeda terrorists in IEDs were insufficient to state plausible JASTA claim because the connections were far too attenuated); *see also Twitter*, 598 U.S. at 504 (concluding that even though the social media company knew that ISIS was using its platform to recruit people to commit terrorist acts and solicit money, this was insufficient to show knowing and substantial assistance given that there was no special treatment of ISIS).

*iv. Holy Land Foundation*

The final entity accountholder not fully addressed above is HLF. (CAB Counter Statement ¶ 12; Averbach Counter Statement ¶ 237). As noted above, HLF was convicted in 2008 of providing material support to Hamas, including money laundering on behalf of Hamas. The question, however, is whether there is evidence that CAB provided both knowing and substantial assistance to the principal by providing banking services to HLF. *Twitter*, 598 U.S. at 497*; Ashley*, 144 F.4th at 438. This requires CAB to have taken some affirmative act with some degree of knowledge before the Attacks that it was aiding the primary violator (Hamas) by providing banking services to HLF. *Twitter*, 598 U.S. at 490 (quoting *Rosemond v. United States*, 572 U.S. 65, 71 (2014)).

To start, unlike other cases in which banks were alleged to have run "Pay-to-Slay" programs to pay families of individuals who were killed while committing violent acts or processed transactions clearly labeled as martyr payments, there is no such evidence here, and Plaintiffs do not identify any HLF transactions that went to fund any acts of terrorism or to otherwise support or promote terrorism. *See Force*, 2026 WL 2295893, at *14 (finding that the complaint stated plausible JASTA claims where plaintiffs asserted that the bank was actively facilitating the approval and processing of martyr applications); *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 45–48 (E.D.N.Y. 2019) (finding that where Arab Bank had allegedly received insurance paperwork identifying the causes of death as "Martyr Operation[s]" and continued to provide financial services, as well as administer an insurance scheme, the bank had knowingly and substantially assisted in the FTOs' terror activity).

Plaintiffs cite a series of transactions involving HLF after it was designated an SDGT on December 4, 2001. (CAB Counter Statement ¶¶ 104, 126–34. *See generally* Gottlieb Report). The transactions span from December 5, 2001, to approximately December 31, 2001. (CAB Counter Statement ¶¶ 104, 126–34; Al Qassem July 2024 Deposition, at 65:11–69:8. *See generally* Gottlieb Report). From HLF's Ramallah Account with CAB, Plaintiffs identify several transactions dated December 5, 2001, that "emptied" the account. (CAB Counter Statement ¶¶ 127–29; ECF No. 450-28 ("Ramallah Account Statements")). These transactions included payments to Al Quds University, Abbas Isma'il Hussein, Hebron University, American Arab University, Bir Zeit University, Al Najah University, and a cash check for 50,000 dollars to Hussein al-Khatib, the executive director of HLF. (Ramallah Account Statements; ECF No. 450-30; CAB Counter Statement ¶ 129). From HLF's Gaza account, Plaintiffs focus on transactions that brought the

balance from 46,946.07 to 33.57 dollars between December 5, 2001, and December 31, 2001. (ECF No. 450-27 ("Gaza Account Statements"); CAB Counter Statement ¶ 130). These transactions include checks to Samar Eid al-Shurafa, Muhammad Ahmad Abu Muharram, Ramadan Abd al-Karim, Bashir Mansur Hajjaj, Fayez Abu Akar Establishment, Gaza National Insurance Company and checks for employee salaries.[45] (Gaza Account Statements; ECF No. 450-31; CAB Counter Statement ¶ 131). From HLF's Hebron account, Plaintiffs focus on the transaction that brought the balance from 1,573.60 dollars on December 5, 2001, to 73.60 dollars on December 31, 2001; however, Plaintiffs have not provided the check, only the account statement. (ECF No. 450-26 ("Hebron Account Statements"); CAB Counter Statement ¶¶ 133–34).

Accepting that these transactions occurred at a time when CAB knew it was not supposed to provide any banking services to HLF because of the SDGT designation and because of warnings from Levi, Plaintiffs provide no evidence that these transactions funded any of the Attacks that injured Plaintiffs, or terror activity generally. (Averbach Counter Statement ¶¶ 177, 253, 448–49). Nor do Plaintiffs provide evidence that CAB provided anything other than routine banking services. *Id.* at 448. As noted above, the mere violation of U.S. sanctions does not itself "support an inference" that the specific injuries arose from the evasion of U.S. regulations. *See, e.g.*, *Bernhardt*, 47 F.4th at 864–65. And, even assuming the evidence is sufficient to show that CAB had general awareness of HLF's ties to Hamas, this is still insufficient for a reasonable jury to find knowing and substantial assistance. *Ashley*, 144 F.4th at 429–30, 440; *see also Twitter*, 598 U.S.

[45] Plaintiffs do not have copies of the checks for two of the transactions, one for 1,500 dollars and one for 150 dollars. (CAB Counter Statement ¶ 132).

at 495–96, 504–05 (stating that general awareness of one's role in terrorist activities is insufficient to allege an aiding-and-abetting claim); *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329–30 (2d Cir. 2018) (JASTA requires more than knowledge of an organization's connection to terrorism; it requires "intent to further [a terrorist organization's] terrorist activities" and "awareness that one is playing a role in those activities."). Although the Court has no doubt that HLF provided material assistance to Hamas based on its 2008 conviction for the same, there is no evidence to suggest CAB consciously and culpably participated in a tortious act of Hamas through its provision of banking services to HLF. It is not a violation of JASTA to merely provide banking services to an SGDT; rather, the knowing and substantial assistance prong of JASTA requires more. *Linde*, 882 F.3d at 329; *Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp.3d 223, 238–39 (E.D.N.Y. 2019 ), *aff'd*, 993 F.3d 144 (2d Cir. 2021).

In sum, no reasonable juror could conclude that CAB consciously and culpably indirectly assisted Hamas in the Attacks or other wrongful conduct from which the Attacks were foreseeable by providing banking services to HLF or any of the other organizational accountholders. Said another way, the connection between CAB and the Attacks is far too attenuated for the JASTA claim to survive summary judgment based on the evidence regarding the organizational accountholders.

**b. *Individual Accountholders***

Plaintiffs also identify individual accountholders they claim are associated with Hamas. As discussed above, one of these accountholders, Al-Sayed, was convicted of planning the Park Hotel bombing. (CAB Counter Statement ¶¶ 205–10). Plaintiffs identify seven transactions

totaling in the aggregate 69,000 dollars from an Arab Bank account belonging to Yousef El-Hayek to Al-Sayed's CAB bank account. (CAB Counter Statement ¶¶ 192–93; Transactions Between El-Hayek and Al-Sayed). Plaintiffs assert that the funds "deposited into al-Sayed's bank accounts were used to finance terror attacks," but do not provide any admissible evidence for this assertion. (CAB Counter Statement ¶ 194; *see supra*). The last transfer from El-Hayek to Al-Sayed is dated May 11, 2001—approximately 10 months before the Park Hotel Bombing. (Transactions Between El-Hayek and Al-Sayed; Averbach Counter Statement ¶ 127). Although it is certainly possible the transactions were for terror activities, the transaction records do not contain any memo line or further indication as to the purpose of the payments. (Transactions Between El-Hayek and Al-Sayed). Plaintiffs do not produce any admissible evidence that the money from these transactions or Al-Sayed's account at CAB was used in the Park Hotel Bombing or for other violence (as opposed to paying for his food, housing or other personal expenses). Plaintiffs tie El-Hayek to other money transfers to other alleged Hamas leaders, but do not cite to evidence that CAB had any knowledge about who El-Hayek was. (*See supra*). Plaintiffs do not cite any evidence that would have put CAB on alert that Al-Sayed was using his CAB account to plan violence. Thus, Plaintiffs do not have sufficient evidence from which a reasonable juror could find CAB consciously and culpably participated in the Park Hotel bombing in such a way as to help make it succeed. *See Twitter*, 598 U.S. at 497; *see also Ashley*, 144 F.4th at 442 (finding that learning that certain transactions may have aided terror after the fact does not demonstrate conscious and culpable conduct before the act of terrorism).

For similar reasons, that CAB maintained an account for Al-Sayed after he was arrested and convicted for the Park Hotel Bombing also does not show knowing and substantial

assistance. It is not a violation of JASTA to merely provide banking services to a known terrorist after he has been jailed; rather, the knowing and substantial assistance prong requires conduct that helps the act of terrorism succeed. *Twitter*, 598 U.S. at 497; *Linde*, 882 F.3d at 329; *Weiss*, 381 F. Supp.3d at 238–39.

As for the remaining individual accountholders, Plaintiffs do not provide evidence tying any of the funds or transactions from their CAB accounts to any wrongful act or terror activity, including the subject Attacks. For those whom it alleges received martyr or prisoner payments, Plaintiffs provide no admissible evidence of the accountholders' relation to the purported Hamas operatives and no admissible evidence of any such transaction. Nor do Plaintiffs produce any evidence that CAB had knowledge of any of these individual accountholders' alleged engagement in, or association with, terror activity.

In sum, even assuming Plaintiffs have sufficient admissible evidence showing that the various organizational and individual CAB accountholders were tied to Hamas and that CAB was generally aware of its role as part of an overall illegal or tortious activity at the time it provided banking services to at least some of the identified accountholders (which is doubtful based on the lack of evidence tying CAB transactions to any Hamas violence or terror activities and lack of evidence of CAB's awareness prior to the Attacks of many of its customers' ties to Hamas), there is no evidence from which a reasonable juror could find that CAB knowingly and substantially assisted Hamas in the Attacks or other terror activities. There is no evidence that CAB encouraged any unlawful act. No CAB transactions are connected to any violence or terror. There is no evidence that CAB was present at the time of the Attacks. CAB is not alleged to have provided banking services to Hamas directly, but rather indirectly through the zakat committees

and other charitable societies and individuals, to which it only provided routine banking services. Although there is evidence that millions of dollars of transactions were processed over the years for the various accountholders, there is no evidence going to CAB's state of mind; rather, at best, there is some evidence that CAB might have been aware of some of its customer's ties to Hamas generally. This is simply not enough to avoid dismissal of the claims on summary judgment. Said another way, given the attenuated connection between CAB and the Attacks (and Hamas violence in general), and the lack of evidence of CAB consciously taking any specific action to encourage or assist Hamas violence, no reasonable juror could find that CAB's assistance was anything but incidental. *See Twitter*, 598 U.S. at 495–96, 504–05; *Ashley*, 144 F.4th at 429–30, 440; *Weiss*, 381 F. Supp.3d at 238–39; *Strauss*, 379 F. Supp. 3d at 160–61; *Linde*, 882 F.3d at 329.

## CONCLUSION

For the reasons set forth above, I respectfully recommend that the Court deny Plaintiffs' motion for summary judgment and grant Defendant's motion for summary judgment.

DATED: New York, New York
November 2, 2026

Respectfully submitted

Katharine H Parker

KATHARINE H. PARKER
United States Magistrate Judge

**NOTICE**

**Plaintiffs shall have fourteen days and Defendant shall have fourteen days from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)). A party may respond to another party's objections after being served with a copy. Fed. R. Civ. P.72(b)(2).**

**Plaintiffs shall have fourteen days to serve and file any response. Defendant shall have fourteen days to serve and file any response. Any objections and any responses to such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Gregory H. Woods at the United States Courthouse, 500 Pearl Street, New York, New York 10007-1312, and served on the other parties. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Woods. The failure to file timely objections shall result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140 (1985).**